IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROAD-CON, INC., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 19-1667 |
| | : | |
| THE CITY OF PHILADELPHIA, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                                                                                                         **March 27, 2020**

Plaintiffs Road-Con, Inc., Neshaminy Constructors, Inc., Loftus Construction Inc., PKF-Mark III, Inc., and Scott Lacava have brought this labor case against Defendants The City of Philadelphia and Mayor James Kenney in his official capacity. They allege the City and the Mayor have been using project labor agreements on all City construction projects. These project labor agreements require contractors' employees who work on City projects to become members of certain unions. Plaintiffs allege Defendants' use of these agreements violates the First Amendment, the National Labor Relations Act, and state and city laws on awarding construction contracts.

Defendants have moved to dismiss this case both for lack of jurisdiction and failure to state a claim. This Court has jurisdiction, and Plaintiffs have stated a claim for violations of the First Amendment. However, Plaintiffs have not stated a claim for violations of federal, state, or local laws and these claims will be dismissed. Therefore, Defendants' motion to dismiss will be granted in part and denied in part. The Court will also grant Plaintiffs leave to amend their Complaint to restate their state and local law claims.

**BACKGROUND**[1]

Road-Con, Neshaminy, Loftus, and PKF-Mark III are construction contractors. They are each bound by a collective bargaining agreement with the United Steelworkers Union. Many of their employees, including Plaintiff Scott Lacava, are members of this union. The Contractor Plaintiffs have worked on public construction projects in Philadelphia for state agencies like the Pennsylvania Department of Transportation. They have all qualifications necessary to work on construction projects for the City of Philadelphia. They would like to bid to work on those projects, but are allegedly prevented from doing so because the City requires contractors on City projects to sign project labor agreements.

From at least as early as 2017, the City has allegedly included mandatory project labor agreements on all City construction projects worth over $3 million. These agreements are between the contractor working on the project and unions affiliated with the Philadelphia Building and Construction Trades Council. Any contractor who bids on a City projects must be willing to sign the accompanying project labor agreement with the Trades Council Unions. The Trade Counsel Unions do not include the United Steelworkers. Therefore, the Contractor Plaintiffs cannot maintain their agreements with the United Steelworkers while working on City projects.

The project labor agreements used by the City have the following relevant provisions: First, the agreements mandate that the contractors' employees working on the project must become members of the applicable Trades Council Unions or, if the employees are already members of those unions, they must remain members throughout the project. Compl., Ex. B, Art. III, § 5.

---

[1] In evaluating Defendants' argument that Plaintiffs failed to state a claim, the Court takes the well-pleaded facts set forth in the Compliant as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). In evaluating Defendants' argument that the Court lacks subject matter jurisdiction, the Court may consider Defendants' competing jurisdictional facts. *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).

2

Second, the agreements require the contractors to recognize the unions as the sole bargaining representative of their employees on the project. *Id.* at § 1. Third, the agreements require the contractors to contact the unions when they are looking for employees to work on the project, and the agreements give the unions 48 hours to refer employees to the contractors before the contractors may seek employees elsewhere (the parties refer to this provision as requiring the use of union hiring halls). *Id.* at § 2. Finally, the project labor agreements incorporate the unions' collective bargaining agreements, so contractors must abide by those agreements to the extent they do not conflict with the project labor agreement itself. *Id.* at Art. II, § 4(b).

In their Complaint, Plaintiffs identify two recent City construction projects that were subject to these project labor agreements: the 15th Street Bridge Project and the Runway Project. As with previous projects, these projects included a project labor agreement with several Trade Council Unions. *See generally* Compl., Exs. C & D. In March 2019, Road-Con contacted the City about bidding on the 15th Street Bridge Project. Road-Con explained it had a collective bargaining agreement with the United Steelworkers and asked if the United Steelworkers could be added to the City's project labor agreement. The City responded that the United Steelworkers could not be added because the agreement included only the Trade Council Unions.

Plaintiffs filed this case on April 17, 2019. They brought four claims alleging: violations of employees' First Amendment rights to free speech and free association; violations of the employees' rights under the National Labor Relations Act (NLRA); violations of Pennsylvania and Philadelphia competitive bidding laws; and violations of the Philadelphia charter and rules

governing City contracts.[2] Plaintiffs seek monetary damages, an injunction to prevent the City from continuing to use project labor agreements, and declaratory relief.

Less than a week after Plaintiffs filed this case, the City removed the project labor agreements from the bidding requirements for the 15th Street Bridge Project and the Runway Project. As a result, Plaintiffs Road-Con and Loftus submitted bids for these projects.

Then, in May 2019, the City advertised for bids on a new construction project: the Return Sludge Line Project. As with past City construction projects, this project included a mandatory project labor agreement with certain Trades Counsel Unions. Plaintiff PKF-Mark III had all necessary licenses and certifications to work on this project. PKF-Mark III did not submit an application to bid on this project. PKF-Mark III states it would have done so if the project had not included a project labor agreement.

Defendants have moved to dismiss this case under Federal Rules of Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim. They argue this Court lacks jurisdiction because the case is either moot or unripe. They also argue Plaintiffs fail to state a claim on each of the four counts in their complaint.

**DISCUSSION**

The Court will grant Defendants' Motion to Dismiss in part. The Court has jurisdiction to hear this case and Plaintiffs have pleaded a First Amendment claim, but Plaintiffs have failed to plead their claims under the NLRA and state and local laws. Plaintiffs' NLRA claim is foreclosed because a government entity can enforce a project labor agreement in the construction industry under the NLRA. Plaintiffs have not pled their state and local law claims because those claims

---

[2] Plaintiffs reference the following state and local laws in their Complaint: Pa. Const. Art III, § 22; 62 Pa. Cons. Stat. § 512; Phila. Charter § 8-200; and Phila. Exec. Order 15-11.

4

may only be brought by local taxpayers. Because Plaintiffs assert they are local taxpayers in their brief, the Court will allow them leave to amend their Complaint to include this allegation.

### A. Jurisdiction

The Court has jurisdiction over this case. Ignoring all past use of project labor agreements, and all future potential use of project labor agreements, Defendants seek to use the doctrines of mootness and ripeness to limit this Court's jurisdiction to the short window when bidding is open on a new City project using a project labor agreement. The Court's jurisdiction is not so limited. This case is not moot because the Court can grant money damages for harm Plaintiffs' suffered on past projects, and the Court can grant injunctive relief to enjoin Defendants' general policy of using project labor agreements on all future City projects. Similarly, the case is ripe because the Plaintiffs challenge the Defendants' policy of using project labor agreements, which has allegedly been in place for several years before this lawsuit. The Court will first address mootness and then address ripeness.

A district court does not have jurisdiction to hear a case that has become moot. *Freedom from Religion Found. Inc v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 475-76 (3d Cir. 2016). A case becomes moot when the parties no longer have any interest in the outcome of the case. *Id.* at 476; *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307-08 (2012) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." (internal citations omitted)). In other words, "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* at 307 (internal quotations omitted).

Plaintiffs' case is not moot here because the Court can grant Plaintiffs some relief. Plaintiffs' case is not limited to the two projects for which the City has withdrawn its project labor

5

agreements. While the injunctive relief Plaintiffs seek on those two projects can no longer be granted, this does not moot the entire case. *See Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001) ("[W]here a plaintiff has requested several forms of relief and some of the requests become moot, the court must still consider the viability of the remaining requests."). Plaintiffs can still seek relief because they were allegedly prevented from bidding on all City projects from 2017 to the present due to unconstitutional project labor agreements. Compl., ¶¶ 34-35, 49-50. Based in part on this injury, Plaintiffs seek monetary damages under 42 U.S.C. § 1983.[3] Compl., p. 22. Cases like this one which seek monetary damages for past wrongs cannot be mooted by the Defendants' subsequent behavior. *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 608–09 (2001) ("[S]o long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case.").

Even if Plaintiffs could not recover monetary damages, this case would not be moot because the Court could award injunctive relief barring the City's general policy of using contract labor agreements on all projects. Defendants argue injunctive relief is unavailable because they have ceased using project labor agreements on the 15th Street Bridge Project and the Runway Project. Even if Defendants voluntarily ceased including project labor agreements on City projects, however, this case is not moot because they could resume doing so.

---

[3] As Defendants do not challenge Plaintiffs request for monetary damages, the Court will not address what kind of damages, if any, would be appropriate for this case. The Court merely notes damages are available against municipalities like the City under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978) ("Local governing bodies, therefore, can be sued directly under § 1983 for *monetary*, declaratory, or injunctive relief . . . [for] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . [or for a] governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." (emphasis added)).

6

When a case would otherwise be moot, a court still has jurisdiction if a defendant voluntarily ceases its allegedly unlawful behavior. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). When this happens, a case is only moot "if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* The defendant bears "[t]he 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (internal citations omitted; second alteration in original). This exception to the mootness doctrine prevents defendants from gaming the system by temporarily stopping their behavior to avoid jurisdiction. *See Id.* (explaining that without the voluntary cessation doctrine "the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" (internal citations omitted; alterations in original)); *see also Knox*, 567 U.S. at 307 (stating a party's decision to change its behavior to potentially moot the case after certiorari is granted should be "viewed with a critical eye").

This voluntary cessation exception applies to the policy at issue in this case. There is no dispute that Defendants voluntarily stopped requiring project labor agreements on the two construction projects identified in the Complaint less than a week after this lawsuit was filed.[4] Therefore, the case is not moot if there is any way Defendants could continue their allegedly wrongful behavior. Not only can Defendants continue to require project labor agreements on City construction projects, they have already done so. They included a project labor agreement on the

---

[4] Although Defendants' motive for ending its behavior is not relevant to the voluntary cessation analysis, Plaintiffs allegations suggest Defendants' may have been motivated at least in part by a desire to avoid this lawsuit. Plaintiff Road-Con allegedly contacted the City a month before filing its Complaint and the City refused to change its project labor agreement on the 15th Street Bridge Project. Then the City suddenly reversed course and removed the project labor agreement from the same project five days after this lawsuit was filed.

7

Return Sludge Line Project after this lawsuit began. Therefore, because Defendants have voluntarily ceased behavior that could recur, this case is not moot.

Defendants' urge the Court to view this case as a challenge to the use of project labor agreements on distinct projects rather than as a challenge to the Defendants' alleged general practice of including project labor agreements on all City construction projects. However, Plaintiffs clearly challenge the ongoing practice of including project labor agreements in City construction projects. Compl., ¶ 23-25 (describing the City's "blanket" use of project labor agreements on all projects worth over $3 million); *id.* ¶ 26-39 (explaining the provisions common to the project labor agreements used on all City projects); *id.* at p. 22 (asking for a permanent injunction barring future use of project labor agreements on City projects). Nor are Plaintiffs required to challenge each project on a piecemeal basis if, as they allege, all the project labor agreements have the same operative provisions, and the City has a general policy of using project agreements regardless of the specific needs of the project. Because plaintiffs' challenge to the City's general practices is not dependent on any specific City projects, it is not moot. *Cf. Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (finding a lawsuit challenging a method of bidding on government projects was not moot even though the project giving rise to the lawsuit had ended based on the exception to the mootness doctrine for controversies capable of repetition but evading review).

Turning to the issue of ripeness, the Court finds this case is ripe for review. If a case is not ripe, a court must dismiss it. A case is not ripe when a party brings it too soon. To determine whether a case is ripe, a court must consider "(1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136,

149 (1967)). When a plaintiff seeks both declaratory and injunctive relief, the Third Circuit has instructed courts to evaluate ripeness using the following three factors: "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Plains All Am. Pipeline L.P.*, 866 F.3d at 540 (internal citations omitted). When courts consider these three factors "*Abbott Labs.*'s 'hardship' and 'fitness' factors still guide [the] analysis." *Id.* The Court will apply the three-factor test here because Plaintiffs seek both declaratory and injunctive relief.

The parties have adverse interests here. To determine whether parties have adverse interests, a court must examine the possibility that the Defendants will cause the Plaintiffs harm. As the Third Circuit has explained, "Although the party seeking review need not have suffered a 'completed harm' to establish adversity of interest, it is necessary that there be a substantial threat of real harm and that the threat 'must remain real and immediate throughout the course of the litigation.'" *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994). Plaintiffs in this case have suffered a completed harm because, from at least 2017, they were allegedly prevented from bidding on City projects. Plaintiffs also face a substantial threat of future harm because they will continue to be barred from bidding on City projects until the City changes its policy regarding project labor agreements. Because Plaintiffs have been harmed by Defendants' policy in the past and they face the threat of harm from this policy in the future, their interest in challenging the policy is sufficiently adverse to Defendants' interest in defending the policy.

The judgment in this case would also be conclusive. To determine whether a judgment would be conclusive, a court must examine whether the facts of the case are sufficiently developed so that any judgment would not be based on a hypothetical situation. *NE Hub Partners, L.P. v.*

*CNG Transmission Corp.*, 239 F.3d 333, 344 (3d Cir. 2001) ("[Conclusiveness] addresses the extent to which further factual development of the case would facilitate decision, so as to avoid issuing advisory opinions."). A judgment is more likely to be conclusive when the issues in the case are legal rather than factual. *Armstrong World Indus., Inc. by Wolfson v. Adams,* 961 F.2d 405, 412 (3d Cir. 1992) ("[A] factual record is not as important where the question presented is "predominantly legal.").

The facts in this case have been sufficiently developed to make the Court's judgment conclusive. The City's policy of including project labor agreements on all construction projects has allegedly been in place for years. The Court can therefore examine the factual record related to Defendants' use of this policy on past projects. In addition, Plaintiffs' claims are largely legal in nature rather than based on the specific facts of each project. Plaintiffs allege the project labor agreements used on all City projects violate the First Amendment and the NLRA. Because the Defendants have allegedly been using the same project labor agreement on all projects, the Court need only decide the legal question of whether the provisions in this agreement violate the First Amendment and the NLRA. While Plaintiffs claims under state and local laws may be more fact intensive, the Court can still resolve the legal question of whether a blanket policy requiring project labor agreements on all projects violates those laws. *See Allan Myers, L.P. v. Dep't of Transp.*, 202 A.3d 205, 215 (Pa. Commw. Ct. 2019) (explaining that project labor agreements are only appropriate under state law "where the contracting agency can establish extraordinary circumstances"). In other words, even if certain projects may be eligible for project labor agreements under state and local laws, the Court could opine on the legality of Defendant's alleged practice of requiring a project labor agreement on all projects without first inquiring into the needs of each project.

Finally, the Court's judgment would have utility. "Practical utility goes to 'whether the parties' plans of actions are likely to be affected by a declaratory judgment,' and considers the hardship to the parties of withholding judgment." *NE Hub Partners, L.P.*, 239 F.3d at 344–45. The parties' actions are likely to be affected by a judgment in this case. If Defendants' policy is unlawful, then they will stop including project labor agreements on City projects. Defendants argue they are reconsidering their policy even in the absence of a Court order. While Defendants are certainly always free to reconsider their policy, a court order would definitively limit Defendants' behavior. In addition, Plaintiffs could be harmed if the Court waits to consider their claim. Plaintiffs could continue to be shut out of bidding for City projects due to Defendants' use of project labor agreements. Also, because the bidding windows for these projects only last a few months, Plaintiffs may find it difficult to get judicial relief in time to prevent any future harm.

In sum, this case is a legal challenge to an ongoing practice and is therefore neither moot nor unripe. Thus, the Court has jurisdiction[5] and it will proceed to address Defendants' motion to dismiss the Complaint for failure to state a claim.

---

[5] Plaintiffs also have standing to bring this case. The Court will not address standing in detail because Defendants have not presented a standing argument distinct from their mootness and ripeness arguments. Nonetheless, because the Court has a sua sponte obligation to address jurisdictional issues, the Court will briefly address standing. To have standing, a plaintiff must meet three elements: (1) it "must have suffered an injury in fact"; (2) the injury has to be "fairly . . . trace[able] to the challenged action of the defendant"; and (3) "the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations omitted; alterations in original). As explained in the Court's mootness and ripeness analysis, each of these elements is met here. The injury element is met for the same reasons the adverse interest factor of the ripeness analysis is met: Plaintiffs have been prevented from bidding on city projects. The causation element is met because Plaintiffs' harm is caused by Defendants' policy. The redressability element is met for the same reasons the utility factor of the ripeness analysis is met, and because the Court can grant meaningful relief as explained in the Court's analysis of whether the case is moot.

## B. Failure to State a Claim

Plaintiffs have stated a claim for relief under the First Amendment, but they have not stated a claim for relief under the NRLA or city and state laws. Plaintiffs have stated a First Amendment claim because they allege all employees on City contracts must become members of certain unions and pay dues to those unions. Plaintiffs have not stated an NLRA claim because, under the NLRA, the City can enforce a project labor agreement in the construction industry. Plaintiffs have also failed to state claims under Pennsylvania and Philadelphia laws because they have not alleged they are city taxpayers. Therefore, the Court will dismiss Plaintiffs' statutory claims, but not Plaintiffs First Amendment claim. The Court will, however, grant Plaintiffs leave to replead their claims under city and state laws. The Court will first discuss the standard applied to Defendants' motion and then apply that standard to each of Plaintiffs' claims in turn.

A court must deny a motion to dismiss for failure to state a claim when, viewing the facts in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted. *Owner Operator Indep. Drivers Ass'n, Inc. v. Pa. Tpk. Comm'n*, 934 F.3d 283, 290 n. 7 (3d Cir. 2019) ("To withstand a motion to dismiss, a complaint must allege a claim that is plausible on its face when accepting all the factual allegations as true and drawing every reasonable inference in favor of the nonmoving party."). To survive a Rule 12(b)(6) motion to dismiss, a complaint "does not need detailed factual allegations" as long as it contains something "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiffs have pleaded their First Amendment claim because they have alleged the City compels employees to join unions and pay union dues. The First Amendment does not merely guarantee a right to speak, it also guarantees a right to "refrain from speaking." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *Wooley v.*

*Maynard*, 430 U.S. 705, 714 (1977)). This right also prevents government action "[c]ompelling a person to subsidize the speech of other private speakers," including unions. *Id.* at 2464. The Supreme Court applies the "exacting scrutiny" standard to determine whether payments to unions violate this First Amendment right. *Id.* at 2465. Under this standard, "a compelled subsidy [of a union] must 'serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Id.* (internal citations omitted).

In *Janus*, the Supreme Court found compelled payments to a union for collective bargaining services did not meet this standard and were therefore unconstitutional. *Id.* at 2465. In that case, Illinois had a policy that, if the majority of public employees choose to be represented by a union those who did not wish to join the union had to pay "agency fees" rather than full dues. *Id.* at 2460. The Supreme Court found this policy did not survive "exacting scrutiny" because, although the state's interest in labor peace may be compelling, this interest could be achieved through other means. *Id.* at 2465-66. The Supreme Court also consider and rejected other possible justifications for Illinois's policy including stopping free riders from benefiting from union bargaining. *Id.* at 2466-69.

If the minimal payments at issue in *Janus* were unconstitutional, then the full union dues alleged here are as well. The Complaint alleges the project labor agreements used on all City projects require employees working on those projects to become members of specific unions. Compl. ¶ 30. Plaintiffs also allege that, as members of these unions, the employees must pay dues. Compl. p. 1. These dues support all union activities, including union speech.

Defendants do not argue the City could constitutionally compel its employees to join unions or pay union dues. Instead, they argue this case is distinguishable from *Janus* because the employees at issue here are not public employees. This distinction is not relevant under the First

Amendment. The First Amendment bars compelled speech. Whether the City directly compels its own employees to make this speech or compels another's employees to make this speech is irrelevant. In *Harris v. Quinn*, the Supreme Court explained that First Amendment concerns continue to exist when a state compels private employees to subsidize union speech. 573 U.S. 616, 643-47 (2014). In that case, the Supreme Court held it was unconstitutional for Illinois to compel personal health assistants to pay fees to a union when those assistants were employed by individuals but paid by the state. *Id.* at 656 ("[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support."). Assuming the allegations in Plaintiffs' Complaint are true, the City is forcing every person who works on a City construction project worth over $3 million to join select unions and pay dues to those unions. If an employee refuses to do so, he cannot work on these City projects. This is compelled speech, and it is prohibited under *Janus*.[6] Therefore, Plaintiffs' First Amendment claim survives Defendants' motion to dismiss.

Turning to the Plaintiffs' NLRA claim, the Court finds Plaintiffs have failed to state a claim for a violation of this statute. Project labor agreements between private parties in the construction industry are permissible under the NLRA. *See* 29 U.S.C. § 158(e)-(f) (enumerating a specific carve out in the NLRA for project labor agreements in the construction industry). These permissible agreements can "provid[e] for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees." *Bldg. & Const. Trades*

---

[6] The Court recognizes these project labor agreements have been used with some frequency in the construction industry before the Supreme Court decided *Janus* and *Harris*. Defendants have not argued that the unique position of the construction industry means the compelled speech in these agreements can meet the "exacting scrutiny" standard used by the Supreme Court. Therefore, the Court will not address this issue at this stage of the case.

14

*Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc. ("Boston Harbor")*, 507 U.S. 218, 230 (1993). The NLRA also permits agreements which "require an employer [in the construction industry] not to hire other contractors performing work on that particular project site unless they agree to become bound by the terms of that [project] labor agreement." *Id.*; *see also* 29 U.S.C. § 158(e). In *Boston Harbor*, the Supreme Court held the NLRA did not prevent a state government agency from requiring contractors bidding on a state-owned construction project to enter into one of these otherwise lawful project labor agreements. *Boston Harbor*, 507 U.S. at 231 ("To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a [project labor] agreement, a public entity as purchaser should be permitted to do the same.").

The Supreme Court's holding in *Boston Harbor* forecloses Plaintiffs' NLRA claim here. Like in *Boston Harbor*, the construction projects at issue here are owned by a government entity,[7] and that entity requires all contractors who bid on the project to sign a project labor agreement. *See id.* at 222 (explaining that the Boston Harbor bid specifications stated, "each successful bidder and any and all levels of subcontractors, as a condition of being awarded a contract or subcontract, will agree to abide by the provisions of the . . . Project Labor Agreement."). The project labor agreement in *Boston Harbor* also contained the same operative provisions as the agreement at issue here: a provision requiring all employees working on the project to join the union, a provision

---

[7] Defendants have not argued the City was acting as a regulator rather than a market participant in enforcing the project labor agreements, so the Court need not address this issue. The Court notes, however, that the City has a proprietary interest in the construction projects it owns, and the project labor agreements are tailored to that interest. *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 216 (3d Cir. 2004); *see also Associated Builders & Contractors Inc. N.J. Chapter v. City of Jersey City, N.J.*, 836 F.3d 412, 418 (3d Cir. 2016) ("The Supreme Court has recognized a government's proprietary interest in a project when it 'owns and manages property' subject to the project or it hires, pays, and directs contractors to complete the project." (internal citations omitted)).

15

making the union the sole bargaining agent for the project, and a provision requiring the use of union hiring halls for the project. *Id.* at 221-22. Plaintiffs make three arguments that *Boston Harbor* is inapplicable to this case. All three are meritless.

First, they argue, because the City is not a construction employer, the NLRA exception for construction employers does not apply to it. This argument fails because this is the exact issue the Supreme Court addressed in *Boston Harbor* where it found that a state agency, which is excluded from the definition of construction employer in the NLRA, can nonetheless require project labor agreements on its own construction project. As the Supreme Court explained:

> [T]he exceptions provided for the construction industry in §§ 8(e) and (f) [of the NLRA, codified at 29 U.S.C. §§ 158(e) and (f)] . . . are not made specifically applicable to the State. This is because the State is excluded from the definition of the term "employer" under the NLRA, see 29 U.S.C. § 152(2), and because the State, in any event, is acting not as an employer but as a purchaser in this case. Nevertheless, the general goals behind passage of §§ 8(e) and (f) are still relevant to determining what Congress intended with respect to the State and its relationship to the agreements authorized by these sections. . . . To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a [project labor] agreement, a public entity as purchaser should be permitted to do the same.

*Id.* at 230–31. Therefore, even though the City is not a construction employer under the NLRA, the Supreme Court's reasoning in *Boston Harbor* permits the City to require contractors to use project labor agreements.

Second, Plaintiffs argue *Boston Harbor*'s holding was limited to specific construction projects where speed and efficiency were unusually necessary, but this is not so. The Supreme Court noted the specific needs of the project at issue in *Boston Harbor* merely to explain why Congress's rationale for allowing project labor agreements in the construction industry should be extended to public projects. *Id.* at 230-32 (describing the reasons the construction industry is unique, explaining how those unique factors were present in the Boston Harbor project, and concluding "[t]here is therefore no basis on which to distinguish the incentives at work here from

16

those that operate elsewhere in the construction industry."). The Supreme Court's holding in *Boston Harbor* applies to all public construction projects. *Id.* at 233 (finding the NLRA did not prohibit a public entity "acting in the role of purchaser of construction services, [from] act[ing] just like a private contractor would act, and condition[ing] its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find").

Third, Plaintiffs incorrectly argue the construction industry exception in the NLRA is too narrow to fit the circumstances at issue here. In support of this argument, they cite to an irrelevant statement in *Spectacor Mgmt. Grp. v. N.L.R.B.*, which sets out a two-factor test for when an otherwise unlawful agreement falls within the NLRA's "work preservation" exception. 320 F.3d 385, 391 (3d Cir. 2003). The "work preservation" exception is entirely distinct from the construction industry exception, and does not apply here. *See id.* at 392-96 (addressing the construction industry exception in a separate section of the opinion). They also rely on *Connell Const. Co. v. Plumbers & Steamfitters Local Union No. 100*, which held that a construction contractor who did not have any bargaining agreement with a union could not require its subcontractors to have an agreement with that union. 421 U.S. 616, 627-28 (1975) (accepting the argument that "Congress did not intend to permit a union to approach a 'stranger' contractor and obtain a binding agreement not to deal with nonunion subcontractors"). *Connell*, which was decided before *Boston Harbor*, is not applicable here because all employees working on each of the City's projects must belong to the same unions, and the City's project labor agreements are entered into on a project-by-project basis. *See Id.* at 633 (noting that an agreement between a union and a stranger contractor may be permissible when the agreement relates "to common-situs relationships on particular jobsites"). Therefore, because *Boston Harbor* holds a government entity

may enforce project labor agreements under the NLRA, Plaintiffs have not stated a claim for a violation of this federal statute.

Finally, the Court will dismiss Plaintiffs' claims for violations of state and local laws. Under Pennsylvania law, a disappointed bidder cannot enforce the state's bidding laws unless this bidder is also a taxpayer. *See R. S. Noonan, Inc. v. Sch. Dist. of City of York*, 162 A.2d 623, 624-25 (Pa. 1960) (explaining that a state competitive bidding statute "does not vest in a disappointed low bidder a cause of action" but rather "gives to the public, in a taxpayer's suit the right to demand that the lowest responsible bidder be awarded the contract"); *see also Am. Totalisator Co. v. Seligman*, 414 A.2d 1037, 1040 (Pa. 1980) ("[A] taxpayer has standing[8] to enjoin the improper award of a public contract and such standing is not defeated by the fact that the complaining taxpayer is also a disappointed bidder."). Plaintiffs have not pled they were taxpayers in their Complaint. Instead, in Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss, they assert they pay Philadelphia taxes. Pls' Br. in Opp. to Mot. to Dismiss at 11. Considering this assertion in Plaintiffs' brief, the Court will grant Plaintiffs leave to amend their Complaint to include allegations concerning their taxpayer status.[9]

---

[8] While the Pennsylvania courts refer to the taxpayer requirement as one of standing, it is distinct from Article III standing. *See, e.g.*, *Weathers v. Sch. Dist. of Phila.*, 383 F. Supp. 3d 388, 398 n.8 (E.D. Pa. 2019) (explaining the distinction between Article III standing and stating a claim under Pennsylvania's competitive bidding statutes); *see also Merriam v. Kunzig*, 476 F.2d 1233, 1240 (3d Cir. 1973) (holding that "an unsuccessful bidder [on a federal government project], does have [Article III] standing to seek judicial review of a government contract award").

[9] Plaintiffs are also free to amend Counts III and IV of their Complaint to assert violations of other Pennsylvania competitive bidding statutes that may be applicable to the City in this case. Currently, Plaintiffs refer to Pa. Const. Art III, § 22 and 62 Pa. Cons. Stat. § 512. The Pennsylvania Constitutional provision Plaintiffs reference creates "a system of competitive bidding . . .[for] all purchases of materials, printing, supplies or other personal property used by the government," but it does not reference services like construction work. Pa. Const. Art III, § 22; *see also Pennsylvania Indus. for Blind & Handicapped v. Larson*, 436 A.2d 122, 124 (Pa. 1981) ("This provision [of the Pennsylvania Constitution] obviously has no applicability to contracts for services."). The

**CONCLUSION**

The Court will grant Defendants' Motion to Dismiss in part. The Court has jurisdiction because this case is ripe and not moot. Therefore, the Court will not grant Defendants' request to dismiss this case for lack of jurisdiction. Plaintiffs have stated a First Amendment claim because Defendants allegedly compel employees on City projects to become dues-paying union members, so the Court will not dismiss this claim. Plaintiffs have not stated an NLRA claim because the NLRA allows government entities to enforce project labor agreements in the construction industry, so the Court will dismiss this claim with prejudice. Plaintiffs also have not stated their state and local law claims because they do not allege they are Philadelphia taxpayers. The Court will therefore dismiss these claims with leave to amend to correct this defect.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

---

Pennsylvania statute Plaintiffs reference provides "[c]ontracts shall be awarded by competitive sealed bidding" but it "applies to every expenditure of funds . . . by *Commonwealth agencies*" rather than municipal agencies. 62 Pa. Cons. Stat. §§ 512, 102 (emphasis added); *see also id.* at § 103 (defining the term state agency and related terms). By contrast 62 Pa. Cons. Stat. § 3911 may be applicable to this case, but was not referenced in Plaintiffs' Complaint. This statute provides "a [construction] contract to be entered into by a *government agency* through competitive sealed bidding . . shall be awarded to the lowest responsible and responsive bidder," and a government agency is defined as "[a]ny institution which receives State funds directly or indirectly for construction." 62 Pa. Cons. Stat. §§ 3911, 3902 (emphasis added).