UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | |
|---|---|
| **Road-Con, Inc.**; **Neshaminy Constructors, Inc.**; **Loftus Construction, Inc.**; **PKF-Mark III**; and **Scott A. Lavaca**, <br><br> Plaintiffs, <br><br> v. <br><br> **City of Philadelphia**; and **James Kenney**, in his official capacity as mayor of the City of Philadelphia, <br><br> Defendants. | Case No. 2:19-cv-01667-JS |

## THIRD AMENDED COMPLAINT

This is a suit to enjoin the mayor and city of Philadelphia from imposing "project labor agreements" on city contractors. A "project labor agreement" forces a city contractor to recognize a city-approved union as the exclusive representative of its employees, even if the contractor's employees have chosen a different union that does not appear on the city-approved list. It also compels every employee of a city contractor to become dues-paying members of a city-approved union, and it compels contractors to contribute to that union's pension and health-care funds and operate in accordance with that union's work rules and employment procedures. These project labor agreements violate the rights of contractors and their employees under the First and Fourteenth Amendments. They also violate state and city competitive-bidding laws, and they violate the city charter as well. Finally, the city of Philadelphia's project labor agreements impose diversity-and-inclusion requirements on unions and contractors that violate 42 U.S.C. § 1981 and the Equal Protection Clause.

## PARTIES

1.   Plaintiff Road-Con, Inc. ("Road-Con") is a heavy and highway contractor. Its principal place of business is located at 902 Camaro Run Drive, West Chester, Pennsylvania 19380. Road-Con is a member of the Pennsylvania Heavy and Highway Contractors Bargaining Association ("PHHCBA") and is bound by the Collective Bargaining Agreement between the United Steelworkers ("USW") and the PHHCBA ("PHHCBA-USW CBA"). Road-Con is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

2.   Road-Con is also a taxpayer of the City of Philadelphia. Road-Con pays to the city Business Income and Receipt Tax (BIRT) and payroll withholding taxes for its employees, among other taxes.

3.   Plaintiff Neshaminy Constructors, Inc. ("Neshaminy") is a heavy and highway contractor. Its principal place of business is located at 1839 Bustleton Pike, P.O. Box 405, Feasterville-Trevose, Pennsylvania 19053-7309. Neshaminy, like Road-Con, is a member of the Pennsylvania Heavy and Highway Contractors Bargaining Association, and is bound by its collective-bargaining agreement with the United Steelworkers. Neshaminy is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

4.   Neshaminy is also a taxpayer of the City of Philadelphia. Neshaminy pays Business Income and Receipts Tax (BIRT) to the city.

5.   Plaintiff Loftus Construction, Inc. ("Loftus") is a heavy and highway contractor. Its principal place of business is located at 1903 Taylors Lane, Cinnaminson, New Jersey 08077. Loftus is also a member of the Pennsylvania Heavy and Highway Contractors Bargaining Association and is bound by its collective-bargaining agreement with the United Steelworkers. Loftus is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

6.   Loftus is also a taxpayer of the City of Philadelphia. Loftus pays Business Income and Receipts Tax (BIRT), sales and use tax, and city wage taxes to the city.

7.   Plaintiff PKF-Mark III ("PKF") is a heavy and highway contractor. Its principal place of business is located at 170 Pheasant Run, Newtown, Pennsylvania 18940. PKF is a signatory to a collective bargaining agreement with United Steelworkers Local 15024 (the "PKF-USW CBA"). PKF is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

8.   PKF is also a taxpayer of the City of Philadelphia. PKF pays Business Income and Receipts Tax (BIRT), sales and use tax, and city wage taxes to the city.

9.   Plaintiffs Road-Con, Neshaminy, Loftus, and PKF will be referred to throughout this complaint as "the contractor plaintiffs."

10.   Plaintiff Scott A. LaCava is an adult individual and resident of the Commonwealth of Pennsylvania. Mr. LaCava is an employee of Road-Con and a member of the United Steelworkers.

11.   The plaintiffs have completed many projects for state and federal agencies, including PennDOT and SEPTA, as well as projects owned by those agencies within the City of Philadelphia.

12.   Defendant the City of Philadelphia is a political subdivision of the Commonwealth of Pennsylvania.

13.   Defendant James Kenney is the Mayor of the City of Philadelphia. He maintains final decision-making authority and is sued in his official capacity.

## JURISDICTION AND VENUE

14.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

15.   Venue is proper under 28 U.S.C. § 1391(b).

## BACKGROUND

### A.    Project Labor Agreements

16.   A project labor agreement ("PLA") is a government-mandated union collective-bargaining agreement that all contractors must sign to work on a public-works construction project.

17.   A PLA usually forces contractors to (a) recognize certain government-chosen unions as the exclusive representative of their employees; (b) require that their employees become members of these government-chosen unions as a condition of employment; (c) require all employees to pay dues to these government-chosen unions as a condition of employment; (d) contribute to the government-chosen union's pension and healthcare funds; (e) operate according to the government-chosen union's work rules; and (f) follow the government-chosen union's procedures for hiring, firing, and disciplining employees.

18.   Twenty-five (25) states currently ban the use of PLAs.[1]

### B.    The City of Philadelphia's Project Labor Agreement

#### 1.    Executive Orders 15-11 and 8-15 and the process to implement a PLA

19.   On November 29, 2011, Mayor Michael A. Nutter signed Executive Order 15-11 (the "Executive Order"). A copy of the Executive Order is attached at Exhibit 1.

20.   The Executive Order was not intended to require the use of a PLA on every City public-works project.

21.   Indeed, Section 3(c) of the Executive Orders states: "This Executive Order does not require the use of a Project Labor Agreement with respect to any particular Project, nor does this Executive Order require the selection of any particular union, trade council, or labor organization." *Id*. at section 3(c).

---

1.   The States that currently ban PLAs are: Alabama, Arkansas, Idaho, Iowa, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, Michigan, Montana, Nevada, New Mexico, North Carolina, North Dakota, Nebraska, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia, and Wisconsin.

22.  Rather, under the Executive Order the City determined that "*certain* projects, because of their size, complexity, need for a variety of craft labor and critical deadlines are generally appropriate for Project Labor Agreements." *See* Executive Order at preamble ¶ 5 (emphasis added).

23.  Accordingly, the Executive Order sets forth a five-step process for selecting the projects appropriate for a PLA.

24.  First, each City Agency is to review each proposed project with an estimated budget of $5,000,000 or more to determine if a PLA is appropriate. *See id*. at Section 2(a).

25.  Second, when a City Agency has determined that a project is appropriate for a PLA, the Agency "shall provide the Mayor's Office with a written description of the Project and the City Agency's recommendation for a Project Labor Agreement." *Id*. at Section 3(a).

26.  Third, the Mayor's Office is to review *every* proposal from an Agency that recommends inclusion of a PLA for "consistency with this Executive Order." *Id*. at Section 4(a)(i).

27.  Fourth, under Section 4(b) of the Executive Order, if the Mayor's Office determines a PLA is appropriate for a project, it will "commence a discussion with labor organizations to determine (i) which labor organization(s) may be appropriate for the Project, and (ii) if a Project Labor Agreement is feasible for the Project." *Id*. at Section 4(b).

28.  Finally, Section 1(d) of the Executive Order provides that every PLA "shall be subject to the review and approval of the City's Law Department" before it is imposed. *Id*. at Section 1(d).

29.  Upon information and belief, the City and the Mayor have never followed this procedure.

30.  Instead, the City and the Mayor have imposed a blanket PLA on all City public-works projects with an estimated construction budget of over $3,000,000.

31.  The City and the Mayor have done so even when a City Agency has not recommended a PLA for a particular public-works project.

32.     On December 31, 2015, Mayor Nutter signed Executive Order 8-15. The provisions of Executive Order 8-15 are almost identical to those in Executive Order 15-11, except that the threshold for imposing a project labor agreement is lowered from $5,000,000 to $3,000,000. A copy of Executive Order 8-15 is attached as Exhibit 2.

33.     Executive Order 8-15 also rescinds Executive Order 15-11. *See* Executive Order 8-15, § 8 ("Executive Order No. 15-11 is hereby rescinded.") (attached as Exhibit 2).

34.     Although Executive Order 8-15 purports to supersede Executive Order 15-11, the city's bid documents occasionally refer to Executive Order 15-11 rather than Executive Order 8-15. *See* Exhibit 3. In addition, the project labor agreement that appears on the city's website is Executive Order 15-11 rather than Executive Order 8-15. *See* https://www.phila.gov/ExecutiveOrders/Executive%20Orders/2011_EO15-11.pdf (last visited on September 3, 2021).

35.     Executive Order 8-15 was in effect when the plaintiffs filed their original complaint on April 18, 2019. It was rescinded on October 15, 2020 — six months after the plaintiffs moved for summary judgment, and nearly 18 months after the plaintiffs sued to enjoin its enforcement. The mayor's decision to rescind Executive Order 8-15 does not moot the plaintiffs' claims for declaratory and injunctive relief against the regime that existed on April 18, 2019. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot."); Order of March 27, 2020 (ECF No. 27) at 6 ("Even if Defendants voluntarily ceased including project labor agreements on City projects, however, this case is not moot because they could resume doing so."); City's Br. in Opp. to Pls.' Supp. Br. (ECF No. 56) at 12 ("The City does not argue that the new Executive Order moots the challenges related to the former Executive Order").

### 2.    The Model PLA

36.    Attached to Executive Order 15-11 is a document titled "Philadelphia Public Project Labor Agreement." A copy of the Philadelphia Public Project Labor Agreement is attached at Exhibit 3.

37.    This document is the PLA that the City uses on public-works projects in excess of $3,000,000.

### 3.    The PLA's Union Membership and Hiring Hall Requirements

38.    The PLA applies to any contractor or subcontractor of any tier that performs work on the project, as well as to any and all employees of those contractors of any tier.

39.    Article III of the PLA is titled "Union Recognition and Employment."

40.    Article III, Section 5 of the PLA expressly requires employees of contractors or subcontractors of any tier that perform work on a City Project subject to the PLA to become members of unions selected by the City as a condition of employment:

> Section 5. <u>Union Security</u>.  **It shall be a condition of employment that all employees** of Contractor covered by this Agreement who are members of the Union(s) in good standing on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members in good standing and **those who are not members on the effective date shall, on the eighth (8th) day following employment, become and remain members in good standing in the Union(s) for the term of this Agreement.**

Exhibit 3, Article III, Section 5 (emphasis added).

41.    Furthermore, Article III, Section 1 of the PLA requires that all contractors and subcontractors of any tier working on a City project recognize city-selected unions as the sole and exclusive bargaining agent of their employees:

> Section 1.  Union Recognition.  The Contractor recognizes the Union(s) as the sole and exclusive bargaining representative of all craft employees working on the Public Works Project within the scope of this Agreement.

42.    Also, Article III, Section 2 of the PLA requires all contractors working on a City project to obtain employees exclusively through union hiring halls.

### C.     The PLA's Incorporation of Certain Union Collective Bargaining Agreements

43.    While the Executive Orders themselves do not identify which unions will participate in a project labor agreement and indicates that the participating unions will be selected on a case-by-case basis, the PLA states that the unions that are parties to the PLA are "the Affiliates of the Philadelphia Building and Construction Trades Council."

44.    Upon information and belief, every PLA that the City has included with its bid specifications for public-works projects is between the City and the unions affiliated with the Philadelphia Building and Construction Trades Council (the "Building Trades Council") only.

45.    Upon information and belief, since 2017, every PLA that the City has included with its bid specifications for a public-works project is signed on behalf of the "Unions" by John Dougherty, who is the "Business Manager" of the Building Trades Council.

46.    The unions affiliated with the Building Trades Council are:

   a.   I.B.E.W. Local 98;

   b.   I.B.E.W. Local 269;

   c.   I.B.E.W. Local 654;

   d.   Elevator Constructors Local 5;

   e.   SEIU 32BJ;

   f.   Insulators & Allied Workers Local 14;

   g.   Insulators & Allied Workers Local 89;

   h.   Cement Masons Plasterers Union Local 592;

   i.   Operative Plasterers and Cement Masons' Local 8;

   j.   Iron Workers Local 401;

   k.   Iron Workers Local 451;

   l.   Laborers' District Council of the Metropolitan Philadelphia Area and Vicinity;

m.  Laborers' Local 135;

n.  Laborers' Local 57;

o.  Laborers' Local 332;

p.  Laborers' Local 413;

q.  Operating Engineers Local 835;

r.  Operating Engineers Local 542;

s.  Painters & Allied Trades, District Council 21;

t.  Plumbers Local 690;

u.  Reinforced Iron Workers Riggers & Machinery Movers Local Union 405;

v.  Roofers Local 30;

w.  IATSE Local 8;

x.  Sheetmetal Workers Local 19;

y.  Sprinkler Fitters Local 692;

z.  Steamfitters Local 420;

aa. Teamsters Locals 312, 384, and 107; and

bb. Bricklayers and Allied Craftworkers Local 1.

We will refer to these affiliated unions collectively as "the Unions."

47.   Moreover, every PLA that the City has incorporated into its bid specifications incorporates the collective-bargaining agreements with the Unions that the City has selected for the public-works projects.

48.   This means that a contractor seeking to work on a city-owned project subject to the PLA must abide by the terms and conditions of the Unions' collective-bargaining agreements, pay various forms of financial support to the Unions, pay fringe benefits and pension contributions to the Unions, and hire all employees from the Unions—even if a contractor has employees represented by a union that is not affiliated with the Building Trades or whose employees have chosen not to be represented by a Union.

49.   This also means that all of a contractor's employees that perform work on a City public-works project as a condition of maintaining employment must become members of one of the Unions that the City has selected.

### D.   The PLA's Diversity-And-Inclusion Goals

50.   Executive Orders 15-11 and 8-15 impose diversity requirements on every union and contractor that performs city work subject to a project labor agreement.

51.   Section 1(a)(iv) of Executive Order 8-15 allows a union to obtain city work subject to a PLA only if it "has identified member diversity as an organizational value and has established objectives for maintaining and increasing diversity among its apprentice and journeyman members." (attached as Exhibit 2).

52.   Section 5(e) of Executive Order 8-15 requires the city's project labor agreements to "[i]nclude diversity goals for appropriate labor organizations and contractors and requirements for annual reporting by participating labor organizations on their efforts and progress toward increasing diversity." (attached as Exhibit 2).

53.   The Philadelphia Public Project Labor Agreement describes and implements the city's diversity requirements in Schedule C, which is attached to the PLA and appears on pages 22–24 of Exhibit 3.

54.   Section 1(c) of Schedule C establishes the numerical "goals" for unions and contractors that work on city construction projects. It says:

> The City shall establish goals for workforce diversity in City and City-funded construction projects. The current goals are based on the March 2009 Report of the Mayor's Advisory Commission on Construction Industry Diversity. For male minority and women employment in the Public Works Project [the goals] shall be at least:
>
> Male Minority: Thirty two (32) percent of all construction employment hours
>
> Women: Seven (7) percent of all construction employment hours.

Exhibit 3, Schedule C § 1(c).

55.    Section 2(b) of Schedule C specifies the diversity requirements for participating unions:

> The Union(s) shall set participation goals that will significantly increase participation of minority males and women. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

Exhibit 3, Schedule C § 2(b).

56.    And sections 3(b) and 3(d) of Schedule C specify the diversity requirements for participating contractors. Section 3(b) says:

> The Contractors shall use their best efforts to add minority males and women to their permanent or steady workforces. The Contractors shall provide workforce demographic information to the City in advance of project commencement.

Exhibit 3, Schedule C § 3(b).

57.    Section 3(d) of Schedule C says:

> The Contractors shall use their best efforts to meet or exceed the goals established for minority males and women participation in Section 1 of this Schedule C.

Exhibit 3, Schedule C § 3(d).

**E.    The City's Persistent Refusal To Include The United Steelworkers In Its Project Labor Agreements**

58.    The United Steelworkers is neither a member nor an affiliate of the Philadelphia Building and Construction Trades Council. As a result, the members of United Steelworkers—and contractors that have collective-bargaining agreements with the United Steelworkers—are ineligible to work on city projects subject to a PLA, at least at the time the plaintiffs filed their original complaint on April 18, 2019.

59.    For nearly a decade, the United Steelworkers and Steelworker-affiliated contractors have been asking the city of Philadelphia to amend its project labor agreement to allow them to work on city construction projects. Inquiries and requests of this sort have been

made repeatedly by letter and by e-mail. Each time, the city has rebuffed or simply ignored these overtures.

60.   The first of these requests came from Crossing Construction Company, Inc., which wrote to city officials on March 31, 2011, and expressed interest in bidding on a city construction project subject to a PLA. *See* Decl. of Walter S. Zimolong ¶ 8 (attached as Exhibit 8); *see also* Exhibit 8.A. Crossing Construction is a Steelworker-affiliated contractor, and it informed the city of its intent to bid on this project notwithstanding the PLA.

61.   On April 12, 2011, the city's law department wrote to Joseph M. Padavan, the president of United Steelworkers Local 15253, and explained that the city's PLA requires employees of city contractors to belong to a union affiliated with the Philadelphia Building and Construction Trades Council, and that Steelworker-affiliated contractors were therefore ineligible to work on city projects subject to a PLA:

> [N]o other labor organizations except those affiliated with the Philadelphia Building and Construction Trades has been identified as capable or stepped forward to request inclusion in a City sponsored project labor agreement. The City is currently unaware of the involvement of United Steelworkers members in City public works projects. . . .
>
> Unfortunately, for Project #70013, the project schedule will not permit the City to accommodate your interest in changing the requirements of this bid.

*See* Decl. of Walter S. Zimolong ¶ 9 (attached as Exhibit 8); *see also* Exhibit 8.B. The city's letter of April 12, 2011, did leave open the possibility that the city might consider including the United Steelworkers in future project labor agreements, but it made no promises in that regard. The letter also mentioned the diversity-and-inclusion goals imposed on signatories to the city's PLA, and it emphasized that the United Steelworkers would be required to agree to those requirements if it were to become a signatory:

> Equally important to the City is that the signatory unions have agreed to very significant goals and processes to increase diversity among their members, and to support local employment and diversity among the public works contractors. . . . The terms of the current project labor agreement related to union diversity will be required.

*Id.*

62.    On April 27, 2011, Joseph M. Padavan, the president of United Steelworkers Local 15253, wrote back to the city's chief deputy city solicitor and made clear that his union was willing and able to comply with the city's diversity-and-inclusion goals:

> We are in full agreement with all aspects of the PLA put in place by the City of Philadelphia and the Public Works Department. The terms of the current project labor agreement related to union diversity create no problem for my union or any of our contractors. We do not expect you to change any requirements of this bid except for the right of the United Steelworkers Union to be a part of this project, with the right to use our members and our Benefit Plans that cover our members.

*See* Decl. of Walter S. Zimolong ¶ 10 (attached as Exhibit 8); *see also* Exhibit 8.C. Mr. Padavan closed his letter with an appeal to include the Steelworkers in the city's project labor agreement:

> The United Steelworkers Union, Local 15253, has a state certified Apprenticeship Program and is very progressive in the recruitment of minority candidates. We have many members that live in the Philadelphia area. We agree that you must have cohesiveness in such complex, costly, and time sensitive projects. Our members deserve the right to be a part of this PLA project and all future PLA's authorized by the City of Philadelphia and any of its departments.

*Id.*

63.    On information and belief, the city did not respond to Mr. Padavan's letter of April 27, 2011.

64.    On August 13, 2013, Arnold Shep Cohen, an attorney representing United Steelworkers Local 15024, wrote to city officials and asked them to allow the United Steelworkers to become a signatory to the city's project labor agreement. *See* Decl. of Walter S. Zimolong ¶ 12 (attached as Exhibit 8); *see also* Exhibit 8.D. United Steelworkers Local 15024 has a collective-bargaining agreement with PKF-Mark III, Inc., one of the plaintiffs in this lawsuit.

65.   On information and belief, the city has not responded to Mr. Cohen's letter of August 13, 2011.

66.   On August 30, 2013, Ronald L. Tobia, yet another attorney representing United Steelworkers Local 15024, wrote to city officials and reiterated the request to allow the United Steelworkers to become a signatory to the city's project labor agreement. *See* Decl. of Walter S. Zimolong ¶ 14 (attached as Exhibit 8); *see also* Exhibit 8.E.

67.   On information and belief, the city has not responded to Mr. Tobia's letter of August 30, 2013.

68.   On September 12, 2018, John E. Shinn, the District 4 Director of the United Steelworkers, and Glenn Ely, the president of PKF-Mark III, co-wrote a letter to the city of Philadelphia's law department and asked it to allow the United Steelworkers to become a signatory to the project labor agreement. *See* Decl. of Walter S. Zimolong ¶ 16 (attached as Exhibit 8); *see also* Exhibit 8.F.

69.   In response to this letter and other correspondence, Deputy Mayor Richard Lazer wrote to Walter S. Zimolong, counsel for the plaintiffs, on November 26, 2018, and explained that the city would be "willing" to include the following language in its project labor agreements, which would allow the United Steelworkers and its affiliated contractors to obtain city work subject to the PLA:

> In the event that a contractor bound by a Collective Bargaining Agreement (CBA) with the United Steelworkers (USW) is the successful bidder, the contractor will be permitted to utilize its USW workforce and its USW CBA provided that the contractor adheres to the conditions and economic terms of the agreement excluding any hiring hall obligation or union security provision. And provided further that the USW contractor is either a protected contractor, under the terms of the Harmony Agreement of February 24, 1994 or has been organized by USW pursuant to paragraph 3 (b) of the Harmony Agreement for at least 120 days prior to the issuance of any bid specification for the Project and provided that it normally performs the type of work being let in the geographical area of the project.

Decl. of Walter S. Zimolong ¶ 17 (attached as Exhibit 8); *see also* Exhibit 8.G. Mr. Lazer's letter also said that the city would "require" the United Steelworkers to "agree to the conditions of Schedule C of the PLA," which contains the city's diversity-and-inclusion requirements. *See id.* Mr. Lazer's letter closed by saying: "We can begin including the new USW language in PLAs as soon as we have received the required affirmation from the United Steelworkers." *Id.* at 2.

70.     On January 3, 2019, Nathan Kilbert, an assistant general counsel for the United Steelworkers, wrote to Mr. Lazer in response to the letter that Mr. Lazer sent to Mr. Zimolong on November 26, 2018. *See* Decl. of Walter S. Zimolong ¶ 18 (attached as Exhibit 8); *see also* Exhibit 8.H. In this letter, Mr. Kilbert asked Mr. Lazer some questions about what the diversity-and-inclusion requirements would require of the United Steelworkers:

> The USW has a few questions related to the obligations contained in Schedule C of the PLA. The USW desires to increase the representation of minority men and women in construction occupations, and it would take seriously its obligations under Schedule C if it became a party to a City of Philadelphia PLA. The USW desires to know what participation goals under Schedule C have been found to be appropriate, both for the project workforce and for apprenticeship programs, for other unions and on other projects. The USW also wishes to understand what types of outreach efforts to minority men and women are regarded as appropriate and what alternatives to apprenticeship recruitment it should consider evaluating. Would it be possible for your office to answer these questions or to provide example reports of compliant activities by other unions (redacted, if necessary)?

> Finally, the USW is concerned with the third party monitoring discussed in Schedule C. Could you indicate whether any current projects are subject to such monitoring, and how many projects have been subject to such monitoring since 2008? What range of costs could be expected if third party monitoring is implemented on a specific project?

*Id.*

71.     On information and belief, Mr. Lazer never responded to Mr. Kilbert's letter of January 3, 2019. And on information and belief, neither Mr. Lazer nor any city official has answered the questions in Mr. Kilbert's letter of January 3, 2019.

72.   After Mr. Kilbert's letter of January 3, 2019, both Mr. Kilbert and Mr. Zimolong made repeated and unsuccessful efforts to follow up with Mr. Lazer about adding the United Steelworkers to the city's project labor agreement. Each of these efforts was met with silence (or near silence) from Mr. Lazer and city officials.

73.   On March 5, 2019, Mr. Zimolong e-mailed Mr. Lazer and wrote:

> Mr. Lazer:
>
> You should recall that I represent PKF Mark III, a USW signatory contractor. Copied on this email is Nate Kilbert, assistant general counsel to the USW. Mr. Kilbert and I would like to arrange for a conference call with you to discuss finalizing the changes to the Philadelphia PLA that would include the USW.
>
> Mr. Kilbert and I are available this Friday, March 8, 2019 and next Thursday, March 14, 2019. Please let us know if either of those dates work for you and we can circulate a conference call number.

Decl. of Walter S. Zimolong ¶ 21 (attached as Exhibit 8); *see also* Exhibit 8.I. Mr. Kilbert was cc'd on this e-mail.

74.   On information and belief, Mr. Lazer did not respond to this e-mail.

75.   On March 14, 2019, Mr. Zimolong e-mailed Mr. Lazer again and wrote:

> Mr. Lazer:
>
> We are following up on the below. Please let us know you[r] availability.

Decl. of Walter S. Zimolong ¶ 23 (attached as Exhibit 8); *see also* Exhibit 8.J.

76.   This time Mr. Lazer e-mailed back and wrote:

> Mr. Zimolong
>
> Let me follow up with my folks and will get back with you.
>
> Rich

Decl. of Walter S. Zimolong ¶ 24 (attached as Exhibit 8); *see also* Exhibit 8.K.

77.   Later that afternoon, Mr. Zimolong e-mailed Mr. Lazer again and wrote:

> Mr. Lazer:

What did your folks say?

Decl. of Walter S. Zimolong ¶ 25 (attached as Exhibit 8); *see also* Exhibit 8.K.

78.    On information and belief, Mr. Lazer did not respond to this follow-up e-mail of March 14, 2019.

79.    On March 19, 2019, Mr. Zimolong e-mailed Mr. Lazer once again, this time cc'ing Mr. Kilbert and Albert Hoffman, the president of Road-Con. *See* Decl. of Walter S. Zimolong ¶ 27 (attached as Exhibit 8); *see also* Exhibit 8.L. In that e-mail, Mr. Zimolong wrote:

> Mr. Lazer:
>
> I am reaching out again regarding the Philadelphia PLA and the USW. Road-Con, Inc. ("Road-Con") is a USW signatory contractor. I understand that Road-Con is interested in bidding on the above referenced project that is subject to the – unamended – PLA. Road-Con has inquired with Anthony Santaniello, Public Works Manager, about the impact of the PLA on USW signatory contractors. Mr. Santaniello said he would forward the inquiry to the Law Department.
>
> At the time of the discussion between Road-Con and Mr. Santaniello, Road-Con was unaware of the considerable progress we have made toward resolving the issues that currently prevent USW signatories from bidding on Philadelphia projects subject to the standard PLA. I can only assume based on Mr. Santaniello's reply that he was as well.
>
> From my perspective, we are at the 1 yard line in getting this issue resolved. I believe the final impediment towards resolution is squaring away some questions that counsel for the USW, Nate Kilbert (who is copied on this email), had. Since this bid is imminent, it['s] time for everyone to lean in here to get this situation resolved and avoid what would be needless litigation, especially since we all agree in princip[le] that the USW should be included in the PLA.
>
> Therefore, can you please provide us with dates for a final phone call or in person meeting with you so that whatever questions the USW has can get resolved and USW contractors, like Road-Con, can move forwar[d] with bidding on Philadelphia projects and establishing a good working relationship with the City?

*Id.*

80.     On information and belief, Mr. Lazer did not respond to Mr. Zimolong's e-mail of March 19, 2019.

81.     On March 22, 2019, Mr. Zimolong e-mailed Mr. Lazer again. *See* Decl. of Walter S. Zimolong ¶ 29 (attached as Exhibit 8); *see also* Exhibit 8.M. In that e-mail, Mr. Zimolong wrote:

> Mr. Lazer:
>
> I am following up on the below.

*Id.*

82.     On information and belief, Mr. Lazer did not respond to Mr. Zimolong's follow-up e-mail of March 22, 2019.

83.     On March 28, 2019, Samantha M. Hart, an employee of Road-Con, e-mailed city officials Anthony Santaniello and Theresa Pilla. *See* Decl. of Walter S. Zimolong ¶ 31 (attached as Exhibit 8); *see also* Exhibit 8.N. Ms. Hart wrote:

> Road Con, Inc is a signatory with the United Steel Workers (heavy and Highway construction). Can the United Steel Workers be added to the Project Labor Agreement?

*Id.*

84.     Mr. Pilla responded to Ms. Hart's e-mail and wrote:

> Regarding the project labor agreement, per our law department: The United Steelworkers are not one of the unions that are signatory to the Project Labor Agreement for this project. As stated in Article IV of the Project Labor Agreement, the "Unions" (defined as the Affiliates of the Philadelphia Building and Construction Trades Council), are the sole and exclusive bargaining representatives of all craft employees working on the Project within the scope of this Agreement. Also, the Union(s) are recognized as the source of employment referrals.

Decl. of Walter S. Zimolong ¶ 32 (attached as Exhibit 8); *see also* Exhibit 8.N.

85.     Finally, on March 29, 2019, Nathan Kilbert wrote to Mr. Lazer. *See* Decl. of Walter S. Zimolong ¶ 33 (attached as Exhibit 8); *see also* Exhibit 8.O. In that letter, Mr. Kilbert wrote:

Deputy Mayor Lazer,

I wrote to you on January 3 regarding the potential participation of the [United Steelworkers] in City of Philadelphia Project Labor Agreements and posing certain questions related to the obligations contained in Schedule C of the PLA. I have enclosed a copy of that letter. Unfortunately, despite several attempts at follow-up by me and by Wally Zimolong, attorney for USW-represented contractor PKF Mark Ill, we have received no substantive response.

In your November 26, 2018, letter to Mr. Zimolong, you expressed the City's willingness to modify the PLA language to permit USW-represented contractors to participate. My January 3 letter was an attempt to engage in good faith to facilitate USW agreement to the terms of the PLA.

This week, the City informed Road-Con, Inc., a USW-represented contractor, that affiliates of the Philadelphia Building and Construction Trades Council are the sole and exclusive bargaining representatives of all craft employees working on a projects within the scope of the PLA. A copy of this March 28 correspondence is attached.

Has the City's position regarding USW-represented contractors' participation in City PLAs changed? If not, please provide the information requested in my January 3 letter and refrain from awarding contracts based upon bidding processes that are arbitrarily excluding USW-represented contractors, including Runway 6-24 Pavement Rehabilitation at the Northeast Philadelphia Airport and the 15 111 Street Bridge Rehab.

Kindly advise as to the City's position as soon as possible.

*Id.*

86.    On information and belief, neither Mr. Lazer nor any city official has responded to Mr. Kilbert's letter of March 29, 2019.

87.    At the time the plaintiffs filed their original complaint on April 18, 2019, neither Mr. Lazer, nor any city official, had indicated or suggested to the plaintiffs that the city was excluding the United Steelworkers from its project labor agreements because the United Steelworkers was unable or unwilling to comply with the city's diversity-and-inclusion goals. No one from the city had ever faulted the United Steelworkers for being insufficiently diverse, nor did anyone from the city claim that the diversity-and-inclusion goals

had anything to do with the city's decade-long refusal to include the United Steelworkers in its project labor agreements.

88.   In addition, the plaintiffs had not been aware of any communication from the United Steelworkers that informed city officials that the union was unable or unwilling to comply with the city's diversity-and-inclusion goals. Although Mr. Kilbert's letter of January 3, 2019, asked questions in an effort to clarify the union's obligations under the diversity-and-inclusion goals, this letter did not say that the United Steelworkers was unable or unwilling to comply with the diversity-and-inclusion goals, and it did not suggest that the diversity-and-inclusion goals would present an obstacle to the United Steelworkers' participation in the PLA. *See* Decl. of Walter S. Zimolong ¶ 18 (attached as Exhibit 8); *see also* Exhibit 8.H.

89.   The evidence produced in discovery, however, shows that the diversity-and-inclusion goals were the but-for cause of the city's refusal to add the United Steelworkers as a signatory to the PLA. Deputy Mayor Richard Lazer produced a sworn declaration that says:

> [I]n or around 2018 the City engaged in discussions with the United Steelworkers in an attempt to include the United Steelworkers as a signatory to the City's PLAs. The discussions were ultimately unsuccessful *because the United Steelworkers believed that their organization could not comply with the diversity and inclusion goals of the City's PLAs*.

Declaration of Richard Lazer ¶ 11 (attached as Exhibit B to the city's statement of material facts, ECF No. 48) (emphasis added).

90.   As a result, the United Steelworkers remains excluded from the city's project labor agreement on account of the city's diversity-and-inclusion goals, and its members and affiliated contractors are ineligible to work on city projects subject to a PLA.

### F.    Plaintiffs' Relationships with the United Steelworkers of America

91.   Each of the "contractor plaintiffs"—Road-Con, Inc., Neshaminy Constructors, Inc., Loftus Construction, Inc., and PKF-Mark III—is a union contractor that maintains a

collective-bargaining agreement with the United Steelworkers of America ("United Steel-workers").

92.   The contractor plaintiffs' employees have chosen the United Steelworkers to be their bargaining representative, and the contractor plaintiffs' employees are members of the United Steelworkers.

93.   Plaintiff LaCava is a member of the United Steelworkers. He is also an employee of Road-Con, one of the contractor plaintiffs in this case.

94.   Accordingly, as condition of employment to work on a City project with a PLA at the time the original complaint was filed, Mr. LaCava would be compelled to become a member of a city-approved union and would be forced to financially support that union rather than the United Steelworkers, at least at the time the original complaint was filed on April 18, 2019.

95.   Additionally, the collective-bargaining agreement between the United Steelwork-ers and the Pennsylvania Heavy and Highway Contractors Bargaining Association ("PHHCBA"), to which each of the contractor plaintiffs belongs, governs the terms and conditions of Mr. LaCava's employment.

96.   The United Steelworkers is neither a member nor an affiliate of the Building Trades Council.

97.   The City has never included the United Steelworkers in any of its project labor agreements.

98.   The City has never incorporated the United Steelworkers' collective-bargaining agreement into any of its project labor agreements.

99.   The contractor plaintiffs are pre-qualified in all respects to perform work on City public-works projects that are subject to a project labor agreement.

100. The contractor plaintiffs, however, could not perform work on City public-works projects subject to a project labor agreement without violating their collective-bargaining agreement with the United Steelworkers, as well as their employees' rights under the First

and Fourteenth Amendments, at least at the time the original complaint was filed on April 18, 2019.

101.  Because of this, the contractor plaintiffs have refrained from submitting bids on several city public-works projects that are subject to a project labor agreement.

**G.**     **City Bid Solicitation B1904805, 15th Street Bridge Rehab Over City Branch Railroad Cut**

102.  In March 2019, the City issued Bid Solicitation B1904805 for the 15th Street Bridge Rehab Over City Branch Railroad Cut (the "15th Street Project").

103.  The bid opening date was April 23, 2019.

104.  At the time the original complaint in this lawsuit was filed on April 18, 2019, the 15th Street Project was subject to a project labor agreement (the "15th Street PLA"). A copy of the project labor agreement for the 15th Street Project is attached at Exhibit 4.

105.  As with all other PLAs, the 15th Street PLA is between the City and the Building Trades Council.

106.  The 15th Street PLA incorporates the collective-bargaining agreements of the following Unions affiliated with the Building Trades Council: the Cement Masons and Plasterers Local 592, Operative Plasterers' and Cement Masons' International Association of the United States and Canada Local 8, Iron Workers Local 401, Laborers District Council of the Metropolitan Area of Philadelphia & Vicinity, Operating Engineers Local 542, Painters & Allied Trades District Council 21, and Teamsters Locals 107, 312, and 384. *See* Exhibit 4, Schedule A.

107.  Article IV, Section 5 of the 15th Street PLA compels any employee working on the Project to become a member of one of these Unions as a condition of maintaining their employment on the Project:

> It shall be a condition of employment that all employees of Contractor covered by this Agreement who are members of the Union(s) in good standing on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members in good standing and those who are not members on the effective date shall, on the eighth (8th)

day following employment, become and remain members in good standing
in the Union(s) for the term of this Agreement.

Exhibit 4, article IV, Section 5.

108.   Article IV, Section 1 of the 15th Street PLA compels any contractor performing work on the 15th Street Project to recognize one of the unions listed in Schedule A as the sole and exclusive bargaining representative of its employees.

109.   Plaintiffs Road-Con, Neshaminy, and Loftus were interested in submitting bids for the 15th Street Project at the time the original complaint was filed on April 18, 2020.

110.   Plaintiffs Road Con, Neshaminy, and Loftus are pre-qualified to perform the work on the 15th Street Project.

111.   If they were the successful bidder, Road Con, Neshaminy, and Loftus are ready, willing, and able to complete the work on the 15th Street Project.

112.   But because Road-Con, Neshaminy, and Loftus maintain a collective-bargaining agreement with the United Steelworkers, they cannot perform work on the 15th Street Project with their current workforce unless they breach their collective-bargaining agreements and violate their employees' rights under the First and Fourteenth Amendments, at least at the time the original complaint was filed on April 18, 2019.

113.   On March 28, 2019, Road-Con e-mailed the City and asked: "Road-Con is a signatory with the United Steel Workers (Heavy and Highway Construction). Can the United Steel Workers be added to the Project Labor Agreement?"

114.   On March 28, 2019, the City e-mailed the following response to Road-Con:

> Regarding the project labor agreement, per our law department: The United Steelworkers are not one of the unions that are signatory to the Project Labor Agreement for this project. As stated in Article IV of the Project Labor Agreement, the "Unions" (defined as the Affiliates of the Philadelphia Building and Construction Trades Council), are the sole and exclusive bargaining representatives of all craft employees working on the Project within the scope of this Agreement. Also, the Union(s) are recognized as the source of employment referrals.

*See* Exhibit 6.

115.  At the time the original complaint in this lawsuit was filed on April 18, 2019, Mr. LaCava could not work on the 15th Street Project unless he became a member of the unions listed in Schedule A and supported those Unions financially.

**H.     City Bid Solicitation No. B1904626-PNE-0340.24 Runway 6-24 Pavement Rehabilitation - Package 2**

116.  In or about March 2019, the City solicited bids for City Bid Solicitation No. B1904626, PW Bid For PNE-0340.24 Runway 6-24 Pavement Rehabilitation - Package 2 (the "Runway Project").

117.  At the time the original complaint in this lawsuit was filed on April 18, 2019, the bid specifications for the Runway Project included the PLA (the "Runway Project PLA"). A copy of the Runway Project PLA is attached at Exhibit 5.

118.  The Runway Project PLA is between the City and the Building Trades Council.

119.  The City chose the following affiliates of the Building Trades Council to participate in the PLA: I.B.E.W. Local 98, the Cement Mason Local 592, Operative Plasterers' and Cement Masons International, Ironworkers Local 401, Laborers District Council of Philadelphia & Vicinity, Operating Engineers Local 542, Painters & Allied Trades, District Council 21, and Teamsters Locals 107, 312, and 384.

120.  Plaintiffs Road-Con and Loftus were interested in submitting bids for the Runway Project at the time the original complaint was filed on April 18, 2020.

121.  Plaintiffs Road-Con and Loftus are pre-qualified to perform the work on the Runway Project.

122.  If it were the successful bidder, Plaintiffs Road Con and Loftus are ready, willing, and able to complete the work on the Runway Project.

123.  But because Road-Con and Loftus maintain a collective-bargaining agreement with the United Steelworkers, they cannot perform work on the Runway Project with their current workforces unless they breach their collective-bargaining agreements and violate their employees' rights under the First Amendment and the National Labor Relations Act.

124.   Thus, Plaintiffs Road-Con and Loftus cannot bid on the Runway Project with their current workforce unless they breach their collective-bargaining agreements with the United Steelworkers, and violate their employees' rights under the First and Fourteenth Amendments, at least at the time the original complaint was filed on April 18, 2019.

125.   Mr. LaCava is a member of the United Steelworkers.

126.   Accordingly, at the time the original complaint in this lawsuit was filed on April 18, 2019, as a condition of employment to work on a City project imposing a PLA, Mr. LaCava would have been compelled to become a member of the Unions and would be forced to financially support the Unions.

### I.   Other Ways In Which The City Of Philadelphia Has Discriminated Against Steelworker-Affiliated Contractors

127.   Plaintiff Road-Con submitted the lowest responsible bid on a project five or six years ago to install safety bollards in front of the Philadelphia Airport terminal, and this contract did not have a project labor agreement attached to it. *See* Hoffman Dep. 34:17–35:3 (attached as Exhibit G to the city's statement of material facts, ECF No. 48).

128.   Despite the fact that Road-Con submitted the lowest responsible bid for the Philadelphia Airport project, the city refused to award the contract to Road-Con. *See* Hoffman Dep. 32:14–18; 35:2–35:5 (attached as Exhibit G to the city's statement of material facts, ECF No. 48).

129.   When Mr. Hoffman asked city officials why the city would not award the Philadelphia Airport project to Road-Con, despite the fact that Road-Con submitted the lowest responsible bid, Mr. Hoffman was told that "we were not of the right union type and it was causing some internal friction inside the City." *See* Hoffman Dep. 35:15–17; 37:25–38:8 (attached as Exhibit G to the city's statement of material facts, ECF No. 48).

130.   In the winter of 2019, Road-Con submitted the lowest responsible bid on another city of Philadelphia contract that did not have a project labor agreement attached, yet the city never presented a contract to Road-Con despite the fact that Road-Con had submitted

the lowest responsible bid. *See* Hoffman Dep. 31:16–32:13; 33:24–34:2; 37:5–24 (attached as Exhibit G to the city's statement of material facts, ECF No. 48).

131.   So on at least two occasions, Road-Con has submitted the lowest responsible bid on a city of Philadelphia contract that did not have a PLA attached, yet the city still refused to execute the contract with Road-Con despite the fact Road-Con submitted the lowest responsible bid. *See* Hoffman Dep. 32:9–13.

### J.   Mayor Kenney Rescinds Executive Order 8-15 And Issues Executive Order 4-20

132.   On October 15, 2020 — six weeks after the plaintiffs filed their motion for summary judgment in this case, and nearly 18 months after the plaintiffs sued to enjoin the enforcement of Executive Order 8-15 — Mayor Kenney unilaterally rescinded Executive Order 8-15 and replaced it with a new executive order that governs the city's project labor agreements. *See* Executive Order 4-20 (attached as Exhibit 7).

133.   This new executive order purports to eliminate the requirement that employees of city contractors join a union affiliated with the Philadelphia Building and Construction Trades Council. *See* Executive Order 4-20 § 4(d) (attached as Exhibit 7).

134.   At the same time, Executive Order 4-20 makes clear that the city will continue enforcing the diversity-and-inclusion goals that have prevented Steelworker-affiliated contractors and tradesmen from working on city construction projects. *See* Executive Order 4-20 §§ 1(a)(iv), 4(c) (attached as Exhibit 7).

135.   The issuance of Executive Order 4-20 does not moot the plaintiffs' challenges to Executive Order 8-15 or the PLAs that were imposed at the time the plaintiffs originally filed suit. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot."); Order of March 27, 2020 (ECF No. 27) at 6 ("Even if Defendants voluntarily ceased including project labor agreements on City projects, however, this case is not moot because they could resume doing so.");

City's Br. in Opp. to Pls.' Supp. Br. (ECF No. 56) at 12 ("The City does not argue that the new Executive Order moots the challenges related to the former Executive Order").

## CAUSES OF ACTION
### COUNT 1

**The Project Labor Agreements And Executive Orders Violate 42 U.S.C. § 1983 And The First and Fourteenth Amendments**

136.  Both public and private employees have a constitutional right to decide whether they will join or associate with a union. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association therefore plainly presupposes a freedom not to associate." (citing *Abood v. Detroit Board of Education*, 431 U.S. 209, 234–35 (1977)); *Pattern Makers' League of N. Am., AFL-CIO v. N.L.R.B.*, 473 U.S. 95, 106 (1985) ("Full union membership thus no longer can be a requirement of employment.").

137.  The First and Fourteenth Amendments also forbid a public employer to require its employees to join or financially support a union as a condition of employment. *See Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018).

138.  The City of Philadelphia and Mayor Kenney are violating the First and Fourteenth Amendments by requiring city contractors and subcontractors to compel their employees to join a Council-affiliated union, and by discriminating against contractors and tradesmen who choose to affiliate with other unions or no union at all.

139.  The City of Philadelphia and Mayor Kenney are also violating the First and Fourteenth Amendments by refusing to include the United Steelworkers as a signatory to the city's PLA—regardless of the city's reasons or excuses for doing so.

140.  Finally, the City of Philadelphia and Mayor Kenney are violating the First and Fourteenth Amendments by excluding tradesmen from city work unless they affiliate with

a union that complies with the city's diversity-and-inclusion goals, and by excluding contractors from city work unless their employees affiliate with a union that complies with the city's diversity-and-inclusion goals.

141.  The court should declare that Executive Order 8-15, Executive Order 4-20, the City of Philadelphia's Project Labor Agreement, the 15th Street Project PLA, and the Runway Project PLA violate the First and Fourteenth Amendments. It should enjoin the defendants from enforcing them, and it should enjoin the defendants from imposing any project labor agreement on any current or future project.

## COUNT 2

**The Project Labor Agreements And Executive Orders Violate 42 U.S.C. § 1981 And The Equal Protection Clause By Imposing Diversity-And-Inclusion Requirements On Contractors and Unions**

142.  Section 2(b) of Schedule C of the City of Philadelphia's Project Labor Agreement says:

> The Union(s) shall set participation goals that *will significantly increase participation of minority males and women*. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

Exhibit 3, Schedule C § 2(b). This language compels participating unions to set goals that "will" change the racial and demographic makeup of their workforces—and it requires that these goals produce a *result* that "significantly increase[s] participation of minority males and women." This explicitly requires participating unions to change the racial and demographic makeup of their workforces as a condition of receiving city work, which is unlawful under 42 U.S.C. § 1981 and the Equal Protection Clause.

143.  Section 3(d) of Schedule C says:

> The Contractors shall use their best efforts to meet or exceed the goals established for minority males and women participation in Section 1 of this Schedule C.

Exhibit 3, Schedule C § 3(d). This provision discriminates among city contractors based on the racial makeup of their workforce. Contractors that have all minority employees are under no obligation to deploy their "best efforts" to change their racial composition. By contrast, a contractor that has mostly white employees, and any contractor that falls short of the city's diversity "goals," must undertake its "best efforts" to change the racial makeup of its workforce as a condition of receiving city work. This violates 42 U.S.C. § 1981, which gives every "person" the "same right" to make and enforce contracts with the city, without regard to the racial makeup of the contracting party. It also violates the Equal Protection Clause by foisting a "best efforts" requirement only on the subset of city contractors that are insufficiently female or minority.

144.   The city's diversity-and-inclusion goals will also compel or induce city contractors to give discriminatory preferences to minorities and women at the expense of white men. By requiring contractors to employ their "best efforts" to ensure that 32 percent of all construction employment hours are allocated to male minorities, and that 7 percent of all construction employment hours are allocated to women, and by requiring contractors to use their "best efforts" to add minority males and women to their permanent or steady workforces, the city is requiring contractors to divert employment opportunities away from white men who would have been awarded that work in a color-blind and gender-neutral process. This violates 42 U.S.C. § 1981, which prohibits private entities from discriminating on account of race when making employment contracts. And it violates the Equal Protection Clause because these discriminatory employment practices are attributable to the "best efforts" edicts in the city's PLAs. See *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614–15 (1989).

145.   The court should therefore declare that Executive Order 8-15, Executive Order 4-20, the City of Philadelphia's Project Labor Agreement, the 15th Street Project PLA, and the Runway Project PLA violate 42 U.S.C. § 1981 and the Equal Protection Clause. It

should enjoin the defendants from enforcing them, and it should enjoin the defendants from imposing diversity-and-inclusion goals on any current or future project.

## COUNT 3

### The Project Labor Agreements And Executive Orders Violate State and City Competitive-Bidding Laws

146. Section 3911(a) of the Commonwealth Procurement Code (Procurement Code) requires that in any "contract to be entered into by a government agency through competitive sealed bidding, the contract shall be awarded to the lowest responsible and responsive bidder within 60 days of the bid opening, or all bids shall be rejected except as otherwise provided in this section." 62 Pa. Cons. Stat. § 3911(a).

147. Section 8-200 of the City of Philadelphia Home Rule Charter also mandates competitive bidding and award of a contract to the lowest responsible bidder.

148. Article III, Section 22 of the Pennsylvania Constitution also mandates competitive bidding and states that the General Assembly "shall maintain by law a system of competitive bidding under which all purchases of materials, printing, supplies or other personal property used by the government of this Commonwealth shall so far as practicable be made." The Pennsylvania Commonwealth Court has held that Article III, section 22 of the Pennsylvania Constitution applies to services and construction projects. *See Allan Myers, L.P. v. Dep't of Transp.*, 202 A.3d 205, 211 (Pa. Cmwlth. 2019).

149. These competitive-bidding requirements "guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts . . . and are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders." *Yohe v. City of Lower Burrell*, 208 A.2d 847, 850 (Pa. 1965).

150. The intent of competitive-bidding statutes is "to 'close, as far as possible, every avenue to favoritism and fraud in its varied forms.'" *Premier Comp Solutions, LLC v. Department of General Services*, 949 A.2d 381, 382 n.1 (Pa. Cmwlth. 2008) (quoting *Loucheim v. Philadelphia*, 66 A. 1121, 1122 (Pa. 1907)).

151.  Bidders for a public contract must be "on an equal footing" and enjoy the same opportunity for open and fair competition. *See Philadelphia Warehousing and Cold Storage v. Hallowell*, 490 A.2d 955, 957 (Pa. Cmwlth. 1985).

152. When there is no common standard on which bids are based, "[t]he integrity of the competitive bidding process is violated and the purpose of competitive bidding is frustrated." *Allan Myers, L.P. v. Dep't of Transp.*, 202 A.3d 205 (Pa. Cmwlth. 2019).

153. Thus, when the actual "procedures followed emasculate the benefits of [competitive] bidding, judicial intervention is proper." *Id*. (quoting *Ezy Parks v. Larson*, 454 A.2d 928, 932 (Pa. 1982)); *see also Conduit and Foundation Corporation v. City of Philadelphia*, 401 A.2d 376, 379 (Pa. Cmwlth. 1979) ("[T]he courts will not condone a situation that reveals a clear potential to become a means of favoritism, regardless of the fact that the . . . officials may have acted in good faith in the particular case.")).

154. The project labor agreements violate the Commonwealth and City competitive-bidding laws because they discriminate against United Steelworkers contractors, afford contractors already maintaining a collective-bargaining agreement with the Unions a competitive advantage, play favorites with contractors affiliated with the Unions, and do not create a level playing field.

155. The diversity-and-inclusion goals in the project labor agreements violate the Commonwealth and City competitive-bidding laws for similar reasons: They discriminate against contractors and unions who are unable or unwilling to agree to the city's requirements, afford a competitive advantage to contractors and unions who already comply with the city's diversity-and-inclusion goals, play favorites with contractors and unions based on their racial and demographic makeup, and do not create a level playing field.

156. Contractors that already maintain collective-bargaining agreements with the city-approved unions will be able to use their current workforce and their current collective-bargaining agreement, while the contractor plaintiffs would be forced hire new employees through the union hiring hall.

157. Moreover, contractors that already maintain a collective-bargaining relationship and even contractors that have no bargaining relationship with any union have a competitive advantage because they would not be forced to violate the NLRA and the Labor Management Relations Act to work on a City public-works project.

158.  This means that the plaintiffs are precluded from work on every City public-works project that imposes a project labor agreement.

159.  Thus, Executive Order 8-15, Executive Order 4-20, the city of Philadelphia's project labor agreement, the 15th Street Project PLA, and the Runway Project PLA, do not prescribe common standards for all bidders, and all contractors bidding on the City's public-works projects are not on an equal footing.

160.  Furthermore, the City of Philadelphia's project labor agreement, the 15th Street Project PLA, and the Runway Project PLA violate the integrity of the competitive-bidding process.

161.  The court should declare that Executive Order 8-15, Executive Order 4-20, the City of Philadelphia's Project Labor Agreement, the 15th Street Project PLA, and the Runway Project PLA violate state and city competitive-bidding laws. It should enjoin the defendants from enforcing them, and it should enjoin the defendants from imposing any project labor agreement on any current or future project.

## COUNT 4
**The Project Labor Agreements And Executive Orders Were Imposed in Violation of the City Charter**

162.  Under Section 8-200 of the Home Rule Charter, only the City Council or the Procurement Department may prescribe and regulate the process by which purchases and contracts are awarded.

163.  Executive Order 15-11, Executive Order 8-15, and Executive Order 4-20 circumvent the City Council and the Procurement Department by empowering the Mayor to

directly regulate the process by which City contracts are procured, in violation of section 8-200 of the Home Rule Charter.

## DEMAND FOR RELIEF

164.  The plaintiffs respectfully request that this Court:

  a.  Declare that the City of Philadelphia's Project Labor Agreement, the 15th Street Project PLA, the Runway Project PLA, Executive Order 8-15, and Executive Order 4-20 violate the plaintiffs' rights under the First and Fourteenth Amendments;

  b.  Declare that the diversity-and-inclusion goals in the City of Philadelphia's Project Labor Agreement, the 15th Street Project PLA, the Runway Project PLA, Executive Order 8-15, and Executive Order 4-20 violate 42 U.S.C. § 1981 and the Equal Protection Clause, the First and Fourteenth Amendments, and state and city competitive-bidding laws, including section 3911(a) of the Commonwealth Procurement Code, section 8-200 of the City of Philadelphia Home Rule Charter, and Article III, section 22 of the Pennsylvania Constitution;

  c.  Declare that the defendants are violating the plaintiffs' federally protected rights under 42 U.S.C. § 1983;

  d.  Declare that the City of Philadelphia's Project Labor Agreement, the 15th Street Project PLA, the Runway Project PLA, and Executive Order 8-15 violate state and city competitive-bidding laws, including section 3911(a) of the Commonwealth Procurement Code, section 8-200 of the City of Philadelphia Home Rule Charter, and Article III, section 22 of the Pennsylvania Constitution;

  e.  Permanently enjoin the defendants from enforcing Executive Order 8-15 and Executive Order 4-20, or from imposing a project labor agreement on

projects procured by the City of Philadelphia, including its subdivisions and agencies;

f.      Permanently enjoin the defendants from disfavoring or discriminating against any city contractor or subcontractor, or any prospective city contractor or subcontractor, on account of the union affiliation (or non-union affiliation) of its employees, or its willingness or ability to agree to or comply with the city's diversity-and-inclusion goals;

g.      Permanently enjoin the defendants from disfavoring or discriminating against the United Steelworkers or any other union on account of its willingness or ability to agree to the city's diversity-and-inclusion goals;

h.      award the plaintiffs nominal and compensatory damages under 42 U.S.C. § 1983;

i.      award the plaintiffs costs and attorneys' fees under 42 U.S.C. § 1988;

j.      award all other relief that the Court deems just, proper, or equitable.

Respectfully submitted.

 /s/ Walter S. Zimolong

JONATHAN F. MITCHELL
Pennsylvania Bar No. 91505
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

WALTER S. ZIMOLONG
Pennsylvania Bar No. 89151
Zimolong, LLC
P.O. Box 552
Villanova, Pennsylvania 19085
(215) 665-0842
wally@zimolonglaw.com

Dated: September 3, 2021

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on September 3, 2021, I served this document through CM/ECF upon:

AMY M. KIRBY
LYDIA FURST
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania 19102
(215) 683-3566
amy.kirby@phila.gov
lydia.furst@phila.gov

*Counsel for Defendants*

/s/ Walter S. Zimolong
WALTER S. ZIMOLONG
*Counsel for Plaintiffs*