# Exhibit 7

**(Plaintiffs' First Set of Requests For Admission, With Exhibits)**

| | |
|---|---|
| Road-Con, Inc.; Neshaminy Constructors, Inc.; Loftus Construction, Inc.; PKF-Mark III; and **Scott A. Lavaca**, <br><br> Plaintiffs, <br><br> v. <br><br> **City of Philadelphia**; and **James Kenney**, in his official capacity as mayor of the City of Philadelphia, <br><br> Defendants. | Case No. 2:19-cv-01667-JS |

## PLAINTIFFS' REQUESTS FOR ADMISSIONS DIRECTED TO THE CITY OF PHILADELPHIA AND JAMES KENNEY

Plaintiffs, Road-Con, Inc., Neshaminy Constructors, Inc., Loftus Construction, Inc., PKF-Mark III, and Scott A. Lavaca, pursuant to Fed. R. Civ. P. 36 serve these requests for admission on Defendants, City of Philadelphia and Mayor James Kenney, as follows:

### DEFINITIONS

1.      "City" shall mean Defendant the City of Philadelphia, and its servants, agents, employees, representatives, divisions, managers, accountants, and attorneys, and anyone else acting on its/their behalf.

2.      "Mayor" shall mean Defendant the Mayor James Kenney, and his servants, agents, employees, representatives, divisions, managers, accountants, and attorneys, and anyone else acting on its/their behalf.

3.    "Executive Order 15-11" shall mean Public Works Project Labor Agreements, Executive Order No. 15-11 (Nov. 29, 2011), executed on November 29, 2011 by Mayor Michael A. Nutter.

4.    "Executive Order 8-15" shall mean Public Works Project Labor Agreements, Executive Order No. 8-15 (Dec. 31, 2015), executed on December 31, 2015 by Mayor Michael A. Nutter.

5.    "15th Street Bridge Project" shall mean the project described in Bid Solicitation B1904805 and known as the 15th Street Bridge Rehab Over City Branch Railroad Cut project.

6.    "Runway Project" shall mean the project described in Bid Solicitation No. B1904626 and known as the PW Bid for PNE-0340.24 Runway 6-24 Pavement Rehabilitation – Package 2 project.

## REQUESTS FOR ADMISSION

1.    Plaintiff Road-Con, Inc. ("Road-Con") is a heavy and highway contractor.

2.    Road-Con's principal place of business is located at 902 Camaro Run Drive, West Chester, Pennsylvania 19380.

3.    Road-Con is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

4.    Neshaminy Constructors, Inc. ("Neshaminy") is a heavy and highway contractor.

5.    Neshaminy's principal place of business is located at 1839 Bustleton Pike, P.O. Box 405, Feasterville-Trevose, Pennsylvania 19053-7309.

6.     Neshaminy is a taxpayer of the City of Philadelphia.

7.     Neshaminy pays Business Income and Receipts Tax (BIRT).

8.     Neshaminy is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

9.     Loftus Construction, Inc. ("Loftus") is a heavy and highway contractor.

10.    Loftus's principal place of business is located at 1903 Taylors Lane, Cinnaminson, New Jersey 08077.

11.    Loftus is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

12.    Road-Con, Neshaminy, and Loftus are members of the Pennsylvania Heavy and Highway Contractors Bargaining Association (the "Association").

13.    A copy of the collective bargaining agreement between the Association and the United Steelworkers is attached at Exhibit "A."

14.    The collective-bargaining agreement between the Association and the United Steelworkers governs the terms and conditions of employment at Road-Con, Neshaminy, and Loftus.

15.    PKF-Mark III ("PKF") is a heavy and highway contractor.

16.    PKF's principal place of business is located at 170 Pheasant Run, Newtown, Pennsylvania 18940.

17.    PKF is a signatory to a collective-bargaining agreement with United Steelworkers Local 15024.

18.    A true and correct copy of PKF's collective bargaining agreement with

the United Steelworkers is attached at Exhibit "B."

19.    The collective-bargaining agreement between PFK and the United Steelworkers governs the terms and conditions of employment at PKF.

20.    PKF is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

21.    PKF is also a taxpayer of the City of Philadelphia.

22.    PKF pays Business Income and Receipts Tax (BIRT), sales and use tax, and city wage taxes to the city.

23.    Scott A. LaCava ("LaCava") is an adult individual who resides in the Commonwealth of Pennsylvania.

24.    LaCava is an employee of Road-Con.

25.    LaCava is a member of the United Steelworkers.

26.    The employees of Road-Con, Neshaminy, Loftus, and PKF have chosen the United Steelworkers to be their bargaining representative.

27.    The collective-bargaining agreement between PFK and the United Steelworkers governs the terms and conditions of employment at PKF.

28.    Road-Con, Neshaminy, Loftus, and PKF have completed many projects for state and federal agencies, including PennDOT and SEPTA, which include projects owned by those agencies located within the City.

29.    On November 29, 2011, then-Mayor Michael A. Nutter signed the Executive Order 15-11.

30.    An authentic copy of Executive Order 15-11 is attached as Exhibit "C."

31.     Attached to the Executive Order 15-11 is a document entitled "Philadelphia Public Projects Labor Agreement."

32.     An authentic copy of the Philadelphia Public Projects Labor Agreement is attached to this stipulation as Exhibit "D."

33.     On December 31, 2015, then-Mayor Michael A. Nutter signed the Executive Order 15-11.

34.     An authentic copy of Executive Order 8-15 is attached as Exhibit "E."

35.     Attached to the Executive Order 8-15 is a document entitled "Philadelphia Public Projects Labor Agreement."

36.     This Philadelphia Public Projects Labor Agreement serves as a model project labor agreement for the city to use when it decides to impose a project labor agreement on a public-works project.

37.     The City has been imposing project labor agreements on all public-works construction projects with an estimated cost in excess of $3,000,000.

38.     The City and the Mayor have imposed project labor agreements even when a City Agency has not recommended a PLA for a particular public-works project.

39.     The unions currently affiliated with the Philadelphia Building & Construction Trades Council are:

    a.  I.B.E.W. Local 98;

    b.  I.B.E.W. Local 269;

    c.  I.B.E.W. Local 654;

    d.  Elevator Constructors Local 5;

e. SEIU 32BJ;

f. Insulators & Allied Workers Local 14;

g. Insulators & Allied Workers Local 89;

h. Cement Masons Plasters Union Local 592;

i. Operative Plasters and Cement Masons' Local 8;

j. Iron Workers Local 401;

k. Iron Workers Local 451;

l. Laborers' District Council of the Metropolitan Philadelphia Area and Vicinity;

m. Laborers' Local 135;

n. Laborers' Local 57;

o. Laborers' Local 332;

p. Laborers' Local 413;

q. Operating Engineers Local 835;

r. Operating Engineers Local 542;

s. Painters & Allied Trades, District Council 21;

t. Plumbers Local 690;

u. Reinforced Iron Workers Riggers & Machinery Movers Local Union 405;

v. Roofers Local 30;

w. IATSE Local 8;

x. Sheetmetal Workers Local 19;

y. Sprinklerfitters Local 692;

z. Steamfitters Local 420;

aa. Teamster Locals 312, 384, and 107; and

bb. Bricklayers and Allied Craftworkers Local 1.

40.     As of the date on which this request for admission is answered, the United Steelworkers is neither a member nor an affiliate of the Building Trades Council.

41.     As of the date on which this request for admission is answered, the City has never included the United Steelworkers in any of its project labor agreements.

42.     A true and correct copy of the city's response to an e-mail inquiry sent by Road-Con on March 28, 2019, is attached at Ex. "F."

43.     Road-Con, Neshaminy, Loftus, and PKF are qualified in all respects to perform work on City public-works projects that are subject to a project labor agreement.

44.     At the time the original complaint in this lawsuit was filed on April 18, 2019, the Mayor and the City were imposing project labor agreements on all public works construction projects procured by the City with an estimated cost in excess of $3,000,000.

45.     In March 2019, the City issued a solicited bids for the 15th Street Bridge Project.

46.     The bidding for the 15th Street Bridge Project opened on April 23, 2019.

47.     At the time the original complaint in this lawsuit was filed on April 18, 2019, the city was using a project labor agreement on the 15th Street Bridge Project.

48.     An authentic copy of the Project Labor Agreement that was originally part of the solicitation for the 15th Street Bridge Project is attached at Exhibit "G."

49.     Plaintiffs Road-Con, Neshaminy, and Loftus were interested in submitting bids for the 15th Street Bridge Project at the time the original complaint

was filed on April 18, 2020.

50.     Plaintiffs Road Con, Neshaminy, and Loftus are qualified to perform the work on the 15th Street Bridge Project.

51.     Plaintiff Road Con, Neshaminy, and Loftus have been pre-qualified by PennDOT to perform the type of work necessary to complete the 15th Street Bridge Project.

52.     Because Road-Con, Neshaminy, and Loftus maintain a collective-bargaining agreement with the United Steelworkers, they cannot perform work on the 15th Street Bridge Project with their current workforces.

53.     At the time the original complaint in this lawsuit was filed on April 18, 2019, LaCava could not work on the 15th Street Bridge Project unless he became a member of one of the unions listed in Schedule A of the 15th Street Bridge Project Labor Agreement and supported that union financially.

54.      In March 2019, the City solicited bids for the Runway Project.

55.     At the time the original complaint in this lawsuit was filed on April 18, 2019, the city was using a project labor agreement on the Runway Project (the "Runway Project PLA").

56.     An authentic copy of the Runway Project PLA that was originally a part of the solicitation for the Runway Project is attached at Exhibit "H."

57.     Plaintiffs Road-Con and Loftus were interested in submitting bids for the Runway Project at the time the original complaint was filed on April 18, 2020.

58.     Plaintiffs Road-Con and Loftus are qualified to perform the work on the

Runway Project.

59. Because Road-Con and Loftus maintain a collective-bargaining agreement with the United Steelworkers, they could not perform work on the Runway Project with their current workforces at the time the original complaint was filed.

60. Because Road-Con and Loftus maintain a collective-bargaining agreement with the United Steelworkers, they could not perform work on the Runway Project with their current workforces at the time the original complaint was filed.

Jonathan F. Mitchell                          /s/ Walter S. Zimolong
Pennsylvania Bar No. 91505              Walter S. Zimolong
Mitchell Law PLLC                           Pennsylvania Bar No. 89151
111 Congress Avenue, Suite 400       Zimolong, LLC
Austin, Texas 78701                          P.O. Box 552
(512) 686-3940 (phone)                    Villanova, Pennsylvania 19085
(512) 686-3941 (fax)                         (215) 665-0842
jonathan@mitchell.law                      wally@zimolonglaw.com

Dated: May 28, 2020

                                                      *Counsel for Plaintiffs*

# EXHIBIT "A."

AGREEMENT

BETWEEN

**PENNSYLVANIA HEAVY AND HIGHWAY**

**CONTRACTORS BARGAINING ASSOCIATION**

AND

**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC**

**Expiration Date:   December 31, 2021**

# I N D E X

**Article**                                                                                                    **Page**


I          SCOPE ....................................................................................................1
II         MANAGEMENT ....................................................................................3
III        UNION REPRESENTATIVES ...............................................................5
IV         HOURS OF WORK, HOLIDAY AND PREMIUM PAY .........................5
V          CALL-IN PAY .......................................................................................7

VI         HIRING HALL .......................................................................................8
VII        GRIEVANCES .....................................................................................10
VIII       UNION SECURITY AND CHECK-OFF, CREDIT UNION, USW PAF ...........11
IX         WAGE SCALE .....................................................................................13
X          HEALTH AND WELFARE ....................................................................13

XI         PENSION PLAN ..................................................................................17
XII        APPRENTICE TRAINING AND EDUCATION .....................................20
XIII       NON-DISCRIMINATION CLAUSE ......................................................21
XIV        WAIVER OF RECOURSE TO LEGAL REMEDIES ...........................22
XV         SAFETY................................................................................................22

XVI        FUNERAL LEAVE................................................................................22
XVII       TERMINATION ...................................................................................22
XVIII      STEEL ERECTION...............................................................................23
XIX        FRINGE BENEFITS.............................................................................23

# A G R E E M E N T

**THIS AGREEMENT** made and entered into as of January 1, 2019, by and between the **PENNSYLVANIA HEAVY AND HIGHWAY CONTRACTORS BARGAINING ASSOCIATION**, party of the first part,

AND

**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC**, on behalf of its signatory local unions who are parties to this contract, exclusive collective bargaining agent for those employees of the Company designated in Article I hereafter, hereinafter referred to as the Union, party of the second part.

Wherever the term "Company" appears, such shall be deemed to refer to any of the employer companies represented by the Association party to this Agreement.

**WITNESSETH:** That in consideration of the mutual and reciprocal promises of the parties hereto, the parties covenant and agree as follows:

## ARTICLE I
### SCOPE

**Section 1.**     That this Agreement is for the exclusive, joint use and benefit of the contracting parties, and the provisions herein defined and set forth shall be construed as binding upon and effective in determining the relations between the parties signatory hereto.  It is the intent and purpose of the parties herein to promote and improve industrial and economic relationships in the highway and heavy construction industry and to set forth herein the rates of pay, hours of work, and conditions of employment to be observed by the parties hereto.

**Section 1(a).**     It is agreed by the parties that crew leaders do not have the authority to hire, transfer, suspend, lay off, recall, promote, discharge, reward or discipline employees, or to adjust grievances or effectively recommend such action, except where the exercise of such authority is of a merely routine or clerical nature.  It is further agreed that during the term of this Agreement the employer will not authorize or direct crew leader to engage in such activities.  In view of the agreement between the parties that the crew leaders do not possess any of the authority set forth above, the exercise of such authority may lead with prior notification to the affected individual crew leader having his alleged supervisory authority removed.  The intent of crew leaders classification (due to economic conditions in the current construction industry) is that this classification enables such bargaining unit employee, employed as such, to direct the work force, make individual work assignments and to personally participate in the performance of the work.  The Union acknowledges that the seniority of an individual member has no bearing in the selection of crew leaders.  Such selection and requirement shall be made by the Company in writing solely by the experience, ability and qualifications of the employee(s).  Crew leaders shall be paid in accordance with the practice of each individual Company but in no event less than Three Dollars ($3.00) over the rate for the classification that said crew leader regularly works for all jobs bid after January 1, 2019.

**Section 2.**     This Agreement shall not cover the engineering staff, clerical employees, watchmen, timekeepers, superintendents, assistant superintendents, general foremen, foremen, or any other supervisors having the right to hire or fire or effectively recommend same and in charge of classes of labor, but shall cover all other persons employed by the contractor in the performance of the work herein covered.

**Section 3.**     When the Company, signatory to this Agreement, subcontracts any of its work, covered by this Agreement, it shall, so far as feasible to do so, be subcontracted subject to all terms and conditions of this Agreement to contractors in agreement with the Union.  The Company agrees that when it subcontracts any work to contractors who are not members of the Association, the Company will make an effort to discuss membership with the subcontractor.  In addition, the Company will advise the Union of the name and address of such subcontractor.  The Company shall notify the Union when work is subcontracted as soon as the subcontract agreement has been executed by both parties and such notice shall be submitted on a form acceptable to the Company and Union.  The provisions of this paragraph shall apply also when a Company, signatory to this Agreement, contractually assigns all of its rights and obligations under a construction contract for work covered by this Agreement to another construction contractor who is not a member of the Association.

The Bargaining Association will publish a list of names, addresses, telephone numbers and work classifications of all members of the Association for distribution to the Union.

**Section 4.**     This contract shall not apply to any employee of an independent contractor which the Company might hire or engage for constructing, repairing, replacing, remodeling, improving or dismantling any part of the plant or equipment of the Company.

**Section 5.**     It is mutually understood that the following terms and conditions relating to the employment of workers covered by this Agreement have been decided upon by means of collective bargaining and that the following provisions will be binding upon the Company and the Union during the term of this Agreement and any renewal thereof.  This Agreement during its life may be modified only by mutual written consent of the parties hereto.  The provisions of this Agreement shall be subject to any changes made necessary by reason of Federal and State legislation, regulations or specifications.

**Section 6.**     This Agreement applies only to heavy and highway construction which shall be deemed to include all types of utility work performed within the States of Pennsylvania, Ohio and New York and on all jobs in those states let by an agency or Department of the United States or one of the above noted states authorized to award contracts; i.e., mine flushing--mine fire control, etc.

The Union and the Association are opposed to project labor agreements on heavy and highway projects in Pennsylvania that do not include the Union, as such agreements may exclude contractor members of the Association and/or members of the Union from working on the covered projects, causing significant economic harm and harm to the public interest.  The Union and the Association agree to exercise their best efforts to gain participation in any project labor agreements under consideration on heavy and highway projects in Pennsylvania or otherwise to ensure that project labor agreements excluding the Union are not put in place.

If any project labor agreements excluding the Union are mandated on heavy and highway projects in Pennsylvania, either party may provide written notice to the other requesting to meet and

discuss possible means to allow the contractors to bid and perform work on any such projects and to employ as many members of the Union as possible. The Union and the Association would also continue to exercise best efforts to gain full participation in any such project labor agreement and/or to ensure that project labor agreements excluding the Unions are not put in place.

**Section 7.**     Where any of the contractors who are parties to the subject agreement which is geographically limited to the States of Pennsylvania, Ohio and New York, elect to bid for, solicit or enter into contracts for work of the type covered by the subject agreement in the States of Delaware, Maryland, New Jersey, North Carolina, South Carolina, Tennessee, Virginia and West Virginia in circumstances where such contractor has no contractual relationship with any organized labor union, the United Steelworkers, as a party to the subject Agreement, do hereby consent and approve the contractors in such circumstances covering any of their employees on Delaware - Maryland - New Jersey - North Carolina - South Carolina - Tennessee - Virginia - West Virginia based work with the health and welfare, pension plans and Apprentice Training and Education Funds provided for in the subject agreement so long as coverage for such employees for work in Delaware, Maryland, New Jersey, North Carolina, South Carolina, Tennessee, Virginia and West Virginia is subject to the same contributory payments, terms and conditions as to eligibility, benefits, and any other matters as would be applicable in Pennsylvania, Ohio and New York on work in those states by reference to the terms of the subject agreement and the related health and welfare, pension plan and Apprentice Training and Education trust agreements and collateral documents.

**Section 8.**     Any and all references in this Agreement to the masculine gender shall apply equally to the feminine gender.

**Section 9.**     Workers shall be free to accept employment in any occupational classification which they have the ability and the training to perform, providing there is a vacancy and they shall be paid the scale of wages applicable to the work performed.

**Section 10.**     Notwithstanding any other provisions of this Agreement, the jurisdictional scope of this Agreement with respect to any employer that joins the Association for the first time on or after January 1, 2004 shall be limited to the State of Pennsylvania, and the Harmony Agreement (as negotiated between the United Steelworkers and the Construction Trades unions) shall only apply to such employers.

**ARTICLE II**
**MANAGEMENT**

**Section 1.**     The management of the work, the direction of the working force, assignment of workers to specific projects and the right to hire and discharge for just cause are vested exclusively in the Company, and the Union shall not abridge this right. It is not the intention of this provision to encourage the discharge of employees.

**Section 2.**     The number of workers to be employed, and the number and classification of workers required to operate any piece of equipment shall be at the sole discretion of the employer. The fact that certain classifications and rates are established does not mean that the employer must employ workers for any one or all such classifications or to man any particular piece of equipment that happens to be on the project unless the employer has need for such workers.

**Section 3.**     The Company shall not be hindered in or prevented from using any type or quality machinery, tools, and appliances, and may secure materials or equipment from any market or sources it deems fit without interference of any kind.  The Company recognizes its obligation to provide a safe working environment in accordance with applicable state and federal safety standards.

**Section 4.**     Employees in the excluded category (see Article I, Section 2) shall not perform any work normally performed by workers under their supervision, except in cases of operating difficulties, or to instruct workers, or to assure the proper performance of work or work of an experimental nature providing regular employees are not thereby replaced.

A penalty as set forth below will be paid into the Health & Welfare Fund when any excluded employee violates the above and such violation is determined through the grievance procedure. The penalty shall be equivalent to the amount of time which the excluded employee works in violation of the above at the classification's rate of pay.  The Health & Welfare Fund shall acknowledge receipt of the payment of the penalty, and the Fund's Administrator shall mail a copy of Fund receipt to Pennsylvania Heavy and Highway Staff Representative, United Steelworkers, 1945 Lincoln Highway, North Versailles, PA 15137.   However, where a clear determination can be made that a specific person has been deprived of a specific sum of money by reference to the foregoing, then that person shall be paid such sum instead of a payment into the Fund.

**Section 5.**     All the provisions of this Article shall be subject to all the other provisions of this Agreement.

**Section 6.     Pinpointing.**  The Union agrees to give good faith consideration to "pinpointing" particular projects that come up for bid where there are competitive issues (such as the presence of non-union bidders and/or AFL-CIO bidders with concessions from the Trades) when asked by an Association contractor at least three (3) days before a bid is due with a view toward enabling the Association's contractors' bids to be competitive and/or enabling the Association contractor to self-perform as much work as feasible.  The concessions, if agreed to, will take place in time to provide all Association contractors bidding on the project the results of the concessions at least 24 hours before the bid is due.  Concessions, if agreed to, shall take place when the project begins and will end upon project completion.  There will be no carryover.

As a pre-condition to any pinpointing discussion, the Company must give the Union a list of all anticipated bidders and must provide as much information as possible to establish that pinpointing is needed in order to be competitive and/or to self-perform a specific aspect of the work on the project. The Union agrees to give good faith consideration to any proposed pinpointing but is under no obligation to grant any such concessions. The Local Union President having jurisdiction shall have the Authority to agree to any pinpointing.

Such pinpointing discussions are limited to such cost factors as rates held for the life of the job, the start day of the work week, overtime premiums, holiday pay, weekend premiums, and the like and such discussions are not a basis for negotiating changes in other portions of the Agreement.

During these discussions the Union shall have the right to submit issues that the competitive contractor may be governed by.

## ARTICLE III
## UNION REPRESENTATIVES

**Section 1.**     Upon notice at the project site to the representatives of the Company in charge of the project, authorized representatives of the Union may visit any of the jobs covered by this Agreement during working hours, provided that the progress of the work is not interfered with or hindered.  Such Union representatives must comply with all safety regulations in effect on the project.

**Section 2.**     The Union shall have the right to name a steward from among the employees on each project.  The steward shall be the last employee laid off and the first employee called back on that project provided that he/she is fully qualified to perform any remaining work. Whenever overtime is assigned to the crew of which the steward is a member the steward shall be given the opportunity to work the overtime hours, provided that he/she is qualified to perform the overtime work.  The steward shall be notified of members being laid off and hired on.

**Section 3.**     The Union shall have the right to transfer an existing selected steward on a project for a certain company to be steward on a new project for the same company as its steward, provided there is a classification for such an employee on a new project and, provided further, that the Company shall have the right to require a discussion with the Union staff representative, Local Union President, before it transfers a non-"grandfathered" or non-long term (has worked for the Company for less than twelve (12) months) steward.  Any objections by the Company to the naming of a steward (whether grandfathered, long term or not) shall be considered in good faith by the Union and not unreasonably rejected by the Union.

## ARTICLE IV
## HOURS OF WORK, HOLIDAY AND PREMIUM PAY

**Section 1.**     The regular work day is intended to consist of eight (8) hours per day.  The intention is to work an eight (8) hour day but in no way is this to be construed as a guarantee of either eight (8) hours of work or payment for eight (8) hours of work on any given day.  The regular work week for all employees shall start with the first shift on Monday and shall consist of forty (40) hours which shall be recognized as regular time, and each employee shall be paid for any of these hours he works at the regular rates of pay specified in this Agreement. Hours worked beyond forty (40) in a week shall be paid for at one and one-half (1 ½) times the regular rate of pay with no pyramiding of overtime.  Time and one-half shall be paid for work performed over eight (8) hours per day only as required by the terms of a contract in effect between the contractor and the awarding agency.  Time and one-half the regular rate shall be paid for all work performed on Saturday except where, due to conditions on a job arising out of inclement weather, where the project is required to work Saturday by the awarding agency, or where the contractor does not have access to the roadway or worksite for at least eight (8) continuous daylight hours during each weekday, Saturday will be a straight time day if the employee has not worked more than five (5) days or forty (40) hours in the week prior to Saturday.  In the event that regular Saturday overtime is scheduled for the project (in the case of a regular six day work week), but forty (40) hours have not been worked in a work week prior to Saturday due to inclement weather, any Saturday time worked in such situations will be paid at a rate of time and one-half the regular rate as planned.  In the event make-up time is to be worked on Saturday, not less than a four (4) hour day shall be scheduled.  Double time the regular rate shall be paid for all work performed on the

seventh consecutive day of work whether or not such is required by the terms of a contract in effect between the contractor and the awarding agency.

**Section 2.      Holidays.**  Memorial Day, Independence Day, Labor Day and Thanksgiving Day shall be paid holidays, although idle, at eight (8) (or the employee's regularly scheduled hours if over 8) times the employee's regular hourly rate provided the employee worked his last scheduled work day before and the first scheduled work day after the holiday within the week prior to the holiday, the week of the holiday, or the week after the holiday occurred.  Moreover, double time the employee's regular rate shall be paid for all work performed on the following legal holidays: New Year's Day and Christmas Day.  In the case of the aforementioned holidays, they shall be considered, although not worked, as the equivalent of eight (8) hours' time worked for the purpose of computing any premium overtime required by law or by contract.  If work is performed on Memorial Day, Independence Day, Labor Day or Thanksgiving Day, the employee shall be paid his or her regular rate plus the double time referred to above.  An employee, upon furnishing a request for the time off during the preceding calendar week, may be granted time off without pay during the three (3) days of deer season; such days, if not worked, shall not be counted as hours worked for the purpose of computing overtime.

If an employee works during the existing window period prior to Thanksgiving but is prevented from working during the existing window period following Thanksgiving solely because the contractor has not scheduled work, then such employee shall be paid for Thanksgiving.

Except as provided herein, the cost of providing paid time off for holidays in accordance with this section will not be credited against the prevailing fringe benefit rate on prevailing wage jobs. Neshaminy Constructors, Inc. and Alex Paris Contracting have previously credited the cost of providing holiday pay against the prevailing fringe benefit rate on prevailing wage jobs and may continue to do so.

**Section 3.**      Absence due to an injury received on the job which is compensable will be counted as time worked for the purpose of computing holiday pay, and in no case will this absence disqualify the employee for holiday pay, provided such absence does not exceed thirty (30) days.

**Section 4.**      No employee shall be laid off during his or her regular work week for the purpose of avoiding payment of premium time or payment for the seventh (7th) consecutive day worked, Sunday, or paid holidays.

**Section 5.**      For all jobs bid after January 1, 2019, if the operation is put on more than one (1) shift, a shift premium of one dollar ($1.00) per hour for the second and third shifts shall be added to the regular rate of pay for hours worked on the second and third shifts respectively.
In the event that the jobsite is working only one shift and employees work second shift or third shift hours, a premium of fifty (50¢) per hour shall be added to the regular rate of pay for hours worked on the second and third shifts.

For the purposes of this Agreement, an employee who starts work on or after 12:00 Noon but before 8:00 P.M. shall have his/her working hours considered second-shift hours, and an employee who starts work on or after 8:00 P.M. but before 4:00 A.M. shall have his or her working hours considered third-shift hours.

Any shift premium paid under this section shall be included in the basic hourly rates for purposes of overtime in this Agreement.

**Section 6.**     In case an employee is injured on the job, the employee will be paid his/her applicable rate for time spent at the medical treatment site, including travel time, up to a total equal to the employee's regular shift for that day.  If the doctor does not return the employee to work that day, the employee shall receive his applicable rate for the balance of his/her regular shift.

**Section 7.**     A Union official who is prevented from working his or her scheduled day before or after a holiday because of Union business will still be eligible to receive payment for the holiday, provided that the Company receives written notice of the official union business at least one week prior to the absence.

**ARTICLE V**
**CALL-IN PAY**

**Section 1.**     For all jobs bid after January 1, 2019, an employee who has been scheduled or notified to report for work and reports at the proper time shall be paid for one hour (but in no event less than Sixty-Five ($65.00) Dollars) at the regular scale of wages and shall be required, in consideration of receiving such call-in pay, to wait a minimum of one hour until it can be determined whether the employee can go to work.   For all jobs bid after January 1, 2021, the call-in pay shall not be less than Seventy ($70) Dollars.  It is understood that the Company shall pay fringe benefits out of call-in pay.  Call-in pay shall not be credited for purposes of computing overtime pay but shall be credited toward the eligibility for holiday pay.   From the time such employee commences work he shall be paid for all actual working time according to the following examples:

(a)    If the employee reports for work and waits for one-half (½) hour before commencing work and then works for 7½ hours, he/she shall be paid for eight (8) hours.

(b)    If the employee reports for work and waits for one (1) hour before commencing work and then works for seven (7) hours, he/she shall be paid for eight (8) hours.

If an employee reports for work and starts to work, he/she will be guaranteed two hours' pay; if an employee reports for work and waits for one hour and then starts to work, he/she will be guaranteed two hours' pay; if an employee reports for work and waits for one hour but does not start to work, he/she will be paid no less than the applicable call-in rate for the one-hour waiting period.

**Section 2.**     At the end of the mandatory one-hour waiting period set forth above, the employer shall either put the employee to work, send him or her home or request the employee to wait for additional time. For all jobs bid after January 1, 2019, the employee shall be paid no less than Thirty ($30) Dollars for any additional waiting time requested of him/her by the Company for the length of such waiting period in addition to the initial one hour.  For all jobs bid after January 1, 2021, the employee shall be paid no less than Thirty-Five ($35) Dollars for any additional waiting time.  Fringe benefits will be paid in addition to the additional waiting time payment.

**ARTICLE VI**
**HIRING HALL**

**Section 1.**     For the duration of this Agreement, the Union agrees to furnish, upon request by the Employer, workers in numbers sufficient to execute the work contracted for by the Employer in the manner and under the conditions specified in this Agreement.  The Employer agrees that all employees required for all work within the scope of this Agreement shall be hired only through the Union.

**Section 2.**     Each Employer shall have the right to request an employee or employees by name who worked on a project which had been shut down in whole or in part, provided that the Employer does not bypass said employee or employees when requesting additional referrals to do the work of said employee or employees.

**Section 3.**     Each Employer shall have the right to request any employee by name who has been on layoff from that Employer for 365 days or less.

**Section 4.**     Referrals will be on a non-discriminatory basis and will not be affected in any way by Union membership, bylaws, rules, regulations, constitutional provisions or other aspects of Union membership, policies or requirements, except to the extent that these may not be in violation of applicable law.

**Section 5.**     Each Employer shall have the right to reject any applicant referred for employment provided the rejection is not based on any reason identified in Section 9(d) of this Article or to "cherry pick" the list.  The Union shall have the burden of proving that the purpose was to "cherry pick."

**Section 6.**     Each Employer shall have the right at any time to lay off any employee for any reason not prohibited by law or identified in Section 9(d) of this Article.

**Section 7.**     The work rules of each individual Employer shall not be affected by this Hiring Hall Agreement.  For example, individual Employer rules as to drug testing or safety shall not be affected.

**Section 8.**     If the Union is unable to fill an Employer's request for employees within forty-eight (48) hours, the Employer shall be free to hire from the outside, provided said employees are hired pursuant to the Union Security and Check-Off Article of this Agreement.  In the event of an emergency need for employees, the Employer shall first notify the Union, and if the Union cannot supply employees in sufficient numbers on an emergency basis, the Employer shall be free to fill the need on a temporary basis.  Such temporary workers shall be replaced by the Employer with employees supplied by the Union.

**Section 9(a).**    If during the term of this Agreement the Labor Management Relations Act of 1947, as amended, shall be further amended to so permit or the decision of a court of competent jurisdiction so permits, then the restrictive provisions of this Article, by which the Union may be required to refer non-members to employment, shall be immediately ineffective.

(b)    The Union agrees that it shall be the sole administrator of the Hiring Hall arrangement and shall not be considered to act as the agent of the Employer, and, thereby, the Union assumes

responsibility for any violations of the law committed by it in connection with its administration of the Hiring Hall arrangement.

(c)     The Employer assumes responsibility for any violations of the law committed by the Employer in connection with hiring or severance of employment.

(d)     The parties to this Agreement agree that they will not discriminate against any applicant for employment or any employee because of race, creed, color, national origin, sex or occupationally irrelevant physical requirements or handicaps, age, exercising any rights under the National Labor Relations Act, or Union membership.

(e)     All employees must put their name on the out-of-work list no later than forty-eight (48) hours after their last day of work with the Employer unless they are on leave such as FMLA, disability, Union, or any contractual leave.  In applying this subsection (e), an employee who fails to place his/her name on the out-of-work list shall cease to receive welfare benefits.

(f)     The Union hereby agrees to indemnify and hold harmless the Employer from and against any and all costs, expenses (including attorneys' fees), and damages that may be incurred in connection with any action, suit, claim or proceeding that may be brought against the Employer which arises from or relates to its obligations or responsibilities set forth in this Article.

**Section 10.**    At all times, any conflict between this Hiring Hall Agreement and federal or state laws or contractual requirements shall be resolved in favor of such requirements.

**Section 11.**    The Union agrees to provide the Association with copies of all rules, procedures and policies used by it in administering this Hiring Hall Agreement.  Current copies of these documents shall at all times be provided.

**Section 12.**    At all times the employee must leave with the project bookkeeping department a telephone number and his/her home mailing address at which the employer can immediately contact the employee for the purpose of notifying him or her of available work.

**Section 13.**    The Company agrees to notify the Local Union Office of the Union having jurisdiction over any of its projects under this Agreement of the following:

(a)     The location of the specific project.

(b)     Job classifications of work available and the number of employees desired for each classification.

(c)     All new jobs.  Failure to so notify shall make the employer subject to a penalty payment of $500 into the Health & Welfare Fund.  The Health & Welfare Fund shall acknowledge receipt of the payment of the penalty, and the Fund's Administrator shall mail a copy of the Fund receipt to the Union.  The above-referenced notification is to be sent to Pennsylvania Heavy and Highway Staff Representatives, United Steelworkers, 1945 Lincoln Highway, North Versailles, PA 15137.

(d)     The Company shall also notify the Union by telephone of all new projects.

**Section 14.** To enhance the USW's ability to refer qualified applicants to the Company, the Union agrees to personally interview each new applicant to the Hiring Hall prior to referring him/her to the Company.

The Union agrees to develop with the Association a skills assessment document for contractors to complete regarding workers referred by the Hiring Hall. The Union will control this document. The Company agrees to complete the Union's assessment document.

The Union agrees to supply qualified minority and female workers, if required by the contract or governmental regulations and when requested by the Company. The Union understands that a qualified minority and female applicant may have priority over others based on the governmental regulations.

The Union agrees that they will not refer applicants who are already working for another PHHCBA contractor, nor will they present another assignment to a worker who is already working for a PHHCBA contractor in order to fulfill the needs of another PHHCBA contractor.

The Company shall have the right to provide the Union with the names and qualifications of any employee from another state or otherwise. The Union may or may not verify said qualifications of said employee. The Union agrees to place the name of that person on its out-of-work list, provided that said person(s) meet all requirements of the Hiring Hall. The Union will send such person before sending any other person from its "D" list.

## ARTICLE VII
## GRIEVANCES

**Section 1.** Should differences arise as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise on the project, an earnest effort will be made to settle such differences, immediately in the following manner, during which time there shall be no suspensions, lockouts, interruptions, or impeding of work, concerted work stoppages, strikes or other interferences with efficient production and plant maintenance.

**FIRST:** Between the aggrieved party who may be accompanied by the Job Steward, if the employee desires his or her presence, and the Company supervisor within seven (7) calendar days from the day the aggrieved party knew or reasonably should have known of the grievance. If this time limit is not met, the grievance shall be deemed to have been waived.

**SECOND:** Should agreement not be reached between the Job Steward and the Company supervisor, the grievance must be reduced to writing and referred to the staff representatives of the Union or designee and representatives of the Company within ten (10) calendar days from completion of the First Step. The contractor shall respond to second step grievances by reducing their response to writing, after conferring with the Union representative in an attempt to resolve the grievance, within ten (10) calendar days of the receipt of same.

**THIRD:** Should agreement not be reached in the Second Step, a Union Committee shall be convened by the Union to review the grievance and determine if the grievance shall be processed to the Fourth Step. This Third Step must be completed no later than fifteen (15) days following the Second Step.

**FOURTH:** Should this procedure fail, the matter shall, within the next thirty (30) days, be jointly and simultaneously reported in writing by either party to the Chairman of the Bargaining Committee for the Association and the Chairman of the Negotiating Committee for the United Steelworkers, and these two or their representative nominee shall attempt to resolve the matter. This Fourth Step shall take no longer than thirty (30) days. In the event that the grievance is not resolved within 30 days after conclusion of the Third Step, then the Fourth Step shall be deemed concluded.

**FIFTH:** Should this procedure fail, either party, after notifying the other party of its intention to proceed, shall do so pursuant to the procedures of the American Arbitration Association. The decision of the arbitrator shall be final and binding. The fees and expenses of the arbitrator so selected shall be borne equally by the Company and the Union. This action must take place within fifteen (15) days of the failure to resolve in the Fourth Step.

The failure of either party to meet these time limits specified in the SECOND, THIRD, FOURTH and FIFTH steps shall result in a default. A condition precedent to extending any of these time limits shall be a mutual written agreement of the parties.

The arbitrator shall not have the authority to add to, detract from or otherwise modify the terms and conditions of this Agreement.

**Section 2.** A decision reached at any stage of the proceedings above outlined shall be binding upon both parties hereto and shall not be subject to reopening by any other party except by mutual agreement.

**Section 3.** On a case-by-case basis, each Employer and the Union may agree upon mediation rather than arbitration of any grievance.

**Section 4.** In the event the Union initiates the grievance at the Second Step rather than the First Step, the written grievance shall be filed with the contractor within seven (7) calendar days from the day the aggrieved party knew or reasonably should have known of the grievance.

**Section 5.** The Company is authorized to use said grievance procedure should differences arise which may result in the Company wishing to initiate a grievance against the Union. Any such grievance shall start at the level of the local union president.

**ARTICLE VIII**
**UNION SECURITY AND CHECK-OFF, CREDIT UNION, USW PAF**

**Section 1.** It shall be a condition of employment that all employees of the employer covered by this Agreement who are members of the Union in good standing on the effective or execution date of this Agreement, whichever is the later, shall remain members in good standing, and those who are not members on the effective or execution date of this Agreement, whichever is later, shall on the eighth (8th) day following the effective or execution date of this Agreement, whichever is the later, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after this effective or execution date, whichever is the later, shall on the eighth (8th) day following the beginning of such employment become and remain members in good standing in the Union.

**Section 2(a).** The membership dues, including initiation fees and assessments of United Steelworkers, as authorized and approved by the International Officers of the Union shall be checked off the wages of such employees as file proper assignments with the Company to United Steelworkers, Box 644485, Pittsburgh, PA 15264-4485. In the case of the Union's prescribed initiation fee, the employer shall deduct fifty percent (50%) during the first week of employment and fifty percent (50%) during the second week of employment.

In addition, each employer shall send two copies of its monthly dues check-off report to the Union at the following address: one to Pennsylvania Heavy and Highway Staff Representative, United Steelworkers, 1945 Lincoln Highway, North Versailles, PA 15137, and the other to the local union that has jurisdiction over the project where the work is being performed.

**Section 2(b).** Each Employer shall, by payroll deduction, deliver and pay over to the local Union an amount of not less than ten cents (10¢) for all hours worked during the previous calendar month by all persons employed in the bargaining unit. Such payment shall be made by each Employer to the local Union office having jurisdiction on or before the tenth (10th) day of the month covering all such hours for all pay periods in the previous calendar month.

**Section 3.** Such remittance shall be accompanied by an itemized statement showing the name of each employee and the amount checked off for dues, initiation fees or assessment, together with a list of employees from whom dues, initiation fees or assessments have not been collected.

**Section 4.** In the event of an overcharge for dues or assessments collected by the Company, the Union shall be responsible for adjustment of such claim with the member. In the event of an undercharge and upon proper notification by the Union, the Company shall make further deduction for this purpose on the next succeeding payday.

**Section 5.** Pursuant to the rules and regulations of the United Steelworkers, no assessments may be levied by any local Union against its members without the approval of the International officers of the Union.

**Section 6.** The Company shall deduct, on behalf of the employee, credit union contributions in the case of any employee who supplies to his or her employer an individual signed authorization in support of such deduction. Each individual employee's contribution shall be uniform for any calendar year and not subject to change during such year.

**Section 7.** The Company shall deduct on behalf of the employee, USW PAF voluntary contributions based upon forms supplied by the Union.

**Section 7(a).** The signing of such USW PAF check-off form and the making of such voluntary contributions are not conditions of membership in the Union or of employment with the Employer.

**Section 7(b).** The Union shall indemnify, defend and hold the Employer harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of action taken or not taken by the Employer for the purpose of complying with any of the provisions of this Article.

**Section 7(c).** The United Steelworkers' Political Action Fund supports various candidates for federal and other elective office, is connected with the United Steelworkers of America, a labor

organization, and solicits and accepts only voluntary contributions, which are deposited in an account separate and segregated from the dues fund of the Union, in its own fund-raising efforts and in joint fund raising efforts with the AFL-CIO and its Committee on Political Education.

## ARTICLE IX
## WAGE SCALE

**Section 1.**     On any heavy and highway work where minimum wage rates are predetermined by the United States or Pennsylvania Department of Labor such wage rates shall prevail on such work.

**Section 2.**     Wage rates in effect at the advertising date of a specific project will establish the wage scale for the entire duration of that project regardless of the termination date of this Agreement and are not to be subject to renegotiation for the duration of that project.

**Section 3.**     For all projects on which rates have not been predetermined by either the Commonwealth of Pennsylvania or an agency of the United States government and which involve highway maintenance and purchase orders let by PennDOT, Counties, Townships and Municipalities within the Commonwealth, and utility work, the rates applicable on such work shall be the rates set forth in the Second Tier Wage Schedule.

**Section 4.**     Any employee assigned to work on a project covered by second tier wage rates shall be free to refuse the work assignment if the work assignment is located outside a sixty (60) mile radius from the home of the employee.

**Section 5.**     Second tier wage rates shall be increased by 3% in all groups effective January 1, 2019.  Second tier wage rates shall be increased by 3% in all groups effective January 1, 2020 and 3% January 1, 2021.

In addition to the above increases, the Group 7 wage rates will be increased by an additional 20¢ effective January 1, 2019, and 20¢ effective January 1, 2021.  For second tier wages only, there shall be a flag person rate of Fifty Cents (50¢) per hour below the laborer.  If an employee performs laborer work within the shift and is moved to flagger, the employee will be paid as a laborer for the shift.

The Contractor will pay the required pension contribution on 2d Tier work.  The employer's share of the H&W contribution rate will be $10.10 effective April 1, 2019, and the contractors will pay up to 50¢ toward any increase in the hourly contribution rates effective April 1, 2020 and up to 50¢ toward any increase in the hourly contribution rates effective April 1, 2021.

On second tier jobs, if the appropriate health and welfare fund contributions made on behalf of any employee are less than those called for in the 2d Tier wage schedule due to election of less costly plan options, the difference between the required health and welfare contribution and the actual contribution will be paid to the employee as wages.

## ARTICLE X
## HEALTH AND WELFARE

**Section 1.**     The Association and the Union shall continue to maintain, during the life of this Agreement, a Welfare Fund to be known and designated as the "United Steelworkers District 10

and Pennsylvania Heavy & Highway Contractors Welfare Fund."  It shall be the duty of the Trustees, comprised of members of the Union and the Company, to administer the said Welfare Fund and to promulgate such rules and regulations as may be necessary for the efficient administration of said Welfare Fund, all in accordance with and not inconsistent with the provisions of this Agreement.  The purpose of the said Welfare Fund shall be to secure and provide certain insurance benefits as hereinafter set forth for the employees of the Company represented by the Union, together with their dependents.  The liability of each Company to make the prescribed health and welfare contributions shall be several and not joint.

**Section 2.**     Effective January 1, 2019, each company represented by the Association shall deliver and pay over to the Administrator of said welfare fund an hourly contribution on all hours actually worked for each employee which corresponds to the type and level of benefit chosen by the employee from among the options determined by the Trustees, at such time and in such manner as the Trustees shall establish.  Hours worked  does not include paid time off for holidays pursuant to Article IV, Section 2 and fund contributions are not due on holiday pay.

The current "credit bank" maximum under the Welfare Fund is 23,250 credits.  The credit bank maximum will increase by an additional 2,000 credits on April 1, 2019 and will increase by an additional 1,500 credits on April 1, 2020 and April 1, 2021, with the timing of such increases to be determined by the Trustees.

Once each year, normally in April, and at such other times as appropriate within the Trustees' sole discretion, the Trustees shall review the contribution rates established herein and the benefits provided by the Welfare Plan and shall adjust contribution rates as appropriate to reflect changes in the cost of the administration and benefits.  The Trustees shall also retain the authority to adjust benefits (and benefits eligibility).  The Trustees generally shall maintain the Plan on the basis of a target fund asset reserve level of approximately six (6) months, with a minimum reserve of approximately three (3) months of costs.

All payments made by each company to the Welfare Fund shall be made on or before the twentieth (20th) of the following month covering all such hours for all pay periods in the previous calendar month.  If the reports and payments are not then in, the delinquent contractors should be subject to a penalty of three percent (3%) of that amount that is delinquent and an additional three percent (3%) for each succeeding thirty (30) days of delinquency.

**Section 2(a).**  Each Company represented by the Association as well as affiliate members of the Association shall have the option at its plan year end or the calendar year to participate in the Health and Welfare Fund for the balance of the contract term for its employees who are not in the bargaining unit.  Such participation shall be on the basis of forty (40) hours per week times the then current hourly contribution rate for bargaining unit employees.

**Section 3.**     A new employee, as defined herein, shall become eligible in accordance with policies determined by the Trustees for the health and welfare benefits herein provided.

**Section 4.**     The Union and the Association shall provide through the agency of the said Welfare Fund for all eligible employees, and their dependents, a schedule of health and welfare benefits as determined by the Trustees of the Health and Welfare Fund.

**Section 5.**     The Trustees shall be ordered to provide the Union each month during the life of this Agreement, with a list of Employees together with the amounts paid into the Fund for each

employee by employing companies, who are covered by the said health and welfare benefits during the month, together with a list of employees who have been paid benefits and the amount received by each such employee during that month.

**Section 6.**      The Trustees shall be ordered to furnish to the Union, as of June 30th and December 31st of each year, a financial statement of the said Welfare Fund including receipts and disbursements and such pertinent information necessary to reveal the operations and conditions of the said Welfare Fund.

**Section 7.**      At appropriate times, the Trustees of the aforesaid Welfare Fund shall review the operation of the said Fund and plan to determine what, if any, changes in eligibility, benefits or other Plan features are justified.  The Trustees will consider a possible lower hour plan option and explore possible lower cost plans.   Any lack of agreement as the result of such meeting shall not otherwise affect the status of this contract.

**Section 8.**      The Health and Welfare provisions of this Agreement apply to all heavy and highway construction work, including all types of utility work performed by all contractors bound by this Agreement in the states of Delaware, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia and West Virginia and any other state in which such contractors may perform work covered by this Agreement.  The above also applies on all jobs in the States of Pennsylvania, Ohio and New York let by any agency of the United States or Pennsylvania, Ohio or New York Departments authorized to award contracts, i.e., mine flushing--mine-fire control, etc.

**Section 9.**      The employee and/or the employee's dependents shall promptly notify the plan administrators of any change in home mailing address and/or change in dependent eligibility.  The plan administrator may be contacted at the following address:  United Steelworkers, District 10 and Pennsylvania Heavy & Highway Contractors Bargaining Association Welfare Fund, c/o the Fund's third party administrator, whose name, address and telephone number shall be furnished to the employees and their dependents by the Fund's Trustees.

**Section 10**.      The parties agree that any contractor who performs work within the scope of this Agreement may participate in its benefit funds provided such contractor is a member of the Association and fully complies with the entire collective bargaining agreement.  The parties further agree that employers who perform work outside the scope of this Agreement may participate in its benefit funds provided such employer becomes an affiliate member of the Association and is in signed relations with a local union which is a party to this collective bargaining agreement.

**Section 11.**      Failure to comply with the provisions of this Agreement related to payment of benefit contributions shall be considered as, and shall constitute, a violation of this Agreement of an especially serious nature.  Therefore, special provisions are provided herein to address such violation as follows:

(a)      If reports and/or contributions remain unpaid on or after the 25th of the month following a delinquency of two (2) consecutive months and a certified demand letter by the Trustees or their designees, the Union may withdraw employees from the employment of the employer, upon forty-eight (48) hours' written notice.  Should the Union withdraw employees for this reason, the employer agrees to pay each and every employee withdrawn for this reason full wages and expenses for each hour of wages lost, until all reports and all payments, contributions and premiums due are made, but in any event not for more than twenty-four (24) hours of wages.  It

is expressly understood that the employer's liability for payment hereunder shall not be subject to the grievance or arbitration procedures set forth in this Agreement and that the no strike clause, if any, shall not prohibit such otherwise lawful action the Union chooses to compel payment of delinquent contributions to the Fund.

(b)     Should the Trustees and/or the Union commence suit in a court of law to enforce compliance with the provisions and requirements of this Agreement related to reports and payments or contributions to the Welfare Fund, the employer agrees to pay the costs, including counsel fees and the cost of any audit of such employer's records, required or requested by the Trustees and all interest and liquidated damages demanded by the Trustees.

(c)     The employer agrees to provide to the Fund and the Union an indemnity bond guaranteeing that the employees and the Funds will be paid amounts due the employees and the Funds in the event that the employer fails to meet and comply with the provisions and requirements of this Agreement related to wages and benefit contributions.  In the event an indemnity bond is not obtainable by the employer, the employer may provide an irrevocable letter of credit.  Such a letter of credit shall be canceled only upon sixty (60) days' notice to the Fund and the Union.

The bond or irrevocable letter of credit shall be reasonably acceptable to the Fund and the Union and shall, at all times, meet the requirements of the following formula:

If ten (10) weeks average Funds contributions ("Funds contributions" shall mean the sum of contributions to the Welfare Fund, Pension Fund, Apprentice Fund and Annuity Fund, all as provided in this Agreement) equals $5,000 or less, then the bond shall be for $5,000.  If greater than $5,000 but less than $10,001, then the bond shall be for $10,000, and so on in increasing amounts until, if ten (10) weeks' average Funds contributions is greater than $100,001, then the bond shall be for $100,000.

Bonds shall be provided for a period of not less than one (1) year, and may be renewable or continuous, until revision of the amount necessary to satisfy the schedule stated herein, at which time the new bond shall be furnished for the same period.

The amount of the bond shall be determined by reference to annual payments made or due for the one year period ending December 31 of any year.  Where a change in the bond amount is required, the change shall take place immediately.

Where the employer has no record of prior contributions, the bond shall be in an amount not less than $20,000, or such other amount reasonably required by the Trustees to cover payments expected or estimated to be required.

Bonds shall be written to provide for payments first covering any unpaid wages (including Union dues and any other unpaid checkoffs or assessments), and thereafter covering:  first, the Annuity Fund, second the Welfare Fund, third the Pension Fund and fourth, the Apprentice Fund.

The posting of a required bond shall not exempt the employer from liability to make required reports and payments.

The employer agrees to have the required bond, in duplicate, in the possession of the Trustees of the Fund within forty-five (45) days after the effective date of this Agreement.

(d)   Should the employer fail to produce the required bond, the employer shall be required to make all reports and payments on a weekly basis.  Reports and payments shall be paid on the same day that wages are paid, and shall cover the same payroll period.  Employers that must report and contribute on a weekly basis, and fail to do so, shall be assessed liquidated damages in the amount of .75% of the amount due for each week, or part of a week, that a contribution is late, up to a maximum of twenty percent (20%).

(e)   The parties agree that the bonding and other provisions described in this Section shall not apply to those companies with a record of consistent, reliable payments as determined by the Trustees.

**Section 12.**   The undersigned hereby agree to accept and confirm five (5) or more representatives of each party as members of the Board of Trustees.  These representatives, together with their successors selected in the manner provided in said Trust Agreement, are hereby authorized to and shall represent the Union and the employer and other employers, that are or become party to this or similar agreements in the administration of the Welfare Fund.

**Section 13.**   If it is determined that the healthcare reform legislation will result in excise taxes which would apply to the Fund, or would allow a more cost effective alternative, the parties will promptly meet in good faith to discuss whether health insurance changes are warranted.

## ARTICLE XI
## PENSION PLAN

**Section 1.**   The Union and the Association shall continue to maintain the " The United Steelworkers, District 10 and Pennsylvania Heavy and Highway Contractors Bargaining Association Pension Plan" and the Trust established thereunder.  The Union and the Association will continue each to appoint 5 trustees to the joint board of trustees that sponsor the Plan.

The Plan will be amended by the Trustees to reflect changes in the contribution rates and Plan funding goals as set forth herein, and generally as discussed by the Benefits Subcommittee.  The purposes of the Pension Plan shall be to secure and provide certain pension benefits.  It shall be the duty of the Trustees, comprised of members of the Union and the Company, to administer the Pension Plan and to promulgate such rules and regulations as may be necessary for the efficient administration of the Pension Plan, in accord with applicable law.

Trustee action shall be in accordance with and not inconsistent with the provisions and requirements of the Employee Retirement Income Security Act of 1974.  The liability of each Company to make the prescribed pension contribution shall be several and not joint.

**Section 2.**   Effective January 1, 2019, each Company represented by the Association shall deliver and pay over to the administrator selected by the Trustees an hourly contribution amount based upon the location and type of work performed as follows:

| | | | |
|---|---|---|---|
| 2nd Tier | Prevailing 29 County Carpenters, Laborers and Truck Drivers | Prevailing Non-5 County | Prevailing 5-County |

| | | | |
|---|---|---|---|
| $7.25 | $6.70 | $7.10 | $8.85 |

Effective January 1, 2020, the contribution rates above will decrease in all tiers by One Dollar ($1.00), and the contractors will contribute One Dollar ($1.00) per hour on all hours worked to the Annuity/Savings Plan called for in Article XIX.

The appropriate contribution shall be paid for each hour worked during the previous calendar months by all persons employed in the bargaining unit as provided by this Agreement. All such payments shall be made by such company to the Administrator on or before the twentieth (20th) day of the following month covering all such hours for all pay periods in the previous calendar month. If the reports and payments are not then in, the delinquent contractors should be subject to a penalty of 3% of that amount that is delinquent and an additional 3% for each succeeding thirty (30) days of delinquency. Hours worked does not include paid time off for holidays pursuant to Article IV, Section 2 and contributions are not due on holiday pay.

**Section 3.** Effective January 1, 2019, the benefit accrual rate will increase to 1.25% for contributions made thereafter and will not exceed 1.25% for the life of this agreement. The Trustees of the Plan may reduce the accrual rate as of January 1, 2020 or January 1, 2021, if the plan does not meet actuarial projections.

**Section 4.** The Trustees shall be ordered to provide the Union, each month during the life of this Agreement, with a list of employees, together with the amount paid into the Fund for each employee by employing companies who are covered by the said Pension Plan during the month.

**Section 5.** The Trustees shall be ordered to furnish to the Union, as of June 30 of each year, a financial statement of the said Pension Trust showing all pertinent information as is necessary to reveal the operations and conditions of the said Pension Trust for the prior calendar year.

**Section 6.** At appropriate times, the Trustees of the aforesaid Pension Trust shall review the operation of the said Fund and Plan to determine what, if any, changes in Plan features are justified; and lack of agreement as the result of such meeting shall not otherwise affect the status of this contract.

**Section 7.** The Pension Plan provisions of this Agreement apply to all heavy and highway construction work including all types of utility work performed by all contractors bound by this Agreement in the states of Delaware, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia and West Virginia and any other state in which such contractors may perform work covered by this Agreement. The above also applies on all jobs in the States of Pennsylvania, Ohio and New York let by any agency of the United States or Pennsylvania, Ohio or New York Departments authorized to award contracts, *i.e.*, mine flushing--mine-fire control, etc.

**Section 8.**     The employee and/or the employee's dependents shall promptly notify the plan administrators of any change in home mailing address and/or change in dependent eligibility.  The plan administrator may be contacted at the following address:  United Steelworkers, District 10 and Pennsylvania Heavy & Highway Contractors Bargaining Association PensionPlan, c/o the Fund's third party administrator, whose name, address and telephone number shall be furnished to the employees and their dependents by the Fund's Trustees.

**Section 9.**     Failure to comply with the provisions of this Agreement related to a payment of benefit contributions shall be considered as, and shall constitute, a violation of this Agreement of an especially serious nature.  Therefore, special provisions are provided herein to address such violation as follows:

(a)     If reports and/or contributions remain unpaid on or after the 25th of the month following a delinquency of two (2) consecutive months and a certified demand letter by the Trustees or their designees, the Union may withdraw employees from the employment of the employer, upon forty-eight (48) hours' written notice.  Should the Union withdraw employees for this reason, the employer agrees to pay each and every employee withdrawn for this reason full wages and expenses for each hour of wages lost, until all reports and all payments, contributions and premiums due are made, but in any event not for more than twenty-four (24) hours of wages.  It is expressly understood that the employer's liability for payment hereunder shall not be subject to the grievance or arbitration procedures set forth in this Agreement and that the no strike clause, if any, shall not prohibit such otherwise lawful action the Union chooses to compel payment of delinquent contributions to the Fund.

(b)     Should the Trustees and/or the Union commence suit in a court of law to enforce compliance with the provisions and requirements of this Agreement related to reports and payments or contributions to the Pension Fund, the employer agrees to pay the costs, including counsel fees and the cost of any audit of such employer's records, required or requested by the Trustees and all interest and liquidated damages demanded by the Trustees.

(c)     The employer agrees to provide to the Fund and the Union an indemnity bond guaranteeing that the employees and the Funds will be paid amounts due the employees and the Funds in the event that the employer fails to meet and comply with the provisions and requirements of this Agreement related to wages and benefit contributions.  In the event an indemnity bond is not obtainable by the employer, the employer may provide an irrevocable letter of credit.  Such a letter of credit shall be canceled only upon sixty (60) days' notice to the Fund and the Union.

The bond or irrevocable letter of credit shall be reasonably acceptable to the Fund and the Union and shall, at all times, meet the requirements of the following formula:

If ten (10) weeks average Funds contributions ("Funds contributions" shall mean the sum of contributions to the Welfare Fund, Pension Fund, Apprentice Fund and Annuity Fund, all as provided in this Agreement) equals $5,000 or less, then the bond shall be for $5,000.  If greater than $5,000 but less than $10,001, then the bond shall be for $10,000, and so on in increasing amounts until, if ten (10) weeks' average Funds contributions is greater than $100,001, then the bond shall be for $100,000.

Bonds shall be provided for a period of not less than one (1) year, and may be renewable or continuous, until revision of the amount necessary to satisfy the schedule stated herein, at which time the new bond shall be furnished for the same period.

The amount of the bond shall be determined by reference to annual payments made or due for the one year period ending December 31 of any year. Where a change in the bond amount is required, the change shall take place immediately.

Where the employer has no record of prior contributions, the bond shall be in an amount not less than $20,000, or such other amount reasonably required by the Trustees to cover payments expected or estimated to be required.

Bonds shall be written to provide for payments first covering any unpaid wages (including Union dues and any other unpaid checkoffs or assessments), and thereafter covering: first, the Annuity Fund, second the Welfare Fund, third the Pension Fund and fourth, the Apprentice Fund.

The posting of a required bond shall not exempt the employer from liability to make required reports and payments.

The employer agrees to have the required bond, in duplicate, in the possession of the Trustees of the Fund within forty-five (45) days after the effective date of this Agreement.

(d)   Should the employer fail to produce the required bond, the employer shall be required to make all reports and payments on a weekly basis. Reports and payments shall be paid on the same day that wages are paid, and shall cover the same payroll period. Employers that must report and contribute on a weekly basis, and fail to do so, shall be assessed liquidated damages in the amount of .75% of the amount due for each week, or part of a week, that a contribution is late, up to a maximum of twenty percent (20%).

(e)   The parties agree that the bonding and other provisions described in this Section shall not apply to those companies with a record of consistent, reliable payments as determined by the Trustees.

**Section 10.**   The undersigned hereby agree to accept and confirm five (5) or more representatives of each party as members of the Board of Trustees. These representatives, together with their successors selected in the manner provided in said Trust Agreement, are hereby authorized to and shall represent the Union and the employer and other employers, that are or become party to this or similar agreements in the administration of the Pension Fund.

**ARTICLE XII**
**APPRENTICE TRAINING AND EDUCATION**

**Section 1.**   Each contractor shall deliver and pay over to the Administrator of the Apprentice Training and Education Fund Fifteen Cents (15¢) on all hours worked during the previous calendar month by all persons employed in the bargaining unit as provided in this Agreement. Effective January 1, 2020, the contribution shall increase to Twenty Cents (20¢). All such payments shall be made by such company to the said administrator on or before the twentieth (20th) day of the following month covering all such hours for all pay periods in the previous calendar month. If the reports and payments are not then in, the delinquent contractors should be subject to a penalty of 3% of that amount that is delinquent and an additional 3% for each succeeding thirty (30) days

of delinquency. Hours worked does not include paid time off for holidays pursuant to Article IV, Section 2 and fund contributions are not due on holiday pay.

**Section 2.**     The Trustees shall be ordered to provide the Union, each month during the life of this Agreement, with a list of employees, together with the amount paid into the Fund for each employee by employing companies who are covered by the said Apprentice Training and Education Fund during the month.

**Section 3.**     The Trustees shall be ordered to furnish to the Union, as of June 30 of each year, a financial statement of the said Apprentice Training and Education Fund showing all pertinent information as is necessary to reveal the operations and conditions of the said Apprentice Training and Education Fund for the prior calendar year.

**Section 4.**     At appropriate times, the Trustees of the aforesaid Apprentice Training and Education Fund shall review together the operation of the said Fund and Plan to determine what, if any, changes in Plan features are justified; and lack of agreement as the result of such meeting shall not otherwise affect the status of this contract.

**Section 5.**     The Apprentice Training and Education Fund provisions of this Agreement apply to all heavy and highway construction work including all types of utility work performed by all contractors bound by this Agreement in the states of Delaware, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia and West Virginia and any other state in which such contractors may perform work covered by this Agreement. The above also applies on all jobs in the States of Pennsylvania, Ohio and New York let by any agency of the United States or Pennsylvania, Ohio or New York Departments authorized to award contracts, *i.e.*, mine flushing-mine-fire control, etc.

**Section 6.**     The provisions of Articles X and XI respecting delinquent to the Welfare and Pension Funds shall apply to the Apprentice Training and Education Fund as well.

**Section 7.**     The parties to this Agreement are committed to working together to ensure that a well-qualified and productive workforce is available to meet the personnel needs of the contractors, to facilitate their competitiveness, and maximize the amount of work available to the employees. The parties encourage the use of apprentices and will work together toward greater utilization of the apprenticeship program. The hiring of Apprentices will be consistent with the Apprenticeship and Training Standards. All Apprentices shall be hired under an Apprenticeship Agreement and will be subject to all provisions of this Agreement that do not conflict with the Apprenticeship Agreement.

<u>**ARTICLE XIII**</u>
**NON-DISCRIMINATION CLAUSE**

**Section 1.**     The Union and the Company agree that they will not discriminate against any employee because of race, color, religion, sex, national origin, age, or because of a physical or mental handicap, membership or non-membership in the Union.

## ARTICLE XIV
## WAIVER OF RECOURSE TO LEGAL REMEDIES

**Section 1.**     In further consideration of the mutual promises contained herein, the parties hereto expressly agree that neither party shall bring or cause to be brought any court or other legal or administrative action against the other until the dispute, claim or grievance or complaint shall have been brought to the attention of the party against whom it shall be made and the said party, after actual notice of same, shall fail within a reasonable time to take steps to correct the cause or circumstances giving rise to such dispute, claim, grievance or complaint.

## ARTICLE XV
## SAFETY

**Section 1.**     The parties hereto shall establish a joint (three representatives from each party) Safety Committee to evaluate all present and future standards and guidelines for on-the-job safety in the heavy and highway industry as may from time to time be promulgated by Federal, State or Insurance Industry representatives.  When the Committee unanimously adopts certain safety standards, it shall recommend to all contractors covered by this contract that they adopt such recommendations within sixty (60) days thereafter.

**Section 2.**     The parties agree that the Union shall be entitled to designate a qualified safety person on each project to voice Union concern over safety on the project.

## ARTICLE XVI
## FUNERAL LEAVE

**Section 1.**     Each and every eligible member of the bargaining unit shall be entitled to three days of funeral leave per calendar year computed at eight times his or her regular hourly rate for each day but funeral leave shall not be considered as time worked for the purpose of computing any premium overtime due by law or by contract provisions.  This leave cannot be accrued from year to year and will be confined to the members of the immediate family consisting of the following:   husband/wife, son/daughter, step-son/step-daughter, brother/sister, father/mother, grandfather/grandmother and current mother-in-law/father-in-law.  The Employer shall have the right to request verification of the death.  If the employee is eligible for funeral leave and needs an additional day off, a fourth day off will be granted, but the day off will be without pay.

## ARTICLE XVII
## TERMINATION

**Section 1.**     This Agreement becomes effective as of January 1, 2019 and will continue up to and including December 31, 2021, but either party may serve written notice on the other party between October 1 and November 1, 2021 that it desires to reopen the contract as to any subjects and the failure to furnish any such written notice shall cause the terms and provisions of this contract automatically to go into effect for another year subject to all the same terms and provisions including this Article on termination.

**Section 2.**     This Agreement has been negotiated by the duly designated Pennsylvania Heavy & Highway Contractors Bargaining Association representing the companies, and by a duly designated Negotiating Committee representing United Steelworkers, AFL-CIO-CLC and is

hereby executed by the proper designated representatives of the Bargaining Association and by a representative of United Steelworkers, AFL-CIO-CLC.

## ARTICLE XVIII
## STEEL ERECTION

All steel erection rates must be negotiated individually for each contract and include health and welfare benefits.

## ARTICLE XIX
## FRINGE BENEFITS

**Section 1.**     Contributions to be made to the administrator of the Health and Welfare Fund and the Pension Fund as provided above.

**Section 2.**     On prevailing wage jobs where the prevailing fringes exceed the fringe benefits provided to the employee under this Agreement, the contractor may participate in the Steelworker Supplemental Retirement Annuity Plan which was approved by the Internal Revenue Service in June 1990 (also referred to as the "Annuity Plan").  Effective January 1, 2020, all contractors covered by this Agreement will participate in the Annuity Plan.

**Section 3.**     "Grandfathered" contractors ("grandfathered" contractors are identified as: Neshaminy Constructors) may contribute the difference between the prevailing fringe and the fringe benefits provided to the employee under this Agreement, up to the maximum allowed by law.  For non-grandfathered contractors, the contributions to the Annuity Plan shall not exceed the following hourly rates:

Non-grandfathered contractors bidding in the five (5) county area shall have the option to contribute a total of up to $5.75 to the Annuity Plan in the five (5) county area.  The Union and a contractor may agree to additional contributions where excess prevailing fringe benefits remain above the cap.

Non-grandfathered contractors bidding on projects outside the five (5) county area shall have the option to contribute a total of up to $3.75 to the Annuity Plan outside of the five (5) county area.

In addition, the contractor(s) and the Union may "pinpoint" a particular project prior to the submission of bids for deductions exceeding those allowed above, for the purpose of making the contractor(s) more competitive.  The Union agrees that if the majority of employees of a particular contractor agree to allow deductions exceeding those allowed above on all appropriate jobs, the contractor shall be entitled to make such additional deductions on all appropriate jobs bid after that date.

**Section 4.**     Effective January 1, 2020, each contractor shall deliver and pay over to the Annuity Plan $1.00 on all hours worked during the previous calendar month by all persons employed in the bargaining unit as provided in this Agreement.  This $1.00 per hour contribution is in addition to any contributions made on prevailing wage jobs where the prevailing fringes exceed the fringe benefits provided to the employee under this Agreement, as permitted under Sections 2 and 3 above.  Hours worked  does not include paid time off for holidays pursuant to Article IV, Section 2 and fund contributions are not due on holiday pay.

**Section 5.**    Contractors will remit the appropriate payment to the Annuity Plan together with a report explaining the contributions on a monthly basis, on or before the twentieth (20th) day of the following month covering all such hours for all pay periods in the previous calendar month.  If the report and payment are not then submitted, the delinquent contractor will be subject to liquidated damages of three percent (3%) of that amount that is delinquent and an additional three percent (3%) for each succeeding thirty (30) days of delinquency.  Such liquidated damages are in addition to any other rights available under the laws to collect delinquencies, including but not limited to rights under the prevailing wage laws and the wage payment and collection laws.

**Section 6.**    In addition, the Union shall have the right to withdraw employees from the employment of the employer if Annuity Plan contributions have been deducted from the prevailing fringe benefit rate, but remain unpaid after the 25th of the month following a delinquency of two (2) consecutive months, pursuant to the procedural requirements set forth in Article X, Section 11(a) and Article XI, Section 8(a).  It is further understood that any delinquencies owed by contractors to the Annuity Plan will be collected promptly and that any monies received from such delinquent contractors will be applied to the outstanding Annuity Plan obligations before being applied to any delinquencies to the other funds established under the CBA.

**Section 7.**    All expenses of the Annuity Plan (administrative, actuarial, accounting, legal, etc.) shall be paid from the assets of the Plan and there shall be no per capita charge.

**IN WITNESS AND TESTIMONY** of the provisions and terms mutually agreed upon and specified herein, the duly authorized officers and/or representatives of the parties hereby affix their signatures the day and year above.

On Behalf of:

PENNSYLVANIA HEAVY & HIGHWAY CONTRACTORS BARGAINING ASSOCIATION

_____
Joseph P. Canuso, President PHHCBA


_____
Alex Paris
Chair, PHHCBA Negotiating Committee


On Behalf of:

UNITED STEELWORKERS, AFL-CIO-CLC


_____
Leo W. Gerard
International President

_____
Thomas D. Jones
Chairman, Union Negotiating Committee
International Staff Representative


_____
Stan Johnson
International Secretary-Treasurer

_____
Bernie Hall
Secretary, Union Negotiating Committee
International Staff Representative


_____
Thomas M. Conway
International Vice-President, Administration

_____
Joseph M. Padavan
President Local 15253


_____
Fredrick D. Redmond
International Vice-President, Human Affairs

_____
Robert Alderson
President Local 14693


_____
Robert McAulliffe, Director, District 10

_____
Michael I. Saporito
Vice President Local 15253

# EXHIBIT "B."

# INDEPENDENT AGREEMENT

Between

## PKF-MARK III, INC.

And

## UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION ON BEHALF OF ITS LOCAL UNION 15024

– – – – –

**Effective: January 1, 2019**
**Expires: December 31, 2021**

## TABLE OF CONTENTS

ARTICLE I - SCOPE ........................................................................................................1

ARTICLE II - MANAGEMENT RIGHTS.....................................................................4

ARTICLE III - UNION REPRESENTATIVES ..............................................................5

ARTICLE IV - PROBATIONARY PERIOD ...................................................................5

ARTICLE V - HOURS OF WORK, HOLIDAYS AND PREMIUM PAY .......................6

ARTICLE VI - HOLIDAYS .............................................................................................6

ARTICLE VII - CALL-IN PAY .......................................................................................8

ARTICLE VIII - ON THE JOB TRAINING .................................................................10

ARTICLE IX - GRIEVANCES & ARBITRATION.......................................................11

ARTICLE X - UNION SECURITY AND CHECK-OFF ..............................................12

ARTICLE XI - WAGE SCHEDULES...........................................................................14

ARTICLE XII - HEALTH, WELFARE, LIFE & DENTAL INSURANCE.......................15

ARTICLE XIII - DEFERRED COMPENSATION PLAN ..............................................15

ARTICLE XIV - APPRENTICESHIP AND TRAINING TRUST FUND .......................16

ARTICLE XV - PENALTY CLAUSE ...........................................................................17

ARTICLE XVI - NON-DISCRIMINATION CLAUSE ..................................................19

ARTICLE XVII - PROHIBITION OF STRIKES, SLOWDOWNS, WORK STOPPAGES, ETC....................................................................................................................19

ARTICLE XVIII - WAIVER OF RECOURSE TO LEGAL REMEDIES .......................19

ARTICLE XIX - SAFETY.............................................................................................20

ARTICLE XX - SUBSTANCE ABUSE & TESTING POLICY.....................................20

ARTICLE XXI - SEPARABILITY AND SAVINGS ......................................................21

ARTICLE XXII - MISCELLANEOUS...........................................................................22

ARTICLE XXIII - PREVAILING WAGE WORK...........................................................22

ARTICLE XXIV - TERMINATION ...............................................................................22

7990333.1

THIS AGREEMENT made and entered into this 1st day of January 2019, to become effective immediately, between PKF-MARK III, INC. (hereinafter referred to as the "Employer" or "Company"), party of the first part and, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION ON BEHALF OF ITS LOCAL 15024, located at 2025 Lincoln Highway, Suite 130, Edison, New Jersey 08817 (732-287-4011) collective bargaining agent for those employees of the Company designated in Article I and covered by the wage schedule annexed hereto, (hereinafter referred to as "United Steel" or the "Union"), party of the second part.

## WITNESSETH

This in consideration of the mutual and reciprocal promise of the parties hereto, the parties covenant and agree as follows:

## ARTICLE I - SCOPE

**Section 1.1**  That this Agreement is for the exclusive, joint use and benefit of the contracting parties, and the provisions herein defined and set forth shall be construed as binding upon and effective in determining the relations between the parties signatory hereto. It is the intent and purpose of the parties herein to promote and improve industrial and economic relationships in the construction industry to set forth herein the rates of pay, hours of work, and conditions of employment to be observed by the parties hereto.

**Section 1.2**  **Recognition and Scope**  The Employer recognizes the Union as the sole and exclusive collective bargaining representative of all employees in the classifications covered by this Agreement engaged in construction, maintenance, support, recycling or allied operations historically performed by the employer prior to February 24, 1994. This Agreement shall cover all persons employed by the Company in the performance of such work in those geographic areas related as closely as practicable to the states in which the Employer has worked or controlled the

assignment of work prior to February 24, 1994. Excluded from the bargaining unit and the coverage of this agreement are engineering staff, clerical employees, watchmen, timekeepers, superintendents, master mechanics, assistant superintendents, or any other supervisors having the right to hire, fire or discipline or effectively recommend the same.

**Section 1.3** **Job Classifications** The job classifications are incorporated by reference into this Agreement as Schedules "A" and "B." The Company and the Union agree to establish a standing Classification and Rate Committee which will be responsible for the determination of the Classifications and Wage Rates covered hereunder. The foregoing is by no means to be construed as prohibiting the right of the Company and the Union from adding or subtracting job classifications from the coverage of this Agreement wherein a particular company has employees who are already covered or may become covered by a contract between that Company and another labor organization. Therefore, the Classification and Rate Committee shall undertake a review of said classifications and limit or extend the coverage of this Agreement as the parties agree. Said Local Agreement shall be negotiated on an individual basis subject to approval of the Classification and Rate Committee and shall be reduced to writing.

**Section 1.4** **Hiring** The Union agrees to furnish upon request by the Employer, through an out-of-work referral list, duly qualified journeymen and apprentice workers in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement. The Employer shall be the sole judge of all applicants and retains the right to reject any applicants for employment referred by the Union.

    a.    The Union agrees that any journeymen or other workers referred for work shall have the minimum qualifications and/or licenses or credentials set by the Company, if any;

7990333.1

b.    The Union agrees that should it be unable to refer workers with the appropriate credentials within twenty-four (24) hours, the Employer may seek workers from any other source.

**Section 1.5    Sub-Contracting Work**   When the Employer signatory to this Agreement subcontracts any work covered by this Agreement, it shall, insofar as is feasible to do so, be subcontracted subject to all terms and conditions of this Agreement to contractors signatory to an agreement with the Union.   The Company shall notify the Union when work is subcontracted whenever practicable.

**Section 1.6    Independent Contractors**   This contract shall not apply to any employee of a bona fide independent contractor nor to independent owner-operators.

**Section 1.7    United Steel-BCTD Agreement**   The parties to this Agreement recognize that the Union's representation of employees in the construction industry is guided by the United Steel's agreement with the Building and Construction Trades Department of the AFL-CIO made effective February 24, 1994 and which was negotiated in an attempt to enable United Steel to continue its existing relationships with employers in the construction industry while resolving the disputes with the Trades which have surrounded these relationships.   With this in mind, the parties have attempted to conform this Collective Bargaining Agreement to the requirements of the United Steel-BCTD agreement as presently understood and agree to discuss such further changes required to conform this agreement to relevant future rulings.   The parties further pledge their continuing good faith efforts to contribute toward a harmonious relationship between United Steel, the Building Trades and employers in the construction industry consistent with the rights of the Employer under this Collective Bargaining Agreement.   In the event mergers, consolidations, joint ventures, etc. occur between certain Unions in the Building and Construction Trades Department

7990333.1

of the AFL-CIO, either the Company(s) or the Union can request to reopen negotiations to bargain over the impact of said events.

**Section 1.8**   It is mutually understood that the following terms and conditions relating to the employment of workmen covered by this Agreement have been decided upon by means of collective bargaining and that the following provisions will be binding upon the Company and the Union during the term of this Agreement and any renewal thereof.  This Agreement during its life may be modified only by mutual written consent of the parties hereto.  The provisions of this Agreement shall be subject to any changes made necessary by reason of Federal and State legislation, regulations or specifications, and the parties will meet in the event a change is mandated to effectuate the same.

## ARTICLE II - MANAGEMENT RIGHTS

**Section 2.1**   The management of the work, the direction of the working force, assignment of men to specific projects and the right to hire and discharge for just cause are vested exclusively in the Company, and the Union shall not abridge this right.  It is not the intention of this provision to encourage the discharge of employees.

**Section 2.2**   The number of men to be employed, and the number and classification of men required to operate any piece of equipment shall be at the sole discretion of the Employer.  The fact that certain classifications and rates are established does not mean that the Employer must employ workmen for any one or all such classifications or to man any particular piece of equipment that happens to be on the project unless the Employer has need for such workmen.

**Section 2.3**   The Company shall not be hindered in or prevented from using any type or quality of machinery, tools, and appliances, and may secure materials or equipment from any market or source it deems fit without interference of any kind.

7990333.1

**Section 2.4**    The Company, except as specifically modified by this Agreement, shall have the right to take whatever other steps it deems necessary to accomplish the mission of the operations.

## ARTICLE III - UNION REPRESENTATIVES

**Section 3.1**    **Visitation**  Upon proper notice to the representatives of the Company in charge of the project, authorized representatives of the Union may visit any of the jobs covered by this Agreement during working hours, provided that the progress of the work is not interfered with or hindered.  Such Union representatives must comply with all safety regulations in effect on the project.

**Section 3.2**    **Chief Job Steward**  It is expressly agreed and understood by the parties hereto that there shall be only one Chief Job Steward for the entire Company appointed by the Union.  The parties agree that the Job Steward will not be discriminated against or disciplined in the reasonable exercise of the duties of his/her office.

**Section 3.3**    **Assistant Job Stewards**  The Union shall have the right to appoint on a temporary basis Assistant Job Stewards on each work project wherein ten (10) or more covered employees are working.

## ARTICLE IV - PROBATIONARY PERIOD

**Section 4.1**    It is agreed that new employees shall be considered probationary employees for the first thirty (30) days of their employment.  Probationary employees may be laid off or discharged for cause as exclusively determined by Management, provided that the provisions hereof will not prevent a probationary employee from joining the Union, after seven (7) days of employment.  It being further provided that the provisions hereof shall not be used by Management for purposes of discrimination because of membership in the Union.

7990333.1

## ARTICLE V - HOURS OF WORK, HOLIDAYS AND PREMIUM PAY

**Section 5.1**   **Hours of Work**   The regular workweek for all employees shall be five (5) workdays starting with the first shift on Sunday, unless otherwise agreed upon, and shall consist of forty (40) hours which shall be recognized as regular time, and each employee shall be paid for any of these hours he works at the regular rates of pay specified in Schedule "A" or "B" which is incorporated by reference into this Agreement. If there is no work in the five-day workweek due to inclement weather, etc., the sixth (6th) day may be used as a make-up day. The foregoing provisions shall in no way be construed to guarantee forty (40) hours of work per week in the event the Employer must lay off employees during the workweek.

**Section 5.2**   **Four Ten-Hour Days**   The Employer may work four (4) ten (10) hour days. The payment of overtime will be required after ten (10) hours each day and forty (40) hours each week, Sunday through Saturday, inclusive. The foregoing provisions shall in no way be construed to guarantee forty (40) hours of work per week in the event the Employer must lay off employees during the workweek.

**Section 5.3**   **Overtime Pay**   Hours worked beyond forty (40) in a week shall be paid at one and one-half (1-1/2) times the regular rate of pay with no pyramiding of overtime.

**Section 5.4**   Time and one-half (1-1/2) shall be paid for work performed over forty (40) hours per week and over eight (8) hours per day only as required by applicable law and/or the terms of a contract in effect between the Contractor and the Awarding Agency.

**Section 5.5**   Double time the regular rate shall be paid for all work performed on the seventh consecutive day of work in the work week.

## ARTICLE VI - HOLIDAYS

**Section 6.1**   The following are the designated Contract Holidays:

6

| | |
|---|---|
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | New Year's Day |

**Section 6.2**   On all prevailing wage jobs, holidays will be paid only if required by the applicable prevailing wage laws.

**Section 6.3   Unworked Holiday Pay**   On all non-prevailing wage jobs, the above Contract Holidays shall be a paid, although idle, holiday at eight (8) times the employee's regular hourly rate, and that holiday in those years shall be considered as time worked for the purpose of computing any overtime due by law or by the contract provisions.

**Section 6.4   Worked Holiday Pay**   On all non-prevailing wage jobs, if the Contract Holiday is worked, the employee's regular straight time rate shall be paid for all work on the above contract holidays in addition to holiday pay.

**Section 6.5   Make-Up Holidays**   Employees may be required to make up a holiday mandated in a contract between the Company and the Awarding Agency provided the employee suffers no loss of holiday or overtime pay.

**Section 6.6   Qualifications for Holiday Pay**   To be eligible for Holiday Pay, an Employee must work three (3) days of the preceding five (5) working days before the holiday or the working day before the Holiday and the working day after the Holiday, but in no event can an Employee who is on the Employer's payroll the work week before and after the Holiday receive Holiday Pay unless he works the working day before and the working day after the Holiday.

**Section 6.7**   No employee shall be laid off during his regular work for the purpose of avoiding payment of over time or premium time for the seventh consecutive day worked.

7990333.1

**Section 6.8**    **Shift Premium** If the operation is put on more than one (1) shift, a premium of ten cents (10¢) per hour for the second shift and fifteen cents (15¢) per hour for the third shift shall be added to the regular rates of pay for hours worked on the second and third shifts respectively.  The premium payments of ten (10¢) and fifteen (15¢) cents for work performed on the second and third shifts, respectively, shall be included in the basic hourly rates of all employees entitled to such shift premiums for purposes of overtime under this Agreement.

## ARTICLE VII - CALL-IN PAY

**Section 7.1**    In the State of New Jersey, the following subsections will apply for call-in pay:

a.    On each day prior to the workday during periods of inclement weather or impending inclement weather, the employee shall call in to the Employer by 3:00 p.m. to determine if the Employee will be needed the following day.

b.    Any employee who has called in and who has been scheduled or notified to report for work and reports at the proper time shall be paid for at least two (2) hours at the regular scale of wages but shall be required, in consideration of receiving such call-in pay, to wait a minimum of two (2) hours until it can be determined whether the employee can go to work. From the time such employee commences work, he shall be paid for all actual working time according to the following examples:

i.    If the employee reports for work and waits for one-half (½) an hour before commencing work and then works for seven and one-half (7-1/2) hours he shall be paid for eight (8) hours;

ii.    If the employee reports for work and waits for one (1) hour before commencing work; and,

8

     iii.    then works for seven (7) hours, he shall be paid for eight (8) hours work.

     c.    If an employee reports for work and starts to work, he will be guaranteed two (2) hours pay; if an employee reports for work and waits for one (1) hour and then starts to work, he will be guaranteed two (2) hours' pay; if an employee reports for work and waits for two (2) hours, but does not start to work, he will be paid for the two (2) hour waiting period only.

     d.    At the end of the mandatory two (2) hour waiting period set forth above, the Employer shall either put the man to work, send him home or request the employee to wait for additional time; the employee shall be paid for any additional waiting time requested of him by the Company for the length of such waiting period in addition to the initial two (2) hours.

     e.    Nothing in this Article shall abridge the right of the employee to decline waiting for the determination of workable conditions, however, said employee shall not receive call-in pay as provided herein if he/she chooses to leave the job site.

**Section 7.2**    In States other than New Jersey, the following subsections will apply for call-in pay:On each day prior to the workday during periods of inclement weather or impending inclement weather, the Employee shall call in to the Employer by 3:00 P.M. to determine if the Employee will be needed the following day.

     b.    Any employee who has called in and who has been scheduled or notified to report for work and reports at the proper time shall be paid for at least one (1) hour at the regular scale of wages but shall be required, in consideration of receiving such call-in pay, to wait a minimum of one (1) hour until it can be determined whether the employee can go to work. From the time such employee commences work, he shall be paid for all actual working time according to the following examples:

7990333.1

i.　If the employee reports for work and waits for one-half (½) an hour before commencing work and then works for seven and one-half (7-1/2) hours he shall be paid for eight (8) hours;

ii.　If the employee reports for work and waits for one (1) hour before commencing work and then works for seven (7) hours, he shall be paid for eight (8) hours work.

c.　If an employee reports for work and starts to work, he will be guaranteed one (1) hour's pay; if an employee reports for work and waits for one (1) hour but does not start to work, he will be paid for the one (1) hour waiting period only.

d.　At the end of the mandatory one (1) hour waiting period set forth above, the Employer shall either put the man to work, send him home or request the employee to wait for additional time; the employee shall be paid for any additional waiting time requested of him by the Company for the length of such waiting period in addition to the initial one (1) hour.

e.　Nothing in this Article shall abridge the right of the employee to decline waiting for the determination of workable conditions, however, said employee shall not receive call-in pay as provided herein if he/she chooses to leave the job site.

## ARTICLE VIII - ON THE JOB TRAINING

**Section 8.1**　Workmen shall be free to accept employment in any occupational classification which they have the ability and the training to perform, providing there is a vacancy, and they shall be paid the scale of wages applicable to the work performed. However, if the Employer so desires, or the employee shows desire to learn an occupation requiring greater skill and of a higher wage rate and the Company sees fit to train this employee, he may work at the new job classification for a training period consistent with Article 13 of the United Steel, Paper

10

and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union on Behalf of its Local Union 15024 – Formerly: United Steelworkers of America, AFL-CIO-CLC, on Behalf of Its Local 15024 and its Signatory Employers Joint Apprenticeship and Training Program and amendments thereto. Subject to the training period, he shall work at the wage rate applying to the job classification performed prior to training consistent with Article XIV, Apprenticeship and Training Program. If at the end of the training period, the workman is not qualified to perform this job classification to the satisfaction of the Company, he shall be entitled to return to his old job.

## ARTICLE IX - GRIEVANCES & ARBITRATION

**Section 9.1**     **Definition of Grievance**  Should differences arise as to the meaning and application of the provisions of this Agreement, an earnest effort will be made to settle such differences immediately in the following manner, during which time there shall be no suspensions, lockouts, interruptions, or impeding of work, concerted work stoppages, strikes or other interferences with efficient operations:

a.     Between the aggrieved party who may be accompanied by the Chief Job Steward or Assistant Job Steward if the employee desires his presence, and his supervising foreman.

b.     Through the Chief Job Steward or Assistant Job Steward and the Job Superintendent.

c.     Through designated representatives of the Union and designated representatives of the Company.

11

d.    Should this procedure fail, the matter shall, within the next ten (10) days, be jointly and simultaneously reported as a written grievance by either party to the other party, the Company and the Union shall attempt to resolve the matter.

e.    Any grievance which remains unsettled after such meeting, or if no meeting shall be called, and which involves either the interpretation or application of a provision of this Agreement; or a disciplinary penalty imposed which is alleged to have been imposed without just cause shall be settled in the following manner: either party, with or without the consent of the other, but only after serving seventy-two (72) hours written notice on the other, may request the New Jersey State Board of Mediation to appoint an arbitrator and if so requested by either party, the New Jersey State Board of Mediation shall designate and appoint such arbitrator. The decision of the arbitrator shall be final and binding. The fees and expenses of the arbitrator so selected shall be borne equally by the Company and the Union.

**Section 9.2**    A decision reached at any stage of the proceedings above outlined shall be binding upon both parties hereto and shall not be subject to the reopening by any other party except by mutual consent.

**Section 9.3**    The arbitrator shall be without jurisdiction or authority to add to or subtract from the terms and conditions of this Agreement, and his award shall be limited to the issue or issues presented thereunder.

## ARTICLE X - UNION SECURITY AND CHECK-OFF

**Section 10.1  Union Security**  It shall be a condition of employment that all employees of the Company covered by this Agreement who are members of the Union in good standing on the effective or execution date of this Agreement, whichever is the later, shall remain members in good standing, and those who are not members on the effective or execution date of this Agreement, whichever is the later, shall on the eighth (8th) day following the effective or execution

7990333.1

date of this Agreement, whichever is the later, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after this effective or execution date, whichever is the later, shall on the eighth (8th) day following the beginning of such employment become and remain members in good standing in the Union.

**Section 10.2  Check-Off**  The membership dues, including initiation fees and assessments of United Steel, as authorized and approved by the International Treasurer of the Union, shall be deducted from the wages of such employees who have filed proper assignments with the Company and shall be remitted by the Company to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, c/o Stanley Johnson or his successor, International Secretary/Treasurer, P.O. Box 644485, Five Gateway Center, Pittsburgh, Pennsylvania 15222-4485.

**Section 10.3**  Such remittance shall be accompanied by an itemized statement showing the name of each employee and the amount checked off for dues, initiation fees or assessment, together with a list of employees from whom dues, initiation fees or assessments have not been collected.

**Section 10.4**  In the event of an overcharge for dues or assessments collected by the Company, the Union shall be responsible for adjustment of such claim with the member. In the event of an undercharge and upon proper notification by the Union, the Company shall make further deduction for this purpose on the next succeeding payday.

**Section 10.5**  Pursuant to the rules and regulations of the United Steelworkers of America, AFL-CIO-CLC, no assessments may be levied by any local Union against its members without the approval of the International Officers of the Union.

13

## ARTICLE XI - WAGE SCHEDULES

**Section 11.1** **Wage Schedules** The wage schedules setting forth the hourly wage rates for the various classifications and occupations represented in the performance of all work covered herein are hereby accepted by the parties as Schedules "A" and "B" which are incorporated by reference into this Agreement. Wage rates for occupations not shown will be a matter for negotiation by the parties signatory hereto.

**Section 11.2** **Existing Work** On any work advertised before January 1, 2019, the prior contract wage scale shall apply.

**Section 11.3** Rates in effect at the advertising date of a specific project will establish the wage scale for the entire duration of that project regardless of the termination date of the Agreement and are not to be subject to renegotiation for the duration of the project.

**Section 11.4** Wherever the Employer covered by this Agreement is required by either State or Federal law, , to pay certain wage rates, including applicable prevailing wage laws, the Company will fulfill its legal obligations and the wages are incorporated by reference into this Agreement as Schedule "A".

**Section 11.5** With regard to private projects and private work, the Company and the Union agree that the wage schedules for the job classifications will be a matter for negotiation by the parties signatory hereto and are incorporated by reference into this Agreement as Schedule "B." Any and all Agreements are incorporated by reference into this Agreement and are binding upon the parties hereto.

**Section 11.6** The Employer and Union agree to establish a Joint Job Classification Committee to provide for employee job classifications and the requisite work to be covered thereunder when the Employer is obligated to pay wages dictated by federal or state law and said

14

classifications are attached hereto as Schedule "E" which is incorporated by reference into this Agreement.

## ARTICLE XII - HEALTH, WELFARE, LIFE & DENTAL INSURANCE

**Section 12.1** During the life of this Agreement, the Employer will maintain Health, Welfare, Life and Dental Insurance Plans for the employees covered hereunder substantially similar to the Plans Described in Schedule "C" hereto. The Employer shall have the right to change carriers and/or insurance during the term of this Agreement without bargaining with the Union, but the question of whether the Plan so provided is substantially similar to that described in Schedule C will be subject to the Grievance Procedure.

**Section 12.2** Employees shall be provided with life insurance coverage of $25,000.00.

## ARTICLE XIII - DEFERRED COMPENSATION PLAN

**Section 13.1 Deferred Compensation Plan** Effective, January 1, 2019, the Employer shall contribute to a Pension Plan, Savings Plan, 401(k) Plan, Cafeteria Plan, Profit Sharing Plan, or other deferred compensation plans established and maintained by the Employer for all of its employees covered by this Agreement. Said plans are incorporated by reference into this Agreement as Schedule "D."

**Section 13.2** The deferred compensation plans are to be established by the Employer in the Company's own name. It is the Company's responsibility to establish, to maintain, to update and to keep in compliance with applicable Federal and State laws and regulations. The Company's deferred compensation plan will need to have its own trustees, administrators, fiduciaries as required by Federal and State law. Contributions to Fringe Benefit, Apprenticeship, Vacation and other funds or plans called for hereunder shall be applied against the "Fringe Benefit" payments called for under any applicable Prevailing Wage laws.

15

## ARTICLE XIV - APPRENTICESHIP AND TRAINING TRUST FUND

**Section 14.1  Apprenticeship and Training Trust Fund**  The Union signatory hereto has adopted and has secured approval by the appropriate Federal and State Agencies, the "United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union on Behalf of its Local Union 15024 – Formerly: United Steelworkers of America, AFL-CIO-CLC, on Behalf of Its Local 15024 and its Signatory Employers Joint Apprentice and Training Program" and amendments thereto (hereinafter referred to as "United Steel Apprenticeship and Training Program"), which includes a set of approved standards for the training both on and off the job apprentices.

**Section 14.2**  The Company agrees to contribute Fifty Cents ($0.50) per hour per covered employee to the Apprentice and Training Trust Fund.

**Section 14.3**  If at any point in the future the Apprentice Program loses its approval of the United States Department of Labor, after all appeals are exhausted, The Company's obligation to participate in the Apprentice Program and contribute to it will cease upon notice by The Company to the Apprentice Plan that it is ceasing payments.

**Section 14.4**  In the event that The Company ceases its participation in the Apprentice Plan as allowed pursuant to this Agreement, The Company shall have the right, but shall not be required, to commence its own Apprentice Plan.

**Section 14.5**  In the event that the Apprenticeship and Training Fund cannot supply sufficient apprentices in a period of thirty (30) days, then The Company will have the right to terminate its participation in the Plan.  In the event of termination, The Company shall have the right, but shall not be required, to commence its own Plan.

7990333.1

**Section 14.6** The United Steel Apprenticeship and Training Program, the Participation Agreement, and the United Steel Apprenticeship and Training Program Trust Fund Agreement are incorporated by reference into this Agreement as Schedule "F."

**Section 14.7** The Employer will, to the best of its ability, maintain at least two (2) apprentices in the Union Apprentice Plan and approved classifications for the duration of the contract. The Employer will endeavor to employ at least one (1) Apprentice for every ten (10) Journeymen employees.

**Section 14.8** Upon reasonable advance written notice, The Trustees of the Apprenticeship & Training Plans, or their designated representatives, may periodically audit the payroll and related tax records of the Employer in order to determine whether the Employer has made contributions as required hereunder. The right to audit is limited to the signatory company only, and the Trustees shall not have the right to audit any related or affiliated companies or business enterprises. Any disputes relating to the accuracy of the audit shall be subject to the grievance and arbitration provisions of this Agreement, but shall not apply to any other disputes relating to said Funds.

## ARTICLE XV - PENALTY CLAUSE

**Section 15.1** <u>PENALTIES FOR FAILURE TO MAKE CONTRIBUTIONS TO THE FUNDS:</u> The Employer contributions to the Welfare, Pension and Apprenticeship & Training Funds are in addition to the basic wage rates. Income Tax deductions are not to be made from these contributions.

**Section 15.2** The failure of The Employer to pay required contributions to any of the above Funds, or to pay interest on such delinquencies, or legal and auditing fees and costs assessed against such delinquent Employer, as provided herein shall constitute a violation of this Agreement and the Union shall be authorized to commence expedited arbitration before the New

7990333.1

Jersey State Board of Mediation. Expedited Arbitration can be commenced within seven (7) days of the Notice to Arbitrate. The Employer is liable for its delinquent payments of contributions, interest, legal and auditing fees of the Fund Administrator.

**Section 15.3**  If the Trustees or the Plan Administrator of the Funds are required to utilize legal services to collect Employer delinquencies or auditing services to ascertain the correct amount due from an Employer, the delinquent Employer shall be required to pay, in addition to 8% interest from the date of delinquency, the reasonable cost of auditing services and legal fees at the following rates: 15% on the first $750.00; 10% on any amount in excess of $750.00; minimum collection fee of $15.00 on any amount less than $100.00.

**Section 15.4**  The Employer who for any reason, whether willfully or not, fails, refuses or neglects to submit required reports to the Welfare, Pension and Apprenticeship & Training Funds or submits reports which do not indicate accurately the number of Employees employed by the Employer, Gross Wages paid or the correct amount of hours worked and contributions due said Funds on behalf of said employees, shall pay liquidated damages in the amount of 10%, from the date due on said monies found to be due said Funds under such circumstances. Said liquidated damages shall be in addition to the 8% interest due the Funds on delinquent contributions by Employers.

**Section 15.5**  All contributions required to be made to either of the aforementioned Funds by the Employer shall be made on a weekly basis on the day the Employees are paid by the Employer, with a copy to the Shop Steward.

**Section 15.6**  The Trustees shall permit an Employer to make monthly, instead of weekly, contributions to the Funds upon such Employer furnishing a Surety Company Bond to the Trustees, to guarantee payment of contributions to the Funds in an amount determined by the

7990333.1

Trustees to be sufficient guarantee in accordance with the size of the project, but in no event to exceed $10,000.00.

## ARTICLE XVI - NON-DISCRIMINATION CLAUSE

**Section 16.1** The Union and the Company agree that they will not discriminate against any employee because of age, race, creed, national origin, ancestry, marital status, affectional or sexual orientation, gender identity or expression, disability, nationality, sex, or union membership or non-membership. The Union and the Company agree to comply with any and all State and Federal laws, regulations, and rules guaranteeing civil rights and liberties to all persons.

## ARTICLE XVII - PROHIBITION OF STRIKES, SLOWDOWNS, WORK STOPPAGES, ETC.

**Section 17.1** Since adequate grievance procedures are provided in this Agreement and since binding arbitration has been agreed to, the Union agrees that it will not engage in, encourage, sanction, or suggest strikes, slowdowns, mass resignations, mass absenteeism, or any other similar action which would involve a work stoppage that may disturb or interfere with the orderly operation of the Company's operations.

## ARTICLE XVIII - WAIVER OF RECOURSE TO LEGAL REMEDIES

**Section 18.1** In further consideration of the mutual promises contained herein, the parties hereto expressly agree that neither party shall bring or cause to be brought any Court or other legal or administrative action against the other until the dispute, claim, grievance or complaint shall have been brought to the attention of the party against whom it shall be made and the said party, after actual notice of same, shall fail within a reasonable time to take steps to correct the cause or circumstances giving rise to such dispute, claim, grievance or complaint.

19

## ARTICLE XIX - SAFETY

**Section 19.1**  The parties hereto shall establish a joint (one representative from each party) Safety Committee to evaluate all present and future standards and guidelines for on-the-job safety in the construction industry as may from time-to-time be promulgated by Federal, State or Insurance Industry representatives.  When the Committee unanimously adopts certain safety standards, it shall recommend to all contractors covered by this contract that they adopt such recommendations within sixty (60) days thereafter.

## ARTICLE XX - SUBSTANCE ABUSE & TESTING POLICY

**Section 20.1  Policy**  The purpose of this policy is to establish a productive and safe working environment and to establish programs promoting high standards of employee health, safety and performance.  This policy outlines expected employee behavior that is considered an essential qualification for all job assignments.  It also covers the responsibilities of various Company departments for administering the substance abuse program and outlines how the program will be implemented.

**Section 20.2**  In this regard, the Union has established an Employee Assistance Program to provide its members that may have alcohol or substance abuse problems the proper professional assistance.  The Company does not have an in-house drug or alcohol rehabilitation program.  Any employee voluntarily admitting to a drug or alcohol problem and requesting help in overcoming the problem should be put into contact with the Substance Abuse Program Administrator who shall be appointed by United Steel.  Employees who have a positive drug test result, who are not immediately discharged, will also be referred to the Substance Abuse Program Administrator for further action.

**Section 20.3**  The Substance Abuse Program Administrator will assist the employee in understanding the medical benefit insurance plan and in enrolling in a drug or alcohol

7990333.1

rehabilitation or counseling program. The Company will not bear any of the expense incurred by the employee in the process of rehabilitation or counseling other than that provided for in the company's medical plan.

**Section 20.4** The Company does not sanction any use of illegal substances under any circumstances.

**Section 20.5 Confidentiality** All actions taken under the authority of this program will strictly maintain the confidentiality of the employees. Information related to investigations, possible employee violations, medical tests, or drug tests will be communicated only on a strict "need to know" basis in accordance with the law and employee consent. Discussions with employees conducted under this policy will be conducted as privately as circumstances permit. The Substance Abuse & Testing Policy is attached as Schedule "G".

## ARTICLE XXI - SEPARABILITY AND SAVINGS

**Section 21.1** If any Article or Section of this Agreement or any Supplement or Riders hereto be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement and of any Supplements or Riders thereto, or the application of such Article or Section to persons or circumstances other than those as to which it has been invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

**Section 21.2** If any work performed hereunder is performed subject to Prevailing Wage Laws, the provisions of the Prevailing Wage Laws shall take precedence over the terms of this Agreement.

7990333.1

## ARTICLE XXII - MISCELLANEOUS

**Section 22.1**  At all times, the employee shall leave with the project bookkeeper department a telephone number and his home mailing address and an email address, if available, at which the Company can immediately contact the employee.

**Section 22.2**  The Company agrees to notify the Sub-District Office of the Union having jurisdiction over any of its projects under this Agreement of the following:

    a.    The location of the specific project.

    b.    Job classifications of work available and the number of men required for each classification.

    c.    The Company further agrees that if additional men are needed, it will hire qualified men who may be sent to the project by the Union before new workers are hired.

## ARTICLE XXIII - PREVAILING WAGE WORK

**Section 23.1**  On all projects which are subject to the Prevailing Wage Laws and regulations of any State, Commonwealth, or other governmental entity, the provisions of the Prevailing Wage Laws and regulations shall take precedence over the terms of this Agreement.

## ARTICLE XXIV - TERMINATION

**Section 24.1**  This Agreement shall continue in full force and effect beginning with the effective date of January 1, 2019, as specified above, and is not subject to termination by any party signatory hereto prior to December 31, 2021 and either party may serve written notice on the other party between September 30, 2021 and October 31, 2021 that it desires to reopen the contract as to any subjects but the failure to furnish any such written notice shall cause the terms and provisions of this contract automatically to go into effect for another year subject to all the same terms and provisions including this Article of Termination.

7990333.1

**[SIGNATURE TO FOLLOW]**

**IN WITNESS AND TESTIMONY** of the provisions and terms mutually agreed upon and specified herein, the duly authorized officers and/or representatives of the parties hereby affix their signatures the day and year above written.

PKF-MARK III, INC.

BY: _____
Glen Ely

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION ON BEHALF OF ITS LOCAL UNION 15024

By: _____
Leo W. Gerard, International President

By: _____
Stan Johnson, Secretary/Treasurer

By: _____
Thomas Conway, Vice President, Administration

By: _____
Fred Redmond, Vice President, Human Affairs

By: _____
John E. Shinn, Director, District #4

By: _____
Michael Fisher, Sub-District Director

24

## SCHEDULES

### A.    PUBLIC WORK WAGE SCHEDULE

The applicable Public Work Wage Schedule, either State, Federal or Local, in the area of a work project is incorporated by reference into this Agreement upon commencement of said project. This wage schedule will be available for inspection at the Company's main or field office(s).

### B.    PRIVATE WORK WAGE SCHEDULE

The Private Work Wage Schedule shall be negotiated with the Company and is incorporated by reference into this Agreement. This wage schedule will be available for inspection at the Company's main or field office(s).

### C.    HEALTH, WELFARE, LIFE & DENTAL INSURANCE PROGRAMS

The Health, Welfare, Life Insurance and Dental Benefits Programs and the Participation Agreements are incorporated by reference into this Agreement and shall be available for inspection at the office of PKF-MARK III, Inc., 17 Blacksmith Road, Newtown, Pennsylvania, 18940, Phone: 215-968-5031, Fax: 215-968-3829.

### D.    DEFERRED COMPENSATION PLAN

The Pension Plan, Savings Plan, 401(k) Plan, Cafeteria Plan Profit Sharing Plan, or other deferred compensation plan established and maintained by the Employer are incorporated by reference into this Agreement and shall be available for inspection at the Company's main office.

### E.    JOINT JOBS CLASSIFICATION COMMITTEE

When wages are dictated by either Federal, State law or private contract, employee job classifications will be made a part hereof by the Joint Jobs Classification Committee. Attached hereto and made part hereof and Schedule E-1 is the detailed description of the job classifications covered by this Agreement.

### F.    APPRENTICESHIP & TRAINING FUND AND PROGRAM

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International AFL-CIO-CLC, on Behalf of its Local 15024 and its Signatory Employers Apprenticeship & Training Program is incorporated by reference into this Agreement and will be available for inspection at the Company's main or field office(s).

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International AFL-CIO-CLC, on Behalf of its Local 15024 and Signatory Employers Apprenticeship & Training Trust Fund Agreements and the Participation Agreements are incorporated by reference into this Agreement and will be available for inspection at the office of United Steel Apprenticeship and Training Program , Administrative Office, 41 Watchung Plaza, #310, Montclair, New Jersey 07042, Phone: 973-580-3116, Fax: 973-484-4827, Email: jsantamaria@njhms.com. Attached hereto and made part hereof as Schedule I is the United Steel Apprenticeship and Training Program Participation Agreement executed by the company.

### G.    SUBSTANCE ABUSE & TESTING POLICY

Attached hereto and made part hereof as Schedule G-1 is the Company's Substance Abuse and Testing Policy for covered employees.

7990333.1

## <u>SCHEDULE E-1</u>

The following craft descriptions are claimed by United Steel as part of its construction jurisdiction and included in this Collective Bargaining Agreement:

EQUIPMENT OPERATORS

CARPENTERS

IRONWORKERS

PLUMBERS

PIPEFITTERS

SPRINKLER FITTER

MILLWRIGHTS

ELECTRICIANS

PAINTERS – INDUSTRIAL, BRIDGE, LINE STRIPPING

CEMENT MASON

BRICK MASON

DOCKBUILDERS

SHEET METAL WORKERS

HVAC WORKERS

HEAVY, GENERAL and BUILDING LABORERS

SURVEYORS

TRUCK DRIVER

WATERPROOFING (see Laborer)

GLAZING

ELEVATOR CONSTRUCTORS

BOILERMAKERS

DIVERS

DRYWALL FINISHERS

HEAT and FROST INSULATOR

ASBESTOS and HAZARDOUS WASTE REMOVAL (see Laborer)

PAPER HANGER

ROOFER

TILE SETTERS and FINISHERS

Any and all classification disputes shall be initially determined by the Contractor. Any and all disputes not resolved by the Contractor shall be determined by dispute provisions of this Agreement.

The following list of certain craft classifications and their respective work assignments are generally described as follows:

**EQUIPMENT OPERATORS:** The following equipment is recognized as falling under "Operator" classification:

Backhoes
Boom Truck
Boring and Drilling Machines
Bridge Deck Finisher
Bulldozer
Concrete Pump
Equipment Mechanic
Front End Loaders
Grader
Cranes
Pan
Paver
Off Road Dump Trucks
Roller (ride on)
Scraper
Hydraulic Excavators
Vacuum Truck

The following pieces of equipment constitute tools of the trade and as such personnel using them do not fall under operator classification.

Telehandlers, Lulls, Forklifts, Motorized telescopic man lifts, Scissor lifts, Welders, Compressors, Hydraulic power packs, Temporary pumps, Walk behind double drum rollers and compactors, Jumping jacks, Plate tampers, Personnel boats, Electric hoists, Monorail and hoist systems.

**CARPENTERS:** The following activities are recognized as falling under "Carpenter" classification.

Fabrication and installation of all temporary concrete formwork (except as incidental to Laborers work)
Installation of Stay in Place Formwork
Installation and removal (for reuse) of temporary shielding
Installation of any sleeve or insert within formwork (except electrical conduit and inslab piping)
Installation of falsework incidental to Carpenters work
Installation of doors, windows and hardware
Installation of architectural finishes
Installation of all precast structural members
Wood or metal stud framing
Finish carpentry

**IRONWORKERS:** The following activities are recognized as falling under "Ironworker "classification.

Installation of reinforcing steel (except for drilled shafts, caissons, piling and in Pennsylvania roadway and duct bank steel which is installed by laborers)
Fabrication of reinforcing steel cages for drilled shafts, caissons and piling
Erection of structural steel
Installation of shear studs
Installation of bride deck expansion joints

**PLUMBERS:** The following activities are recognized as falling under "Plumber" classification.

Installation of all piping systems which require a licensed plumber. This typically includes hot and cold potable water, drainage, waste and venting. However this may vary based on different city or municipality requirements.

**PIPEFITTERS:** The following activities are recognized as falling under "Pipefitter" classification

All interior piping systems including equipment and underslab or inslab piping not covered by

Licensed plumber requirements or sprinkler fitter classification.
Installation of in-line pumps
Installation of in-line instrumentation
Installation of Pneumatic Instrumentation panels
Installation of all Pneumatic Instruments and piping

**SPRINKLER FITTERS:** The following activities are recognized as falling under "Sprinkler Fitter" classification

All work associated with fire suppression sprinkler piping systems.

7990333.1

**MILLWRIGHTS:** The following activities are recognized as falling under "Millwright" classification.

      Installation of Miscellaneous Metals
      Installation of Skid Mounted Pumping Equipment
      Installation of all Water and Sewage Process Equipment
      Installation of Stop Logs, Gates and Actuators

**ELECTRICIANS:** The following activities are recognized as falling under "Electrician" classification

      Installation of wire
      Installation of conduits (except in ductbanks)
      Installation of all electrical equipment
      Relocation of all electrical equipment
      Installation of all lighting systems
      Installation of non in-line electronic instrumentation
      All terminations of wire
      Installation of electronic security systems
      Installation of temporary power and lighting
      Installation of permanent generators

**PAINTERS:** The following activities are recognized as falling under "Painter" classification.

      All painting (except foundation waterproofing)
      All painted labeling
      Drywall taping
      All painting preparatory work i.e. scraping and sandblasting

**CEMENT MASON:** (see Laborers)

**BRICK MASONS:** The following activities are recognized as falling under "Brick Mason" classification.

      Installation of all types of masonry material for buildings.
      Installation of all types of natural stone material for buildings

**DOCKBUILDERS:** The following activities are recognized as falling under "Dockbuilder" classification.

      Installation of all types of foundation or earth retention piling
      Installation of any falsework or templates incidental to dockbuilders work
      Installation and removal of temporary trestles
      Installation of fender systems
      Installation of casings for micropiles, drilled shafts or caissons (dockbuilder as lead person, laborers as support)

7990333.1

Installation of reinforcing steel cages for piles, caissons or drilled shafts
All load testing of piles, caissons, drilled shafts or micro-piles


**SHEET METAL WORKERS:** The following activities are recognized as falling under "Sheet Metal Worker" classification.

Installation of all types of ducts for HVAC systems


**HVAC WORKERS:** The following activities are recognized as falling under "HVAC" classification.

Installation of heating, ventilating and air-conditioning equipment


**HEAVY, GENERAL and BUILDING LABORERS:** The following activities are recognized as falling under "Laborer" classification.

Material Handling, including unloading and transporting on site
Demolition
Clearing
Excavating
Filling
Backfilling
Landscaping
Placing Concrete
Finishing Concrete
Installation of Concrete and Brick Pavers
Installation of all Foundation and Roadway Subgrade
Rock Drilling
Blasting
Directional Drilling
Gabion Baskets
Installation of Roadway Mats and Mesh
Installation of Precast Retaining Walls
Installation of Precast Barrier Curb
Installation of Poured in Place Roadway Barrier
Installation of Precast Noise Wall panels and posts
Installation of Fibre Optic Cable
Installation of  Duct Banks
All Railroad Track Work
Oiling and Cleaning of all Concrete Forms
Final Stripping of any Concrete Form not to be used again on the Project
Installation and Removal of Lagging for Earth Retention Systems
Installation of All Exterior Piping not requiring a plumber's license
Installation of Asphalt
Traffic Directors
Flagmen
Traffic Control
Installation of Tie Back Systems

7990333.1

Installation and removal of falsework, tarping and scaffolding for painting and masonry work

Installation of all foundation waterproofing systems

Installation of curing compounds and floor sealers

Asbestos and Hazardous Waste Removal

Installation of casings for micro-piles, caissons and drilled shafts (dockbuilder as lead person laborers as support crew)

Deck hand on all barges

Monitoring and maintenance of temporary pumps, generators, compressors, heating systems and enclosures

Site cleanup and debris removal

Installation of any type of process media i.e. carbon, sand, stone or synthetic material

**SURVEYORS:** The following activities are recognized as falling under "Surveyor" classification.

Party Chief
Instrumentperson
Chainperson
Rodperson

**TRUCK DRIVER:** The following activities are recognized as falling under "Truck Driver" classification.

Driving Dump Trucks on Site
Driving Tractor / Trailers on Site
Hauling Material off Site in Vehicles requiring a CDL license

**WATERPROOFING:** (see Laborers)

**GLAZING:** The following activities are recognized as falling under "Glazing" classification.

Installation and sealing of glass in a framed opening.

**ELEVATOR CONSTRUCTOR:** The following activities are recognized as falling under "Elevator Constructor" classification.

Installation of elevator mechanical systems

**BOILERMAKER:** The following activities are recognized as falling under "Boilermaker" classification.

Welding of open top liquid containment vessels.

**DIVERS:** The following activities are recognized as falling under "Diver" classification.

7990333.1

Performing any type of work beneath the surface of the water where mechanical breathing equipment is required.

**DRYWALL FINISHER:** The following activities are recognized as falling under "Drywall Finisher" classification.

The installation of any type of drywall material.

**HEAT and FROST INSULATOR:** The following activities are recognized as falling under "Heat and Frost Insulator" classification.

Installation of all insulating material for heat, frost and condensation protection on pipes, equipment and all other surfaces.

**ASBESTOS and HAZARDOUS WASTE REMOVAL:** (see Laborer)

**PAPER HANGER:** The following activities are recognized as falling under "Paper Hanger" classification.

Application of any paper, cloth or vinyl material to a wall or ceiling.

**ROOFER:** The following activities are recognized as falling under "Roofer" classification.

Installation of all roofing systems

**TILE SETTERS and FINISHERS:** The following activities are recognized as falling under "Tile Setter and Finisher" classification.

Installation of any tile material.

# SCHEDULE G-1

**Section 1.1**     **Scope**   This policy applies to all employees of the Company.

**Section 1.2**     **Definitions**

       a.     <u>Legal Drug</u> - A drug prescribed for use by a duly licensed medical practitioner licensed to issue prescriptions or a drug that is authorized pursuant to federal or state law for general distribution and use without a prescription in the treatment of human diseases, ailments or injuries.

       b.     <u>Illegal Drug - Illegal Drugs</u> includes any drug which the sale, use of or possession of is unlawful, i.e., amphetamines, cannabinoids, cocaine, phencyclidine (PCP), hallucinogens, methaqualone, opiates, barbiturates, benzodiazepines, synthetic narcotics, designer drugs, controlled dangerous substances, controlled substance analogs or volatile substances which produce the psychological or physiological effects of a controlled dangerous substance through deliberate inhalation or a metabolite of any of these substances but shall not mean any these substances if the employee is utilizing any of theses substances as prescribed by a licensed medical practitioner and if used in accordance with company policy.

       c.     <u>Alcohol</u> includes any ingestible liquid which contains alcohol.

       d.     <u>Other Substances</u> includes but is not limited to stimulants, sedatives, narcotics, prescribed drugs, and inhalants which may be legal substances but are improperly used.

       e.     <u>Drug Test</u> - a chemical test administered for the purpose of determining the presence or absence of a drug or drug metabolites in a specimen.

       f.     <u>Specimen -</u> a tissue or product of the human body (e.g. urine, saliva, hair, blood, sweat) chemically capable of revealing the presence of drugs in the human body.

       g.     <u>Initial Test</u> - The first test of a specimen to determine the presence or absence of drugs or their metabolites in specimens. This initial test, if positive, should be confirmed by a confirmation test. The initial test shall use an immunoassay which meets the requirements of the Food and Drug Administration for commercial distribution.

       h.     <u>On-Site Test</u> - a drug test that is easily portable and can be administered in a location outside a laboratory and has met the requirements of the Food and Drug Administration (FDA) for commercial distribution and that has met generally accepted cutoff levels such as those in the Mandatory Guidelines for Federal Workplace Drug Testing Programs.

       i.     <u>Confirmation Test</u> - If the initial test is positive, a second test by gas chromatography mass spectrometry (GC/MS) should be done immediately. This confirmatory test is highly accurate and will rule out any false positives on the first test.

       j.     <u>Medical Review Officer</u> – a licensed physician and/or an acceptable testing laboratory with specific training in drug and alcohol testing procedures and substance abuse used by the Company to evaluate drug test results.

7990333.1

k.     For the purpose of testing relative to the Drug-Free Workplace Act, Department of Transportation Regulations, the Americans with Disabilities Act and the New Jersey Law Against Discrimination, the substances for which the employee will be tested are marijuana, cocaine, opiates, amphetamines and Phencyclidines (PCP'S).  These substances are hereinafter referred to as "DOT Substances."

l.     "Under the influence" means for the purpose of this policy that the employee is affected by a DOT Substance, Other Substance, or Alcohol or the combination of the above in any detectable manner.

m.     At work for the purpose of this policy means an employee's work hours and all other times an employee spends performing Company business or anytime an employee is on Company property.

n.     "Reasonable suspicion" means a belief that the action or appearance or conduct of an employee while at work is indicative of the use of controlled substances or alcohol. Controlled Substances is meant to include both other substances and DOT Substances. It means a belief that an employee is using or has used drugs in violation of the employer's policy drawn from specific objective and articulable facts and reasonable inferences drawn from those facts in light of experience, and may be based upon, among other things:

i.     Observable phenomena, such as direct observation of drug use and/or the physical symptoms or manifestations of being "under the influence" of a drug;

ii.     Abnormal conduct or erratic behavior while at work, absenteeism, tardiness, or deterioration in work performance.

iii.     A report of drug use provided by reliable and credible source.

iv.     Evidence that an individual has tampered with a drug test, during his/her employ with the Company.

v.     Information that an employee has caused or contributed to an accident while at work.

vi.     Evidence that an employee is involved in the use, possession, sale, solicitation, or transfer of drugs while working or while on the employer's premises or operating the employer's vehicle, machinery, or equipment.

vii.     When there is reasonable cause to suspect that an employee is having drug-related work performance problems, or is displaying abnormal behavior that may be drug-related, a supervisor shall request that the employee submit to a drug test.  A supervisor may take the following steps:

(1)     In conjunction with another supervisor, confront the employee stating his or her suspicions, and ask for an explanation.  The conduct must be witnessed by at least two supervisors, if at all feasible.  If only one supervisor is available, only one supervisor need witness the conduct.  Additional management or security personnel may also be present as appropriate.

(2)     If suspected contraband is involved and the supervisor is not satisfied with the explanation, the contraband will be confiscated and a receipt will be issued. If an employee claims that items suspected of being contraband are prescription or otherwise legal drugs, a single item will be confiscated for testing arranged by the Substance Abuse Program Administrator, who shall be appointed by United Steel. The contraband will be turned over to the law enforcement authorities.

(3)     Any employee who is "under the influence" will be suspended pending further investigation. Such an employee, who insists on driving away from a work site, will be instructed under penalty of discharge to use public transportation or other safe transportation and not to drive themselves appropriate, the employee will be advised that local authorities will be notified that the employee who seems to be "under the influence" is trying to leave the work site and drive.

(4)     If the employee seems to be "under the influence" or there exists other reasonable cause, the supervisor(s) shall require that the employee take a drug test. An employee shall submit to testing upon reasonable cause when requested to do so. Non-cooperation may result in discharge and other penalties.

(5)     The supervisor will then identify witnesses and prepare a detailed written statement describing his/her observations which shall be forwarded to the Union. The documentation of the employee's conduct shall be prepared and signed by the supervisor(s) within 24 hours of the observed behavior or before the results of the tests are released, whichever is earlier.

**Section 1.3     Responsibilities**  It is the responsibility of each employee to read and understand this policy and to abide by the procedures of such policy.  It is the responsibility of the Union to submit the appropriate form to the Company once the employee has read the policy and acknowledges the same by executing the form.  Employees are responsible for making their own life style choices.  However, the Company sees no reason to accept even small risks that on-the-job or off-the-job drug use by employees might cause.

**Section 1.4     Expected Employee Behavior**  The Company expects its employees to report to work fit for duty with no alcohol or illegal drugs in their bodies.  Violation of this policy can result in sanctions against employees up to and including discharge from employment.

**Section 1.5     Testing**

a.     **Post-hire / Pre-employment Testing** – will be required of all applicants whom the Company has selected to hire.  Prior to employment, the applicant must pass a physical which will include a controlled substance and alcohol test.  All job applicants must be drug-free at the time of their pre-employment medical examination.  Drug testing has been demonstrated to be an accurate method of determining the presence or absence of illegal drugs in a person's body.

b.     **Reasonable Suspicion Testing** – applies to all employees of the Company.

7990333.1

c. **Post Accident Testing** –

      i.     An employee shall provide a urine specimen to be tested for the use of drugs and a blood sample to be tested for alcohol as soon as possible after a reportable accident, but in no case later than 24 hours after the accident.

      ii.    An employee who is seriously injured and cannot provide a specimen at the time of the accident shall provide the necessary consent for obtaining hospital reports and other documents that would indicate whether there were any drugs in his/her system.

      iii.   Employees believed responsible for or injured in on-site accidents or employees causing damage to Company property shall provide a urine specimen to be tested for controlled substances and a blood sample to be tested for alcohol.

      d.    **Return To Duty Testing** – In order to ensure that employees remain drug-free after receiving education/counseling for a substance abuse problem, the Company will conduct Return to Duty Testing. The company will periodically test employees who return to work after participating in an alcohol or other drug rehabilitation program.

      e.    **Random/Neutral Selection Testing**

      i.     Random testing is a mechanism for selecting employees for drug tests that (1) results in an equal probability that any employee from a group of employees subject to the selection mechanism will be selected and (2) does not give the company discretion to waive the selection of any employee selected under the mechanism.

      ii.    The Company shall use a random selection process for selecting employees to be tested for the use of drugs. Employees shall submit to drug testing when selected by a random selection process used by the Company. The Company shall use a random selection process for selecting employees to be tested for the use of drugs. Employees shall submit to drug testing when selected by a random selection process used by the Company.

      f.    **Random Testing** is required of all employees at the discretion of the employer.

      g.    **Periodic Testing** The Company requires an employee to be tested once under the requirements of this section for the use of drugs during the first medical examination of the employee after implementation of the drug-testing program.

      i.     Exception - The Company may discontinue periodic testing after the first calendar year when it has implemented its neutral selection drug-testing program and, therefore, is testing 25 percent (25%) of employees subject to testing under its neutral selection testing program.

## Section 1.6   Post Testing Action

      a.    A potential employee who is found to have a positive confirmatory test will not be hired.

      b.    If an employee is found to have a confirmatory test result, the following action will be taken:

7990333.1

i.    <u>First offense</u>: Employee may be terminated from employment with the Company or given such other discipline in the sole discretion of the Company which could include weekly, mandatory random testing and such other conditions at the employees' expense.

ii.    <u>Testing Procedures</u>

The drug testing program is limited to tests for marijuana, cocaine, opiates, amphetamines, and Phencyclidines (PCP)This is subject to amendment at the discretion of the Company.

Testing for drugs will use the following drug detection cutoff levels.  If a specimen is identified as a positive on the initial drug test, a confirmation test using gas chromatography/mass spectrometry (GCMS) techniques at the cutoff levels listed below will be used to confirm the initial drug test.

| Type of Drug or Metabolite | Initial Test | Confirmation Test |
|---|---|---|
| (1)   Marijuana metabolities<br>(i)    Delta-9-tetrahydrocannabinol-9-caroxylic acid (THC) | 50 | 15 |
| (2)   Cocaine metabolities (Benzoylecgonine) | 300 | 150 |
| (3)   Phencyclidine (PCP) | 25 | 25 |
| (4)   Amphetamines | 1000 | |
| (i)    Amphetamine | | 500 |
| (ii)   Methamphetamine | | 500   (Specimen must also contain amphetaime at a concentration of greater than or equal to 200 ng/mL) |
| (5)   Opiate metabolities | 2000 | |
| (i)    Codeine | | 2000 |
| (ii)   Morphine | | 2000 |
| (iii)  6acety1morphine | | 10<br>Test for 6-AM in the specimen. Conduct this test only when specimen contains morphine at a concentration greater than or equal to 2000 ng/mL. |

These cutoff levels are subject to change by the Company.

7990333.1

These drugs may have a lingering effect in the body. The presence of these drugs may affect the user and/or be detected in the body several days after use.

All specimen collection and testing for drugs under this policy shall be performed in accordance with the following procedures:

The collection of specimens shall be performed under reasonable and sanitary conditions. Individual dignity shall be preserved to the extent practicable;

Specimens shall be collected in a manner reasonably calculated to prevent substitution of specimens and interference with the collection or testing of specimens;

Specimen collection shall be documented, and the documentation procedures shall include labeling of specimen containers to reasonably preclude the likelihood of erroneous identification of test results.

Specimen storage and transportation shall be performed in a reasonable manner to preclude specimen contamination or adulteration; and

Specimen testing for drugs shall conform to scientifically accepted analytical methods and procedures.

Any drug testing conducted or requested by an employer under this policy shall occur during or immediately after the regular work period of current employees, and shall be deemed to be performed during work time for purposes of determining compensation and benefits for current employees.

Any testing for drugs under this policy may only conduct those tests necessary to determine the presence of illegal drugs in the specimen.

A confirmation test shall use a method of equal or greater reliability than that used on the initial drug test. If an initial drug test is negative, there shall be no confirmation test. All confirmed positive drug test results shall be reviewed by a Medical Review Officer before being used by the company.

Within five working days after receipt of a confirmed positive test result, the Company shall, in writing, inform the employee of such positive test result and inform the employee in writing of the consequences of such a report and the options available to him/her.

An employee may request and receive from the Company a copy of the test result report. Within 10 working days after receiving notice of a confirmed positive test result, the employee may submit information to the Company explaining the test results, and why the results do not constitute a violation of the Company's policy.

**Other Substances** -- Employees are subject to the same testing and post action testing regarding other substances.

**Notification of Test Results and Record Keeping** – The Company shall notify an employee or job applicant of the results of the individual's drug test conducted under this policy. The employee must also be advised what drug was discovered.

7990333.1

The Company shall retain in the employee's file information only indicating the following:

the employee submitted to a drug test.

the date of such test.

the location of such test.

the identity of the person or entity performing the test.

whether the confirmation test finding was "positive" or "negative."

**Employee Compliance** – All employees are expected to comply fully and promptly with instructions issued under the authority of this program. Failure to do so can result in discipline, up to, and including discharge.

Company policies, procedures, and substance abuse programs, are not intended to create or alter any existing, implied, or express contracts, written or verbal, between the Company and its employees, independent contractors, or job applicants. The Company reserves the right to alter any of its policies, procedures, or programs, at will, and without notice to its employees, independent contractors, or job applicants. The Company creates no promises with any of its policies, procedures, and programs, and remains free to change wages and all other working conditions without having to consult employees or anyone else and without anyone's agreement. The Company reserves the right to discipline or discharge any employee or independent contractor with or without good cause or to refuse to hire any job applicant as is consistent with existing law.

## Refusal to Submit to a Drug-Test

If an employee or a job applicant refuses to submit to drug testing administered in accordance with this policy, the company shall not be barred from discharging, disciplining or referring the employee to assessment or drug abuse rehabilitation or from refusing to hire the job applicant.

An employee or job applicant required to submit to a drug test under this policy may be requested to sign a statement indicating that he/she has read and understands the drug testing policy and notice. An employee's or job applicant's refusal to sign such a statement shall not invalidate the results of any drug test, or bar the Company from administering the drug test or from taking action consistent with the terms of an applicable collective bargaining agreement or the Company's drug testing policy, or from refusing to hire the job applicant.

## Legal Drugs

a.    **Abuse of Legal Drugs** – Various drugs that may be used legally can cause potential safety or other job performance problems. Improper use of such substances on duty will not be tolerated. Employees who are found to improperly use such substances on duty, or who are complained about by customers for improperly using these substances on duty, will be referred to the Substance Abuse Program Administrator for evaluation and further action that can include discharge.

39

b.   **Possession of Illegal Drugs** – Any employee who possesses, sells, or receives an illegal drug while on duty or on Company property, or who leaves an illegal drug on Company property, or at a work site, will be immediately discharged and the matter will be referred to the law enforcement authorities for investigation.

Such illegal behavior on the part of an employee may damage the Company's reputation or, in the case of leaving illegal drugs on Company property, may incriminate innocent persons.

c.   **Affirmative Defense** – Any employee who is alleged to have violated this policy shall have available as an affirmative defense, to be proven by the employee through clear and convincing evidence, that his/her use of a drug was prescribed by a licensed medical practitioner who is familiar with the employee's medical history and assigned duties and that the drug was used in accordance with company policies.   The MRO may provide an opportunity for an employee to discuss a positive test result and clarify if a prescribed medication or other legal drug was involved.

d.   **Discharge of an Employee** – An employee discharged on the basis of a confirmed positive drug test in accordance with this policy shall be considered to have been discharged for willful misconduct under State law.

**After-Care Monitoring** – After returning to work, employees who test positive and have been allowed to attend rehabilitation or counseling must continue in any after-care program and may be subject to follow-up testing for not longer than 60 months following return to work.

**Negative Test Results**  Whenever an individual suspected of drug use passes the drug test (e.g. the results are negative for illegal drugs), the employee will receive the confidential memo shown below.  A copy will be placed in the employee's personnel file.

To Our Valued Employee

The specimen you submitted on (date) was found to be free of detectable illegal drugs.  We regret any inconvenience this test may have caused you, but we are confident that you understand the importance of maintaining a workplace where all employees can be reasonably assured that their safety is not being jeopardized by co-workers who are under the influence of illegal drugs.  The Company thanks you for being drug-free.

7990333.1

# APPRENTICESHIP & TRAINING TRUST FUND
## PARTICIPATION AGREEMENT

**BETWEEN:** UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL AFL-CIO-CLC, ON BEHALF OF ITS LOCAL 15024

**AND:** SIGNATORY EMPLOYERS APPRENTICESHIP & TRAINING TRUST FUND

**AND:** UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL AFL-CIO-CLC, on Behalf of its LOCAL 15024 and APPRENTICESHIP & TRAINING TRUST FUND

**This Apprenticeship & Training Participation Agreement**, effective January 1, 2015, is made and entered into by and between ("Employer") and the UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL AFL-CIO-CLC, on Behalf of its LOCAL 15024, ("Union"), by their duly authorized representatives.

## W I T N E S S E T H:

**WHEREAS**, the Employers and the Union, in their current collective bargaining agreement, have provided for contributions to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International AFL-CIO-CLC, on Behalf of its Local 15024 and Signatory Employers; and

**WHEREAS**, the payments shall be used to create and maintain a Apprenticeship & Training Fund, which shall be named the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International AFL-CIO-CLC, on Behalf of its Local 15024 and its Signatory Employers, for the purpose of establishing a Trust to administer an Apprenticeship & Training program for the benefit of the eligible employees covered by the collective bargaining agreement.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements herein expressed, the employer signatory hereto agrees as follows:

- The Union and Employer agree to be bound by and hereby assent to all of the terms of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International AFL-CIO-CLC, on Behalf of its Local 15024 and its Signatory Employers ("Apprentice Ship & Training Trust Agreement"), as amended, creating the Apprenticeship & Training Fund, all of the rules and regulations already adopted and which may hereinafter be adopted by the Trustees of the Fund pursuant to provisions of the Apprenticeship & Training Trust Agreement, and all of the actions taken or to be taken by the Trustees in administering the Apprenticeship & Training Fund in accordance with provisions of the Apprenticeship & Training Trust Agreement, the Apprenticeship & Training Fund, and all rules and regulations promulgated under and pursuant to the Apprenticeship & Training Trust Agreement and the Apprenticeship & Training Fund.

7990333.1

- The Employer accepts as Employer Trustees the present Trustees appointed in accordance with provisions of the Apprenticeship Trust Agreement and all such past or succeeding Employer Trustees as shall have been or will be appointed in accordance with provisions of the Apprenticeship Trust Agreement.

The contribution rate as of January 1, 2019 is fifty cents ($0.50) per hour.

Payments shall be remitted to the Multiskilled Apprenticeship & Training Fund on a monthly basis and mailed to 41 Watchung Plaza, #310, Montclair, NJ 07042.

Failure on the part of the Employer to contribute as specified in paragraphs 3(a), 3(b) and 3(c) shall make it liable for all claims, including interest, penalties and attorney's fees and costs incurred by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International AFL-CIO-CLC, on Behalf of its Local 15024 and its Signatory Employers Apprenticeship & Training Fund, plus all arrears.

The Trustees or their designated representatives shall have the authority to audit the payroll, wage and tax records of the Employer for all covered employees for the purpose of determining the accuracy of the remittance reports and contributions submitted to the Fund by the Employer and the Employer's adherence to the requirements of this Agreement regarding contributions. For the purpose of such audit, the Trustees or their designated representatives shall have access to the payroll, wage and tax records of any individual covered by the Apprenticeship & Training Plan who the Trustees or their designated representatives reasonably believe may be subject to the Employer's contribution obligation.

**IN WITNESS WHEREOF,** the Employer and Trustees have caused this instrument to be executed by their duly authorized representatives.

[SIGNATURE TO FOLLOW]

PKF-MARK III, INC.,

MULTI-SKILLED EMPLOYEES AND
EMPLOYERS APPRECENTICESHIP &
TRAINING TRUST FUND

BY:     GLEN ELY, President

        17 Blacksmith Road
        Newtown, Pennsylvania, 18940
        Phone: 215-968-5031
        Fax: 215-968-3829

BY: _____
                      , Employer Trustee

BY: _____
                      , Union Trustee

BY: _____

        MICHAEL FISHER, Sub-District Director

DATED:

7990333.1

## SIDE LETTER BETWEEN PKF-MARK III, INC. AND USW 15024 REGARDING
## ARTICLE XII, HEALTH, WELFARE, LIFE & DENTAL INSURANCE AND SCHEDULE C

The parties hereto have entered into this side letter regarding their agreed upon interpretation of Article XII of the collective bargaining agreement between the parties. The Agreement provides that "The Employer shall have the right to change carriers and/or insurance during the term of this Agreement without bargaining with the Union, but the question of whether the Plan so provided is substantially similar to that described in Schedule C will be subject to the Grievance Procedure." The parties hereby agree, as a binding interpretation of that provision of the collective bargaining agreement that, in considering whether the Plan so provided is substantially similar, the Arbitrator may not consider only benefits, but must also consider all factors pertinent to the insurance, including, but not limited to:

- Type of Plan (PPO, POS, HMO, etc.);
- Strength of Provider Networks (number of providers in employer's geographic area);
- Plan Administration (ho easy for participant to access benefits and have claims paid);
- Levels of coverage (co-pays, annual and lifetime maximums, deductibles, etc.);
- Coverage Exclusions (do the Plans cover the same services);
- Premium Structure (overall premium costs and structure (tiered vs. composite);

The Arbitrator must also place substantial weight on the fact that the premiums are paid out of prevailing wage predeterminations which would otherwise be paid as wages to the employee(s). In the event that the Arbitrator finds that the Plans are not substantially similar, he/she must set forth with specificity what particular provision(s) of the Plan(s) are not substantially similar and why in order that the Employer may make appropriate changes to the Plan(s). The Employer shall, within Ninety (90) says, make appropriate change(s) to the Plain(s) or it may elect to participate in the Health and Welfare Plan that the Union makes available to a majority of the Employer in the heavy and highway industry.

Agreed this _____ day of _____, 2017, effective as of January 1, 2019.

USW LOCAL 15024                                  PKF-MARK III, INC.

_____                  _____

Michael L. Fisher USW Rep.                        Glenn A. Ely   President
Printed name and title                            Printed name and title

44

7990333.1

# EXHIBIT "C."

# EXECUTIVE ORDER No. 15-11

## PUBLIC WORKS PROJECT LABOR AGREEMENTS

WHEREAS, the City of Philadelphia ("City") has a compelling interest in awarding building or construction work contracts so as to yield the lowest reasonable costs and the highest standard of quality and efficiency; and

WHEREAS, Project Labor Agreements can ensure that a building or construction work project is completed at the lowest reasonable cost; by the highest quality and most professional work force; and in a timely manner without labor disruptions such as strikes, lockouts or slowdowns; and

WHEREAS, Project Labor Agreements can provide opportunities for the City, contractors and labor organizations to make progress in meeting their respective goals for worker diversity and local employment;

WHEREAS, the City has been a party to several Project Labor Agreements pursuant to Executive Order No. 5-95 and has gained useful insight into when Project Labor Agreements are most appropriate and beneficial to the City;

WHEREAS, the City has determined that certain projects, because of their size, complexity, need for a variety of craft labor and critical deadlines are generally appropriate for Project Labor Agreements; and

WHEREAS, guidance to City departments and agencies on the use of Project Labor Agreements benefits the interests of the City:

WHEREAS, an Advisory Committee can provide continuing guidance on the use and form of Project Labor Agreements;

NOW, THEREFORE, by the powers vested in me by the Philadelphia Home Rule Charter, it is hereby ORDERED:

**SECTION 1. Definitions.**

    (a)    Appropriate Labor Organization. An organization representing, for purposes of collective bargaining, journeymen in one or more crafts or trades with a Federal or state certified approved apprenticeship training program and which:

        (i)    has entered into a labor agreement with an employer in the building and construction industry;

        (ii)    has represented journeymen, mechanics and apprentices employed

on projects similar to the project for which a Project Labor Agreement is being considered;

(iii) possesses the present ability to refer, provide or represent qualified journeymen and apprentices in the crafts or trades required by the project, in sufficient numbers to perform the contracted work involved in the project; and

(iv) has identified member diversity as an organizational value and has established objectives for maintaining and increasing diversity among its apprentice and journeyman members.

(b) City Agency. A City office, department, board, commission or other entity which procures goods and services directly or through the City Procurement Department.

(c) Project(s). This Executive Order shall apply to building or construction work under a contract with the City governed by Section 17-107 of The Philadelphia Code.

(d) Project Labor Agreement. A collective bargaining agreement between a contractor as an employer and an Appropriate Labor Organization relating to the building or construction work performed at a particular site ("Project"). Such an agreement sets forth the terms and conditions of employment for workers hired by the employer and sets forth certain work rules, no-strike clauses, jurisdictional determinations and other project-specific provisions that the City, the employer or the Labor Organization deem important for the completion of the project. Any Project Labor Agreement shall be subject to the review and approval of the City's Law Department.

SECTION 2. Public Works Project Review.

(a) Each City Agency shall review all proposed Projects with an estimated construction cost of Five Million Dollars ($5,000,000) or more to determine if a particular Project would be appropriate for a Project Labor Agreement. Projects with lower estimated costs may also be appropriate for Project Labor Agreements, and City Agencies are encouraged to review Projects with lower construction costs. Appropriate Projects include the following characteristics:

(i) Projects that have high anticipated construction costs;

(ii) Projects that require the labor of multiple construction crafts or trades;

<blockquote>

(iii) Projects that have complex labor requirements that may conflict with existing collective bargaining agreements;

(iv) Projects that require completion without delay; and

(v) Projects that further urgent City goals.

</blockquote>

(b) All Projects with estimated construction budgets of Five Million Dollars ($5,000,000) or more shall be reviewed by City Agencies prior to issuing an invitation for bids. PLA's should be used when any of the criteria under Section 2(a) are met, unless clear countervailing considerations are present. City Agencies shall forward the findings of the Project review to the Mayor's Office.

## SECTION 3. Referral for Project Labor Agreements.

(a) When a City Agency has determined that a Project is appropriate for a Project Labor Agreement, the City Agency shall provide the Mayor's Office with a written description of the Project and the City Agency's recommendation for a Project Labor Agreement.

(b) The recommendation of the appropriateness and feasibility of using a Project Labor Agreement for a particular project shall describe how it will benefit and enhance the interests of the City on the basis of costs, efficiency, quality, safety and/or timeliness, and shall specifically address the following factors;

<blockquote>

(i) The need for safe, timely and efficient completion of the project;

(ii) The need for predictable costs and enforcement of prevailing wage requirements;

(iii) The need for effective mechanisms for resolution of disputes;

(iv) The need for a ready and adequate supply of highly skilled and highly trained craft workers and the need to guarantee performance of the project in a workmanlike and professional manner; and

(v) The opportunity to provide significant employment opportunities for qualified City residents, including minority males and women, and for women- and minority-owned businesses.

</blockquote>

(c) This Executive Order does not require the use of a Project Labor Agreement with respect to any particular Project, nor does this Executive Order require the selection of any particular union, trade council or labor organization.

**SECTION 4. Determination for Project Labor Agreement.**

(a)    The Mayor's Office shall review all submittals required for Projects.

(i)    Whether a Project Labor Agreement has been recommended or not, the Project shall be reviewed for consistency with this Executive Order.

(b)    When the Mayor's Office determines that a Project Labor Agreement is appropriate, it shall, in consultation with the City Agency, commence a discussion with labor organizations to determine

(i)    which labor organization(s) may be appropriate for the Project, and

(ii)    if a Project Labor Agreement is feasible for the Project.

(c)    The Mayor's Office may determine that a Project Labor Agreement will benefit from third party monitoring of the opportunities provided for qualified City residents, minorities and women. If so determined, the Mayor's Office will direct the Office of Economic Opportunity to select and contract with a qualified monitor ("Monitor").

(i)    If a Monitor is engaged for the Project, the cost shall be shared by the City, contractor(s) and the Appropriate Labor Organizations

**SECTION 5. Required Provisions In Project Labor Agreements.**

Any Project Labor Agreement entered into pursuant to this Executive Order shall:

(a)    Contain guarantees against strikes, lockouts, slowdowns and similar actions;

(b)    Set forth effective, immediate and mutually binding procedures for resolving jurisdictional disputes arising before the completion of the work; and

(c)    Include diversity goals for appropriate labor organizations and contractors.

**SECTION 6. Procedures When Project Labor Agreements Are Used.**

If a Project Labor Agreement is used pursuant to this Executive Order for any Project, the procedures listed in this section shall be followed:

(a)    A Project Labor Agreement shall be made part of the bid specifications in substantially the form attached hereto as the "Philadelphia Public Projects

Labor Agreement," or such other form of agreement that the City Solicitor may approve.

(b)     The Instructions to Bidders shall provide that the City, the Project manager and any contractor shall have the absolute right to select any qualified bidder for the award of project contracts without reference to whether the bidder was unionized, provided, however, that only a bidder willing to execute and comply with the Project Labor Agreement would be designated the successful bidder;

(c)     The Instructions to Bidders shall provide that the Project Labor Agreement shall be made binding on all contractors and subcontractors on the Project through inclusion of appropriate bid specifications in all relevant bid documents;

(d)     Following the award of the contract for the Project, the Project Labor Agreement shall be finalized and executed by the contractor or its project manager, subject to the review and approval of the City; and

(e)     The Project contract and the Project Labor Agreement shall comply with all other provisions of law.

**SECTION 7. Advisory Committee for Project Labor Agreements.**

(a)     An Advisory Committee for Project Labor Agreements is hereby established. The Advisory Committee shall consist of the following City officials or their designees:

> Mayor's Chief of Staff
> City Solicitor
> Managing Director
> Director of Finance
> Deputy Mayor for Transportation and Utilities
> Deputy Mayor for Economic Development

Other City officials, employees or private citizens may serve on the Advisory Committee at the request of the Mayor's Chief of Staff.

(b)     Duties. The Advisory Committee shall:

(i)     Monitor and evaluate Project Labor Agreements entered into pursuant to this Executive Order;

(ii)     Make periodic evaluations to the Mayor regarding the use of Project Labor Agreements, including recommendations for modifications of Project Labor Agreements;

5

       (iii)    Perform such other duties as the Mayor may from time to time assign.

## SECTION 8.  Prior Order Rescinded.

Executive Order No. 5-95 is hereby rescinded.

## SECTION 9.  Effective Date.

This Executive Order shall take effect immediately.

_11/29/11_
Date

_Michael A. Nutter, Mayor_

## PHILADELPHIA PUBLIC PROJECTS LABOR AGREEMENT

THIS CITY OF PHILADELPHIA PUBLIC PROJECT LABOR AGREEMENT (hereinafter the

"Agreement"), is entered into this _____ day of _____, 20__, by and between

_____

_____

(hereinafter the "Signatory Contractors"), their successors or assigns, and the Affiliates of the Philadelphia

Building and Construction Trades Council pursuant to, and in accordance with, the Mayor's Executive

Order No. 15-11 with respect to the public works project of and within the City of Philadelphia ("City") or

City–owned facilities, described in Article II, Section 2 of this Agreement, and referred to herein as the

"Public Works Project."

      **WHEREAS** the parties to this Agreement acknowledge that the timely construction of City

projects is critical to the City and its residents; and

      **WHEREAS** the City and its contractors, reflecting the objectives of the City, desire to provide for

the efficient, safe, quality and timely completion of projects in a manner designed to afford the lowest

reasonable cost to the City and the public it represents, and to achieve the advancement of public policy

objectives; and

      **WHEREAS** this Agreement will foster the achievement of those goals by, among other things,

avoiding the costly delays of disruption or interference with work and promote labor harmony and peace;

and

      **WHEREAS** this Agreement will further the policy objectives of the City, its contractors and the

Union(s) to include employment opportunities for minorities, women, Philadelphia residents and the

economically disadvantaged in the construction industry; and

**WHEREAS** the Union(s) have demonstrated a commitment to the expansion of such employment opportunities; and

**WHEREAS** the Union(s) desire the stability, security and work opportunities made possible by this Agreement; and

**WHEREAS** the City, under Executive Order No. 15-11, and consistent with other directives of the Mayor, reviews all proposed public works projects with projected construction costs over Five Million Dollars ($5,000,000) to determine whether the size, complexity, number and types of labor involved or other factors would make them appropriate for the use of a Project Labor Agreement; and

**WHEREAS** the City has determined that the Public Works Project, identified herein at Article II, Section 2 is an appropriate project for a Project Labor Agreement;

**NOW, THEREFORE,** the Parties enter into this Agreement.

The term "Contractor" shall include the Signatory Contractors, all contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement.

The term "craft" as applied to employees and workers shall mean those skills, crafts and trades of workers represented by the Union(s) as defined herein.

The Union(s) and the Contractors, their assigns, subcontractors and transferees agree to abide by the terms and conditions contained in this Agreement with respect to the performance of the construction by the Contractors of the Public Works Project covered by this Agreement. This Agreement represents the complete understanding of the parties, and it is further understood that no Contractor is required to sign any other agreement as a condition of performing work within the scope of this Agreement. No practice, understanding or agreement between a Contractor and a Union party which is not explicitly set forth in this Agreement and the Schedules hereto shall be binding on any other party.

# ARTICLE I - PURPOSE

As provided in Mayor's Executive Order No. 15-11, the City has a compelling interest in carrying out the Public Works Project at the lowest reasonable cost, highest level of efficiency, and the highest degree of quality.

Further, it has been recognized by the City that certain major Public Works Projects can best be carried out through the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 15-11, which ensure that labor disputes are resolved without disruptions resulting from strikes, lockouts or slowdowns and which provide for enforceable guarantees that the Public Works Project will be carried out in an orderly and timely manner without strikes, lockouts or slowdowns and with provisions protecting the wages, hours, working conditions and safety of those workers whose skills are required to complete such projects. Project Labor Agreements can provide the City with cost savings and efficiencies through project-specific adjustments to collective bargaining agreements that allow for project-specific appropriate hours of work, length of workday and workweek, overtime, starting times, breaks, shift work, crew apprentice ratios, holidays, dispute resolution and management rights, as have been mutually determined and agreed to by the City and the Union(s).

Further, the City has recognized that it can best accomplish these goals by permitting the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 15-11, in major public works projects, on a project by project basis, through which the City has determined, based on thorough investigation, analysis and justification, pursuant to, and in accordance with the procedures set forth in Mayor's Executive Order No. 15-11 and other policies of the Mayor's Office, that the use of a Project Labor Agreement will benefit and enhance the interest of the City from a cost, efficiency, quality and/or safety standpoint.

Further, the City and the Union(s) have received a Report and Recommendations from the Mayor's Advisory Commission on Construction Industry Diversity (the "Commission Report") and the parties

3

have determined that Project Labor Agreements can provide a framework for meeting long term goals of the City, the Union(s) and Contractors for increasing the opportunities for minorities and women to have successful careers in the construction trades.

Further, the City has recognized that it can best accomplish these goals by requiring that in major public works projects governed by Section 17-107 of the Philadelphia Code, a precondition regarding the award of a contract will be a requirement that the Contractors enter into a Project Labor Agreement with the Philadelphia Building & Construction Trades Council and its affiliated Union(s) requiring such Contractors as well as all subcontractors, assignees or transferees to abide by an agreement setting forth the wages, hours and working conditions of the workers employed on such public works projects.

Accordingly, the parties to this Agreement recognize that it is essential that the construction work on the Public Works Project covered by this Agreement be done in an efficient and economical manner in order to secure optimum productivity and to eliminate any delays in the work. In recognition of the needs of the Public Works Project covered by this Agreement, and to maintain a spirit of harmony, labor-management peace, and stability during the term of this Agreement, the parties agree to establish effective methods for the settlement of all misunderstandings, disputes or grievances which may arise under this Agreement.

## ARTICLE II - SCOPE OF THE AGREEMENT

Section 1.     Scope of Agreement.  This Agreement shall apply and is limited to all construction work under the direction of the signatory Contractors and performed by those Contractors of whatever tier which have contracts awarded for such work on and after the effective date of this Agreement, for the City, for the Public Works Project defined in Section 2 below.

Section 2. Covered Projects. The Public Works Project covered by this Agreement is generally described as the construction of the _____

_____.

Section 3. Award of Project Contracts.

(a) The City has the absolute right to select any qualified bidder for the award of contracts on this Public Works Project without reference to the existence or non-existence of any agreements between such bidder and any party to this Agreement provided, however, only that such bidder is ready, willing and able to execute and comply with this Agreement, which it shall do should it be designated the successful bidder.

(b) It is agreed that all direct subcontractors of Contractors, of whatever tier, who have been awarded contracts for work covered by this Agreement on or after the effective date of this Agreement shall be required to accept and be bound by the terms and conditions of this Project Labor Agreement.

Section 4. Contract Administration.

(a) This Agreement is intended to provide close cooperation between management and labor. The Project Relations Committee (as further described in Section 4 (c)), shall monitor compliance with this Agreement by all Contractors which, through their execution of this Agreement, together with their subcontractors or transferees, have become bound hereto. The Project Relations Committee shall monitor compliance with this Agreement by all Union(s) which, through their execution of this Agreement have become bound hereto.

(b) The provisions of this Agreement, including Collective Bargaining Agreements which are listed on and collectively designated as Schedule A, shall apply to the construction of the Public Works Project covered by this Agreement, notwithstanding the provisions of Local or International Agreements which may conflict or differ from the terms of this Agreement. Where a subject covered by

5

the provisions of this Project Labor Agreement, including but not limited to, Schedule D Project Specific Conditions, is also covered by any of the Collective Bargaining Agreements on Schedule A, the provisions of this Agreement shall prevail.

   (c)  The Signatory Contractors to this Agreement shall agree to establish a Project Relations Committee composed of "thirteen (13) members. Four (4) individuals shall be appointed by the Contractors signatory to this Agreement, four (4) individuals shall be appointed by the Union(s) and four (4) individuals shall be appointed by the City. The Philadelphia Area Labor Management Committee shall appoint one representative who will act as facilitator and staff to the Committee. The Project Relations Committee shall operate under the Philadelphia Area Labor-Management Built-Rite process.

   (d)  The Project Relations Committee shall meet as required, but not less than once each quarter to review performance and the operation of this Agreement.

   (e)  The purpose of this Project Relations Committee is as follows:

     (1)  To improve communications between representatives of labor and management and engender cooperative and harmonious relations between labor and management performing work under this Agreement.

     (2)  Provide workers and Contractors with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness. (Example: Joint process to reduce worksite injuries.)

     (3)  Provide a forum for open and honest discussion of problems confronting labor and management, and of eliminating potential problems.

     (4)  Study and explore ways of increasing productivity of both labor and management, and of eliminating potential problems.

     (5)  Enhance the involvement of workers in making decisions that affect their working lives, and to improve the quality of work life for the employees.

(6)     Expand and improve working relationships between workers and managers.

(7)     Identify conflicts between labor and management before they arise as disputes, and promptly assist in fairly resolving disputes when they do arise.

(8)     Seek to maintain a productive dialogue.

(9)     Pursue, achieve and document the implementation of all aspects of Schedule C, pertaining to increasing employment opportunities for women and minorities.

(10)    Support the Contractors in meeting general obligations and specific project goals for local hiring and for worker diversity as may be part of the Economic Opportunity Plan for the Public Works Project and as further described in Schedule E.

Section 5.     Binding Effect.  This Agreement and Schedules, including but not limited to Schedules A, B, C, D and E, attached hereto shall only be binding on the signatory parties hereto and shall not apply to the parents, affiliates, subsidiaries, or other ventures of any such party.

Section 6.     Limitations.  This Agreement shall be limited to work historically recognized as construction work, including, specifically, the site preparation and related demolition work necessary to prepare the site for construction, and such rehabilitation of existing facilities as is directed by the City. Nothing contained herein shall be construed to prohibit, restrict or interfere with the performance of any other operation, work or function which may occur in or around the Public Works Project site or be associated with the development of the Public Works Project, or with the ongoing operations of the City.

Section 7.     Exclusions.  Items specifically excluded from the scope of this Agreement include, but are not limited to, the following:

(a)     Work of non-manual employees, including but not limited to, superintendents, supervisors, staff engineers, surveyors (except where expressly covered by a Collective Bargaining Agreement in Schedule A), inspectors, quality control personnel, quality assurance personnel, timekeepers, mail carriers, clerks and office workers, including messengers, guards, emergency medical

and first aid technicians and other professional, engineering, administrative, supervisory and management employees.

(b)     Equipment and machinery owned or controlled and operated by the City.

(c)     All off-site handling of materials, equipment or machinery and all deliveries to and from the Public Works Project site except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(d)     All employees of the City.

(e)     Any work performed on or near, or leading to or into, the Public Works Project site by state, county, city or other governmental bodies, or their Contractors; or by public utilities or their Contractors and/or by the City, or its contractors, for work which is expressly not part of the Public Works Project covered by this Agreement.

(f)     Off-site maintenance on leased equipment and on-site supervision of such work except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(g)     Off-site warranty functions and warranty work and on-site supervision of such work except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(h)     Exploratory geophysical testing, except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(i)     Laboratory or specialty testing or inspections or monitoring activities not ordinarily done by the crafts.

(j)     Other work which may occur from time to time.

Section 8.     Applicability of Agreement.  Nothing contained herein shall be construed to prohibit or restrict the City or its employees from performing work not covered by this Agreement on a Public Works Project site.  As areas and systems of a Public Works Project are inspected, construction

tested and accepted by the City, the Agreement shall not have further force or effect on such items or areas, except when the Contractors are directed by the City to engage in repairs, modifications, check-out, and/or warranty functions required by their contract(s) with the City .

        Section 9.      Termination, Delay or Suspension of Public Works Project. It is understood that the City, at its sole option, may terminate, delay and or suspend any or all portions of the Public Works Project at any time.

        Section 10.      Contractor and Union(s) Liability. It is understood and agreed that the liability of any Contractor and the liability of separate Union(s) under this Agreement shall be several and not joint. The Union(s) agree that this Agreement does not have the effect of creating any joint employment status between or among the City and any Contractor.

## ARTICLE III - UNION RECOGNITION AND EMPLOYMENT

        Section 1.      Union Recognition. The Contractor recognizes the Union(s) as the sole and exclusive bargaining representatives of all craft employees working on the Public Works Project within the scope of this Agreement.

        Section 2.      Referrals. The Union(s) are recognized as the source of employment referrals. The appropriate Union(s) will be contacted and shall refer all applicants for employment to this Public Works Project according to the standards or criteria uniformly applied to any construction project in the area. In the event that any Union is unable to fill any requisition for employees within a forty eight (48) hour period after such requisition is made by the Contractor (Saturdays, Sundays and Holidays excepted), the Contractor may solicit and employ applicants from any other available source. The Contractor shall notify the Union(s) of employees hired by any source other than referral by the Union(s).

Section 3.    Referral Systems.  Subject to the Contractor's right to call for a specific skill or ability, the job referral systems provided in the Collective Bargaining Agreements of the Union(s) set forth in Schedule A hereto, or, in the absence of such language, the referral practices in place at the Union(s), will be in effect for the purpose of initial employment only.  Such job referral system, whether by contract or practice, must be operated in a non-discriminatory manner and in full compliance with Federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspect or obligations of Union membership and shall be subject to such other conditions as established in this Article and in Schedule C.

Section 4.    Competency.  The Contractor shall have the right to determine the competence of all employees, the right to determine the number of employees required and have the sole responsibility for selecting the employees to be laid-off consistent with this Agreement regardless of membership or non-membership in the Union(s).   The Contractor shall also have the right to reject any applicant referred by the Union(s).

Section 5.    Union Security.  It shall be a condition of employment that all employees of Contractor covered by this Agreement who are members of the Union(s) in good standing on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members in good standing and those who are not members on the effective date shall, on the eighth (8th) day following employment, become and remain members in good standing in the Union(s) for the term of this Agreement.

Section 6.    Skilled Craftsmen.  The Union(s) will exert their utmost efforts to recruit sufficient numbers of skilled craftsmen to fulfill the manpower requirements of the Contractor.

Section 7.    Selection of Foremen.  The selection of craft foremen and/or general foremen and the number of foremen required shall be entirely the responsibility of the Contractor.   All foremen shall

10

take orders exclusively from the designated Contractor representatives. Craft foremen shall be designated as working foremen by the Contractor, except when the Contractor determines that it is not possible for a particular foreman to be working foreman.

Section 8.     Seniority. Individual seniority shall not be recognized or applied to employees working on the Public Works Project.

## ARTICLE IV - UNION REPRESENTATION

Section 1.     Access to Public Works Project Site. Authorized and designated representatives of the Union(s) shall have access to the Public Works Project, consistent with rules, regulations and policies as have been established for site security and safety and through established Contractor procedures, for the purpose of transacting business in connection with the job. Such representatives shall be subject to security clearances and may require authorized escorts to enter secure areas of the Public Works Project. Such representatives shall not interfere with the work of employees or cause unnecessary loss of time by the employees.

Section 2.     Stewards. Stewards shall be appointed consistent with the appropriate Collective Bargaining Agreement as included in Schedule A.

Section 3.     Non-interference. On work where City personnel or personnel of other contractors not signatory to this Agreement may be working in close proximity of the construction activities, the Union(s) agree that the Union's representatives, stewards and individual workers will not interfere with the City's personnel or the personnel of other contractors not signatory to this Agreement or with the work which is being performed by the City's personnel or personnel of other contractors not signatory to this Agreement. There shall be no interference by employees covered under this Agreement with on-site concessionaires.

11

# ARTICLE V - MANAGEMENT RIGHTS

Section 1.     Management Rights.  The Contractor retains full and exclusive authority for the

management of its operation consistent with this Project Labor Agreement and the collective bargaining

agreements included in Schedule A.  The Contractors retain the right to (i) plan, direct and control the

workforce and the operation of all of his work, including the hiring, promotion, demotion, transfer, layoff,

suspension, discipline or discharge for just cause of its employees; (ii) select foremen, determine the size

and make-up of each crew; (iii) assign and schedule work; (iv) promulgate work rules; (v) regulate the use

of all equipment and other property of the Contractors, decide the amount of equipment to be used, the

number of employees needed; and (vi) regulate overtime work, the determination of when it shall be

worked, and the number and identity of employees engaged for such work.  No rules, customs or practices

which limit or restrict productivity, efficiency or the individual and/or joint working efforts of employees

shall be permitted or observed. The Contractors may utilize any methods or techniques of construction.

Section 2.     Choice of Materials.  There shall be no limitation or restriction upon the

Contractors' choice of materials or design, nor, subject to the principle of legitimate work preservation set

forth in the following sentence, upon the full use and installation of equipment, machinery, package units,

pre-cast, pre-fabricated, pre-finished, or pre-assembled materials, tools, or other labor-saving devices

unless otherwise specified in Schedule A.  The on-site installation or application of such items shall be

performed by the craft having jurisdiction over such work:  provided, however, it is recognized that other

personnel having special talents or qualifications may participate in the installation consistent with

Schedule A, including, but not limited to check-off or testing of specialized or unusual equipment or

facilities.

Section 3.     New Technology and Devices.  It is recognized that the use of new technology,

equipment, machinery, tools and/or labor saving devices and methods of performing work will be initiated

by the Contractor from time to time during the Public Works Project.  The Union(s) agree that they will

not in any way restrict the implementation of such new devices or work methods. If there is any disagreement between the Contractors and the Union(s) concerning the manner or implementation of such device or method of work, the implementation shall proceed as directed by the Contractors, and the Union(s) shall have the right to grieve and/or arbitrate the dispute as set forth in Article XIII of this Agreement.

## ARTICLE VI - HOURS OF WORK, OVERTIME, SHIFTS AND HOLIDAYS

Section 1. Hours of Work, Overtime, Shifts and Holidays shall be governed by the Collective Bargaining Agreements included in Schedule A, except as mutually determined and agreed to by the Union(s) and the City and provided in Schedule D Project Specific Conditions.

Section 2. Where modifications to the Collective Bargaining Agreements or the provisions of Schedule D Project Specific Conditions are in the best interest of a project, such departure may be requested by the Contractors, Union(s) and the City. Such departures shall be requested utilizing the Project Relations Committee and shall be approved by mutual consent.

## ARTICLE VII - WORKING CONDITIONS

Section 1. Job Site Conditions. All job site working conditions, including rest periods, coffee breaks and work practices, shall be as determined by the Contractors.

Section 2. Public Works Project Rules. The Contractors shall establish such other reasonable Public Works Project rules as each Contractor deems appropriate. All rules and regulations shall be observed by Union employees who, by virtue of their Union membership and coverage under an appropriate Collective Bargaining Agreement, are made subject to such rules.

## ARTICLE VIII - APPRENTICES

Section 1.    Apprentices.  Recognizing the need to maintain continuing supportive programs

designed to develop adequate numbers of competent workers in the construction industry, the Contractors

will employ apprentices in their respective crafts to perform such work as is within their capabilities

which is customarily performed by the craft in which they are indentured.  Apprentices shall be employed

in a manner consistent with the provisions of this Agreement including but not limited to Schedules C and

E.  The Contractors may also utilize apprentices as appropriate and consistent with the Schedule A

Collective Bargaining Agreements or as provided in Schedule D Project Specific Conditions.


## ARTICLE IX – EMPLOYMENT OPPORTUNITIES FOR PHILADELPHIA RESIDENTS, MINORITIES AND WOMEN

Section 1.    Employment Opportunities For Philadelphia Residents.  The parties recognize that

the size and scope of the Public Works Project covered by this Agreement, the number of craftsmen and

others expected to be employed in order to complete the work in a timely fashion, and the extended period

of time during which the construction will be underway should provide significant employment

opportunities for qualified residents of the City of Philadelphia.  The parties further recognize that the

Economic Opportunity Plan for the Public Works Project includes specific local hiring goals for the

Contractors as established in Schedule C.

Section 2.    Opportunities for Women and Minorities.  The parties also agree that increasing

participation by women and minorities employees on the Public Works Project is a desirable goal.

Accordingly, the parties shall undertake the activities identified in Schedule C to support the City, Union

and Contractor objectives of increased opportunities for participation in the Union(s) and for actual work

performed. Additional responsibilities of the Contractor under the Economic Opportunity Plan related to diversity are described and required in Schedule E.

## ARTICLE X - SAFETY, PROTECTION OF PERSON AND PROPERTY

Section 1.    Safe Working Conditions.  In accordance with the requirements of the Occupational Safety and Health Act, it shall be the exclusive responsibility of each Contractor on the job site to ensure safe working conditions for its employees and their compliance with any safety rules contained herein or established by the Contractors, provided however, it is understood that the employees have an obligation as set forth in Section 2 below.

Section 2.    Safe Performance of Work.  Employees must use diligent care to perform their work in a safe manner and to protect themselves, other persons and the property of the Contractors or the City.  Failure to do so will be grounds for discipline, including discharge.

Section 3.    Safety, Security and Visitor Rules.  Employees covered by the terms of this Agreement shall at all times while in the employ of the Contractors be bound by the safety, security and visitor rules as established by the City and/or the Contractors in accordance with applicable State and Federal safety and health statutes and regulations.  These rules will be published and posted in conspicuous places through the Project.

## ARTICLE XI - NO DISCRIMINATION

Section 1.    No Discrimination.  The Contractors and Union(s) agree that they will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or age in any manner prohibited by law or regulation.  It is recognized that special procedures may be established by joint agreement of the parties to this Agreement and governmental agencies for the training and employment of persons who have not previously qualified to be employed on

15

construction projects of the type covered by this Agreement. The parties to this Agreement will make all good faith efforts to assist in the proper implementation of such orders, regulations or agreements for the benefit of the population within the jurisdiction of the City of Philadelphia.

Section 2.    Complaints. Any complaints regarding application of the provisions of Section 1 should be brought to the immediate attention of the involved Contractors for consideration and resolution.

Section 3.    Masculine or Feminine Gender. The use of the masculine or feminine gender in this Agreement shall be construed as including both genders.

## ARTICLE XII - WORK STOPPAGES AND LOCKOUTS

Section 1.    There shall be no strike, picketing, work stoppages, slowdowns, sickouts or other disruptive activity for any reason by the Union(s) or employees against any Contractor covered under this Agreement, and there shall be no lockouts by the Contractors. Failure of any of the Union(s) or any employee to cross any picket line established by any Union, signatory or non-signatory, or any other organization, at or in proximity to the Project site is a violation of this Article.

Section 2.    The Contractors may discharge any employee violating Section 1 above, and any such employee will not be eligible for referral under this Agreement for a period of ninety (90) working days from the date of his discharge. The Contractors and the Union(s) shall take all steps necessary to obtain compliance with this Article and neither shall be held liable for conduct for which it is not responsible.

## ARTICLE XIII - DISPUTES AND GRIEVANCES

Section 1.    Agreement Interpretation. It is specifically agreed that in the event any disputes arise out of the interpretation or application of this Agreement the same shall be settled by the Project Relations Committee. All disputes arising out of Contractor-employee issues shall be governed by

16

Section 2 of this Article. No such grievance shall be recognized unless called to the attention of the Contractor within seven (7) calendar days after the alleged violation was committed.

Section 2. Unless otherwise provided for in Schedule D Project Specific Conditions, it is specifically agreed that in the event any disputes arise between the Contractors and Union employees that do not involve the interpretation or application of this Agreement, and/or questions of jurisdiction of work, the same shall be settled by means of the grievance procedures currently set forth in the local Collective Bargaining Agreements set forth in Schedule A.

## ARTICLE XIV - JURISDICTIONAL DISPUTES

Section 1. There will be no strikes, no work stoppages or slowdowns, or other interferences with the work because of jurisdictional disputes. Pending the resolution of the dispute, the work shall continue uninterrupted as assigned by the Contractors.

Section 2. This Agreement shall generally recognize the traditional craft jurisdiction of the Union(s) and shall require Contractors to abide by said traditional craft jurisdiction. Contractors will utilize the Collective Bargaining Agreements in Schedule A as references to establish the Unions' basic jurisdictions. If there is any dispute concerning this section, the issue may be submitted by any concerned party for final and binding resolution to the American Arbitration Association.

## ARTICLE XV - SAVINGS AND REPARABILITY

Section 1. It is not the intention of either the Contractors or the Union parties to violate any laws governing the subject matter of this Agreement. The parties hereto agree that in the event any provisions of the Agreement are finally held or determined to be illegal or void as being in contravention of any applicable law, the remainder of the Agreement shall remain in full force and effect unless the part or parts so found to be void are wholly inseparable from the remaining portions of this Agreement.

Further, the Contractors and Union(s) agree that if and when any and all provisions of this Agreement are finally held or determined to be illegal or void by Court of competent jurisdiction, the parties will promptly enter into negotiations concerning the substance affected by such decision for the purpose of achieving conformity with the requirements of any applicable law and the intent of the parties hereto.

Section 2.    This Article shall not be construed to waive the prohibitions of Article XII, and if the parties are unable to resolve their differences, the matter shall be referred to arbitration for resolution as provided for in the grievance-arbitration procedure of Article XIII.


## ARTICLE XVI - DURATION OF THE AGREEMENT

This Agreement shall be effective the _____ day of _____, 20___ and shall continue in effect for the duration of the Public Works Project construction work described in Article II hereof. Construction of any phase, portion, section or segment of Public Works Project shall be deemed complete when such phase, portion, section or segment has been turned over to the City of Philadelphia and has received the final acceptance from the City of Philadelphia's representative.

Each Collective Bargaining Agreement contained in Schedule A hereof attached to this Agreement shall continue in full force and effect until the Contractor(s) or Union(s) who are parties to such Agreement notify the City of the mutually agreed upon changes in those provisions of such Agreements which are applicable to this Public Works Project, and the effective date thereof, which shall then become the effective date under this Agreement. Unless otherwise provided in this Agreement, increases to wages and benefit payments from the effective date each new or amended Collective Bargaining Agreement shall be due and owing upon notification to the Contractors and the City of such increases. The parties agree that any provisions negotiated into any Collective Bargaining Agreement contained in Schedule A hereof will not apply to work on Public Works Project if such provisions are less favorable to the Contractors than those uniformly required of Contractors for construction work normally covered by such an

18

agreement; nor shall any provision be recognized or applied on any Public Works Project if it may reasonably be construed to apply exclusively to work covered by this Agreement.

In the renegotiation of any of the Collective Bargaining Agreements contained in Schedule A hereof, the Union(s) party to this Agreement agree that there will be no strikes, work stoppages, sympathy strikes, picketing, slowdowns or other disruptive activity affecting the Public Works Project covered by this Agreement because of or related to the renegotiation of any such Collective Bargaining Agreement contained in Schedule A hereof, nor shall there by any lockout on this Public Works Project affecting the Union(s) party to this Agreement during the course of such negotiations.

Any disagreement between the parties over the incorporation into any Collective Bargaining Agreement contained in Schedule A hereof of such provisions agreed upon in the renegotiation of any such Collective Bargaining Agreement as is contained in Schedule A shall be referred to Article XIII hereof for resolution.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and effective as of the day and year above written.

**FOR THE UNION(S):**                    **FOR THE CONTRACTORS:**

_____              _____

                                     Contractor

                                     _____

                                     Contractor

                                     _____

                                     Contractor

                                     _____

                                     Contractor

# SCHEDULE A

## COLLECTIVE BARGAINING AGREEMENTS

## SCHEDULE B

## RESERVED

## SCHEDULE C

## INCREASING OPPORTUNITIES FOR WOMEN AND MINORITIES
## IN THE BUILDING TRADES UNION(S) AND THE PUBLIC WORKS PROJECTS

Consistent with the Mayor's Advisory on Construction Industry Diversity Report and Recommendations, the City of Philadelphia, the Union(s) and Contractors shall undertake the following activities:

Section 1.     City Activities.

(a)     The City shall collect, tabulate and analyze data, including certified payrolls, related to the participation of male minorities, women and Philadelphia residents in City and City-funded construction projects.

(b)     The City shall establish goals for employment of Philadelphia residents in City and City-funded construction projects. For City residents employment in the Public Works Project shall be at least:

Philadelphia Residents: Fifty (50) percent of all construction employment hours.

(c)     The City shall establish goals for workforce diversity in City and City-funded construction projects. The current goals are based on the March 2009 Report of the Mayor's Advisory Commission on Construction Industry Diversity. For male minority and women employment in the Public Works Project shall be at least:

Male Minority: Thirty two (32) percent of all construction employment hours

Women:          Seven (7) percent of all construction employment hours

(e)     The City shall assist the Union(s) in undertaking activities which would benefit from City participation and support.

(f)     The City shall establish and support a standing Advisory Commission on Construction Industry Diversity. The City shall invite union leaders, large and small contractors, contractor associations project owners and community leaders to participate.

22

(g)     The City shall designate a City agency for the receipt and redress of complaints from the public about the opportunities for employment on City-funded construction projects.

Section 2.     Union Activities.

(a)     The Union(s) shall collect demographic data on participation in the Public Works Project. The Union(s) shall provide that information to the City on monthly basis while the Project Labor Agreement is in effect.

(b)     The Union(s) shall set participation goals that will significantly increase participation of minority males and women. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

(c)     The Union(s) shall establish goals for participation of in apprenticeship programs for minority males and women. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

(d)     The Union(s) shall actively recruit minority males and women for apprenticeship positions. Outreach efforts must be appropriate for reaching minority males and women and consistent with the goals the Union(s) have established for membership of the Union(s).

(e)     The Union(s) shall evaluate alternatives to apprenticeship recruitment for adding minority males and women to membership.

(f)     The Union(s) shall each identify a representative who shall be responsible for reporting on each Union's progress in improving opportunities for minority males and women.

Section 3.     Contractor Activities.

(a)     The Contractors shall support the City and Union efforts to increase the participation of minority males and women in the Public Works Project through apprenticeship programs and other initiatives.

(b)     The Contractors shall use their best efforts to add minority males and women to their permanent or steady workforces. The Contractors shall provide workforce demographic information to the City in advance of project commencement.

(c)     The Contractors shall ensure a work environment that is free from discrimination and supportive of greater participation of minority males and women in the Public Works Project.

(d)     The Contractors shall use their best efforts to meet or exceed the goals established for minority males and women participation in Section 1 of this Schedule C.

(e)     The Contractors shall provide monthly updates to the City, including but not limited to payroll reports, for the requirements of this Section 3.

Section 4.     Third Party Monitoring

(a)     In the event that the City determines that the Agreement and the goals for participation in the Public Works Project by Philadelphia residents, male minorities and women would benefit from monitoring by a qualified third party ("Monitor"), the monitoring shall be performed by a Monitor selected by the parties. The Contractors and Unions shall provide information and access to the Monitor consistent with the requirements of this Schedule C and the Agreement.

(b)     The costs of monitoring by the Monitor shall be shared equally by the parties.

## SCHEDULE D

### PROJECT SPECIFIC CONDITIONS

Project specific conditions agreed upon by the Union(s) and the City supersede the provisions established in Schedule A Collective Bargaining Agreements only as to the Public Works Project.

## SCHEDULE E

## ECONOMIC OPPORTUNITY PLAN

# EXHIBIT "D."

## PHILADELPHIA PUBLIC PROJECTS LABOR AGREEMENT

THIS CITY OF PHILADELPHIA PUBLIC PROJECT LABOR AGREEMENT (hereinafter the

"Agreement"), is entered into this _____ day of _____, 20__, by and between

_____

_____

(hereinafter the "Signatory Contractors"), their successors or assigns, and the Affiliates of the Philadelphia

Building and Construction Trades Council pursuant to, and in accordance with, the Mayor's Executive

Order No. 15-11 with respect to the public works project of and within the City of Philadelphia ("City") or

City–owned facilities, described in Article II, Section 2 of this Agreement, and referred to herein as the

"Public Works Project."

    **WHEREAS** the parties to this Agreement acknowledge that the timely construction of City

projects is critical to the City and its residents; and

    **WHEREAS** the City and its contractors, reflecting the objectives of the City, desire to provide for

the efficient, safe, quality and timely completion of projects in a manner designed to afford the lowest

reasonable cost to the City and the public it represents, and to achieve the advancement of public policy

objectives; and

    **WHEREAS** this Agreement will foster the achievement of those goals by, among other things,

avoiding the costly delays of disruption or interference with work and promote labor harmony and peace;

and

    **WHEREAS** this Agreement will further the policy objectives of the City, its contractors and the

Union(s) to include employment opportunities for minorities, women, Philadelphia residents and the

economically disadvantaged in the construction industry; and

**WHEREAS** the Union(s) have demonstrated a commitment to the expansion of such employment opportunities; and

**WHEREAS** the Union(s) desire the stability, security and work opportunities made possible by this Agreement; and

**WHEREAS** the City, under Executive Order No. 15-11, and consistent with other directives of the Mayor, reviews all proposed public works projects with projected construction costs over Five Million Dollars ($5,000,000) to determine whether the size, complexity, number and types of labor involved or other factors would make them appropriate for the use of a Project Labor Agreement; and

**WHEREAS** the City has determined that the Public Works Project, identified herein at Article II, Section 2 is an appropriate project for a Project Labor Agreement;

**NOW, THEREFORE,** the Parties enter into this Agreement.

The term "Contractor" shall include the Signatory Contractors, all contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement.

The term "craft" as applied to employees and workers shall mean those skills, crafts and trades of workers represented by the Union(s) as defined herein.

The Union(s) and the Contractors, their assigns, subcontractors and transferees agree to abide by the terms and conditions contained in this Agreement with respect to the performance of the construction by the Contractors of the Public Works Project covered by this Agreement. This Agreement represents the complete understanding of the parties, and it is further understood that no Contractor is required to sign any other agreement as a condition of performing work within the scope of this Agreement. No practice, understanding or agreement between a Contractor and a Union party which is not explicitly set forth in this Agreement and the Schedules hereto shall be binding on any other party.

## ARTICLE I - PURPOSE

As provided in Mayor's Executive Order No. 15-11, the City has a compelling interest in carrying out the Public Works Project at the lowest reasonable cost, highest level of efficiency, and the highest degree of quality.

Further, it has been recognized by the City that certain major Public Works Projects can best be carried out through the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 15-11, which ensure that labor disputes are resolved without disruptions resulting from strikes, lockouts or slowdowns and which provide for enforceable guarantees that the Public Works Project will be carried out in an orderly and timely manner without strikes, lockouts or slowdowns and with provisions protecting the wages, hours, working conditions and safety of those workers whose skills are required to complete such projects. Project Labor Agreements can provide the City with cost savings and efficiencies through project-specific adjustments to collective bargaining agreements that allow for project-specific appropriate hours of work, length of workday and workweek, overtime, starting times, breaks, shift work, crew apprentice ratios, holidays, dispute resolution and management rights, as have been mutually determined and agreed to by the City and the Union(s).

Further, the City has recognized that it can best accomplish these goals by permitting the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 15-11, in major public works projects, on a project by project basis, through which the City has determined, based on thorough investigation, analysis and justification, pursuant to, and in accordance with the procedures set forth in Mayor's Executive Order No. 15-11 and other policies of the Mayor's Office, that the use of a Project Labor Agreement will benefit and enhance the interest of the City from a cost, efficiency, quality and/or safety standpoint.

Further, the City and the Union(s) have received a Report and Recommendations from the Mayor's Advisory Commission on Construction Industry Diversity (the "Commission Report") and the parties

3

have determined that Project Labor Agreements can provide a framework for meeting long term goals of the City, the Union(s) and Contractors for increasing the opportunities for minorities and women to have successful careers in the construction trades.

Further, the City has recognized that it can best accomplish these goals by requiring that in major public works projects governed by Section 17-107 of the Philadelphia Code, a precondition regarding the award of a contract will be a requirement that the Contractors enter into a Project Labor Agreement with the Philadelphia Building & Construction Trades Council and its affiliated Union(s) requiring such Contractors as well as all subcontractors, assignees or transferees to abide by an agreement setting forth the wages, hours and working conditions of the workers employed on such public works projects.

Accordingly, the parties to this Agreement recognize that it is essential that the construction work on the Public Works Project covered by this Agreement be done in an efficient and economical manner in order to secure optimum productivity and to eliminate any delays in the work. In recognition of the needs of the Public Works Project covered by this Agreement, and to maintain a spirit of harmony, labor-management peace, and stability during the term of this Agreement, the parties agree to establish effective methods for the settlement of all misunderstandings, disputes or grievances which may arise under this Agreement.

## ARTICLE II - SCOPE OF THE AGREEMENT

Section 1.     Scope of Agreement. This Agreement shall apply and is limited to all construction work under the direction of the signatory Contractors and performed by those Contractors of whatever tier which have contracts awarded for such work on and after the effective date of this Agreement, for the City, for the Public Works Project defined in Section 2 below.

Section 2.     Covered Projects.  The Public Works Project covered by this Agreement is generally described as the construction of the _____

_____.

Section 3.     Award of Project Contracts.

(a)     The City has the absolute right to select any qualified bidder for the award of contracts on this Public Works Project without reference to the existence or non-existence of any agreements between such bidder and any party to this Agreement provided, however, only that such bidder is ready, willing and able to execute and comply with this Agreement, which it shall do should it be designated the successful bidder.

(b)     It is agreed that all direct subcontractors of Contractors, of whatever tier, who have been awarded contracts for work covered by this Agreement on or after the effective date of this Agreement shall be required to accept and be bound by the terms and conditions of this Project Labor Agreement.

Section 4.     Contract Administration.

(a)     This Agreement is intended to provide close cooperation between management and labor. The Project Relations Committee (as further described in Section 4 (c)), shall monitor compliance with this Agreement by all Contractors which, through their execution of this Agreement, together with their subcontractors or transferees, have become bound hereto.  The Project Relations Committee shall monitor compliance with this Agreement by all Union(s) which, through their execution of this Agreement have become bound hereto.

(b)     The provisions of this Agreement, including Collective Bargaining Agreements which are listed on and collectively designated as Schedule A, shall apply to the construction of the Public Works Project covered by this Agreement, notwithstanding the provisions of Local or International Agreements which may conflict or differ from the terms of this Agreement.   Where a subject covered by

the provisions of this Project Labor Agreement, including but not limited to, Schedule D Project Specific Conditions, is also covered by any of the Collective Bargaining Agreements on Schedule A, the provisions of this Agreement shall prevail.

(c)     The Signatory Contractors to this Agreement shall agree to establish a Project Relations Committee composed of "thirteen (13) members. Four (4) individuals shall be appointed by the Contractors signatory to this Agreement, four (4) individuals shall be appointed by the Union(s) and four (4) individuals shall be appointed by the City. The Philadelphia Area Labor Management Committee shall appoint one representative who will act as facilitator and staff to the Committee. The Project Relations Committee shall operate under the Philadelphia Area Labor-Management Built-Rite process.

(d)     The Project Relations Committee shall meet as required, but not less than once each quarter to review performance and the operation of this Agreement.

(e)     The purpose of this Project Relations Committee is as follows:

(1)     To improve communications between representatives of labor and management and engender cooperative and harmonious relations between labor and management performing work under this Agreement.

(2)     Provide workers and Contractors with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness. (Example: Joint process to reduce worksite injuries.)

(3)     Provide a forum for open and honest discussion of problems confronting labor and management, and of eliminating potential problems.

(4)     Study and explore ways of increasing productivity of both labor and management, and of eliminating potential problems.

(5)     Enhance the involvement of workers in making decisions that affect their working lives, and to improve the quality of work life for the employees.

6

(6)     Expand and improve working relationships between workers and managers.

(7)     Identify conflicts between labor and management before they arise as disputes, and promptly assist in fairly resolving disputes when they do arise.

(8)     Seek to maintain a productive dialogue.

(9)     Pursue, achieve and document the implementation of all aspects of Schedule C, pertaining to increasing employment opportunities for women and minorities.

(10)     Support the Contractors in meeting general obligations and specific project goals for local hiring and for worker diversity as may be part of the Economic Opportunity Plan for the Public Works Project and as further described in Schedule E.

Section 5.     <u>Binding Effect</u>. This Agreement and Schedules, including but not limited to Schedules A, B, C, D and E, attached hereto shall only be binding on the signatory parties hereto and shall not apply to the parents, affiliates, subsidiaries, or other ventures of any such party.

Section 6.     <u>Limitations</u>. This Agreement shall be limited to work historically recognized as construction work, including, specifically, the site preparation and related demolition work necessary to prepare the site for construction, and such rehabilitation of existing facilities as is directed by the City. Nothing contained herein shall be construed to prohibit, restrict or interfere with the performance of any other operation, work or function which may occur in or around the Public Works Project site or be associated with the development of the Public Works Project, or with the ongoing operations of the City.

Section 7.     <u>Exclusions</u>. Items specifically excluded from the scope of this Agreement include, but are not limited to, the following:

(a)     Work of non-manual employees, including but not limited to, superintendents, supervisors, staff engineers, surveyors (except where expressly covered by a Collective Bargaining Agreement in Schedule A), inspectors, quality control personnel, quality assurance personnel, timekeepers, mail carriers, clerks and office workers, including messengers, guards, emergency medical

and first aid technicians and other professional, engineering, administrative, supervisory and management employees.

       (b)     Equipment and machinery owned or controlled and operated by the City.

       (c)     All off-site handling of materials, equipment or machinery and all deliveries to and from the Public Works Project site except where expressly covered by a Collective Bargaining Agreement in Schedule A.

       (d)     All employees of the City.

       (e)     Any work performed on or near, or leading to or into, the Public Works Project site by state, county, city or other governmental bodies, or their Contractors; or by public utilities or their Contractors and/or by the City, or its contractors, for work which is expressly not part of the Public Works Project covered by this Agreement.

       (f)     Off-site maintenance on leased equipment and on-site supervision of such work except where expressly covered by a Collective Bargaining Agreement in Schedule A.

       (g)     Off-site warranty functions and warranty work and on-site supervision of such work except where expressly covered by a Collective Bargaining Agreement in Schedule A.

       (h)     Exploratory geophysical testing, except where expressly covered by a Collective Bargaining Agreement in Schedule A.

       (i)     Laboratory or specialty testing or inspections or monitoring activities not ordinarily done by the crafts.

       (j)     Other work which may occur from time to time.

       Section 8.     <u>Applicability of Agreement</u>.  Nothing contained herein shall be construed to prohibit or restrict the City or its employees from performing work not covered by this Agreement on a Public Works Project site.  As areas and systems of a Public Works Project are inspected, construction

tested and accepted by the City, the Agreement shall not have further force or effect on such items or areas, except when the Contractors are directed by the City to engage in repairs, modifications, check-out, and/or warranty functions required by their contract(s) with the City .

Section 9.    Termination, Delay or Suspension of Public Works Project.  It is understood that the City, at its sole option, may terminate, delay and or suspend any or all portions of the Public Works Project at any time.

Section 10.    Contractor and Union(s) Liability.  It is understood and agreed that the liability of any Contractor and the liability of separate Union(s) under this Agreement shall be several and not joint. The Union(s) agree that this Agreement does not have the effect of creating any joint employment status between or among the City and any Contractor.

## ARTICLE III - UNION RECOGNITION AND EMPLOYMENT

Section 1.    Union Recognition.  The Contractor recognizes the Union(s) as the sole and exclusive bargaining representatives of all craft employees working on the Public Works Project within the scope of this Agreement.

Section 2.    Referrals.  The Union(s) are recognized as the source of employment referrals.  The appropriate Union(s) will be contacted and shall refer all applicants for employment to this Public Works Project according to the standards or criteria uniformly applied to any construction project in the area.  In the event that any Union is unable to fill any requisition for employees within a forty eight (48) hour period after such requisition is made by the Contractor (Saturdays, Sundays and Holidays excepted), the Contractor may solicit and employ applicants from any other available source.  The Contractor shall notify the Union(s) of employees hired by any source other than referral by the Union(s).

Section 3.     Referral Systems.  Subject to the Contractor's right to call for a specific skill or ability, the job referral systems provided in the Collective Bargaining Agreements of the Union(s) set forth in Schedule A hereto, or, in the absence of such language, the referral practices in place at the Union(s), will be in effect for the purpose of initial employment only.  Such job referral system, whether by contract or practice, must be operated in a non-discriminatory manner and in full compliance with Federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspect or obligations of Union membership and shall be subject to such other conditions as established in this Article and in Schedule C.

Section 4.     Competency.  The Contractor shall have the right to determine the competence of all employees, the right to determine the number of employees required and have the sole responsibility for selecting the employees to be laid-off consistent with this Agreement regardless of membership or non-membership in the Union(s).  The Contractor shall also have the right to reject any applicant referred by the Union(s).

Section 5.     Union Security.  It shall be a condition of employment that all employees of Contractor covered by this Agreement who are members of the Union(s) in good standing on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members in good standing and those who are not members on the effective date shall, on the eighth (8th) day following employment, become and remain members in good standing in the Union(s) for the term of this Agreement.

Section 6.     Skilled Craftsmen.  The Union(s) will exert their utmost efforts to recruit sufficient numbers of skilled craftsmen to fulfill the manpower requirements of the Contractor.

Section 7.     Selection of Foremen.  The selection of craft foremen and/or general foremen and the number of foremen required shall be entirely the responsibility of the Contractor.  All foremen shall

take orders exclusively from the designated Contractor representatives. Craft foremen shall be designated as working foremen by the Contractor, except when the Contractor determines that it is not possible for a particular foreman to be working foreman.

Section 8.    Seniority.    Individual seniority shall not be recognized or applied to employees working on the Public Works Project.


## ARTICLE IV - UNION REPRESENTATION

Section 1.    Access to Public Works Project Site.    Authorized and designated representatives of the Union(s) shall have access to the Public Works Project, consistent with rules, regulations and policies as have been established for site security and safety and through established Contractor procedures, for the purpose of transacting business in connection with the job. Such representatives shall be subject to security clearances and may require authorized escorts to enter secure areas of the Public Works Project. Such representatives shall not interfere with the work of employees or cause unnecessary loss of time by the employees.

Section 2.    Stewards.    Stewards shall be appointed consistent with the appropriate Collective Bargaining Agreement as included in Schedule A.

Section 3.    Non-interference.    On work where City personnel or personnel of other contractors not signatory to this Agreement may be working in close proximity of the construction activities, the Union(s) agree that the Union's representatives, stewards and individual workers will not interfere with the City's personnel or the personnel of other contractors not signatory to this Agreement or with the work which is being performed by the City's personnel or personnel of other contractors not signatory to this Agreement. There shall be no interference by employees covered under this Agreement with on-site concessionaires.

## ARTICLE V - MANAGEMENT RIGHTS

Section 1.     Management Rights.   The Contractor retains full and exclusive authority for the management of its operation consistent with this Project Labor Agreement and the collective bargaining agreements included in Schedule A.  The Contractors retain the right to (i) plan, direct and control the workforce and the operation of all of his work, including the hiring, promotion, demotion, transfer, layoff, suspension, discipline or discharge for just cause of its employees; (ii) select foremen, determine the size and make-up of each crew; (iii) assign and schedule work; (iv) promulgate work rules; (v) regulate the use of all equipment and other property of the Contractors, decide the amount of equipment to be used, the number of employees needed; and (vi) regulate overtime work, the determination of when it shall be worked, and the number and identity of employees engaged for such work.  No rules, customs or practices which limit or restrict productivity, efficiency or the individual and/or joint working efforts of employees shall be permitted or observed. The Contractors may utilize any methods or techniques of construction.

Section 2.     Choice of Materials.   There shall be no limitation or restriction upon the Contractors' choice of materials or design, nor, subject to the principle of legitimate work preservation set forth in the following sentence, upon the full use and installation of equipment, machinery, package units, pre-cast, pre-fabricated, pre-finished, or pre-assembled materials, tools, or other labor-saving devices unless otherwise specified in Schedule A.  The on-site installation or application of such items shall be performed by the craft having jurisdiction over such work:  provided, however, it is recognized that other personnel having special talents or qualifications may participate in the installation consistent with Schedule A, including, but not limited to check-off or testing of specialized or unusual equipment or facilities.

Section 3.     New Technology and Devices.   It is recognized that the use of new technology, equipment, machinery, tools and/or labor saving devices and methods of performing work will be initiated by the Contractor from time to time during the Public Works Project.   The Union(s) agree that they will

not in any way restrict the implementation of such new devices or work methods. If there is any disagreement between the Contractors and the Union(s) concerning the manner or implementation of such device or method of work, the implementation shall proceed as directed by the Contractors, and the Union(s) shall have the right to grieve and/or arbitrate the dispute as set forth in Article XIII of this Agreement.

## ARTICLE VI - HOURS OF WORK, OVERTIME, SHIFTS AND HOLIDAYS

Section 1. Hours of Work, Overtime, Shifts and Holidays shall be governed by the Collective Bargaining Agreements included in Schedule A, except as mutually determined and agreed to by the Union(s) and the City and provided in Schedule D Project Specific Conditions.

Section 2. Where modifications to the Collective Bargaining Agreements or the provisions of Schedule D Project Specific Conditions are in the best interest of a project, such departure may be requested by the Contractors, Union(s) and the City. Such departures shall be requested utilizing the Project Relations Committee and shall be approved by mutual consent.

## ARTICLE VII - WORKING CONDITIONS

Section 1.    Job Site Conditions. All job site working conditions, including rest periods, coffee breaks and work practices, shall be as determined by the Contractors.

Section 2.    Public Works Project Rules. The Contractors shall establish such other reasonable Public Works Project rules as each Contractor deems appropriate. All rules and regulations shall be observed by Union employees who, by virtue of their Union membership and coverage under an appropriate Collective Bargaining Agreement, are made subject to such rules.

## ARTICLE VIII - APPRENTICES

Section 1.     Apprentices.  Recognizing the need to maintain continuing supportive programs

designed to develop adequate numbers of competent workers in the construction industry, the Contractors

will employ apprentices in their respective crafts to perform such work as is within their capabilities

which is customarily performed by the craft in which they are indentured.  Apprentices shall be employed

in a manner consistent with the provisions of this Agreement including but not limited to Schedules C and

E.  The Contractors may also utilize apprentices as appropriate and consistent with the Schedule A

Collective Bargaining Agreements or as provided in Schedule D Project Specific Conditions.


## ARTICLE IX – EMPLOYMENT OPPORTUNITIES FOR PHILADELPHIA RESIDENTS, MINORITIES AND WOMEN

Section 1.     Employment Opportunities For Philadelphia Residents.   The parties recognize that

the size and scope of the Public Works Project covered by this Agreement, the number of craftsmen and

others expected to be employed in order to complete the work in a timely fashion, and the extended period

of time during which the construction will be underway should provide significant employment

opportunities for qualified residents of the City of Philadelphia.  The parties further recognize that the

Economic Opportunity Plan for the Public Works Project includes specific local hiring goals for the

Contractors as established in Schedule C.

Section 2.     Opportunities for Women and Minorities.  The parties also agree that increasing

participation by women and minorities employees on the Public Works Project is a desirable goal.

Accordingly, the parties shall undertake the activities identified in Schedule C to support the City, Union

and Contractor objectives of increased opportunities for participation in the Union(s) and for actual work

performed. Additional responsibilities of the Contractor under the Economic Opportunity Plan related to diversity are described and required in Schedule E.

## ARTICLE X - SAFETY, PROTECTION OF PERSON AND PROPERTY

Section 1.     Safe Working Conditions.   In accordance with the requirements of the Occupational Safety and Health Act, it shall be the exclusive responsibility of each Contractor on the job site to ensure safe working conditions for its employees and their compliance with any safety rules contained herein or established by the Contractors, provided however, it is understood that the employees have an obligation as set forth in Section 2 below.

Section 2.     Safe Performance of Work.   Employees must use diligent care to perform their work in a safe manner and to protect themselves, other persons and the property of the Contractors or the City.  Failure to do so will be grounds for discipline, including discharge.

Section 3.     Safety, Security and Visitor Rules.   Employees covered by the terms of this Agreement shall at all times while in the employ of the Contractors be bound by the safety, security and visitor rules as established by the City and/or the Contractors in accordance with applicable State and Federal safety and health statutes and regulations.  These rules will be published and posted in conspicuous places through the Project.

## ARTICLE XI - NO DISCRIMINATION

Section 1.     No Discrimination.   The Contractors and Union(s) agree that they will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or age in any manner prohibited by law or regulation.  It is recognized that special procedures may be established by joint agreement of the parties to this Agreement and governmental agencies for the training and employment of persons who have not previously qualified to be employed on

15

construction projects of the type covered by this Agreement. The parties to this Agreement will make all good faith efforts to assist in the proper implementation of such orders, regulations or agreements for the benefit of the population within the jurisdiction of the City of Philadelphia.

Section 2. <u>Complaints</u>. Any complaints regarding application of the provisions of Section 1 should be brought to the immediate attention of the involved Contractors for consideration and resolution.

Section 3. <u>Masculine or Feminine Gender</u>. The use of the masculine or feminine gender in this Agreement shall be construed as including both genders.

## ARTICLE XII - WORK STOPPAGES AND LOCKOUTS

Section 1. There shall be no strike, picketing, work stoppages, slowdowns, sickouts or other disruptive activity for any reason by the Union(s) or employees against any Contractor covered under this Agreement, and there shall be no lockouts by the Contractors. Failure of any of the Union(s) or any employee to cross any picket line established by any Union, signatory or non-signatory, or any other organization, at or in proximity to the Project site is a violation of this Article.

Section 2. The Contractors may discharge any employee violating Section 1 above, and any such employee will not be eligible for referral under this Agreement for a period of ninety (90) working days from the date of his discharge. The Contractors and the Union(s) shall take all steps necessary to obtain compliance with this Article and neither shall be held liable for conduct for which it is not responsible.

## ARTICLE XIII - DISPUTES AND GRIEVANCES

Section 1. <u>Agreement Interpretation</u>. It is specifically agreed that in the event any disputes arise out of the interpretation or application of this Agreement the same shall be settled by the Project Relations Committee. All disputes arising out of Contractor-employee issues shall be governed by

Section 2 of this Article. No such grievance shall be recognized unless called to the attention of the Contractor within seven (7) calendar days after the alleged violation was committed.

Section 2. Unless otherwise provided for in Schedule D Project Specific Conditions, it is specifically agreed that in the event any disputes arise between the Contractors and Union employees that do not involve the interpretation or application of this Agreement, and/or questions of jurisdiction of work, the same shall be settled by means of the grievance procedures currently set forth in the local Collective Bargaining Agreements set forth in Schedule A.

## ARTICLE XIV - JURISDICTIONAL DISPUTES

Section 1. There will be no strikes, no work stoppages or slowdowns, or other interferences with the work because of jurisdictional disputes. Pending the resolution of the dispute, the work shall continue uninterrupted as assigned by the Contractors.

Section 2. This Agreement shall generally recognize the traditional craft jurisdiction of the Union(s) and shall require Contractors to abide by said traditional craft jurisdiction. Contractors will utilize the Collective Bargaining Agreements in Schedule A as references to establish the Unions' basic jurisdictions. If there is any dispute concerning this section, the issue may be submitted by any concerned party for final and binding resolution to the American Arbitration Association.

## ARTICLE XV - SAVINGS AND REPARABILITY

Section 1. It is not the intention of either the Contractors or the Union parties to violate any laws governing the subject matter of this Agreement. The parties hereto agree that in the event any provisions of the Agreement are finally held or determined to be illegal or void as being in contravention of any applicable law, the remainder of the Agreement shall remain in full force and effect unless the part or parts so found to be void are wholly inseparable from the remaining portions of this Agreement.

Further, the Contractors and Union(s) agree that if and when any and all provisions of this Agreement are finally held or determined to be illegal or void by Court of competent jurisdiction, the parties will promptly enter into negotiations concerning the substance affected by such decision for the purpose of achieving conformity with the requirements of any applicable law and the intent of the parties hereto.

Section 2.    This Article shall not be construed to waive the prohibitions of Article XII, and if the parties are unable to resolve their differences, the matter shall be referred to arbitration for resolution as provided for in the grievance-arbitration procedure of Article XIII.

## ARTICLE XVI - DURATION OF THE AGREEMENT

This Agreement shall be effective the _____ day of _____, 20__ and shall continue in effect for the duration of the Public Works Project construction work described in Article II hereof.  Construction of any phase, portion, section or segment of Public Works Project shall be deemed complete when such phase, portion, section or segment has been turned over to the City of Philadelphia and has received the final acceptance from the City of Philadelphia's representative.

Each Collective Bargaining Agreement contained in Schedule A hereof attached to this Agreement shall continue in full force and effect until the Contractor(s) or Union(s) who are parties to such Agreement notify the City of the mutually agreed upon changes in those provisions of such Agreements which are applicable to this Public Works Project, and the effective date thereof, which shall then become the effective date under this Agreement.  Unless otherwise provided in this Agreement, increases to wages and benefit payments from the effective date each new or amended Collective Bargaining Agreement shall be due and owing upon notification to the Contractors and the City of such increases.  The parties agree that any provisions negotiated into any Collective Bargaining Agreement contained in Schedule A hereof will not apply to work on Public Works Project if such provisions are less favorable to the Contractors than those uniformly required of Contractors for construction work normally covered by such an

agreement; nor shall any provision be recognized or applied on any Public Works Project if it may reasonably be construed to apply exclusively to work covered by this Agreement.

In the renegotiation of any of the Collective Bargaining Agreements contained in Schedule A hereof, the Union(s) party to this Agreement agree that there will be no strikes, work stoppages, sympathy strikes, picketing, slowdowns or other disruptive activity affecting the Public Works Project covered by this Agreement because of or related to the renegotiation of any such Collective Bargaining Agreement contained in Schedule A hereof, nor shall there by any lockout on this Public Works Project affecting the Union(s) party to this Agreement during the course of such negotiations.

Any disagreement between the parties over the incorporation into any Collective Bargaining Agreement contained in Schedule A hereof of such provisions agreed upon in the renegotiation of any such Collective Bargaining Agreement as is contained in Schedule A shall be referred to Article XIII hereof for resolution.


**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and effective as of the day and year above written.


**FOR THE UNION(S):**                    **FOR THE CONTRACTORS:**


_____

                                         _____
                                         Contractor

                                         _____
                                         Contractor

                                         _____
                                         Contractor

                                         _____
                                         Contractor

# SCHEDULE A

## COLLECTIVE BARGAINING AGREEMENTS

## SCHEDULE B

## **RESERVED**

## SCHEDULE C

## INCREASING OPPORTUNITIES FOR WOMEN AND MINORITIES IN THE BUILDING TRADES UNION(S) AND THE PUBLIC WORKS PROJECTS

Consistent with the Mayor's Advisory on Construction Industry Diversity Report and Recommendations, the City of Philadelphia, the Union(s) and Contractors shall undertake the following activities:

Section 1.     City Activities.

(a)     The City shall collect, tabulate and analyze data, including certified payrolls, related to the participation of male minorities, women and Philadelphia residents in City and City-funded construction projects.

(b)     The City shall establish goals for employment of Philadelphia residents in City and City-funded construction projects. For City residents employment in the Public Works Project shall be at least:

Philadelphia Residents: Fifty (50) percent of all construction employment hours.

(c)     The City shall establish goals for workforce diversity in City and City-funded construction projects. The current goals are based on the March 2009 Report of the Mayor's Advisory Commission on Construction Industry Diversity. For male minority and women employment in the Public Works Project shall be at least:

Male Minority: Thirty two (32) percent of all construction employment hours

Women:          Seven (7) percent of all construction employment hours

(e)     The City shall assist the Union(s) in undertaking activities which would benefit from City participation and support.

(f)     The City shall establish and support a standing Advisory Commission on Construction Industry Diversity. The City shall invite union leaders, large and small contractors, contractor associations project owners and community leaders to participate.

22

(g)     The City shall designate a City agency for the receipt and redress of complaints from the public about the opportunities for employment on City-funded construction projects.

Section 2.     Union Activities.

(a)     The Union(s) shall collect demographic data on participation in the Public Works Project. The Union(s) shall provide that information to the City on monthly basis while the Project Labor Agreement is in effect.

(b)     The Union(s) shall set participation goals that will significantly increase participation of minority males and women. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

(c)     The Union(s) shall establish goals for participation of in apprenticeship programs for minority males and women.  Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

(d)     The Union(s) shall actively recruit minority males and women for apprenticeship positions. Outreach efforts must be appropriate for reaching minority males and women and consistent with the goals the Union(s) have established for membership of the Union(s).

(e)      The Union(s) shall evaluate alternatives to apprenticeship recruitment for adding minority males and women to membership.

(f)     The Union(s) shall each identify a representative who shall be responsible for reporting on each Union's progress in improving opportunities for minority males and women.

Section 3.     Contractor Activities.

(a)     The Contractors shall support the City and Union efforts to increase the participation of minority males and women in the Public Works Project through apprenticeship programs and other initiatives.

(b)     The Contractors shall use their best efforts to add minority males and women to their permanent or steady workforces. The Contractors shall provide workforce demographic information to the City in advance of project commencement.

(c)     The Contractors shall ensure a work environment that is free from discrimination and supportive of greater participation of minority males and women in the Public Works Project.

(d)     The Contractors shall use their best efforts to meet or exceed the goals established for minority males and women participation in Section 1 of this Schedule C.

(e)     The Contractors shall provide monthly updates to the City, including but not limited to payroll reports, for the requirements of this Section 3.

Section 4.     Third Party Monitoring

(a)     In the event that the City determines that the Agreement and the goals for participation in the Public Works Project by Philadelphia residents, male minorities and women would benefit from monitoring by a qualified third party ("Monitor"), the monitoring shall be performed by a Monitor selected by the parties.  The Contractors and Unions shall provide information and access to the Monitor consistent with the requirements of this Schedule C and the Agreement.

(b)     The costs of monitoring by the Monitor shall be shared equally by the parties.

## SCHEDULE D

## PROJECT SPECIFIC CONDITIONS

Project specific conditions agreed upon by the Union(s) and the City supersede the provisions established in Schedule A Collective Bargaining Agreements only as to the Public Works Project.

# SCHEDULE E

## ECONOMIC OPPORTUNITY PLAN

# EXHIBIT E

EXECUTIVE ORDER NO. 8-15

## PUBLIC WORKS PROJECT LABOR AGREEMENTS

WHEREAS, the City of Philadelphia ("City") has a compelling interest in awarding building or construction work contracts so as to yield the lowest reasonable costs and the highest standard of quality and efficiency; and

WHEREAS, Project Labor Agreements can ensure that a building or construction work project is completed at the lowest reasonable cost; by the highest quality and most professional work force; and in a timely manner without labor disruptions such as strikes, lockouts or slowdowns; and

WHEREAS, Project Labor Agreements can provide opportunities for the City, contractors and labor organizations to make progress in meeting their respective goals for worker diversity and local employment;

WHEREAS, the City has been a party to Project Labor Agreements pursuant to Executive Orders No. 5-95 and No. 15-11, and has gained useful insight into when Project Labor Agreements are most appropriate and beneficial to the City;

WHEREAS, the City has determined that certain projects, because of their size, complexity, need for a variety of craft labor and critical deadlines are generally appropriate for Project Labor Agreements; and

WHEREAS, guidance to City departments and agencies on the use of Project Labor Agreements benefits the interests of the City:

WHEREAS, an Advisory Committee can provide continuing guidance on the use and form of Project Labor Agreements;

NOW, THEREFORE, by the powers vested in me by the Philadelphia Home Rule Charter, it is hereby ORDERED:

**SECTION 1. Definitions.**

    (a)    <u>Appropriate Labor Organization.</u> An organization representing, for purposes of collective bargaining, journeymen in one or more crafts or trades with a Federal or state certified approved apprenticeship training program and which:

        (i)    has entered into a labor agreement with an employer in the building and construction industry;

        (ii)    has represented journeymen, mechanics and apprentices employed

on projects similar to the project for which a Project Labor
Agreement is being considered;

    (iii)    possesses the present ability to refer, provide or represent qualified
journeymen and apprentices in the crafts or trades required by the
project, in sufficient numbers to perform the contracted work
involved in the project; and

    (iv)    has identified member diversity as an organizational value and has
established objectives for maintaining and increasing diversity
among its apprentice and journeyman members.

(b)    City Agency. A City office, department, board, commission or other
entity which procures goods and services directly or through the City
Procurement Department.

(c)    Project(s). This Executive Order shall apply to building or construction
work, including maintenance and service projects which include
substantial building improvements under a contract with the City governed
by Section 17-107 of The Philadelphia Code.

(d)    Project Labor Agreement. A collective bargaining agreement between a
contractor as an employer and an Appropriate Labor Organization relating
to the building or construction work performed at a particular site
("Project"). Such an agreement sets forth the terms and conditions of
employment for workers hired by the employer and sets forth certain work
rules, no-strike clauses, jurisdictional determinations and other project-
specific provisions that the City, the employer or the Labor Organization
deem important for the completion of the project. Any Project Labor
Agreement shall be subject to the review and approval of the City's Law
Department.

**SECTION 2. Public Works Project Review.**

(a)    Each City Agency shall review all proposed Projects, with an estimated
construction cost of Three Million Dollars ($3,000,000.00) or more to
determine if a particular Project would be appropriate for a Project Labor
Agreement. Projects with lower estimated costs may also be appropriate
for Project Labor Agreements, and City Agencies are encouraged to
review Projects with lower construction costs. Appropriate Projects
include the following characteristics:

    i.    Projects that have high anticipated construction costs;

    ii.    Projects that require the labor of multiple construction crafts or
trades;

2

iii.      Projects that have complex labor requirements that may conflict with existing collective bargaining agreements;

iv.      Projects that require completion without delay

v.      Projects that further urgent City goals and

vi.      Projects being performed in complex work environments or for which the provisions of Section 5 are required.

(b)      All Projects with estimated construction budgets of Three Million Dollars ($3,000,000.00) or more shall be reviewed by City Agencies prior to issuing an invitation for bids. PLA's should be used when any of the criteria under Section 2(a) are met, unless clear countervailing considerations are present. City Agencies shall forward the findings of the Project review to the Mayor's Office.

**SECTION 3. Referral for Project Labor Agreements.**

(a)      When a City Agency has determined that a Project is appropriate for a Project Labor Agreement, the City Agency shall provide the Mayor's Office with a written description of the Project and the City Agency's recommendation for a Project Labor Agreement.

(b)      The recommendation of the appropriateness and feasibility of using a Project Labor Agreement for a particular project shall describe how it will benefit and enhance the interests of the City on the basis of costs, efficiency, quality, safety and/or timeliness, and shall specifically address the following factors;

      (i)      The need for safe, timely and efficient completion of the project;

      (ii)      The need for predictable costs and enforcement of prevailing wage requirements;

      (iii)      The need for effective mechanisms for resolution of disputes;

      (iv)      The need for a ready and adequate supply of highly skilled and highly trained craft workers and the need to guarantee performance of the project in a workmanlike and professional manner; and

      (v)      The opportunity to provide significant employment opportunities for qualified City residents, including minority males and women, and for women- and minority-owned businesses.

(c)     This Executive Order does not require the use of a Project Labor Agreement with respect to any particular Project, nor does this Executive Order require the selection of any particular union, trade council or labor organization.

**SECTION 4. Determination for Project Labor Agreement.**

(a)     The Mayor's Office shall review all submittals required for Projects.

   (i)     Whether a Project Labor Agreement has been recommended or not, the Project shall be reviewed for consistency with this Executive Order.

(b)     When the Mayor's Office determines that a Project Labor Agreement is appropriate, it shall, in consultation with the City Agency, commence a discussion with labor organizations to determine

   (i)     which labor organization(s) may be appropriate for the Project, and

   (ii)    if a Project Labor Agreement is feasible for the Project.

(c)     Where the Mayor's Office determines that a Project Labor Agreement will benefit from monitoring of the opportunities provided for qualified City residents, minorities and women, the Office of Economic Opportunity shall provide such monitoring services and report results to the Mayor's Office on a periodic basis, but not less than yearly.

**SECTION 5. Required Provisions In Project Labor Agreements.**

Any Project Labor Agreement entered into pursuant to this Executive Order shall:

(a)     Contain guarantees against strikes, lockouts, slowdowns and similar actions;

(b)     Set forth effective, immediate and mutually binding procedures for resolving jurisdictional disputes arising before the completion of the work;

(c)     Contain guarantees for the availability of labor for the Project;

(d)     Require the participating labor organizations to make available at the time of bidding for the Project all collective bargaining agreements and current wage rates applicable to the work;

(e)     Include diversity goals for appropriate labor organizations and contractors and requirements for annual reporting by participating labor organizations on their efforts and progress toward increasing diversity; and

(e)     Require participating labor organizations and contractors to cooperate with the City's Office of Economic Opportunity on providing information on economic opportunity plans and other diversity issues

**SECTION 6.  Procedures When Project Labor Agreements Are Used.**

If a Project Labor Agreement is used pursuant to this Executive Order for any Project, the procedures listed in this section shall be followed:

(a)     A Project Labor Agreement shall be made part of the bid specifications in substantially the form attached hereto as the "Philadelphia Public Projects Labor Agreement," or such other form of agreement that the City Solicitor may approve.

(b)     The Instructions to Bidders shall provide that the City, the Project manager and any contractor shall have the absolute right to select any qualified bidder for the award of project contracts without reference to whether the bidder was unionized, provided, however, that only a bidder willing to execute and comply with the Project Labor Agreement would be designated the successful bidder;

(c)     The Instructions to Bidders shall provide that the Project Labor Agreement shall be made binding on all contractors and subcontractors on the Project through inclusion of appropriate bid specifications in all relevant bid documents;

(d)     Following the award of the contract for the Project, the Project Labor Agreement shall be finalized and executed by the contractor or its project manager, subject to the review and approval of the City; and

(e)     The Project contract and the Project Labor Agreement shall comply with all other provisions of law.

**SECTION 7.  Advisory Committee for Project Labor Agreements.**

(a)     An Advisory Committee for Project Labor Agreements is hereby established.  The Advisory Committee shall consist of the following City officials or their designees:

> Mayor's Chief of Staff
> City Solicitor
> Managing Director
> Director of Finance
> Deputy Mayor for Transportation and Utilities
> Deputy Mayor for Economic Development

Other City officials, employees or private citizens may serve on the Advisory Committee at the request of the Mayor's Chief of Staff.

(b) Duties. The Advisory Committee shall:

(i) Monitor and evaluate Project Labor Agreements entered into pursuant to this Executive Order, , and review reports from City departments and participating labor organizations on the use of the agreement provisions in Section 5 in meeting the objectives of this Executive Order, including but not limited to, avoiding labor unrest, providing skilled high quality labor, and meeting the diversity goals agreed to by the participating Unions. If reports from Unions are not provided to the City, the Advisory Committee may recommend that the use of Project Labor Agreements be suspended by the City until such time as reports are received and can be evaluated;

(ii) Make periodic recommendations to the Mayor regarding the use of Project Labor Agreements , including recommendations for modifications of the terms and conditions of Project Labor Agreements, changes to the policies established herein for their use, and the expansion, limitation, suspension or termination of their use; and

(iii) Perform such other duties as the Mayor may from time to time assign.

**SECTION 8. Prior Order Rescinded.**

Executive Order No. 15-11 is hereby rescinded.

**SECTION 9. Effective Date.**

This Executive Order shall take effect immediately.


12/31/15
Date

Michael A. Nutter, Mayor

EXHIBIT F

Good morning Samantha -

The bid has been postponed, it will now open Tues. 04-09-19, thus the approved bidders list will be posted about one week before, as is the city's standard.

Per my below instructions to Anthony, you can access the bid after the prequalification bid closes by NOT logging into the PHL Contracts, but just going in to view as the general public to open bids. You will then be able to see the bid and all of the documents, whether you ultimately end up as an approved bidder or not. Once approved bidders are added about a week before opening, then you will be able to sign in and actually submit a bid.

Regarding the project labor agreement, per our law department: The United Steelworkers are not one of the unions that are signatory to the Project Labor Agreement for this project. As stated in Article IV of the Project Labor Agreement, the "Unions" (defined as the Affiliates of the Philadelphia Building and Construction Trades Council), are the sole and exclusive bargaining representatives of all craft employees working on the Project within the scope of this Agreement. Also, the Union(s) are recognized as the source of employment referrals.

Thank you.



Procurement Technician I

City of Philadelphia

Procurement Department, Public Works

Municipal Services Building

1

1401 J. F. Kennedy Boulevard, Room 120

Philadelphia, PA 19102

215.686.4712     215.686.4728 fax

theresa.pilla@phila.gov



www.PHLContracts.phila.gov

*Procurement – Focused on Service. Committed to Quality.*
*Let Us Know How We Did.*
**https://www.surveymonkey.com/r/proc_cust_excellence**

---

**From:** Samantha Hart <Samantha.Hart@road-con.com>
**Sent:** Thursday, March 28, 2019 8:32 AM
**To:** Anthony Santaniello
**Cc:** Theresa Pilla
**Subject:** RE: Supplemental Pre-Qualification Questionnaire

When will the approved bidders be notified?

If the job bids on April 2nd and we still don't know that is leaving very little time to work up a bid?

Road Con, Inc is a signatory with the United Steel Workers (heavy and Highway construction). Can the United Steel Workers be added to the Project Labor Agreement?

*Samantha M. Hart*
Road-Con, Inc.
902 Camaro Run Drive
West Chester, Pa. 19380
P: 610-429-8089
F: 610-429-8098

EXHIBIT G

Bid No. **3858**
Streets Work No. 19427

CITY OF PHILADELPHIA
DEPARTMENT OF STREETS
SURVERYS, DESIGN, AND CONSTRUCTION DIVISION

PROPOSAL AND SPECIFICATIONS
FOR
## 15TH STREET BRIDGE REHAB OVER CITY BRANCH RAILROAD CUT

### SUBMISSION OF PROPOSALS:
QUOTES ARE TO BE SUBMITTED UNTIL **10:30 A.M.** EASTERN TIME ON
WWW.PHLCONTRACTS.PHILA.GOV. AN OPENING OF QUOTES RECEIVED WILL BE HELD IN
ROOM 170A, MUNICIPAL SERVICES BUILDING, 1401 JOHN F. KENNEDY BOULEVARD,
PHILADELPHIA, PA 19102 AT **10:30 A.M.** EASTERN TIME ON **TUESDAY APRIL 2, 2019**.

### NOTICE:
NO QUOTE WILL BE ACCEPTED UNLESS THE PRE-QUALIFICATION QUESTIONAIRE WITH
ALL QUESTIONS FULLY ANSWERED IS SUBMITTED WITHIN THE PREQUALIFICATION
SOLICITATION **B1904808** ON WWW.PHLCONTRACTS.PHILA.GOV ON OR BEFORE 11:59P
**TUESDAY, MARCH 19, 2019**.

### QUESTIONS AND CLARIFICATIONS
QUESTIONS MAY BE SUBMITTED VIA PHLCONTRACTS BY **5:00 PM** EASTERN TIME **MARCH
19, 2019**.

### PRE-BID MEETING
A PRE-BID MEETING WILL BE HELD IN THE MUNICIPAL SERVICES BUILDING, 1401 JOHN F.
KENNEDY BOULEVARD, PHILADELPHIA, PA 19102 ON THE 16TH FLOOR IN ROOM "X" AT
10:00 A.M. EASTERN TIME ON **FRIDAY MARCH 15, 2019**.

# TABLE OF CONTENTS

## STREETS BID #3858

| | |
|---|---|
| COVER SHEET | 1 |
| TABLE OF CONTENTS | 2 |
| INSTRUCTIONS TO SELLERS | 3 |
| DIESEL ENGINE EMISSIONS CONTROLS IN PUBLIC WORKS PROJECTS | 8 |
| NOTICE TO SELLERS – OFFICE OF INSPECTOR GENERAL (OIG) MEMO (7-14) | 12 |
| PROJECT SCOPE OF WORK | 13 |
| PROJECT LOCATION MAP | 17 |
| WORK PROPOSAL | 18 |
| PERFORMANCE OF WORK BY CONTRACTOR | 37 |
| PUBLIC WORKS LBE LANGUAGE (17-109) | 38 |
| BID BOND | 39 |
| INFORMATION REGARDING THE EOP | 41 |
| NOTICE TO SELLERS - PROJECT LABOR AGREEMENT | 42 |
| PHILADELPHIA PUBLIC PROJECTS LABOR AGREEMENT | 43 |
| DISCLOSURE OF MINORITIES & WOMEN AS BOARD MEMBERS AND EXECUTIVE STAFF (17-104) | 83 |
| PHL CONTRACTS BID PROCESSING FEES | 84 |
| STANDARD CONTRACT REQUIREMENTS FOR PUBLIC WORKS CONTRACTS | 85 |
| ACT 127 VERIFICATION FORM ADDENDUM | 132 |
| PIDC WORKING CAPITAL LINE-OF-CREDIT INFORMATION | 133 |
| NOTICE TO SELLERS LCP TRACKER (17-107) | 134 |
| PREVAILING CITY WAGE SCHEDULE | 135 |
| STANDARD CITY LANGUAGE FOR STREET TREES, ETC | 153 |
| BUSINESS, CORPORATE AND SLAVERY ERA INSURANCE DISCLOSURE (17-104) | 157 |
| TECHNICAL SPECIFICATIONS/ SPECIAL PROVISIONS | 158 |
| PENNSYLVANIA SALES TAX | 389 |
| ASPHALT DIESEL PRICES | 401 |
| PRICES FOR CONTINGENT WORK | 403 |
| UTILITY SUMMARY | 407 |
| EXHIBIT A- BASEMENT FLOOR WORK AREA | 411 |
| EXHIBIT A1 – INSURANCE REQUIREMENTS | 413 |
| EXHIBIT B1 – PWD SPECIFICATIONS | 416 |
| EXHIBIT B2 – DETAILS PWD WATER | 496 |
| EXHIBIT B3 – DETAILS PWD SEWER | 541 |

## PHILADELPHIA PUBLIC PROJECTS LABOR AGREEMENT

THIS CITY OF PHILADELPHIA PUBLIC PROJECT LABOR AGREEMENT (hereinafter the "Agreement") is entered into by and between:

_____

_____

(hereinafter the "Signatory Contractor(s)"), their successors or assigns, and the Affiliates of the Philadelphia Building and Construction Trades Council (hereinafter the "Unions(s)") pursuant to, and in accordance with, the Mayor's Executive Order No.8-15 with respect to the public works project or maintenance or service project which includes substantial building improvements described in Article III, Section 2 of this Agreement, and referred to herein as the "Project."

**WHEREAS** the City, under Executive Order No. 8-15, and consistent with other directives of the Mayor, reviews all proposed public works projects and maintenance or service projects which include substantial building improvements with projected construction costs over Three Million Dollars ($3,000,000) to determine whether the time-sensitivity, size, complexity, number and types of labor involved or other factors would make them appropriate for the use of a Project Labor Agreement; and

**WHEREAS** the City has determined that the project, identified herein at Article III, Section 2 is an appropriate project for a Project Labor Agreement;

**NOW, THEREFORE,** the Signatory Contractor(s) and the Unions, intending to be legally bound, enter into this Agreement.

## <u>ARTICLE I - DEFINITIONS</u>

Section 1.    The term "City" shall mean the City of Philadelphia, including its departments, agencies, officials, employees and agents.

Section 2.    The term "Contractor" shall include the Signatory Contractor, all contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement.

Section 3.    The term "craft" as applied to employees and workers shall mean those skills, crafts and trades of workers represented by the Union(s) as defined herein.

Section 4.    The term "Party" shall mean either Signatory Contractor or a Union.

Section 5.    The term "Project" refers to the public works project or maintenance/service project identified in Article III, Section 2.

Section 6.    Masculine or Feminine Gender.  The use of words denoting the masculine or feminine gender in this Agreement shall be construed as including both genders.

## ARTICLE II - PURPOSE

Section 1.    As provided in Mayor's Executive Order No. 8-15, the City has a compelling interest in carrying out the Project at the lowest reasonable cost, highest level of efficiency, and the highest degree of quality.

Section 2.    The City has determined that certain major projects can best be carried out through the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 8-15, which ensure that labor disputes are resolved without disruptions resulting from strikes, lockouts or slowdowns and which provide for enforceable guarantees that the projects will be carried out in an orderly and timely manner without strikes, lockouts or slowdowns and with provisions protecting the wages, hours, working conditions and safety of those workers whose skills are required to complete such projects.  Project Labor Agreements can provide the City with cost savings and efficiencies through project-specific adjustments to collective bargaining agreements that allow for project-specific appropriate hours of work, length of workday and workweek, overtime, starting times, breaks, shift work, crew apprentice ratios, holidays, dispute resolution and management rights, as have been mutually determined and agreed to by the City and the Union(s).

Section 3.     The City can best accomplish these goals by permitting the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 8-15, on a project by project basis, through which the City has determined, based on thorough investigation, analysis and justification, pursuant to, and in accordance with, the procedures set forth in Mayor's Executive Order No. 8-15 and other policies of the Mayor's Office, that the use of a Project Labor Agreement will benefit and enhance the interest of the City from a cost, efficiency, quality, timeliness and/or safety standpoint.

Section 4.     The City and the Unions have determined that Project Labor Agreements can provide a framework for meeting long term goals of the City, the Union(s) and Contractors for increasing the opportunities for minorities and women to have successful careers in the construction trades.

Section 5.     The City has determined that it can best accomplish all these goals by requiring for projects for which it determines the requirement is appropriate that the Contractors enter into a Project Labor Agreement with the Union(s) prior to the award of the contract. The Project Labor Agreement shall require such Contractors as well as all subcontractors, assignees or transferees to abide by an agreement setting forth the wages, hours and working conditions of the workers employed on such projects.

Section 6.     The Parties to this Agreement recognize that it is essential that the construction work on the Project covered by this Agreement be done in an efficient and economical manner in order to secure optimum productivity and to eliminate any delays in the work. In recognition of the needs of the Project covered by this Agreement, and to maintain a spirit of harmony, labor-management peace, and stability during the term of this Agreement, the Parties agree to establish effective methods for the settlement of all misunderstandings, disputes or grievances which may arise under this Agreement.

Section 7.     The Union(s) and the Contractors, their assigns, subcontractors and transferees agree to abide by the terms and conditions contained in this Agreement with respect to the performance of the work by the Contractors of the Project covered by this Agreement. This Agreement represents the complete understanding of the Parties, and it is further understood that no Contractor is required to sign

any other agreement as a condition of performing work within the scope of this Agreement. No practice, understanding or agreement between a Contractor and a Union Party which is not explicitly set forth in this Agreement and the Schedules hereto shall be binding on any other Party.

## ARTICLE III - SCOPE OF THE AGREEMENT

Section 1. Scope of Agreement. This Agreement shall apply and is limited to all construction work under the direction of the Signatory Contractor and performed by those Contractors of whatever tier which have contracts awarded for such work on and after the effective date of this Agreement, for the City, for the Project defined in Section 2 below.

Section 2. Covered Projects. The Project covered by this Agreement is generally described as the 15th Street Bridge Rehab over City Branch Railway Cut project, Bid Number 3858.

Section 3. Award of Project Contracts.

(a) The City has the absolute right to select any qualified bidder for the award of contracts on this Project without reference to the existence or non-existence of any agreements between such bidder and any Party to this Agreement provided, however, only that such bidder is ready, willing and able to execute and comply with this Agreement, which it shall do should it be designated the successful bidder.

(b) It is agreed that all direct subcontractors of Contractors, of whatever tier, who have been awarded contracts for work covered by this Agreement on or after the effective date of this Agreement shall be required to accept and be bound by the terms and conditions of this Project Labor Agreement.

Section 4. Contract Administration.

(a) This Agreement is intended to provide close cooperation between management and labor. At the request of the City or a Party to this Agreement, a Project Relations Committee (as further

described in Section 4 (c)), shall be formed and shall monitor compliance with this Agreement by all Contractors which, through their execution of this Agreement, together with their subcontractors or transferees, have become bound hereto. The Project Relations Committee shall monitor compliance with this Agreement by all Union(s) which, through their execution of this Agreement have become bound hereto.

(b)     The provisions of this Agreement, including Collective Bargaining Agreements which are listed on and collectively designated as Schedule A, shall apply to the construction of the Project covered by this Agreement, notwithstanding the provisions of Local or International Agreements which may conflict or differ from the terms of this Agreement.   Where a subject covered by the provisions of this Project Labor Agreement, including but not limited to, Schedule D Project Specific Conditions, is also covered by any of the Collective Bargaining Agreements in Schedule A, the provisions of this Agreement shall prevail.

(c)     When established, the Project Relations Committee shall be composed of a representative of the City, representatives of each Signatory Contractor, and four representatives of the craft trades engaged in labor on the Project.   The Philadelphia Area Labor Management Committee shall appoint one representative who will act as facilitator and staff to the Committee. The Project Relations Committee shall operate under the Philadelphia Area Labor-Management Built-Rite process.

(d)     The Project Relations Committee shall meet as required, but not less than once each quarter to review performance and the operation of this Agreement.

(e)     The purpose of this Project Relations Committee is as follows:

(1)     To improve communications between representatives of labor and management and engender cooperative and harmonious relations between labor and management performing work under this Agreement.

(2)     Provide workers and Contractors with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness. (Example: Joint process to reduce worksite injuries.)

(3)     Provide a forum for open and honest discussion of problems confronting labor and management, and of eliminating potential problems.

(4)     Study and explore ways of increasing productivity of both labor and management, and of eliminating potential problems.

(5)     Enhance the involvement of workers in making decisions that affect their working lives, and to improve the quality of work life for the employees.

(6)     Expand and improve working relationships between workers and managers.

(7)     Identify conflicts between labor and management before they arise as disputes, and promptly assist in fairly resolving disputes when they do arise.

(8)     Seek to maintain a productive dialogue.

(9)     Pursue, achieve and document the implementation of all aspects of Schedule C, pertaining to increasing employment opportunities for women and minorities.

(10)     Support the Contractors in meeting general obligations and specific project goals for local hiring and for worker diversity as may be part of the Economic Opportunity Plan for the Project and as further described in Schedule E.

Section 5.     Binding Effect.  This Agreement and Schedules, including but not limited to Schedules A, B, C, D and E, attached hereto shall only be binding on the signatory Parties hereto and shall not apply to the parents, affiliates, subsidiaries, or other ventures of any such Party.

Section 6.     Limitations.  This Agreement shall be limited to work historically recognized as construction or building improvement work, including, specifically, the site preparation and related demolition work necessary to prepare the site for construction, and such rehabilitation of existing facilities

as is directed by the City. Nothing contained herein shall be construed to prohibit, restrict or interfere with the performance of any other operation, work or function which may occur in or around the Project site or be associated with the development of the Project, or with the ongoing operations of the City.

Section 7. Exclusions. Items specifically excluded from the scope of this Agreement include, but are not limited to, the following:

(a) Work of non-manual employees, including but not limited to, superintendents, supervisors, staff engineers, surveyors (except where expressly covered by a Collective Bargaining Agreement in Schedule A), inspectors, quality control personnel, quality assurance personnel, timekeepers, mail carriers, clerks and office workers, including messengers, guards, emergency medical and first aid technicians and other professional, engineering, administrative, supervisory and management employees.

(b) Equipment and machinery owned or controlled and operated by the City.

(c) All off-site handling of materials, equipment or machinery and all deliveries to and from the Project site except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(d) All employees of the City.

(e) Any work performed on or near, or leading to or into, the Project site by state, county, city or other governmental bodies, or their Contractors; or by public utilities or their Contractors and/or by the City, or its contractors, for work which is expressly not part of the Project covered by this Agreement.

(f) Off-site maintenance on leased equipment and on-site supervision of such work except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(g) Off-site warranty functions and warranty work and on-site supervision of such work except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(h)     Exploratory geophysical testing, except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(i)     Laboratory or specialty testing or inspections or monitoring activities not ordinarily done by the crafts.

(j)     Other work which may occur from time to time.

Section 8.     Applicability of Agreement.  Nothing contained herein shall be construed to prohibit or restrict the City or its employees from performing work not covered by this Agreement on a Project site.  As areas and systems of a Project are inspected, construction tested and accepted by the City, the Agreement shall not have further force or effect on such items or areas, except when the Contractors are directed by the City to engage in repairs, modifications, check-out, and/or warranty functions required by their contract(s) with the City.

Section 9.     Termination, Delay or Suspension of Project.  It is understood that the City, at its sole option, may terminate, delay and or suspend any or all portions of the Project at any time.

Section 10.     Contractor and Union(s) Liability.  It is understood and agreed that the liability of any Contractor and the liability of separate Union(s) under this Agreement shall be several and not joint. The Union(s) agree that this Agreement does not have the effect of creating any joint employment status between or among the City and any Contractor.

## ARTICLE IV - UNION RECOGNITION AND EMPLOYMENT

Section 1.     Union Recognition.  The Contractor recognizes the Union(s) as the sole and exclusive bargaining representatives of all craft employees working on the Project within the scope of this Agreement.

Section 2.     Referrals.  The Union(s) are recognized as the source of employment referrals.  The appropriate Union(s) will be contacted and shall refer all applicants for employment to this Project according to the standards or criteria uniformly applied to any construction project in the area.  In the

event that any Union is unable to fill any requisition for employees within a forty eight (48) hour period after such requisition is made by the Contractor (Saturdays, Sundays and Holidays excepted), the Contractor may solicit and employ applicants from any other available source. The Contractor shall notify the Union(s) of employees hired by any source other than referral by the Union(s).

Section 3.    Referral Systems. Subject to the Contractor's right to call for a specific skill or ability, the job referral systems provided in the Collective Bargaining Agreements of the Union(s) set forth in Schedule A hereto, or, in the absence of such language, the referral practices in place at the Union(s), will be in effect for the purpose of initial employment only. Such job referral system, whether by contract or practice, must be operated in a non-discriminatory manner and in full compliance with Federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspect or obligations of Union membership and shall be subject to such other conditions as established in this Article IV and in Schedule C.

Section 4.    Competency. The Contractor shall have the right to determine the competence of all employees, the right to determine the number of employees required and have the sole responsibility for selecting the employees to be laid-off consistent with this Agreement regardless of membership or non-membership in the Union(s). The Contractor shall also have the right to reject any applicant referred by the Union(s).

Section 5.    Union Security. It shall be a condition of employment that all employees of Contractor covered by this Agreement who are members of the Union(s) in good standing on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members in good standing and those who are not members on the effective date shall, on the eighth (8th) day following employment, become and remain members in good standing in the Union(s) for the term of this Agreement.

Section 6.     Skilled Craftsmen.  The Union(s) will exert their utmost efforts to recruit sufficient numbers of skilled craftsmen to fulfill the manpower requirements of the Contractor.

Section 7.     Selection of Foremen.  The selection of craft foremen and/or general foremen and the number of foremen required shall be entirely the responsibility of the Contractor.  All foremen shall take orders exclusively from the designated Contractor representatives.  Craft foremen shall be designated as working foremen by the Contractor, except when the Contractor determines that it is not possible for a particular foreman to be working foreman.

Section 8.     Seniority.  Individual seniority shall not be recognized or applied to employees working on the Project.

### ARTICLE V - UNION REPRESENTATION

Section 1.     Access to Project Site.  Authorized and designated representatives of the Union(s) shall have access to the Project, consistent with rules, regulations and policies as have been established for site security and safety and through established Contractor procedures, for the purpose of transacting business in connection with the job.  Such representatives shall be subject to security clearances and may require authorized escorts to enter secure areas of the Project.  Such representatives shall not interfere with the work of employees or cause unnecessary loss of time by the employees.

Section 2.     Stewards.  Stewards shall be appointed consistent with the appropriate Collective Bargaining Agreement as included in Schedule A.

Section 3.     Non-interference.  On work where City personnel or personnel of other contractors not signatory to this Agreement may be working in close proximity of the construction activities, the Union(s) agree that the Union's representatives, stewards and individual workers will not interfere with the City's personnel or the personnel of other contractors not signatory to this Agreement or with the work which is being performed by the City's personnel or personnel of other contractors not signatory to this

Agreement. There shall be no interference by employees covered under this Agreement with on-site concessionaires.

## ARTICLE VI - MANAGEMENT RIGHTS

Section 1.    Management Rights.    The Contractor retains full and exclusive authority for the management of its operation consistent with this Project Labor Agreement and the collective bargaining agreements included in Schedule A.  The Contractors retain the right to (i) plan, direct and control the workforce and the operation of all of his work, including the hiring, promotion, demotion, transfer, layoff, suspension, discipline or discharge for just cause of its employees; (ii) select foremen, determine the size and make-up of each crew; (iii) assign and schedule work; (iv) promulgate work rules; (v) regulate the use of all equipment and other property of the Contractors, decide the amount of equipment to be used, the number of employees needed; and (vi) regulate overtime work, the determination of when it shall be worked, and the number and identity of employees engaged for such work.  No rules, customs or practices which limit or restrict productivity, efficiency or the individual and/or joint working efforts of employees shall be permitted or observed. The Contractors may utilize any methods or techniques of construction.

Section 2.    Choice of Materials.    There shall be no limitation or restriction upon the Contractors' choice of materials or design, nor, subject to the principle of legitimate work preservation set forth in the following sentence, upon the full use and installation of equipment, machinery, package units, pre-cast, pre-fabricated, pre-finished, or pre-assembled materials, tools, or other labor-saving devices unless otherwise specified in Schedule A.  The on-site installation or application of such items shall be performed by the craft having jurisdiction over such work:  provided, however, it is recognized that other personnel having special talents or qualifications may participate in the installation consistent with Schedule A, including, but not limited to check-off or testing of specialized or unusual equipment or facilities.

Section 3.     New Technology and Devices.   It is recognized that the use of new technology, equipment, machinery, tools and/or labor saving devices and methods of performing work will be initiated by the Contractor from time to time during the Project.   The Union(s) agree that they will not in any way restrict the implementation of such new devices or work methods.   If there is any disagreement between the Contractors and the Union(s) concerning the manner or implementation of such device or method of work, the implementation shall proceed as directed by the Contractors, and the Union(s) shall have the right to grieve and/or arbitrate the dispute as set forth in Article XIV of this Agreement.

## ARTICLE VII - HOURS OF WORK, OVERTIME, SHIFTS AND HOLIDAYS

Section 1.  Hours of Work, Overtime, Shifts and Holidays shall be governed by the Collective Bargaining Agreements included in Schedule A, except as mutually determined and agreed to by the Union(s) and the City and provided in Schedule D Project Specific Conditions.

Section 2.  Where modifications to the Collective Bargaining Agreements or the provisions of Schedule D Project Specific Conditions are in the best interest of a project, such departure may be requested by the Contractors, Union(s) and the City.   Such departures shall be requested utilizing the Project Relations Committee and shall be approved by mutual consent.

## ARTICLE VIII - WORKING CONDITIONS

Section 1.     Job Site Conditions.   All job site working conditions, including rest periods, coffee breaks and work practices, shall be as determined by the Contractors.

Section 2.     Project Rules.   The Contractors shall establish such other reasonable Project rules as each Contractor deems appropriate.   All rules and regulations shall be observed by Union employees who, by virtue of their Union membership and coverage under an appropriate Collective Bargaining Agreement, are made subject to such rules.

## ARTICLE IX - APPRENTICES

Section 1.    Apprentices.  Recognizing the need to maintain continuing supportive programs designed to develop adequate numbers of competent workers in the construction industry, the Contractors will employ apprentices in their respective crafts to perform such work as is within their capabilities which is customarily performed by the craft in which they are indentured.  Apprentices shall be employed in a manner consistent with the provisions of this Agreement including but not limited to Schedules C and E.  The Contractors may also utilize apprentices as appropriate and consistent with the Schedule A Collective Bargaining Agreements or as provided in Schedule D Project Specific Conditions.

## ARTICLE X – EMPLOYMENT OPPORTUNITIES FOR PHILADELPHIA RESIDENTS, MINORITIES AND WOMEN

Section 1.    Employment Opportunities For Philadelphia Residents.  The parties recognize that the size and scope of the Project covered by this Agreement, the number of craftsmen and others expected to be employed in order to complete the work in a timely fashion, and the extended period of time during which the construction will be underway should provide significant employment opportunities for qualified residents of the City of Philadelphia.  The parties further recognize that the Economic Opportunity Plan for the Project includes specific local hiring goals for the Contractor as established in Schedule C.

Section 2.    Opportunities for Women and Minorities.  The parties agree that increasing participation by women and minorities employees on the Project is a desirable goal.  Accordingly, the Parties shall undertake the activities identified in Schedule C to support the City, Union(s) and Contractor objectives of increased opportunities for participation in the Union(s) and for actual work performed.  Additional responsibilities of the Contractor under the Economic Opportunity Plan related to diversity are described and required in Schedule E.

## ARTICLE XI - SAFETY, PROTECTION OF PERSON AND PROPERTY

Section 1.    Safe Working Conditions.  In accordance with the requirements of the Occupational Safety and Health Act, it shall be the exclusive responsibility of each Contractor on the job site to ensure safe working conditions for its employees and their compliance with any safety rules contained herein or established by the Contractors, provided however, it is understood that the employees have an obligation as set forth in Section 2 below.

Section 2.    Safe Performance of Work.  Employees must use diligent care to perform their work in a safe manner and to protect themselves, other persons and the property of the Contractors or the City.  Failure to do so will be grounds for discipline, including discharge.

Section 3.    Safety, Security and Visitor Rules.  Employees covered by the terms of this Agreement shall at all times while in the employ of the Contractors be bound by the safety, security and visitor rules as established by the City and/or the Contractors in accordance with applicable State and Federal safety and health statutes and regulations.  These rules will be published and posted in conspicuous places through the Project.

## ARTICLE XII - NO DISCRIMINATION

Section 1.    No Discrimination.  The Contractors and Union(s) agree that they will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or age in any manner prohibited by law or regulation.  It is recognized that special procedures may be established by joint agreement of the parties to this Agreement and governmental agencies for the training and employment of persons who have not previously qualified to be employed on construction projects of the type covered by this Agreement.  The parties to this Agreement will make all good faith efforts to assist in the proper implementation of such orders, regulations or agreements for the benefit of the population within the jurisdiction of the City of Philadelphia.

Section 2.    Complaints.  Any complaints regarding application of the provisions of Section 1 should be brought to the immediate attention of the involved Contractors for consideration and resolution.

## ARTICLE XIII - WORK STOPPAGES AND LOCKOUTS

Section 1.    There shall be no strike, picketing, work stoppages, slowdowns, sickouts or other disruptive activity for any reason by the Union(s) or employees against any Contractor covered under this Agreement, and there shall be no lockouts by the Contractors.  Failure of any of the Union(s) or any employee to cross any picket line established by any Union, signatory or non-signatory, or any other organization, at or in proximity to the Project site is a violation of this Article.

Section 2.    The Contractors may discharge any employee violating Section 1 above, and any such employee will not be eligible for referral under this Agreement for a period of ninety (90) working days from the date of his discharge.  The Contractors and the Union(s) shall take all steps necessary to obtain compliance with this Article and neither shall be held liable for conduct for which it is not responsible.

## ARTICLE XIV - DISPUTES AND GRIEVANCES

Section 1.    Agreement Interpretation.  It is specifically agreed that in the event any disputes arise out of the interpretation or application of this Agreement the same shall be settled by the Project Relations Committee.  All disputes arising out of Contractor-employee issues shall be governed by Section 2 of this Article.   No such grievance shall be recognized unless called to the attention of the Contractor within seven (7) calendar days after the alleged violation was committed.

Section 2.    Unless otherwise provided for in Schedule D Project Specific Conditions, it is specifically agreed that in the event any disputes arise between the Contractors and Union employees that do not involve the interpretation or application of this Agreement, and/or questions of jurisdiction of work,

the same shall be settled by means of the grievance procedures currently set forth in the local Collective Bargaining Agreements set forth in Schedule A.

## ARTICLE XV - JURISDICTIONAL DISPUTES

Section 1.     There will be no strikes, no work stoppages or slowdowns, or other interferences with the work because of jurisdictional disputes.  Pending the resolution of the dispute, the work shall continue uninterrupted as assigned by the Contractors.

Section 2.     This Agreement shall generally recognize the traditional craft jurisdiction of the Union(s) and shall require Contractors to abide by said traditional craft jurisdiction.  Contractors will utilize the Collective Bargaining Agreements in Schedule A as references to establish the Unions' basic jurisdictions.  If there is any dispute concerning this section, the issue may be submitted by any concerned Party for final and binding resolution to the American Arbitration Association.

## ARTICLE XVI - SAVINGS AND REPARABILITY

Section 1.     It is not the intention of either the Contractors or the Union parties to violate any laws governing the subject matter of this Agreement.  The parties hereto agree that in the event any provisions of the Agreement are finally held or determined to be illegal or void as being in contravention of any applicable law, the remainder of the Agreement shall remain in full force and effect unless the part or parts so found to be void are wholly inseparable from the remaining portions of this Agreement.  Further, the Contractors and Union(s) agree that if and when any and all provisions of this Agreement are finally held or determined to be illegal or void by Court of competent jurisdiction, the parties will promptly enter into negotiations concerning the substance affected by such decision for the purpose of achieving conformity with the requirements of any applicable law and the intent of the parties hereto.

Section 2.    This Article shall not be construed to waive the prohibitions of Article XIII, and if the parties are unable to resolve their differences, the matter shall be referred to arbitration for resolution as provided for in the grievance-arbitration procedure of Article XIV.

## ARTICLE XVII - DURATION OF THE AGREEMENT

Section 1.    This Agreement shall be effective upon execution by the parties and shall continue in effect for the duration of the Project construction work described in Article III hereof.  Construction of any phase, portion, section or segment of the Project shall be deemed complete when such phase, portion, section or segment has been turned over to the City of Philadelphia and has received the final acceptance from the City of Philadelphia's representative.

Section 2.    Each Collective Bargaining Agreement contained in Schedule A hereof attached to this Agreement shall continue in full force and effect until the Contractor(s) or Union(s) who are parties to such Agreement notify the City of the mutually agreed upon changes in those provisions of such Agreements which are applicable to this Project, and the effective date thereof, which shall then become the effective date under this Agreement.  Unless otherwise provided in this Agreement, increases to wages and benefit payments from the effective date each new or amended Collective Bargaining Agreement shall be due and owing upon notification to the Contractors and the City of such increases.  The Parties agree that any provisions negotiated into any Collective Bargaining Agreement contained in Schedule A hereof will not apply to work on Project if such provisions are less favorable to the Contractors than those uniformly required of Contractors for construction work normally covered by such an agreement; nor shall any provision be recognized or applied on any Project if it may reasonably be construed to apply exclusively to work covered by this Agreement.

Section 3.    The Union(s) shall provide notice to all Contractors that are Parties to this Agreement who are not signatory to collective bargaining agreements with the Unions of any changes in the Schedule A. Collective Bargaining Agreements and/or changes to rates for wages and benefits.  Such

changes shall not be effective as to the Contractors who are not signatory to the Collective Bargaining Agreements until such notice has been given.

Section 4.    In the renegotiation of any of the Collective Bargaining Agreements contained in Schedule A hereof, the Union(s) Party to this Agreement agree that there will be no strikes, work stoppages, sympathy strikes, picketing, slowdowns or other disruptive activity affecting the Project covered by this Agreement because of or related to the renegotiation of any such Collective Bargaining Agreement contained in Schedule A hereof, nor shall there by any lockout on this Project affecting the Union(s) Party to this Agreement during the course of such negotiations.

Section 5.    Any disagreement between the parties over the incorporation into any Collective Bargaining Agreement contained in Schedule A hereof of such provisions agreed upon in the renegotiation of any such Collective Bargaining Agreement as is contained in Schedule A shall be referred to Article XIV hereof for resolution.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed and effective as of the day and year above written.

**FOR THE UNION(S):**                    **FOR THE CONTRACTOR:**

Date  2/26/19

Contractor                    Date

18

**SCHEDULE A**

**COLLECTIVE BARGAINING AGREEMENTS**

The Collective Bargaining Agreements, described in Article III, Section 4(b) of this Agreement,

are:

1. Form of Independent Contractor Collective Bargaining Agreement that the **Cement Masons and Plasterers** Union Local 592 currently enters into with Philadelphia area employers;

2. Form of Contractor Agreement that the **Operative Plasterers' and Cement Masons'** International Association of the United States and Canada Local 8 currently enters into with Philadelphia area employers;

3. Current Agreement between the Steel Erectors' Association of Metropolitan Philadelphia and Vicinity and **Iron Workers** Local Union No. 401.

4. Current Agreement between the Contractors Association of Eastern Pennsylvania and **Laborers'** District Council of the Metropolitan Area of Philadelphia & Vicinity covering Heavy & Highway Construction;

5. Current Agreement between the General Building Contractors Association and the Concrete Contractors Association and **Laborers'** District Council of the Metropolitan Area of Philadelphia & Vicinity;

6. Current Collective Bargaining Agreement between the International Union of **Operating Engineers** Local Union 542 and the Contractors Associations of Eastern Pennsylvania and Delaware;

7. Form of Collective Bargaining Agreement that the International Union of **Painters** & Allied Trades, District Council 21 currently has in effect; and

8. Current Agreement for All Construction between the Contractors Association of Eastern Pennsylvania and **Teamsters** Local Union #312, Truck Drivers, Chauffeurs and Helpers Local Union #384, and General Teamsters, Chauffeurs, Helpers & Yardmen, Local Union #107.

# SCHEDULE B

## **RESERVED**

# EXHIBIT "H"

# PROJECT LABOR AGREEMENT

1. The following pages of the Bid Proposal represent a Project Labor Agreement to be implemented for this project.

2. The bidder awarded this contract will be required to sign this Project Labor Agreement and submit it to Procurement after the bidder has been awarded the contract, as part of the process of conforming its contract.

3. This PLA for this project is required by the City in accordance with the Mayor's Executive Order 8-15, which is available at www.phila.gov.

THIS PAGE LEFT INTENTIONALLY BLANK

## PHILADELPHIA PUBLIC PROJECTS LABOR AGREEMENT

THIS CITY OF PHILADELPHIA PUBLIC PROJECT LABOR AGREEMENT (hereinafter the "Agreement") is entered into by and between:

_____

_____

_____

_____

(hereinafter the "Signatory Contractor"), its successors or assigns, and the Affiliates of the Philadelphia Building and Construction Trades Council (hereinafter the "Union(s)") pursuant to, and in accordance with, the Mayor's Executive Order No. 8-15 with respect to the public works project of and within the City of Philadelphia ("City") or City–owned facilities, described in Article III, Section 2 of this Agreement, and referred to herein as the "Project."

**WHEREAS** the City, under Executive Order No. 8-15, and consistent with other directives of the Mayor, reviews all proposed public works projects and maintenance or service projects which include substantial building improvements with projected construction costs over Three Million Dollars ($3,000,000) to determine whether the time-sensitivity, size, complexity, number and types of labor involved or other factors would make them appropriate for the use of a Project Labor Agreement; and

**WHEREAS** the City has determined that the Project, identified herein at Article III, Section 2, is an appropriate project for a Project Labor Agreement;

**NOW, THEREFORE,** the Signatory Contractor and the Unions, intending to be legally bound, enter into this Agreement.

## ARTICLE I - DEFINITIONS

Section 1.　　The term "City" shall mean the City of Philadelphia, including its departments, agencies, officials, employees and agents.

Section 2.　　The term "Contractor" shall include the Signatory Contractor and all its subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement.

Section 3.　　The term "craft" as applied to employees and workers shall mean those skills, crafts and trades of workers represented by the Union(s) as defined herein.

Section 4.　　The term "Party" shall mean either Signatory Contractor or a Union.

Section 5.　　The term "Project" refers to the public works project identified in Article III, Section 2.

Section 6.　　Masculine or Feminine Gender. The use of words denoting the masculine or feminine gender in this Agreement shall be construed as including both genders.

## ARTICLE II - PURPOSE

Section 1.　　As provided in Mayor's Executive Order No. 8-15, the City has a compelling interest in carrying out the Project at the lowest reasonable cost, highest level of efficiency, and the highest degree of quality.

Section 2.　　The City has determined that certain major projects can best be carried out through the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 8-15, which ensure that labor disputes are resolved without disruptions resulting from strikes,

lockouts or slowdowns and which provide for enforceable guarantees that the projects will be carried out in an orderly and timely manner without strikes, lockouts or slowdowns and with provisions protecting the wages, hours, working conditions and safety of those workers whose skills are required to complete such projects. Project Labor Agreements can provide the City with cost savings and efficiencies through project-specific adjustments to collective bargaining agreements that allow for project-specific appropriate hours of work, length of workday and workweek, overtime, starting times, breaks, shift work, crew apprentice ratios, holidays, dispute resolution and management rights, as have been mutually determined and agreed to by the City and the Union(s).

Section 3.    The City can best accomplish these goals by permitting the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 8-15, on a project by project basis, through which the City has determined, based on thorough investigation, analysis and justification, pursuant to, and in accordance with, the procedures set forth in Mayor's Executive Order No. 8-15 and other policies of the Mayor's Office, that the use of a Project Labor Agreement will benefit and enhance the interest of the City from a cost, efficiency, quality, timeliness and/or safety standpoint.

Section 4.    The City and the Unions have determined that Project Labor Agreements can provide a framework for meeting long term goals of the City, the Union(s) and Contractors for increasing the opportunities for minorities and women to have successful careers in the construction trades.

Section 5.    The City has determined that it can best accomplish all these goals by requiring for projects for which it determines the requirement is appropriate that the Contractors enter into a Project Labor Agreement with the Union(s) prior to the award of the contract. The

Project Labor Agreement shall require such Contractors as well as all subcontractors, assignees or transferees to abide by an agreement setting forth the wages, hours and working conditions of the workers employed on such projects.

Section 6.    The Parties to this Agreement recognize that it is essential that the construction work on the Project covered by this Agreement be done in an efficient and economical manner in order to secure optimum productivity and to eliminate any delays in the work.  In recognition of the needs of the Project covered by this Agreement, and to maintain a spirit of harmony, labor-management peace, and stability during the term of this Agreement, the Parties agree to establish effective methods for the settlement of all misunderstandings, disputes or grievances which may arise under this Agreement.

Section 7.    The Unions and the Contractors, their assigns, subcontractors and transferees agree to abide by the  terms and conditions contained in this Agreement with respect to the performance of the work by the Contractors of the Project covered by this Agreement.  This Agreement represents the  complete understanding of the Parties, and it is further understood that no Contractor is required to sign any agreement as a condition of performing work within the scope of this Agreement.  No practice, understanding or agreement between a Contractor and a Union party which is not explicitly set forth in  this Agreement and the Schedules hereto shall be binding on any other Party.

## ARTICLE III - SCOPE OF THE AGREEMENT

Section 1.    <u>Scope of Agreement</u>.  This Agreement shall apply and is limited to all construction work under the direction of the signatory Contractor and performed by those Contractors of whatever tier that have contracts awarded for such work on and after the effective date of this Agreement, for the  City, for the Project defined in Section 2 below.

Section 2.　　Covered Project. The Public Works Project covered by this Agreement is the Runway 6-24 Pavement Rehabilitation – Package 2 project, City Bid Number 6478.

Section 3.　　Award of Project Contracts.

(a)　　The City has the absolute right to select any qualified bidder for the award of contracts on this Project without reference to the existence or non-existence of any agreements between such bidder and any party to this Agreement provided, however, only that such bidder is ready, willing and able to execute and comply with this Agreement, which it shall do should it be designated the successful bidder.

(b)　　It is agreed that all direct subcontractors of Contractors, of whatever tier, who have been awarded contracts for work covered by this Agreement on or after the effective date of this Agreement shall be required to accept and be bound by the terms and conditions of this Project Labor Agreement.

Section 4.　　Contract Administration.

(a)　　This Agreement is intended to provide close cooperation between management and labor. At the request of the City or a Party to this Agreement, a Project Relations Committee (as further described in Section 4 (c)), shall monitor compliance with this Agreement by all Contractors that, through their execution of this Agreement, together with their subcontractors or transferees, have become bound hereto. The Project Relations Committee shall monitor compliance with this Agreement by all Unions which, through their execution of this Agreement have become bound hereto.

(b)　　The provisions of this Agreement, including Collective Bargaining Agreements which are listed on and collectively designated as Schedule A, shall apply to the

construction of the Project covered by this Agreement, notwithstanding the provisions of Local or International Agreements which may conflict or differ from the terms of this Agreement.

Where a subject covered by the provisions of this Project Labor Agreement, including but not limited to, Schedule D Project Specific Conditions, is also covered by any of the Collective Bargaining Agreements on Schedule A, the provisions of this Agreement shall prevail.

 (c) When established, the Project Relations Committee shall be composed of a representative of the City, a representative of the Signatory Contractor, and four representatives of the craft trades engaged in labor on the Project. The Philadelphia Area Labor Management Committee shall appoint one representative who will act as facilitator and staff to the Committee. The Project Relations Committee shall operate under the Philadelphia Area Labor-Management Built-Rite process.

 (d) The Project Relations Committee shall meet as required, but not less than once each quarter to review performance and the operation of this Agreement.

 (e) The purpose of this Project Relations Committee is as follows:

 (1) To improve communications between representatives of labor and management and engender cooperative and harmonious relations between labor and management performing work under this Agreement.

 (2) Provide workers and Contractors with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness. (Example: Joint process to reduce worksite injuries.)

 (3) Provide a forum for open and honest discussion of problems confronting labor and management, and of eliminating potential problems.

(4)     Study and explore ways of increasing productivity of both labor and management, and of eliminating potential problems.

(5)     Enhance the involvement of workers in making decisions that affect their working lives, and to improve the quality of work life for the employees.

(6)     Expand and improve working relationships between workers and managers.

(7)     Identify conflicts between labor and management before they arise as disputes, and promptly assist in fairly resolving disputes when they do arise.

(8)     Seek to maintain a productive dialogue.

(9)     Pursue, achieve and document the implementation of all aspects of Schedule C, pertaining to increasing employment opportunities for women and minorities.

(10)    Support the Contractor in meeting general obligations and specific project goals for worker diversity as may be part of the Project bid package section titled Disadvantaged Business Enterprises in City Contracts; Instructions, Forms and Contract Provisions Relating to Participation of Disadvantaged Business Enterprises in Federally Funded Projects, a copy of which is attached as Schedule E.

Section 5.     Binding Effect.  This Agreement and Schedules, including but not limited to Schedules A, B, C, D and E, attached hereto shall only be binding on the signatory Parties hereto and shall not apply to the parents, affiliates, subsidiaries, or other ventures of any such party.

Section 6.     Limitations.  This Agreement shall be limited to work historically recognized as construction work, including, specifically, the site preparation and related demolition work necessary to prepare the site for construction, and such rehabilitation of

existing facilities as is directed by the City.  Nothing contained herein shall be construed to

prohibit, restrict or interfere with the performance of any  other operation, work or function

which may occur in or around the Project site or be  associated with the development of the

Project, or with the ongoing operations of the City.

Section 7.        Exclusions.  Items specifically excluded from the scope of this

Agreement include, but are not limited to, the following:

(a)        Work of non-manual employees, including but not limited to,

superintendents,  supervisors, staff engineers, surveyors (except where expressly covered by a

Collective Bargaining   Agreement in Schedule A), inspectors, quality control personnel, quality

assurance personnel,  timekeepers, mail carriers, clerks and office workers, including messengers,

guards, emergency medical   and first aid technicians and other professional, engineering,

administrative, supervisory and management   employees.

(b)        Equipment and machinery owned or controlled and operated by the City.

(c)        All off-site handling of materials, equipment or machinery and all

deliveries to and  from the Project site except where expressly covered by a Collective Bargaining

Agreement  in Schedule A.

(d)        All employees of the City.

(e)        Any work performed on or near, or leading to or into, the Project site  by

state, county, city or other governmental bodies, or their contractors; or by public utilities or their

contractors and/or by the City, or its contractors, for work which is expressly not part of the

Project covered by this Agreement.

(f)        Off-site maintenance on leased equipment and on-site supervision of such

work  except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(g)     Off-site warranty functions and warranty work and on-site supervision of such work  except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(h)     Exploratory geophysical testing, except where expressly covered by a Collective Bargaining Agreement in Schedule A.

(i)     Laboratory or specialty testing or inspections or monitoring activities not ordinarily done by the crafts.

(j)     Other work which may occur from time to time.

Section 8.     Applicability of Agreement.  Nothing contained herein shall be construed to prohibit or restrict the City or its employees from performing work not covered by this Agreement on a Project site.  As areas and systems of a Project are inspected, construction tested and accepted by the City, the Agreement shall not have further force or effect on such items or areas, except when the Contractors are directed by the City to engage in repairs, modifications, check-out, and/or warranty functions required by their contract(s) with the City.

Section 9.     Termination, Delay or Suspension of Project.  It is understood that the City, at its sole option, may terminate, delay and or suspend any or all portions of the Project at any time.

Section 10.     Contractor and Union(s) Liability.  It is understood and agreed that the liability of any Contractor and the liability of separate Unions under this Agreement shall be several and not joint.  The Unions agree that this Agreement does not have the effect of creating any joint employment status  between or among the City and any Contractor.

## ARTICLE IV - UNION RECOGNITION AND EMPLOYMENT

Section 1. Union Recognition. The Contractor recognizes the Union(s) as the sole and exclusive bargaining representatives of all craft employees working on the Project within the scope of this Agreement.

Section 2. Referrals. The Union(s) are recognized as the source of employment referrals. The appropriate Union(s) will be contacted and shall refer all applicants for employment to this Project according to the standards or criteria uniformly applied to any construction project in the area. In the event that any Union is unable to fill any requisition for employees within a forty eight (48) hour period after such requisition is made by the Contractor (Saturdays, Sundays and Holidays excepted), the Contractor may solicit and employ applicants from any other available source. The Contractor shall notify the Union(s) of employees hired by any source other than referral by the Union(s).

Section 3. Referral Systems. Subject to the Contractor's right to call for a specific skill or ability, the job referral systems provided in the Collective Bargaining Agreements of the Union(s) set forth in Schedule A hereto, or, in the absence of such language, the referral practices in place at the Union(s), will be in effect for the purpose of initial employment only. Such job referral system, whether by contract or practice, must be operated in a non-discriminatory manner and in full compliance with Federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspect or obligations of Union membership and shall be subject to such other conditions as established in this Article IV and in Schedule C.

Section 4.    Competency.  The Contractor shall have the right to determine the competence of all employees, the right to determine the number of employees required and have the sole responsibility for selecting the employees to be laid-off consistent with this Agreement regardless of membership or non-membership in the Unions.  The Contractor shall also have the right to reject any applicant referred by the Unions.

Section 5.    Union Security.  It shall be a condition of employment that all employees of Contractor covered by this Agreement who are members of any of the Union(s) in good standing on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members in good standing and those who are not members on the effective date shall, on the eighth (8th) day following employment, become and remain members in good standing in the Union(s) for the term of this Agreement.

Section 6.    Skilled Craftsmen.  The Union(s) will exert their utmost efforts to recruit sufficient numbers of skilled craftsmen to fulfill the manpower requirements of the Contractors.

Section 7.    Selection of Foremen.  The selection of craft foremen and/or general foremen and the number of foremen required shall be entirely the responsibility of the Contractor.  All foremen shall take orders exclusively from the designated Contractor representatives.   Craft foremen shall be designated   as working foremen by the Contractor, except when the Contractor determines that it is not possible for a  particular foreman to be a working foreman.

Section 8.    Seniority.  Individual seniority shall not be recognized or applied to employees working on the Public Works Project.

## ARTICLE V - UNION REPRESENTATION

Section 1.     Access to Project Site. Authorized and designated representatives of the

Union(s) shall have access to the Project, consistent with rules, regulations and policies as have

been established for site security and safety and through established Contractor procedures, for

the purpose of transacting business in connection with the job. Such representatives shall be

subject to security clearances and may require authorized escorts to enter secure areas of the

Project. Such representatives shall not interfere with the work of employees or cause unnecessary

loss of time by the employees.

Section 2.     Stewards. Stewards shall be appointed consistent with the appropriate

Collective Bargaining Agreement as included in Schedule A.

Section 3.     Non-interference.  On work where City personnel or personnel of other

contractors not signatory to this Agreement may be working in close proximity of the construction

activities, the Union(s) agree that the Union's representatives, stewards and individual workers

will not interfere with the City's personnel or the personnel of other contractors not signatory to

this Agreement or with the work which is being performed by the City's personnel or personnel

of other contractors not signatory to this Agreement.  There shall be no interference by

employees covered under this Agreement with on-site concessionaires.

## ARTICLE VI - MANAGEMENT RIGHTS

Section 1.     Management Rights.  The Contractor retains full and exclusive authority

for the management of its operation consistent with this Project Labor Agreement and the

collective bargaining  agreements included in Schedule A.  The Contractors retains the right to (i)

plan, direct and control the   workforce and the operation of all of their work, including the hiring,

promotion, demotion, transfer, layoff, suspension, discipline or discharge for just cause of its

employees; (ii) select foremen, determine the size and make-up of each crew; (iii) assign and

schedule work; (iv) promulgate work rules; (v) regulate the use of all equipment and other

property of the Contractors, decide the amount of equipment to be used, the number of

employees needed; and (vi) regulate overtime work, the determination of when it shall be

worked, and the number and identity of employees engaged for such work. No rules, customs or

practices which limit or restrict productivity, efficiency or the individual and/or joint working

efforts of employees shall be permitted or observed. The Contractors may utilize any methods or

techniques of construction.

      Section 2.     Choice of Materials. There shall be no limitation or restriction upon the

Contractors' choice of materials or design, nor, subject to the principle of legitimate work

preservation set forth in the following sentence, upon the full use and installation of equipment,

machinery, package units, pre-cast, pre-fabricated, pre-finished, or pre-assembled materials, tools,

or other labor-saving devices unless otherwise specified in Schedule A. The on-site installation or

application of such items shall be performed by the craft having jurisdiction over such work:

provided, however, it is recognized that other personnel having special talents or qualifications

may participate in the installation consistent with Schedule A, including, but not limited to check-

off or testing of specialized or unusual equipment or facilities.

      Section 3.     New Technology and Devices. It is recognized that the use of new

technology, equipment, machinery, tools and/or labor saving devices and methods of performing

work will be initiated by the Contractor from time to time during the Project. The Union(s)

agree that they will not in any way restrict the implementation of such new devices or work

methods. If there is any disagreement between the Contractor(s) and the Union(s) concerning

the manner or implementation of such device or method of work, the implementation shall

proceed as directed by the Contractors, and the Union(s) shall have the right to grieve and/or

arbitrate the dispute as set forth in Article XIV of this Agreement.

## ARTICLE VII - HOURS OF WORK, OVERTIME, SHIFTS AND HOLIDAYS

Section 1. Hours of Work, Overtime, Shifts and Holidays shall be governed by the

Collective Bargaining Agreements included in Schedule A, except as mutually determined and

agreed to by the Union(s) and the City and provided in Schedule D Project Specific Conditions.

Section 2. Where modifications to the Collective Bargaining Agreements or the

provisions of Schedule D Project Specific Conditions are in the best interest of a project, such

departure may be requested by the Contractor(s), Union(s) and the City. Such departures shall

be requested utilizing the Project Relations Committee, if it has been formed, and shall be

approved by mutual consent.

## ARTICLE VIII - WORKING CONDITIONS

Section 1.     Job Site Conditions. All job site working conditions, including rest

periods, coffee breaks and work practices, shall be as determined by the Contractor.

Section 2.     Project Rules. The Contractors shall establish such other reasonable

Project rules as each Contractor deems appropriate. All rules and regulations shall be observed

by Union employees who, by virtue of their Union membership and coverage under an

appropriate Collective Bargaining Agreement, are made subject to such rules.

## ARTICLE IX - APPRENTICES

Section 1.     Apprentices. Recognizing the need to maintain continuing supportive

programs designed to develop adequate numbers of competent workers in the construction

industry, the Contractors will employ apprentices in their respective crafts to perform such work

as is within their capabilities which is customarily performed by the craft in which they are

indentured. Apprentices shall be employed in a manner consistent with the provisions of this

Agreement including but not limited to Schedules C and E. The Contractors may also utilize

apprentices as appropriate and consistent with the Schedule A Collective Bargaining Agreements

or as provided in Schedule D Project Specific Conditions.

## ARTICLE X – EMPLOYMENT OPPORTUNITIES FOR MINORITIES AND WOMEN

Section 1.     Opportunities for Women and Minorities. The Parties agree that

increasing participation by women and minorities employees on the Project is a desirable goal.

Accordingly, the Parties shall undertake the activities identified in Schedule C to support the

City, Union(s) and Contractor objectives of increased opportunities for participation in the

Union(s) and for actual work performed. Additional responsibilities of the Contractor related to

diversity are described and required in Schedule E.

## ARTICLE XI - SAFETY, PROTECTION OF PERSON AND PROPERTY

Section 1.     Safe Working Conditions. In accordance with the requirements of the

Occupational Safety and Health Act, it shall be the exclusive responsibility of each Contractor on

the job site to ensure safe working conditions for its employees and their compliance with any

safety rules contained herein or established by the Contractors, provided however, it is

understood that the employees have an obligation as set forth in Section 2 below.

Section 2.     Safe Performance of Work. Employees must use diligent care to perform

their work in a safe manner and to protect themselves, other persons and the property of the

Contractors or the City. Failure to do so will be grounds for discipline, including discharge.

Section 3.     Safety, Security and Visitor Rules. Employees covered by the terms of this

Agreement shall at all times while in the employ of the Contractors be bound by the safety,

security and visitor rules as established by the City and/or the Contractors in accordance with applicable State and Federal safety and health statutes and regulations. These rules will be published and posted in conspicuous places through the Project.

## ARTICLE XII - NO DISCRIMINATION

Section 1.     No Discrimination. The Contractor and Union(s) agree that they will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or age in any manner prohibited by law or regulation. It is recognized that special procedures may be established by joint agreement of the parties to this Agreement and governmental agencies for the training and employment of persons who have not previously qualified to be employed on construction projects of the type covered by this Agreement. The parties to this Agreement will make all good faith efforts to assist in the proper implementation of such orders, regulations or agreements for the benefit of the population within the jurisdiction of the City of Philadelphia.

Section 2.     Complaints. Any complaints regarding application of the provisions of Section 1 should be brought to the immediate attention of the involved Contractor(s) for consideration and resolution.

## ARTICLE XIII - WORK STOPPAGES AND LOCKOUTS

Section 1.     There shall be no strike, picketing, work stoppages, slowdowns, sickouts or other disruptive activity for any reason by the Union(s) or employees against any Contractor covered under this Agreement, and there shall be no lockouts by the Contractors. Failure of any of the Unions or any employee to cross any picket line established by any Union, signatory or non-signatory, or any other organization, at or in proximity to the Project site is a violation of this Article.

Section 2.    The Contractor may discharge any employee violating Section 1 above, and any such employee will not be eligible for referral under this Agreement for a period of ninety (90) working days from the date of his discharge. The Contractor and the Union(s) shall take all steps necessary to obtain compliance with this Article and neither shall be held liable for conduct for which it is not responsible.

## ARTICLE XIV - DISPUTES AND GRIEVANCES

Section 1.    Agreement Interpretation. It is specifically agreed that in the event any disputes arise out of the interpretation or application of this Agreement the same shall be settled by the Project Relations Committee. All disputes arising out of Contractor-employee issues shall be governed by Section 2 of this Article. No such grievance shall be recognized unless called to the attention of the Contractor within seven (7) calendar days after the alleged violation was committed.

Section 2.    Unless otherwise provided for in Schedule D Project Specific Conditions, it is specifically agreed that in the event any disputes arise between the Contractor and Union employees that do not involve the interpretation or application of this Agreement, and/or questions of jurisdiction of work, the same shall be settled by means of the grievance procedures currently set forth in the local Collective Bargaining Agreements set forth in Schedule A.

## ARTICLE XV - JURISDICTIONAL DISPUTES

Section 1.    There will be no strikes, no work stoppages or slowdowns, or other interferences with the work because of jurisdictional disputes. Pending the resolution of the dispute, the work shall continue uninterrupted as assigned by the Contractors.

Section 2.    This Agreement shall generally recognize the traditional craft jurisdiction of the Union(s) and shall require Contractors to abide by said traditional craft jurisdiction.

Contractors will utilize the Collective Bargaining Agreements in Schedule A as references to establish the Unions' basic jurisdictions. If there is any dispute concerning this section, the issue may be submitted by any concerned Party for final and binding resolution to the American Arbitration Association.

## ARTICLE XVI - SAVINGS AND REPARABILITY

Section 1.     It is not the intention of either the Contractors or the Union parties to violate any laws governing the subject matter of this Agreement. The parties hereto agree that in the event any provisions of the Agreement are finally held or determined to be illegal or void as being in contravention of any applicable law, the remainder of the Agreement shall remain in full force and effect unless the part or parts so found to be void are wholly inseparable from the remaining portions of this Agreement. Further, the Contractors and Union(s) agree that if and when any and all provisions of this Agreement are finally held or determined to be illegal or void by Court of competent jurisdiction, the parties will promptly enter into negotiations concerning the substance affected by such decision for the purpose of achieving conformity with the requirements of any applicable law and the intent of the parties hereto.

Section 2.     This Article shall not be construed to waive the prohibitions of Article XIII, and if the parties are unable to resolve their differences, the matter shall be referred to arbitration for resolution as provided for in the grievance-arbitration procedure of Article XIV.

## ARTICLE XVII - DURATION OF THE AGREEMENT

Section 1.     This Agreement shall be effective upon execution by the parties and shall continue in effect for the duration of the Project construction work described in Article III hereof. Construction of any phase, portion, section or segment of the Project shall be deemed complete when such phase, portion, section or segment has been turned over to the City of

Philadelphia and has received the final acceptance from the City of Philadelphia's representative.

Section 2.    Each Collective Bargaining Agreement contained in Schedule A hereof attached to this Agreement shall continue in full force and effect until the Contractor(s) or Union(s) who are parties to such Agreement notify the City of the mutually agreed upon changes in those provisions of such Agreements which are applicable to this Project, and the effective date thereof, which shall then become the effective date under this Agreement.  Unless otherwise provided in this Agreement, increases to wages and benefit payments from the effective date each new or amended Collective Bargaining Agreement shall be due and owing upon notification to the Contractors and the City of such increases.  The Parties agree that any provisions negotiated into any Collective Bargaining Agreement contained in Schedule A hereof will not apply to work on the Project if such provisions are less favorable to the Contractors than those uniformly required of Contractors for construction work normally covered by such an agreement; nor shall any provision be recognized or applied on any Project if it may reasonably be construed to apply exclusively to work covered by this Agreement.

Section 3.    The Union(s) shall provide notice to all Contractors that are Parties to this Agreement who are not signatory to collective bargaining agreements with the Unions of any changes in the Schedule A. Collective Bargaining Agreements and/or changes to rates for wages and benefits.  Such changes shall not be effective as to the Contractors who are not signatory to the Collective Bargaining Agreements until such notice has been given.

Section 4.    In the renegotiation of any of the Collective Bargaining Agreements contained in Schedule A hereof, the Union(s) party to this Agreement agree that there will be no strikes, work stoppages, sympathy strikes, picketing, slowdowns or other disruptive activity affecting the Project covered by this Agreement because of or related to the renegotiation of any

such Collective Bargaining Agreement  contained in Schedule A hereof, nor shall there by any

lockout on this Project affecting the  Union(s) party to this Agreement during the course of such

negotiations.

Section 5.       Any disagreement between the parties over the incorporation into any

Collective Bargaining   Agreement contained in Schedule A hereof of such provisions agreed

upon in the renegotiation of any  such Collective Bargaining Agreement as is contained in

Schedule A shall be referred to Article XIV  hereof for resolution.

### ARTICLE XVIII - COUNTERPARTS

Section 1.       Counterparts.  This Agreement may be executed in one or more identical

counterparts, each of which will be deemed an original, and all of which, together, will comprise

a single agreement.


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and

effective  as of the day and year above written.


**FOR THE UNIONS:**                    **FOR THE CONTRACTOR:**



Title: _Business Manager_         Title: _____



Date  _2/26/19_                Date  _____

1.  This PLA for this project is required by the City in accordance with the Mayor's Executive
    Order 8-15, which is available at www.phila.gov.