UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | |
|---|---|
| **Road-Con, Inc.**; **Neshaminy Constructors, Inc.**; **Loftus Construction, Inc.**; **PKF-Mark III, Inc.**; and **Scott A. LaCava**,<br><br>                Plaintiffs,<br><br>v.<br><br>**City of Philadelphia**; and **James Kenney**, in his official capacity as mayor of the City of Philadelphia,<br><br>                Defendants. | Case No. 2:19-cv-01667-JS |

**MOTION FOR SUMMARY JUDGMENT**

The plaintiffs respectfully move for summary judgment, as there are no genuine issues of material fact and the plaintiffs are entitled to judgment as a matter of law.

**UNDISPUTED FACTS**

When the plaintiffs filed this lawsuit in April of 2019, the city of Philadelphia was imposing "project labor agreements" on most of its public-works projects with an estimated construction budget of over $3,000,000. *See* Pls.' Statement of Undisputed Facts ¶ 43 & Ex. 8. The city's model Project Labor Agreement appears as an attachment to Executive Order 15-11, and this document served as the template for PLAs that the city imposes on its public-works projects. *See id.* ¶ 15 & Ex. 7D. The city imposed these PLAs pursuant to Executive Order 8-15, which authorized city officials to use project labor agreements on any project whose estimated budget exceeds $3,000,000. *See id.* ¶¶ 16–17 & Ex. 7E.

These city-imposed project labor agreements prohibit employees of city contractors or subcontractors from working on a city project unless they become dues-paying members

of a union affiliated with the Philadelphia Building and Construction Trades Council. Article III, section 5 of the city's model Project Labor Agreement provides:

> Section 5. <u>Union Security</u>. **It shall be a condition of employment that all employees** of Contractor covered by this Agreement who are members of the Union(s) in good standing on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members in good standing and **those who are not members on the effective date shall, on the eighth (8th) day following employment, become and remain members in good standing in the Union(s) for the term of this Agreement.**

Pls.' Statement of Undisputed Facts Ex. 7C, page 10 (emphasis added). In addition, Article III, section 1 of the PLA requires every contractor working on a city project to recognize a Council-affiliated union as the sole and exclusive bargaining agent of its employees:

> Section 1. Union Recognition. The Contractor recognizes the Union(s) as the sole and exclusive bargaining representative of all craft employees working on the Public Works Project within the scope of this Agreement.

Pls.' Statement of Undisputed Facts Ex. 7C, page 9. Article III, section 2 of the city's PLA also requires contractors working on city projects to obtain their employees for that project through union hiring halls:

> The Union(s) are recognized as the source of employment referrals. The appropriate Union(s) will be contacted and shall refer all applicants for employment to this Public Works Project according to the standards or criteria uniformly applied to any construction project in the area. In the event that any Union is unable to fill any requisition for employees within a forty eight (48) hour period after such requisition is made by the Contractor (Saturdays, Sundays and Holidays excepted), the Contractor may solicit and employ applicants from any other available source. The Contractor shall notify the Union(s) of employees hired by any source other than referral by the Union(s).

Pls.' Statement of Undisputed Facts Ex. 7C, page 9.

The city also imposes diversity-and-inclusion requirements on every union and contractor that performs city work subject to a project labor agreement. Pls.' Statement of Undisputed Facts ¶¶ 44–51 & Ex. 7D pages 22–24. The city's diversity goals are for 32% of all construction employment hours to be allocated to "male minority" workers, and 7% to

women. *See id.* at ¶ 48 & Ex. 7D page 22. The city requires unions to "set participation goals that will significantly increase participation of minority males and women," and requires its contractors to "use their best efforts to meet or exceed the goals established for minority males and women participation." *Id.* at ¶¶ 49, 51 & Ex. 7D pages 23–24. The city also requires contractors to "use their best efforts to add minority males and women to their permanent or steady workforces," regardless of whether they already meet the city-imposed goals, and to "provide workforce demographic information to the City in advance of project commencement." *Id.* at ¶ 50 & Ex. 7D page 24.

Four of the plaintiffs in this case are union contractors whose employees are represented by the United Steelworkers. *See* Pls.' Statement of Undisputed Facts ¶¶ 4–9. The fifth plaintiff, Mr. Scott LaCava, is an employee of Road-Con and a member of the United Steelworkers. *See id.* at ¶ 11. The United Steelworkers is neither a member nor an affiliate of the Building Trades Council, and the city has never included the United Steelworkers in any of its project labor agreements. *See id.* at ¶¶ 18–19. For nearly a decade, the United Steelworkers and Steelworker-affiliated contractors have been asking the city of Philadelphia to amend its project labor agreement to allow them to work on city construction projects, but the city has rebuffed or ignored their repeated requests. *See id.* at ¶¶ 52–94. Deputy Mayor Richard Lazer has stated that the city's diversity-and-inclusion goals were the but-for cause of the city's refusal to add the United Steelworkers as a signatory to the PLA:

> [I]n or around 2018 the City engaged in discussions with the United Steelworkers in an attempt to include the United Steelworkers as a signatory to the City's PLAs. The discussions were ultimately unsuccessful because the United Steelworkers believed that their organization could not comply with the diversity and inclusion goals of the City's PLAs.

*Id.* at ¶ 95 & Ex. 13 ¶ 11.

When the plaintiffs filed this lawsuit on April 18, 2019, Road-Con, Inc. ("Road-Con") was interested in bidding on two projects that were subject to project labor agreements: the 15th Street Bridge Project and the Runway Project. *See* Pls.' Statement of Undisputed Facts

¶¶ 25, 35. Plaintiffs Neshaminy Constructors, Inc. ("Neshaminy") and Loftus Construction, Inc. ("Loftus") were also interested in bidding on the 15th Street Bridge Project. *See id.* ¶ 25. The project labor agreements imposed on the 15th Street Bridge Project and the Runway Project resembled the model Project Labor Agreement attached to Executive Order 15-11. *See id.* ¶¶ 24, 34 & Exs. 7G and 7H. The city's project labor agreements and the city-imposed diversity-and-inclusion goals were preventing each of the plaintiff contractors from performing work on those city projects with their current workforces. *See id.* at ¶ 41. They were also preventing Mr. LaCava from working on those city projects because he belongs to the United Steelworkers rather than a Council-affiliated union. *See id.* at ¶ 42.

The city has also refused to award contracts to Road-Con when it submitted the lowest responsible bid on city projects that were *not* subject to a PLA. *See* Pls.' Statement of Undisputed Facts ¶¶ 98–102. When Albert D. Hoffman, the President of Road-Con, asked city officials why the city would not award the Philadelphia Airport project to Road-Con, despite the fact that Road-Con had submitted the lowest responsible bid, Mr. Hoffman was told that "we were not of the right union type and it was causing some internal friction inside the City." *Id.* at ¶ 100 & Ex. 14 (Hoffman Dep. 35:15–17; 37:25–38:8).

On October 15, 2020, Mayor James Kenney rescinded Executive Order 8-15 and replaced it with Executive Order 4-20, which purports to eliminate the requirement that employees of city contractors join a union affiliated with the Philadelphia Building and Construction Trades Council. *See* Pls.' Statement of Undisputed Facts ¶ 103 & Ex. 15 § 4(d). At the same time, Executive Order 4-20 reaffirms the diversity-and-inclusion goals that have prevented Steelworker-affiliated contractors and tradesmen from working on city construction projects. *See id.* ¶ 104 & Ex. 15 §§ 1(a)(iv), 4(c).

Plaintiffs Neshaminy and PKF-Mark III, Inc. ("PKF") are taxpayers of the City of Philadelphia. *See* Pls.' Statement of Undisputed Facts ¶ 10.

I. **THE PLAINTIFFS HAVE STANDING TO CHALLENGE THE CITY'S EXECUTIVE ORDERS, PROJECT LABOR AGREEMENTS, AND DIVERSITY-AND-INCLUSION GOALS, AND THEIR CLAIMS HAVE NOT BEEN MOOTED BY EXECUTIVE ORDER 4-20**

A litigant's standing is assessed the moment the complaint is filed. *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020) ("[S]tanding is assessed 'at the time the action commences'" (citation omitted)). When the plaintiffs sued on April 18, 2019, they were suffering injury in fact because they were being excluded from city contracts. *See* Pls.' Statement of Undisputed Facts ¶¶ 25–43, 52–97, 98–102. Those injuries were fairly traceable to the defendants' enforcement of Executive Order 8-15 and the city's diversity-and-inclusion goals. *See id.* And those injuries will be redressed by an award of nominal damages and injunctive relief. Neshaminy and PKF also have taxpayer standing to challenge the city's executive orders, project labor agreements, and diversity-and-inclusion goals. *See id.* ¶ 10.

The issuance of Executive Order 4-20 does not moot the plaintiffs' claims, because a defendant cannot moot a claim for prospective relief by unilaterally changing its ways after a plaintiff sues. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); Memorandum Opinion, ECF No. 20, at 5–8. The mayor remains free to reinstate Executive Order 8-15, and a claim for prospective relief cannot be moot if dismissal would leave the defendant "'free to return to [its] old ways.'" *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 217 (3d Cir. 2005) (quoting *Iron Arrow Honor Soc. v. Heckler,* 464 U.S. 67, 72 (1983)).[1] The plaintiffs are also seeking damages over the past enforcement of Executive Order 8-15, and they are at least entitled to nominal damages if the Court finds that the enforcement of the erstwhile executive order violated the plaintiffs' constitutional or statutory rights. *See Burns v.*

---

1. *See also United States v. Grape*, 549 F.3d 591, 597–98 (3d Cir. 2008); *DeJohn v. Temple University*, 537 F.3d 301, 309 (3d Cir. 2008); *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285–86 (3d Cir. 2004); *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003); *Phillips v. Pennsylvania Higher Education Assistance Agency*, 657 F.2d 554, 570 (3d Cir. 1981) ("Present intentions may not be carried out, and, at any rate, they are not controlling on the issue of mootness.").

*PA Dep't of Correction*, 544 F.3d 279, 284 (3d Cir. 2008) (claim for nominal damages prevents mootness even when prospective relief is no longer available).

## II. THE CITY'S PROJECT LABOR AGREEMENTS AND EXECUTIVE ORDERS VIOLATE 42 U.S.C. § 1983 AND THE FIRST AND FOURTEENTH AMENDMENTS

The city's project labor agreements compel employees of city contractors to join and pay a city-approved union as a condition of working on a city project. This cannot be sustained under the First Amendment,[2] as interpreted by the Supreme Court in *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018).

The city cannot compel its own employees to join or pay a union as a condition of employment. *See Janus*, 138 S. Ct. at 2486. It follows that the city cannot require the employees of city contractors to become union members either. *See* Memorandum Opinion, ECF No. 20, at 13 ("If the minimal payments at issue in *Janus* were unconstitutional, then the full union dues alleged here are as well."). Otherwise a municipal employer can evade *Janus* by creating a separate corporate entity to "employ" each of the city's workers—and then enter into a contract that compels that employer to require membership in the SEIU or AFSCME as a condition of employment. More importantly, individuals have a constitutionally protected right to decide whether they will join a union or any other association. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association therefore plainly presupposes a freedom not to associate." (citing *Abood v. Detroit Board of Education*, 431 U.S. 209, 234–35 (1977)). The city may not compel workers to relinquish this constitutional right as a condition of working on city projects. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) ("[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . .

---

2. In this brief, we will use "the First Amendment" as shorthand to refer to the incorporated free-speech protections protected against state abridgment by the Fourteenth Amendment. *See Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) ("It has long been established that these First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States.").

freedom of speech even if he has no entitlement to that benefit." (citation and internal quotation marks omitted)); *Sherbert v. Verner*, 374 U.S. 398, 405 (1963) ("[C]onditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms.").

In its previous briefing, the city attempted to place the blame on the private contractors who agree to the city's project labor agreement, insisting that those contractors—and not the city itself—are the ones who compel their workers to join the city-approved union. *See* Mem. of Law in Support of City's Mot. to Dismiss, ECF No. 6, at 9–10; *see also id.* at 10 ("If Mr. LaCava has any plausible claim for violation of his First Amendment rights, it would be against Plaintiff Road-Con, if in fact Road-Con 'compels' Mr. LaCava to join a union as the Complaint alleges it might."). But the state-action doctrine holds the city responsible for any requirements it imposes on private employers—including private employers that act as city contractors. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614–15 (1989) (federal regulations that require private employers to drug-test their employees are subject to Fourth Amendment scrutiny, even when tests are performed by the private employer rather than the government); *id.* (federal regulations that merely *authorize* private employers to drug-test their employees make the resulting tests attributable to the government and subject to constitutional scrutiny). If the city enacted an ordinance that required city contractors to allow only dues-paying members of the Democratic Party to work on city construction projects, Mr. LaCava could assuredly sue the city for violating his First Amendment rights—even though his employer would ultimately decide whether to accede to these city-imposed conditions.

The city has also tried to defeat the First Amendment claim by insisting that it doesn't *really* require employees of city contractors to become union members, because contractors like Road-Con can comply with the PLA by preventing their employees from working on city construction projects and obtaining separate labor for those projects through the city-approved union hiring halls. *See* Mem. of Law in Support of City's Mot. to Dismiss, ECF

No. 6, at 9–10. That observation does nothing to rebut the plaintiffs' First Amendment grievances. Mr. LaCava *wants* to work on city construction projects, and Road-Con *wants* to use its existing workforce on city construction projects. Yet the city has forbidden Mr. LaCava and Road-Con's employees to work on city construction projects because they have exercised their constitutional right to decline membership in the city-approved unions. *That* is what violates the First Amendment. *See Janus*, 138 S. Ct. at 2740 ("[A] government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment" (citation and internal quotation marks omitted)); *Rumsfeld*, 547 U.S. at 59 ("[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." (citation and internal quotation marks omitted)); *Sherbert*, 374 U.S. at 405 ("[C]onditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms."). It is no different from a law that that requires employees who work on city construction projects to join and pay membership dues to the mayor's political party.

This situation is even worse than *Janus*, because the city requires the employees of its contractors to both *join and subsidize* a city-approved union as a condition of working on city construction projects. In *Janus*, the employee was put to the choice of subsidizing a union or resigning from state employment. The choice imposed by the city of Philadelphia, by contrast, requires workers to either join and subsdize a city-approved union, or else relinquish any prospect of working on a city construction project. This regime cannot be sustained under the First Amendment. Employees have a constitutional right to decide whether they will join or support a union, and no governmental entity can withhold employment opportunities from those who decline union membership or decide to join a union that does not appear on a city-approved list.

The court should declare that Executive Order 8-15, the City of Philadelphia's Public Projects Labor Agreement, the 15th Street Project PLA, and the Runway Project PLA violate the First and Fourteenth Amendments. It should enjoin the defendants from enforcing them, and from imposing a project labor agreement on any current or future city contract.

### III. THE CITY'S DIVERSITY-AND-INCLUSION GOALS VIOLATE 42 U.S.C. § 1981, THE EQUAL PROTECTION CLAUSE, AND THE PENNSYLVANIA CONSTITUTION

The city has admitted that it excluded the United Steelworkers from its project labor agreements because the Steelworkers were unable to meet the city's "diversity and inclusion" goals. *See* Pls. Statement of Undisputed Facts ¶ 95 & Ex. 13 ¶ 11. That confesses a violation of 42 U.S.C. § 1981, which forbids the city to withhold contracts from a union or employer based on the racial makeup of its workforce. *See* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens"). It also violates the Equal Protection Clause, which imposes similar prohibitions on race and sex discrimination by government entities. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989); *United States v. Virginia*, 518 U.S. 515 (1996).

Mr. Lazer's declaration acknowledges that the United Steelworkers asked the city to add it to the city's PLA in 2018. *See* Pls. Statement of Undisputed Facts ¶ 95 & Ex. 13 ¶ 11. And Mr. Lazer admits that these discussions were unsuccessful "because" the Steelworkers were unable to comply with the PLA's diversity-and-inclusion goals:

> [I]n or around 2018 the City engaged in discussions with the United Steelworkers in an attempt to include the United Steelworkers as a signatory to the City's PLAs. The discussions were ultimately unsuccessful because the United Steelworkers believed that their organization could not comply with the diversity and inclusion goals of the City's PLAs.

*Id.* That establishes but-for causation between the city's diversity-and-inclusion goals and its exclusion of the United Steelworkers from the PLA. *See Comcast Corp. v. Nat'l Assn. of African-American Owned Media*, 140 S. Ct. 1009, 1013–15 (2020) (but-for causation

needed to establish a violation of 42 U.S.C. § 1981). Nothing more is needed to show that the city is violating 42 U.S.C. § 1981 by excluding the United Steelworkers from its PLAs.

The city is also violating the Equal Protection Clause by withholding city contracts from the United Steelworkers and its affiliated contractors. The Equal Protection Clause does not allow the city to exclude a union from its project labor agreements because the union is unable or unwilling to comply with racial quotas that the city has imposed on its contracted work. *See Croson*, 488 U.S. at 498–508. The city has never alleged that the Steelworkers have discriminated against racial minorities, and it cannot demand that city contractors reserve a portion of construction employment hours for "male minority" workers absent evidence of past or present racial discrimination by those specific contractors or their affiliated unions. *See id.* at 500 (rejecting a requirement that 30% of construction contracts to go to minority-owned businesses when "[t]here is nothing approaching a prima facie case of a constitutional or statutory violation by *anyone* in the Richmond construction industry."). The city is also constitutionally forbidden to demand that the Steelworkers (and its affiliated contractors) set aside a portion of construction employment hours for women. Sex classifications of this sort are impermissible absent an "exceedingly persuasive justification,"[3] and there is no "exceedingly persuasive justification" in forcing city contractors to allocate 7% of their construction employment hours for women absent evidence that the contractor has discriminated or is discriminating against women.

The city's diversity-and-inclusion goals also violate article I, section 28 of the Pennsylvania Constitution, which provides:

> Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

Pa. Const. article I, section 28. They also violate article I, section 28 of the state constitution, which imposes a similar rule with respect to race:

---

3. *See Virginia*, 518 U.S. at 531.

> Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual.

Pa. Const. article I, section 29. Executive orders that encourage or compel city contractors to give discriminatory preferences to women and members of racial-minority groups at the expense of white men are the antithesis of "equality of rights under the law." And any exclusion of the United Steelworkers (or anyone else) from the city's PLA that rests on an excluded entity's purported inability to comply with *any* of the city's diversity-and-inclusion goals violates the Pennsylvania Constitution.

### IV. THE CITY'S PROJECT LABOR AGREEMENTS VIOLATE STATE AND CITY COMPETITIVE-BIDDING LAWS

The Constitution and laws of Pennsylvania—as well as the city charter of Philadelphia—require government contracts to be awarded to the lowest responsible bidder. Article III, Section 22 of the Pennsylvania Constitution mandates competitive bidding and requires the General Assembly to "maintain by law a system of competitive bidding under which all purchases of materials, printing, supplies or other personal property used by the government of this Commonwealth shall so far as practicable be made." Section 3911(a) of the Commonwealth Procurement Code provides that "In the case of a contract to be entered into by a government agency through competitive sealed bidding, the contract shall be awarded to the lowest responsible and responsive bidder within 60 days of the bid opening, or all bids shall be rejected except as otherwise provided in this section." 62 Pa. Cons. Stat. § 3911(a). And section 8-200 of the City of Philadelphia Home Rule Charter likewise mandates competitive bidding and requires contracts to be awarded to the lowest responsible bidder.[4]

These competitive-bidding requirements "guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts . . . and are enacted

---

4. A "responsible bidder" is "[a] bidder that has submitted a responsive bid and that possesses the capability to fully perform the contract requirements in all respects and the integrity and reliability to assure good faith performance." 62 Pa. Cons. Stat. § 103.

for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders." *Yohe v. City of Lower Burrell*, 208 A.2d 847, 850 (Pa. 1965). The intent of competitive-bidding statutes is "to 'close, as far as possible, every avenue to favoritism and fraud in its varied forms.'" *Premier Comp Solutions, LLC v. Department of General Services*, 949 A.2d 381, 382 n.1 (Pa. Cmwlth. 2008) (quoting *Louchheim v. Philadelphia*, 66 A. 1121, 1122 (Pa. 1907)). Bidders for a public contract must be "on an equal footing" and enjoy the same opportunity for open and fair competition. *See Philadelphia Warehousing and Cold Storage v. Hallowell*, 490 A.2d 955, 957 (Pa. Cmwlth. 1985). And when there is no common standard on which bids are based, "[t]he integrity of the competitive bidding process is violated and the purpose of competitive bidding is frustrated." *Allan Myers, L.P. v. Dep't of Transp.*, 202 A.3d 205 (Pa. Cmwlth. 2019).

The city's project labor agreements flout these competitive-bidding laws because they patently discriminate against contractors who employ members of the United Steelworkers. They also discriminate against non-union contractors. None of those contractors are permitted to use their own employees to perform city work, while contractors that have existing collective-bargaining agreements with the city-preferred unions can bid and contract for city work with their existing workforces. It is hard to imagine a more blatant violation of the principle of competitive bidding. Indeed, the Commonwealth Court of Pennsylvania has already held that this type of discrimination among contractors in PLAs violates the state's competitive-bidding laws:

> [T]he competitive bidding laws . . . prohibit discrimination between union and nonunion contractors in the award of public contracts. To be sure, the PLA states that "any qualified contractors may bid or perform work on this Project, regardless of whether or not they are affiliated with the [Building and Construction] Council or its Local Unions." R.R. 26a. Notwithstanding this lip service to the principle of competitive bidding, the PLA does not place nonunion contractors "on an equal footing" with union contractors. Unlike contractors affiliated with the Local Unions or United Steelworkers, a nonunion contractor that bids on the Markley Street Project cannot use its own experienced workforce. Rather, under Article I of the PLA, the nonunion contractor must hire all craft labor personnel employed on the Project

> through the Local Unions "in accordance with the hiring procedures of Local Agreements, included as Appendix B hereto." R.R. 28a. . . .
>
> Allan Myers cannot make its employees or subcontractors join a union. *See Labor Relations Board v. Fabrication Specialists, Inc.*, 477 Pa. 23, 383 A.2d 802 (1978) (recognizing that an employee has a right to join, or decline to join, a union or other existing labor organizations). The PLA does not guarantee that the Local Unions will accept Allan Myers' existing workforce as members or assign them back if they are accepted. Allan Myers cannot bid for the Project with an unknown workforce. The PLA has effectively precluded a nonunion contractor, such as Allan Myers, from participating in the bid solicitation.

*Allan Myers, L.P. v. Dep't of Transportation*, 202 A.3d 205, 214 (Pa. Commw. Ct. 2019) (some citations omitted). So too here. The city's project labor agreement has "effectively precluded" the plaintiff contractors from obtaining city work because their employees have chosen the United Steelworkers rather than a city-preferred union as their representative, and as a result the contractors cannot use their existing workforces on city construction projects. This violates the competitive-bidding rules established in section 3911(a) of the Commonwealth Procurement Code and section 8-200 of the city charter.

The city is also violating these competitive-bidding laws by discriminating against contractors and unions that are unable or unwilling to agree to the city's diversity-and-inclusion goals. This confers a competitive advantage to contractors and unions who comply with the diversity-and-inclusion goals, plays favorites with contractors and unions based on their racial and demographic makeup, and does not create a level playing field.

## V.  THE MAYOR'S EXECUTIVE ORDERS VIOLATE SECTION 8-200 OF THE CITY CHARTER

Section 8-200 of the city charter requires competitive bidding, but it also contains a proviso that allows the City Council to enact ordinances that depart from this requirement in certain situations:

> Except in the purchase of unique articles or articles which for any other reason cannot be obtained in the open market, competitive bids shall be secured before any purchase, by contract or otherwise, is made or before any contract is awarded for construction, alterations, repairs or maintenance or

> for rendering any services to the City other than professional services and, except as provided in subsection (5) below, the purchase shall be made from or the contract shall be awarded to the lowest responsible bidder and in conformity with any procedure established by the Procurement Department by regulation, designed to appropriately maximize accessibility by vendors, maximize transparency to the public, and minimize costs to the City; *provided, however, that City Council may, by ordinance, prescribe bid preferences for businesses located in or doing business in Philadelphia*, and provided further that Council may, by ordinance, regulate the process by which purchases and contracts not subject to the lowest responsible bidder requirement of this paragraph are awarded, and may require that contracts with agencies (as that term is defined in subsection 6-400(c) of this Charter) or with other entities include provisions obligating such agencies or entities to comply with any process established by Council under the authority of this subsection, except that such regulations may not require Council authorization of a contract unless Council authorization is required by some other provision of this Charter.

Philadelphia Home Rule Charter § 8-200(1) (emphasis added). This makes clear that the mayor has no authority to issue unilateral decrees that confer bid preferences upon contractors that employ members of city-preferred unions, or that allocate a sufficient number of employment hours to women and minorities. The City Council is the *only* entity empowered to prescribe "bid preferences"—and it may do so *only* by enacting an "ordinance" that confers bid preferences upon "businesses located in or doing business in Philadelphia." The mayor has no authority to establish his own bid preferences by executive ukase.

## VI. THE COURT SHOULD DECLARE EXECUTIVE ORDER 4-20 UNLAWFUL AND ENJOIN ITS ENFORCEMENT

Executive Order 4-20 purports to remove the "union security" requirements of Executive Order 8-15, but it reaffirms and continues to impose the diversity-and-inclusion goals that prevented the United Steelworkers and its affiliated contractors from working on city construction projects. *See* Pls.' Statement of Undisputed Facts Ex. 15 §§ 1(a)(iv), 4(c). This not only violates 42 U.S.C. § 1981 and the Equal Protection Clause, it also violates state competitive-bidding laws and the city charter, which make no allowance for city officials to reject or exclude a bidder based on the demographic makeup of its workforce or the number of "construction employment hours" that it allocates to women and minorities.

The Court should also enjoin the city from discriminating against the plaintiffs in any manner when awarding city contracts—regardless of whether the discrimination is authorized or compelled by an executive order or project labor agreement. The mayor tried to pull the rug from under the plaintiffs' previous motion for summary judgment by amending the city's PLA six weeks after the plaintiffs filed their motion, and by rescinding the executive order that the plaintiffs had specifically asked this Court to enjoin. But the mayor's maneuvering only shows the need for a broader remedy that does not depend on the shifting contents of the city's executive orders or project labor agreements. The Court should simply enjoin the city from discriminating against the plaintiffs when awarding city contracts, which will prohibit not only the enforcement of discriminatory PLAs but also the more subtle and underhanded tactics described in the deposition testimony. *See id.* Ex. 14 (Hoffman Dep. 31:16–18; 33:24–34:2; 34:17–35:3; 35:2–35:5; 37:5–24).

## CONCLUSION

The plaintiffs' motion for summary judgment should be granted.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

| | |
|---|---|
| WALTER S. ZIMOLONG | JONATHAN F. MITCHELL |
| Pennsylvania Bar No. 89151 | Pennsylvania Bar No. 91505 |
| Zimolong, LLC | Mitchell Law PLLC |
| P.O. Box 552 | 111 Congress Avenue, Suite 400 |
| Villanova, Pennsylvania 19085 | Austin, Texas 78701 |
| (215) 665-0842 (phone) | (512) 686-3940 (phone) |
| wally@zimolonglaw.com | (512) 686-3941 (fax) |
| | jonathan@mitchell.law |

Dated: December 6, 2021          *Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I certify that on December 6, 2021, I served this document through CM/ECF upon:

AMY M. KIRBY
LYDIA FURST
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania 19102
(215) 683-3566
amy.kirby@phila.gov
lydia.furst@phila.gov

*Counsel for Defendants*

EDWARD T. KANG
SUSAN MOON O
Kang Haggerty & Fetbroyt LLC
123 South Broad Street, Suite 1670
Philadelphia, Pennsylvania 19109
(215) 525-5850
ekang@khflaw.com
so@khflaw.com

*Counsel for Intervenors*

                                        /s/ Jonathan F. Mitchell
                                        JONATHAN F. MITCHELL
                                        *Counsel for Plaintiffs*