# Exhibit A

EXECUTIVE ORDER NO. 8-15

## PUBLIC WORKS PROJECT LABOR AGREEMENTS

WHEREAS, the City of Philadelphia ("City") has a compelling interest in awarding building or construction work contracts so as to yield the lowest reasonable costs and the highest standard of quality and efficiency; and

WHEREAS, Project Labor Agreements can ensure that a building or construction work project is completed at the lowest reasonable cost; by the highest quality and most professional work force; and in a timely manner without labor disruptions such as strikes, lockouts or slowdowns; and

WHEREAS, Project Labor Agreements can provide opportunities for the City, contractors and labor organizations to make progress in meeting their respective goals for worker diversity and local employment;

WHEREAS, the City has been a party to Project Labor Agreements pursuant to Executive Orders No. 5-95 and No. 15-11, and has gained useful insight into when Project Labor Agreements are most appropriate and beneficial to the City;

WHEREAS, the City has determined that certain projects, because of their size, complexity, need for a variety of craft labor and critical deadlines are generally appropriate for Project Labor Agreements; and

WHEREAS, guidance to City departments and agencies on the use of Project Labor Agreements benefits the interests of the City;

WHEREAS, an Advisory Committee can provide continuing guidance on the use and form of Project Labor Agreements;

NOW, THEREFORE, by the powers vested in me by the Philadelphia Home Rule Charter, it is hereby ORDERED:

**SECTION 1.  Definitions.**

    (a)    <u>Appropriate Labor Organization.</u>  An organization representing, for purposes of collective bargaining, journeymen in one or more crafts or trades with a Federal or state certified approved apprenticeship training program and which:

        (i)    has entered into a labor agreement with an employer in the building and construction industry;

        (ii)    has represented journeymen, mechanics and apprentices employed

on projects similar to the project for which a Project Labor Agreement is being considered;

    (iii)   possesses the present ability to refer, provide or represent qualified journeymen and apprentices in the crafts or trades required by the project, in sufficient numbers to perform the contracted work involved in the project; and

    (iv)   has identified member diversity as an organizational value and has established objectives for maintaining and increasing diversity among its apprentice and journeyman members.

(b)    <u>City Agency</u>.  A City office, department, board, commission or other entity which procures goods and services directly or through the City Procurement Department.

(c)    <u>Project(s)</u>.  This Executive Order shall apply to building or construction work, including maintenance and service projects which include substantial building improvements under a contract with the City governed by Section 17-107 of The Philadelphia Code.

(d)    <u>Project Labor Agreement</u>.   A collective bargaining agreement between a contractor as an employer and an Appropriate Labor Organization relating to the building or construction work performed at a particular site ("Project").  Such an agreement sets forth the terms and conditions of employment for workers hired by the employer and sets forth certain work rules, no-strike clauses, jurisdictional determinations and other project-specific provisions that the City, the employer or the Labor Organization deem important for the completion of the project.  Any Project Labor Agreement shall be subject to the review and approval of the City's Law Department.

**SECTION 2.  Public Works Project Review.**

(a)    Each City Agency shall review all proposed Projects, with an estimated construction cost of  Three Million Dollars ($3,000,000.00) or more to determine if a particular Project would be appropriate for a Project Labor Agreement.  Projects with lower estimated costs may also be appropriate for Project Labor Agreements, and City Agencies are encouraged to review Projects with lower construction costs. Appropriate Projects include the following characteristics:

    i.   Projects that have high anticipated construction costs;

    ii.   Projects that require the labor of multiple construction crafts or trades;

2

      iii.        Projects that have complex labor requirements that may conflict with existing collective bargaining agreements;

      iv.        Projects that require completion without delay

      v.        Projects that further urgent City goals and

      vi.        <u>Projects being performed in complex work environments or for which the provisions of Section 5 are required.</u>

(b)      <u>All Projects with estimated construction budgets of Three Million Dollars ($3,000,000.00)</u> or more shall be reviewed by City Agencies prior to issuing an invitation for bids. PLA's should be used when any of the criteria under Section 2(a) are met, unless clear countervailing considerations are present. City Agencies shall forward the findings of the Project review to the Mayor's Office.

## SECTION 3. Referral for Project Labor Agreements.

(a)      When a City Agency has determined that a Project is appropriate for a Project Labor Agreement, the City Agency shall provide the Mayor's Office with a written description of the Project and the City Agency's recommendation for a Project Labor Agreement.

(b)      The recommendation of the appropriateness and feasibility of using a Project Labor Agreement for a particular project shall describe how it will benefit and enhance the interests of the City on the basis of costs, efficiency, quality, safety and/or timeliness, and shall specifically address the following factors;

      (i)        The need for safe, timely and efficient completion of the project;

      (ii)        The need for predictable costs and enforcement of prevailing wage requirements;

      (iii)        The need for effective mechanisms for resolution of disputes;

      (iv)        The need for a ready and adequate supply of highly skilled and highly trained craft workers and the need to guarantee performance of the project in a workmanlike and professional manner; and

      (v)        The opportunity to provide significant employment opportunities for qualified City residents, including minority males and women, and for women- and minority-owned businesses.

3

(c)    This Executive Order does not require the use of a Project Labor Agreement with respect to any particular Project, nor does this Executive Order require the selection of any particular union, trade council or labor organization.

**SECTION 4.   Determination for Project Labor Agreement.**

(a)    The Mayor's Office shall review all submittals required for Projects.

(i)    Whether a Project Labor Agreement has been recommended or not, the Project shall be reviewed for consistency with this Executive Order.

(b)    When the Mayor's Office determines that a Project Labor Agreement is appropriate, it shall, in consultation with the City Agency, commence a discussion with labor organizations to determine

(i)    which labor organization(s) may be appropriate for the Project, and

(ii)    if a Project Labor Agreement is feasible for the Project.

(c)    Where the Mayor's Office determines that a Project Labor Agreement will benefit from monitoring of the opportunities provided for qualified City residents, minorities and women, the Office of Economic Opportunity shall provide such monitoring services and report results to the Mayor's Office on a periodic basis, but not less than yearly.

**SECTION 5.   Required Provisions In Project Labor Agreements.**

Any Project Labor Agreement entered into pursuant to this Executive Order shall:

(a)    Contain guarantees against strikes, lockouts, slowdowns and similar actions;

(b)    Set forth effective, immediate and mutually binding procedures for resolving jurisdictional disputes arising before the completion of the work;

(c)    Contain guarantees for the availability of labor for the Project;

(d)    Require the participating labor organizations to make available at the time of bidding for the Project all collective bargaining agreements and current wage rates applicable to the work;

(e)    Include diversity goals for appropriate labor organizations and contractors and requirements for annual reporting by participating labor organizations on their efforts and progress toward increasing diversity; and

     (e)     Require participating labor organizations and contractors to cooperate with the City's Office of Economic Opportunity on providing information on economic opportunity plans and other diversity issues

**SECTION 6.   Procedures When Project Labor Agreements Are Used**.

If a Project Labor Agreement is used pursuant to this Executive Order for any Project, the procedures listed in this section shall be followed:

     (a)     A Project Labor Agreement shall be made part of the bid specifications in substantially the form attached hereto as the "Philadelphia Public Projects Labor Agreement," or such other form of agreement that the City Solicitor may approve.

     (b)     The Instructions to Bidders shall provide that the City, the Project manager and any contractor shall have the absolute right to select any qualified bidder for the award of project contracts without reference to whether the bidder was unionized, provided, however, that only a bidder willing to execute and comply with the Project Labor Agreement would be designated the successful bidder;

     (c)     The Instructions to Bidders shall provide that the Project Labor Agreement shall be made binding on all contractors and subcontractors on the Project through inclusion of appropriate bid specifications in all relevant bid documents;

     (d)     Following the award of the contract for the Project, the Project Labor Agreement shall be finalized and executed by the contractor or its project manager, subject to the review and approval of the City; and

     (e)     The Project contract and the Project Labor Agreement shall comply with all other provisions of law.

**SECTION 7.   Advisory Committee for Project Labor Agreements.**

     (a)     An Advisory Committee for Project Labor Agreements is hereby established.  The Advisory Committee shall consist of the following City officials or their designees:

                  Mayor's Chief of Staff
                  City Solicitor
                  Managing Director
                  Director of Finance
                  Deputy Mayor for Transportation and Utilities
                  Deputy Mayor for Economic Development

Other City officials, employees or private citizens may serve on the Advisory Committee at the request of the Mayor's Chief of Staff.

(b)   <u>Duties.</u>  The Advisory Committee shall:

   (i)   Monitor and evaluate Project Labor Agreements entered into pursuant to this Executive Order, , and review reports from City departments and participating labor organizations on the use of the agreement provisions in Section 5 in meeting the objectives of this Executive Order,  including but not limited to,  avoiding labor unrest, providing skilled high quality  labor, and meeting the diversity goals agreed to by the participating Unions. If reports from Unions are not provided to the City, the Advisory Committee may recommend that the use of Project Labor Agreements be suspended by the City until such time as reports are received and can be evaluated;

   (ii)   Make periodic recommendations to the Mayor regarding the use of Project Labor Agreements , including recommendations for modifications of the terms and conditions of Project Labor Agreements, changes to the policies established herein for their use, and the expansion, limitation, suspension or termination of their use; and

   (iii)   Perform such other duties as the Mayor may from time to time assign.

**SECTION 8.  Prior Order Rescinded.**

Executive Order No. 15-11 is hereby rescinded.

**SECTION 9.  Effective Date.**

This Executive Order shall take effect immediately.


12/31/15
Date

Michael A. Nutter, Mayor

6

# Exhibit B

# EXECUTIVE ORDER No. 15-11

## PUBLIC WORKS PROJECT LABOR AGREEMENTS

WHEREAS, the City of Philadelphia ("City") has a compelling interest in awarding building or construction work contracts so as to yield the lowest reasonable costs and the highest standard of quality and efficiency; and

WHEREAS, Project Labor Agreements can ensure that a building or construction work project is completed at the lowest reasonable cost; by the highest quality and most professional work force; and in a timely manner without labor disruptions such as strikes, lockouts or slowdowns; and

WHEREAS, Project Labor Agreements can provide opportunities for the City, contractors and labor organizations to make progress in meeting their respective goals for worker diversity and local employment;

WHEREAS, the City has been a party to several Project Labor Agreements pursuant to Executive Order No. 5-95 and has gained useful insight into when Project Labor Agreements are most appropriate and beneficial to the City;

WHEREAS, the City has determined  that certain projects, because of their size, complexity, need for a variety of craft labor and critical deadlines are generally appropriate for Project Labor Agreements; and

WHEREAS, guidance to City departments and agencies on the use of Project Labor Agreements benefits the interests of the City:

WHEREAS, an Advisory Committee can provide continuing guidance on the use and form of Project Labor Agreements;

NOW, THEREFORE, by the powers vested in me by the Philadelphia Home Rule Charter, it is hereby ORDERED:

**SECTION 1.  Definitions.**

    (a)    <u>Appropriate Labor Organization.</u>  An organization representing, for purposes of collective bargaining, journeymen in one or more crafts or trades with a Federal or state certified approved apprenticeship training program and which:

        (i)    has entered into a labor agreement with an employer in the building and construction industry;

        (ii)    has represented journeymen, mechanics and apprentices employed

on projects similar to the project for which a Project Labor Agreement is being considered;

(iii)   possesses the present ability to refer, provide or represent qualified journeymen and apprentices in the crafts or trades required by the project, in sufficient numbers to perform the contracted work involved in the project; and

(iv)   has identified member diversity as an organizational value and has established objectives for maintaining and increasing diversity among its apprentice and journeyman members.

(b)   <u>City Agency</u>.  A City office, department, board, commission or other entity which procures goods and services directly or through the City Procurement Department.

(c)   <u>Project(s)</u>.  This Executive Order shall apply to building or construction work under a contract with the City governed by Section 17-107 of The Philadelphia Code.

(d)   <u>Project Labor Agreement</u>.  A collective bargaining agreement between a contractor as an employer and an Appropriate Labor Organization relating to the building or construction work performed at a particular site ("Project").  Such an agreement sets forth the terms and conditions of employment for workers hired by the employer and sets forth certain work rules, no-strike clauses, jurisdictional determinations and other project-specific provisions that the City, the employer or the Labor Organization deem important for the completion of the project.  Any Project Labor Agreement shall be subject to the review and approval of the City's Law Department.

**SECTION 2.  Public Works Project Review.**

(a)   Each City Agency shall review all proposed Projects with an estimated construction cost of Five Million Dollars ($5,000,000) or more to determine if a particular Project would be appropriate for a Project Labor Agreement.  Projects with lower estimated costs may also be appropriate for Project Labor Agreements, and City Agencies are encouraged to review Projects with lower construction costs. Appropriate Projects include the following characteristics:

(i)   Projects that have high anticipated construction costs;

(ii)   Projects that require the labor of multiple construction crafts or trades;

2

     (iii)     Projects that have complex labor requirements that may conflict with existing collective bargaining agreements;

     (iv)     Projects that require completion without delay; and

     (v)     Projects that further urgent City goals.

(b)     All Projects with estimated construction budgets of Five Million Dollars ($5,000,000) or more shall be reviewed by City Agencies prior to issuing an invitation for bids. PLA's should be used when any of the criteria under Section 2(a) are met, unless clear countervailing considerations are present. City Agencies shall forward the findings of the Project review to the Mayor's Office.

**SECTION 3.  Referral for Project Labor Agreements.**

(a)     When a City Agency has determined that a Project is appropriate for a Project Labor Agreement, the City Agency shall provide the Mayor's Office with a written description of the Project and the City Agency's recommendation for a Project Labor Agreement.

(b)     The  recommendation of the appropriateness and feasibility of using a Project Labor Agreement for a particular project shall describe how it will benefit and enhance the interests of the City on the basis of costs, efficiency, quality, safety and/or timeliness, and shall specifically address the following factors;

     (i)     The need for safe, timely and efficient completion of the project;

     (ii)     The need for predictable costs and enforcement of prevailing wage requirements;

     (iii)     The need for effective mechanisms for resolution of disputes;

     (iv)     The need for a ready and adequate supply of highly skilled and highly trained craft workers and the need to guarantee performance of the project in a workmanlike and professional manner; and

     (v)     The opportunity to provide significant employment opportunities for qualified City residents, including minority males and women, and for women- and minority-owned businesses.

(c)     This Executive Order does not require the use of a Project Labor Agreement with respect to any particular Project, nor does this Executive Order require the selection of any particular union, trade council or labor organization.

**SECTION 4.  Determination for Project Labor Agreement.**

    (a)    The Mayor's Office shall review all submittals required for Projects.

        (i)    Whether a Project Labor Agreement has been recommended or not, the Project shall be reviewed for consistency with this Executive Order.

    (b)    When the Mayor's Office determines that a Project Labor Agreement is appropriate, it shall, in consultation with the City Agency, commence a discussion with labor organizations to determine

        (i)    which labor organization(s) may be appropriate for the Project, and

        (ii)    if a Project Labor Agreement is feasible for the Project.

    (c)    The Mayor's Office may determine that a Project Labor Agreement will benefit from third party monitoring of the opportunities provided for qualified City residents, minorities and women. If so determined, the Mayor's Office will direct the Office of Economic Opportunity to select and contract with a qualified  monitor ("Monitor").

        (i)    If a Monitor is engaged for the Project, the cost shall be shared by the City, contractor(s) and the Appropriate Labor Organizations

**SECTION 5.  Required Provisions In Project Labor Agreements.**

Any Project Labor Agreement entered into pursuant to this Executive Order shall:

    (a)    Contain guarantees against strikes, lockouts, slowdowns and similar actions;

    (b)    Set forth effective, immediate and mutually binding procedures for resolving jurisdictional disputes arising before the completion of the work; and

    (c)    Include diversity goals for appropriate labor organizations and contractors.

**SECTION 6.  Procedures When Project Labor Agreements Are Used.**

If a Project Labor Agreement is used pursuant to this Executive Order for any Project, the procedures listed in this section shall be followed:

    (a)    A Project Labor Agreement shall be made part of the bid specifications in substantially the form attached hereto as the "Philadelphia Public Projects

Labor Agreement," or such other form of agreement that the City Solicitor may approve.

(b) The Instructions to Bidders shall provide that the City, the Project manager and any contractor shall have the absolute right to select any qualified bidder for the award of project contracts without reference to whether the bidder was unionized, provided, however, that only a bidder willing to execute and comply with the Project Labor Agreement would be designated the successful bidder;

(c) The Instructions to Bidders shall provide that the Project Labor Agreement shall be made binding on all contractors and subcontractors on the Project through inclusion of appropriate bid specifications in all relevant bid documents;

(d) Following the award of the contract for the Project, the Project Labor Agreement shall be finalized and executed by the contractor or its project manager, subject to the review and approval of the City; and

(e) The Project contract and the Project Labor Agreement shall comply with all other provisions of law.

**SECTION 7. Advisory Committee for Project Labor Agreements.**

(a) An Advisory Committee for Project Labor Agreements is hereby established. The Advisory Committee shall consist of the following City officials or their designees:

> Mayor's Chief of Staff
> City Solicitor
> Managing Director
> Director of Finance
> Deputy Mayor for Transportation and Utilities
> Deputy Mayor for Economic Development

Other City officials, employees or private citizens may serve on the Advisory Committee at the request of the Mayor's Chief of Staff.

(b) <u>Duties.</u> The Advisory Committee shall:

(i) Monitor and evaluate Project Labor Agreements entered into pursuant to this Executive Order;

(ii) Make periodic evaluations to the Mayor regarding the use of Project Labor Agreements, including recommendations for modifications of Project Labor Agreements;

5

(iii)   Perform such other duties as the Mayor may from time to time assign.

**SECTION 8.  Prior Order Rescinded.**

Executive Order No. 5-95 is hereby rescinded.

**SECTION 9.  Effective Date.**

This Executive Order shall take effect immediately.

_11/29/11_
Date

Michael A. Nutter, Mayor

# PHILADELPHIA PUBLIC PROJECTS LABOR AGREEMENT

THIS CITY OF PHILADELPHIA PUBLIC PROJECT LABOR AGREEMENT (hereinafter the "Agreement"), is entered into this _____ day of _____, 20__, by and between

_____

_____

(hereinafter the "Signatory Contractors"), their successors or assigns, and the Affiliates of the Philadelphia Building and Construction Trades Council pursuant to, and in accordance with, the Mayor's Executive Order No. 15-11 with respect to the public works project of and within the City of Philadelphia ("City") or City–owned facilities, described in Article II, Section 2 of this Agreement, and referred to herein as the "Public Works Project."

 **WHEREAS** the parties to this Agreement acknowledge that the timely construction of City projects is critical to the City and its residents; and

 **WHEREAS** the City and its contractors, reflecting the objectives of the City, desire to provide for the efficient, safe, quality and timely completion of projects in a manner designed to afford the lowest reasonable cost to the City and the public it represents, and to achieve the advancement of public policy objectives; and

 **WHEREAS** this Agreement will foster the achievement of those goals by, among other things, avoiding the costly delays of disruption or interference with work and promote labor harmony and peace; and

 **WHEREAS** this Agreement will further the policy objectives of the City, its contractors and the Union(s) to include employment opportunities for minorities, women, Philadelphia residents and the economically disadvantaged in the construction industry; and

**WHEREAS** the Union(s) have demonstrated a commitment to the expansion of such employment opportunities; and

**WHEREAS** the Union(s) desire the stability, security and work opportunities made possible by this Agreement; and

**WHEREAS** the City, under Executive Order No. 15-11, and consistent with other directives of the Mayor, reviews all proposed public works projects with  projected construction costs over Five  Million Dollars ($5,000,000) to determine whether the size, complexity, number and types of labor involved  or other factors would make them appropriate for the use of a Project Labor Agreement; and

**WHEREAS** the City has determined that the Public Works Project, identified herein at Article II, Section 2 is an appropriate project for a Project Labor Agreement;

**NOW, THEREFORE,** the Parties enter into this Agreement.

The term "Contractor" shall include the Signatory Contractors, all contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement.

The term "craft" as applied to employees and workers shall mean those skills, crafts and trades of workers represented by the Union(s) as defined herein.

The Union(s) and the Contractors, their assigns, subcontractors and transferees agree to abide by the terms and conditions contained in this Agreement with respect to the performance of the construction by the Contractors of the Public Works Project covered by this Agreement.   This Agreement represents the complete understanding of the parties, and it is further understood that no Contractor is required to sign any other agreement as a condition of performing work within the scope of this Agreement.   No practice, understanding or agreement between a Contractor and a Union party which is not explicitly set forth in this Agreement and the Schedules hereto shall be binding on any other party.

## ARTICLE I - PURPOSE

As provided in Mayor's Executive Order No. 15-11, the City has a compelling interest in carrying out the Public Works Project at the lowest reasonable cost, highest level of efficiency, and the highest degree of quality.

Further, it has been recognized by the City that certain major Public Works Projects can best be carried out through the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 15-11, which ensure that labor disputes are resolved without disruptions resulting from strikes, lockouts or slowdowns and which provide for enforceable guarantees that the Public Works Project will be carried out in an orderly and timely manner without strikes, lockouts or slowdowns and with provisions protecting the wages, hours, working conditions and safety of those workers whose skills are required to complete such projects. Project Labor Agreements can provide the City with cost savings and efficiencies through project-specific adjustments to collective bargaining agreements that allow for project-specific appropriate hours of work, length of workday and workweek, overtime, starting times, breaks, shift work, crew apprentice ratios, holidays, dispute resolution and management rights, as have been mutually determined and agreed to by the City and the Union(s).

Further, the City has recognized that it can best accomplish these goals by permitting the use of Project Labor Agreements, as defined in Mayor's Executive Order No. 15-11, in major public works projects, on a project by project basis, through which the City has determined, based on thorough investigation, analysis and justification, pursuant to, and in accordance with the procedures set forth in Mayor's Executive Order No. 15-11 and other policies of the Mayor's Office, that the use of a Project Labor Agreement will benefit and enhance the interest of the City from a cost, efficiency, quality and/or safety standpoint.

Further, the City and the Union(s) have received a Report and Recommendations from the Mayor's Advisory Commission on Construction Industry Diversity (the "Commission Report") and the parties

have determined that Project Labor Agreements can provide a framework for meeting long term goals of the City, the Union(s) and Contractors for increasing the opportunities for minorities and women to have successful careers in the construction trades.

Further, the City has recognized that it can best accomplish these goals by requiring that in major public works projects governed by Section 17-107 of the Philadelphia Code, a precondition regarding the award of a contract will be a requirement that the Contractors enter into a Project Labor Agreement with the Philadelphia Building & Construction Trades Council and its affiliated Union(s) requiring such Contractors as well as all subcontractors, assignees or transferees to abide by an agreement setting forth the wages, hours and working conditions of the workers employed on such public works projects.

Accordingly, the parties to this Agreement recognize that it is essential that the construction work on the Public Works Project covered by this Agreement be done in an efficient and economical manner in order to secure optimum productivity and to eliminate any delays in the work.  In recognition of the needs of the Public Works Project covered by this Agreement, and to maintain a spirit of harmony, labor-management peace, and stability during the term of this Agreement, the parties agree to establish effective methods for the settlement of all misunderstandings, disputes or grievances which may arise under this Agreement.

## ARTICLE II - SCOPE OF THE AGREEMENT

Section 1.        Scope of Agreement.  This Agreement shall apply and is limited to all construction work under the direction of the signatory Contractors and performed by those Contractors of whatever tier which have contracts awarded for such work on and after the effective date of this Agreement, for the City, for the Public Works Project defined in Section 2 below.

Section 2.     Covered Projects.  The Public Works Project covered by this Agreement is

generally described as the construction of the _____

_____.

Section 3.     Award of Project Contracts.

(a)     The City has the absolute right to select any qualified bidder for the award of

contracts on this Public Works Project without reference to the existence or non-existence of any

agreements between such bidder and any party to this Agreement provided, however, only that such

bidder is ready, willing and able to execute and comply with this Agreement, which it shall do should it be

designated the successful bidder.

(b)     It is agreed that all direct subcontractors of Contractors, of whatever tier, who have

been awarded contracts for work covered by this Agreement on or after the effective date of this

Agreement shall be required to accept and be bound by the terms and conditions of this Project Labor

Agreement.

Section 4.     Contract Administration.

(a)     This Agreement is intended to provide close cooperation between management and

labor. The Project Relations Committee (as further described in Section 4 (c)), shall monitor compliance

with this Agreement by all Contractors which, through their execution of this Agreement, together with

their subcontractors or transferees, have become bound hereto.  The Project Relations Committee shall

monitor compliance with this Agreement by all Union(s) which, through their execution of this Agreement

have become bound hereto.

(b)     The provisions of this Agreement, including Collective Bargaining Agreements

which are listed on and collectively designated as Schedule A, shall apply to the construction of the Public

Works Project covered by this Agreement, notwithstanding the provisions of Local or International

Agreements which may conflict or differ from the terms of this Agreement.   Where a subject covered by

5

the provisions of this Project Labor Agreement, including but not limited to, Schedule D Project Specific Conditions, is also covered by any of the Collective Bargaining Agreements on Schedule A, the provisions of this Agreement shall prevail.

(c)     The Signatory Contractors  to this Agreement shall agree to establish a Project Relations Committee composed of "thirteen (13) members.  Four (4) individuals shall be appointed by the Contractors signatory to this Agreement, four (4) individuals shall be appointed by the Union(s) and four (4) individuals shall be appointed by the City.  The Philadelphia Area Labor Management Committee shall appoint one representative who will act as facilitator and staff to the Committee.  The Project Relations Committee shall operate under the Philadelphia Area Labor-Management Built-Rite process.

(d)     The Project Relations Committee shall meet as required, but not less than once each quarter to review performance and the operation of this Agreement.

(e)     The purpose of this Project Relations Committee is as follows:

(1)     To improve communications between representatives of labor and management and engender cooperative and harmonious relations between labor and management performing work under this Agreement.

(2)     Provide workers and Contractors with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness.  (Example:  Joint process to reduce worksite injuries.)

(3)     Provide a forum for open and honest discussion of problems confronting labor and management, and of eliminating potential problems.

(4)     Study and explore ways of increasing productivity of both labor and management, and of eliminating potential problems.

(5)     Enhance the involvement of workers in making decisions that affect their working lives, and to improve the quality of work life for the employees.

(6)     Expand and improve working relationships between workers and managers.

(7)     Identify conflicts between labor and management before they arise as disputes, and promptly assist in fairly resolving disputes when they do arise.

(8)     Seek to maintain a productive dialogue.

(9)     Pursue, achieve and document the implementation of all aspects of Schedule C, pertaining to increasing employment opportunities for women and minorities.

(10)    Support the Contractors in meeting general obligations and specific project goals for local hiring and for worker diversity as may be part of the Economic Opportunity Plan for the Public Works Project and as further described in Schedule E.

Section 5.     <u>Binding Effect</u>.  This Agreement and Schedules, including but not limited to Schedules A, B, C, D and E, attached hereto shall only be binding on the signatory parties hereto and shall not apply to the parents, affiliates, subsidiaries, or other ventures of any such party.

Section 6.     <u>Limitations</u>.  This Agreement shall be limited to work historically recognized as construction work, including, specifically, the site preparation and related demolition work necessary to prepare the site for construction, and such rehabilitation of existing facilities as is directed by the City. Nothing contained herein shall be construed to prohibit, restrict or interfere with the performance of any other operation, work or function which may occur in or around the Public Works Project site or be associated with the development of the Public Works Project, or with the ongoing operations of the City.

Section 7.     <u>Exclusions</u>.  Items specifically excluded from the scope of this Agreement include, but are not limited to, the following:

(a)     Work of non-manual employees, including but not limited to, superintendents, supervisors, staff engineers, surveyors (except where expressly covered by a Collective Bargaining Agreement in Schedule A), inspectors, quality control personnel, quality assurance personnel, timekeepers, mail carriers, clerks and office workers, including messengers, guards, emergency medical

and first aid technicians and other professional, engineering, administrative, supervisory and management employees.

       (b)    Equipment and machinery owned or controlled and operated by the City.

       (c)    All off-site handling of materials, equipment or machinery and all deliveries to and from the Public Works Project site except where expressly covered by a Collective Bargaining Agreement in Schedule A.

       (d)    All employees of the City.

       (e)    Any work performed on or near, or leading to or into, the Public Works Project site by state, county, city or other governmental bodies, or their Contractors; or by public utilities or their Contractors and/or by the City, or its contractors, for work which is expressly not part of the Public Works Project covered by this Agreement.

       (f)    Off-site maintenance on leased equipment and on-site supervision of such work except where expressly covered by a Collective Bargaining Agreement in Schedule A.

       (g)    Off-site warranty functions and warranty work and on-site supervision of such work except where expressly covered by a Collective Bargaining Agreement in Schedule A.

       (h)    Exploratory geophysical testing, except where expressly covered by a Collective Bargaining Agreement in Schedule A.

       (i)    Laboratory or specialty testing or inspections or monitoring activities not ordinarily done by the crafts.

       (j)    Other work which may occur from time to time.

    Section 8.    <u>Applicability of Agreement</u>.  Nothing contained herein shall be construed to prohibit or restrict the City or its employees from performing work not covered by this Agreement on a Public Works Project site.   As areas and systems of a Public Works Project are inspected, construction

tested and accepted by the City, the Agreement shall not have further force or effect on such items or areas, except when the Contractors are directed by the City to engage in repairs, modifications, check-out, and/or warranty functions required by their contract(s) with the City .

Section 9.    Termination, Delay or Suspension of Public Works Project.  It is understood that the City, at its sole option, may terminate, delay and or suspend any or all portions of the Public Works Project at any time.

Section 10.    Contractor and Union(s) Liability.  It is understood and agreed that the liability of any Contractor and the liability of separate Union(s) under this Agreement shall be several and not joint. The Union(s) agree that this Agreement does not have the effect of creating any joint employment status between or among the City and any Contractor.


## ARTICLE III - UNION RECOGNITION AND EMPLOYMENT

Section 1.    Union Recognition.  The Contractor recognizes the Union(s) as the sole and exclusive bargaining representatives of all craft employees working on the Public Works Project within the scope of this Agreement.

Section 2.    Referrals.  The Union(s) are recognized as the source of employment referrals.  The appropriate Union(s) will be contacted and shall refer all applicants for employment to this Public Works Project according to the standards or criteria uniformly applied to any construction project in the area.  In the event that any Union is unable to fill any requisition for employees within a forty eight (48) hour period after such requisition is made by the Contractor (Saturdays, Sundays and Holidays excepted), the Contractor may solicit and employ applicants from any other available source.  The Contractor shall notify the Union(s) of employees hired by any source other than referral by the Union(s).

Section 3.   <u>Referral Systems</u>.  Subject to the Contractor's right to call for a specific skill or ability, the job referral systems provided in the Collective Bargaining Agreements of the Union(s) set forth in Schedule A hereto, or, in the absence of such language, the referral practices in place at the Union(s), will be in effect for the purpose of initial employment only.  Such job referral system, whether by contract or practice, must be operated in a non-discriminatory manner and in full compliance with Federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspect or obligations of Union membership and shall be subject to such other conditions as established in this Article and in Schedule C.

Section 4.   <u>Competency</u>.  The Contractor shall have the right to determine the competence of all employees, the right to determine the number of employees required and have the sole responsibility for selecting the employees to be laid-off consistent with this Agreement regardless of membership or non-membership in the Union(s).   The Contractor shall also have the right to reject any applicant referred by the Union(s).

Section 5.   <u>Union Security</u>.  It shall be a condition of employment that all employees of Contractor covered by this Agreement who are members of the Union(s) in good standing on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members in good standing and those who are not members on the effective date shall, on the eighth (8th) day following employment, become and remain members in good standing in the Union(s) for the term of this Agreement.

Section 6.   <u>Skilled Craftsmen</u>.  The Union(s) will exert their utmost efforts to recruit sufficient numbers of skilled craftsmen to fulfill the manpower requirements of the Contractor.

Section 7.   <u>Selection of Foremen</u>.  The selection of craft foremen and/or general foremen and the number of foremen required shall be entirely the responsibility of the Contractor.   All foremen shall

10

take orders exclusively from the designated Contractor representatives.   Craft foremen shall be designated as working foremen by the Contractor, except when the Contractor determines that it is not possible for a particular foreman to be working foreman.

Section 8.   <u>Seniority</u>.   Individual seniority shall not be recognized or applied to employees working on the Public Works Project.

## ARTICLE IV  -  UNION REPRESENTATION

Section 1.   <u>Access to Public Works Project Site</u>.   Authorized and designated representatives of the Union(s) shall have access to the Public Works Project, consistent with rules, regulations and policies as have been established for site security and safety and through established Contractor procedures, for the purpose of transacting business in connection with the job.   Such representatives shall be subject to security clearances and may require authorized escorts to enter secure areas of the Public Works Project. Such representatives shall not interfere with the work of employees or cause unnecessary loss of time by the employees.

Section 2.   <u>Stewards</u>.   Stewards shall be appointed consistent with the appropriate Collective Bargaining Agreement as included in Schedule A.

Section 3.   <u>Non-interference</u>.   On work where City personnel or personnel of other contractors not signatory to this Agreement may be working in close proximity of the construction activities, the Union(s) agree that the Union's representatives, stewards and individual workers will not interfere with the City's personnel or the personnel of other contractors not signatory to this Agreement or with the work which is being performed by the City's personnel or personnel of other contractors not signatory to this Agreement.  There shall be no interference by employees covered under this Agreement with on-site concessionaires.

11

## ARTICLE V - MANAGEMENT RIGHTS

Section 1.    <u>Management Rights</u>.   The Contractor retains full and exclusive authority for the management of its operation consistent with this Project Labor Agreement and the collective bargaining agreements included in Schedule A.  The Contractors retain the right to (i) plan, direct and control the workforce and the operation of all of his work, including the hiring, promotion, demotion, transfer, layoff, suspension, discipline or discharge for just cause of its employees; (ii) select foremen, determine the size and make-up of each crew; (iii) assign and schedule work; (iv) promulgate work rules; (v) regulate the use of all equipment and other property of the Contractors, decide the amount of equipment to be used, the number of employees needed; and (vi) regulate overtime work, the determination of when it shall be worked, and the number and identity of employees engaged for such work.  No rules, customs or practices which limit or restrict productivity, efficiency or the individual and/or joint working efforts of employees shall be permitted or observed. The Contractors may utilize any methods or techniques of construction.

Section 2.    <u>Choice of Materials</u>.  There shall be no limitation or restriction upon the Contractors' choice of materials or design, nor, subject to the principle of legitimate work preservation set forth in the following sentence, upon the full use and installation of equipment, machinery, package units, pre-cast, pre-fabricated, pre-finished, or pre-assembled materials, tools, or other labor-saving devices unless otherwise specified in Schedule A.  The on-site installation or application of such items shall be performed by the craft having jurisdiction over such work:  provided, however, it is recognized that other personnel having special talents or qualifications may participate in the installation consistent with Schedule A, including, but not limited to check-off or testing of specialized or unusual equipment or facilities.

Section 3.    <u>New Technology and Devices</u>.   It is recognized that the use of new technology, equipment, machinery, tools and/or labor saving devices and methods of performing work will be initiated by the Contractor from time to time during the Public Works Project.   The Union(s) agree that they will

12

not in any way restrict the implementation of such new devices or work methods.   If there is any disagreement between the Contractors and the Union(s) concerning the manner or implementation of such device or method of work, the implementation shall proceed as directed by the Contractors, and the Union(s) shall have the right to grieve and/or arbitrate the dispute as set forth in Article XIII of this Agreement.

## ARTICLE VI  -  HOURS OF WORK, OVERTIME, SHIFTS AND HOLIDAYS

Section 1.  Hours of Work, Overtime, Shifts and Holidays shall be governed by the Collective Bargaining Agreements included in Schedule A, except as mutually determined and agreed to by the Union(s) and the City and provided in Schedule D Project Specific Conditions.

Section 2.  Where modifications to the Collective Bargaining Agreements or the provisions of Schedule D Project Specific Conditions are in the best interest of a project, such departure may be requested by the Contractors, Union(s) and the City.  Such departures shall be requested utilizing the Project Relations Committee and shall be approved by mutual consent.

## ARTICLE VII  -  WORKING CONDITIONS

Section 1.      Job Site Conditions.  All job site working conditions, including rest periods, coffee breaks and work practices, shall be as determined by the Contractors.

Section 2.      Public Works Project Rules.  The Contractors shall establish such other reasonable Public Works Project rules as each Contractor deems appropriate.   All rules and regulations shall be observed by Union employees who, by virtue of their Union membership and coverage under an appropriate Collective Bargaining Agreement, are made subject to such rules.

## ARTICLE VIII - APPRENTICES

Section 1.     Apprentices.  Recognizing the need to maintain continuing supportive programs designed to develop adequate numbers of competent workers in the construction industry, the Contractors will employ apprentices in their respective crafts to perform such work as is within their capabilities which is customarily performed by the craft in which they are indentured.  Apprentices shall be employed in a manner consistent with the provisions of this Agreement including but not limited to Schedules C and E.  The Contractors may also utilize apprentices as appropriate and consistent with the Schedule A Collective Bargaining Agreements or as provided in Schedule D Project Specific Conditions.

## ARTICLE IX – EMPLOYMENT OPPORTUNITIES FOR PHILADELPHIA RESIDENTS, MINORITIES AND WOMEN

Section 1.     Employment Opportunities For Philadelphia Residents.   The parties recognize that the size and scope of the Public Works Project covered by this Agreement, the number of craftsmen and others expected to be employed in order to complete the work in a timely fashion, and the extended period of time during which the construction will be underway should provide significant employment opportunities for qualified residents of the City of Philadelphia.  The parties further recognize that the Economic Opportunity Plan for the Public Works Project includes specific local hiring goals for the Contractors as established in Schedule C.

Section 2.     Opportunities for Women and Minorities.  The parties also agree that increasing participation by women and minorities employees on the Public Works Project is a desirable goal. Accordingly, the parties shall undertake the activities identified in Schedule C to support the City, Union and Contractor objectives of increased opportunities for participation in the Union(s) and for actual work

14

performed.  Additional responsibilities of the Contractor under the Economic Opportunity Plan related to diversity are described and required in Schedule E.

## ARTICLE X - SAFETY, PROTECTION OF PERSON AND PROPERTY

Section 1.     Safe Working Conditions.  In accordance with the requirements of the Occupational Safety and Health Act, it shall be the exclusive responsibility of each Contractor on the job site to ensure safe working conditions for its employees and their compliance with any safety rules contained herein or established by the Contractors, provided however, it is understood that the employees have an obligation as set forth in Section 2 below.

Section 2.     Safe Performance of Work.   Employees must use diligent care to perform their work in a safe manner and to protect themselves, other persons and the property of the Contractors or the City.  Failure to do so will be grounds for discipline, including discharge.

Section 3.     Safety, Security and Visitor Rules.  Employees covered by the terms of this Agreement shall at all times while in the employ of the Contractors be bound by the safety, security and visitor rules as established by the City and/or the Contractors in accordance with applicable State and Federal safety and health statutes and regulations.  These rules will be published and posted in conspicuous places through the Project.

## ARTICLE XI - NO DISCRIMINATION

Section 1.     No Discrimination.  The Contractors and Union(s) agree that they will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or age in any manner prohibited by law or regulation.  It is recognized that special procedures may be established by joint agreement of the parties to this Agreement and governmental agencies for the training and employment of persons who have not previously qualified to be employed on

15

construction projects of the type covered by this Agreement.  The parties to this Agreement will make all good faith efforts to assist in the proper implementation of such orders, regulations or agreements for the benefit of the population within the jurisdiction of the City of Philadelphia.

Section 2.	Complaints.  Any complaints regarding application of the provisions of Section 1 should be brought to the immediate attention of the involved Contractors for consideration and resolution.

Section 3.	Masculine or Feminine Gender.  The use of the masculine or feminine gender in this Agreement shall be construed as including both genders.

## ARTICLE XII -  WORK STOPPAGES AND LOCKOUTS

Section 1.	There shall be no strike, picketing, work stoppages, slowdowns, sickouts or other disruptive activity for any reason by the Union(s) or employees against any Contractor covered under this Agreement, and there shall be no lockouts by the Contractors.  Failure of any of the Union(s) or any employee to cross any picket line established by any Union, signatory or non-signatory, or any other organization, at or in proximity to the Project site is a violation of this Article.

Section 2.	The Contractors may discharge any employee violating Section 1 above, and any such employee will not be eligible for referral under this Agreement for a period of ninety (90) working days from the date of his discharge.  The Contractors and the Union(s) shall take all steps necessary to obtain compliance with this Article and neither shall be held liable for conduct for which it is not responsible.

## ARTICLE XIII  -  DISPUTES AND GRIEVANCES

Section 1.	Agreement Interpretation.   It is specifically agreed that in the event any disputes arise out of the interpretation or application of this Agreement the same shall be settled by the Project Relations Committee.  All disputes arising out of Contractor-employee issues shall be governed by

Section 2 of this Article.   No such grievance shall be recognized unless called to the attention of the Contractor within seven (7) calendar days after the alleged violation was committed.

Section 2.     Unless otherwise provided for in Schedule D Project Specific Conditions, it is specifically agreed that in the event any disputes arise between the Contractors and Union employees that do not involve the interpretation or application of this Agreement, and/or questions of jurisdiction of work, the same shall be settled by means of the grievance procedures currently set forth in the local Collective Bargaining Agreements set forth in Schedule A.

## ARTICLE XIV - JURISDICTIONAL DISPUTES

Section 1.     There will be no strikes, no work stoppages or slowdowns, or other interferences with the work because of jurisdictional disputes.  Pending the resolution of the dispute, the work shall continue uninterrupted as assigned by the Contractors.

Section 2.     This Agreement shall generally recognize the traditional craft jurisdiction of the Union(s) and shall require Contractors to abide by said traditional craft jurisdiction.  Contractors will utilize the Collective Bargaining Agreements in Schedule A as references to establish the Unions' basic jurisdictions.  If there is any dispute concerning this section, the issue may be submitted by any concerned party for final and binding resolution to the American Arbitration Association.

## ARTICLE XV - SAVINGS AND REPARABILITY

Section 1.     It is not the intention of either the Contractors or the Union parties to violate any laws governing the subject matter of this Agreement.  The parties hereto agree that in the event any provisions of the Agreement are finally held or determined to be illegal or void as being in contravention of any applicable law, the remainder of the Agreement shall remain in full force and effect unless the part or parts so found to be void are wholly inseparable from the remaining portions of this Agreement.

Further, the Contractors and Union(s) agree that if and when any and all provisions of this Agreement are finally held or determined to be illegal or void by Court of competent jurisdiction, the parties will promptly enter into negotiations concerning the substance affected by such decision for the purpose of achieving conformity with the requirements of any applicable law and the intent of the parties hereto.

Section 2.    This Article shall not be construed to waive the prohibitions of Article XII, and if the parties are unable to resolve their differences, the matter shall be referred to arbitration for resolution as provided for in the grievance-arbitration procedure of Article XIII.

## ARTICLE XVI - DURATION OF THE AGREEMENT

This Agreement shall be effective the _____ day of _____, 20__ and shall continue in effect for the duration of the Public Works Project construction work described in Article II hereof.  Construction of any phase, portion, section or segment of Public Works Project shall be deemed complete when such phase, portion, section or segment has been turned over to the City of Philadelphia and has received the final acceptance from the City of Philadelphia's representative.

Each Collective Bargaining Agreement contained in Schedule A hereof attached to this Agreement shall continue in full force and effect until the Contractor(s) or Union(s) who are parties to such Agreement notify the City of the mutually agreed upon changes in those provisions of such Agreements which are applicable to this Public Works Project, and the effective date thereof, which shall then become the effective date under this Agreement.  Unless otherwise provided in this Agreement, increases to wages and benefit payments from the effective date each new or amended Collective Bargaining Agreement shall be due and owing upon notification to the Contractors and the City of such increases.  The parties agree that any provisions negotiated into any Collective Bargaining Agreement contained in Schedule A hereof will not apply to work on Public Works Project if such provisions are less favorable to the Contractors than those uniformly required of Contractors for construction work normally covered by such an

18

agreement; nor shall any provision be recognized or applied on any Public Works Project if it may reasonably be construed to apply exclusively to work covered by this Agreement.

In the renegotiation of any of the Collective Bargaining Agreements contained in Schedule A hereof, the Union(s) party to this Agreement agree that there will be no strikes, work stoppages, sympathy strikes, picketing, slowdowns or other disruptive activity affecting the Public Works Project covered by this Agreement because of or related to the renegotiation of any such Collective Bargaining Agreement contained in Schedule A hereof, nor shall there by any lockout on this Public Works Project affecting the Union(s) party to this Agreement during the course of such negotiations.

Any disagreement between the parties over the incorporation into any Collective Bargaining Agreement contained in Schedule A hereof of such provisions agreed upon in the renegotiation of any such Collective Bargaining Agreement as is contained in Schedule A shall be referred to Article XIII hereof for resolution.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed and effective as of the day and year above written.

**FOR THE UNION(S):**                    **FOR THE CONTRACTORS:**

_____

                                          _____
                                          Contractor

                                          _____
                                          Contractor

                                          _____
                                          Contractor

                                          _____
                                          Contractor

19

# SCHEDULE A

## <u>COLLECTIVE BARGAINING AGREEMENTS</u>

## SCHEDULE B

## **<u>RESERVED</u>**

## SCHEDULE C

## INCREASING OPPORTUNITIES FOR WOMEN AND MINORITIES IN THE BUILDING TRADES UNION(S) AND THE PUBLIC WORKS PROJECTS

Consistent with the Mayor's Advisory on Construction Industry Diversity Report and Recommendations, the City of Philadelphia, the Union(s) and Contractors shall undertake the following activities:

Section 1.     City Activities.

(a)     The City shall collect, tabulate and analyze data, including certified payrolls, related to the participation of male minorities, women and Philadelphia residents in City and City-funded construction projects.

(b)     The City shall establish goals for employment of Philadelphia residents in City and City-funded construction projects.  For City residents employment in the Public Works Project shall be at least:

Philadelphia Residents:  Fifty (50) percent of all construction employment hours.

(c)     The City shall establish goals for workforce diversity in City and City-funded construction projects. The current goals are based on the March 2009 Report of the Mayor's Advisory Commission on Construction Industry Diversity. For male minority and women employment in the Public Works Project shall be at least:

Male Minority:  Thirty two (32) percent of all construction employment hours

Women:          Seven (7) percent of all construction employment hours

(e)     The City shall assist the Union(s) in undertaking activities which would benefit from City participation and support.

(f)     The City shall establish and support a standing Advisory Commission on Construction Industry Diversity.  The City shall invite union leaders, large and small contractors, contractor associations project owners and community leaders to participate.

22

(g)     The City shall designate a City agency for the receipt and redress of complaints from the public about the opportunities for employment on City-funded construction projects.

Section 2.     Union Activities.

(a)     The Union(s) shall collect demographic data on participation in the Public Works Project. The Union(s) shall provide that information to the City on monthly basis while the Project Labor Agreement is in effect.

(b)     The Union(s) shall set participation goals that will significantly increase participation of minority males and women. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

(c)     The Union(s) shall establish goals for participation of in apprenticeship programs for minority males and women.  Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

(d)     The Union(s) shall actively recruit minority males and women for apprenticeship positions. Outreach efforts must be appropriate for reaching minority males and women and consistent with the goals the Union(s) have established for membership of the Union(s).

(e)     The Union(s) shall evaluate alternatives to apprenticeship recruitment for adding minority males and women to membership.

(f)     The Union(s) shall each identify a representative who shall be responsible for reporting on each Union's progress in improving opportunities for minority males and women.

Section 3.     Contractor Activities.

(a)     The Contractors shall support the City and Union efforts to increase the participation of minority males and women in the Public Works Project through apprenticeship programs and other initiatives.

(b)      The Contractors shall use their best efforts to add minority males and women to their permanent or steady workforces. The Contractors shall provide workforce demographic information to the City in advance of project commencement.

(c)      The Contractors shall ensure a work environment that is free from discrimination and supportive of greater participation of minority males and women in the Public Works Project.

(d)      The Contractors shall use their best efforts to meet or exceed the goals established for minority males and women participation in Section 1 of this Schedule C.

(e)      The Contractors shall provide monthly updates to the City, including but not limited to payroll reports, for the requirements of this Section 3.

Section 4.      Third Party Monitoring

(a)      In the event that the City determines that the Agreement and the goals for participation in the Public Works Project by Philadelphia residents, male minorities and women would benefit from monitoring by a qualified third party ("Monitor"), the monitoring shall be performed by a Monitor selected by the parties.  The Contractors and Unions shall provide information and access to the Monitor consistent with the requirements of this Schedule C and the Agreement.

(b)      The costs of monitoring by the Monitor shall be shared equally by the parties.

## SCHEDULE D

## PROJECT SPECIFIC CONDITIONS

Project specific conditions agreed upon by the Union(s) and the City supersede the provisions established in Schedule A Collective Bargaining Agreements only as to the Public Works Project.

**SCHEDULE E**

## ECONOMIC OPPORTUNITY PLAN

Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROAD-CON, INC.; NESHAMINY CONSTRUCTORS, INC.; LOFTUS CONSTRUCTION, INC.; PKF-MARK III; and SCOTT A LAVACA : Plaintiff : | |
| : | Case No. |
| : | 2:19-cv-01667-JS |
| vs. : | |
| : | |
| THE CITY OF PHILADELPHIA; and JAMES KENNEY, : In his official capacity as Mayor of the City of Philadelphia : Defendants : | |

**DEFENDANTS' RESPONSES AND OBJECTIONS**
**TO PLAINTIFFS' REQUESTS FOR ADMISSION**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendants Mayor James Kenney and the City of Philadelphia (the "City"), by and through their undersigned attorneys, respond to Plaintiffs' Requests for Admission (the "Requests") as follows.

**GENERAL OBJECTIONS**

1.      The City objects to all of the Requests on the basis that they repeat nearly verbatim allegations contained in the Second Amended Complaint in this case.  The City has already answered the Second Amended Complaint and admitted or denied each allegation contained therein.  As the Requests are duplicative of the pleadings in this case, they unnecessarily burden the City and do not assist in resolving the issues in this case.

**SPECIFIC RESPONSES TO REQUESTS FOR ADMISSION**

1.      Plaintiff Road-Con, Inc. ("Road-Con") is a heavy and highway contractor.

**ANSWER:** Admitted.

2. Road-Con's principal place of business is located at 902 Camaro Run Drive, West Chester, Pennsylvania 19380.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

3. Road-Con is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

4. Neshaminy Constructors, Inc. ("Neshaminy") is a heavy and highway contractor.

**ANSWER:** Admitted.

5. Neshaminy's principal place of business is located at 1839 Bustleton Pike, P.O. Box 405, Feasterville-Trevose, Pennsylvania 19053-7309.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

6. Neshaminy is a taxpayer of the City of Philadelphia.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

7. Neshaminy pays Business Income and Receipts Tax (BIRT).

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

8. Neshaminy is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily

obtain is insufficient to enable it to admit or deny this Request.

9. Loftus Construction, Inc. ("Loftus") is a heavy and highway contractor.

**ANSWER:** Admitted.

10. Loftus's principal place of business is located at 1903 Taylors Lane, Cinnaminson, New Jersey 08077.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

11. Loftus is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

12. Road-Con, Neshaminy, and Loftus are members of the Pennsylvania Heavy and Highway Contractors Bargaining Association (the "Association").

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

13. A copy of the collective bargaining agreement between the Association and the United Steelworkers is attached at Exhibit "A."

**ANSWER:** Admitted.

14. The collective-bargaining agreement between the Association and the United Steelworkers governs the terms and conditions of employment at Road-Con, Neshaminy, and Loftus.

**ANSWER:** The City objects to this Request on the grounds that it calls for a legal conclusion that is an ultimate legal issue in the case. Subject to and without waiver of the

foregoing objection, after reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

15. PKF-Mark III ("PKF") is a heavy and highway contractor.

**ANSWER:** Admitted.

16. PKF's principal place of business is located at 170 Pheasant Run, Newtown, Pennsylvania 18940.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

17. PKF is a signatory to a collective-bargaining agreement with United Steelworkers Local 15024.

**ANSWER:** Admitted.

18. A true and correct copy of PKF's collective bargaining agreement with the United Steelworkers is attached at Exhibit "B."

**ANSWER:** Admitted.

19. The collective-bargaining agreement between PFK and the United Steelworkers governs the terms and conditions of employment at PKF.

**ANSWER:** The City objects to this Request on the grounds that it calls for a legal conclusion that is an ultimate legal issue in the case. Subject to and without waiver of the foregoing objection, after reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

20. PKF is a prequalified PennDOT contractor that regularly works on PennDOT projects with employees who are members of the United Steelworkers.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily

obtain is insufficient to enable it to admit or deny this Request.

 21. PKF is also a taxpayer of the City of Philadelphia.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

 22. PKF pays Business Income and Receipts Tax (BIRT), sales and use tax, and city wage taxes to the city.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

 23. Scott A. LaCava ("LaCava") is an adult individual who resides in the Commonwealth of Pennsylvania.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

 24. LaCava is an employee of Road-Con.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

 25. LaCava is a member of the United Steelworkers.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

 26. The employees of Road-Con, Neshaminy, Loftus, and PKF have chosen the United Steelworkers to be their bargaining representative.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

 27. The collective-bargaining agreement between PFK and the United Steelworkers

governs the terms and conditions of employment at PKF.

**ANSWER:**  The City objects to this Request on the grounds that it calls for a legal conclusion that is an ultimate legal issue in the case.  Subject to and without waiver of the foregoing objection, after reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

28. Road-Con, Neshaminy, Loftus, and PKF have completed many projects for state and federal agencies, including PennDOT and SEPTA, which include projects owned by those agencies located within the City.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

29. On November 29, 2011, then-Mayor Michael A. Nutter signed the Executive Order 15-11.

**ANSWER:**  Admitted.

30. An authentic copy of Executive Order 15-11 is attached as Exhibit "C."

**ANSWER:**  Admitted.

31. Attached to the Executive Order 15-11 is a document entitled "Philadelphia Public Projects Labor Agreement."

**ANSWER:**  Admitted.

32. An authentic copy of the Philadelphia Public Projects Labor Agreement is attached to this stipulation as Exhibit "D."

**ANSWER:**  Admitted.

33. On December 31, 2015, then-Mayor Michael A. Nutter signed the Executive Order 8-15.

**ANSWER:** Admitted.

34. An authentic copy of Executive Order 8-15 is attached as Exhibit "E."

**ANSWER:** Admitted.

35. Attached to the Executive Order 8-15 is a document entitled "Philadelphia Public Projects Labor Agreement."

**ANSWER:** Denied.  There is no document entitled "Philadelphia Public Projects Labor Agreement attached to Executive Order 8-15.

36. This Philadelphia Public Projects Labor Agreement serves as a model project labor agreement for the city to use when it decides to impose a project labor agreement on a public-works project.

**ANSWER:** The City objects to this Request on the grounds that the term "model" is vague and undefined.  The City admits only that the Philadelphia Public Projects Labor Agreement serves as a template and that the City may modify the template for particular projects.

37. The City has been imposing project labor agreements on all public-works construction projects with an estimated cost in excess of $3,000,000.

**ANSWER:** Denied.

38. The City and the Mayor have imposed project labor agreements even when a City Agency has not recommended a PLA for a particular public-works project.

**ANSWER:** Denied.

39. The unions currently affiliated with the Philadelphia Building & Construction Trades Council are:

a. I.B.E.W. Local 98;

7

b. I.B.E.W. Local 269;

c. I.B.E.W. Local 654;

d. Elevator Constructors Local 5;

e. SEIU 32BJ;

f. Insulators & Allied Workers Local 14;

g. Insulators & Allied Workers Local 89;

h. Cement Masons Plasters Union Local 592;

i. Operative Plasters and Cement Masons' Local 8;

j. Iron Workers Local 401;

k. Iron Workers Local 451;

l. Laborers' District Council of the Metropolitan Philadelphia Area and Vicinity;

m. Laborers' Local 135;

n. Laborers' Local 57;

o. Laborers' Local 332;

p. Laborers' Local 413;

q. Operating Engineers Local 835;

r. Operating Engineers Local 542;

s. Painters & Allied Trades, District Council 21;

t. Plumbers Local 690;

u. Reinforced Iron Workers Riggers & Machinery Movers Local Union 405;

v. Roofers Local 30;

w. IATSE Local 8;

x. Sheetmetal Workers Local 19;

y. Sprinklerfitters Local 692;

z. Steamfitters Local 420;

aa. Teamster Locals 312, 384, and 107; and

bb. Bricklayers and Allied Craftworkers Local 1.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

40. As of the date on which this request for admission is answered, the United Steelworkers is neither a member nor an affiliate of the Building Trades Council.

**ANSWER:** Admitted.

41. As of the date on which this request for admission is answered, the City has never included the United Steelworkers in any of its project labor agreements.

**ANSWER:** Admitted.

42. A true and correct copy of the city's response to an e-mail inquiry sent by Road-Con on March 28, 2019, is attached at Ex. "F."

**ANSWER:** Admitted. However, the City makes no admission with respect to the admissibility of Ex. F into evidence.

43. Road-Con, Neshaminy, Loftus, and PKF are qualified in all respects to perform work on City public-works projects that are subject to a project labor agreement.

**ANSWER:** Denied.

44. At the time the original complaint in this lawsuit was filed on April 18,

2019, the Mayor and the City were imposing project labor agreements on all public works construction projects procured by the City with an estimated cost in excess of $3,000,000.

**ANSWER:**  Denied.

45. In March 2019, the City issued a solicited bids for the 15th Street Bridge Project.

**ANSWER:**  Admitted.

46. The bidding for the 15th Street Bridge Project opened on April 23, 2019.

**ANSWER:**  Denied.  Per the PHL Contracts website, opening of bids for this project occurred on April 30, 2019.

47. At the time the original complaint in this lawsuit was filed on April 18, 2019, the city was using a project labor agreement on the 15th Street Bridge Project.

**ANSWER:**  Denied as stated.  The City admits that at the time the original complaint in this lawsuit was filed, the city planned to use a project labor agreement for the 15th Street Bridge Project.  However, the City withdrew the Project Labor Agreement for this Project and the project proceeded without any Project Labor Agreement.

48. An authentic copy of the Project Labor Agreement that was originally part of the solicitation for the 15th Street Bridge Project is attached at Exhibit "G."

**ANSWER:**  Admitted.

49. Plaintiffs Road-Con, Neshaminy, and Loftus were interested in submitting bids for the 15th Street Bridge Project at the time the original

complaint was filed on April 18, 2020.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.  At this time, the City can admit only that Plaintiff Road-Con submitted a bid for the 15th Street Bridge Project.

50. Plaintiffs Road Con, Neshaminy, and Loftus are qualified to perform the work on the 15th Street Bridge Project.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.  At this time, the City can admit only that Plaintiffs Road-Con and Loftus were recommended for qualification to bid on the 15th Street Bridge Project.

51. Plaintiff Road Con, Neshaminy, and Loftus have been pre-qualified by PennDOT to perform the type of work necessary to complete the 15th Street Bridge Project.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

52. Because Road-Con, Neshaminy, and Loftus maintain a collective bargaining agreement with the United Steelworkers, they cannot perform work on the 15th Street Bridge Project with their current workforces.

**ANSWER:**  The City objects to this Request on the grounds that it calls for a legal conclusion that is an ultimate legal issue in the case.  Subject to and without waiver of the foregoing objection, after reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

53. At the time the original complaint in this lawsuit was filed on April 18,

2019, LaCava could not work on the 15th Street Bridge Project unless he became a member of one of the unions listed in Schedule A of the 15th Street Bridge Project Labor Agreement and supported that union financially.

**ANSWER:**  The City objects to this Request on the grounds that it calls for a legal conclusion that is an ultimate legal issue in the case.  Subject to and without waiver of the foregoing objection, after reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

54. In March 2019, the City solicited bids for the Runway Project.

**ANSWER:**  Admitted.

55. At the time the original complaint in this lawsuit was filed on April 18, 2019, the city was using a project labor agreement on the Runway Project (the "Runway Project PLA").

**ANSWER:**  Denied as stated.  The City admits that at the time the original complaint in this lawsuit was filed, the city planned to use a project labor agreement for the Runway Project.  However, the City withdrew the Project Labor Agreement for this Project and the project proceeded without any Project Labor Agreement.

56. An authentic copy of the Runway Project PLA that was originally a part of the solicitation for the Runway Project is attached at Exhibit "H."

**ANSWER:**  Admitted.

57. Plaintiffs Road-Con and Loftus were interested in submitting bids for the Runway Project at the time the original complaint was filed on April 18, 2020.

**ANSWER:**  After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.  At this time, the City can

admit only that Plaintiff Road-Con submitted a bid for the Runway Project.

58. Plaintiffs Road-Con and Loftus are qualified to perform the work on the Runway Project.

**ANSWER:** After reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request. At this time, the City can admit only that Plaintiff Road-Con was recommended for qualification to bid on the Runway Project.

59. Because Road-Con and Loftus maintain a collective-bargaining agreement with the United Steelworkers, they could not perform work on the Runway Project with their current workforces at the time the original complaint was filed.

**ANSWER:** The City objects to this Request on the grounds that it calls for a legal conclusion that is an ultimate legal issue in the case. Subject to and without waiver of the foregoing objection, after reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

60. Because Road-Con and Loftus maintain a collective-bargaining agreement with the United Steelworkers, they could not perform work on the Runway Project with their current workforces at the time the original complaint was filed.

**ANSWER:** The City objects to this Request on the grounds that it calls for a legal conclusion that is an ultimate legal issue in the case. Subject to and without waiver of the foregoing objection, after reasonable inquiry, the information that the City knows or can readily obtain is insufficient to enable it to admit or deny this Request.

Date: June 29, 2020                                    Respectfully Submitted,

/s/ Lydia Furst_____
Amy M. Kirby
Deputy City Solicitor
Pa. Attorney ID No. 323938
Lydia M. Furst
Deputy City Solicitor
Pa Attorney ID No. 307450
City of Philadelphia
Law Department
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
(215) 683-3573
amy.kirby@phila.gov
lydia.furst@phila.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I served a true and correct copy of the foregoing Responses and Objections to Plaintiffs' Requests for Admission by email on the following counsel:

Walter S. Zimolong
Zimolong, LLC
P.O. Box 552
Villanova, Pennsylvania 19085
(215) 665-0842
wally@zimolonglaw.com

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs*

BY:   /s/ Lydia Furst
        Deputy City Solicitor

Dated:  June 29, 2020

Exhibit D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | |
|---|---|
| **Road-Con, Inc.**; **Neshaminy Constructors, Inc.**; **Loftus Construction, Inc.**; **PKF-Mark III, Inc.**; and **Scott A. LaCava**, <br><br> Plaintiffs, <br><br> v. <br><br> **City of Philadelphia**; and **James Kenney**, in his official capacity as mayor of the City of Philadelphia, <br><br> Defendants. | Case No. 2:19-cv-01667-JS |

## STIPULATION

The parties stipulate to the following:

The city used a project labor agreement on a majority of the public-works construction projects with an estimated cost in excess of $3,000,000 procured by the City from January 1, 2016, to April 18, 2019.


JONATHAN F. MITCHELL
Pennsylvania Bar No. 91505
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs*

Dated: September 1, 2020

LYDIA FURST
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania 19102
(215) 683-3566
lydia.furst@phila.gov

*Counsel for Defendants*

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROAD-CON, INC, et al., | : | |
| *Plaintiffs,* | : | Civil No: 2:19-cv-01667 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADEPHIA, et al. | : | |
| *Defendants.* | : | |

I, Richard Lazer, make this declaration and aver as follows:

1.      I am the Deputy Mayor of Labor for the City of Philadelphia (the "City").

2.      In my capacity as Deputy Mayor of Labor, I am the primary point-of-contact for the City's labor community and I am responsible for labor policy within the Philadelphia Department of Labor.  I oversee the Department of Labor, which manages negotiations and grievance resolution with the City's internal bargaining units.

3.      In my capacity as Deputy Mayor of Labor, I am also responsible for reviewing and either approving or rejecting all recommendations for use of Project Labor Agreements ("PLAs") submitted to the Mayor's Office by City Agencies.

4.      The City uses PLAs to ensure that complex, multi-trade and time-sensitive projects are completed in a timely and efficient manner.

5.      The City's PLAs contain provisions that provide for labor harmony and avoid work stoppages on projects.

6.      The City's PLAs also contain provisions related to diversity and inclusion within the labor organizations that sign on to City PLAs.  During my time as Deputy Mayor of Labor, I have seen improvement in the diversity of workforces used on City projects that require PLAs.  I believe these improvements are due, at least in part, to the City's use of PLAs.

7.      The 15th Street Bridge Project initially included a PLA because the complex and time-sensitive nature of the work demanded it.  The work on this project required close coordination between contractors and several utility companies.  In addition, if the 15th Street Bridge Project was delayed, it also would have delayed the police department's move to its new headquarters.

8.      The Runway Project at Philadelphia Northeast Airport also initially included a PLA because it was time-sensitive and required multiple trades.  Delay on this project would have impacted airport operations.

9.      In the past, the United Steelworkers union has not been a signatory to City PLAs, for several reasons.

10.     Many City contracts do not involve the type of heavy road work projects which United Steelworkers-affiliated contractors typically perform, so the United Steelworkers have not been selected as an appropriate labor union for some projects.

11.     Further, in or around 2018 the City engaged in discussions with the United Steelworkers in an attempt to include the United Steelworkers as a signatory to the City's PLAs. The discussions were ultimately unsuccessful because the United Steelworkers believed that their organization could not comply with the diversity and inclusion goals of the City's PLAs.

12.     Prior to the 15th Street Bridge and Runway Projects, I am not aware of any time when United Steelworkers-affiliated contractors notified the City of their interest in bidding on a specific City public works project that required a PLA to which the United Steelworkers were not a party.

13.     After this case was filed in April 2018, the City has re-evaluated its practices with respect to PLAs.  During this re-evaluation period, the City has refrained from using PLAs on

2

projects. From April 18, 2019 to the present, the City has solicited a bid for one project that required a PLA, which was a re-bid of a project that was originally bid prior to the filing of this lawsuit.

14.     On October 15, 2020, Mayor James Kenney signed a new Executive Order related to PLAs, which rescinded Executive Order 8-15. A copy of the new Executive Order is attached to this Declaration as Attachment 1.

15.     The new Executive Order removes the dollar threshold for PLAs and tailors the PLA recommendation process to the factors that Pennsylvania courts have focused on in evaluating the use of PLAs by government entities, such as the size and complexity of a project, the need for multiple trades, and an inflexible construction deadline.

16.     If the City decides to use a PLA on a project in the future and it is a project for which the United Steelworkers may be an appropriate labor organization, the United Steelworkers will be provided an opportunity to sign on to the PLA before bids are solicited for the project.

17.     I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Date:   December 1, 2020

RICHARD LAZER
Philadelphia Deputy Mayor of Labor

# Attachment 1

# EXECUTIVE ORDER NO. _____

## PUBLIC WORKS PROJECT LABOR AGREEMENTS

WHEREAS, the Courts in Pennsylvania have provided guidance on when certain government projects, because of their critical deadlines, are generally appropriate for Project Labor Agreements; and

WHEREAS, the City has gained useful insight into when Project Labor Agreements are appropriate and beneficial to the City; and

WHEREAS, the City's history with Project Labor Agreements has demonstrated that such agreements are a valuable public contracting approach for ensuring that a building or construction work project is completed at the lowest reasonable cost, by the highest quality and most professional work force, and in a timely manner without labor disruptions such as strikes, lockouts, or slowdowns; and

WHEREAS, the City of Philadelphia ("City") has a compelling interest in awarding building or construction work contracts so as to yield the lowest reasonable costs and the highest standard of quality and efficiency;

NOW, THEREFORE, by the powers vested in me by the Philadelphia Home Rule Charter, it is hereby ORDERED:

**SECTION 1. Definitions**

(a) <u>Appropriate Labor Organization.</u>  An organization representing, for purposes of collective bargaining, journeymen in one or more crafts or trades with a Federal or State-certified apprenticeship training program, and which:

    i.    has entered into a labor agreement with an employer in the building and construction industry;

    ii.    has represented journeymen, mechanics, and apprentices employed on projects similar to the Project for which a Project Labor Agreement is being considered;

    iii.    possesses the present ability to refer, provide, or represent qualified journeymen and apprentices in the crafts or trades required by the Project, in sufficient numbers to perform the contracted work involved in the project; and

iv.  has identified member diversity as an organizational value and has established objectives for maintaining and increasing diversity among its apprentice and journeyman members.

b) <u>City Agency</u>.  A City office, department, board, commission, or other entity that procures goods and services directly or through the City Procurement Department.

(c) <u>Project.</u>  The work performed at a specified location or under specified City contracts.

(d) <u>Project Labor Agreement</u>.   A collective bargaining agreement between a contractor as an employer and an Appropriate Labor Organization and relating to a Project.  Such an agreement sets forth the terms and conditions of employment for workers hired by the employer and sets forth certain work rules, no-strike clauses, jurisdictional determinations and other Project-specific provisions that the City or the Labor Organization deem important for the completion of the Project.  All Project Labor Agreements shall be subject to the review and approval of the City's Office of Labor and Law Department.

## SECTION 2.  Recommendations for Project Labor Agreements

(a) When a City Agency has determined that a Project is appropriate for a Project Labor Agreement, the City Agency shall provide the Mayor's Office of Labor ("Office of Labor") with a written description of the Project and the City Agency's recommendation for a Project Labor Agreement.

(b) The recommendation of the appropriateness and feasibility of using a Project Labor Agreement shall specifically address the following factors:

i.  The need for completion without delay, and without the interruption of strikes, lockouts, or any work stoppage or slowdown that affects a Project;

ii.  The need for effective and timely mechanisms for resolution of disputes; and

iii.  The need for a ready and adequate supply of highly skilled and highly trained craft workers for the performance of the Project.

## SECTION 3.  Approval for Project Labor Agreement

(a) The Office of Labor shall review all recommendations in consultation with the Law Department. All Project Labor Agreements shall be subject to the review and approval of the City's Office of Labor and Law Department.

(b) If the Office of Labor determines that the Project may benefit from a Project Labor Agreement, the Office of Labor shall identify and contact the Appropriate

Labor Organizations regarding their interest and willingness to enter into a Project Labor Agreement.

(c) The Office of Labor may determine that a Project Labor Agreement will benefit from third-party monitoring of the opportunities provided for qualified City residents, minorities, and women. If so determined, the Office of Labor will direct the Labor Standards Unit to select and contract with a qualified monitor ("Monitor").  If a Monitor is engaged for the Project, the cost shall be shared by the City contractor(s) and the Appropriate Labor Organizations.

## SECTION 4.  Required Provisions In Project Labor Agreements

Any Project Labor Agreement entered into pursuant to this Executive Order shall:

(a) Contain guarantees against strikes, lockouts, slowdowns, and similar actions;

(b) Set forth effective, immediate, and mutually binding procedures for resolving jurisdictional disputes;

(c) Include diversity goals for Appropriate Labor Organizations and contractors;

(d) Make clear that no employee shall be required to be or become a member of an Appropriate Labor Organization or pay any agency fees to an Appropriate Labor Organization, as a condition of performing work under the Project Labor Agreement. Any provision in a Project Labor Agreement that requires an employee to be, or become, a member of Appropriate Labor Organization, or to pay any agency fees to an Appropriate Labor Organization, shall be unenforceable, null, and void; and

(e) Be consistent with rulings of Pennsylvania courts and other courts of competent jurisdiction.

## SECTION 5.  Procedures for Project Labor Agreements

If a Project Labor Agreement is used pursuant to this Executive Order for any Project, the procedures listed in this section shall be followed:

(a) A Project Labor Agreement shall be made part of the bid specifications in a form approved by the City's Law Department;

(b) The instructions to bidders shall provide that the City, the Project manager, and any contractor shall have the absolute right to select any qualified bidder for the award of Project contracts without reference to whether the bidder was unionized; provided, however, that only a bidder willing to execute and comply with the Project Labor Agreement would be designated the successful bidder;

3

(c) The instructions to bidders shall provide that the Project Labor Agreement shall be made binding on all contractors and subcontractors on the Project through inclusion of appropriate bid specifications in all relevant bid documents;

(d) Following the award of the contract for the Project, the Project Labor Agreement shall be finalized and executed by the contractor or its project manager; and

(e) The Project contract and the Project Labor Agreement shall comply with all other provisions of law.

**SECTION 6.  Prior Order Rescinded**

Executive Order No. 8-15 is hereby rescinded.

**SECTION 7.  Effective Date**

This Executive Order shall take effect immediately.


_10/15/20_
Date

James F. Kenney, Mayor

4

# Exhibit F



# CITY OF PHILADELPHIA

**JAMES F. KENNEY, Mayor**

Mayor's Office of Labor

**RICHARD LAZER**
**Deputy Mayor for Labor**
205 City Hall
Philadelphia, PA   19107
(215) 686-2163

November 26, 2018

Wally Zimolong, Esquire
353 West Lancaster Avenue, Suite 300 |
Wayne, PA  19087
Mailing Address:  P.O. Box 552, Villanova, PA  19085-0552
wally@zimolonglaw.com

Dear Mr. Zimolong,

The City has given your correspondence a thorough review.  Our conclusion is that the City is willing to include in City Project Labor Agreements (PLAs) the language that had previously been used in a PennDOT PLA.  That language is:

In the event that a contractor bound by a Collective Bargaining Agreement (CBA) with the United Steelworkers (USW) is the successful bidder, the contractor will be permitted to utilize its WSW workforce and its USW CBA provided that the contractor adheres to the conditions and economic terms of the agreement excluding any hiring hall obligation or union security provision. And provided further that the USW contractor is either a protected contractor, under the terms of the Harmony Agreement of February 24, 1994 or has been organized by USW pursuant to paragraph 3 (b) of the Harmony Agreement for at least 120 days prior to the issuance of any bid specification for the Project and provided that it normally performs the type of work being let in the geographical area of the project.

The City is not considering other changes to its standard PLA.

In addition to the USW contractor agreeing to City bid requirements, including City Economic Opportunity Plans and other City workforce and subcontracting provisions, the City requires that the United Steelworkers agree to the conditions of Schedule C of the PLA.  The City will require a letter from the appropriate leadership of the United Steelworkers affirming its agreement with the Union obligations in Schedule C.

Specifically, the Union obligations are as follows:

Section 2. Union Activities.

(a)   The Union(s) shall collect demographic data on participation in the Public Works Project. The Union(s) shall provide that information to the City on monthly basis while the Project Labor Agreement is in effect.

(b)   The Union(s) shall set participation goals that will significantly increase participation of minority males and women. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

(c)   The Union(s) shall establish goals for participation of in apprenticeship programs for minority males and women. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

(d)   The Union(s) shall actively recruit minority males and women for apprenticeship positions. Outreach efforts must be appropriate for reaching minority males and women and consistent with the goals the Union(s) have established for membership of the Union(s).

(e)   The Union(s) shall evaluate alternatives to apprenticeship recruitment for adding minority males and women to membership.

(f)   The Union(s) shall each identify a representative who shall be responsible for reporting on each Union's progress in improving opportunities for minority males and women.

I have attached a draft PLA including the USW inclusion language.  It is found in Article I Section 8 (page 4).  I have also included for your convenience a separate copy of Schedule C which may be attached and referred to in the letter to the City from the United Steelworkers.

I believe the approach described above addresses the concerns you have raised about the City's PLA.  We can begin including the new USW language in PLAs as soon as we have received the required affirmation from the United Steelworkers.

Sincerely,

Richard Lazer
Deputy Mayor for Labor

Exhibit G



**UNITED STEELWORKERS**

**UNITY AND STRENGTH FOR WORKERS**

Writer's Direct Dial: (412) 562 2548
Writer's E-mail: nkilbert@usw.org
Writer's Direct Fax: (412) 562-2429

January 3, 2019

*Via first-class mail and email to Rich.Lazer@phila.gov*

Richard Lazer
Deputy Mayor for Labor
205 City Hall
Philadelphia, PA 19107

Deputy Mayor Lazer,

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("USW") is interested in becoming a party to City of Philadelphia Project Labor Agreements. I have reviewed your November 26, 2018, letter to Wally Zimolong regarding a revised PLA that would permit USW-represented contractors to utilize their workforces and their collective bargaining agreements with the USW on City projects.

The USW has a few questions related to the obligations contained in Schedule C of the PLA. The USW desires to increase the representation of minority men and women in construction occupations, and it would take seriously its obligations under Schedule C if it became a party to a City of Philadelphia PLA. The USW desires to know what participation goals under Schedule C have been found to be appropriate, both for the project workforce and for apprenticeship programs, for other unions and on other projects. The USW also wishes to understand what types of outreach efforts to minority men and women are regarded as appropriate and what alternatives to apprenticeship recruitment it should consider evaluating. Would it be possible for your office to answer these questions or to provide example reports of compliant activities by other unions (redacted, if necessary)?

Finally, the USW is concerned with the third party monitoring discussed in Schedule C. Could you indicate whether any current projects are subject to such monitoring, and how many projects have been subject to such monitoring since 2008? What range of costs could be expected if third party monitoring is implemented on a specific project?

Thank you for your efforts at facilitating USW participation in City of Philadelphia projects. We appreciate any information you could provide.

Sincerely yours,

Nathan Kilbert
Assistant General Counsel

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

60 Boulevard of the Allies, Pittsburgh, PA  15222 • 412-562-2400 • www.usw.org     Plaintffs0976

# Exhibit H

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| ROAD-CON, INC, et al., | : | |
| *Plaintiffs,* | : | Civil No: 2:19-cv-01667 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADEPHIA, et al. | : | |
| *Defendants.* | : | |

I, Richard Lazer, make this declaration and aver as follows:

1.      I am the Deputy Mayor of Labor for the City of Philadelphia (the "City").

2.      In my capacity as Deputy Mayor of Labor, I am the primary point-of-contact for the City's labor community and I am responsible for labor policy within the Philadelphia Department of Labor.  I oversee the Department of Labor, which manages negotiations and grievance resolution with the City's internal bargaining units.

3.      In my capacity as Deputy Mayor of Labor, I am also responsible for reviewing and either approving or rejecting all recommendations for use of Project Labor Agreements ("PLAs") submitted to the Mayor's Office by City Agencies.

4.      In my previous Declaration in this case, I stated that discussions with the United Steelworkers regarding their inclusion as a signatory to the City's PLAs "were ultimately unsuccessful because the United Steelworkers believed that their organization could not comply with the diversity and inclusion goals of the City's PLAs." In this statement, I was attempting to reference and summarize a January 3, 2019 letter from the United Steelworkers to me, which specifically expressed concern regarding a provision of Schedule C to the City's template PLA related to monitoring.

5.      I understand that Plaintiffs in this case subsequently amended their pleadings and now claim that the City did not allow the United Steelworkers to sign on to the City's PLAs because the United Steelworkers' membership was not sufficiently diverse. This is incorrect.

6.      To the contrary, the City's PLAs do not and have never required contractors or labor organizations to meet any percentage of minority or female employees or members.

7.      Further, it is my understanding that the United Steelworkers shared the City's goal of increasing diversity in construction occupations. I had no concern regarding the United Steelworkers' ability or willingness to undertake best efforts to recruit a diverse membership.

8.      Rather, the United Steelworkers expressed financial concerns about whether they could agree to a provision of the PLA related to monitoring, to which all other PLA signatories were bound. I understood the *Allan Myers* decision to mean that the City could not treat one signatory labor organization differently from the others, and I became concerned that the United Steelworkers would not agree to this subsection of Schedule C and that the manner in which we were attempting to include the United Steelworkers would not be in compliance with *Allan Myers*.

9.      The City has not used a PLA on a City project since April 2019. If the City decides to use a PLA on a project in the future and it is a project for which the United Steelworkers may be an appropriate labor organization, the United Steelworkers will be provided an opportunity to sign on to the PLA before bids are solicited for the project.

10.     I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

is true and correct.


Date:   December 6, 2021

_____

RICHARD LAZER
Philadelphia Deputy Mayor of Labor

# Exhibit I

**UNITED STEELWORKERS**

*Writer's Direct Dial: 412-562-2545*
*Writer's Facsimile: 412-562-2574*
*djury@usw.org*

November 8, 2021

**UNITY AND STRENGTH FOR WORKERS**

<u>**All By Electronic Mail Only**</u>

Walter Stephen Zimolong (wally@zimolonglaw.com)
Zimolong LLC
P.O. Box 552
Villanova, PA 19085

Edward T. Kang (ekang@kanghaggerty.com)
Kang Haggerty & Fetbroyt LLC
123 South Broad Street, Suite 1670
Philadelphia, PA 19109

Amy Marie Kirby (amy.kirby@phila.gov)
City of Philadelphia
1515 Arch Street, 15th Floor
Philadelphia, PA 19102

RE:   **Road-Con, Inc. et al. v. City of Philadelphia et al.,**
      **Case No.: 2:19-cv-01667 (E.D. Pa.)**

Dear Mr. Zimolong, Ms. Kirby, and Mr. Kang:

On behalf of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"), I am writing to you in your capacity as counsel for the parties in *Road-Con, Inc. et al. v. City of Philadelphia et al.*, No. 2:19-cv-01667 (E.D. Pa.). USW recently learned of the Third Amended Complaint filed in this litigation, to which USW is not a party.[1]  We write in the interest of ensuring that the USW's positions concerning the matters in dispute are not misrepresented or misunderstood.

For more than a decade, USW and its affiliated local unions have urged the City of Philadelphia ("City") to amend its project labor agreements ("PLAs") to permit contractors who have entered into collective bargaining agreements with the USW to bid on construction projects subject to a PLA. Those attempts have not been successful.

We remind the litigants that the Building and Construction Trades Department ("BCTD") and USW are parties to an agreement—known as the Harmony Agreement—that has the express purpose of ensuring that workers represented by a BCTD affiliate and workers represented by a USW affiliate can work side-by-side on construction projects in certain states, including Pennsylvania. Given that the Harmony Agreement bars BCTD affiliates from striking, picketing,

---

[1]   The plaintiffs are four contractors, each of which has employees represented by USW, and Scott Lacava, who, according to the Third Amended Complaint, was a member of a USW affiliate. Mr. Lacava is not and was not an employee or agent of USW and, as a consequence, does not speak for the USW.

**United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union**

60 Boulevard of the Allies, Pittsburgh, PA  15222 • 412-562-2400 • www.usw.org          City_0111

Road-Con, Inc. letter To Parties
November 8, 2021
RE:  Road-Con, Inc. et al. v. City of Philadelphia et al.,
Page 2

or utilizing other economic-pressure tactics because a USW-represented contractor is performing
work on a project, there is no viable pro-competitive justification for the City to agree to a PLA
that prevents USW-represented contractors from submitting a bid. Thus, as alleged in Count 3 of
the Third Amended Complaint, USW agrees with the plaintiffs that excluding USW-represented
contractors from bidding on construction projects violates Pennsylvania and City of Philadelphia
competitive-bidding laws.  In the interest of resolving this matter, USW urges the City and all
affected parties to consent to permitting USW-represented contractors participate in these and
other City PLAs.

USW does not, however, agree that the PLAs violate the U.S. Constitution or federal law,
as plaintiffs allege in Counts 1 and 2 of their Third Amended Complaint.  We disagree that PLA
provisions requiring recognition of signatory unions as the exclusive bargaining representative of
all employees working on the project violates the First Amendment as these provisions do not
impermissibly infringe on an individual's right to join (or right to refrain from joining) any labor
union.  We further disagree that the diversity-and-inclusion provisions of Schedule C of the PLAs
violate the Fourteenth Amendment or 42 U.S.C. § 1981, and, consequently, we reject the premise
for subsection (g) of the prayer for relief, which requests that the court "enjoin the defendants from
disfavoring or discriminating against the United Steelworkers . . . on account of its willingness to
agree to the city's diversity-and-inclusion goals."

None of the plaintiffs have standing to assert any harm on USW's behalf, let alone ascribe
particular Constitutional or statutory theories to this labor organization.  Rather, as USW made
clear in Nathan Kilbert's January 3, 2019 letter to the City's Deputy Mayor for Labor Richard
Lazer, USW strongly supports the efforts of the City and other jurisdictions to increase minority
and female representation in construction occupations, and we remain willing to comply with the
requirements of Schedule C as soon as we receive answers to the clarifying questions we sought
nearly three years ago.

Respectfully submitted,

David R. Jury
General Counsel

DRJ/cp

cc:     *(All By E-mail Only)*
        Jonathan F. Mitchell (jonathan@mitchell.law)
        Lydia M. Furst (lydia.furst@phila.gov)
        Susan Moon O (so@khflaw.com)

Exhibit J

# MEMORANDUM     CITY OF PHILADELPHIA

## STREETS DEPARTMENT

TO : Rich Lazer, Deputy Mayor for Labor, Office of Mayor James F. Kenney

FROM : Carlton Williams, Streets Commissioner

DATE : December 27, 2018

**SUBJECT : PLA Recommendation Request**
**15th Street Bridge Rehab over City Branch Railroad Cut – Bid # 3858**

The Streets Department is in the process of finalizing the advertisement package for the subject public works contract and we would like to recommend the inclusion of a project labor agreement (PLA).

The scope of this project is for the demolition and removal of the superstructure and portions of north abutment; Removal and replacement of reinforced concrete deck over the entire structure; superstructure jacking and temporary support; removal and replacement of the caps of pier 1 and pier 2; utility relocation; and the installation of a curb barrier, security fence, street lighting, right-of-way fence, traffic lights, ADA-compliant curb ramps, and pavement markings required to facilitate two-way traffic on Callowhill Street; milling and repaving, as well as other related miscellaneous construction. The engineer's estimate for the project is $7,731,830.  Funding for this project will be 100 percent City Capital funds, including approximately $1.6M City funds anticipated from Department of Public Property.  A PLA form is attached.

We therefore request your review of our recommendation.

Attachment

Cc:
        J. Barry Davis, Law
        B. Bak, Airport
        M. Cintron, MDO
        V. Fleysh
        J. Janiszewski, Procurement
        R. Montanez
        A. Santaniello
        N. Sen
        M. Webb

# Streets Project Labor Agreement

| Work Number: TBD | Bid Number:    3858 | Date:        12/26/2018 |
|---|---|---|

| | | |
|---|---|---|
| Title: | 15th Street Bridge Rehab over City Branch Railroad Cut | Engineer's Estimate:  $7,712,368.00 |
| | | Material Estimate:        $6,169,894.40 |
| | | Labor Estimate:           $1,542,473.60 |

**Description of Project:**
Demolition and removal of the superstructure and portions of north abutment; Removal and replacement of reinforced concrete deck over the entire structure; superstructure jacking and temporary support; removal and replacement of the caps of pier 1 and pier 2; utility relocation; and the installation of a curb barrier, security fence, street lighting, right-of-way fence, traffic signals at several intersections, ADA-compliant curb ramps, and pavement markings required to facilitate two-way traffic on Callowhill Street; roadway resurfacing, as well as other related miscellaneous construction.

**Anticipated Dates:**

| | |
|---|---|
| Bid Opening: | **2/7/2019** |
| Awarded: | **5/15/2019** |
| NTP: | **6/15/2019** |
| Completion: | **7/15/2020** |

**List Anticipated Trades:**

| | |
|---|---|
| laborers | operating engineers |
| cement finishers | iron workers |
| teamsters | Painters |

**Describe Complexity of Work:**
Coordination between contractors substantially complicates this project. The low bidder must coordinate access with Keating Inquirer Builders and several utility companies (Veolia, PECO, Verizon). In addition, the work is to be completed in stages, and because most of the steel members are remaining in place, there will be significant jacking of the bridge to accomodate pier and abutment work.

**Describe any Time Constraints:**
Work must be completed prior to Police move-in by end of calendar year 2020.

**Other Factors:**
None

**Streets Recommendation:**

Include a PLA in the Contract

| | |
|---|---|
| _Carlton Willis_ | _12/27/18_ |
| Streets Commissioner Signature | Date |

**15TH STREET BRIDGE REHABILITATION**
**COST ESTIMATE**
**FOR**
**CITY OF PHILADELPHIA**

| ITEM NO. | ITEM NAME | QUAN | UOM | UNIT PRICE | COST |
|---|---|---|---|---|---|
| 0201-0001 | CLEARING AND GRUBBING | 1 | LS | $ 20,000.00 | $ 20,000.00 |
| 0203-0001 | CLASS 1 EXCAVATION | 28 | CY | $ 150.00 | $ 4,200.00 |
| 0203-0004 | CLASS 1B EXCAVATION | 41 | CY | $ 68.00 | $ 2,788.00 |
| 0204-0100 | CLASS 3 EXCAVATION | 100 | CY | $ 56.00 | $ 5,600.00 |
| 0220-0001 | FLOWABLE BACKFILL, TYPE A | 25 | CY | $ 100.00 | $ 2,500.00 |
| 0350-0104 | SUBBASE 4" DEPTH (NO. 2A) | 111 | SY | $ 31.00 | $ 3,441.00 |
| 0350-0106 | SUBBASE 6" DEPTH (NO. 2A) | 107 | SY | $ 60.00 | $ 6,420.00 |
| 0411-0482 | SUPERPAVE ASPHALT MIXTURE DESIGN, WMA WEARING COURSE, PG 64-22, 0.3 TO < 3 MILLION ESALS, 9.5 MM MIX, 1 1/2" DEPTH, SRL-H | 11084 | SY | $ 15.00 | $ 166,260.00 |
| 0411-1592 | SUPERPAVE ASPHALT MIXTURE DESIGN, WMA WEARING COURSE (LEVELING), PG 64-22, 3 TO < 10 MILLION ESALS, 9.5 MM MIX, SRL-H | 10.5 | Ton | $ 150.00 | $ 1,575.00 |
| 0411-6450 | SUPERPAVE ASPHALT MIXTURE DESIGN, WMA BINDER COURSE, PG 64-22 0.3 TO <3 MILLION ESALS, 19.0 MM MIX, 2 1/2" DEPTH | 82 | SY | $ 37.00 | $ 3,034.00 |
| 0411-6470 | SUPERPAVE ASPHALT MIXTURE DESIGN, WMA BINDER COURSE, PG 64-22, 0.3 TO < 3 MILLION ESALS, 19.0 MM MIX | 3.5 | Ton | $ 200.00 | $ 700.00 |
| 0460-0001 | BITUMINOUS TACK COAT | 10977 | SY | $ 0.35 | $ 3,841.95 |
| 0501-0028 | PLAIN CEMENT CONCRETE PAVEMENT, 8" DEPTH | 131 | SY | $ 125.00 | $ 16,375.00 |
| 0505-0001 | BRIDGE APPROACH SLAB | 48 | SY | $ 800.00 | $ 38,400.00 |
| 0608-0001 | MOBILIZATION | 1 | LS | $ 280,000.00 | $ 280,000.00 |
| 4609-0002 | INSPECTOR'S FIELD OFFICE AND INSPECTION FACILITIES, TYPE A INDOOR LAVATORY AND ADDITIONAL EQUIPMENT | 1 | LS | $ 35,000.00 | $ 35,000.00 |
| 0609-0009 | EQUIPMENT PACKAGE | 1 | LS | $ 5,000.00 | $ 5,000.00 |
| 4624-0001 | RIGHT-OF-WAY FENCE TYPE 1 WITH ARMS, 8' HEIGHT | 50 | LF | $ 28.50 | $ 1,424.91 |
| 0630-0001 | PLAIN CEMENT CONCRETE CURB | 91 | SY | $ 35.50 | $ 3,230.50 |
| 0630-0010 | PLAIN CEMENT CONCRETE CURB, INCLUDING REMOVAL OF EXISTING CURB | 56 | LF | $ 100.00 | $ 5,600.00 |
| 0643-0001 | TEMPORARY CONCRETE BARRIER, STRUCTURE MOUNTED | 51 | LF | $ 120.00 | $ 6,120.00 |
| 0644-0001 | TEMPORARY CONCRETE BARRIER, STRUCTURE MOUNTED, RESET | 51 | LF | $ 60.00 | $ 3,060.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4676-0002 | CEMENT CONCRETE SIDEWALK SEALED JOINTS | 111 | SY | $ | 150.00 | $ | 16,650.00 |
| 4686-0050 | CONSTRUCTION SURVEYING, TYPE D PHILADELPHIA STANDARD | 1 | LS | $ | 15,000.00 | $ | 15,000.00 |
| 0688-0002 | MICROCOMPUTER WITH BATTERY BACKUP SYSTEM, TYPE A | 1 | LS | $ | 5,000.00 | $ | 5,000.00 |
| 0689-0003 | CPM SCHEDULE | 1 | LS | $ | 7,500.00 | $ | 7,500.00 |
| 0845-0001 | UNFORESEEN WATER POLLUTION CONTROL | 5000 | DOLL | $ | 1.00 | $ | 5,000.00 |
| 0849-0001 | ROCK CONSTRUCTION ENTRANCE MODIFIED | 2 | EACH | $ | 3,000.00 | $ | 6,000.00 |
| 0855-0003 | PUMPED WATER FILTER BAG | 1 | EACH | $ | 350.00 | $ | 350.00 |
| 0855-0004 | REPLACEMENT PUMPED WATER FILTER BAG | 2 | EACH | $ | 300.00 | $ | 600.00 |
| 0860-0000 | INLET FILTER BAG FOR TYPE M INLET | 1 | EACH | $ | 200.00 | $ | 200.00 |
| 0860-0002 | INLET FILTER BAG FOR TYPE C INLET | 3 | EACH | $ | 200.00 | $ | 600.00 |
| 0867-0012 | COMPOST FILTER SOCK, 12" DIAMETER | 300 | LF | $ | 10.00 | $ | 3,000.00 |
| 4901-0001 | MAINTENANCE AND PROTECTION OF TRAFFIC DURING CONSTRUCTION PHILADELPHIA STANDARD | 1 | LS | $ | 275,000.00 | $ | 275,000.00 |
| 0910-4065 | CONDUCTOR | 150 | LF | $ | 5.00 | $ | 750.00 |
| 0910-4113 | AWG 2 ABOVE GROUND CABLE, COPPER, 1 CONDUCTOR | 450 | LF | $ | 4.00 | $ | 1,800.00 |
| 0910-5175 | 2" EXPOSED CONDUIT | 150 | LF | $ | 41.00 | $ | 6,150.00 |
| 0910-5255 | 2" CONDUIT IN STRUCTURE | 12 | LF | $ | 23.00 | $ | 276.00 |
| 0910-7210 | TESTING OF ENTIRE LIGHT SYSTEM | 1 | LS | $ | 3,900.00 | $ | 3,900.00 |
| 0956-0500 | PEDESTRIAN PUSH BUTTON | 2 | EA | $ | 500.00 | $ | 1,000.00 |
| 0960-0005 | 6" WHITE HOT THERMOPLASTIC PAVEMENT MARKINGS | 6000 | LF | $ | 2.00 | $ | 12,000.00 |
| 0960-0021 | 24" WHITE HOT THERMOPLASTIC PAVEMENT MARKINGS | 3350 | LF | $ | 8.00 | $ | 26,800.00 |
| 0960-0101 | WHITE HOT THERMOPLASTIC LEGEND, "ONLY", 8' - 0" | 5 | EA | $ | 200.00 | $ | 1,000.00 |
| 0960-0118 | WHITE HOT THERMOPLASTIC LEGEND, "BICYCLE WITH RIDER", 8' - 0" X 4-0" | 4 | EA | $ | 370.00 | $ | 1,480.00 |
| 0960-0222 | WHITE HOT THERMOPLASTIC LEGEND, "RIGHT ARROW", 12' - 0" X 3' - 0" | 3 | EA | $ | 150.00 | $ | 450.00 |
| 0960-0224 | WHITE HOT THERMOPLASTIC LEGEND, "LEFT ARROW", 12' - 0" X 3' - 0" | 2 | EA | $ | 150.00 | $ | 300.00 |
| 0960-0228 | WHITE HOT THERMOPLASTIC LEGEND, "THRU AND RIGHT ARROW", 20' - 0" X 3' - 7" | 1 | EA | $ | 200.00 | $ | 200.00 |
| 0963-0001 | PAVEMENT MARKING REMOVAL | 550 | SF | $ | 7.00 | $ | 3,850.00 |
| 1001-0010 | CLASS A CEMENT CONCRETE | 3 | CY | $ | 820.00 | $ | 2,460.00 |
| 1001-0730 | SELECTED BORROW EXCAVATION, STRUCTURAL BACKFILL | 104 | CY | $ | 75.00 | $ | 7,800.00 |
| 1001-0910 | CLASS AA CEMENT CONCRETE | 1 | CY | $ | 1,690.00 | $ | 1,690.00 |
| 1001-0960 | CLASS AAAP CEMENT CONCRETE | 310 | CY | $ | 1,375.00 | $ | 426,250.00 |

| 1002-0052 | REINFORCEMENT BARS, EPOXY COATED | 112430 | LB | $ | 1.89 | $ | 212,492.70 |
|---|---|---|---|---|---|---|---|
| 5017-0000 | PRESSURE MORTAR POINTING, REPOINT EXISTING | 26 | LF | $ | 575.00 | $ | 14,950.00 |
| 5018-0050 | REMOVAL OF PORTION OF EXISTING BRIDGE IN URBAN AREA | 1 | LS | $ | 250,000.00 | $ | 250,000.00 |
| 1019-0040 | PROTECTIVE COATING FOR REINFORCED CONCRETE SURFACES (PENETRATING SEALERS, REINFORCED CONCRETE SUBSTRUCTURE SURFACES) | 138 | SY | $ | 20.00 | $ | 2,760.00 |
| 1019-0050 | PROTECTIVE COATING FOR REINFORCED CONCRETE SURFACES (PENETRATING SEALERS, BRIDGE SUPERSTRUCTURE) | 1568 | SY | $ | 18.00 | $ | 28,224.00 |
| 1026-0015 | NEOPRENE STRIP SEAL DAM, (3" MOVEMENT) | 52 | LF | $ | 495.00 | $ | 25,740.00 |
| 1056-0100 | FABRICATED STRUCTURAL STEEL | 55823 | LB | $ | 9.00 | $ | 502,407.00 |
| 1056-0470 | SHEAR CONNECTORS | 3092 | EA | $ | 6.00 | $ | 18,552.00 |
| 5070-0150 | PAINTING EXISTING STRUCTURAL STEEL USING ORGANIC ZINC COATING SYSTEMS | 1 | LS | $ | 600,000.00 | $ | 600,000.00 |
| 1091-0331 | EPOXY INJECTION CRACK SEAL | 67 | LF | $ | 74.00 | $ | 4,958.00 |
| 9000-0001 | LED ROADWAY LUMINAIRE | 3 | EA | $ | 850.00 | $ | 2,550.00 |
| 9000-0002 | REMOVE STREET LIGHT POLE | 3 | EA | $ | 2,900.00 | $ | 8,700.00 |
| 9000-0003 | STREET LIGHT POLE, 15" BOLT CIRCLE | 3 | EA | $ | 4,000.00 | $ | 12,000.00 |
| 9000-0004 | STREET LIGHTING BRACKET, 6 FEET | 3 | EA | $ | 500.00 | $ | 1,500.00 |
| 9000-0005 | REPLACE EXISTING BEARING | 72 | EA | $ | 3,600.00 | $ | 259,200.00 |
| 9000-0006 | STEEL REPAIR | 24280 | LB | $ | 18.00 | $ | 437,040.00 |
| 9000-0007 | METAL CURB BARRIER | 239 | LF | $ | 230.00 | $ | 54,970.00 |
| 9000-0008 | REPLACE LONGITUDINAL JOINT | 252 | LF | $ | 725.00 | $ | 182,700.00 |
| 9000-0009 | SUBSTRUCTURE CONCRETE REPAIR, TYPE 2 | 361 | SF | $ | 120.00 | $ | 43,320.00 |
| 9000-0010 | CLEAN BRIDGE SEATS | 1 | LS | $ | 5,100.00 | $ | 5,100.00 |
| 9000-0013 | TEMPORARY SHIELDING | 1 | LS | $ | 300,000.00 | $ | 300,000.00 |
| 9000-0014 | JACKING BRIDGE SUPERSTRUCTURE WITH TEMPORARY SUPPORT OF STRUCTURES | 1 | LS | $ 1,050,000.00 | | $ 1,050,000.00 | |
| 9000-0015 | SOUTH ABUTMENT RECONSTRUCTION | 1 | LS | $ | 46,000.00 | $ | 46,000.00 |
| 9000-0016 | REPLACE CONCRETE PIER CAP AT PIER 2 | 1 | LS | $ | 50,000.00 | $ | 50,000.00 |
| 9000-0017 | NORTH ABUTMENT RECONSTRUCTION | 1 | LS | $ | 175,000.00 | $ | 175,000.00 |
| 9000-0018 | SECURITY FENCE | 278 | LF | $ | 90.00 | $ | 25,020.00 |
| 9000-0019 | NEOPRENE STRIP SEAL DAM, (4.5" MOVEMENT) | 52 | LF | $ | 655.00 | $ | 34,060.00 |
| 9000-0020 | DOWEL HOLES | 474 | EA | $ | 46.00 | $ | 21,804.00 |
| 9000-0021 | TEMPORARY SUPPORT OF UTILITIES | 1 | LS | $ | 75,000.00 | $ | 75,000.00 |
| 9000-0022 | POWER SUPPLY (PECO COORDINATION) | 12000 | DOLLA | $ | 1.00 | $ | 12,000.00 |
| 9000-0023 | CONTAINMENT | 1 | LS | $ | 250,000.00 | $ | 250,000.00 |
| 9000-0024 | WORKER HEALTH AND SAFETY | 1 | LS | $ | 100,000.00 | $ | 100,000.00 |
| 9000-0025 | BRONZE INSCRIPTION TABLET | 2 | EA | $ | 2,000.00 | $ | 4,000.00 |
| 9000-0101 | REPLACEABLE DETECTABLE WARNING SURFACE | 144 | SF | $ | 40.00 | $ | 5,760.00 |
| 9000-0107 | RELOCATE FIRE HYDRANT | 1 | EA | $ | 12,000.00 | $ | 12,000.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9000-0153 | INLET PROTECTION, CURBED | 9 | EA | $ | 250.00 | $ | 2,250.00 |
| 9000-0326 | RESET PWD MANHOLE FRAME AND COVER (36" AND SMALLER) | 10 | EA | $ | 1,000.00 | $ | 10,000.00 |
| 9000-0327 | RESET PWD MANHOLE FRAME AND COVER (GREATER THAN 36") | 10 | EA | $ | 1,200.00 | $ | 12,000.00 |
| 9000-0362 | RESET CITY INLET TOP | 9 | EA | $ | 200.00 | $ | 1,800.00 |
| 9000-0365 | REBUILD INLET | 5 | CY | $ | 750.00 | $ | 3,750.00 |
| 9000-0406 | FIBER OPTIC ETHERNET COMMUNICATIONS APPLIANCE 1G LAYER, 2 SWITCH | 4 | EA | $ | 5,000.00 | $ | 20,000.00 |
| 9000-0408 | FIBER OPTIC PATCH CABLE, LC CONNECTORS | 4 | EA | $ | 50.00 | $ | 200.00 |
| 9000-0410 | SYSTEM SUPPORT EQUIPMENT | 1 | LS | $ | 10,000.00 | $ | 10,000.00 |
| 9000-0411 | OPERATIONAL SUPPORT PERIOD | 1 | LS | $ | 10,000.00 | $ | 10,000.00 |
| 9000-0451 | ATMS INTEGRATION AND SOFTWARE MODIFICATIONS, CITY OF PHILADELPHIA | 26000 | DOLLA | $ | 1.00 | $ | 26,000.00 |
| 9000-0600 | UNFORSEEN CONSTRUCTION | 1 | DOLLA | $ | 60,000.00 | $ | 60,000.00 |
| 9000-0633 | MILLING, FULL WIDTH (MATERIAL RETAINED BY CONTRACTOR) | 10895 | SY | $ | 5.00 | $ | 54,475.00 |
| 9000-0637 | MILLING, ADJUSTMENT AREA (MATERIAL RETAINED BY CONTRACTOR) | 1500 | SY | $ | 10.00 | $ | 15,000.00 |
| 9000-0790 | UNIFORM TRAFFIC CONTROL OFFICERS | 1 | DOLLA | $ | 50,000.00 | $ | 50,000.00 |
| 9000-0900 | SCHOOL FLASHER ASSEMBLY | 1 | EA | $ | 4,000.00 | $ | 4,000.00 |
| 9000-0962 | WIRELESS CMMUNICATION SYSTEM | 3 | EA | $ | 8,900.00 | $ | 26,700.00 |
| 9000-0964 | WIRELESS COMMUNICATIONS SYSTEM SITE SURVEY | 1 | LS | $ | 41,000.00 | $ | 41,000.00 |
| 9000-1000 | EXCAVATION FOR WATER MAINS | 90 | CY | $ | 57.00 | $ | 5,130.00 |
| 9000-1001 | 6" DIAMETER DUCTILE IRON PIPE, PUSH-ON JOINT | 10 | LF | $ | 70.00 | $ | 700.00 |
| 9000-1002 | 8" DIAMETER DUCTILE IRON PIPE, PUSH-ON JOINT | 120 | LF | $ | 94.00 | $ | 11,280.00 |
| 9000-1003 | 8" DIAMETER 0.25" THICK STEEL PIPE AND APPURTENANCE MATERIALS, INCLUDING COUPLINGS AND FROST PROTECTION | 270 | LF | $ | 225.00 | $ | 60,750.00 |
| 9000-1004 | COMPACT DUCTILE IRON FITTINGS, STANDARD PRESSURE | 0.5 | TON | $ | 5,000.00 | $ | 2,500.00 |
| 9000-1005 | 6" STANDARD PRESSURE GATE VALVE WITH STANDARD VALVE BOX | 1 | EA | $ | 4,150.00 | $ | 4,150.00 |
| 9000-1006 | 8" STANDARD PRESSURE GATE VALVE WITH STANDARD VALVE BOX | 2 | EA | $ | 4,940.00 | $ | 9,880.00 |
| 9000-1007 | 1" INCH MANUAL AIR VALVE WITH STEEL CHAMBERS | 1 | EA | $ | 2,220.00 | $ | 2,220.00 |
| 9000-1008 | STANDARD PRESSURE FIRE HYDRANT WITH CENTER COMPRESSION LOCK | 1 | EA | $ | 7,820.00 | $ | 7,820.00 |
| 9000-1009 | REMOVE FIRE HYDRANT AND VALVE, STANDARD PRESSURE | 1 | EA | $ | 750.00 | $ | 750.00 |
| 9000-1010 | REMOVE HIGH PRESSURE FIRE HYDRANT AND VALVE | 2 | EA | $ | 1,165.00 | $ | 2,330.00 |
| 9000-1011 | CONCRTE ANCHOR | 8 | CY | $ | 81.00 | $ | 648.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9000-1012 | FURNISHING, PLACING, AND COMPACTING SELECT BACKFILL MATERIALS (2RC) | 110 | CY | $ | 17.00 | $ | 1,870.00 |
| 9000-1013 | INSTALLATION OF PWD FACILITIES ON STRUCTURES | 1 | LS | $ | 20,000.00 | $ | 20,000.00 |
| 9000-1014 | EXCAVATION FOR PIPE SEWERS INCLUDING SHEATING AND SHORING | 20 | CY | $ | 178.00 | $ | 3,560.00 |
| 9000-1015 | 15 INCH INLET CONNECTION | 15 | LF | $ | 206.00 | $ | 3,090.00 |
| 9000-1016 | FILLING ABANDONED MANHOLES | 1 | EA | $ | 465.00 | $ | 465.00 |
| 9000-1017 | 4 FOOT OPEN MOUTH GRATE INLET | 1 | EA | $ | 8,425.00 | $ | 8,425.00 |
| 9000-1200 | REMOVE STREET LIGHT ARM & LUMINAIRE FROM WOOD POLE | 1 | EA | $ | 750.00 | $ | 750.00 |
| 9000-1221 | RESET PWD WATER VALVE BOX | 10 | EA | $ | 500.00 | $ | 5,000.00 |
| 9000-1230 | REPLACE PWD WATER VALVE FRAME AND COVER | 10 | EA | $ | 400.00 | $ | 4,000.00 |
| 9000-1512 | STREET LIGHT LUMINAIRE | 9 | EA | $ | 1,200.00 | $ | 10,800.00 |
| 9000-1593 | 12' STREET LIGHTING BRACKET | 9 | EA | $ | 600.00 | $ | 5,400.00 |
| 9000-2001 | CONDUIT TRENCHING AND RESTORATION | 873 | LF | $ | 200.00 | $ | 174,600.00 |
| 9000-2005 | PVC STREETLIGHTING CONDUIT, 2" | 560 | LF | $ | 8.00 | $ | 4,480.00 |
| 9000-2007 | PVC STREETLIGHT CONDUIT ELBOW, 2" | 31 | EA | $ | 30.00 | $ | 930.00 |
| 9000-2009 | PVC TRAFFIC CONDUIT, 3" | 763 | LF | $ | 10.00 | $ | 7,630.00 |
| 9000-2011 | PVC TRAFFIC CONDUIT, 3" ELBOW | 36 | EA | $ | 45.00 | $ | 1,620.00 |
| 9000-2017 | COMPOSITE JUNCTION BOX, 12" X 18" X 12" | 6 | EA | $ | 900.00 | $ | 5,400.00 |
| 9000-2019 | CIRCULAR COMPOSITE JUNCTION BOX, 39" OD X 24" | 3 | EA | $ | 4,200.00 | $ | 12,600.00 |
| 9000-2023 | TRAFFIC C-POST, 20' | 6 | EA | $ | 3,500.00 | $ | 21,000.00 |
| 9000-2024 | PECO SERVICES | 2 | EA | $ | 1,800.00 | $ | 3,600.00 |
| 9000-2025 | TRAFFIC D-POLE | 9 | EA | $ | 4,000.00 | $ | 36,000.00 |
| 9000-2026 | UTILITY MANHOLE MODIFICATION | 2 | EA | $ | 1,700.00 | $ | 3,400.00 |
| 9000-2027 | STANDARD FOUNDATION (D-POLE) | 9 | EA | $ | 3,500.00 | $ | 31,500.00 |
| 9000-2033 | TRAFFIC SIGNAL SUPPORT, 30' MAST ARM | 3 | EA | $ | 9,600.00 | $ | 28,800.00 |
| 9000-2045 | STANDARD FOUNDATION, TYPE 1 (35' OR LESS) | 3 | EA | $ | 3,800.00 | $ | 11,400.00 |
| 9000-2051 | PEDESTRIAN SIGNAL HEAD, COUNTDOWN | 22 | EA | $ | 900.00 | $ | 19,800.00 |
| 9000-2055 | SOLID STATE CONTROLLER CABINET, TYPE 333 | 2 | EA | $ | 30,000.00 | $ | 60,000.00 |
| 9000-2056 | SOLID STATE CONTROLLER CABINET, TYPE 336 | 1 | EA | $ | 30,000.00 | $ | 30,000.00 |
| 9000-2059 | TRAFFIC SIGNAL CABLE, 5 CONDUCTOR | 574 | LF | $ | 5.00 | $ | 2,870.00 |
| 9000-2061 | TRAFFIC SIGNAL CABLE, 30 CONDUCTOR | 889 | LF | $ | 15.00 | $ | 13,335.00 |
| 9000-2063 | ELECTRICAL SERVICE WIRE - #6 AWG | 790 | LF | $ | 8.00 | $ | 6,320.00 |
| 9000-2065 | TRIPLEX SERVICE CABLE | 30 | LF | $ | 6.00 | $ | 180.00 |
| 9000-2067 | AERIAL ELECTRICAL SERVICE CONNECTION | 2 | EA | $ | 1,100.00 | $ | 2,200.00 |
| 9000-2070 | COMMUNICATION CABLE, FIBER OPTIC, 48 STRAND, UNDERGROUND | 711 | LF | $ | 8.00 | $ | 5,688.00 |
| 9000-2072 | REMOVAL OF TRAFFIC SIGNS | 16 | EA | $ | 50.00 | $ | 800.00 |
| 9000-2074 | METRO STREET NAME SIGN 12" X 48" | 8 | EA | $ | 650.00 | $ | 5,200.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9000-2075 | METRO STREET NAME SIGN 12" X 36" | 2 | EA | $ | 650.00 | $ | 1,300.00 |
| 9000-2076 | METRO/ONEWAY STREET NAME SIGN 24" X 36" | 2 | EA | $ | 700.00 | $ | 1,400.00 |
| 9000-2077 | OVERHEAD STREET NAME SIGN | 12 | SF | $ | 100.00 | $ | 1,200.00 |
| 9000-2079 | 3-SECTION, 12" TRAFFIC SIGNAL HEAD, POLE MOUNT | 20 | EA | $ | 1,500.00 | $ | 30,000.00 |
| 9000-2084 | VIDEO DETECTION SYSTEM, 1 CAMERA | 1 | EA | $ | 7,000.00 | $ | 7,000.00 |
| 9000-2088 | REMOVAL OF TRAFFIC SIGNAL EQUIPMENT PER INTERSECTION | 4 | EA | $ | 5,000.00 | $ | 20,000.00 |
| 9000-2089 | REMOVE STREET LIGHT & FOUNDATION | 4 | EA | $ | 3,500.00 | $ | 14,000.00 |
| 9000-2093 | TRAFFIC SIGN, POST MOUNTED | 23 | EA | $ | 150.00 | $ | 3,450.00 |
| 9000-5001 | DESIGN OF CURB RAMPS (BY QUADRANT) | 10 | EA | $ | 2,000.00 | $ | 20,000.00 |
| 9000-5002 | CONSTRUCTION OF ADA RAMPS (BY QUADRANT), CONCRETE | 10 | EA | $ | 20,000.00 | $ | 200,000.00 |
| 9073-2001 | DISPOSAL OF BRIDGE WASTE | 1 | LS | $ | 150,000.00 | $ | 150,000.00 |
| | | | | **TOTAL** | | $ 7,731,830.06 | |

# Exhibit K

# PNE – Runway 6-24 Pavement Rehabilitation – Package – 2
## PROJECT #: PNE-0340.24, BID #:6478
## Construction Trades Analysis
## MEMORANDUM

DATE:     12/11/2018
TO:        Keith Brune
FROM:   Amna Ali, PMP
RE:         Construction Trades Analysis

**Purpose:**
Evaluate the anticipated trades associated with the construction activity for Project – PNE Runway 6-24 Pavement Rehabilitation – Package – 2

**Scope of the Project:**
This project involves the pavement rehabilitation of approximately 2200 feet of Runway 6-24 from the southerly portion of Package – 1 including Taxiway J and Taxiway C. It also includes Taxiway A as a part of Bid Alternate # 1.  The existing Runway pavement is in a distressed condition. This project will eliminate the distressed pavement and also modify the taxiway connectors to the latest FAA standards. In addition to the pavement rehabilitation, it also involves installation of electrical components like runway edge lights, signs and sign foundations, duct work. This project will also entail pavement markings and runway grooving.

**Evaluation:**

The engineer's estimate for this project is $8.1 M (BASE BID) and $1.5 M in Bid Alternate #1, exceeding PLA (Executive Order No. 8-15) threshold of $3,000,000; thus, a formal evaluation is needed.

The evaluation of anticipated trades associated with the construction activity for the above project compares the activity and associated cost total to the anticipated trades necessary to complete the activity. Typically, airport related construction falls under the trade guidelines for heavy/highway construction given the similarities of materials and placement techniques. The heavy/highway construction trades involved in airport related construction typically include the following:

    1. Carpenters        (United Brotherhood of Carpenters)
    2. Cement Masons  (Cement Masons and Plasterers Union)
    3. Electricians       (International Brotherhood of Electrical Workers)
    4. Laborers          (Laborers Union)
    5. Operators        (International Union of Operating Engineers)
    6. Teamsters       (International Brotherhood of Teamsters)

The current construction cost estimate for this project is $9.6 million (**including Base Bid and Bid Alternate # 1**). In general, for heavy/highway construction, labor costs represents 15 to 20 percent of a project item's unit price. The labor cost associated with trucking and barging materials typically represents an additional 15 to 30 percent of a project item's unit price. With the abundance of electrical and civil earthwork and paving work associated with this package, a total of 50 percent was used to determine the anticipated labor cost.

Table 1 presents the major construction activity and a breakdown of the anticipated construction value of each of these major activities. The table also includes the trade involvement and associated labor costs anticipated for each major activity.

**Table 1 – Project Trades for Runway 6-24 Pavement Rehabilitation**

| Major Project Activity | Anticipated Construction Value (millions) | Anticipated Trade Involvement | Anticipated Labor Cost (millions) |
|---|---|---|---|
| *General Administrative Items*<br>- Mobilization<br>- Safety and Security | $0.7 | Teamsters, Operators and Laborers | $0.35 |
| *Earthwork and Paving*<br>- Excavation<br>- Site Grading<br>- Removal and Disposal of Asphalt Pavement<br>- Asphalt Paving<br>- Airfield Markings | $6.5 | Teamsters, Operators, Laborers, Carpenters | $3.25 |
| *Electrical Construction Items*<br>- Removal of existing electrical structures<br>- Installation of signs<br>- Installation of conduits<br>- Installation of signs<br>- Installation of PAPIs | $2.4 | Electricians, Cement Masons | $1.2 |
| **Total** | **$9.6** | | **$4.8** |

**PLA Recommendation:**

This project meets the criteria in Executive Order 8-15 and requires phasing to allow aircraft to move in a safe and timely manner, with minimal disruptions, across the PNE airfield.  In order to support the safe and efficient completion of the project by ensuring the availability of effective mechanism for dispute resolution among the trades, the Division of Aviation recommends that a PLA be established for this important airfield project.

_____          12/11/2018
          Signature                                Date

Exhibit L

Albert D. Hoffman
September 25, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - -

ROAD-CON, INC., NESHAMINY    :  CIVIL ACTION
CONSTRUCTORS, INC., LOFTUS   :  NO. 2:19-cv-01667-JS
CONSTRUCTION, INC.,          :
PKF-MARK III, and SCOTT A.   :
LACAVA                       :
                 Plaintiffs, :
                             :
       -V-                   :
                             :
CITY OF PHILADELPHIA and     :
JAMES KENNEY, IN HIS         :
OFFICIAL CAPACITY AS MAYOR   :
OF THE CITY OF PHILADELPHIA  :
                 Defendants. :


- - - - - - - - - - - - - - - -


- - -


Friday, September 25, 2020


- - -



ORAL ZOOM DEPOSITION OF ALBERT D.

HOFFMAN, taken pursuant to the Subpeona, held remotely

and by Zoom videoconference in Pennsylvania, commencing

at 9:00 a.m., before SHARON RICCI, RMR, CRR - Notary

Public there being present.

Albert D. Hoffman
September 25, 2020

Page 2

A P P E A R A N C E S:


ZIMOLONG, LLC

BY:        WALTER S. ZIMOLONG, ESQUIRE
           P.O. Box 552
           Villanova, PA 19085
           (215)665-0842
           wally@zimolonglaw.com

           Representing the Plaintiffs



KANG, HAGGERTY & FETBROYT, LLC

BY:        MICHAEL SCOTT WEINERT, ESQUIRE
           123 S. Broad Street, Suite 1670
           Philadelphia, PA 19109
           (215)525-5850
           mweinert@khflaw.com

           Representing the Intervenors



CITY OF PHILADELPHIA LAW DEPARTMENT

BY:        LYDIA FURST, ESQUIRE
           AMY KIRBY, ESQUIRE
           1515 Arch Street, 15th Floor
           Philadelphia, PA 19102
           (215)683-3573
           lydia.furst@phila.gov
           amy.kirby@phila.gov

           Representing the Defendants


ALSO PRESENT:  Karli Ramirez, Intern for City of Phila
               Thomas Isenberg, Rep for PKF-Mark III

Albert D. Hoffman
September 25, 2020

Page 3

I N D E X

WITNESS                                   PAGE

ALBERT HOFFMAN
(Witness sworn)                            6

EXAMINATION BY:

MS. FURST:                                6,33
MR. WEINERT:                               31
MR. ZIMOLONG:                              36

- - -

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| HOFFMAN 1 | STATUS CONTRACT SHEET | 12 |
| HOFFMAN 6 | AFFIDAVIT | 24 |

- - -

Albert D. Hoffman
September 25, 2020

Page 4

1          COURT REPORTER:  Counsel, I will

2    read a stipulation into the record.  Please

3    bear with me, as it is long.

4               It is hereby stipulated and agreed

5    by and between counsel for all parties present

6    that pursuant to 231 Pa. Code 4002 this

7    deposition is being conducted by Zoom

8    conference, that the court reporter, all

9    counsel, and the witness are all in separate

10   remote locations and participating via Zoom

11   conference meeting under the control of

12   Strehlow & Associates Court Reporting Service,

13   that the officer administering the oath to the

14   witness need not be in the place of the

15   deposition and the witness shall be sworn in

16   remotely by the court reporter after

17   confirming the witness's identity, that this

18   Zoom conference will not be recorded unless

19   previously noticed as a videotaped deposition

20   and that any recording without the express

21   written consent of all parties shall be

22   considered unauthorized, in violation of law,

23   and shall not be used for any purpose in this

24   litigation or otherwise.

25               It is further stipulated that

Albert D. Hoffman
September 25, 2020

Page 5

1  exhibits may be marked by the attorney

2  presenting the exhibit to the witness, and

3  that a copy of any exhibit presented to a

4  witness shall be emailed to or otherwise in

5  possession of all counsel prior to any

6  questioning of a witness regarding the exhibit

7  in question.  All parties shall bear their own

8  costs in the conduct of this deposition by

9  Zoom conference.

10              So stipulated, counsel?

11              MS. FURST:  Lydia Furst, counsel

12  for the City of Philadelphia.  And, yes, I

13  agree to the stipulation.

14              MR. WEINERT:  Michael Weinert,

15  counsel for intervenors.  Yes, I agree to the

16  stipulation.

17              MR. ZIMOLONG:  And counsel for

18  plaintiffs, Wally Zimolong.  We stipulate.

19              MS. KIRBY:  And Amy Kirby, attorney

20  for the City of Philadelphia.  We agree to the

21  stipulation.

22              MR. ZIMOLONG:  Real quick, Lydia is

23  on and Amy is on as well.  Just to be clear,

24  there's only one attorney doing the

25  questioning today?

Albert D. Hoffman
September 25, 2020

1              MS. KIRBY:  Yes.  Lydia is handling

2         this morning, I'm going to be handling this

3         afternoon.

4              MR. ZIMOLONG:  Fair enough.

5              ...ALBERT HOFFMAN, after having

6         been first duly sworn, was examined and

7         testified as follows:

8              – – –

9         DIRECT EXAMINATION

10             – – –

11   BY MS. FURST:

12   Q.    Good morning, Mr. Hoffman.  My name is Lydia

13   Furst, I'm an attorney for the City of Philadelphia, and

14   I'm representing the defendants in this case, along with

15   my co-counsel, Amy Kirby.

16             Mr. Hoffman, have you ever been deposed

17   before?

18   A.    Yes.

19   Q.    Okay.  So I'll just run through the ground rules

20   really, really quickly.  As you already know, the court

21   reporter is here taking down everything everyone says,

22   so rather than nodding your head yes or no, you'll need

23   to provide a verbal answer to questions.

24             We should still, even though we're doing this

25   remotely, try to avoid crosstalk so that everything is

Albert D. Hoffman
September 25, 2020

Page 7

1    clear to the court reporter.  So I will do my best to

2    avoid interrupting you, and I just ask that you do the

3    same for me.

4              If, at any time, you need to take a break,

5    please just let us know and we can do that.  I would

6    only ask that you not take a break in the middle of a

7    question pending, so wait until you've answered the

8    question and ask to take a break, and we can do that at

9    any time.

10             Does that all sound okay?

11   A.      That's fine.

12   Q.      Okay.  And, Mr. Hoffman, is there any reason that

13   you cannot answer questions truthfully today?

14   A.      No.

15   Q.      Okay.  What is your current job?

16   A.      I'm the president of Road-Con Incorporated, heavy

17   and highway contractor in West Chester, PA.

18   Q.      And how long have you held that position at

19   Road-Con?

20   A.      As president, for approximately three years.

21   Overall, I've been with the company 25 years.

22   Q.      And just briefly, can you describe for me what

23   your duties are as president of Road-Con?

24   A.      Overall supervision and oversight of the entire

25   company's operations, including procurement, management

Albert D. Hoffman
September 25, 2020

Page 8

1   of the projects, management of our resources and shop,

2   and general accounting functions.

3   Q.      And what position did you hold prior to

4   president?

5   A.      Vice president.

6   Q.      Okay.  And can you again just briefly describe

7   what your duties were as vice president of Road-Con?

8   A.      Same overall duties except I had a superior at

9   that time.

10  Q.      Okay.  And how long were you in the position of

11  vice president for?

12  A.      Approximately 20 years.

13  Q.      As president, do you have a role in choosing

14  which contracts Road-Con will bid on?

15  A.      I do.

16  Q.      And as vice president, did you also have a role

17  in choosing which contracts Road-Con bids on?

18  A.      Yes, I did.

19  Q.      Going back to your role as president, is there

20  anyone else at Road-Con who's involved in the

21  decision-making upon choosing which projects Road-Con

22  will bid on?

23  A.      My chief estimator, Murray Blaker, would suggest

24  projects for us to target, however, I have the final say

25  whether we move ahead or not.

Albert D. Hoffman
September 25, 2020

1   Q.      Okay.  And then in your role as vice president,

2   who else was involved in making decisions as to which

3   projects Road-Con would bid on?

4   A.      The current president at that time, Edward J.

5   McKenna.

6   Q.      And was the chief estimator also involved in

7   decision-making around bidding while your were vice

8   president?

9   A.      At the time he came on board, which was

10  approximately four to five years ago, yes, at that point

11  he was involved.  Prior to that, he was not in

12  the -- the position was not here at Road-Con.

13  Q.      Okay.  So just to clarify, until five years ago,

14  there was no estimator at Road-Con?

15  A.      No, there was no chief estimator's position.  I

16  would take care of the estimating, along with other

17  project management staff, and then we added the position

18  of chief estimator.

19  Q.      When did Road-Con commence business?

20  A.      The company was incorporated in 1993.

21  Q.      And sorry if I'm doing the math wrong, but does

22  that mean you've been with the company since it was

23  founded?

24  A.      Shortly thereafter, yes.

25  Q.      Is Road-Con a member of the Pennsylvania Heavy

Albert D. Hoffman
September 25, 2020

Page 10

 1   and Highway Contractors Bargaining Association?

 2   A.      We are.

 3   Q.      And when did Road-Con become a member of that

 4   association?

 5   A.      Upon inception of the company, in 1993.  The

 6   company was a buy -- or transfer from another company,

 7   Rocon, R-O-C-O-N.  That company was a member of the

 8   Bargaining Association, therefore, the new company

 9   continued in that fashion.

10   Q.      Okay.  And is Road-Con still a member of that

11   association?

12   A.      Yes.

13   Q.      Were there ever any lapses in Road-Con's

14   membership in that association?

15   A.      No.

16   Q.      So you've mentioned the term "heavy and highway."

17           Can you just describe for me what type of

18   construction work does that term include?

19   A.      That would include road and street construction,

20   airports, bridgework, sewer treatment plants, all --

21   that's what we classify as heavy construction, in lieu

22   of what it does not include, such as, commercial and

23   residential building.

24   Q.      How much of Road-Con's business is Public Works

25   projects?

Albert D. Hoffman
September 25, 2020

Page 11

1   A.     Over 95 percent.

2   Q.     What is a typical contract amount for Road-Con?

3   A.     Our contracts range from $200,000 to $60 million,

4   however, our average size would most likely be in the 5

5   to $15 million range.

6   Q.     Okay.  Mr. Hoffman, I would just like to show you

7   what I've previously marked as Hoffman Exhibit 1.  And

8   I -- I don't know if you have this yet, but I did email

9   it around to counsel last night.

10                    MR. ZIMOLONG:  I haven't shared any

11             of the documents with the witness.  I got them

12             late last night.  I'm just seeing them now.

13             So you would have to share the screen.

14                    MS. FURST:  What I may do -- unless

15             the court reporter tells me this is not a good

16             idea -- is to put it in the chat.  I think

17             that just might be smoother.  Let me see if I

18             can do that.

19                    MR. ZIMOLONG:  Off the record.

20                         - - -

21                    (A brief discussion was held off

22             the record.)

23                         - - -

24                    MS. FURST:  Okay.  I apologize for

25             the delay, everyone.  I had to rotate the

Albert D. Hoffman
September 25, 2020

Page 12

1              image so it was not sideways.

2                        - - -

3                        (Exhibit Hoffman 1 marked for

4              identification.)

5                        - - -

6    BY MS. FURST:

7    Q.     Mr. Hoffman, can you see this document on the

8    screen?

9    A.     Yes, I can.

10   Q.     Okay.  And this has been marked as Hoffman 1.

11          And is this familiar to you, Mr. Hoffman, this

12   document?

13   A.     That looks like one of our status of contract

14   sheets that we often put in when an owner requests

15   qualifications or current backlog.

16   Q.     Okay.  So starting on the first page, it says at

17   the top, 2019 contracts.  And then looking at the

18   contract prices, is it accurate that all of the contract

19   prices on this page are under one million?

20   A.     On that page, yes.

21   Q.     Okay.  And then we'll go to the next page, which

22   is 2018 contracts.

23          And then there is it accurate that the contract

24   listed in the very first row is for 12 million and

25   change, and the rest of the contracts on that page for

Albert D. Hoffman
September 25, 2020

Page 13

1    2018 are for 2 million or less; is that right?

2    A.     That's correct.

3    Q.     And then just one more page.  Let's just look at

4    the third page, which is 2017 contracts.

5           So just to confirm here, the second row from

6    the top is a contract for approximately $3 million; is

7    that right?

8    A.     Yes.

9    Q.     Just over $3 million.

10          And then three rows below that, there's a

11   contract for underlying $5 million; is that right?

12   A.     That is correct.

13   Q.     And then if you scroll down to the bottom, the

14   second row from the bottom is a contract for

15   approximately $3 and a half million; is that

16   correct?

17   A.     That is correct.

18   Q.     But the rest of these contracts reflected on this

19   page for 2017 are all less than $3 million; is that

20   right?

21   A.     Yes.

22   Q.     Okay.  And is this document a summary of all of

23   Road-Con's contracts for these years?

24   A.     Depending on when that document was printed, it

25   may or may not be all-inclusive.  For example, 2019 does

Albert D. Hoffman
September 25, 2020

Page 14

1    not appear to be all-inclusive.

2              We generally have 20 or more contracts per

3    year.  So that looks to be an incomplete document.  It

4    may have been printed during the course of 2019.

5    Q.    Understood.  So setting aside 2019, does this

6    appear to be accurate for the years 2018 or 2017?

7    A.    To the best of my knowledge, yes.  I don't

8    believe I can remember every project off the top of my

9    head.  It appears to be complete.

10   Q.    Okay.  I'm going to end the screenshare.

11             So, Mr. Hoffman, is it fair to say that

12   Road-Con has many contracts under $3 million?

13   A.    Yes, we have a good portion that fall under 3

14   million, depending on market conditions and the

15   availability of work, yes.

16   Q.    You said that Road-Con is located in West

17   Chester; is that correct?

18   A.    That is our home office location, yes.

19   Q.    In what states does Road-Con work?

20   A.    Pennsylvania, New Jersey, Delaware, occasionally

21   Maryland, although we have not been down in Maryland for

22   quite some time.

23   Q.    Okay.  Anywhere else?

24   A.    No.  That's generally our geographical area.

25   Q.    Focusing on Pennsylvania, what parts of

Albert D. Hoffman
September 25, 2020

Page 15

1    Pennsylvania does Road-Con work in?

2    A.      Generally we target east of the Susquehanna River

3    or the Harrisburg area, so the eastern half of PA, and

4    traveling north up generally to Pocono-type region, the

5    mountain region.  Although we do expand further than

6    that on occasion -- we have done projects outside of

7    that area -- that is our normal target area of

8    Pennsylvania.

9    Q.      So when working in any of the counties or states

10   outside of Philadelphia, has Road-Con ever signed on to

11   a project labor agreement?

12   A.      No.

13   Q.      Has Road-Con ever bid on a project that required

14   the successful bidder to sign on to a project labor

15   agreement?

16   A.      No, we have not.

17   Q.      Does Road-Con monitor Philadelphia invitations to

18   bid on project labor agreements?

19   A.      We monitor Philadelphia, as with all the other

20   owners, for overall projects.  We review the project to

21   see if there is a project labor agreement before

22   proceeding.

23   Q.      Who does that monitoring or review?

24   A.      Myself or my chief estimator, Murray Blaker.

25   Q.      Okay.  What factors does Road-Con consider when

Albert D. Hoffman
September 25, 2020

Page 16

1   determining whether to bid on a City of Philadelphia

2   Public Works project?

3   A.      Same as most other projects.  It would be the

4   need that we have for capacity and the type of work it

5   is at the time.

6           For example, the company does bridgework, it

7   does roadwork, it does pipework.  Those are all

8   different resources.  The leaders of those crews are

9   specialized in those areas.  So, for example, at one

10  given time of the year we may be full capacity on

11  pipework, but we may be light on bridgework, so we would

12  look for a bridge project to fill that gap.

13          So it's not carte blanche.  In other words, we

14  just continue to bid work.  We look for the discipline

15  that we're short on at the time or to fill in the gap or

16  schedules for that year.

17  Q.      Do you consider the estimated cost of the

18  contract or the contract amounts in determining whether

19  to bid on a project?

20  A.      Yes, we look at the size of the project and we

21  also look at the time of it, the duration of the

22  project.

23          For example, a $10-million job that needed to

24  be done in one year may or may not fit our schedule,

25  versus a $10-million job that spans over two years.

Albert D. Hoffman
September 25, 2020

Page 17

1          So size and time and the discipline of the work
2      all come into factors as to whether or not we make a
3      decision to bid.
4      Q.     And is there a minimum contract amount that
5      you're looking for when you're reviewing Philadelphia
6      Public Works projects?
7      A.     No, we don't set a hard minimum.  We see what
8      fits at that time.
9      Q.     Anything else you can think of that you have to
10     consider when deciding whether to place a bid on a
11     Philadelphia Public Works project?
12     A.     The only other item I would think of is if we
13     need -- the load on our estimating department at that
14     time is to the point where we have to make a decision
15     whether we target all projects available or we have to
16     pick and choose because we simply don't have enough time
17     to price all the projects.
18     Q.     How much time is typically required for the
19     estimating department to put together a bid?
20     A.     That's a complex question to answer.  It depends
21     on the complexity of the project, the type of work it
22     is.  For example, a straight asphalt overlay project is
23     fairly simple for the estimators to put together,
24     whereas a complex bridge project, in the middle of the
25     city, with a lot of utilities, that would take a lot

Albert D. Hoffman
September 25, 2020

Page 18

1    more time.

2              So they can range from a couple of days, to put

3    a price together, to a few weeks.

4    Q.      Do you consider the City of Philadelphia one of

5    Road-Con's clients?

6    A.      We consider them an available owner for us to

7    work for.  We have targeted the City of Philadelphia

8    projects in the past when available.  We do work in the

9    city when we're working for PennDOT.  Often PennDOT will

10   be the owner on the project, so we go into the city

11   limits quite often.

12             The -- obviously, the PLA in the past has

13   hampered some of our ability to go in and work directly

14   for the City.

15   Q.      Are you familiar with the 15th Street Bridge

16   project that's discussed in the complaint in this case?

17   A.      I am, yes.

18   Q.      Are you aware that the PLA requirement was

19   removed for that project?

20   A.      Yes, I was.

21   Q.      And did Road-Con ultimately bid on that project

22   after the PLA was removed?

23   A.      I believe we did, and I believe we were second

24   place bidder out of five or so bidders.

25   Q.      And are you familiar with the runway project

Albert D. Hoffman
September 25, 2020

Page 19

1    that's also discussed in the complaint in this case?

2    A.      Yes.  Yes, I am.

3    Q.      And are you aware that the PLA requirement was

4    removed for that project?

5    A.      Yes, I was.

6    Q.      Do you know if Road-Con bid on that project after

7    the PLA was removed?

8    A.      We did.  We were less competitive on that project

9    due to the nature of the project, but we did place a bid

10   on the project.

11   Q.      So prior to the time that the complaint in the

12   case was filed in April of 2019, did Road-Con bid on

13   City of Philadelphia Public Works projects?

14   A.      We have in the past, yes.  We've bid on City of

15   Philadelphia and the Philadelphia Airport projects in

16   the past.

17   Q.      Okay.  And can you give me sort of a timeframe of

18   when you recall Road-Con bidding on City of Philadelphia

19   Public Works projects?

20   A.      I cannot state a date, which dates we bid on

21   projects over the years.  For example, we have 30

22   projects currently on our bid list that generally carry,

23   so we bid a host of projects every year.  The timing, I

24   wouldn't be able to -- I would be guessing.

25   Q.      Do you believe that Road-Con has placed bids on

Albert D. Hoffman
September 25, 2020

Page 20

1   City of Philadelphia projects within the last five

2   years?

3   A.     I believe so.  But, again, I'm guessing to some

4   extent of the timing.

5   Q.     Okay.  Has Road-Con ever been a successful bidder

6   on a Philadelphia Public Works project?

7   A.     I cannot recall if we ever worked directly for

8   the City under their Public Works program.  Again, we

9   worked in the city for other owners, public owners,

10  SEPTA and PennDOT, but I cannot recall.  I cannot

11  recall.  I am sorry.

12  Q.     Has Road-Con ever refrained from bidding on a

13  city Public Works projects for a reason other than a PLA

14  requirement?

15  A.     I am sure there is an instance where we analyze

16  the project and did not like the level of risk or the

17  timing with the schedule and we declined.  We do that on

18  many projects, for many owners.  We begin to estimate

19  the project.

20         And if, during the course of reviewing it, we

21  find items that we're not comfortable with, then we will

22  discontinue and not price the project.

23  Q.     I want to move now to, sort of, projects that

24  post-date the 15th Street and runway project.

25         So do you know if Road-Con has bid on any

Albert D. Hoffman
September 25, 2020

Page 21

1    City of Philadelphia Public Works projects after April

2    2019?

3    A.      We have.  We have bid on -- two, off the top of

4    my head, were what they call green stormwater

5    improvement projects, and I can't recall if there was

6    another bridge project in there or not.  But we have bid

7    directly to the City on a couple projects since that

8    time.

9    Q.      Okay.  And was Road-Con the successful bidder on

10   any of those projects?

11   A.      We were not.

12   Q.      Other than -- just setting aside the 15th Street

13   and runway projects for a moment, has Road-Con refrained

14   from submitting bids on other Public Works projects

15   because they include a project labor agreement?

16   A.      Yes, we have.

17   Q.      Which projects were those?

18   A.      There was a series of projects at the

19   Philadelphia Airport, which we inquired about, saw there

20   was a PLA, and declined bidding because we cannot enter

21   into a PLA with our current workforce.

22   Q.      And this is a separate airport project from

23   the runway project, that's the subject of the complaint?

24   A.      That is correct, yes.

25   Q.      Do you recall what year that project is from?

Albert D. Hoffman
September 25, 2020

Page 22

1    A.      There have been a couple projects over the
2    last -- each of the last three years at the Philadelphia
3    Airport, which we have declined because they included a
4    PLA.
5    Q.      At the time you declined those projects, did you
6    reach out to anyone in the City to -- or the airport to
7    let them know about Road-Con's interest in bidding?
8    A.      We inquired to the point of asking if the project
9    had a project labor agreement.  Once they said it did,
10   we declined.  On a couple occasions they said it did
11   not, we proceeded.
12   Q.      Has Road-Con ever bid on a City project that
13   requires a PLA?
14   A.      No.
15   Q.      How many employees does Road-Con have?
16   A.      Well, our employees vary in total because we are
17   seasonal to some effect.  The management staff and the
18   tradespeople included would total approximately 100 to
19   120, depending on the volume each year.
20   Q.      Okay.  And let's start with management staff.
21           How many employees do you have under that
22   category?
23   A.      All inclusive, approximately 30.
24   Q.      And are those employees full-time employees?
25   A.      Yes, the management staff are all full-time

Albert D. Hoffman
September 25, 2020

Page 23

1    employees.

2    Q.     And are they permanent employees?

3    A.     Yes.

4    Q.     So they're not seasonal employees, correct?

5    A.     That's correct.

6    Q.     Now for tradespeople, approximately how many

7    tradespeople?

8    A.     Again, it varies season to season.  Anywhere from

9    60 to 90, depending on the workload and type of work

10   that we have.  For example, bridgework tends to take

11   more people than roadwork.  If we're a little heavier on

12   bridgework, that would increase our volume of

13   tradespeople that particular year.

14   Q.     Okay.  And the Road-Con tradespeople, are they

15   permanent employees or temporary employees or seasonal

16   employees?

17   A.     They're provided to us from the United

18   Steelworker hiring vault under the collective-bargaining

19   agreement, so they are permitted to come and go.  For

20   example, as they have a layoff, they can be reassigned

21   to a different steelworker company.

22   Q.     So some of the tradespeople that work at

23   Road-Con also work for other contractors; is that

24   correct?

25   A.     Other contractors under the Pennsylvania Heavy

Albert D. Hoffman
September 25, 2020

Page 24

1    and Highway Contractors bargaining agreement, yes.

2    Q.    Are all of Road-Con's employees members of the

3    United Steelworkers Union?

4    A.    Can you repeat that for me?

5    Q.    Sure.  Are all of Road-Con's employees members of

6    the United Steelworkers?

7    A.    No, the management people would not be, only the

8    trade folks we talked about.

9    Q.    Apologies.  There's some background noise where

10   I'm at.

11            Are Road-Con's management employees members of

12   any union?

13   A.    No, they are not.

14   Q.    Are all of the tradespeople who work for Road-Con

15   members of the United Steelworkers?

16   A.    Yes, they are.

17   Q.    I'm going to share my screen again and show you

18   what I've previously marked as Hoffman Exhibit 6.

19            Just one second, please.

20                  MS. FURST:  Okay.  This is Hoffman

21          deposition Exhibit 6.

22                  - - -

23                  (Exhibit Hoffman 6 marked for

24          identification.)

25                  - - -

Albert D. Hoffman
September 25, 2020

Page 25

 1  BY MS. FURST:

 2  Q.     And, Mr. Hoffman, this is your affidavit from a

 3  motion that your counsel recently filed.

 4         Do you want to take a quick look at this?

 5  Just take a moment.

 6  A.     I'm familiar with the document.

 7  Q.     Okay.  And have you -- let's look at paragraph 6,

 8  which says Road-Con -- sorry, paragraph 10, which says

 9  that the employees of Road-Con have chosen the United

10  Steelworkers to be their bargaining representative.

11  A.     Okay.

12  Q.     What do you mean when you say that "They have

13  chosen the United Steelworkers to be their bargaining

14  representative"?

15  A.     The employees have the option to be union or to

16  not be union.  As I said, from the inception of the

17  company, the current company, was a purchase of an

18  original company founded back in 1969.  The employees

19  back at that date, I can't testify to that or how that

20  came about, procured the United Steelworkers or joined

21  the United Steelworkers.

22         And with that, they maintain that status to

23  current day, including through the buyout of when Rocon

24  bought Road-Con.

25         They are -- I don't -- yep, I don't know what

Albert D. Hoffman
September 25, 2020

Page 26

1   else I can explain to it.

2   Q.     Okay.  Could the employees of Road-Con choose

3   another union in the future to represent them?

4   A.     We have an attorney, Andrew Levi, which

5   particularly advises me on the terms and conditions of

6   the bargaining agreement between us and the United

7   Steelworkers.  I would say I would look to him to tell

8   me how that process would take place.

9          I would imagine it would have to be a group

10  move.  In other words, the individual employees cannot

11  choose to go to another union.  They're not allowed to

12  participate in dual unions.

13         But I would imagine that under a certain

14  scenario, the employees as a collective group could vote

15  the union out, but I'm not sure.  I would have to refer

16  to my attorney for that.

17  Q.     Okay.  Thanks.  Let's go down to paragraph 22 of

18  your affidavit.  And I'll read it.

19         "Because Road-Con maintains a

20  collective-bargaining agreement with United

21  Steelworkers, it cannot perform work on any City of

22  Philadelphia Public Works subject to a project labor

23  agreement with its current workforce."

24         What does the phrase "current workforce" mean

25  in this paragraph?

Albert D. Hoffman
September 25, 2020

Page 27

1    A.      It would mean the United Steelworkers.

2    Q.      Does it include both Road-Con's management

3    employees and the seasonal tradespeople employees?

4    A.      No.  I would say my statement to current

5    workforce would be attributed to the seasonal

6    tradespeople.  That's what we consider our workforce,

7    our direct force that executes the work.

8    Q.      Could Road-Con decide to disaffiliate from the

9    Steelworkers?

10   A.      I would have to refer again to my attorney,

11   Andrew Levi, who handles that, and what that process

12   would be.  It has not been explored, so I can't really

13   answer the question.

14   Q.      Road-Con can perform work on Philadelphia Public

15   Works projects that are not subject to a project labor

16   agreement with its current workforce, correct?

17   A.      Yes.  Yes.  That's why we continue to attempt to

18   procure work from the City.

19   Q.      Have you ever asked any employee of Road-Con to

20   change their union membership so that Road-Con can bid

21   on a City of Philadelphia Public Works projects that

22   require a PLA?

23   A.      We have not asked the employees that, no.

24   Q.      And why not?

25   A.      We are under agreement that, to my knowledge,

Albert D. Hoffman
September 25, 2020

Page 28

1   prohibits that.

2   Q.      And is that the agreement -- let me go back

3   to -- is that the agreement that the Pennsylvania Heavy

4   and Highway Contractors Bargaining Association entered

5   into with the Steelworkers?

6   A.      Yes.  The Heavy and Highway Contracting

7   Bargaining Association agreement, at the beginning,

8   explains in the agreement the coverage area for that

9   agreement, and it includes Philadelphia.

10  Q.      Would you bid on a City of Philadelphia Public

11  Works project that required a PLA if the United

12  Steelworkers were a party to the PLA?

13  A.      That would require a review of the terms of the

14  PLA.  If the PLA agreement incorporated the

15  collective-bargaining agreement from the Pennsylvania

16  Heavy and Highway Contractors Bargaining Association,

17  then we could consider it.

18          Otherwise, I would have to refer to my

19  attorney, Andrew Levi, to see if we could work under the

20  terms of the PLA if it included the Steelworkers, but

21  the terms did not mimic our current

22  collective-bargaining agreement.  So it's sort of a

23  complex question.

24  Q.      Understand.  Let me ask it in a less complex way.

25          Would you bid on a City of Philadelphia Public

Albert D. Hoffman
September 25, 2020

Page 29

1    Works project that required a PLA if you could still use
2    Road-Con's current workforce for the project?
3                        MR. ZIMOLONG:  I'm going to object
4            to the extent that requests a hypothetical,
5            but the witness can clearly answer.
6                        THE WITNESS:  Yes.  Again, there
7            are a couple considerations with that.  If we
8            could use our current workforce and maintain
9            our current Health and Welfare Pension
10           programs and not have to duplicate pay or ask
11           our employees to forego their benefits,
12           that's -- as I stated, it is a bit of a
13           complex question.
14                        MS. FURST:  Okay.  Thank you,
15           Mr. Hoffman.
16                        I think we should take about a
17           ten-minute break.  I may -- I'm either done or
18           will have just a very short amount of
19           questions left after the break.  And then I
20           think intervenors may have questions as well,
21           but I think now would be a good time to take a
22           brief break.
23                        MR. ZIMOLONG:  Just a quick --
24           we're off -- we can go off the record for
25           this.

Albert D. Hoffman
September 25, 2020

Page 30

```
 1                         – – –
 2                    (A brief discussion was held off
 3             the record.)
 4                         – – –
 5    BY MS. FURST:
 6    Q.      As president of Road-Con, do you have any say in
 7    whether your employees join a union?
 8    A.      No, I do not, not under the current situation.
 9    We are signatory to the bargaining agreement, and I do
10    not have a choice to tell the employees to join or not
11    join the union.
12             As they are hired, they are immediately signed
13    into the union if they're hired for a trade position.
14    Q.      And do you have any say in whether Road-Con
15    continues to be a member of the association that has
16    entered into the agreement with the Steelworkers?
17    A.      The association renews its contract with the
18    United Steelworkers every three years.  There is an
19    opportunity to exit from the association.
20    Q.      And do you have a say in whether Road-Con takes
21    an -- takes that opportunity to exit the association?
22    A.      Yes, I do.
23                         MS. FURST:  That's all for me for
24             now.
25                         MR. WEINERT:  I just have a few
```

Albert D. Hoffman
September 25, 2020

Page 31

1        questions.

2                - - -

3            CROSS-EXAMINATION

4                - - -

5    BY MR. WEINERT:

6    Q.      Mr. Hoffman, my name is Michael Weinert.  I

7    represent the intervenors in this matter, the National

8    Electrical Contractors Association and the Mechanical

9    Service Contractors Association.

10           And previously you testified that you have

11   been on two projects for the City since April of 2019.

12           Did those two projects have PLAs on them?

13   A.      Mike, actually, after the question was asked, I

14   had the opportunity to refresh my memory a little bit.

15   It's actually been more than those two projects.

16           In all cases, the projects did not include a

17   PLA.  In one case we did on a project, which I did not

18   mention, which was bid through PennDOT but the owner was

19   the City of Philadelphia.  It was for a green stormwater

20   management installation.  We were a low bidder on that

21   project.  The City would ultimately have to sign the

22   contract with us.  They did not react for the 60 days

23   and the bid expires at 60 days.

24           When inquired as to why they were not entering

25   into the contract, they said they had some

Albert D. Hoffman
September 25, 2020

Page 32

1  administrative issues and it was going to take longer,

2  if we wanted to extend the time to award, we could,

3  under the condition that the end of the contract was not

4  changed and the price was not changed.

5         Well, obviously, once 60 days goes by, all our

6  pricing expires with our vendors.  And not knowing when

7  we could expect to get an award from the City, we had to

8  walk away at that point.

9         That's actually happened on two occasions over

10 the last five years where we bid and we were a low

11 bidder and the City failed to execute the contract

12 within the 60-day limit that's in that contract for the

13 City.

14        The other project was at the Philadelphia

15 Airport.  It did not include a PLA.  It was to put some

16 safety bollards in front of the over -- or in front of

17 the terminal.  And, again, the 60 days was allowed to

18 expire without them signing the contract with us.

19 Q.    So that first PennDOT project, that project did

20 have a PLA on it, correct?

21 A.    No, it did not.

22 Q.    Okay.

23 A.    None of the projects I talked about had a PLA.

24 Q.    So you've never been on a project for the City

25 with a PLA and been the successful bidder and then

Albert D. Hoffman
September 25, 2020

Page 33

1    reached the point where you would have signed the

2    PLA?

3    A.    That is correct, and we've never been in that

4    situation.

5    Q.    Okay.

6                        MR. WEINERT:  That's all the

7              questions I have.

8                        MR. ZIMOLONG:  I just have -- do

9              you have anything, Lydia?

10                       MS. FURST:  Thanks, Wally.  I was

11             just going to follow up on a couple things

12             real quickly.

13                       - - -

14             REDIRECT EXAMINATION

15                       - - -

16   BY MS. FURST:

17   Q.    So, Mr. Hoffman, you mentioned a stormwater

18   project that was bid through PennDOT but owned by the

19   City of Philadelphia?

20   A.    Yes.  That's a local match situation.  They do it

21   quite often where PennDOT will bid the project, but

22   ultimately the contract is with the City, executed by

23   the City.

24   Q.    Understood.  Do you remember approximately when

25   you bid on this project?

Albert D. Hoffman
September 25, 2020

Page 34

1    A.      It was winter of last year, 2019, 2020.  I do not

2    recall the exact date.  It was over the winter.

3    Q.      Do you remember anything about the contract

4    amount?

5    A.      Approximately 1.3, 1.4 million.

6    Q.      And do you remember anything about what the

7    project was called?

8    A.      I do not.  I believe it was 52nd Street in West

9    Philadelphia, was the location.  PennDOT would have

10   assigned an SR number, and I don't remember that off the

11   top of my head.

12   Q.      Okay.  And do you recall, was this the

13   Philadelphia Water Department?

14   A.      I believe the contract was to be executed by the

15   City of Philadelphia.  I don't know the particular

16   division that was handling the job.

17   Q.      Okay.  And then you mentioned another project

18   that you recalled Road-Con bidding on and being the

19   lowest responsible bidder.

20           What else can you tell me about that project?

21   A.      The timing of which was some years ago.  I'm

22   going to say five or six years ago.  It was a project

23   for the Philadelphia Airport to install safety bollards

24   in front of the terminal and reconstruct.  It was a

25   couple-million-dollar project.

Albert D. Hoffman
September 25, 2020

Page 35

1          Same situation back then, we were low bidder,

2     there was no PLA on the project, so we bid it.  We were

3     the lowest responsible bidder.  The City was not moving

4     forward with an award.  We inquired about it.  They said

5     they were having some internal issues.

6          We went down for a scope meeting to review the

7     project, and during the meeting, off the record, they

8     had said they really did not want to award the project

9     to us.  And at that time, we let the award expire, we

10    did not fight that situation.

11    Q.    Was a reason given as to why the City did not

12    want to award the project to Road-Con?

13    A.    Verbally, off the record, I asked them to let me

14    know if there was a problem, and verbally, off the

15    record, he said we were not of the right union type

16    and it was causing some internal friction inside the

17    City.

18    Q.    And do you have any recollection of who you spoke

19    to at the airport about this?

20    A.    No.  It was a meeting between myself, my

21    estimator, project manager that handled the job and

22    about three folks from the City.

23    Q.    And, Mr. Hoffman, did you look at any documents

24    in preparation for your deposition?

25    A.    Today, just my affidavit.

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Albert D. Hoffman
September 25, 2020

Page 36

1   Q.      Okay.  And what about previous to today, did you

2   look at any documents in preparation for your

3   deposition?

4   A.      No.

5   Q.      Okay.  And you stated that you sort of refreshed

6   your recollection about some things while we just took a

7   break; is that right?

8   A.      Yes.  Yes.  In particular, I was looking -- I

9   knew we had bid more than just the two projects for the

10  City over the course of the last year, and I had not

11  pulled it together as quick as I would have liked to

12  while we were going through the questions.

13  Q.      Okay.  And did you remember any other projects

14  that Road-Con bid on over the past several years?

15  A.      They were the only two that came to mind.  We

16  actually do have one or two currently on our bid list to

17  bid on over the upcoming weeks.

18                      MS. FURST:  Okay.  Just one second.

19          Let me just check one thing.

20                      (Pause.)

21                      Okay.  That's all.

22                      _ _ _

23                  RECROSS-EXAMINATION

24                      _ _ _

25  BY MR. ZIMOLONG:

Albert D. Hoffman
September 25, 2020

Page 37

1   Q.     This is Wally Zimolong.  It's not usual I ask my

2   own witnesses some questions at the deposition, but I

3   just wanted to follow up on a couple points to clarify

4   the record.

5          Mr. Hoffman, you testified that Road-Con bid on

6   a project that was going to be -- the contract was going

7   to be signed by the City of Philadelphia, and you did

8   that, or Road-Con did that in the winter of 2019,

9   correct?

10  A.     That's correct.

11  Q.     And that -- would it have been in and around

12  December of 2019, sound about correct?

13  A.     It's about correct, yes.  I'd have to pull the

14  records out to find the actual bid date.

15  Q.     And that was -- that bid was submitted during the

16  pendency of this litigation, correct?

17  A.     Yes.

18  Q.     Okay.  And Road-Con was the lowest responsible

19  bidder on that project, correct?

20  A.     Correct.

21  Q.     Okay.  And 60 days expired, but the City of

22  Philadelphia never presented a contract to Road-Con,

23  correct?

24  A.     That's correct.

25  Q.     And on a previous occasion, Road-Con bid on a

Albert D. Hoffman
September 25, 2020

Page 38

1    project owned by the City of Philadelphia Airport in

2    which a similar circumstance occurred, correct?

3    A.      Correct.

4    Q.      And there were representatives of the City of

5    Philadelphia that told you the reason why Road-Con was

6    not presented a contract was because of its union

7    affiliation, correct?

8    A.      Correct.

9                      MR. ZIMOLONG:  Okay.  I don't have

10           anything else for the witness.  Thank you.

11                    Are we all done?  Is the witness

12           done?  Lydia?  Michael?

13                    MR. WEINERT:  I have nothing

14           further.

15                    MS. FURST:  Yeah, I have nothing

16           further.

17                    MR. ZIMOLONG:  Thank you.  Thanks,

18           Al.  Have a good day.

19                    - - -

20                    (Deposition concluded at 10:07

21           a.m.)

22                    - - -

23

24

25

Albert D. Hoffman
September 25, 2020

Page 39

1

2          C E R T I F I C A T I O N

3

4

5          I, hereby certify that the proceedings and

6     evidence noted are contained fully and accurately in the

7     stenographic notes taken by me in the foregoing matter,

8     and that this is a correct transcript of the same.

9

10

11

12

          _____

13                   Court Reporter - Notary Public

14

15

16          (The foregoing certification of this

17     transcript does not apply to any reproduction of the

18     same by any means, unless under the direct control

19     and/or supervision of the certifying reporter.)

20

21

22

23

24

25

Albert D. Hoffman
September 25, 2020

**A**

**a.m** 1:21
38:21
**ability** 18:13
**able** 19:24
**accounting**
8:2
**accurate**
12:18,23
14:6
**accurately**
39:6
**ACTION** 1:4
**actual** 37:14
**added** 9:17
**administeri...**
4:13
**administra...**
32:1
**advises** 26:5
**affidavit** 3:16
25:2 26:18
35:25
**affiliation**
38:7
**afternoon** 6:3
**ago** 9:10,13
34:21,22
**agree** 5:13,15
5:20
**agreed** 4:4
**agreement**
15:11,15,21
21:15 22:9
23:19 24:1
26:6,20,23
27:16,25
28:2,3,7,8,9
28:14,15,22
30:9,16
**agreements**
15:18
**ahead** 8:25
**airport** 19:15
21:19,22
22:3,6
32:15 34:23
35:19 38:1
**airports**
10:20
**Al** 38:18
**ALBERT**
1:18 3:4
6:5

**all-inclusive**
13:25 14:1
**allowed**
26:11 32:17
**amount** 11:2
17:4 29:18
34:4
**amounts**
16:18
**Amy** 2:17
5:19,23
6:15
**amy.kirby...**
2:20
**analyze** 20:15
**and/or** 39:19
**Andrew** 26:4
27:11 28:19
**answer** 6:23
7:13 17:20
27:13 29:5
**answered** 7:7
**Apologies**
24:9
**apologize**
11:24
**appear** 14:1
14:6
**appears** 14:9
**apply** 39:17
**approxima...**
7:20 8:12
9:10 13:6
13:15 22:18
22:23 23:6
33:24 34:5
**April** 19:12
21:1 31:11
**Arch** 2:18
**area** 14:24
15:3,7,7
28:8
**areas** 16:9
**aside** 14:5
21:12
**asked** 27:19
27:23 31:13
35:13
**asking** 22:8
**asphalt** 17:22
**assigned**
34:10
**Associates**
4:12

**association**
10:1,4,8,11
10:14 28:4
28:7,16
30:15,17,19
30:21 31:8
31:9
**attempt**
27:17
**attorney** 5:1
5:19,24
6:13 26:4
26:16 27:10
28:19
**attributed**
27:5
**availability**
14:15
**available**
17:15 18:6
18:8
**average** 11:4
**avoid** 6:25
7:2
**award** 32:2,7
35:4,8,9,12
**aware** 18:18
19:3

**B**

**B** 3:13
**back** 8:19
25:18,19
28:2 35:1
**background**
24:9
**backlog**
12:15
**bargaining**
10:1,8 24:1
25:10,13
26:6 28:4,7
28:16 30:9
**bear** 4:3 5:7
21:12
**beginning**
28:7
**believe** 14:8
18:23,23
19:25 20:3
34:8,14
**benefits**
29:11
**best** 7:1 14:7
**bid** 8:14,22

9:3 15:13
15:18 16:1
16:14,19
17:3,10,19
18:21 19:6
19:9,12,14
19:20,22,23
20:25 21:3
21:6 22:12
27:20 28:10
28:25 31:18
31:23 32:10
33:18,21,25
35:2 36:9
36:14,16,17
37:5,14,15
37:25
**bidder** 15:14
18:24 20:5
21:9 31:20
32:11,25
34:19 35:1
35:3 37:19
**bidders** 18:24
**bidding** 9:7
19:18 20:12
21:20 22:7
34:18
**bids** 8:17
19:25 21:14
**bit** 29:12
31:14
**Blaker** 8:23
15:24
**blanche**
16:13
**board** 9:9
**bollards**
32:16 34:23
**bottom** 13:13
13:14
**bought** 25:24
**Box** 2:4
**break** 7:4,6,8
29:17,19,22
36:7
**bridge** 16:12
17:24 18:15
21:6
**bridgework**
10:20 16:6
16:11 23:10
23:12
**brief** 11:21

29:22 30:2
**briefly** 7:22
8:6
**Broad** 2:11
**building**
10:23
**business** 9:19
10:24
**buy** 10:6
**buyout** 25:23

**C**

**C** 2:1 39:2,2
**call** 21:4
**called** 34:7
**capacity** 1:9
16:4,10
**care** 9:16
**carry** 19:22
**carte** 16:13
**case** 6:14
18:16 19:1
19:12 31:17
**cases** 31:16
**category**
22:22
**causing** 35:16
**certain** 26:13
**certification**
39:16
**certify** 39:5
**certifying**
39:19
**change** 12:25
27:20
**changed** 32:4
32:4
**chat** 11:16
**check** 36:19
**Chester** 7:17
14:17
**chief** 8:23 9:6
9:15,18
15:24
**choice** 30:10
**choose** 17:16
26:2,11
**choosing** 8:13
8:17,21
**chosen** 25:9
25:13
**circumstance**
38:2
**city** 1:8,10

2:16,23
5:12,20
6:13 16:1
17:25 18:4
18:7,9,10
18:14 19:13
19:14,18
20:1,8,9,13
21:1,7 22:6
22:12 26:21
27:18,21
28:10,25
31:11,19,21
32:7,11,13
32:24 33:19
33:22,23
34:15 35:3
35:11,17,22
36:10 37:7
37:21 38:1
38:4
**CIVIL** 1:4
**clarify** 9:13
37:3
**classify** 10:21
**clear** 5:23 7:1
**clearly** 29:5
**clients** 18:5
**co-counsel**
6:15
**Code** 4:6
**collective**
26:14
**collective-b...**
23:18 26:20
28:15,22
**come** 17:2
23:19
**comfortable**
20:21
**commence**
9:19
**commencing**
1:20
**commercial**
10:22
**company**
7:21 9:20
9:22 10:5,6
10:6,7,8
16:6 23:21
25:17,18,18
**company's**
7:25

**competitive**
19:8
**complaint**
18:16 19:1
19:11 21:23
**complete**
14:9
**complex**
17:20,24
28:23,24
29:13
**complexity**
17:21
**concluded**
38:20
**condition**
32:3
**conditions**
14:14 26:5
**conduct** 5:8
**conducted**
4:7
**conference**
4:8,11,18
5:9
**confirm** 13:5
**confirming**
4:17
**consent** 4:21
**consider**
15:25 16:17
17:10 18:4
18:6 27:6
28:17
**considerati...**
29:7
**considered**
4:22
**construction**
1:5 10:18
10:19,21
**CONSTRU...**
1:4
**contained**
39:6
**continue**
16:14 27:17
**continued**
10:9
**continues**
30:15
**contract** 3:16
11:2 12:13
12:18,18,23

13:6,11,14
16:18,18
17:4 30:17
31:22,25
32:3,11,12
32:18 33:22
34:3,14
37:6,22
38:6
**Contracting**
28:6
**contractor**
7:17
**contractors**
10:1 23:23
23:25 24:1
28:4,16
31:8,9
**contracts**
8:14,17
11:3 12:17
12:22,25
13:4,18,23
14:2,12
**control** 4:11
39:18
**copy** 5:3
**correct** 13:2
13:12,16,17
14:17 21:24
23:4,5,24
27:16 32:20
33:3 37:9
37:10,12,13
37:16,19,20
37:23,24
38:2,3,7,8
39:8
**cost** 16:17
**costs** 5:8
**counsel** 4:1,5
4:9 5:5,10
5:11,15,17
11:9 25:3
**counties** 15:9
**couple** 18:2
21:7 22:1
22:10 29:7
33:11 37:3
**couple-mill...**
34:25
**course** 14:4
20:20 36:10
**court** 1:1 4:1

4:8,12,16
6:20 7:1
11:15 39:13
**coverage**
28:8
**crews** 16:8
**CROSS-E...**
31:3
**crosstalk**
6:25
**CRR** 1:21
**current** 7:15
9:4 12:15
21:21 25:17
25:23 26:23
26:24 27:4
27:16 28:21
29:2,8,9
30:8
**currently**
19:22 36:16

___ **D** ___

**D** 1:18 3:1
**date** 19:20
25:19 34:2
37:14
**dates** 19:20
**day** 25:23
38:18
**days** 18:2
31:22,23
32:5,17
37:21
**December**
37:12
**decide** 27:8
**deciding**
17:10
**decision** 17:3
17:14
**decision-m...**
8:21 9:7
**decisions** 9:2
**declined**
20:17 21:20
22:3,5,10
**defendants**
1:10 2:21
6:14
**Delaware**
14:20
**delay** 11:25
**department**

2:16 17:13
17:19 34:13
**depending**
13:24 14:14
22:19 23:9
**depends**
17:20
**deposed** 6:16
**deposition**
1:18 4:7,15
4:19 5:8
24:21 35:24
36:3 37:2
38:20
**describe** 7:22
8:6 10:17
**DESCRIP...**
3:15
**determining**
16:1,18
**different** 16:8
23:21
**direct** 6:9
27:7 39:18
**directly**
18:13 20:7
21:7
**disaffiliate**
27:8
**discipline**
16:14 17:1
**discontinue**
20:22
**discussed**
18:16 19:1
**discussion**
11:21 30:2
**DISTRICT**
1:1,1
**division**
34:16
**document**
12:7,12
13:22,24
14:3 25:6
**documents**
11:11 35:23
36:2
**doing** 5:24
6:24 9:21
**dual** 26:12
**due** 19:9
**duly** 6:6
**duplicate**

29:10
**duration**
16:21
**duties** 7:23
8:7,8

___ **E** ___

**E** 2:1,1 3:1,13
39:2
**east** 15:2
**eastern** 1:1
15:3
**Edward** 9:4
**effect** 22:17
**either** 29:17
**Electrical**
31:8
**email** 11:8
**emailed** 5:4
**employee**
27:19
**employees**
22:15,16,21
22:24,24
23:1,2,4,15
23:15,16
24:2,5,11
25:9,15,18
26:2,10,14
27:3,3,23
29:11 30:7
30:10
**enter** 21:20
**entered** 28:4
30:16
**entering**
31:24
**entire** 7:24
**ESQUIRE**
2:4,10,17
2:17
**estimate**
20:18
**estimated**
16:17
**estimating**
9:16 17:13
17:19
**estimator**
8:23 9:6,14
9:18 15:24
35:21
**estimator's**
9:15

**estimators**
17:23
**evidence** 39:6
**exact** 34:2
**EXAMINA...**
3:7 6:9
33:14
**examined** 6:6
**example**
13:25 16:6
16:9,23
17:22 19:21
23:10,20
**execute** 32:11
**executed**
33:22 34:14
**executes** 27:7
**exhibit** 5:2,3
5:6 11:7
12:3 24:18
24:21,23
**exhibits** 5:1
**exit** 30:19,21
**expand** 15:5
**expect** 32:7
**expire** 32:18
35:9
**expired** 37:21
**expires** 31:23
32:6
**explain** 26:1
**explains** 28:8
**explored**
27:12
**express** 4:20
**extend** 32:2
**extent** 20:4
29:4

___ **F** ___

**F** 39:2
**factors** 15:25
17:2
**failed** 32:11
**fair** 6:4 14:11
**fairly** 17:23
**fall** 14:13
**familiar**
12:11 18:15
18:25 25:6
**fashion** 10:9
**FETBROYT**
2:9
**fight** 35:10

**filed** 19:12
25:3
**fill** 16:12,15
**final** 8:24
**find** 20:21
37:14
**fine** 7:11
**first** 6:6
12:16,24
23:19
**fit** 16:24
**fits** 17:8
**five** 9:10,13
18:24 20:1
32:10 34:22
**Floor** 2:18
**Focusing**
14:25
**folks** 24:8
35:22
**follow** 33:11
37:3
**follows** 6:7
**force** 27:7
**forego** 29:11
**foregoing**
39:7,16
**forward** 35:4
**founded** 9:23
25:18
**four** 9:10
**friction** 35:16
**Friday** 1:14
**front** 32:16
32:16 34:24
**full** 16:10
**full-time**
22:24,25
**fully** 39:6
**functions** 8:2
**Furst** 2:17
3:8 5:11,11
6:11,13
11:14,24
12:6 24:20
25:1 29:14
30:5,23
33:10,16
36:18 38:15
**further** 4:25
15:5 38:14
38:16
**future** 26:3

___ **G** ___

**gap** 16:12,15
**general** 8:2
**generally**
14:2,24
15:2,4
19:22
**geographical**
14:24
**give** 19:17
**given** 16:10
35:11
**go** 12:21
18:10,13
23:19 26:11
26:17 28:2
29:24
**goes** 32:5
**going** 6:2
8:19 14:10
24:17 29:3
32:1 33:11
34:22 36:12
37:6,6
**good** 6:12
11:15 14:13
29:21 38:18
**green** 21:4
31:19
**ground** 6:19
**group** 26:9
26:14
**guessing**
19:24 20:3

___ **H** ___

**H** 3:13
**HAGGER...**
2:9
**half** 13:15
15:3
**hampered**
18:13
**handled**
35:21
**handles**
27:11
**handling** 6:1
6:2 34:16
**happened**
32:9
**hard** 17:7
**Harrisburg**
15:3

**head** 6:22
14:9 21:4
34:11
**Health** 29:9
**heavier** 23:11
**heavy** 7:16
9:25 10:16
10:21 23:25
28:3,6,16
**held** 1:19
7:18 11:21
30:2
**highway** 7:17
10:1,16
24:1 28:4,6
28:16
**hired** 30:12
30:13
**hiring** 23:18
**Hoffman**
1:9 3:4,16
3:16 6:5,12
6:16 7:12
11:6,7 12:3
12:7,10,11
14:11 24:18
24:20,23
25:2 29:15
31:6 33:17
35:23 37:5
**hold** 8:3
**home** 14:18
**host** 19:23
**hypothetical**
29:4

___ **I** ___

**idea** 11:16
**identification**
12:4 24:24
**identity** 4:17
**III** 1:5 2:23
**image** 12:1
**imagine** 26:9
26:13
**immediately**
30:12
**improvement**
21:5
**inception**
10:5 25:16
**include** 10:18
10:19,22
21:15 27:2

31:16 32:15
**included** 22:3
22:18 28:20
**includes** 28:9
**including**
7:25 25:23
**inclusive**
22:23
**incomplete**
14:3
**incorporated**
7:16 9:20
28:14
**increase**
23:12
**individual**
26:10
**inquired**
21:19 22:8
31:24 35:4
**inside** 35:16
**install** 34:23
**installation**
31:20
**instance**
20:15
**interest** 22:7
**Intern** 2:23
**internal** 35:5
35:16
**interrupting**
7:2
**intervenors**
2:13 5:15
29:20 31:7
**invitations**
15:17
**involved** 8:20
9:2,6,11
**Isenberg**
2:23
**issues** 32:1
35:5
**item** 17:12
**items** 20:21

___ **J** ___

**J** 9:4
**JAMES** 1:9
**Jersey** 14:20
**job** 7:15
16:23,25
34:16 35:21
**join** 30:7,10

30:11
joined 25:20

**K**
KANG 2:9
Karli 2:23
KENNEY
1:9
Kirby 2:17
5:19,19 6:1
6:15
knew 36:9
know 6:20
7:5 11:8
19:6 20:25
22:7 25:25
34:15 35:14
knowing 32:6
knowledge
14:7 27:25

**L**
labor 15:11
15:14,18,21
21:15 22:9
26:22 27:15
LACAVA
1:6
lapses 10:13
late 11:12
law 2:16 4:22
layoff 23:20
leaders 16:8
left 29:19
let's 13:3
22:20 25:7
26:17
level 20:16
Levi 26:4
27:11 28:19
lieu 10:21
light 16:11
liked 36:11
limit 32:12
limits 18:11
list 19:22
36:16
listed 12:24
litigation
4:24 37:16
little 23:11
31:14
LLC 2:3,9
load 17:13

local 33:20
located 14:16
location
14:18 34:9
locations
4:10
LOFTUS 1:4
long 4:3 7:18
8:10
longer 32:1
look 13:3
16:12,14,20
16:21 25:4
25:7 26:7
35:23 36:2
looking 12:17
17:5 36:8
looks 12:13
14:3
lot 17:25,25
low 31:20
32:10 35:1
lowest 34:19
35:3 37:18
Lydia 2:17
5:11,22 6:1
6:12 33:9
38:12
lydia.furst...
2:19

**M**
maintain
25:22 29:8
maintains
26:19
making 9:2
management
7:25 8:1
9:17 22:17
22:20,25
24:7,11
27:2 31:20
manager
35:21
marked 5:1
11:7 12:3
12:10 24:18
24:23
market 14:14
Maryland
14:21,21
match 33:20
math 9:21

matter 31:7
39:7
MAYOR 1:9
McKenna 9:5
mean 9:22
25:12 26:24
27:1
means 39:18
Mechanical
31:8
meeting 4:11
35:6,7,20
member 9:25
10:3,7,10
30:15
members
24:2,5,11
24:15
membership
10:14 27:20
memory
31:14
mention
31:18
mentioned
10:16 33:17
34:17
Michael 2:10
5:14 31:6
38:12
middle 7:6
17:24
Mike 31:13
million 11:3
11:5 12:19
12:24 13:1
13:6,9,11
13:15,19
14:12,14
34:5
mimic 28:21
mind 36:15
minimum
17:4,7
moment
21:13 25:5
monitor
15:17,19
monitoring
15:23
morning 6:2
6:12
motion 25:3
mountain

15:5
move 8:25
20:23 26:10
moving 35:3
Murray 8:23
15:24
mweinert...
2:12

**N**
N 2:1 3:1
39:2
name 6:12
31:6
National 31:7
nature 19:9
need 4:14
6:22 7:4
16:4 17:13
needed 16:23
NESHAMI...
1:4
never 32:24
33:3 37:22
new 10:8
14:20
night 11:9,12
nodding 6:22
noise 24:9
normal 15:7
north 15:4
Notary 1:21
39:13
noted 39:6
notes 39:7
noticed 4:19
number 3:15
34:10

**O**
O 39:2
oath 4:13
object 29:3
obviously
18:12 32:5
occasion 15:6
37:25
occasionally
14:20
occasions
22:10 32:9
occurred
38:2
office 14:18

officer 4:13
OFFICIAL
1:9
okay 6:19
7:10,12,15
8:6,10 9:1
9:13 10:10
11:6,24
12:10,16,21
13:22 14:10
14:23 15:25
19:17 20:5
21:9 22:20
23:14 24:20
25:7,11
26:2,17
29:14 32:22
33:5 34:12
34:17 36:1
36:5,13,18
36:21 37:18
37:21 38:9
once 22:9
32:5
operations
7:25
opportunity
30:19,21
31:14
option 25:15
ORAL 1:18
original
25:18
outside 15:6
15:10
overall 7:21
7:24 8:8
15:20
overlay 17:22
oversight
7:24
owned 33:18
38:1
owner 12:14
18:6,10
31:18
owners 15:20
20:9,9,18

**P**
P 2:1,1
P.O 2:4
Pa 2:5,11,18
4:6 7:17

15:3
page 3:3,15
12:16,19,20
12:21,25
13:3,4,19
paragraph
25:7,8
26:17,25
participate
26:12
participating
4:10
particular
23:13 34:15
36:8
particularly
26:5
parties 4:5,21
5:7
parts 14:25
party 28:12
Pause 36:20
pay 29:10
pendency
37:16
pending 7:7
PennDOT
18:9,9
20:10 31:18
32:19 33:18
33:21 34:9
Pennsylvania
1:1,20 9:25
14:20,25
15:1,8
23:25 28:3
28:15
Pension 29:9
people 23:11
24:7
percent 11:1
perform
26:21 27:14
permanent
23:2,15
permitted
23:19
Phila 2:23
Philadelphia
1:8,10 2:11
2:16,18
5:12,20
6:13 15:10
15:17,19

16:1 17:5
17:11 18:4
18:7 19:13
19:15,15,18
20:1,6 21:1
21:19 22:2
26:22 27:14
27:21 28:9
28:10,25
31:19 32:14
33:19 34:9
34:13,15,23
37:7,22
38:1,5
phrase 26:24
pick 17:16
pipework
16:7,11
PKF-Mark
1:5 2:23
PLA 18:12
18:18,22
19:3,7
20:13 21:20
21:21 22:4
22:13 27:22
28:11,12,14
28:14,20
29:1 31:17
32:15,20,23
32:25 33:2
35:2
place 4:14
17:10 18:24
19:9 26:8
placed 19:25
plaintiffs 1:6
2:7 5:18
plants 10:20
PLAs 31:12
please 4:2 7:5
24:19
Pocono-type
15:4
point 9:10
17:14 22:8
32:8 33:1
points 37:3
portion 14:13
position 7:18
8:3,10 9:12
9:15,17
30:13
possession

5:5
post-date
20:24
preparation
35:24 36:2
present 1:22
2:23 4:5
presented 5:3
37:22 38:6
presenting
5:2
president
7:16,20,23
8:4,5,7,11
8:13,16,19
9:1,4,8 30:6
previous 36:1
37:25
previously
4:19 11:7
24:18 31:10
price 17:17
18:3 20:22
32:4
prices 12:18
12:19
pricing 32:6
printed 13:24
14:4
prior 5:5 8:3
9:11 19:11
problem
35:14
proceeded
22:11
proceeding
15:22
proceedings
39:5
process 26:8
27:11
procure
27:18
procured
25:20
procurement
7:25
program
20:8
programs
29:10
prohibits
28:1
project 9:17

14:8 15:11
15:13,14,18
15:20,21
16:2,12,19
16:20,22
17:11,21,22
17:24 18:10
18:16,19,21
18:25 19:4
19:6,8,9,10
20:6,16,19
20:22,24
21:6,15,22
21:23,25
22:8,9,12
26:22 27:15
28:11 29:1
29:2 31:17
31:21 32:14
32:19,19,24
33:18,21,25
34:7,17,20
34:22,25
35:2,7,8,12
35:21 37:6
37:19 38:1
projects 8:1
8:21,24 9:3
10:25 15:6
15:20 16:3
17:6,15,17
18:8 19:13
19:15,19,21
19:22,23
20:1,13,18
20:23 21:1
21:5,7,10
21:13,14,17
21:18 22:1
22:5 27:15
27:21 31:11
31:12,15,16
32:23 36:9
36:13
provide 6:23
provided
23:17
public 1:22
10:24 16:2
17:6,11
19:13,19
20:6,8,9,13
21:1,14
26:22 27:14

27:21 28:10
28:25 39:13
pull 37:13
pulled 36:11
purchase
25:17
purpose 4:23
pursuant
1:19 4:6
put 11:16
12:14 17:19
17:23 18:2
32:15

_____
Q
_____
qualificatio...
12:15
question 5:7
7:7,8 17:20
27:13 28:23
29:13 31:13
questioning
5:6,25
questions
6:23 7:13
29:19,20
31:1 33:7
36:12 37:2
quick 5:22
25:4 29:23
36:11
quickly 6:20
33:12
quite 14:22
18:11 33:21

_____
R
_____
R 2:1 39:2
R-O-C-O-N
10:7
Ramirez 2:23
range 11:3,5
18:2
reach 22:6
reached 33:1
react 31:22
read 4:2
26:18
real 5:22
33:12
really 6:20,20
27:12 35:8
reason 7:12
20:13 35:11

38:5
reassigned
23:20
recall 19:18
20:7,10,11
21:5,25
34:2,12
recalled
34:18
recollection
35:18 36:6
reconstruct
34:24
record 4:2
11:19,22
29:24 30:3
35:7,13,15
37:4
recorded
4:18
recording
4:20
records
37:14
RECROSS...
36:23
REDIRECT
33:14
refer 26:15
27:10 28:18
reflected
13:18
refrained
20:12 21:13
refresh 31:14
refreshed
36:5
regarding 5:6
region 15:4,5
remember
14:8 33:24
34:3,6,10
36:13
remote 4:10
remotely
1:19 4:16
6:25
removed
18:19,22
19:4,7
renews 30:17
Rep 2:23
repeat 24:4
reporter 4:1

4:8,16 6:21
7:1 11:15
39:13,19
Reporting
4:12
represent
26:3 31:7
representat...
25:10,14
representat...
38:4
representing
2:7,13,21
6:14
reproduction
39:17
requests
12:14 29:4
require 27:22
28:13
required
15:13 17:18
28:11 29:1
requirement
18:18 19:3
20:14
requires
22:13
residential
10:23
resources 8:1
16:8
responsible
34:19 35:3
37:18
rest 12:25
13:18
review 15:20
17:5 20:20
RICCI 1:21
right 13:1,7
13:11,20
35:15 36:7
risk 20:16
River 15:2
RMR 1:21
road 10:19
Road-Con
1:4 7:16,19
7:23 8:7,14
8:17,20,21

9:3,12,14
9:19,25
10:3,10
11:2 14:12
14:16,19
15:1,10,13
15:17,25
18:21 19:6
19:12,18,25
20:5,12,25
21:9,13
22:12,15
23:14,23
24:14 25:8
25:9,24
26:2,19
27:8,14,19
27:20 30:6
30:14,20
34:18 35:12
36:14 37:5
37:8,18,22
37:25 38:5
Road-Con's
10:13,24
13:23 18:5
22:7 24:2,5
24:11 27:2
29:2
roadwork
16:7 23:11
Rocon 10:7
25:23
role 8:13,16
8:19 9:1
rotate 11:25
row 12:24
13:5,14
rows 13:10
rules 6:19
run 6:19
runway
18:25 20:24
21:13,23

_____
S
_____
S 2:1,4,11
3:13
safety 32:16
34:23
saw 21:19
says 6:21
12:16 25:8
25:8

scenario
26:14
schedule
16:24 20:17
schedules
16:16
scope 35:6
SCOTT 1:5
2:10
screen 11:13
12:8 24:17
screenshare
14:10
scroll 13:13
season 23:8,8
seasonal
22:17 23:4
23:15 27:3
27:5
second 13:5
13:14 18:23
24:19 36:18
see 11:17
12:7 15:21
17:7 28:19
seeing 11:12
separate 4:9
21:22
SEPTA 20:10
September
1:14
series 21:18
Service 4:12
31:9
set 17:7
setting 14:5
21:12
sewer 10:20
share 11:13
24:17
shared 11:10
SHARON
1:21
SHEET 3:16
sheets 12:14
shop 8:1
short 16:15
29:18
Shortly 9:24
show 11:6
24:17
sideways
21:7
sign 15:14

31:21
signatory
30:9
signed 15:10
30:12 33:1
37:7
signing 32:18
similar 38:2
simple 17:23
simply 17:16
situation 30:8
33:4,20
35:1,10
six 34:22
size 11:4
16:20 17:1
smoother
11:17
sorry 9:21
20:11 25:8
sort 19:17
20:23 28:22
36:5
sound 7:10
37:12
spans 16:25
specialized
16:9
spoke 35:18
SR 34:10
staff 9:17
22:17,20,25
start 22:20
starting
12:16
state 19:20
stated 29:12
36:5
statement
27:4
states 1:1
14:19 15:9
status 3:16
12:13 25:22
steelworker
23:18,21
Steelworkers
24:3,6,15
25:10,13,20
25:21 26:7
26:21 27:1
27:9 28:5
28:12,20
30:16,18

stenographic
39:7
stipulate 5:18
stipulated 4:4
4:25 5:10
stipulation
4:2 5:13,16
5:21
stormwater
21:4 31:19
33:17
straight
17:22
street 2:11,18
10:19 18:15
20:24 21:12
34:8
Strehlow
4:12
subject 21:23
26:22 27:15
submitted
37:15
submitting
21:14
Subpeona
1:19
successful
15:14 20:5
21:9 32:25
suggest 8:23
Suite 2:11
summary
13:22
superior 8:8
supervision
7:24 39:19
sure 20:15
24:5 26:15
Susquehanna
15:2
sworn 3:5
4:15 6:6

_____
T
_____
T 3:13 39:2,2
take 7:4,6,8
9:16 17:25
23:10 25:4
25:5 26:8
29:16,21
32:1
taken 1:19
39:7

Albert D. Hoffman
September 25, 2020

| | | | | | | |
|---|---|---|---|---|---|---|
| takes 30:20 | today 5:25 | 35:15 38:6 | we're 6:24 | 17:11 19:13 | 16:23,25 | 31 3:9 |
| 30:21 | 7:13 35:25 | unions 26:12 | 16:15 18:9 | 19:19 20:6 | 10:07 38:20 | 36 3:9 |
| talked 24:8 | 36:1 | United 1:1 | 20:21 23:11 | 20:8,13 | 100 22:18 | |
| 32:23 | told 38:5 | 23:17 24:3 | 29:24 | 21:1,14 | 12 3:16 12:24 | **4** |
| target 8:24 | top 12:17 | 24:6,15 | we've 19:14 | 26:22 27:15 | 120 22:19 | 4002 4:6 |
| 15:2,7 | 13:6 14:8 | 25:9,13,20 | 33:3 | 27:21 28:11 | 123 2:11 | |
| 17:15 | 21:3 34:11 | 25:21 26:6 | weeks 18:3 | 29:1 | 15 11:5 | **5** |
| targeted 18:7 | total 22:16,18 | 26:20 27:1 | 36:17 | wouldn't | 1515 2:18 | 5 11:4 13:11 |
| tell 26:7 | trade 24:8 | 28:11 30:18 | Weinert 2:10 | 19:24 | 15th 2:18 | 52nd 34:8 |
| 30:10 34:20 | 30:13 | upcoming | 3:9 5:14,14 | written 4:21 | 18:15 20:24 | 552 2:4 |
| tells 11:15 | tradespeople | 36:17 | 30:25 31:5 | wrong 9:21 | 21:12 | |
| temporary | 22:18 23:6 | use 29:1,8 | 31:6 33:6 | | 1670 2:11 | **6** |
| 23:15 | 23:7,13,14 | usual 37:1 | 38:13 | **X** | 19085 2:5 | 6 3:5,16 |
| ten-minute | 23:22 24:14 | utilities 17:25 | Welfare 29:9 | X 3:1,13 | 19102 2:18 | 24:18,21,23 |
| 29:17 | 27:3,6 | | went 35:6 | | 19109 2:11 | 25:7 |
| tends 23:10 | transcript | **V** | West 7:17 | **Y** | 1969 25:18 | 6,33 3:8 |
| term 10:16 | 39:8,17 | V- 1:7 | 14:16 34:8 | Yeah 38:15 | 1993 9:20 | 60 11:3 23:9 |
| 10:18 | transfer 10:6 | varies 23:8 | winter 34:1,2 | year 14:3 | 10:5 | 31:22,23 |
| terminal | traveling | vary 22:16 | 37:8 | 16:10,16,24 | | 32:5,17 |
| 32:17 34:24 | 15:4 | vault 23:18 | witness 3:3,5 | 19:23 21:25 | **2** | 37:21 |
| terms 26:5 | treatment | vendors 32:6 | 4:9,14,15 | 22:19 23:13 | 2 13:1 | 60-day 32:12 |
| 28:13,20,21 | 10:20 | verbal 6:23 | 5:2,4,6 | 34:1 36:10 | 2:19-cv-016... | |
| testified 6:7 | truthfully | verbally | 11:11 29:5 | years 7:20,21 | 1:4 | **7** |
| 31:10 37:5 | 7:13 | 35:13,14 | 29:6 38:10 | 8:12 9:10 | 20 8:12 14:2 | |
| testify 25:19 | try 6:25 | versus 16:25 | 38:11 | 9:13 13:23 | 200,000 11:3 | **8** |
| Thank 29:14 | two 16:25 | vice 8:5,7,11 | witness's | 14:6 16:25 | 2017 13:4,19 | |
| 38:10,17 | 21:3 31:11 | 8:16 9:1,7 | 4:17 | 19:21 20:2 | 14:6 | **9** |
| Thanks 26:17 | 31:12,15 | videoconfe... | witnesses | 22:2 30:18 | 2018 12:22 | 9:00 1:21 |
| 33:10 38:17 | 32:9 36:9 | 1:20 | 37:2 | 32:10 34:21 | 13:1 14:6 | 90 23:9 |
| thing 36:19 | 36:15,16 | videotaped | words 16:13 | 34:22 36:14 | 2019 12:17 | 95 11:1 |
| things 33:11 | type 10:17 | 4:19 | 26:10 | yep 25:25 | 13:25 14:4 | |
| 36:6 | 16:4 17:21 | Villanova 2:5 | work 10:18 | | 14:5 19:12 | |
| think 11:16 | 23:9 35:15 | violation 4:22 | 14:15,19 | **Z** | 21:2 31:11 | |
| 17:9,12 | typical 11:2 | volume 22:19 | 15:1 16:4 | Zimolong 2:3 | 34:1 37:8 | |
| 29:16,20,21 | typically | 23:12 | 16:14 17:1 | 2:4 3:9 | 37:12 | |
| third 13:4 | 17:18 | vote 26:14 | 17:21 18:7 | 5:17,18,22 | 2020 1:14 | |
| Thomas 2:23 | | | 18:8,13 | 6:4 11:10 | 34:1 | |
| three 7:20 | **U** | **W** | 23:9,22,23 | 11:19 29:3 | 215)525-5850 | |
| 13:10 22:2 | ultimately | wait 7:7 | 24:14 26:21 | 29:23 33:8 | 2:12 | |
| 30:18 35:22 | 18:21 31:21 | walk 32:8 | 27:7,14,18 | 36:25 37:1 | 215)665-0842 | |
| time 7:4,9 8:9 | 33:22 | Wally 5:18 | 28:19 | 38:9,17 | 2:5 | |
| 9:4,9 14:22 | unauthorized | 33:10 37:1 | worked 20:7 | Zoom 1:18 | 215)683-3573 | |
| 16:5,10,15 | 4:22 | wally@zim... | 20:9 | 1:20 4:7,10 | 2:19 | |
| 16:21 17:1 | underlying | 2:6 | workforce | 4:18 5:9 | 22 26:17 | |
| 17:8,14,16 | 13:11 | WALTER | 21:21 26:23 | | 231 4:6 | |
| 17:18 18:1 | Understand | 2:4 | 26:24 27:5 | **0** | 24 3:16 | |
| 19:11 21:8 | 28:24 | want 20:23 | 27:6,16 | | 25 1:14 7:21 | |
| 22:5 29:21 | Understood | 25:4 35:8 | 29:2,8 | **1** | | |
| 32:2 35:9 | 14:5 33:24 | 35:12 | working 15:9 | 1 3:16 11:7 | **3** | |
| timeframe | union 24:3,12 | wanted 32:2 | 18:9 | 12:3,10 | 3 13:6,9,15 | |
| 19:17 | 25:15,16 | 37:3 | workload | 1.3 34:5 | 13:19 14:12 | |
| timing 19:23 | 26:3,11,15 | Water 34:13 | 23:9 | 1.4 34:5 | 14:13 | |
| 20:4,17 | 27:20 30:7 | way 28:24 | Works 10:24 | 10 25:8 | 30 19:21 | |
| 34:21 | 30:11,13 | we'll 12:21 | 16:2 17:6 | 10-million | 22:23 | |

Exhibit M

Scott Lacava
September 25, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - -

ROAD-CON, INC., NESHAMINY    :   CIVIL ACTION
CONSTRUCTORS, INC., LOFTUS   :   NO. 2:19-cv-01667-JS
CONSTRUCTION, INC.,          :
PKF-MARK III, and SCOTT A.   :
LACAVA                       :
                Plaintiffs,  :
                             :
        -V-                  :
                             :
CITY OF PHILADELPHIA and      :
JAMES KENNEY, IN HIS         :
OFFICIAL CAPACITY AS MAYOR   :
OF THE CITY OF PHILADELPHIA  :
                Defendants.  :

- - - - - - - - - - - - - - - -

- - -

Friday, September 25, 2020

- - -

                ORAL ZOOM DEPOSITION OF SCOTT LACAVA,
taken pursuant to the Subpeona, held remotely and by
Zoom videoconference in Pennsylvania, commencing at 1:00
p.m., before SHARON RICCI, RMR, CRR - Notary Public
there being present.

Scott Lacava
September 25, 2020

Page 2

A P P E A R A N C E S:


MITCHELL LAW PLLC

BY:        JONATHAN F. MITCHELL, ESQUIRE
           111 Congress Avenue, Suite 400
           Austin, Texas 78701
           (512)686-3940
           jonathan@mitchell.law

           Representing the Plaintiffs



KANG, HAGGERTY & FETBROYT, LLC

BY:        MICHAEL SCOTT WEINERT, ESQUIRE
           123 S. Broad Street, Suite 1670
           Philadelphia, PA 19109
           (215)525-5850
           mweinert@khflaw.com

           Representing the Intervenors



CITY OF PHILADELPHIA LAW DEPARTMENT

BY:        LYDIA FURST, ESQUIRE
           AMY KIRBY, ESQUIRE
           1515 Arch Street, 15th Floor
           Philadelphia, PA 19102
           (215)683-3573
           lydia.furst@phila.gov
           amy.kirby@phila.gov

           Representing the Defendants

Scott Lacava
September 25, 2020

I N D E X

WITNESS                                          PAGE

SCOTT LACAVA
(Witness sworn)                                    5

EXAMINATION BY:

MS. KIRBY:                                         5

- - -

E X H I B I T S

NUMBER              DESCRIPTION          PAGE

(None presented.)

- - -

Scott Lacava
September 25, 2020

Page 4

```
 1              COURT REPORTER:  Counsel, I will
 2    read a stipulation into the record.  Please
 3    bear with me, as it is long.
 4              It is hereby stipulated and agreed
 5    by and between counsel for all parties present
 6    that pursuant to 231 Pa. Code 4002 this
 7    deposition is being conducted by Zoom
 8    conference, that the court reporter, all
 9    counsel, and the witness are all in separate
10    remote locations and participating via Zoom
11    conference meeting under the control of
12    Strehlow & Associates Court Reporting Service,
13    that the officer administering the oath to the
14    witness need not be in the place of the
15    deposition and the witness shall be sworn in
16    remotely by the court reporter after
17    confirming the witness's identity, that this
18    Zoom conference will not be recorded unless
19    previously noticed as a videotaped deposition
20    and that any recording without the express
21    written consent of all parties shall be
22    considered unauthorized, in violation of law,
23    and shall not be used for any purpose in this
24    litigation or otherwise.
25              It is further stipulated that
```

Scott Lacava
September 25, 2020

Page 5

1   exhibits may be marked by the attorney

2   presenting the exhibit to the witness, and

3   that a copy of any exhibit presented to a

4   witness shall be emailed to or otherwise in

5   possession of all counsel prior to any

6   questioning of a witness regarding the exhibit

7   in question.  All parties shall bear their own

8   costs in the conduct of this deposition by

9   Zoom conference.

10              So stipulated, counsel?

11              MS. KIRBY:  This is Amy Kirby for

12   the City of Philadelphia.  We agree to the

13   stipulation.

14              MR. WEINERT:  Michael Weinert,

15   attorney for the intervenors.  We agree to the

16   stipulation.

17              MR. MITCHELL:  Jonathan Mitchell

18   for the plaintiffs, and we agree to the

19   stipulation.

20              ...SCOTT LACAVA, after having been

21   first duly sworn, was examined and testified

22   as follows:

23              — — —

24      DIRECT EXAMINATION

25              — — —

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Scott Lacava
September 25, 2020

Page 6

1  BY MS. KIRBY:

2  Q.     Good morning, Mr. Lacava.

3  A.     How are you doing?

4  Q.     My name is Amy Kirby, I'm an attorney for the

5  City of Philadelphia, and I will be taking your

6  deposition today.

7          Have you ever had your deposition taken before?

8  A.     No.  Well --

9  Q.     Okay.

10 A.     No.

11 Q.     No?  Okay.

12         Then so I assume this is your first time

13 virtual deposition also?

14 A.     Yes.

15 Q.     Okay.  So I'll go over just a few ground rules so

16 we're both on the same page.  I will ask you a question

17 and I will ask that you don't respond until I get

18 through my complete question, because we have a court

19 reporter here with us.  We want to make sure that we

20 have everything down in the transcript, so make sure

21 that your answers include a verbal response as opposed

22 to just a head nod or shake of your head or anything

23 like that.

24 A.     Sure.

25 Q.     If you don't understand a question that I ask or

Scott Lacava
September 25, 2020

Page 7

1   you need me to repeat it, I'm happy to do so.  If you

2   need to take any breaks during the deposition, you can

3   feel free.  I would just ask that you answer any

4   question that's being posed before you ask for a break.

5   A.      Sure.

6   Q.      And I will say that I also tend to talk pretty

7   quickly.  So if I talk too fast for you or you need me

8   to repeat something because I am talking too fast, feel

9   free to tell me to slow down.  I won't be offended, I

10  promise.

11          Prior to the deposition today, Mr. Lacava,

12  have you looked at anything related to this case to

13  refresh your memory?

14  A.      Yes.

15  Q.      Okay.  And what have you looked at?

16  A.      I looked at the paperwork that I originally

17  signed.

18  Q.      Was that the litigation document, like the

19  complaint, or the affidavit?

20  A.      It was the affidavit.

21  Q.      Okay.  Did you consult with anyone prior to your

22  deposition today?

23  A.      Yes, I did.

24  Q.      Okay.  And who was that?

25  A.      That was the attorney.

Scott Lacava
September 25, 2020

Page 8

1   Q.     Okay.  And is there anything that might not allow

2   you to give truthful answers today?

3   A.     No.

4   Q.     Okay.  All right.  So I'm going to get started,

5   and I just want to understand a little bit of your

6   background.

7          So could you tell me, what do you do for a

8   living, Mr. Lacava?

9   A.     I build bridges.  Highway work.  Heavy

10  construction.

11  Q.     Okay.

12  A.     I'm a carpenter and some jobs as a carpenter

13  foreman.

14  Q.     Okay.  And tell me a little bit about -- and I'll

15  show my ignorance here by understanding what a carpenter

16  does, but tell me a little bit about specifically what

17  you do when you build bridges?

18         I mean, are you bringing supplies in?  Are you

19  building things up?  Are you watching other people

20  construct things?  How does your day-to-day job

21  generally work?

22  A.     On a bridge construction or even in a roadway,

23  it's from the ground up.  Everything involved in that

24  project is pretty much -- there's going to be a

25  carpenter involved.  From laying out to building the

Scott Lacava
September 25, 2020

Page 9

1    project to walking the beams, setting everything,

2    setting the beams, doing the decks, everything.

3    Q.      Okay.  And how long have you been doing carpentry

4    work or have you been a carpenter?

5    A.      Thirty-seven years.

6    Q.      Okay.  Have you done any other kind of

7    construction work other than carpentry?

8    A.      Finishing and iron worker.

9    Q.      And what kind of training have you received in

10   order to, you know, have your position or be a

11   carpenter?

12   A.      The training we received was -- most of it was on

13   the job site.  It was very long ago, but most of it was

14   on the job site and they came up through -- you had to

15   work underneath the -- what it was, was my father, who

16   was, you know, Steelworkers.

17   Q.      And you just mentioned the Steelworkers.

18           Are you affiliated with the Steelworkers?

19   A.      Yes, I am.

20   Q.      Are you a member of the Steelworkers Union?

21   A.      Yes, I am.

22   Q.      Okay.  Do they provide any -- or did they provide

23   any training back in the day when you first started 37

24   years ago?

25   A.      They -- the training they had, they had -- you

Scott Lacava
September 25, 2020

Page 10

1    could go -- they had classes you could go to and things
2    like that.  And people did go to that to go through the
3    training.
4             I know it progressed over the years where it's
5    a lot better, but -- it's very good now, but, yeah, most
6    of it back then was we were on that project and we
7    learned from the project.  That was the early 80's.
8    Q.    Okay.  Do you have any specific certifications or
9    anything like that?
10   A.    Yes, certified on the -- actually, the crane,
11   small cranes, Lulls, I'm a concrete finisher tester.
12   Q.    And for those certifications, did you get those
13   through the Steelworkers or is that a separate situation
14   where you're able to obtain the certifications?
15   A.    The Steelworkers.  It's often from the
16   Steelworkers.
17   Q.    Okay.  How long have you been a member of the
18   Steelworkers Union?
19   A.    Thirty-four years.
20   Q.    Okay.  Is that continuous, so since the time you
21   started as a member of the Steelworkers, you've always
22   been a member of the Steelworkers?
23   A.    Yes.
24   Q.    Okay.  Prior to that, prior to those 34 years,
25   were you a member of any other unions?

Scott Lacava
September 25, 2020

Page 11

1    A.      No.

2    Q.      Okay.  And during those 34 years, have you been a

3    member of any other unions?

4    A.      Yes.

5    Q.      Okay.  What other unions?

6    A.      Local 592.

7    Q.      Okay.  And tell me, what is Local 592?

8    A.      592 is the Finishers Union.

9    Q.      Okay.  And, again, forgive my ignorance about the

10   union process, but were you a member of the Steelworkers

11   Union and the Local 592 at the same time?

12   A.      No.  No.  It was six months I worked for Local

13   592 and --

14   Q.      Okay.  And when was that?

15   A.      I believe that was in 19 -- I think, believe it

16   was 1989.

17   Q.      Okay.  Definitely not a memory test, so I'm

18   impressed that you know even that close to the range.

19   That's fine.

20           So other than that little stint where you were

21   a member of Local 592, you've always been a member of

22   the Steelworkers?

23   A.      Yes.

24   Q.      Okay.  And are you familiar with Road-Con?

25   A.      Yes, I am.

Scott Lacava
September 25, 2020

Page 12

1   Q.      Are you an employee of Road-Con?

2   A.      Yes, I am.

3   Q.      Okay.  And how long have you worked for Road-Con?

4   A.      Road-Con, it's 25 years.

5   Q.      Okay.  And prior to that, who did you work for?

6   A.      It was Rocon.

7   Q.      Okay.  So it was the company that was the

8   predecessor to Road-Con, correct?

9   A.      Yes.  They had two other predecessors to it, but

10  it was always the same company.  It was different names.

11  Q.      And what was your position with Road-Con?

12  A.      I am a foreman, carpenter foreman.

13  Q.      And explain to me a little bit how that works.

14  Because I understand -- we spoke to Mr. Hoffman this

15  morning and he explained that the management officials

16  are not members of unions and, obviously, the Road-Con

17  management officials.

18          You are a member of a union, so how does that

19  fit in with your employment at Road-Con?  Are you

20  specifically employed with them?  Do you receive

21  checks from them or do you receive them from the

22  Steelworkers?

23  A.      No, I get paid from Road-Con.  All the big

24  decisions on a job site are made by the company.  Since

25  I'm a union member, I can't do anything at the

Scott Lacava
September 25, 2020

Page 13

1  management -- the guys can do.

2  Q.    Okay.  So aside from management, how many union

3  employees are employed by Road-Con, if you know?

4  A.    There's probably about -- I would say roughly 70.

5  Q.    Okay.  And do you only do work for Road-Con or do

6  you ever work for any other construction contractors?

7  A.    Over the years, I worked for other companies, but

8  they were United Steelworkers.  But only for short, you

9  know, short periods of time.

10  Q.   So explain to me how that would work.  If you're

11  technically an employee of Road-Con and you're working

12  on another project, is it because Road-Con gives you the

13  approval to work for another company, or do Steelworkers

14  tell you to work for that other company?

15        How does that actually work that you can go

16  work for someone else?

17  A.    They're with the United Steelworkers.  Say with

18  Neshaminy, Neshaminy Contractors, they're with the

19  United Steelworkers and I'm a carpenter.  And so we're

20  working on the same project, so I would just work for

21  them for two weeks or whatever.

22  Q.    Okay.  And when you say "work for them," does

23  that mean they're paying your checks, your income, or

24  what else does it look like when you say "work for

25  them"?

Scott Lacava
September 25, 2020

Page 14

1   A.      It would still be Road-Con banking.

2   Q.      So if you're working for Neshaminy, you're still

3   getting paid by Road-Con, but what does that look like?

4           Do they pay any of your benefits?  Are they the

5   ones supervising you?  How did you know you were working

6   for Neshaminy instead of Road-Con?

7   A.      Road-Con would still carry all the benefits and

8   take care of it that way.

9   Q.      Okay.  So is it fair to say -- and, again, I'm

10  just trying to figure this out so I understand -- that

11  Road-Con essentially loaned you out to Neshaminy because

12  they needed someone with your skillset?

13  A.      Possibly.

14  Q.      Okay.  I'm just -- if I am mischaracterizing it,

15  then, by all means, tell me.

16  A.      Yeah.  I don't -- possibly.  I don't --

17  Q.      Okay.

18  A.      -- know now.

19  Q.      Let me ask one more question about Local 592.

20          Why did you decide to leave Local 592?

21  A.      I worked there for -- it was like six months and

22  I -- I couldn't -- there was no work at the time.  And

23  to me, the short time I worked there, the United

24  Steelworkers, when I went back there, the reason I did

25  it is because I believed they worked together for the

Scott Lacava
September 25, 2020

Page 15

1   United Steelworkers.  I felt more comfortable working

2   with them.

3           They -- I could find work.  I could call the

4   union hall.  I could find work better.  To me, it was a

5   better organization to work on the other end.

6   Q.      So why did you decide to leave the Steelworkers

7   to go work for Local 592 for that brief period of time?

8   A.      Back in the early -- or 80's and 90's, you used

9   to have cold winters and a lot of times jobs didn't

10  carry through the winters.  And I like to keep working,

11  just like the other guys in the union.

12  Q.      Okay.  So did the Steelworkers stop working in

13  the winter, is that why --

14  A.      A project would be shut down.

15  Q.      Okay.  And the Local 592 would continue to work

16  through the winter?

17  A.      On a project they were working through the winter

18  and they continued working after that, after I left,

19  because it just wasn't -- it just wasn't comfortable for

20  me to work there.

21  Q.      Oh, I see.  So you wanted to work and they had a

22  specific project that you were available to work on, so

23  you went to work for that union, Local 592; is that

24  right?

25  A.      Yes.

Scott Lacava
September 25, 2020

Page 16

1  Q.     Okay.  And throughout the complaint and the
2  affidavit, I see the words "bargaining representative."
3           Can you tell me what that means, in your mind,
4  related to unions?
5  A.     He takes care of all the -- actually, all the
6  legal work for what we're allowed to -- what we're
7  allowed to do on jobs and who controls the workforce.
8  Q.     Okay.  Are you a bargaining representative?
9  A.     No.  No, I'm not.
10  Q.     Okay.  Is it other employees at Road-Con, is
11  that -- someone else is a bargaining representative, is
12  that how it works?
13  A.     I don't get into the bargaining representative.
14  I'm at the work end.
15  Q.     Okay.
16  A.     I'm an employee who performs the work.
17  Q.     Okay.  Bear with me for a brief moment.  I want
18  to see if I can pull up an exhibit.
19           Page one, paragraph four.
20           So, Mr. Lacava, take a look at paragraph four,
21  if you don't mind, and if you could just read it to
22  yourself.  And I just want to understand.
23           It says:  My fellow co-workers and I have
24  chosen the United Steelworkers to serve as our
25  bargaining representative.

Scott Lacava
September 25, 2020

Page 17

 1            What does it mean, chosen?  How does that
 2    process work?
 3    A.      When you join the union, when you join the union,
 4    you're joining the organization.  So we chose them when
 5    we joined.
 6    Q.      Okay.  Were there other unions that were
 7    competing for your membership?
 8    A.      No.
 9    Q.      Okay.  Was -- is there a vote among employees to
10    join the union?
11    A.      The -- no.  The union has been around for a long
12    time.  That would have had -- it wasn't at the -- it
13    wasn't at Road-Con.  Road-con wasn't already in it.
14    Q.      Okay.  So essentially you -- is it fair to say
15    you chose to work for Road-Con, they were affiliated
16    with United Steelworkers, so you decided to be
17    affiliated with United Steelworkers?
18    A.      I joined the United Steelworkers because I liked
19    it.
20    Q.      Okay.  So the Steelworkers first, and then
21    Road-Con?
22    A.      It was Road-Con -- at the same time Road-Con
23    wasn't allowed to hire until they -- I guess they have
24    the -- they hire you and you got to decide whether
25    you're going to join the union or not, because it's a

Scott Lacava
September 25, 2020

Page 18

1   union.

2   Q.     Okay.  So is it fair to say it's a condition of

3   employment with Road-Con that you become a member of the

4   United Steelworkers?

5   A.     Yes.

6   Q.     Okay.  And when you joined, you had already known

7   about the Steelworkers and you had liked them, so that

8   wasn't an issue for you; is that correct?

9   A.     It was in the family.  The family has been in it.

10  Q.     So if you didn't want to be a member of the

11  Steelworkers, could you work for Road-Con?

12  A.     I don't believe so.

13  Q.     Okay.  Other than management, are you aware of

14  any other employees of Road-Con that are not members of

15  the union, the Steelworkers?

16  A.     No, I do not.

17  Q.     So we talked before about the 70 employees who

18  are -- well, strike that.

19          During your time with Road-Con, has there ever

20  been a discussion about joining a different union

21  besides the Steelworkers?

22  A.     No.

23  Q.     Okay.  If you or your other

24  Steelworkers-associated Road-Con employees, so that 70,

25  wanted to join a union, could you guys vote or could you

Scott Lacava
September 25, 2020

Page 19

1   make that decision?

2   A.      Could we make a decision --

3   Q.      Like if you decided in this hypothetical -- if

4   you wanted to go all work for Local 592, could you guys

5   vote to switch unions from the Steelworkers to the Local

6   592 and work for them instead?

7   A.      I don't know.  I don't know.

8   Q.      Okay.  Fair enough.  And with Road-Con, are you a

9   full-time employee?

10  A.      Yes.

11  Q.      Okay.  Is any of your work ever seasonal?

12  A.      No.

13  Q.      Okay.  So you're every 365 -- you know, every

14  year you work -- you're a Road-Con employee all

15  throughout the year, correct?

16  A.      Yes.

17  Q.      Okay.  And you're not hired on a

18  project-by-project basis, correct?

19  A.      (No response.)

20  Q.      I am sorry.  Did you say no?

21  A.      It is project-based.

22  Q.      Okay.

23  A.      It's no, but it's project based.  You know, you

24  have to have a project or you're not going to be

25  working.

Scott Lacava
September 25, 2020

Page 20

1   Q.     So if Road-Con didn't have -- right now, you
2   know, it's September 25th.  Say you're about to finish
3   your project and they didn't have any new projects on
4   the horizon until October, what would happen to your
5   employment?
6   A.     They would have to -- usually they do
7   find -- they try to find more work.  I guess you would
8   be laid off.
9   Q.     Okay.  Have you ever been laid off at any point
10  since you started working for Road-Con?
11  A.     Yes.
12  Q.     Okay.  How often?
13  A.     Earlier years when it was cold out, quite a few
14  times.
15  Q.     Okay.  How about recently, in the last five
16  years?
17  A.     No.
18  Q.     Okay.
19  A.     We work rain or snow.
20  Q.     And if you were laid off, say at the end of this
21  year or next year, could you go work for another company
22  in the meantime?
23  A.     Within the union.
24  Q.     Okay.  So as long as it was a
25  Steelworkers-affiliated company, you could go do a

Scott Lacava
September 25, 2020

Page 21

1  different job?

2  A.      Yes.

3  Q.      Okay.  So does Road-Con increase their workforce

4  if they get a really big job?

5          I know you said there's about 70 of you that

6  are Road-Con employees and also Steelworker Union

7  employees.  They get a really big job, can they pull

8  people in to work on those jobs?

9  A.      Yes.

10  Q.      Do they do that often?

11  A.      Yes.

12  Q.      In the last five years, how often do you recall

13  that happening?

14  A.      I recall the turnpike.  Other than that, I don't

15  see the management end of it where there was more

16  people.

17  Q.      Okay.  Do you ever work on multiple projects at

18  once?

19  A.      Yes.

20  Q.      How often does that happen?

21  A.      It happens, I would say, about three months out

22  of the year.

23  Q.      Okay.  And have you ever worked on multiple

24  projects, one for Road-Con and one for another

25  construction company?

Scott Lacava
September 25, 2020

Page 22

1   A.     No.

2   Q.     So at the same time you've never worked on a

3   Road-Con and a non-Road-Con project?

4   A.     Correct.

5   Q.     Okay.  Have you ever worked on any projects for

6   the City of Philadelphia?

7   A.     I don't believe so.  I don't believe any of them

8   were done.

9   Q.     Okay.  Have any of the 70 employees, your other

10  union representative Road-Con employees, worked on

11  projects for the City of Philadelphia, if you know?

12  A.     I do not know that.  I don't have that

13  information.

14  Q.     Do you have any preference as to what kind of

15  projects you work on?

16  A.     No.

17  Q.     Okay.  Do you have any preference as to location

18  of projects?

19  A.     No.

20  Q.     Okay.  Do you get any say if there's two Road-Con

21  projects that are going to start around the same time,

22  do you get any say as to which one you work on?

23  A.     Wouldn't that be nice?  No.

24  Q.     And who tells you which project to work on, is it

25  Road-Con or is it the Steelworkers?

Scott Lacava
September 25, 2020

Page 23

1   A.      Road-Con directs us through the Steelworkers

2   which projects we're going to.

3   Q.      Okay.  So do you know who makes those decisions?

4   If they say Scott Lacava is going to work on a project,

5   would it be Road-Con or would it be the Steelworkers?

6   A.      It probably would be Road-Con to tell them.

7   Q.      Okay.  But you're not involved in the process?

8   A.      No.

9   Q.      Okay.  To your knowledge, have you ever worked on

10  any projects that have PLAs on them?

11  A.      I don't recall.

12  Q.      Okay.  I'm going to take a look at one more

13  exhibit, see if I want to pull it up.

14          Are you familiar with the City projects in this

15  lawsuit?

16  A.      I did hear about it.

17  Q.      Okay.  So there's two projects.  There's one,

18  we'll call the 15th Street project.

19          Does that sound familiar to you?  Do you know

20  anything about that project?

21  A.      Yes, I did hear something about it, yes.

22  Q.      Okay.  If -- and if you've heard about it, do you

23  understand that Road-Con has been on that project?

24  A.      Yes.

25  Q.      Do you know if they had been awarded the project,

Scott Lacava
September 25, 2020

Page 24

1    would you personally have worked on it?

2    A.      For the United Steelworkers, yes.

3    Q.      Okay.  And do you know in what capacity you would

4    have worked on that project?

5    A.      Carpenter foreman.

6    Q.      Okay.  And I'll ask you the same question for the

7    other contract.  We call it the runway project.  It's a

8    project at the airport.

9            Do you recall if you would have worked on that

10   project if Road-Con would have won a bid for it?

11   A.      I don't recall the job.  It must have been a

12   while ago.

13   Q.      Okay.

14                   MS. KIRBY:  I wonder if we could

15           have five minutes?  I think that might be all

16           I have.

17                   1:30, could we just have until

18           1:35.  Of course, if anyone else wants to

19           chime in, but I want to see if we have

20           anything left.

21                   MR. WEINERT:  No objection.

22                   MS. KIRBY:  Okay.  All right.  I'll

23           pop back in in five minutes.

24                   MR. WEINERT:  Great.

25                   _ _ _

Scott Lacava
September 25, 2020

Page 25

 1                         (Whereupon, a brief recess was

 2              taken.)

 3                         – – –

 4                         MS. KIRBY:  All right.  I think

 5              we're all back.  I just have a few follow-up

 6              questions and then I think we're all done.

 7    BY MS. KIRBY:

 8    Q.       Mr. Lacava, do you live in Philadelphia?

 9    A.       No.

10    Q.       Okay.  And what kind of trades are represented by

11    the Steelworkers?

12    A.       Every trade, every trade is -- for miner workers,

13    carpenters, laborers.  And in each one there's 10 to 12

14    different categories.  Operators -- there's different

15    categories, different qualifications and they cover

16    most -- almost everything.

17    Q.       Okay.  Is there any limit to the type of

18    construction projects that Steelworkers can work on?

19              I know you said they do a lot of heavy highway

20    work, but is there any type of projects they don't do?

21    A.       No.

22    Q.       Okay.  And do the Steelworkers directly pay any

23    of their members?

24              Like, would you ever get a check from the

25    Steelworkers if you worked on a project that was, you

Scott Lacava
September 25, 2020

Page 26

1   know, represented by the Steelworkers?

2   A.      When we do our training, they pay Road-Con to pay

3   us.  They have a percentage that they pay -- they pay

4   the wages for us.

5   Q.      Okay.  But you're never getting a check through

6   the Steelworkers, it's all coming through whatever

7   company you're affiliated with, correct?

8   A.      Correct.

9                   MS. KIRBY:  Okay.  I have no

10              further questions.  I don't know if Michael

11              has any, or Jonathan.

12                   MR. MITCHELL:  I don't have any

13              questions.

14                   MR. WEINERT:  No questions from me.

15                   MS. KIRBY:  All right.  I guess I

16              talked slow enough that we took almost an

17              hour, but we did'nt take too long, so I'm

18              happy about that.

19                   Thank you for you time, Mr. Lacava.

20              I appreciate it.  Thank you.

21                   - - -

22                   (Deposition concluded at 1:38 p.m.)

23                   - - -

24

25

Scott Lacava
September 25, 2020

Page 27

1

2

3            C E R T I F I C A T I O N

4

5

6          I, hereby certify that the proceedings and

7    evidence noted are contained fully and accurately in the

8    stenographic notes taken by me in the foregoing matter,

9    and that this is a correct transcript of the same.

10

11

12

13

         _____
14                  Court Reporter - Notary Public

15

16

17          (The foregoing certification of this

18   transcript does not apply to any reproduction of the

19   same by any means, unless under the direct control

20   and/or supervision of the certifying reporter.)

21

22

23

24

25

Scott Lacava
September 25, 2020

Page 1

**A**

able 10:14
accurately
  27:7
ACTION 1:4
administeri...
  4:13
affidavit 7:19
  7:20 16:2
affiliated
  9:18 17:15
  17:17 26:7
ago 9:13,24
  24:12
agree 5:12,15
  5:18
agreed 4:4
airport 24:8
allow 8:1
allowed 16:6
  16:7 17:23
Amy 2:17
  5:11 6:4
amy.kirby...
  2:20
and/or 27:20
answer 7:3
answers 6:21
  8:2
apply 27:18
appreciate
  26:20
approval
  13:13
Arch 2:18
aside 13:2
Associates
  4:12
assume 6:12
attorney 5:1
  5:15 6:4
  7:25
Austin 2:5
available
  15:22
Avenue 2:4
awarded
  23:25
aware 18:13

**B**

B 3:12
back 9:23
  10:6 14:24

15:8 24:23
  25:5
background
  8:6
banking 14:1
bargaining
  16:2,8,11
  16:13,25
based 19:23
basis 19:18
beams 9:1,2
bear 4:3 5:7
  16:17
believe 11:15
  11:15 18:12
  22:7,7
believed
  14:25
benefits 14:4
  14:7
better 10:5
  15:4,5
bid 24:10
big 12:23
  21:4,7
bit 8:5,14,16
  12:13
break 7:4
breaks 7:2
bridge 8:22
bridges 8:9
  8:17
brief 15:7
  16:17 25:1
bringing 8:18
Broad 2:11
build 8:9,17
building 8:19
  8:25

**C**

C 2:1 27:3,3
call 15:3
  23:18 24:7
capacity 1:9
  24:3
care 14:8
  16:5
carpenter
  8:12,12,15
  8:25 9:4,11
  12:12 13:19
  24:5
carpenters

25:13
carpentry 9:3
  9:7
carry 14:7
  15:10
case 7:12
categories
  25:14,15
certification
  27:17
certifications
  10:8,12,14
certified
  10:10
certify 27:6
certifying
  27:20
check 25:24
  26:5
checks 12:21
  13:23
chime 24:19
chose 17:4,15
chosen 16:24
  17:1
City 1:8,10
  2:16 5:12
  6:5 22:6,11
  23:14
CIVIL 1:4
classes 10:1
close 11:18
co-workers
  16:23
Code 4:6
cold 15:9
  20:13
comfortable
  15:1,19
coming 26:6
commencing
  1:20
companies
  13:7
company
  12:7,10,24
  13:13,14
  20:21,25
  21:25 26:7
competing
  17:7
complaint
  7:19 16:1
complete

6:18
concluded
  26:22
concrete
  10:11
condition
  18:2
conduct 5:8
conducted
  4:7
conference
  4:8,11,18
  5:9
confirming
  4:17
Congress 2:4
consent 4:21
considered
  4:22
construct
  8:20
construction
  1:5 8:10,22
  9:7 13:6
  21:25 25:18
CONSTRU...
  1:4
consult 7:21
contained
  27:7
continue
  15:15
continued
  15:18
continuous
  10:20
contract 24:7
contractors
  13:6,18
control 4:11
  27:19
controls 16:7
copy 5:3
correct 12:8
  18:8 19:15
  19:18 22:4
  26:7,8 27:9
costs 5:8
counsel 4:1,5
  4:9 5:5,10
course 24:18
court 1:1 4:1
  4:8,12,16
  6:18 27:14

cover 25:15
crane 10:10
cranes 10:11
CRR 1:21

**D**

D 3:1
day 9:23
day-to-day
  8:20
decide 14:20
  15:6 17:24
decided
  17:16 19:3
decision 19:1
  19:2
decisions
  12:24 23:3
decks 9:2
Defendants
  1:10 2:21
Definitely
  11:17
DEPART...
  2:16
deposition
  1:18 4:7,15
  4:19 5:8
  6:6,7,13 7:2
  7:11,22
  26:22
DESCRIP...
  3:14
did'nt 26:17
different
  12:10 18:20
  21:1 25:14
  25:14,15
direct 5:24
  27:19
directly
  25:22
directs 23:1
discussion
  18:20
DISTRICT
  1:1,1
document
  7:18
doing 6:3 9:2
  9:3
duly 5:21

**E**

E 2:1,1 3:1,12
  27:3
Earlier 20:13
early 10:7
  15:8
EASTERN
  1:1
emailed 5:4
employed
  12:20 13:3
employee
  12:1 13:11
  16:16 19:9
  19:14
employees
  13:3 16:10
  17:9 18:14
  18:17,24
  21:6,7 22:9
  22:10
employment
  12:19 18:3
  20:5
ESQUIRE
  2:4,10,17
  2:17
essentially
  14:11 17:14
evidence 27:7
EXAMINA...
  3:7 5:24
examined
  5:21
exhibit 5:2,3
  5:6 16:18
  23:13
exhibits 5:1
explain 12:13
  13:10
explained
  12:15
express 4:20

**F**

F 2:4 27:3
fair 14:9
  17:14 18:2
  19:8
familiar
  11:24 23:14
  23:19
family 18:9,9
fast 7:7,8
father 9:15

feel 7:3,8
fellow 16:23
felt 15:1
FETBROYT
  2:9
figure 14:10
find 15:3,4
  20:7,7
fine 11:19
finish 20:2
finisher
  10:11
Finishers
  11:8
Finishing 9:8
first 5:21
  6:12 9:23
  17:20
fit 12:19
five 20:15
  21:12 24:15
  24:23
Floor 2:18
follow-up
  25:5
follows 5:22
foregoing
  27:8,17
foreman 8:13
  12:12,12
  24:5
forgive 11:9
four 16:19,20
free 7:3,9
Friday 1:14
full-time 19:9
fully 27:7
FURST 2:17
further 4:25
  26:10

**G**

generally
  8:21
getting 14:3
  26:5
give 8:2
gives 13:12
go 6:15 10:1
  10:1,2,2
  13:15 15:7
  19:4 20:21
  20:25
going 8:4,24

17:25 19:24
  22:21 23:2
  23:4,12
good 6:2 10:5
Great 24:24
ground 6:15
  8:23
guess 17:23
  20:7 26:15
guys 13:1
  15:11 18:25
  19:4

**H**

H 3:12
HAGGER...
  2:9
hall 15:4
happen 20:4
  21:20
happening
  21:13
happens
  21:21
happy 7:1
  26:18
head 6:22,22
hear 23:16,21
heard 23:22
heavy 8:9
  25:19
held 1:19
highway 8:9
  25:19
hire 17:23,24
hired 19:17
Hoffman
  12:14
horizon 20:4
hour 26:17
hypothetical
  19:3

**I**

identity 4:17
ignorance
  8:15 11:9
III 1:5
impressed
  11:18
include 6:21
income 13:23
increase 21:3
information

22:13
**intervenors**
2:13 5:15
**involved** 8:23
8:25 23:7
**iron** 9:8
**issue** 18:8

**J**

**JAMES** 1:9
**job** 8:20 9:13
9:14 12:24
21:1,4,7
24:11
**jobs** 8:12
15:9 16:7
21:8
**join** 17:3,3,10
17:25 18:25
**joined** 17:5
17:18 18:6
**joining** 17:4
18:20
**Jonathan** 2:4
5:17 26:11
**jonathan@...**
2:6

**K**

**KANG** 2:9
**keep** 15:10
**KENNEY**
1:9
**kind** 9:6,9
22:14 25:10
**Kirby** 2:17
3:8 5:11,11
6:1,4 24:14
24:22 25:4
25:7 26:9
26:15
**know** 9:10,16
10:4 11:18
13:3,9 14:5
14:18 19:7
19:7,13,23
20:2 21:5
22:11,12
23:3,19,25
24:3 25:19
26:1,10
**knowledge**
23:9
**known** 18:6

**L**

**laborers**
25:13
**Lacava** 1:6
1:18 3:4
5:20 6:2
7:11 8:8
16:20 23:4
25:8 26:19
**laid** 20:8,9,20
**law** 2:3,16
4:22
**lawsuit** 23:15
**laying** 8:25
**learned** 10:7
**leave** 14:20
15:6
**left** 15:18
24:20
**legal** 16:6
**liked** 17:18
18:7
**limit** 25:17
**litigation**
4:24 7:18
**little** 8:5,14
8:16 11:20
12:13
**live** 25:8
**living** 8:8
**LLC** 2:9
**loaned** 14:11
**Local** 11:6,7
11:11,12,21
14:19,20
15:7,15,23
19:4,5
**location**
22:17
**locations**
4:10
**LOFTUS** 1:4
**long** 4:3 9:3
9:13 10:17
12:3 17:11
20:24 26:17
**look** 13:24
14:3 16:20
23:12
**looked** 7:12
7:15,16
**lot** 10:5 15:9
25:19
**Lulls** 10:11

**LYDIA** 2:17
**lydia.furst...**
2:19

**M**

**management**
12:15,17
13:1,2
18:13 21:15
**marked** 5:1
**matter** 27:8
**MAYOR** 1:9
**mean** 8:18
13:23 17:1
**means** 14:15
16:3 27:19
**meeting** 4:11
**member** 9:20
10:17,21,22
10:25 11:3
11:10,21,21
12:18,25
18:3,10
**members**
12:16 18:14
25:23
**membership**
17:7
**memory** 7:13
11:17
**mentioned**
9:17
**Michael** 2:10
5:14 26:10
**mind** 16:3,21
**miner** 25:12
**minutes**
24:15,23
**mischaract...**
14:14
**Mitchell** 2:3
2:4 5:17,17
26:12
**moment**
16:17
**months** 11:12
14:21 21:21
**morning** 6:2
12:15
**multiple**
21:17,23
**mweinert...**
2:12

**N**

**N** 2:1 3:1
27:3
**name** 6:4
**names** 12:10
**need** 4:14 7:1
7:2,7
**needed** 14:12
**Neshaminy**
1:4 13:18
13:18 14:2
14:6,11
**never** 22:2
26:5
**new** 20:3
**nice** 22:23
**nod** 6:22
**non-Road-...**
22:3
**Notary** 1:21
27:14
**noted** 27:7
**notes** 27:8
**noticed** 4:19
**NUMBER**
3:14

**O**

**O** 27:3
**oath** 4:13
**objection**
24:21
**obtain** 10:14
**obviously**
12:16
**October** 20:4
**offended** 7:9
**officer** 4:13
**OFFICIAL**
1:9
**officials**
12:15,17
**Oh** 15:21
**Okay** 6:9,11
6:15 7:15
7:21,24 8:1
8:4,11,14
9:3,6,22
10:8,17,20
10:24 11:2
11:5,7,9,14
11:17,24
12:3,5,7
13:2,5,22

14:9,14,17
15:12,15
16:1,8,10
16:15,17
17:6,9,14
17:20 18:2
18:6,13,23
19:8,11,13
19:17,22
20:9,12,15
20:18,24
21:3,17,23
22:5,9,17
22:20 23:3
23:7,9,12
23:17,22
24:3,6,13
24:22 25:10
25:17,22
26:5,9
**once** 21:18
**ones** 14:5
**Operators**
25:14
**opposed** 6:21
**ORAL** 1:18
**order** 9:10
**organization**
15:5 17:4
**originally**
7:16

**P**

**P** 2:1,1
**p.m** 1:21
26:22
**Pa** 2:11,18
4:6
**page** 3:3,14
6:16 16:19
**paid** 12:23
14:3
**paperwork**
7:16
**paragraph**
16:19,20
**participating**
4:10
**parties** 4:5,21
5:7
**pay** 14:4
25:22 26:2
26:2,3,3
**paying** 13:23

**Pennsylvania**
1:1,20
**people** 8:19
10:2 21:8
21:16
**percentage**
26:3
**performs**
16:16
**period** 15:7
**periods** 13:9
**personally**
24:1
**Philadelphia**
1:8,10 2:11
2:16,18
5:12 6:5
22:6,11
25:8
**PKF-MARK**
1:5
**place** 4:14
**plaintiffs** 1:6
2:7 5:18
**PLAs** 23:10
**Please** 4:2
**PLLC** 2:3
**point** 20:9
**pop** 24:23
**posed** 7:4
**position** 9:10
12:11
**possession**
5:5
**possibly**
14:13,16
**predecessor**
12:8
**predecessors**
12:9
**preference**
22:14,17
**present** 1:22
4:5
**presented**
3:15 5:3
**presenting**
5:2
**pretty** 7:6
8:24
**previously**
4:19
**prior** 5:5
7:11,21

10:24,24
12:5
**probably**
13:4 23:6
**proceedings**
27:6
**process** 11:10
17:2 23:7
**progressed**
10:4
**project** 8:24
9:1 10:6,7
13:12,20
15:14,17,22
19:23,24
20:3 22:3
22:24 23:4
23:18,20,23
23:25 24:4
24:7,8,10
25:25
**project-bas-...**
19:21
**project-by-...**
19:18
**projects** 20:3
21:17,24
22:5,11,15
22:18,21
23:2,10,14
23:17 25:18
25:20
**promise** 7:10
**provide** 9:22
9:22
**Public** 1:21
27:14
**pull** 16:18
21:7 23:13
**purpose** 4:23
**pursuant**
1:19 4:6

**Q**

**qualificatio...**
25:15
**question** 5:7
6:16,18,25
7:4 14:19
24:6
**questioning**
5:6
**questions**
25:6 26:10

26:13,14
**quickly** 7:7
**quite** 20:13

**R**

**R** 2:1 27:3
**rain** 20:19
**range** 11:18
**read** 4:2
16:21
**really** 21:4,7
**reason** 14:24
**recall** 21:12
21:14 23:11
24:9,11
**receive** 12:20
12:21
**received** 9:9
9:12
**recess** 25:1
**record** 4:2
**recorded**
4:18
**recording**
4:20
**refresh** 7:13
**regarding** 5:6
**related** 7:12
16:4
**remote** 4:10
**remotely**
1:19 4:16
**repeat** 7:1,8
**reporter** 4:1
4:8,16 6:19
27:14,20
**Reporting**
4:12
**representat...**
16:2,8,11
16:13,25
22:10
**represented**
25:10 26:1
**Representing**
2:7,13,21
**reproduction**
27:18
**respond** 6:17
**response**
6:21 19:19
**RICCI** 1:21
**right** 8:4
15:24 20:1

Scott Lacava
September 25, 2020

24:22 25:4
26:15
**RMR** 1:21
**Road-Con**
1:4 11:24
12:1,3,4,8
12:11,16,19
12:23 13:3
13:5,11,12
14:1,3,6,7
14:11 16:10
17:13,13,15
17:21,22,22
18:3,11,14
18:19,24
19:8,14
20:1,10
21:3,6,24
22:3,10,20
22:25 23:1
23:5,6,23
24:10 26:2
**roadway** 8:22
**Rocon** 12:6
**roughly** 13:4
**rules** 6:15
**runway** 24:7

_____ **S** _____

**S** 2:1,11 3:12
**says** 16:23
**Scott** 1:5,18
2:10 3:4
5:20 23:4
**seasonal**
19:11
**see** 15:21
16:2,18
21:15 23:13
24:19
**separate** 4:9
10:13
**September**
1:14 20:2
**serve** 16:24
**Service** 4:12
**setting** 9:1,2
**shake** 6:22
**SHARON**
1:21
**short** 13:8,9
14:23
**show** 8:15
**shut** 15:14

**signed** 7:17
**site** 9:13,14
12:24
**situation**
10:13
**six** 11:12
14:21
**skillset** 14:12
**slow** 7:9
26:16
**small** 10:11
**snow** 20:19
**sorry** 19:20
**sound** 23:19
**specific** 10:8
15:22
**specifically**
8:16 12:20
**spoke** 12:14
**start** 22:21
**started** 8:4
9:23 10:21
20:10
**STATES** 1:1
**Steelworker**
21:6
**Steelworkers**
9:16,17,18
9:20 10:13
10:15,16,18
10:21,22
11:10,22
12:22 13:8
13:13,17,19
14:24 15:1
15:6,12
16:24 17:16
17:17,18,20
18:4,7,11
18:15,21
19:5 22:25
23:1,5 24:2
25:11,18,22
25:25 26:1
26:6
**Steelworke...**
20:25
**Steelworke...**
18:24
**stenographic**
27:8
**stint** 11:20
**stipulated** 4:4
4:25 5:10

**stipulation**
4:2 5:13,16
5:19
**stop** 15:12
**Street** 2:11
2:18 23:18
**Strehlow**
4:12
**strike** 18:18
**Subpeona**
1:19
**Suite** 2:4,11
**supervising**
14:5
**supervision**
27:20
**supplies** 8:18
**sure** 6:13,20
6:24 7:5
**switch** 19:5
**sworn** 3:5
4:15 5:21

_____ **T** _____

**T** 3:12 27:3,3
**take** 7:2 14:8
16:20 23:12
26:17
**taken** 1:19
6:7 25:2
27:8
**takes** 16:5
**talk** 7:6,7
**talked** 18:17
26:16
**talking** 7:8
**technically**
13:11
**tell** 7:9 8:7,14
8:16 11:7
13:14 14:15
16:3 23:6
**tells** 22:24
**tend** 7:6
**test** 11:17
**tester** 10:11
**testified** 5:21
**Texas** 2:5
**Thank** 26:19
26:20
**things** 8:19
8:20 10:1
**think** 11:15
24:15 25:4

25:6
**Thirty-four**
10:19
**Thirty-seven**
9:5
**three** 21:21
**time** 6:12
10:20 11:11
13:9 14:22
14:23 15:7
17:12,22
18:19 22:2
22:21 26:19
**times** 15:9
20:14
**today** 6:6
7:11,22 8:2
**trade** 25:12
25:12
**trades** 25:10
**training** 9:9
9:12,23,25
10:3 26:2
**transcript**
6:20 27:9
27:18
**truthful** 8:2
**try** 20:7
**trying** 14:10
**turnpike**
21:14
**two** 12:9
13:21 22:20
23:17
**type** 25:17,20

_____ **U** _____

**unauthorized**
4:22
**underneath**
9:15
**understand**
6:25 8:5
12:14 14:10
16:22 23:23
**understand...**
8:15
**union** 9:20
10:18 11:8
11:10,11
12:18,25
13:2 15:4
15:11,23
17:3,3,10

17:11,25
18:1,15,20
18:25 20:23
21:6 22:10
**unions** 10:25
11:3,5
12:16 16:4
17:6 19:5
**United** 1:1
13:8,17,19
14:23 15:1
16:24 17:16
17:17,18
18:4 24:2
**usually** 20:6

_____ **V** _____

**V-** 1:7
**verbal** 6:21
**videoconfe...**
1:20
**videotaped**
4:19
**violation** 4:22
**virtual** 6:13
**vote** 17:9
18:25 19:5

_____ **W** _____

**wages** 26:4
**walking** 9:1
**want** 6:19 8:5
16:17,22
18:10 23:13
24:19
**wanted** 15:21
18:25 19:4
**wants** 24:18
**wasn't** 15:19
15:19 17:12
17:13,13,23
18:8
**watching**
8:19
**way** 14:8
**we'll** 23:18
**we're** 6:16
13:19 16:6
16:6 23:2
25:5,6
**weeks** 13:21
**Weinert** 2:10
5:14,14
24:21,24

26:14
**went** 14:24
15:23
**winter** 15:13
15:16,17
**winters** 15:9
15:10
**witness** 3:3,5
4:9,14,15
5:2,4,6
**witness's**
4:17
**won** 24:10
**wonder** 24:14
**words** 16:2
**work** 8:9,21
9:4,7,15
12:5 13:5,6
13:10,13,14
13:15,16,20
13:22,24
14:22 15:3
15:4,5,7,15
15:20,21,22
15:23 16:6
16:14,16
17:2,15
18:11 19:4
19:6,11,14
20:7,19,21
21:8,17
22:15,22,24
23:4 25:18
25:20
**worked** 11:12
12:3 13:7
14:21,23,25
21:23 22:2
22:5,10
23:9 24:1,4
24:9 25:25
**worker** 9:8
**workers**
25:12
**workforce**
16:7 21:3
**working**
13:11,20
14:2,5 15:1
15:10,12,17
15:18 19:25
20:10
**works** 12:13
16:12

**Wouldn't**
22:23
**written** 4:21

_____ **X** _____

**X** 3:1,12

_____ **Y** _____

**yeah** 10:5
14:16
**year** 19:14,15
20:21,21
21:22
**years** 9:5,24
10:4,19,24
11:2 12:4
13:7 20:13
20:16 21:12

_____ **Z** _____

**Zoom** 1:18
1:20 4:7,10
4:18 5:9

_____ **0** _____

_____ **1** _____

**1:00** 1:20
**1:30** 24:17
**1:35** 24:18
**1:38** 26:22
**10** 25:13
**111** 2:4
**12** 25:13
**123** 2:11
**1515** 2:18
**15th** 2:18
23:18
**1670** 2:11
**19** 11:15
**19102** 2:18
**19109** 2:11
**1989** 11:16

_____ **2** _____

**2:19-cv-016...**
1:4
**2020** 1:14
**215)525-5850**
2:12
**215)683-3573**
2:19
**231** 4:6
**25** 1:14 12:4

**25th** 20:2

_____ **3** _____

**34** 10:24 11:2
**365** 19:13
**37** 9:23

_____ **4** _____

**400** 2:4
**4002** 4:6

_____ **5** _____

**5** 3:5,8
**512)686-3940**
2:5
**592** 11:6,7,8
11:11,13,21
14:19,20
15:7,15,23
19:4,6

_____ **6** _____

_____ **7** _____

**70** 13:4 18:17
18:24 21:5
22:9
**78701** 2:5

_____ **8** _____

**80's** 10:7 15:8

_____ **9** _____

**90's** 15:8

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Exhibit N

Kevin J. Loftus
October 6, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROAD-CON, INC., NESHAMINY   : No. 2:19-cv-01667-JS
CONSTRUCTORS, INC., LOFTUS  :
CONSTRUCTION, INC., PKF-MARK:
III, AND SCOTT A. LACAVA    :
                            :
          Plaintiffs,       :
                            :
     v.                     :
                            :
CITY OF PHILADELPHIA AND    :
JAMES KENNEY, in his        :
Official capacity as Mayor  :
Of the City of Philadelphia :
                            :
          Defendants.       :


                   -   -   -

          Wednesday, October 6, 2020

                   -   -   -

          Videoconference deposition of KEVIN

J. LOFTUS was taken before Kathryn Doyle, a Notary

Public of the Commonwealth of Pennsylvania, on the

above date, commencing at 2:23 p.m.

                   -   -   -

          STREHLOW & ASSOCIATES
          54 FRIENDS LANE, SUITE 116
          NEWTOWN, PENNSYLVANIA 18940
              (215) 504-4622
          WWW.STREHLOWCOURTREPORTING.COM

Kevin J. Loftus
October 6, 2020

Page 2

A P P E A R A N C E S:


        ZIMOLONG, LLC
        BY: WALTER S. ZIMOLONG, ESQUIRE
            353 Lancaster Avenue
            Suite 300
            Wayne, PA 19087
            wally@zimolonglaw.com
            (215) 665-0842

        Representing the Plaintiffs
        (Via Zoom.)


        KANG HAGGERTY & FETBROYT LLC
        BY: MICHAEL S. WEINERT, ESQUIRE
            123 S Broad Street
            Suite 1670
            Philadelphia, PA 19109
            mweinert@khflaw.com
            (215) 525-5850

        Representing the Mechanical and
        Service Contractors Association
        (Via Zoom.)


        CITY OF PHILADELPHIA - LAW DEPARTMENT
        BY: AMY KIRBY, ESQUIRE
            1515 Arch Street
            15th Floor
            Philadelphia, PA 19102
            Amy.Kirby@phila.gov
            (215) 683-3566

        Representing the City of Philadelphia.
        (Via Zoom.)

Kevin J. Loftus
October 6, 2020

I N D E X

WITNESS:

KEVIN J. LOFTUS

| BY | EXAMINATION | PAGE |
|---|---|---|
| MS. KIRBY | DIRECT EXAMINATION | 6 |
| MR. ZIMOLONG | CROSS-EXAMINATION | 31 |
| MS. KIRBY | REDIRECT EXAMINATION | 31 |

E X H I B I T S

NUMBER                  DESCRIPTION              PAGE


    (No exhibits were marked for identification.)

Kevin J. Loftus
October 6, 2020

Page 4

```
1                    -  -  -  -  -
2              (It is agreed by and between
3    counsel that all objections, except as to the
4    form of the questions, are reserved until the
5    time of the trial.)
6                    -  -  -  -  -
7              KEVIN J. LOFTUS, having been duly
8    sworn according to law, was examined, and
9    testified as follows:
10                   -  -  -  -  -
11                      PROCEEDINGS
12                   -  -  -  -  -
13             THE COURT REPORTER:  I have to read a
14        statement into the record before we get
15        started.
16             It is hereby stipulated and agreed by and
17        between counsel for all parties present that
18        pursuant to 231 Pa. Code Section 4002 this
19        deposition is being conducted by video
20        conference, that the court reporter, all
21        counsel, and the witness are all in separate
22        remote locations and participating via Zoom
23        videoconference under the control of Strehlow &
24        Associates Court Reporting Service, that the
```

Kevin J. Loftus
October 6, 2020

Page 5

1        officer administering the oath to the witness

2        need not be in the place of the deposition and

3        the witness shall be sworn in remotely by the

4        court reporter after confirming the witness's

5        identity, that this video conference will not

6        be recorded unless previously noticed as a

7        videotaped deposition and that any recording

8        without the express written consent of all

9        parties shall be considered unauthorized, in

10       violation of law, and shall not be used for any

11       purpose in this litigation or otherwise.

12            It is further stipulated that exhibits may

13       be marked by the attorney presenting the

14       exhibit to the witness, and that a copy of any

15       exhibit presented to a witness shall be emailed

16       to or otherwise in possession of all counsel

17       prior to any questioning of a witness regarding

18       the exhibit in question.

19            And that all parties shall bear their own

20       costs in the conduct of this deposition by

21       video conference.

22            Is that agreeable?

23            MS. KIRBY:  Yes.  Amy Kirby for the City

24       of Philadelphia, yes, that's acceptable.

Kevin J. Loftus
October 6, 2020

Page 6

1          MR. ZIMOLONG:  As to plaintiffs, yes.

2          The only other stipulation I'd put on the

3     record is we reserve the right to read and

4     sign -- the witness would like to read and

5     sign, if you can put that on the record,

6     please.

7          MR. WEINERT:  And Michael Weinert agrees

8     to the stipulation.

9               -  -  -  -  -

10              DIRECT EXAMINATION

11              -  -  -  -  -

12   BY MS. KIRBY:

13     Q    Good afternoon, Mr. Loftus.

14     A    Good afternoon.

15     Q    My name is Amy Kirby.  I'm an attorney

16   with the City of Philadelphia and I'm going to be

17   taking your deposition this afternoon.

18              Have you ever been deposed before?

19     A    I have.

20     Q    Okay.  Has it been recently?

21     A    No, a couple years.

22     Q    Okay.  I'll go over some ground rules

23   since it's been a couple years, but feel free to ask

24   questions if you have any.

Kevin J. Loftus
October 6, 2020

Page 7

 1                      I'll be asking you questions.  Please

 2    wait until I ask a full question before you start

 3    answering.  That helps the court reporters to make

 4    sure she can hear us both.

 5                      When you respond to a question,

 6    please make sure that you have a verbal response and

 7    not just a nod of the head or a shake of the head so

 8    that she can take that down.

 9                      If you don't understand a question or

10    if I talk to you too fast and you can't hear me,

11    feel free to tell me to slow down or repeat a

12    question.

13                      If you have any follow-up concerns

14    about a question, feel free to jump in and ask me

15    about them.

16                      I don't anticipate this will be a

17    long deposition, but if you do need a break, of

18    course, you're welcome to take one.  I just ask that

19    you don't take a break when there's a question

20    pending.  So you have to answer any question before

21    then.

22                      Is there any reason that you can't be

23    truthful this afternoon?

24        A     No reason.

Kevin J. Loftus
October 6, 2020

Page 8

1       Q     Okay.  Let's start a little bit with your

2  background.

3                    So tell me about your current

4  position.

5       A     I'm president and CEO of Loftus

6  Construction, Incorporated.

7       Q     Okay.  And how long have you been in that

8  position?

9       A     26 years.

10      Q     Okay.  And just tell me, generally, a

11  little bit about what your duties are?

12      A     I'm responsible for the overall financial

13  administration of the business, the procurement

14  side, and I oversee operations.

15      Q     Okay.  So you said you're in charge of

16  procurement.

17                    Does that mean that you are in charge

18  of choosing which project Loftus will bid on?

19      A     That's correct.

20      Q     Okay.  Do you do that with anyone else in

21  the office or is that just mainly your job?

22      A     The chief estimator, I do it in

23  conjunction with them.

24      Q     Okay.  Prior to your 26 years with Loftus,

Kevin J. Loftus
October 6, 2020

Page 9

1    what did you do before then?

2         A    I graduated from college at Drexel in

3    1987.  I worked for four years for Brandy

4    Corporation on the Schuylkill Expressway and Vine

5    Street reconstruction projects.

6                   And I worked for a couple years in

7    Maryland for Facchina Construction and a year for

8    Agate Construction in Cape May County.

9         Q    Okay.  So is it fair to say you have the

10   final authority on which projects you bid on for

11   Loftus Construction?

12        A    Yes, ma'am.

13        Q    Okay.  Tell me a little bit about Loftus,

14   itself.

15                  How long has Loftus been in business?

16        A    We formed it in 1994.  Our office is

17   located in New Jersey.  90 percent of our work is in

18   Pennsylvania.

19                  We do heavy civil construction,

20   primarily, bridges.  We also do some dam

21   reconstruction projects and heavy structures.

22        Q    Okay.  And forgive me, because I'm not

23   good at math.

24                  How many years was Loftus in business

Kevin J. Loftus
October 6, 2020

Page 10

1    before you became the CEO or did you start Loftus?

2         A    I started it.

3         Q    Okay.  Fair enough.

4              Is Loftus a member of the

5    Pennsylvania Heavy and Highway Contractors

6    Bargaining Association?

7         A    Yes, ma'am.

8         Q    Okay.  How long have you been a member of

9    the Heavy Highway Contractors Association?

10        A    23 years.

11        Q    Okay.  So you were on board, you were

12   working for Loftus when you guys became a member?

13        A    Yes, ma'am.

14        Q    Tell me why you made the decision to

15   become a member.

16        A    Primarily to increase our ability to get

17   qualified workers.

18        Q    Okay.

19        A    Rather than posting ads in newspapers, it

20   gives us the opportunity to have a viable hiring

21   haul.

22        Q    Tell me a little bit, if you know, about

23   the actual association.  I mean, you're saying it

24   helps you have a viable hiring haul.

Kevin J. Loftus
October 6, 2020

Page 11

1               What do they do for Loftus

2    Construction?

3        A     Well, the association is the bargaining

4    entity for the contractors working in conjunction

5    with the United Steelworkers of America.

6        Q     Okay.  So is it fair to say there's kind

7    of like Loftus, the association and then the

8    steelworkers, they are kind of a go between, the

9    association is?

10       A     We're members of the association.  I'd put

11   us in line with the association.

12             I'm on the executive committee, so

13   I'm active in the association.

14       Q     Okay.  And you're currently a member,

15   correct?

16       A     Yes, ma'am.

17       Q     Okay.  So you said you did generally civil

18   construction, some damming projects, a couple of

19   other types of things.

20             Do you do heavy and highway

21   construction?

22       A     Yes.  Heavy and highway -- bridges falls

23   within that realm.  So majority of the work that I

24   refer to as heavy bridges is heavy highway.

Kevin J. Loftus
October 6, 2020

Page 12

1        Q     Okay.

2        A     We don't do road work.  We sub that out.

3        Q     Okay.  How much of your business, like

4    percentage-wise, is bridges?

5        A     Right now, 100 percent.

6        Q     Okay.  Just generally, over the last five

7    years?

8        A     Generally, 80 to 90 percent.

9        Q     Okay.  And then the other 10 to 20 percent

10   is dam --

11       A     Foundations.  We've done bulkheads.  We've

12   done dams.

13       Q     Okay.  How much of Loftus' business is in

14   public works projects?

15       A     Right now, 100 percent.

16       Q     Okay.  And again, last five years

17   probably?

18       A     98 percent.  We do very little private

19   work.  We did one job last year.

20       Q     Okay.  Was that a bridge job, that private

21   job?

22       A     It was a bulkhead in a residential -- I

23   mean, a commercial development.

24       Q     Okay.  Tell me a little bit about -- we'll

Kevin J. Loftus
October 6, 2020

Page 13

1   stick with this five year period.

2                   What's the typical contract amount

3   for Loftus?

4       A    It does vary.  Typical contract amount is

5   between 2 million and 15 million.

6       Q    Okay.  And are most of those projects as

7   primes or do you ever work as a subcontractor?

8       A    I honestly can't remember the last time I

9   worked as a sub.

10      Q    Okay.  Do you ever work on any smaller

11  projects under that $2 million threshold?

12      A    Sure.

13      Q    Okay.  But not as often -- the typical

14  projects are over 2 million?

15      A    Right.

16      Q    Okay.  Tell me a little bit about the

17  geographic area where Loftus works -- what states,

18  what counties?

19      A    Right now all of our work is in the five

20  county area, so Philadelphia and the four suburban

21  counties.

22                  We also look at work in the southern

23  counties of New Jersey -- Burlington County, Camden

24  County.

Kevin J. Loftus
October 6, 2020

Page 14

1                    We do very little work outside -- in

2      Pennsylvania that's outside of the five county area.

3           Q     How about Delaware?  Do you do any work

4      there?

5           A     No.

6           Q     It's all PA and New Jersey?

7           A     Yes, ma'am.

8           Q     Okay.  So in your time working in other PA

9      counties or New Jersey, I guess all of your work, do

10     you ever work -- do you ever sign on other project

11     labor agreements?

12          A     No, ma'am.

13          Q     Okay.  So do you recall in the last five

14     years working on any projects with a project labor

15     agreement?

16          A     In 26 years we've never.

17          Q     Okay.  Fair enough.  And is that by

18     design?  Do you avoid projects with project labor

19     agreements or it just ends up that the projects you

20     bid on don't have them?

21          A     We typically don't bid a job with a

22     project labor agreement, because of -- our workers

23     are all steelworkers.

24                    And the rules that are typically in a

Kevin J. Loftus
October 6, 2020

Page 15

1   PLA are negotiated by someone other than a

2   bargaining association.  And we find them to be a

3   challenge.

4       Q    Okay.  Have you ever bid on a project with

5   a project labor agreement?

6       A    No, ma'am.

7       Q    Okay.  Do you know of any project labor

8   agreements that include the steelworkers in the

9   areas that you work in?

10      A    I'm not aware of any.

11      Q    Okay.  I want to talk a little bit about

12  any business that Loftus has with the City of

13  Philadelphia.

14               So does Loftus -- either you or

15  someone in your company -- monitor the Philadelphia

16  invitations to bid?

17      A    Yes, ma'am.

18      Q    Okay.  And when you're monitoring those

19  and looking at the projects, what factors do you

20  consider when determining whether to bid on a City

21  of Philadelphia project?

22      A    Project scope, project size and our

23  current backlog -- meaning, what periods of time we

24  need work.

Kevin J. Loftus
October 6, 2020

Page 16

1                 Contract times are typically very

2     critical.  If they give you two years to build a job

3     that's going to take a year, it's more attractive

4     than a job that's going to take all two years.

5          Q     Do you ever pass on projects that are

6     shorter duration because you can find something with

7     a longer duration somewhere else?

8          A     Yes.

9          Q     Okay.  When you say scope, I'm assuming

10    that means limited to your area of expertise?

11         A     Yes, ma'am.

12         Q     Okay.  Do you ever look at projects to

13    determine if they have a PLA and then determine not

14    to bid on them?

15         A     Yes, ma'am.

16         Q     Okay.  Does -- this is probably along the

17    scope in size -- but does the cost of the project

18    factor in to whether you bid on it or not?

19         A     Yeah.  That's what I would refer to as the

20    size.  Typically, the contract amount -- estimated

21    contract amount.

22         Q     Okay.  Are there certain City departments

23    that you work with more than others?

24         A     Typically, it's the Streets Department,

Kevin J. Loftus
October 6, 2020

Page 17

1    especially in the last five years.

2         Q    Okay.  Would you consider the City of

3    Philadelphia as, you know, one of your clients or

4    one of your repeat, you know?

5         A    It's certainly one of the markets that we

6    track.  And we bid their work when it suits our

7    business model, along with SEPTA and PennDOT and

8    various municipalities and counties.

9         Q    In the last five years, approximately, how

10   many jobs have you done for the City of

11   Philadelphia?

12        A    Two.

13        Q    Which were those projects?

14        A    41st Street bridge in Southwest

15   Philadelphia over SEPTA.  And we did a smaller

16   stream bank stabilization on the Schuylkill River.

17        Q    And I'm assuming the 41st Street bridge

18   was for Streets?

19        A    Yes, ma'am.

20        Q    Was the stream bank for Streets, also?

21        A    No.  It was Parks.

22        Q    I don't know.  But it sounds like that

23   would be --

24        A    It's not actually Parks, but it's that

Kevin J. Loftus
October 6, 2020

Page 18

1    group.

2        Q    Okay.  And do you remember the dollar

3    value of that 41st Street bridge project,

4    approximately?

5        A    13 million.

6        Q    Okay.  I'm assuming that one did not have

7    a PLA on it?

8        A    That's correct.

9        Q    Okay.  What about the stream bank project?

10   What was the dollar value?

11       A    700,000.

12       Q    Okay.  Again, I'm assuming that one didn't

13   have a PLA on it either?

14       A    Correct.

15       Q    Okay.  Are you familiar with the 15th

16   Street project that's the subject of this

17   litigation?

18       A    Yes, ma'am.

19       Q    Okay.  Was Loftus interested in bidding on

20   that project?

21       A    Yes.

22       Q    Did you bid on that project?

23       A    I did not.

24       Q    You did not, okay.

Kevin J. Loftus
October 6, 2020

Page 19

1                    Were you prequalified to bid on that

2    project?

3         A    Yes.

4         Q    Okay.  So explain a little bit about that

5    prequalification process.

6                    What did you have to submit and give

7    to the City in order to be prequalified?

8         A    It's a four or five page packet where you

9    list your qualifications, the projects you've done.

10   I believe there's something on there that talks

11   about financial capacity.

12        Q    Okay.  And I understand you were

13   recommended for qualification on that project; is

14   that right?

15        A    Yes, ma'am.

16        Q    Be you didn't end up bidding?

17        A    No, ma'am.

18        Q    Why was that?

19        A    We picked up other work in the interim.

20                   And as I mentioned earlier, we

21   balance out procurement efforts to match our current

22   backlog.  And our backlog was too large for us to

23   handle 15th Street project.

24        Q    Okay.  Are you familiar with the runway

Kevin J. Loftus
October 6, 2020

Page 20

1    project that's the subject of this litigation?

2         A    Vaguely.  I didn't look at the plans.  I

3    just heard about it.

4         Q    Okay.  So it's fair to say that wasn't a

5    project that you bid on?

6         A    That's correct.

7         Q    And it wasn't a project that you requested

8    prequalification for?

9         A    No.

10        Q    Okay.  Why was that?

11        A    We don't do runway work.

12        Q    Okay.  You're answering all of my

13   questions before I get to them.  I'm just going

14   through them to make sure I didn't miss anything.

15   It happens all the time and I don't hate it.  I

16   appreciate it.

17        A    I'd like to apologize --

18        Q    No, I appreciate it.

19                  I think you probably answered this,

20   but I'll ask it kind of in a different way.

21                  Has Loftus ever refrained from

22   bidding on a City of Philadelphia public works

23   project for a reason other than a PLA?

24        A    Yes.

Kevin J. Loftus
October 6, 2020

Page 21

1      Q     And is it kind of that same answer you

2   gave me before?  Because you're looking at scope and

3   size?

4      A     Exactly.

5      Q     Okay.  And again, maybe you already

6   answered this one in a different way.

7                Have you ever seen a City of

8   Philadelphia project and said:  Hey.  This is

9   perfect.  This is within our scope, within size, but

10  did not bid on it because there was a PLA?

11     A     No.

12     Q     Okay.  How many employees does Loftus

13  have -- I'll separate them.

14                How many management employees?  Let's

15  do it that way.

16     A     Eighteen.

17     Q     Okay.  And they are all non-union

18  employees?

19     A     Yes, ma'am.

20     Q     Okay.  And so none of those are members of

21  the Steelworkers, correct?

22     A     Correct.

23     Q     Okay.  And none of them are members of

24  another union, correct?

Kevin J. Loftus
October 6, 2020

Page 22

1        A    Correct.

2        Q    Okay.  So how many -- and are those 18

3   employees permanent employees of Loftus?

4        A    Yes.

5        Q    Okay.  Other than your 18 management

6   employees, how many employees does Loftus have,

7   let's say, right now?

8        A    38.

9        Q    Okay.  So that means we have 20 employees,

10  if I'm doing my math right, who are steelworkers,

11  correct -- is that right?

12       A    No.  It's 38 in addition to the

13  management.

14       Q    Oh, okay.  So we have 38 employees.

15            Are those union employees?

16       A    35 of the 38 are, yes.

17       Q    Okay.  And those 35, what union are they

18  affiliated with?

19       A    United Steelworkers of America.

20       Q    And then the other three, what are they?

21       A    They are shop employees.  The bargaining

22  agreement does not cover the shop -- mechanics.

23       Q    Are they supervisors?  I'm just curious.

24       A    Yes, they are.

Kevin J. Loftus
October 6, 2020

Page 23

1      Q     Okay.  But they are also temporary

2  employees, so they are not employees of Loftus?

3      A     Other than when we were suspended by the

4  governor because of COVID, those gentlemen haven't

5  been laid off in many years.

6      Q     Okay.

7      A     So I'm not sure what the definition of

8  temporary is.

9      Q     Sure.  Fair enough.

10               I guess they have not permanent

11  employees of Loftus --

12      A     They are hourly employees, if that makes a

13  distinguishment.

14            MR. ZIMOLONG:  I'm not really sure what

15        you mean by permanent, but it sounds like they

16        are salary employees.  They've been there for

17        10 years.

18            THE WITNESS:  They are hourly, but they

19        consider themselves permanent and so do I.

20            MS. KIRBY:  Okay.

21  BY MS. KIRBY:

22      Q     So for the steelworkers employees, these

23  35 you have right now, when you don't have work for

24  them, do they go work for other contractors?

Kevin J. Loftus
October 6, 2020

Page 24

1        A    Yes.

2        Q    Okay.  Is it fair to say these 35

3    employees, are they generally employed by Loftus or

4    is it kind of like 100 percent, 80 percent, 50/50

5    with you and other contractors?

6        A    I would say that of the 35, 25 haven't

7    been laid off, again, other than when we were

8    suspended by the governor in well past the five year

9    window you were referring to.

10                 And the others, with some seasonal

11   transitions, they may get laid off for a few months

12   during the winter.

13                 At that point, it's up to them

14   whether they go back to work or wait to be

15   re-called.

16       Q    Okay.  Since you're doing kind of, I'll

17   call it, a discrete construction, you're just doing

18   bridge work, do you generally get the same

19   steelworker employees to come work for Loftus?

20       A    We don't layoff, typically.  When we bring

21   steelworkers in, we keep them.

22                 When we do lay them off for seasonal,

23   they are aware when they are laid off if they are

24   expected to be recalled.  And typically, we recall

Kevin J. Loftus
October 6, 2020

Page 25

1    everybody.  We don't terminate by layoff.

2         Q    I see.  Is bridge work pretty seasonal?

3         A    No.  Certain parts of bridge work are

4    seasonal -- the temperature and weather control.

5    But there's a lot of work that we do that we can do

6    12 months a year.

7         Q    Okay.  In your declaration -- and I can

8    show it to you if you don't recall this -- it says

9    that the employees of Loftus have chosen the United

10   Steelworkers as their bargaining representative.

11              How does that process work?  I'm

12   trying to figure out what the word chosen means?

13        A    They were referred to us upon request by

14   the steelworkers.  They had already reached an

15   agreement to be a steelworker.

16        Q    So this is -- the individual employees are

17   deciding they want to be affiliated with the

18   steelworkers?

19        A    Correct.

20        Q    Loftus had no say in that --

21        A    No.  When we first signed, we had three

22   employees that joined the union by their choice.

23   Everybody else that works for us has been referred

24   to us by the Union as a union member.

Kevin J. Loftus
October 6, 2020

Page 26

1       Q     Okay.  Do you know, could these employees

2  have chosen another union to represent them?

3       A     Sure.

4       Q     Okay.  Do you know if any of these

5  steelworker employees work with any unions in

6  addition to the steelworkers?

7       A     I'm not aware of any.

8       Q     To your knowledge, are they allowed to?

9       A     I don't believe so.  I'm not really sure.

10 I've never seen the documents that they sign as an

11 employee for union members, sorry.

12      Q     Fair enough.

13            To your knowledge, could they chose

14 another union to represent them in the future?

15      A     I don't know.  I've never talked to the

16 union about that.

17      Q     Sure.  Another statement in your

18 declaration is:  Because Loftus maintains a

19 collective bargaining agreement with the United

20 Steelworkers, they cannot perform work of any City

21 of Philadelphia public works project subject to a

22 project labor agreement with its current workforce.

23      A     Correct.

24      Q     So when you say current workforce, could

Kevin J. Loftus
October 6, 2020

Page 27

1    it perform -- I guess I want to understand what

2    current workforce means.

3                 That's means these 35 steelworkers,

4    correct?

5         A    Correct.

6         Q    Could you perform City of Philadelphia

7    public works projects with another workforce?

8         A    With or without a PLA?

9         Q    With a PLA.

10        A    No.  Because we're obligated to use the

11   bargaining association, that's who we chose to use

12   and that's our business model.  That's who we prefer

13   to use.

14        Q    Okay.  Could you chose to disaffiliate

15   with the Steelworkers if you wanted to?

16        A    I'd have to ask Andrew Levy, the

17   bargaining association attorney.

18                 That's not something I've ever

19   considered, so I don't know.

20        Q    Okay.  So it's fair to say that you can

21   perform City of Philadelphia public works contract

22   without PLAs on them, correct?

23        A    Absolutely.

24        Q    Okay.  Have you ever asked an employee of

Kevin J. Loftus
October 6, 2020

Page 28

1    Loftus to change their union membership so that

2    Loftus could bid on a City of Philadelphia project?

3        A    No.

4        Q    Okay.

5        A    I was waiting for you to say with the PLA.

6        Q    Essentially, I guess, I would have to say

7    with a PLA, but either way.

8              Do you anticipate asking any of your

9    employees to change their union affiliations so you

10   can benefit on a city public works project with a

11   PLA?

12       A    No.

13       Q    Would you bid on a City of Philadelphia

14   public works project that required a PLA if the

15   United Steelworkers were a member of that PLA?

16       A    Not without having seen the agreement.

17   The agreements are all drafted by different

18   individuals and it may not be something that we can

19   comply with.

20              The project labor agreement, by

21   virtue of its term, is an agreement that's

22   structured between, typically, as I understand it,

23   the unions and the owner -- in this case, the City

24   of Philadelphia.

Kevin J. Loftus
October 6, 2020

Page 29

1                    They then give us that agreement and

2    we have a choice to play by those rules or not play.

3         Q    Okay.

4         A    So I can't answer your question without

5    seeing the agreement.

6                    Every agreement I've read is

7    different.

8         Q    What terms or concerns would you have --

9    what would you be looking for if you were looking at

10   the PLA -- assume the Steelworkers are included, so

11   you're over that hurdle.

12                   What other things would you be

13   looking for in that PLA?

14        A    Anything that's different than my

15   agreement with the Steelworkers.  Any departure from

16   how we currently do business.

17        Q    And honestly, I want to understand what

18   that means.

19                   If you can give me an example of a

20   term that would not be appropriate for something

21   that wouldn't allow you to bid on a project.

22        A    The agreement that we have with the

23   Steelworkers allows a worker to perform a specific

24   trade that's needed that day.  He's not precluded

Kevin J. Loftus
October 6, 2020

Page 30

1    from doing a trade.

2              As an example, if a carpenter wants

3    to finish concrete, he can if he's skilled enough.

4    Whereas some of building trades, that portability

5    may not be allowed.

6        Q    Okay.  Any other examples or any other

7    thing you'd be looking at?

8        A    That's the best one I can come up with.

9        Q    Okay.  Fair enough.

10             MS. KIRBY:  I think that's it.  Let me

11        take 30 seconds to look through my notes.

12                       -  -  -  -  -

13    (Whereupon a discussion was held off the record.)

14                       -  -  -  -  -

15             MS. KIRBY:  I think that's it.  I told you

16        I'd be pretty quick -- unless Wally has any

17        follow up or Michael.

18             MR. WEINERT:  I don't have anything.

19             MR. ZIMOLONG:  Kevin, just stop your video

20        and mute.

21                       -  -  -  -  -

22    (Whereupon a discussion was held off the record.)

23                       -  -  -  -  -

24                  CROSS-EXAMINATION

Kevin J. Loftus
October 6, 2020

Page 31

```
 1                    -  -  -  -  -

 2   BY MR. ZIMOLONG:

 3        Q    Good afternoon, Mr. Loftus.  I wanted to

 4   just talk to you briefly about your testimony

 5   regarding the 15th Street bridge project.

 6                 Is that okay?

 7        A    Yes, sir.

 8        Q    Okay.  Did I hear your testimony correctly

 9   that Loftus decided to not submit a bid on the 15th

10   Street project because at the time, it was busy with

11   other work?

12        A    That's correct.

13        Q    Okay.  In any event, if Loftus was not

14   busy with other projects -- is my understanding

15   correct -- that it would not have submitted a bid

16   because it had a PLA?

17        A    Correct.

18             MR. ZIMOLONG:  I don't have anything

19        further.

20             MS. KIRBY:  Just a brief follow up.

21                    -  -  -  -  -

22                 REDIRECT EXAMINATION

23                    -  -  -  -  -

24   BY MS. KIRBY:
```

Kevin J. Loftus
October 6, 2020

Page 32

1        Q     Mr. Loftus, are you aware that the PLA was

2    removed from the 15th Street project?

3        A     Yes.

4        Q     Okay.  So knowing that the PLA was removed

5    and -- would you have bid on that project or did you

6    still have other projects that became more

7    important?

8        A     In the interim from when the project was

9    originally advertised until the PLA was removed, we

10   picked up other work.  So it was no longer an

11   attractive project for us because of our business

12   model.

13       Q     Okay.  But it wasn't based on the fact

14   that there was a PLA or not a PLA on the project?

15       A     No.

16             MS. KIRBY:  Okay.  Nothing further from

17       the City.

18             MR. ZIMOLONG:  Nothing from me.

19                    -  -  -  -  -

20    (Whereupon the deposition concluded at 2:53 p.m.)

21                    -  -  -  -  -

22

23

24

Kevin J. Loftus
October 6, 2020

Page 33

1              C E R T I F I C A T I O N

2

3                   I, hereby certify that the

4        proceedings and evidence noted are

5        contained fully and accurately in the

6        stenographic notes taken by me in the

7        foregoing matter, and that this is a

8        correct transcript of the same.

9

10       _____

11       Kathryn Doyle
         Court Reporter - Notary Public
12

13

14                   (The foregoing certification of

15       this transcript does not apply to any

16       reproduction of the same by any means,

17       unless under the direct control/or

18       supervision of the certifying reporter.)

19

20

21

22

23

24

Kevin J. Loftus
October 6, 2020

**A**

**ability** 10:16
**Absolutely** 27:23
**acceptable** 5:24
**accurately** 33:5
**active** 11:13
**actual** 10:23
**addition** 22:12 26:6
**administeri...** 5:1
**administra...** 8:13
**ads** 10:19
**advertised** 32:9
**affiliated** 22:18 25:17
**affiliations** 28:9
**afternoon** 6:13,14,17 7:23 31:3
**Agate** 9:8
**agreeable** 5:22
**agreed** 4:2,16
**agreement** 14:15,22 15:5 22:22 25:15 26:19 26:22 28:16 28:20,21 29:1,5,6,15 29:22
**agreements** 14:11,19 15:8 28:17
**agrees** 6:7
**allow** 29:21
**allowed** 26:8 30:5
**allows** 29:23
**America** 11:5 22:19
**amount** 13:2 13:4 16:20 16:21
**Amy** 2:16 5:23 6:15
**Amy.Kirby...**

**2**:18
**Andrew** 27:16
**answer** 7:20 21:1 29:4
**answered** 20:19 21:6
**answering** 7:3 20:12
**anticipate** 7:16 28:8
**apologize** 20:17
**apply** 33:15
**appreciate** 20:16,18
**appropriate** 29:20
**approxima...** 17:9 18:4
**Arch** 2:17
**area** 13:17,20 14:2 16:10
**areas** 15:9
**asked** 27:24
**asking** 7:1 28:8
**Associates** 1:20 4:24
**association** 2:13 10:6,9 10:23 11:3 11:7,9,10 11:11,13 15:2 27:11 27:17
**assume** 29:10
**assuming** 16:9 17:17 18:6,12
**attorney** 5:13 6:15 27:17
**attractive** 16:3 32:11
**authority** 9:10
**Avenue** 2:4
**avoid** 14:18
**aware** 15:10 24:23 26:7 32:1

**B**

**B** 3:9

**back** 24:14
**background** 8:2
**backlog** 15:23 19:22 19:22
**balance** 19:21
**bank** 17:16 17:20 18:9
**bargaining** 10:6 11:3 15:2 22:21 25:10 26:19 27:11,17
**based** 32:13
**bear** 5:19
**believe** 19:10 26:9
**benefit** 28:10
**best** 30:8
**bid** 8:18 9:10 14:20,21 15:4,16,20 16:14,18 17:6 18:22 19:1 20:5 21:10 28:2 28:13 29:21 31:9,15 32:5
**bidding** 18:19 19:16 20:22
**bit** 8:1,11 9:13 10:22 12:24 13:16 15:11 19:4
**board** 10:11
**Brandy** 9:3
**break** 7:17 7:19
**bridge** 12:20 17:14,17 18:3 24:18 25:2,3 31:5
**bridges** 9:20 11:22,24 12:4
**brief** 31:20
**briefly** 31:4
**bring** 24:20
**Broad** 2:10
**build** 16:2

**building** 30:4
**bulkhead** 12:22
**bulkheads** 12:11
**Burlington** 13:23
**business** 8:13 9:15,24 12:3,13 15:12 17:7 27:12 29:16 32:11
**busy** 31:10 31:14

**C**

**C** 2:1 33:1,1
**call** 24:17
**Camden** 13:23
**capacity** 1:8 19:11
**Cape** 9:8
**carpenter** 30:2
**case** 28:23
**CEO** 8:5 10:1 25:3
**certain** 16:22
**certainly** 17:5
**certification** 33:14
**certify** 33:3
**certifying** 33:18
**challenge** 15:3
**change** 28:1 28:9
**charge** 8:15 8:17
**chief** 8:22
**choice** 25:22 29:2
**choosing** 8:18
**chose** 26:13 27:11,14
**chosen** 25:9 25:12 26:2
**city** 1:7,9 2:16,20 5:23 6:16

**15**:12,20
**16**:22 17:2
**17**:10 19:7
**20**:22 21:7
**26**:20 27:6
**27**:21 28:2
**28**:10,13,23
**32**:17
**civil** 9:19 11:17
**clients** 17:3
**Code** 4:18
**collective** 26:19
**college** 9:2
**come** 24:19 30:8
**commencing** 1:18
**commercial** 12:23
**committee** 11:12
**Commonw...** 1:17
**company** 15:15
**comply** 28:19
**concerns** 7:13 29:8
**concluded** 32:20
**concrete** 30:3
**conduct** 5:20
**conducted** 4:19
**conference** 4:20 5:5,21
**confirming** 5:4
**conjunction** 8:23 11:4
**consent** 5:8
**consider** 15:20 17:2 23:19
**considered** 5:9 27:19
**construction** 1:4 8:6 9:7 9:8,11,19 11:2,18,21 24:17
**CONSTRU...**

**1**:3
**contained** 33:5
**contract** 13:2 13:4 16:1 16:20,21 27:21
**contractors** 2:13 10:5,9 11:4 23:24 24:5
**control** 4:23 25:4
**control/or** 33:17
**copy** 5:14
**Corporation** 9:4
**correct** 8:19 11:15 18:8 18:14 20:6 21:21,22,24 22:1,11 25:19 26:23 27:4,5,22 31:12,15,17 33:8
**correctly** 31:8
**cost** 16:17
**costs** 5:20
**counsel** 4:3 4:17,21 5:16
**counties** 13:18,21,23 14:9 17:8
**county** 9:8 13:20,23,24 14:2
**couple** 6:21 6:23 9:6 11:18
**course** 7:18
**court** 1:1 4:13,20,24 5:4 7:3 33:11
**cover** 22:22
**COVID** 23:4
**critical** 16:2
**CROSS-E...** 3:6 30:24
**curious** 22:23

**current** 8:3 15:23 19:21 26:22,24 27:2
**currently** 11:14 29:16

**D**

**D** 3:1
**dam** 9:20 12:10
**damming** 11:18
**dams** 12:12
**date** 1:18 30:13,22
**day** 29:24
**decided** 31:9
**deciding** 25:17
**decision** 10:14
**declaration** 25:7 26:18
**Defendants** 1:10
**definition** 23:7
**Delaware** 14:3
**Department** 2:16 16:24
**departments** 16:22
**departure** 29:15
**deposed** 6:18
**deposition** 1:15 4:19 5:2,7,20 6:17 7:17 32:20
**DESCRIP...** 3:10
**design** 14:18
**determine** 16:13,13
**determining** 15:20
**development** 12:23
**different** 20:20 21:6 28:17 29:7 29:14

**direct** 3:5 6:10 33:17
**disaffiliate** 27:14
**discrete** 24:17
**discussion** 30:13,22
**distinguish...** 23:13
**DISTRICT** 1:1,1
**documents** 26:10
**doing** 22:10 24:16,17 30:1
**dollar** 18:2 18:10
**Doyle** 1:16 33:11
**drafted** 28:17
**Drexel** 9:2
**duly** 4:7
**duration** 16:6 16:7
**duties** 8:11

**E**

**E** 2:1,1 3:1,9 33:1
**earlier** 19:20
**EASTERN** 1:1
**efforts** 19:21
**Eighteen** 21:16
**either** 15:14 18:13 28:7
**emailed** 5:15
**employed** 24:3
**employee** 26:11 27:24
**employees** 21:12,14,18 22:3,3,6,6,9 22:14,15,21 23:2,2,11 23:12,16,22 24:3,19 25:9,16,22 26:1,5 28:9
**ends** 14:19

entity 11:4
especially
17:1
ESQUIRE
2:3,9,16
Essentially
28:6
estimated
16:20
estimator
8:22
event 31:13
everybody
25:1,23
evidence 33:4
Exactly 21:4
EXAMINA...
3:4,5,7 6:10
31:22
examined 4:8
example
29:19 30:2
examples
30:6
executive
11:12
exhibit 5:14
5:15,18
exhibits 3:12
5:12
expected
24:24
expertise
16:10
explain 19:4
express 5:8
Expressway
9:4

**F**
F 33:1
Facchina 9:7
fact 32:13
factor 16:18
factors 15:19
fair 9:9 10:3
11:6 14:17
20:4 23:9
24:2 26:12
27:20 30:9
falls 11:22
familiar
18:15 19:24
fast 7:10

feel 6:23 7:11
7:14
FETBROYT
2:9
figure 25:12
final 9:10
financial 8:12
19:11
find 15:2
16:6
finish 30:3
first 25:21
five 12:6,16
13:1,19
14:2,13
17:1,9 19:8
24:8
Floor 2:17
follow 30:17
31:20
follow-up
7:13
follows 4:9
foregoing
33:7,14
forgive 9:22
form 4:4
formed 9:16
Foundations
12:11
four 9:3
13:20 19:8
free 6:23 7:11
7:14
FRIENDS
1:20
full 7:2
fully 33:5
further 5:12
31:19 32:16
future 26:14

**G**
generally
8:10 11:17
12:6,8 24:3
24:18
gentlemen
23:4
geographic
13:17
give 16:2
19:6 29:1
29:19

gives 10:20
go 6:22 11:8
23:24 24:14
going 6:16
16:3,4
20:13
good 6:13,14
9:23 31:3
governor
23:4 24:8
graduated
9:2
ground 6:22
group 18:1
guess 14:9
23:10 27:1
28:6
guys 10:12

**H**
H 3:9
HAGGER...
2:9
handle 19:23
happens
20:15
hate 20:15
haul 10:21,24
head 7:7,7
hear 7:4,10
31:8
heard 20:3
heavy 9:19
9:21 10:5,9
11:20,22,24
11:24
held 30:13,22
helps 7:3
10:24
Hey 21:8
highway 10:5
10:9 11:20
11:22,24
hiring 10:20
10:24
honestly 13:8
29:17
hourly 23:12
23:18
hurdle 29:11

**I**
identification
3:12

identity 5:5
III 1:4
important
32:7
include 15:9
included
29:10
Incorporated
8:6
increase
10:16
individual
25:16
individuals
28:18
interested
18:19
interim 19:19
32:8
invitations
15:16

**J**
J 1:16 3:3 4:7
JAMES 1:8
Jersey 9:17
13:23 14:6
14:9
job 8:21
12:19,20,21
14:21 16:2
16:4
jobs 17:10
joined 25:22
jump 7:14

**K**
KANG 2:9
Kathryn 1:16
33:11
keep 24:21
KENNEY
1:8
Kevin 1:15
3:3 4:7
30:19
kind 11:6,8
20:20 21:1
24:4,16
Kirby 2:16
3:5,7 5:23
5:23 6:12
6:15 23:20
23:21 30:10

30:15 31:20
31:24 32:16
know 10:22
15:7 17:3,4
17:22 26:1
26:4,15
27:19
knowing 32:4
knowledge
26:8,13

**L**
labor 14:11
14:14,18,22
15:5,7
26:22 28:20
LACAVA
1:4
laid 23:5 24:7
24:11,23
Lancaster
2:4
LANE 1:20
large 19:22
law 2:16 4:8
5:10
lay 24:22
layoff 24:20
25:1
let's 8:1
21:14 22:7
Levy 27:16
limited 16:10
line 11:11
list 19:9
litigation
5:11 18:17
20:1
little 8:1,11
9:13 10:22
12:18,24
13:16 14:1
15:11 19:4
LLC 2:3,9
located 9:17
locations
4:22
Loftus 1:3,16
3:3 4:7
6:13 8:5,18
8:24 9:11
9:13,15,24
10:1,4,12
11:1,7 13:3

13:17 15:12
15:14 18:19
20:21 21:12
22:3,6 23:2
23:11 24:3
24:19 25:9
25:20 26:18
28:1,2 31:3
31:9,13
32:1
Loftus' 12:13
long 7:17 8:7
9:15 10:8
longer 16:7
32:10
look 13:22
16:12 20:2
30:11
looking 15:19
21:2 29:9,9
29:13 30:7
lot 25:5

**M**
ma'am 9:12
10:7,13
11:16 14:7
14:12 15:6
15:17 16:11
16:15 17:19
18:18 19:15
19:17 21:19
maintains
26:18
majority
11:23
management
21:14 22:5
22:13
marked 3:12
5:13
markets 17:5
Maryland
9:7
match 19:21
math 9:23
22:10
matter 33:7
Mayor 1:8
mean 8:17
10:23 12:23
23:15
meaning
15:23

means 16:10
22:9 25:12
27:2,3
29:18 33:16
Mechanical
2:13
mechanics
22:22
member 10:4
10:8,12,15
11:14 25:24
28:15
members
11:10 21:20
21:23 26:11
membership
28:1
mentioned
19:20
Michael 2:9
6:7 30:17
million 13:5
13:5,11,14
18:5
model 17:7
27:12 32:12
monitor
15:15
monitoring
15:18
months 24:11
25:6
municipalit...
17:8
mute 30:20
mweinert...
2:11

**N**
N 2:1 3:1
33:1
name 6:15
need 5:2 7:17
15:24
needed 29:24
negotiated
15:1
NESHAML...
1:3
never 14:16
26:10,15
New 9:17
13:23 14:6
14:9

newspapers
10:19
NEWTOWN
1:21
nod 7:7
non-union
21:17
Notary 1:16
33:11
noted 33:4
notes 30:11
33:6
noticed 5:6
NUMBER
3:10

**O**
O 33:1
oath 5:1
objections
4:3
obligated
27:10
October 1:13
9:16
office 8:21
officer 5:1
Official 1:8
Oh 22:14
okay 6:20,22
8:1,7,10,15
8:20,24 9:9
9:13,22
10:3,8,11
10:18 11:6
11:14,17
12:1,3,6,9
12:13,16,20
12:24 13:6
13:10,13,16
14:8,13,17
15:4,7,11
15:18 16:9
16:12,16,22
17:2 18:2,6
18:9,12,15
18:19,24
19:4,12,24
20:4,10,12
21:5,12,17
21:20,23
22:2,5,9,14
22:17 23:1
23:6,20

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 24:2,16 | 29:23 | **presented** | 26:21 27:7 | 3:7 31:22 | 1:3 | **southern** | **subcontrac...** |
| 25:7 26:1,4 | **period** 13:1 | 5:15 | 27:21 28:10 | **refer** 11:24 | **rules** 6:22 | 13:22 | 13:7 |
| 27:14,20,24 | **periods** 15:23 | **presenting** | 28:14 33:11 | 16:19 | 14:24 29:2 | **Southwest** | **subject** 18:16 |
| 28:4 29:3 | **permanent** | 5:13 | **purpose** 5:11 | **referred** | **runway** | 17:14 | 20:1 26:21 |
| 30:6,9 31:6 | 22:3 23:10 | **president** 8:5 | **pursuant** | 25:13,23 | 19:24 20:11 | **specific** 29:23 | **submit** 19:6 |
| 31:8,13 | 23:15,19 | **pretty** 25:2 | 4:18 | **referring** | | **stabilization** | 31:9 |
| 32:4,13,16 | **Philadelphia** | 30:16 | **put** 6:2,5 | 24:9 | | 17:16 | **submitted** |
| **operations** | 1:7,9 2:11 | **previously** | 11:10 | **refrained** | **S** | **start** 7:2 8:1 | 31:15 |
| 8:14 | 2:16,18,20 | 5:6 | | 20:21 | **S** 2:1,3,9,10 | 10:1 | **suburban** |
| **opportunity** | 5:24 6:16 | **primarily** | | **regarding** | 3:9 | **started** 4:15 | 13:20 |
| 10:20 | 13:20 15:13 | 9:20 10:16 | **Q** | 5:17 31:5 | **salary** 23:16 | 10:2 | **Suite** 1:20 2:4 |
| **order** 19:7 | 15:15,21 | **primes** 13:7 | **qualification** | **remember** | **saying** 10:23 | **statement** | 2:10 |
| **originally** | 17:3,11,15 | **prior** 5:17 | 19:13 | 5:17 31:5 | **says** 25:8 | 4:14 26:17 | **suits** 17:6 |
| 32:9 | 20:22 21:8 | 8:24 | **qualificatio...** | **remote** 4:22 | **Schuylkill** | **states** 1:1 | **supervision** |
| **outside** 14:1 | 26:21 27:6 | **private** 12:18 | 19:9 | **remotely** 5:3 | 9:4 17:16 | 13:17 | 33:18 |
| 14:2 | 27:21 28:2 | 12:20 | **qualified** | **removed** 32:2 | **scope** 15:22 | **steelworker** | **supervisors** |
| **overall** 8:12 | 28:13,24 | **probably** | 10:17 | 32:4,9 | 16:9,17 | 24:19 25:15 | 22:23 |
| **oversee** 8:14 | **picked** 16:19 | 12:17 16:16 | **question** 5:18 | **repeat** 7:11 | 21:2,9 | 26:5 | **sure** 7:4,6 |
| **owner** 28:23 | 32:10 | 20:19 | 7:2,5,9,12 | 17:4 | **SCOTT** 1:4 | **steelworkers** | 13:12 20:14 |
| | **PKF-MARK** | **proceedings** | 7:14,19,20 | **reporter** 4:13 | **seasonal** | 11:5,8 | 23:7,9,14 |
| **P** | 1:4 | 4:11 33:4 | 29:4 | 4:20 5:4 | 24:10,22 | 14:23 15:8 | 26:3,9,17 |
| **P** 2:1,1 | **PLA** 15:1 | **process** 19:5 | **questioning** | 33:11,18 | 25:2,4 | 21:21 22:10 | **suspended** |
| **p.m** 1:18 | 16:13 18:7 | 25:11 | 5:17 | **reporters** 7:3 | **seconds** | 22:19 23:22 | 23:3 24:8 |
| 32:20 | 18:13 20:23 | **procurement** | **questions** 4:4 | **Reporting** | 30:11 | 24:21 25:10 | **sworn** 4:8 5:3 |
| **Pa** 2:5,11,18 | 21:10 27:8 | 8:13,16 | 6:24 7:1 | 4:24 | **Section** 4:18 | 25:14,18 | |
| 4:18 14:6,8 | 27:9 28:5,7 | 19:21 | 20:13 | **represent** | **see** 25:2 | 26:6,20 | **T** |
| **packet** 19:8 | 28:11,14,15 | **project** 8:18 | **quick** 30:16 | 26:2,14 | **seeing** 29:5 | 27:3,15 | **T** 3:9 33:1,1 |
| **page** 3:4,10 | 29:10,13 | 14:10,14,18 | | **representat...** | **seen** 21:7 | 28:15 29:10 | **take** 7:8,18 |
| 19:8 | 31:16 32:1 | 14:22 15:4 | **R** | 25:10 | 26:10 28:16 | 29:15,23 | 7:19 16:3,4 |
| **Parks** 17:21 | 32:4,9,14 | 15:5,7,21 | **R** 2:1 33:1 | **Representing** | **separate** 4:21 | **stenographic** | 30:11 |
| 17:24 | 32:14 | 15:22,22 | **re-called** | 2:7,13,20 | 21:13 | 33:6 | **taken** 1:16 |
| **participating** | **place** 5:2 | 16:17 18:3 | 24:15 | **reproduction** | **SEPTA** 17:7 | **stick** 13:1 | 33:6 |
| 4:22 | **plaintiffs** 1:5 | 18:9,16,20 | **reached** | 33:16 | 17:15 | **stipulated** | **talk** 7:10 |
| **parties** 4:17 | 2:7 6:1 | 18:22 19:2 | 25:14 | **request** 25:13 | **Service** 2:13 | 4:16 5:12 | 15:11 31:4 |
| 5:9,19 | **plans** 20:2 | 19:13,23 | **read** 4:13 6:3 | **requested** | 4:24 | **stipulation** | **talked** 26:15 |
| **parts** 25:3 | **PLAs** 27:22 | 20:1,5,7,23 | 6:4 29:6 | 20:7 | **shake** 7:7 | 6:2,8 | **talks** 19:10 |
| **pass** 16:5 | **play** 29:2,2 | 21:8 26:21 | **really** 23:14 | **required** | **shop** 22:21 | **stop** 30:19 | **tell** 7:11 8:3 |
| **pending** 7:20 | **please** 6:6 7:1 | 26:22 28:2 | 26:9 | 28:14 | 22:22 | **stream** 17:16 | 8:10 9:13 |
| **PennDOT** | 7:6 | 28:10,14,20 | **realm** 11:23 | **reserve** 6:3 | **shorter** 16:6 | 17:20 18:9 | 10:14,22 |
| 17:7 | **point** 24:13 | 29:21 31:5 | **reason** 7:22 | **reserved** 4:4 | **show** 25:8 | **Street** 2:10 | 12:24 13:16 |
| **Pennsylvania** | **portability** | 31:10 32:2 | 7:24 20:23 | **residential** | **side** 8:14 | 2:17 9:5 | **temperature** |
| 1:1,17,21 | 30:4 | 32:5,8,11 | **recall** 14:13 | 12:22 | **sign** 6:4,5 | 17:14,17 | 25:4 |
| 9:18 10:5 | **position** 8:4,8 | 32:14 | 24:24 25:8 | **respond** 7:5 | 14:10 26:10 | 18:3,16 | **temporary** |
| 14:2 | **possession** | **projects** 9:5 | **recalled** | **response** 7:6 | **signed** 25:21 | 19:23 31:5 | 23:1,8 |
| **percent** 9:17 | 5:16 | 9:10,21 | 24:24 | **responsible** | **sir** 31:7 | 31:10 32:2 | **term** 28:21 |
| 12:5,8,9,15 | **posting** 10:19 | 11:18 12:14 | **recommen...** | 8:12 | **size** 15:22 | **Streets** 16:24 | 29:20 |
| 12:18 24:4 | **precluded** | 13:6,11,14 | 19:13 | **right** 6:3 12:5 | 16:17,20 | 17:18,20 | **terminate** |
| 24:4 | 29:24 | 14:14,18,19 | **reconstruct...** | 12:15 13:15 | 21:3,9 | **Strehlow** | 25:1 |
| **percentage...** | **prefer** 27:12 | 15:19 16:5 | 9:5,21 | 13:19 19:14 | **skilled** 30:3 | 1:20 4:23 | **terms** 29:8 |
| 12:4 | **prequalific...** | 16:12 17:13 | **record** 4:14 | 22:7,10,11 | **slow** 7:11 | **structured** | **testified** 4:9 |
| **perfect** 21:9 | 19:5 20:8 | 19:9 27:7 | 6:3,5 30:13 | 23:23 | **smaller** 13:10 | 28:22 | **testimony** |
| **perform** | **prequalified** | 31:14 32:6 | 30:22 | **River** 17:16 | 17:15 | **structures** | 31:4,8 |
| 26:20 27:1 | 19:1,7 | **public** 1:17 | **recorded** 5:6 | **road** 12:2 | **sorry** 26:11 | 9:21 | **thing** 30:7 |
| 27:6,21 | **present** 4:17 | 12:14 20:22 | **recording** 5:7 | **ROAD-CON** | **sounds** 17:22 | **sub** 12:2 13:9 | **things** 11:19 |
| | | | **REDIRECT** | | 23:15 | | |

Kevin J. Loftus
October 6, 2020

29:12
**think** 20:19
  30:10,15
**three** 22:20
  25:21
**threshold**
  13:11
**time** 4:5 13:8
  14:8 15:23
  20:15 31:10
**times** 16:1
**told** 30:15
**track** 17:6
**trade** 29:24
  30:1
**trades** 30:4
**transcript**
  33:8,15
**transitions**
  24:11
**trial** 4:5
**truthful** 7:23
**trying** 25:12
**two** 16:2,4
  17:12
**types** 11:19
**typical** 13:2,4
  13:13
**typically**
  14:21,24
  16:1,20,24
  24:20,24
  28:22

_____ **U** _____
**unauthorized**
  5:9
**understand**
  7:9 19:12
  27:1 28:22
  29:17
**understand...**
  31:14
**union** 21:24
  22:15,17
  25:22,24,24
  26:2,11,14
  26:16 28:1
  28:9
**unions** 26:5
  28:23
**United** 1:1
  11:5 22:19
  25:9 26:19

28:15
**use** 27:10,11
  27:13

_____ **V** _____
**v** 1:6
**Vaguely** 20:2
**value** 18:3,10
**various** 17:8
**vary** 13:4
**verbal** 7:6
**viable** 10:20
  10:24
**video** 4:19
  5:5,21
  30:19
**videoconfe...**
  1:15 4:23
**videotaped**
  5:7
**Vine** 9:4
**violation** 5:10
**virtue** 28:21

_____ **W** _____
**wait** 7:2
  24:14
**waiting** 28:5
**Wally** 30:16
**wally@zim...**
  2:5
**WALTER**
  2:3
**want** 15:11
  25:17 27:1
  29:17
**wanted** 27:15
  31:3
**wants** 30:2
**wasn't** 20:4,7
  32:13
**way** 20:20
  21:6,15
  28:7
**Wayne** 2:5
**we'll** 12:24
**we're** 11:10
  27:10
**we've** 12:11
  12:11 14:16
**weather** 25:4
**Wednesday**
  1:13
**Weinert** 2:9

6:7,7 30:18
**welcome** 7:18
**window** 24:9
**winter** 24:12
**witness** 3:2
  4:21 5:1,3
  5:14,15,17
  6:4 23:18
**witness's** 5:4
**word** 25:12
**work** 9:17
  11:23 12:2
  12:19 13:7
  13:10,19,22
  14:1,3,9,10
  15:9,24
  16:23 17:6
  19:19 20:11
  23:23,24
  24:14,18,19
  25:2,3,5,11
  26:5,20
  31:11 32:10
**worked** 9:3,6
  13:9
**worker** 29:23
**workers**
  10:17 14:22
**workforce**
  26:22,24
  27:2,7
**working**
  10:12 11:4
  14:8,14
**works** 12:14
  13:17 20:22
  25:23 26:21
  27:7,21
  28:10,14
**wouldn't**
  29:21
**written** 5:8
**WWW.ST...**
  1:22

_____ **X** _____
**X** 3:1,9

_____ **Y** _____
**Yeah** 16:19
**year** 9:7
  12:19 13:1
  16:3 24:8
  25:6

**years** 6:21,23
  8:9,24 9:3,6
  9:24 10:10
  12:7,16
  14:14,16
  16:2,4 17:1
  17:9 23:5
  23:17

_____ **Z** _____
**ZIMOLONG**
  2:3,3 3:6
  6:1 23:14
  30:19 31:2
  31:18 32:18
**Zoom** 2:7,14
  2:20 4:22

_____ **0** _____

_____ **1** _____
**10** 12:9 23:17
**100** 12:5,15
  24:4
**116** 1:20
**12** 25:6
**123** 2:10
**13** 18:5
**15** 13:5
**1515** 2:17
**15th** 2:17
  18:15 19:23
  31:5,9 32:2
**1670** 2:10
**18** 22:2,5
**18940** 1:21
**19087** 2:5
**19102** 2:18
**19109** 2:11
**1987** 9:3
**1994** 9:16

_____ **2** _____
**2** 13:5,11,14
**2:19-cv-016...**
  1:3
**2:23** 1:18
**2:53** 32:20
**20** 12:9 22:9
**2020** 1:13
**215** 1:21 2:6
  2:12,19
**23** 10:10
**231** 4:18

**25** 24:6
**26** 8:9,24
  14:16

_____ **3** _____
**30** 30:11
**300** 2:4
**31** 3:6,7
**35** 22:16,17
  23:23 24:2
  24:6 27:3
**353** 2:4
**38** 22:8,12,14
  22:16

_____ **4** _____
**4002** 4:18
**41st** 17:14,17
  18:3

_____ **5** _____
**50/50** 24:4
**504-4622**
  1:21
**525-5850**
  2:12
**54** 1:20

_____ **6** _____
**6** 1:13 3:5
**665-0842** 2:6
**683-3566**
  2:19

_____ **7** _____
**700,000**
  18:11

_____ **8** _____
**80** 12:8 24:4

_____ **9** _____
**90** 9:17 12:8
**98** 12:18

# Exhibit O

Thomas Isenberg
September 30, 2020

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - -

ROAD-CON, INC., NESHAMINY    :   CIVIL ACTION
CONSTRUCTORS, INC., LOFTUS   :   NO. 2:19-cv-01667-JS
CONSTRUCTION, INC.,          :
PKF-MARK III, and SCOTT A.   :
LACAVA                       :
                  Plaintiffs, :
                             :
       -V-                   :
                             :
CITY OF PHILADELPHIA and     :
JAMES KENNEY, IN HIS         :
OFFICIAL CAPACITY AS MAYOR   :
OF THE CITY OF PHILADELPHIA  :
                  Defendants. :

- - - - - - - - - - - - - - - -

- - -

Wednesday, September 30, 2020

- - -

ORAL ZOOM DEPOSITION OF THOMAS
ISENBERG, taken pursuant to the Subpoena, held remotely
and by Zoom videoconference in Pennsylvania, commencing
at 10:00 a.m., before SHARON RICCI, RMR, CRR - Notary
Public there being present.

Thomas Isenberg
September 30, 2020

Page 2

A P P E A R A N C E S:


ZIMOLONG, LLC

BY:          WALTER S. ZIMOLONG, ESQUIRE
             P.O. Box 552
             Villanova, PA 19085
             (215)665-0842
             wally@zimolonglaw.com

             Representing the Plaintiffs



KANG, HAGGERTY & FETBROYT, LLC

BY:          MICHAEL SCOTT WEINERT, ESQUIRE
             123 S. Broad Street, Suite 1670
             Philadelphia, PA 19109
             (215)525-5850
             mweinert@khflaw.com

             Representing the Intervenors



CITY OF PHILADELPHIA LAW DEPARTMENT

BY:          LYDIA FURST, ESQUIRE
             AMY KIRBY, ESQUIRE
             1515 Arch Street, 15th Floor
             Philadelphia, PA 19102
             (215)683-3573
             lydia.furst@phila.gov
             amy.kirby@phila.gov

             Representing the Defendants

Thomas Isenberg
September 30, 2020

Page 3

I N D E X

WITNESS                                    PAGE

THOMAS ISENBERG
(Witness sworn)                              5


EXAMINATION BY:

MS. FURST:                                   6


- - -


E X H I B I T S

NUMBER              DESCRIPTION        PAGE

ISENBERG 1          CONTRACT           19
ISENBERG 2          CONTRACT           19
ISENBERG 3          Affidavit          25

- - -

Thomas Isenberg
September 30, 2020

Page 4

```
1              COURT REPORTER:  Counsel, I will
2    read a stipulation into the record.  Please
3    bear with me, as it is long.
4                   It is hereby stipulated and agreed
5    by and between counsel for all parties present
6    that pursuant to 231 Pa. Code 4002 this
7    deposition is being conducted by Zoom
8    conference, that the court reporter, all
9    counsel, and the witness are all in separate
10   remote locations and participating via Zoom
11   conference meeting under the control of
12   Strehlow & Associates Court Reporting Service,
13   that the officer administering the oath to the
14   witness need not be in the place of the
15   deposition and the witness shall be sworn in
16   remotely by the court reporter after
17   confirming the witness's identity, that this
18   Zoom conference will not be recorded unless
19   previously noticed as a videotaped deposition
20   and that any recording without the express
21   written consent of all parties shall be
22   considered unauthorized, in violation of law,
23   and shall not be used for any purpose in this
24   litigation or otherwise.
25                   It is further stipulated that
```

Thomas Isenberg
September 30, 2020

Page 5

1    exhibits may be marked by the attorney

2    presenting the exhibit to the witness, and

3    that a copy of any exhibit presented to a

4    witness shall be emailed to or otherwise in

5    possession of all counsel prior to any

6    questioning of a witness regarding the exhibit

7    in question.  All parties shall bear their own

8    costs in the conduct of this deposition by

9    Zoom conference.

10              So stipulated, counsel?

11              MS. FURST:  Lydia Furst for the

12   City of Philadelphia.  Yes, I agree.

13              MR. ZIMOLONG:  Wally Zimolong.

14   Yes, we agree.

15              And I would put one thing on the

16   record.  I don't know if -- that was kind of

17   long-winded.  I didn't hear it.  But before I

18   forget, the witness would like to read and

19   sign.

20              Thank you.

21              MR. WEINERT:  And Michael Weinert.

22   I agree to the stipulation.

23              ...THOMAS ISENBERG, after having

24   been first duly sworn, was examined and

25   testified as follows:

Thomas Isenberg
September 30, 2020

 1                      _ _ _

 2                 DIRECT EXAMINATION

 3                      _ _ _

 4   BY MS. FURST:

 5   Q.     Okay.  Good morning, Mr. Isenberg.  How are you?

 6   A.     Thank you.  Good morning.

 7   Q.     So I introduced myself before we went on the

 8   record, but my name is Lydia Furst, and I'm an attorney

 9   for the City of Philadelphia and I represent the City in

10   this case.

11           Before we get started, have you ever had your

12   deposition taken before?

13   A.     No, I've never given a deposition before.

14   Q.     Okay.  I'll just go over some ground rules really

15   briefly.  The first thing to remember is that Ms. Ricci

16   is taking down everything we say, so we need to remember

17   to provide verbal answers instead of a shake of a head

18   or a nod of the head for yes or no, for example.

19           We also want to avoid talking over each other,

20   so I'm going to do my best to wait until you're done

21   your answer to give the next question.  And if you could

22   make sure I'm done asking my question before you start

23   answering, that will help her clearly take down

24   everything we're saying.

25           Does that sound okay?

Thomas Isenberg
September 30, 2020

1   A.      It does.

2   Q.      Okay.  And if you, at any time, need to take a

3   break, that's completely fine.  You can just let us

4   know.  I would just ask that you answer whatever

5   question is pending before you ask to take a break.

6           Is that all right?

7   A.      Yes.

8   Q.      Great.  And if, at any time, you don't understand

9   the question I've asked or, you know, there's a

10  technical issue and you aren't able to hear me, just let

11  me know and I can repeat the question for you.  Okay?

12  A.      Okay.

13  Q.      Mr. Isenberg, did you meet with anyone to prepare

14  for this deposition?

15  A.      Counsel.

16  Q.      And did you review any documents to prepare for

17  this deposition?

18  A.      I may have taken a quick look at the affidavit

19  like yesterday or the day before, but that was about it.

20  Q.      And that's your affidavit?

21  A.      Correct.

22  Q.      Okay.  And were you present at the deposition of

23  Al Hoffman last week?

24  A.      I was.

25  Q.      Okay.  And were you also present at the

Thomas Isenberg
September 30, 2020

Page 8

1   deposition of Scott Lacava last week?

2   A.      I was not.

3   Q.      Mr. Isenberg, what is your current job?

4   A.      My title is director of compliance and contract

5   controls at PKF-Mark III.

6   Q.      How long have you been in that position?

7   A.      About seven and a half years.  March will be

8   eight years.

9   Q.      And how long have you been with the company, PKF?

10  A.      Same amount of time.  I came in as a director of

11  contract and contract controls.

12  Q.      So immediately prior to joining PKF, what did you

13  do?

14  A.      I was in private practice as a lawyer for about

15  18 years prior to that.

16  Q.      Oh, interesting.  And what kind of law did you

17  practice?

18  A.      When I first got out of school, I worked at a

19  general practice firm in Lancaster, and then I moved to

20  Harrisburg and was a commercial litigator for probably

21  about six years, and then moved to the Harrisburg office

22  of Duane Morris and started working with a partner who

23  was -- who did a lot of construction work, and so after

24  that, it was mostly representing contractors and

25  subcontractors.

Thomas Isenberg
September 30, 2020

Page 9

1   Q.      Okay.  Interesting.  So can you just describe for

2   me briefly what your duties are as compliance of

3   contract controls manager or director at PKF?

4   A.      So I wear a lot of hats.  That's the title they

5   give me, but I, obviously, handle all of our contracts

6   with any contractor, any subs, suppliers.  I handle all

7   of our insurance-related claims.

8           And when I say "handle," pretty much liaison

9   with outside counsel or defense counsel or any

10  third-party liability claims, workers' compensation.

11  And my department is responsible for our HR functions,

12  hiring, transferring, advertising for jobs, things along

13  those lines.

14          I serve basically as in-house counsel for the

15  firm as well when needed.  I am the BDE liaison officer

16  for the company, the firm's EEO officer.  I sit on the

17  apprentice board for our Steelworker's Union, so I work

18  with a lot of the apprentices.  That's probably about

19  it, but I'm sure there's more stuff as things come up.

20  Q.      Okay.  Do you have any role in selecting which

21  project PKF will bid on?

22  A.      Not the final determination of any jobs, but if

23  there's a question about a particular job, our chief

24  estimator or one of our other corporate officers might

25  come to me and have a question or might input on a

Thomas Isenberg
September 30, 2020

Page 10

1   particular risky item.  You know, there's some kind of

2   contractual risk or something involved.  They would help

3   me to take a look at it, but I don't get to say yes or

4   no on any job.

5   Q.      Okay.  And are you generally aware of PKF's

6   process for selecting which projects to bid on?

7   A.      Generally, yes.

8   Q.      And so who is the person with decision-making

9   authority as to which projects PKF will bid on?

10  A.      I can't say there's one person with ultimate

11  authority.  We have a chief estimator who is our -- is

12  one of our vice presidents.  He's in charge of,

13  obviously, pulling all the estimates together,

14  evaluating jobs, looking for new jobs to bid.

15          If he has questions or concerns, the other

16  three corporate officers -- well, yes, the other three

17  corporate officers, two VPs and a president, will have

18  input.  And generally they'll come to a consensus as to

19  whether there's a particular job or jobs that our chief

20  estimator may have a question or concern about.

21  Q.      Okay.  So what's the name of the chief estimator

22  and VP?

23  A.      His name is Mitch Baland, B-A-L-A-N-D.

24  Q.      And what are the names of the other three

25  individuals you mentioned who are involved in selecting

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Thomas Isenberg
September 30, 2020

Page 11

1   projects?

2   A.     Well, Mitch is the prime selector of projects.

3   We have a president, his name is Glenn Ely, E-L-Y; we

4   have another vice president, Larry Keough, K-E-O-U-G-H,

5   and another vice president, Mark Reisinger,

6   R-E-I-S-I-N-G-E-R.  Each VP has a specialty sort of

7   niche area.  So if there's a drilling project, Mr. Keogh

8   handles our drilling operations and so he might talk to

9   Mitch.  Mr. Reisinger handles more of our mechanical or

10  electrical component.  So if we're doing a big pump

11  station or waste management treatment plant, he may talk

12  to Mitch as well, yeah, that looks like a good job, you

13  know, that didn't look like a good job, based on all the

14  other sort of factors that go into selecting jobs in

15  terms of workforce, how long the job is, where it's

16  located, things along those lines.

17          Our backlog always is an issue, whether we have

18  too much or too little, things like that.

19  Q.     Okay.  You mentioned that sometimes your input is

20  sought in the selection process if an issue comes up.

21          Can you provide some examples of when you would

22  be asked about potentially being on a project?

23  A.     Well, often times, they'll have me look at what

24  the -- if there's any issues with the liquidated damages

25  or particular milestone dates that are out of contract,

Thomas Isenberg
September 30, 2020

Page 12

1    to assess that level of risk.  You know, if there's a

2    project labor agreement on the job, he'll basically tell

3    me there's a PLA on this job, take a look at it.

4            You know, are the Steelworkers included in the

5    PLA or in the list of, you know, quote, unquote, proper

6    union affiliation, things like that.

7    Q.    Okay.  So going back to the selection process for

8    which projects PKF will bid on, can you just list all

9    the factors you are aware of that go into the decision

10   as to whether to bid on a project?

11   A.    I can give you at least what my understanding is.

12   I'm sure there are others based on the technical aspect.

13   Remember, all these guys were all engineers.  I'm just

14   the poor guy that went to law school because I'm not

15   good at math.

16           So the technical concept, I don't have any

17   bearing on, but, you know, one of the big ones would be

18   bonding capacity.  Our bonding company sets a certain

19   capacity that we either are prohibited or need to seek

20   permission to bid a job over our preapproved bonding

21   capacity.  You know, our workforce.

22           If we currently -- as an example, if we

23   currently have a heavy electrical job going on, we would

24   in all likelihood forego another large electrical job

25   because we wouldn't necessarily have the available

Thomas Isenberg
September 30, 2020

Page 13

1    workforce to man both projects.  You know, there's a lot
2    of factors in terms of our backlog.
3              If we had a lot of backlog, I'm sure
4    there's -- you know, we have a lot of work in the
5    pipeline, I'm sure there's many jobs we don't even look
6    at because we have a fair amount of back work.  If the
7    backlog is low, we may look at some other jobs that we
8    might not normally look at.
9              But current status of the economy is always
10   something that is to be considered, what projects we see
11   in the pipeline that may look more attractive based on
12   what we do and what we do well.  You know, if we know
13   there's one coming several months down the road, we may
14   forego other jobs and vice versa.
15             So things along those lines.  That's probably
16   what I am privy to.  The other things would be more in
17   line with the technical aspect of the project.
18   Q.    I understand.  And you mentioned the word
19   "backlog."
20             Can you just explain what you mean by that?
21   A.    Well, a lot of our projects are several years
22   long, almost all of them are, and so the backlog is how
23   much work we may have on our current project still yet
24   to do, and so that backlog, if that's -- you know, if
25   there's $150 million or $300 million worth of work yet

Thomas Isenberg
September 30, 2020

Page 14

1  to do, again, a lot of that goes into whether we're
2  manned properly to be able to bid more work with a large
3  backlog, or we have a small backlog where a lot of our
4  work is wrapping up, that we need to go get more.
5  Q.     Okay.  Do you know if the amount of the contract
6  or the estimated cost of the project plays any role in
7  the selection process?
8  A.     Well, it does, again, based on our bonding
9  capacity, you know, where we would not without bonding
10  company approval -- I don't know what the hard and fast
11  rule is, but I know anything close to like $400 million
12  we would need the bonding company to say, yes, you can
13  go ahead and bid that job.
14         You know, we tend to like bigger jobs.  We
15  rarely do things -- we rarely do many jobs less than 3
16  to $5 million.  We have had some smaller ones where
17  we're just doing a little niche operation, if we have a
18  little drilling job for, we'll say, Amtrak, that may be
19  5, $600,000, but there's only been a couple of those
20  since I've been here.  Most of them are larger
21  projects.
22  Q.     What is the limit for the bonding capacity?
23  A.     I'm not exactly sure, to be honest with you.  My
24  recollection is it's somewhere around 300 million, but
25  that's my recollection.

Thomas Isenberg
September 30, 2020

1    Q.     And you mentioned that one of the things you do

2    is check -- look at the PLA, if there's a PLA

3    requirement for a project; is that right?

4    A.     Right.

5    Q.     Does PKF ever bid on projects that have a PLA

6    requirement?

7    A.     Well, that's a -- I would say we have bid on a

8    project as a general contractor that has a PLA on it

9    because the Steelworkers were included, the United

10   Steelworkers Union was included as a signatory union.

11   This was before my time.

12          But I do know of the job and it did have a PLA,

13   but the Steelworkers were included.  I'm assuming there

14   was some wrangling to get them included, but they were

15   included, and we were low on that project.  It was a New

16   Jersey DOT project.

17   Q.     Okay.  And that was before your time at PKF, you

18   said?

19   A.     The project, yes.

20   Q.     Do you know around approximately what year that

21   project was?

22   A.     I don't.  I don't.

23   Q.     Okay.  Where is PKF located?

24   A.     Our home office is located in Newtown, Bucks

25   County, Pennsylvania.

Thomas Isenberg
September 30, 2020

Page 16

1    Q.     And does PKF have other offices?

2    A.     Well, we have field offices at our projects.

3    Some projects do, some projects don't, but we do have

4    field offices at -- most of our projects we put a

5    trailer or two that have offices in there.

6    Q.     Okay.  I understand.  I won't ask you about all

7    of those.

8            When did PKF commence business?

9    A.     We just did our 50 years, so 1969.  That wasn't

10   PKF-Mark III at the time.  It was PKF, and then, I

11   think, maybe six or seven years later, they merged with

12   a company called Mark III that was more mechanical.  But

13   since its initiation, it has been since 1969.

14   Q.     Is PKF presently affiliated with the Steelworkers

15   Union?

16   A.     That is correct.

17   Q.     When did that relationship start?

18   A.     I do not know the specific date.  I believe it

19   was in the early 90's.

20   Q.     Okay.  Are you aware of any time there's been a

21   lapse in PKF's affiliation with the United Steelworkers?

22   A.     Not since we signed on, no.

23   Q.     Okay.  I am going to show you a couple of

24   exhibits right now, Mr. Isenberg.  I'm going to do a

25   share screen.

Thomas Isenberg
September 30, 2020

Page 17

```
 1                   - - -

 2                   (A brief discussion was held off

 3           the record.)

 4                   - - -

 5   BY MS. FURST:

 6   Q.      Mr. Isenberg, are you able to see this?  And we

 7   can just look at the first page.

 8   A.      Well, I'm only seeing your screen.  I'm not

 9   seeing a document yet.

10   Q.      Okay.  I'm going to try that again.  Sorry about

11   that, everyone.  All right.

12           Are you seeing the document now, Mr. Isenberg?

13   A.      I am.

14   Q.      Okay.  Is this the agreement between PKF and the

15   Steelworkers?

16   A.      Not the current one.  That looks like it's from

17   '15 to '17.

18   Q.      Okay.  So is it accurate that this agreement

19   started January 1st, 2015 and expired December 31st,

20   2017?

21   A.      It would appear that way, yes.

22   Q.      Okay.  Do you know if the agreements between PKF

23   and the Steelworkers are typically for three years like

24   this one is?

25   A.      They are.
```

Thomas Isenberg
September 30, 2020

Page 18

1    Q.      Okay.  One second while I get the next document.

2    Okay.

3            Are you seeing this document on the screen,

4    Mr. Isenberg?

5    A.      Yes.

6    Q.      And is this the present agreement, the current

7    agreement, between PKF and the Steelworkers?

8    A.      I believe that to be the case.

9    Q.      Okay.  And this agreement was effective January

10   1st, 2019, and it will expire December 31st, 2021.

11           Is that correct?

12   A.      That seems to be the case, correct.

13   Q.      And this one is also a three-year contract it

14   looks like; is that right?

15   A.      It appears that way.

16   Q.      Okay.  So was there any agreement between PKF and

17   the Steelworkers for 2018?

18   A.      Well, we were -- I don't know if I have a

19   document that does just the one year.  I know after the

20   last CBA expired, our labor lawyer entered into some

21   kind of Evergreen agreement because the president or the

22   director of the Local Steelworkers 15024 had been -- or

23   had left and there was never a lapse, but we didn't get

24   an agreement done.

25           So when we did the next agreement, we just

Thomas Isenberg
September 30, 2020

Page 19

1   started it in 2019 when we entered into it.  So there

2   was some kind of Evergreen agreement is what he called

3   it.  I don't know what that means in the labor world.

4   I'm not a labor guy.

5   Q.     Okay.  So for 2018, did you consider PKF to be

6   bound by an agreement with the Steelworkers?

7   A.     Yes, under the same terms as the '15 -- whatever

8   the last one was, '15 to '17 or '14 to '17, under the

9   same terms.  Those terms continued until then we got

10  into the '19 to '21 term.

11                      MS. FURST:  Okay.  And just to

12            clarify the record, I failed to state the

13            exhibit number.  I'll mark the exhibit number.

14                      So the first document I pulled up

15            is going to be Isenberg 1 and the second

16            document is going to be Isenberg 2.

17                      - - -

18                      (Exhibits Isenberg 1 and Isenberg 2

19            marked for identification.)

20                      - - -

21  BY MS. FURST:

22  Q.     What types of construction work does PKF do?

23  A.     We would be what you call a heavy and highway

24  contractor.  So generally speaking, we like to be the

25  prime contractor and contract with the owner.  We have

Thomas Isenberg
September 30, 2020

Page 20

1   done some subcontract work, but not very often.

2           And so we build bridges, highways, things like

3   that.  We don't do any of our own paving, but we build

4   the bridges and roadways, and then we do waste water

5   treatment plants, other kind of plant work, pump station

6   work.  That would be the more heavy side of the heavy

7   highway contract.

8   Q.    Does PKF do any building construction?

9   A.    Commercial, like banks and Wal-Marts and stuff

10  like that, no.  There might be buildings on some of our

11  projects that we build.

12          We did a job for SEPTA where we built a train

13  station down at the Secane Station, but not commercial

14  building, per se.

15  Q.    Okay.  So just to clarify, does PKF ever do

16  Public Works projects that are purely building

17  construction projects?

18  A.    Don't --

19                  MR. ZIMOLONG:  Objection to form.

20                  THE WITNESS:  I don't understand

21          the question.  We are -- for the most part,

22          99.8 percent of our work is Public Works.  I

23          don't know what you mean by public building

24          construction.  We don't build high-rises and

25          things like that.

Thomas Isenberg
September 30, 2020

Page 21

1  BY MS. FURST:

2  Q.    Understood that.  I think what I'm asking is

3  would PKF ever do a -- ever do a construction project

4  that was a building construction project?

5                        MR. ZIMOLONG:  I object to the

6            form.  I think you should -- we need

7            to --

8                        THE WITNESS:  It's the term

9            "building construction project" I'm not quite

10           understanding.  We've had jobs that have

11           buildings on them, I can say that.

12  BY MS. FURST:

13  Q.    So when you say that you had jobs that have

14  buildings on them, is PKF doing the construction of the

15  building?

16  A.    Well, it depends what -- it depends what work

17  activity is required for that building.  In other words,

18  we would, generally speaking, not put a roof on the

19  building and would subcontract that out.

20        We would, generally speaking, do the foundation

21  and the drilling work for the building.  We might put

22  the doors and windows in or we might sub that out,

23  depending on what kind of price we get from the

24  subcontractor willing to do the same work.  So that's

25  about what I can give you on that.

Thomas Isenberg
September 30, 2020

Page 22

1    Q.    Okay.  When PKF uses subcontractors for its

2    projects, do the terms of this agreement with the

3    Steelworkers apply to the subcontractor as well?

4    A.    If the subcontractor has a bargaining agreement

5    with the Steelworkers, it would.  As a Steelworker

6    contractor, we can sub work, we're allowed to sub work

7    to building trade unions and we're allowed to sub work

8    to non-union merit shop subcontractors as well, and we

9    do both.  We've had plenty of union subs on our jobs,

10   other union subs on our jobs.

11   Q.    In what states does PKF do construction work?

12   A.    Most of our work traditionally is in New Jersey.

13   We have done work in Pennsylvania and are currently

14   doing some work in Pennsylvania generally within the

15   five counties.  I say five counties surrounding

16   Philadelphia area.

17         We have done some work for Delaware DOT and

18   we've done a little bit of work in Maryland as well.  I

19   mentioned like our Amtrak jobs, we've done some work for

20   them, drilling work for Amtrak down in Maryland.  But

21   that's it.

22         I don't think -- years and years and years ago

23   PKF did some work down in the Carolinas, but that's

24   probably been 20 years.

25   Q.    Okay.  So approximately what percentage of PKF's

Thomas Isenberg
September 30, 2020

Page 23

1   work is in Pennsylvania?

2   A.      Currently very little.  We're wrapping up about a

3   $50 million pump station job that is through PennDOT in

4   Bucks County and Philadelphia County, but that's getting

5   wrapped up.

6           A couple years ago we had the big turnpike,

7   I-95 connector project, that was like $150 million.  So

8   while that was running, a good portion of our

9   work -- it's all really a dollar-based concept.  Right

10  now probably not a whole heck of a lot in Pennsylvania.

11  Q.      How many employees does PKF have?

12  A.      Hourly or salary or both?

13  Q.      Let's start with salary.  How many salaried

14  employees does PKF have?

15  A.      I think we have about 65 or 67 salaried folks.

16  Somewhere in that general vicinity.

17  Q.      Okay.  And are the salaried employees management

18  employees or tradespeople or both?

19  A.      Most of them we would classify as supervision,

20  management, supervision.  We have a couple of folks who

21  work at our equipment yard who are -- you know, work on

22  our equipment, and things along those lines, that you

23  wouldn't qualify as supervision, but they are not

24  necessarily tradesmen.

25  Q.      Okay.  So the salaried employees at PKF, are they

Thomas Isenberg
September 30, 2020

Page 24

1   members of the Steelworkers Union?

2   A.      No.

3   Q.      So how many hourly employees does PKF have?

4   A.      That, too, will vary based on the amount of work

5   we have going on.  Right now I'm not exactly sure.  I

6   think we're probably in the 70, 75.

7           We've been as high, depending if we're really

8   busy, to 200 hourly folks.

9   Q.      And are all of the hourly employees members of

10  the Steelworkers Union?

11  A.      That is correct.

12  Q.      And are the hourly employees hired on a project

13  by project basis?

14  A.      That's a -- well, I could say no.  We have many

15  longstanding hourly workers who go from project to

16  project who may have been with us 20, 25 years.  If

17  there is a project that we need more manpower, we will

18  go out and find new employees who may be around just for

19  that project, depending on what the next project holds.

20          If we have more work, we'll keep them on.  And

21  if they're good workers, we'll keep them on and send

22  them to the next project.  But the vast majority of our

23  folks are -- go from project to project and stay with us

24  as a career.

25  Q.      Okay.  I'm going to show you what I'm going to

Thomas Isenberg
September 30, 2020

Page 25

1    mark as Isenberg Exhibit 3.

2           Just give me one moment.

3                         - - -

4                  (Exhibit Isenberg 3 marked for

5           identification.)

6                         - - -

7    BY MS. FURST:

8    Q.    Mr. Isenberg, do you recognize this document?

9    A.    I do.

10   Q.    And what is it?

11   A.    It's an affidavit that was incorporated into some

12   document in this present litigation.

13   Q.    I'm just scrolling down to the bottom of your

14   affidavit, paragraph 13, which reads:  "Because PKF

15   maintains a collective-bargaining agreement with the

16   United Steelworkers, it cannot perform work on any City

17   of Philadelphia Public Works subject to a project labor

18   agreement with its current workforce."

19   A.    Correct, that's what it says.

20   Q.    What does the phrase "current workforce" mean in

21   this paragraph?

22   A.    With our current workers, as of whatever date

23   that was and currently now, our current workers, meaning

24   our current Steelworker workers, we cannot work on a PLA

25   in Philadelphia because the Steelworkers are not

Thomas Isenberg
September 30, 2020

Page 26

1    included as a signatory union to that PLA.  To any

2    PLA.

3    Q.     Does current workforce refer to both the

4    permanent hourly employees and the project to project

5    hourly employees at PKF?

6    A.     It would apply to any PKF employee, any hourly

7    PKF employee on our payroll whenever the work current

8    would be current.

9           Everybody we hire is a member of the

10   Steelworkers Union and would not be able to work on a

11   project with a PLA on it in Philadelphia.

12   Q.     Going back to our discussion of hourly employees,

13   when you bring on sort of additional hourly employees

14   for a project, are those employees always members of the

15   Steelworkers Union?

16   A.     Correct.

17   Q.     And those employees that are brought on for

18   specific projects, do they sometimes work for other

19   contractors?

20   A.     I don't know the answer to that question.  I

21   don't know if they have side jobs or do something on the

22   side on the weekends or something like that, I don't

23   know.

24   Q.     Well, when you add hourly employees for a large

25   project, are those employees -- do those employees

Thomas Isenberg
September 30, 2020

Page 27

 1   become permanent employees of PKF?

 2   A.     They are -- I don't know what you mean by the

 3   term "permanent," but they are employees of PKF, whether

 4   for that job or into the future.  We don't hire just for

 5   a specific job, we hire for a need and keep them as

 6   long as we have work for them to do and they're good

 7   workers.

 8   Q.     Are there times when the additional hourly

 9   employees that are brought on for a large project are

10   not retained by PKF after the project ends?

11   A.     I would -- I don't know the answer to that

12   question because, again, it depends on what our

13   available work is at the time that the project ends and

14   whether the worker, him or herself, were good workers to

15   keep on our staff, to keep in our employ.

16          Again, we don't hire specifically just for a

17   job and then send them on their way when the job is

18   over, unless there's a reason to do so, which would be

19   lack of work or not a good worker.

20   Q.     Okay.  Has PKF -- let me start again.

21          During your time at PKF, has the company ever

22   had to send the worker on its way, as you said, because

23   of a lack of work after a project is done?

24   A.     We've done that all the time.

25   Q.     Okay.  And is it your understanding that those

Thomas Isenberg
September 30, 2020

Page 28

1  workers that are sent on their way may go work for

2  another Steelworker-affiliated contractor?

3  A.    They very well may.  I don't know if they do or

4  not.  Some of our folks, who get laid off for lack of

5  work, sit at home and wait for us to call them back at a

6  later time.

7        Now, they may find a job in the interim and

8  don't come back when we call them back.  We call that

9  being on the bench.  Some guys and ladies may just stay

10 home, get their unemployment compensation until we

11 have -- we are no longer in a lack of work position.

12 Q.    Okay.  Mr. Isenberg, is it accurate to say that

13 PKF can perform work on Philadelphia Public Works

14 projects that are not subject to a project labor

15 agreement?

16 A.    Let's make sure I got this correct.  Can you ask

17 that question again?

18        Can we work on a Philadelphia public project

19 that is not subject to a PLA?

20 Q.    That's correct.  That's the question.

21 A.    We can and we have.

22 Q.    Tell me about the times that you have, that you

23 recall.

24 A.    Well, none since I have been here.  I do know

25 that PKF has done work for the Philadelphia Water

Thomas Isenberg
September 30, 2020

Page 29

1    Department in the past.  I don't know when.
2    Certainly -- well, certainly not within the last eight
3    years, probably goes back a little further than that,
4    but we have done, my understanding is, several PWD jobs
5    that did not have a PLA on them.
6    Q.     Okay.  And do you have a sense of timeframe when
7    those jobs were done?
8    A.     I do not.
9    Q.     Have you or anyone else at PKF ever asked any
10   employee of PKF to change their union membership so that
11   PKF could bid on a City of Philadelphia public project
12   that requires a PLA?
13   A.     I don't know.
14   Q.     Well, let me ask the question just directed at
15   you.
16          Have you ever asked any employee of PKF to
17   change their union membership?
18   A.     Oh, no, because we have an agreement with the
19   Steelworkers, we would not -- we would -- we couldn't
20   keep that guy on staff if we asked them to switch to a
21   different union.  He would have to go somewhere else to
22   work.
23   Q.     Okay.  Would PKF consider bidding on a City of
24   Philadelphia Public Works project that requires a PLA if
25   the United Steelworkers were signatory to the PLA?

Thomas Isenberg
September 30, 2020

Page 30

 1   A.      They would -- PKF, we would certainly consider
 2   bidding on such a job.
 3   Q.      And, in fact, PKF has done that in the past with
 4   other project owners; is that correct?
 5   A.      At least New Jersey Department of Transportation,
 6   our Driscoll Bridge project, the Steelworkers were
 7   included and we did work under a PLA for that project.
 8   Q.      Okay.  Does PKF monitor Philadelphia invitations
 9   to bid?
10   A.      I would say yes.
11   Q.      What factors does PKF consider when determining
12   whether to bid on a City of Philadelphia Public Works
13   work?
14   A.      Well, I think the factors would all be the same
15   as any other job, including project labor agreement, the
16   presence of a project labor agreement.
17   Q.      Okay.  So those other factors would include the
18   backlog that we discussed earlier; is that right?
19   A.      Correct, available workforce, bonding capacity.
20   You know, City of Philadelphia, obviously, has its own,
21   you know, different kind of considerations I would
22   assume as well, location.  Because everything being so
23   tight, there may not be available space to get around,
24   depending on what kind of equipment you have to get down
25   into the city, things along those lines, because of the

Thomas Isenberg
September 30, 2020

Page 31

1  congestion of people and buildings and whatnot, may go

2  into additional, you know, thought processes of whether

3  we want to bid a job in Philadelphia or not, a publics

4  job, a Public Works job in Philadelphia.

5  Q.    Are you familiar with the 15th Street Bridge

6  project that's discussed in this lawsuit?

7  A.    I am not.

8  Q.    Okay.  Are you aware that the complaint in this

9  case alleges that PKF wanted to bid on the 15th Street

10 Bridge project?

11 A.    I am not aware of that either.  I don't -- yeah,

12 I don't know if we -- I don't know if we looked at that

13 15th Street Bridge project or not.  Most of the work

14 that we -- that I have had to review, mainly because of

15 a PLA, were mostly Philadelphia Water Department jobs,

16 but I don't know much about the 15th Street Bridge

17 project.

18 Q.    Okay.  So are you aware of the Northeast Airport

19 runway project?  That's another project that's the

20 subject of this case.

21 A.    To that extent, that's all I'm aware of, the

22 airport project that is subject to this case.

23 Q.    Okay.  Are you aware -- do you know whether PKF

24 was interested in bidding on this project?

25 A.    I do not.

Thomas Isenberg
September 30, 2020

Page 32

1   Q.      Do you know if PKF did bid on the project?

2   A.      We did not.

3   Q.      Are you aware that the PLA requirement was

4   removed for that project?

5   A.      I am aware of that, yes.

6   Q.      Who at PKF could speak to the company's interest

7   in bidding on those two projects, the 15th Street and

8   runway projects?

9   A.      Probably our chief estimator, but I don't know.

10  Q.      Are you aware of Philadelphia's prequalification

11  process for Public Works projects?

12  A.      Only to the extent that I know they have one.

13  I'm not aware of the process or what's required for the

14  prequal.

15  Q.      Okay.  And who at PKF would be aware -- would be

16  aware of that?

17  A.      Either our chief estimator, vice president, Mitch

18  Baland, or our -- what is his title?  Chief financial

19  manager, his name is Don Michell, M-I-C-H-E-L-L.  Don

20  handles a lot of our prequal applications and things

21  along those lines, does the work.  Because a lot of

22  times they ask for financial -- you know, how you are

23  financially and things like that.  So Don handles a lot

24  of that.

25              But, again, outside of knowing they have a

Thomas Isenberg
September 30, 2020

Page 33

1  prequal, I'm not familiar with what's required in a

2  prequal.

3  Q.    Okay.  Is it fair to say that when PKF is

4  interested in bidding on a project, and the project

5  requires prequalification, that PKF submits a

6  prequalification for the project?

7  A.    I think it's fair to assume that, yes, if it's

8  required.

9  Q.    Has PKF ever refrained from bidding on a City of

10  Philadelphia Public Works project for a reason other

11  than a PLA requirement?

12  A.    Well, I guess my question, for jobs that have a

13  PLA or jobs that don't have a PLA?

14  Q.    Let's talk about jobs that don't have a PLA.

15  A.    Okay.

16  Q.    Has PKF ever refrained from bidding on a

17  Philadelphia job for some other reason?

18  A.    Without having first-hand knowledge of that, I

19  would have to assume yes.

20  Q.    And who would have firsthand knowledge of that at

21  PKF?

22  A.    Our chief estimator, Mitch Baland.  With that,

23  having said that, I have to give one caveat when I

24  mention Mr. Baland.

25         Mitch has been in the role as chief estimator

Thomas Isenberg
September 30, 2020

Page 34

1    for approximately a year, year and a half.  Our previous

2    executive vice president, chief estimator, is no longer

3    with PKF, and so anything prior to the last year, Mitch

4    would not really have the ability to comment on what he

5    has passed on or what he has not passed on, and our

6    prior gentleman is no longer with us.

7    Q.     Okay.  What was the name of the gentleman who's

8    no longer with PKF?

9    A.     Craig Coleman.  But I'm sure Mitch has looked at

10   some in the last year as well.  I just wanted to make

11   sure -- he won't have the 30-year history of jobs,

12   that's all, but I'm sure he's looked at some as well.

13   Q.     Okay.  Thanks.  I appreciate that.

14          Has PKF refrained from submitting bids on

15   Philadelphia Public Works projects that are subject to a

16   project labor agreement?

17   A.     Yes.

18   Q.     Which projects are you aware of that PKF

19   refrained from submitting a bid on because of the

20   existence of the PLA requirement?

21   A.     I can't tell you exactly what jobs they were.

22   I -- when Craig was still working here, if he saw a, for

23   the most part, a PWD job that had a PLA, he would send

24   it to me with a -- well, some kind of comment in terms

25   of it has a PLA, guess we can't bid this one, but double

Thomas Isenberg
September 30, 2020

Page 35

1   check and make sure the Steelworkers are or are not

2   included.

3          And they always came back as not included,

4   so -- and I know we didn't bid them, so I would assume

5   we didn't bid them because of the PLA.  But I don't know

6   what jobs they are because it would just be an email

7   with a bid advertisement attached to it and it would,

8   you know, double check this but if we're not included,

9   we can't bid, type of comment.

10  Q.    Okay.  So if a City of Philadelphia PLA bid did

11  include the Steelworkers, that would not be a bar to PKF

12  potentially bidding on that contract; is that right?

13  A.    Correct.

14                    MS. FURST:  I think that is all I

15            have.  I think other counsel may have

16            questions, but thank you very much,

17            Mr. Isenberg.

18                    THE WITNESS:  You're more than

19            welcome.

20                    MR. WEINERT:  I actually don't have

21            any questions.  Thanks.

22                    MR. ZIMOLONG:  No questions.  Thank

23            you.

24                    MS. FURST:  All right.  Thanks,

25            everyone.  See you this afternoon.

Thomas Isenberg
September 30, 2020

Page 36

1                         - - -

2                         (Deposition concluded at 10:47

3          a.m.)

4                         - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Thomas Isenberg
September 30, 2020

Page 37

```
 1
 2              C E R T I F I C A T I O N
 3
 4
 5          I, hereby certify that the proceedings and
 6    evidence noted are contained fully and accurately in the
 7    stenographic notes taken by me in the foregoing matter,
 8    and that this is a correct transcript of the same.
 9
10
11
12
13          _____
            Court Reporter - Notary Public
14
15
16          (The foregoing certification of this
17    transcript does not apply to any reproduction of the
18    same by any means, unless under the direct control
19    and/or supervision of the certifying reporter.)
20
21
22
23
24
25
```

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Thomas Isenberg
September 30, 2020

| | | | | | | |
|---|---|---|---|---|---|---|
| **A** | 22:7 | **attorney** 5:1 | 10:9,14 | **business** 16:8 | 34:9 | 10:18 | 4:9 5:5,10 |

**A**

**a.m** 1:21 36:3
**ability** 34:4
**able** 7:10
    14:2 17:6
    26:10
**accurate**
    17:18 28:12
**accurately**
    37:6
**ACTION** 1:4
**activity** 21:17
**add** 26:24
**additional**
    26:13 27:8
    31:2
**administeri...**
    4:13
**advertisem...**
    35:7
**advertising**
    9:12
**affidavit** 3:16
    7:18,20
    25:11,14
**affiliated**
    16:14
**affiliation**
    12:6 16:21
**afternoon**
    35:25
**ago** 22:22
    23:6
**agree** 5:12,14
    5:22
**agreed** 4:4
**agreement**
    12:2 17:14
    17:18 18:6
    18:7,9,16
    18:21,24,25
    19:2,6 22:2
    22:4 25:15
    25:18 28:15
    29:18 30:15
    30:16 34:16
**agreements**
    17:22
**ahead** 14:13
**airport** 31:18
    31:22
**Al** 7:23
**alleges** 31:9
**allowed** 22:6

22:7
**amount** 8:10
    13:6 14:5
    24:4
**Amtrak**
    14:18 22:19
    22:20
**AMY** 2:17
**amy.kirby...**
    2:20
**and/or** 37:19
**answer** 6:21
    7:4 26:20
    27:11
**answering**
    6:23
**answers** 6:17
**appear** 17:21
**appears**
    18:15
**applications**
    32:20
**apply** 22:3
    26:6 37:17
**appreciate**
    34:13
**apprentice**
    9:17
**apprentices**
    9:18
**approval**
    14:10
**approxima...**
    12:10 22:25
    34:1
**Arch** 2:18
**area** 11:7
    22:16
**asked** 7:9
    11:22 29:9
    29:16,20
**asking** 6:22
    21:2
**aspect** 12:12
    13:17
**assess** 12:1
**Associates**
    4:12
**assume** 30:22
    33:7,19
    35:4
**assuming**
    15:13
**attached** 35:7

**attorney** 5:1
    6:8
**attractive**
    13:11
**authority**
    10:9,11
**available**
    12:25 27:13
    30:19,23
**avoid** 6:19
**aware** 10:5
    12:9 16:20
    31:8,11,18
    31:21,23
    32:3,5,10
    32:13,15,16
    34:18

**B**

**B** 3:12
**B-A-L-A-N...**
    10:23
**back** 12:7
    13:6 26:12
    28:5,8,8
    29:3 35:3
**backlog**
    11:17 13:2
    13:3,7,19
    13:22,24
    14:3,3
    30:18
**Baland** 10:23
    32:18 33:22
    33:24
**banks** 20:9
**bar** 35:11
**bargaining**
    22:4
**based** 11:13
    12:12 13:11
    14:8 24:4
**basically** 9:14
    12:2
**basis** 24:13
**BDE** 9:15
**bear** 4:3 5:7
**bearing**
    12:17
**believe** 16:18
    18:8
**bench** 28:9
**best** 6:20
**bid** 9:21 10:6

10:9,14
    12:8,10,20
    14:2,13
    15:5,7
    29:11 30:9
    30:12 31:3
    31:9 32:1
    34:19,25
    35:4,5,7,9
    35:10
**bidding**
    29:23 30:2
    31:24 32:7
    33:4,9,16
    35:12
**bids** 34:14
**big** 11:10
    12:17 23:6
**bigger** 14:14
**bit** 22:18
**board** 9:17
**bonding**
    12:18,18,20
    14:8,9,12
    14:22 30:19
**bottom** 25:13
**bound** 19:6
**Box** 2:4
**break** 7:3,5
**Bridge** 30:6
    31:5,10,13
    31:16
**bridges** 20:2
    20:4
**brief** 17:2
**briefly** 6:15
    9:2
**bring** 26:13
**Broad** 2:11
**brought**
    26:17 27:9
**Bucks** 15:24
    23:4
**build** 20:2,3
    20:11,24
**building** 20:8
    20:14,16,23
    21:4,9,15
    21:17,19,21
    22:7
**buildings**
    20:10 21:11
    21:14 31:1
**built** 20:12

**business** 16:8
**busy** 24:8

**C**

**C** 2:1 37:2,2
**call** 19:23
    28:5,8,8
    19:2
**capacity** 1:9
    12:18,19,21
    14:9,22
    30:19
**career** 24:24
**Carolinas**
    22:23
**case** 6:10
    18:8,12
    31:9,20,22
**caveat** 33:23
**CBA** 16:12
    16:12 27:21
**certain** 12:18
**certainly**
    29:2,2 30:1
**certification**
    37:16
**certify** 37:5
**certifying**
    37:19
**change** 29:10
    29:17
**charge** 10:12
**check** 15:2
    35:1,8
**chief** 9:23
    10:11,19,21
    32:9,17,18
    33:22,25
    34:2
**city** 1:8,10
    2:16 5:12
    6:9,9 25:16
    29:11,23
    30:12,20,25
    33:9 35:10
**CIVIL** 1:4
**claims** 9:7,10
    5:9
**clarify** 19:12
    20:15
**classify** 23:19
**clearly** 6:23
**close** 14:11
**Code** 4:6
**Coleman**

34:9
**collective-b...**
    25:15
**come** 9:19,25
    10:18 28:8
**comes** 11:20
**coming** 13:13
**commence**
    16:8
**commencing**
    1:20
**comment**
    34:4,24
    35:9
**commercial**
    8:20 20:9
    20:13
**company** 8:9
    9:16 12:18
    14:10,12
    16:12 27:21
**company's**
    32:6
**compensati...**
    9:10 28:10
**complaint**
    31:8
**completely**
    7:3
**compliance**
    8:4 9:2
    22:6 28:2
**component**
    11:10
**concept**
    12:16 23:9
**concern**
    10:20
**concerns**
    10:15
**concluded**
    36:2
**conduct** 5:8
**conducted**
    4:7
**conference**
    4:8,11,18
    5:9
**confirming**
    4:17
**congestion**
    31:1
**connector**
    23:7
**consensus**

10:18
**consent** 4:21
**consider** 19:5
    29:23 30:1
    30:11
**considerati...**
    30:21
**considered**
    4:22 13:10
**construction**
    1:5 8:23
    19:22 20:8
    20:17,24
    21:3,4,9,14
    22:11
**CONSTRU...**
    1:4
**contained**
    37:6
**continued**
    19:9
**contract** 3:15
    3:16 8:4,11
    8:11 9:3
    11:25 14:5
    18:13 19:25
    20:7 35:12
**contractor**
    9:6 15:8
    19:24,25
    22:6 28:2
**contractors**
    8:24 26:19
**contracts** 9:5
**contractual**
    10:2
**control** 4:11
    37:18
**controls** 8:5
    8:11 9:3
**copy** 5:3
**corporate**
    9:24 10:16
    10:17
**correct** 7:21
    16:16 18:11
    18:12 24:11
    25:19 26:16
    28:16,20
    30:4,19
    35:13 37:8
**cost** 14:6
**costs** 5:8
**counsel** 4:1,5

4:9 5:5,10
    7:15 9:9,16
    9:14 35:15
**counties**
    22:15,15
**County** 15:25
    23:4,4
**couple** 14:19
    16:23 23:6
    23:20
**court** 1:1 4:1
    4:8,12,16
    37:13
**Craig** 34:9,22
**CRR** 1:21
**current** 8:3
    13:9,23
    17:16 18:6
    25:18,20,22
    25:23,24
    26:3,7,8
**currently**
    12:22,23
    22:13 23:2
    25:23

**D**

**D** 3:1
**damages**
    11:24
**date** 16:18
    25:22
**dates** 11:25
**day** 7:19
**December**
    17:19 18:10
**decision** 12:9
**decision-m...**
    10:8
**Defendants**
    1:10 2:21
**defense** 9:9
**Delaware**
    22:17
**department**
    2:16 9:11
    29:1 30:5
    31:15
**depending**
    21:23 24:7
    24:19 30:24
**depends**
    21:16,16
    27:12

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

**deposition**
1:18 4:7,15
4:19 5:8
6:12,13
7:14,17,22
8:1 36:2
**describe** 9:1
**DESCRIP...**
3:14
**determinat...**
9:22
**determining**
30:11
**different**
29:21 30:21
**direct** 6:2
37:18
**directed**
29:14
**director** 8:4
8:10 9:3
18:22
**discussed**
30:18 31:6
**discussion**
17:2 26:12
**DISTRICT**
1:1,1
**document**
17:9,12
18:1,3,19
19:14,16
25:8,12
**documents**
7:16
**doing** 11:10
14:17 21:14
22:14
**dollar-based**
23:9
**Don** 32:19,19
32:23
**doors** 21:22
**DOT** 15:16
22:17
**double** 34:25
35:8
**drilling** 11:7
11:8 14:18
21:21 22:20
**Driscoll** 30:6
**Duane** 8:22
**duly** 5:24
**duties** 9:2

**E**

**E** 2:1,1 3:1,12
37:2
**E-L-Y** 11:3
**earlier** 30:18
**early** 16:19
**EASTERN**
1:1
**economy**
13:9
**EEO** 9:16
**effective** 18:9
**eight** 8:8 29:2
**either** 12:19
31:11 32:17
**electrical**
11:10 12:23
12:24
**Ely** 11:3
**email** 35:6
**emailed** 5:4
**employ** 27:15
**employee**
26:6,7
29:10,16
**employees**
23:11,14,17
23:18,25
24:3,9,12
24:18 26:4
26:5,12,13
26:14,17,24
26:25,25
27:1,3,9
**ends** 27:10,13
**engineers**
12:13
**entered** 18:20
19:1
**equipment**
23:21,22
30:24
**ESQUIRE**
2:4,10,17
2:17
**estimated**
14:6
**estimates**
10:13
**estimator**
9:24 10:11
10:20,21
32:9,17
33:22,25

34:2
**evaluating**
10:14
**Evergreen**
18:21 19:2
**Everybody**
26:9
**evidence** 37:6
**exactly** 14:23
24:5 34:21
**EXAMINA...**
3:7 6:2
**examined**
5:24
**example** 6:18
12:22
**examples**
11:21
**executive**
34:2
**exhibit** 5:2,3
5:6 19:13
19:13 25:1
25:4
**exhibits** 5:1
16:24 19:18
**existence**
34:20
**expire** 18:10
**expired** 17:19
18:20
**explain** 13:20
**express** 4:20
**extent** 31:21
32:12

**F**

**F** 37:2
**fact** 30:3
**factors** 11:14
12:9 13:2
30:11,14,17
**failed** 19:12
**fair** 13:6 33:3
33:7
**familiar** 31:5
33:1
**fast** 14:10
**FETBROYT**
2:9
**field** 16:2,4
**final** 9:22
**financial**
32:18,22

**financially**
32:23
**find** 24:18
28:7
**fine** 7:3
**firm** 8:19
9:15
**firm's** 9:16
**first** 5:24
6:15 8:18
17:7 19:14
**first-hand**
33:18
**firsthand**
33:20
**five** 22:15,15
**Floor** 2:18
**folks** 23:15
23:20 24:8
24:23 28:4
**follows** 5:25
**forego** 12:24
13:14
**foregoing**
37:7,16
**forget** 5:18
**form** 20:19
21:6
**foundation**
21:20
**fully** 37:6
**functions**
9:11
**Furst** 2:17
3:8 5:11,11
6:4,8 17:5
19:11,21
21:1,12
25:7 35:14
35:24
**further** 4:25
29:3
**future** 27:4

**G**

**general** 8:19
15:8 23:16
**generally**
10:5,7,18
19:24 21:18
21:20 22:14
**gentleman**
34:6,7
**getting** 23:4

**give** 6:21 9:5
12:11 21:25
25:2 33:23
**given** 6:13
**Glenn** 11:3
**go** 6:14 11:14
12:9 14:4
14:13 24:15
24:18,23
28:1 29:21
31:1
**goes** 14:1
29:3
**going** 6:20
12:7,23
16:23,24
17:10 19:15
19:16 24:5
24:24,25
26:12
**good** 6:5,6
11:12,13
12:15 23:8
24:21 27:6
27:14,19
**Great** 7:8
**ground** 6:14
**guess** 33:12
34:25
**guy** 12:14
19:4 29:20
**guys** 12:13
28:9

**H**

**H** 3:12
**HAGGER...**
2:9
**half** 8:7 34:1
**handle** 9:5,6
9:8
**handles** 11:8
11:9 32:20
32:23
**hard** 14:10
**Harrisburg**
8:20,21
**hats** 9:4
**he'll** 12:2
**head** 6:17,18
**hear** 5:17
7:10
**heavy** 12:23
19:23 20:6

20:6
**heck** 23:10
**held** 1:19
17:2
**help** 6:23
10:2
**high** 24:7
**high-rises**
20:24
**highway**
19:23 20:7
**highways**
20:2
**hire** 26:9
27:4,5,16
**hired** 24:12
**hiring** 9:12
**history** 34:11
**Hoffman**
7:23
**holds** 24:19
**home** 15:24
28:5,10
**honest** 14:23
**hourly** 23:12
24:3,8,9,12
24:15 26:4
26:5,6,12
26:13,24
27:8
**HR** 9:11

**I**

**I-95** 23:7
**identification**
19:19 25:5
**identity** 4:17
**III** 1:5 8:5
16:10,12
**immediately**
8:12
**in-house** 9:14
**include** 30:17
35:11
**included** 12:4
15:9,10,13
15:14,15
26:1 30:7
35:2,3,8
**including**
30:15
**incorporated**
25:11
**individuals**

10:25
**initiation**
16:13
**input** 9:25
10:18 11:19
**insurance-r...**
9:7
**interest** 32:6
**interested**
31:24 33:4
**interesting**
8:16 9:1
**interim** 28:7
**Intervenors**
2:13
**introduced**
6:7
**invitations**
30:8
**involved** 10:2
10:25
**Isenberg**
1:19 3:4,15
3:16,16
5:23 6:5
7:13 8:3
16:24 17:6
17:12 18:4
19:15,16,18
19:18 25:1
25:4,8
28:12 35:17
**issue** 7:10
11:17,20
**issues** 11:24
**item** 10:1

**J**

**JAMES** 1:9
**January**
17:19 18:9
**Jersey** 15:16
22:12 30:5
**job** 8:3 9:23
10:4,19
11:12,13,15
12:2,3,20
12:23,24
14:13,18
15:12 20:12
23:3 27:4,5
27:17,17
28:7 30:2
30:15 31:3

31:4,4
33:17 34:23
**jobs** 9:12,22
10:14,14,19
11:14 13:5
13:7,14
14:14,15
21:10,13
22:9,10,19
26:21 29:4
29:7 31:15
33:12,13,14
34:11,21
35:6
**joining** 8:12

**K**

**K-E-O-U-...**
11:4
**KANG** 2:9
**keep** 24:20
24:21 27:5
27:15,15
29:20
**KENNEY**
1:9
**Keogh** 11:7
**Keough** 11:4
**kind** 5:16
8:16 10:1
18:21 19:2
20:5 21:23
30:21,24
34:24
**KIRBY** 2:17
**know** 5:16
7:4,9,11
10:1 11:13
12:1,4,5,17
12:21 13:1
13:4,12,12
13:24 14:5
14:9,10,11
14:14 15:12
15:20 16:18
17:22 18:18
18:19 19:3
20:23 23:21
26:20,21,23
27:2,11
28:3,24
29:1,13
30:20,21
31:2,12,12

Thomas Isenberg
September 30, 2020

31:16,23
32:1,9,12
32:22 35:4
35:5,8
knowing
32:25
knowledge
33:18,20

**L**
labor 12:2
18:20 19:3
19:4 25:17
28:14 30:15
30:16 34:16
Lacava 1:6
8:1
lack 27:19,23
28:4,11
ladies 28:9
laid 28:4
Lancaster
8:19
lapse 16:21
18:23
large 12:24
14:2 26:24
27:9
larger 14:20
Larry 11:4
law 2:16 4:22
8:16 12:14
lawsuit 31:6
lawyer 8:14
18:20
left 18:23
Let's 23:13
28:16 33:14
level 12:1
liability 9:10
liaison 9:8,15
likelihood
12:24
limit 14:22
line 13:17
lines 9:13
11:16 13:15
23:22 30:25
32:21
liquidated
11:24
list 12:5,8
litigation
4:24 25:12

litigator 8:20
little 11:18
14:17,18
22:18 23:2
29:3
LLC 2:3,9
Local 18:22
located 11:16
15:23,24
location
30:22
locations
4:10
LOFTUS 1:4
long 4:3 8:6,9
11:15 13:22
27:6
long-winded
5:17
longer 28:11
34:2,6,8
longstanding
24:15
look 7:18
10:3 11:13
11:23 12:3
13:5,7,8,11
15:2 17:7
looked 31:12
34:9,12
looking 10:14
looks 11:12
17:16 18:14
lot 8:23 9:4
9:18 13:1,3
13:4,21
14:1,3
23:10 32:20
32:21,23
low 13:7
15:15
Lydia 2:17
5:11 6:8
lydia.furst...
2:19

**M**
M-I-C-H-E...
32:19
maintains
25:15
majority
24:22
man 13:1

management
11:11 23:17
23:20
manager 9:3
32:19
manned 14:2
manpower
24:17
March 8:7
mark 11:5
16:12 19:13
25:1
marked 5:1
19:19 25:4
Maryland
22:18,20
math 12:15
matter 37:7
MAYOR 1:9
mean 13:20
20:23 25:20
27:2
meaning
25:23
means 19:3
37:18
mechanical
11:9 16:12
meet 7:13
meeting 4:11
member 26:9
members
24:1,9
26:14
membership
29:10,17
mention
33:24
mentioned
10:25 11:19
13:18 15:1
22:19
merged 16:11
merit 22:8
Michael 2:10
5:21
Michell 32:19
milestone
11:25
million 13:25
13:25 14:11
14:16,24
23:3,7
Mitch 10:23

11:2,9,12
32:17 33:22
33:25 34:3
34:9
moment 25:2
monitor 30:8
months 13:13
morning 6:5
6:6
Morris 8:22
moved 8:19
8:21
mweinert...
2:12

**N**
N 2:1 3:1
37:2
name 6:8
10:21,23
11:3 32:19
34:7
names 10:24
necessarily
12:25 23:24
need 4:14
6:16 7:2
12:19 14:4
14:12 21:6
24:17 27:5
needed 9:15
NESHAMI...
1:4
never 6:13
18:23
new 10:14
15:15 22:12
24:18 30:5
Newtown
15:24
niche 11:7
14:17
nod 6:18
non-union
22:8
normally
13:8
Northeast
31:18
Notary 1:21
37:13
noted 37:6
notes 37:7
noticed 4:19

number 3:14
19:13,13

**O**
O 37:2
oath 4:13
object 21:5
Objection
20:19
obviously 9:5
10:13 30:20
office 8:21
15:24
officer 4:13
9:15,16
officers 9:24
10:16,17
offices 16:1,2
16:4,5
OFFICIAL
1:9
Oh 8:16
29:18
okay 6:5,14
6:25 7:2,11
7:12,22,25
9:1,20 10:5
10:21 11:19
12:7 14:5
15:17,23
16:6,20,23
17:10,14,18
17:22 18:1
18:2,9,16
19:5,11
20:15 22:1
22:25 23:17
23:25 24:25
27:20,25
28:12 29:6
29:23 30:8
30:17 31:8
31:18,23
32:15 33:3
33:15 34:7
34:13 35:10
ones 12:17
14:16
operation
14:17
operations
11:8
ORAL 1:18
outside 9:9

32:25
owner 19:25
owners 30:4

**P**
P 2:1,1
P.O 2:4
Pa 2:5,11,18
4:6
page 3:3,14
17:7
paragraph
25:14,21
part 20:21
34:23
participating
4:10
particular
9:23 10:1
10:19 11:25
parties 4:5,21
5:7
partner 8:22
passed 34:5,5
paving 20:3
payroll 26:7
pending 7:5
PennDOT
23:3
Pennsylvania
1:1,20
15:25 22:13
22:14 23:1
23:10
people 31:1
percent 20:22
percentage
22:25
perform
25:16 28:13
permanent
26:4 27:1,3
permission
12:20
person 10:8
10:10
Philadelphia
1:8,10 2:11
2:16,18
5:12 6:9
22:16 23:4
25:17,25
26:11 28:13
28:18,25

29:11,24
30:8,12,20
31:3,4,15
33:10,17
34:15 35:10
Philadelphi...
32:10
phrase 25:20
pipeline 13:5
13:11
PKF 8:9,12
9:3,21 10:9
12:8 15:5
15:17,23
16:1,8,10
16:14 17:14
17:22 18:7
18:16 19:5
19:22 20:8
20:15 21:3
21:14 22:1
22:11,23
23:11,14,25
24:3 25:14
26:5,6,7
27:1,3,10
27:20,21
28:13,25
29:9,10,11
29:16,23
30:1,3,8,11
31:9,23
32:1,6,15
33:3,5,9,16
33:21 34:3
34:8,14,18
35:11
PKF's 10:5
16:21 22:25
PKF-Mark
1:5 8:5
16:10
PLA 12:3,5
15:2,2,5,8
15:12 25:24
26:1,2,11
28:19 29:5
29:12,24,25
30:7 31:15
32:3 33:11
33:13,13,14
34:20,23,25
35:5,10
place 4:14

Plaintiffs 1:6
2:7
plant 11:11
20:5
plants 20:5
plays 14:6
Please 4:2
plenty 22:9
poor 12:14
portion 23:8
position 8:6
28:11
possession
5:5
potentially
11:22 35:12
practice 8:14
8:17,19
preapproved
12:20
prepare 7:13
7:16
prequal
32:14,20
33:1,2
prequalific...
32:10 33:5
33:6
presence
30:16
present 1:22
4:5 7:22,25
18:6 25:12
presented 5:3
presenting
5:2
presently
16:14
president
10:17 11:3
11:4,5
18:21 32:17
34:2
presidents
10:12
pretty 9:8
previous 34:1
previously
4:19
price 21:23
prime 11:2
19:25
prior 5:5
8:12,15

Thomas Isenberg
September 30, 2020

34:3,6
private 8:14
privy 13:16
probably
  8:20 9:18
  13:15 22:24
  23:10 24:6
  29:3 32:9
proceedings
  37:5
process 10:6
  11:20 12:7
  14:7 32:11
  32:13
processes
  31:2
prohibited
  12:19
project 9:21
  11:7,22
  12:2,10
  13:17,23
  14:6 15:3,8
  15:15,16,19
  15:21 21:3
  21:4,9 23:7
  24:12,13,15
  24:16,17,19
  24:19,22,23
  24:23 25:17
  26:4,4,11
  26:14,25
  27:9,10,13
  27:23 28:14
  28:18 29:11
  29:24 30:4
  30:6,7,15
  30:16 31:6
  31:10,13,17
  31:19,19,22
  31:24 32:1
  32:4 33:4,4
  33:6,10
  34:16
projects 10:6
  10:9 11:1,2
  12:8 13:1
  13:10,21
  14:21 15:5
  16:2,3,3,4
  20:11,16,17
  22:2 26:18
  28:14 32:7
  32:8,11

34:15,18
proper 12:5
properly 14:2
provide 6:17
  11:21
public 1:22
  20:16,22,23
  25:17 28:13
  28:18 29:11
  29:24 30:12
  31:4 32:11
  33:10 34:15
  37:13
publics 31:3
pulled 19:14
pulling 10:13
pump 11:10
  20:5 23:3
purely 20:16
purpose 4:23
pursuant
  1:19 4:6
put 5:15 16:4
  21:18,21
PWD 29:4
  34:23

_____
  Q
qualify 23:23
question 5:7
  6:21,22 7:5
  7:9,11 9:23
  9:25 10:20
  20:21 26:20
  27:12 28:17
  28:20 29:14
  33:12
questioning
  5:6
questions
  10:15 35:16
  35:21,22
quick 7:18
quite 21:9
quote 12:5

_____
  R
R 2:1 37:2
R-E-I-S-I-...
  11:6
rarely 14:15
  14:15
read 4:2 5:18
reads 25:14

really 6:14
  23:9 24:7
  34:4
reason 27:18
  33:10,17
recall 28:23
recognize
  25:8
recollection
  14:24,25
record 4:2
  5:16 6:8
  17:3 19:12
recorded
  4:18
recording
  4:20
refer 26:3
refrained
  33:9,16
  34:14,19
regarding 5:6
Reisinger
  11:5,9
relationship
  16:17
remember
  6:15,16
  12:13
remote 4:10
remotely
  1:19 4:16
removed 32:4
repeat 7:11
reporter 4:1
  4:8,16
  37:13,19
Reporting
  4:12
represent 6:9
representing
  2:7,13,21
  8:24
reproduction
  37:17
required
  21:17 32:13
  33:1,8
requirement
  15:3,6 32:3
  33:11 34:20
requires
  29:12,24
  33:5

responsible
  9:11
retained
  27:10
review 7:16
  31:14
Ricci 1:21
  6:15
right 7:6 15:3
  15:4 16:24
  17:11 18:14
  23:9 24:5
  30:18 35:12
  35:24
risk 10:2 12:1
risky 10:1
RMR 1:21
road 13:13
ROAD-CON
  1:4
roadways
  20:4
role 9:20 14:6
  33:25
roof 21:18
rule 14:11
rules 6:14
running 23:8
runway
  31:19 32:8

_____
  S
S 2:1,4,11
  3:12
salaried
  23:13,15,17
  23:25
salary 23:12
  23:13
saw 34:22
saying 6:24
says 25:19
school 8:18
  12:14
Scott 1:5 2:10
  8:1
screen 16:25
  17:8 18:3
scrolling
  25:13
se 20:14
Secane 20:13
second 18:1
  19:15

see 13:10
  17:6 35:25
seeing 17:8,9
  17:12 18:3
seek 12:19
selecting 9:20
  10:6,25
  11:14
selection
  11:20 12:7
  14:7
selector 11:2
send 24:21
  27:17,22
  34:23
sense 29:6
sent 28:1
separate 4:9
SEPTA 20:12
September
  1:14
serve 9:14
Service 4:12
sets 12:18
seven 8:7
  16:11
shake 6:17
share 16:25
SHARON
  1:21
shop 22:8
show 16:23
  24:25
side 20:6
  26:21,22
sign 5:19
signatory
  15:10 26:1
  29:25
signed 16:22
sit 9:16 28:5
six 8:21 16:11
small 14:3
smaller 14:16
Sorry 17:10
sort 11:6,14
  26:13
sought 11:20
sound 6:25
space 30:23
speak 32:6
speaking
  19:24 21:18
  21:20

specialty 11:6
specific 16:18
  26:18 27:5
specifically
  27:16
staff 27:15
  29:20
start 6:22
  16:17 23:13
  27:20
started 6:11
  8:22 17:19
  19:1
state 19:12
states 1:1
  22:11
station 11:11
  20:5,13,13
  23:3
status 13:9
stay 24:23
  28:9
Steelworker
  22:5 25:24
Steelworke...
  9:17
Steelworke...
  28:2
Steelworkers
  12:4 15:9
  15:10,13
  16:14,21
  17:15,23
  18:7,17,22
  19:6 22:3,5
  24:1,10
  25:16,25
  26:10,15
  29:19,25
  30:6 35:1
  35:11
stenographic
  37:7
stipulated 4:4
  4:25 5:10
stipulation
  4:2 5:22
Street 2:11
  2:18 31:5,9
  31:13,16
  32:7
Strehlow
  4:12
stuff 9:19

20:9
sub 21:22
  22:6,6,7
subcontract
  20:1 21:19
subcontrac...
  21:24 22:3
  22:4
subcontrac...
  8:25 22:1,8
subject 25:17
  28:14,19
  31:20,22
  34:15
submits 33:5
submitting
  34:14,19
Subpoena
  1:19
subs 9:6 22:9
  22:10
Suite 2:11
supervision
  23:19,20,23
  37:19
suppliers 9:6
sure 6:22
  9:19 12:12
  13:3,5
  14:23 24:5
  28:16 34:9
  34:11,12
  35:1
surrounding
  22:15
switch 29:20
sworn 3:5
  4:15 5:24

_____
  T
T 3:12 37:2,2
take 6:23 7:2
  7:5 10:3
  12:3
taken 1:19
  6:12 7:18
  37:7
talk 11:8,11
  33:14
talking 6:19
technical
  7:10 12:12
  12:16 13:17
tell 12:2

28:22 34:21
tend 14:14
term 19:10
  21:8 27:3
terms 11:15
  13:2 19:7,9
  19:9 22:2
  34:24
testified 5:25
thank 5:20
  6:6 35:16
  35:22
Thanks 34:13
  35:21,24
thing 5:15
  6:15
things 9:12
  9:19 11:16
  11:18 12:6
  13:15,16
  14:15 15:1
  20:2,25
  23:22 30:25
  32:20,23
think 16:11
  21:2,6
  22:22 23:15
  24:6 30:14
  33:7 35:14
  35:15
third-party
  9:10
THOMAS
  1:18 3:4
  5:23
thought 31:2
three 10:16
  10:16,24
  17:23
three-year
  18:13
tight 30:23
time 7:2,8
  8:10 15:11
  15:17 16:10
  16:20 27:13
  27:21,24
  28:6
timeframe
  29:6
times 11:23
  27:8 28:22
  32:22
title 8:4 9:4

32:18
trade 22:7
tradesmen
23:24
tradespeople
23:18
traditionally
22:12
trailer 16:5
train 20:12
transcript
37:8,17
transferring
9:12
Transporta...
30:5
treatment
11:11 20:5
try 17:10
turnpike 23:6
two 10:17
16:5 32:7
type 35:9
types 19:22
typically
17:23

**U**

ultimate
10:10
unauthorized
4:22
understand
7:8 13:18
16:6 20:20
understand...
12:11 21:10
27:25 29:4
Understood
21:2
unemploy...
28:10
union 9:17
12:6 15:10
15:10 16:15
22:9,10
24:1,10
26:1,10,15
29:10,17,21
unions 22:7
United 1:1
15:9 16:21
25:16 29:25
unquote 12:5

uses 22:1

**V**

V- 1:7
vary 24:4
vast 24:22
verbal 6:17
versa 13:14
vice 10:12
11:4,5
13:14 32:17
34:2
vicinity 23:16
videoconfe...
1:20
videotaped
4:19
Villanova 2:5
violation 4:22
VP 10:22
11:6
VPs 10:17

**W**

wait 6:20
28:5
Wal-Marts
20:9
Wally 5:13
wally@zim...
2:6
WALTER
2:4
want 6:19
31:3
wanted 31:9
34:10
wasn't 16:9
waste 11:11
20:4
water 20:4
28:25 31:15
way 17:21
18:15 27:17
27:22 28:1
we'll 14:18
24:20,21
we're 6:24
11:10 14:1
14:17 22:6
22:7 23:2
24:6,7 35:8
we've 21:10
22:9,18,19

24:7 27:24
wear 9:4
Wednesday
1:14
week 7:23 8:1
weekends
26:22
Weinert 2:10
5:21,21
35:20
welcome
35:19
went 6:7
12:14
whatnot 31:1
willing 11:24
windows
21:22
witness 3:3,5
4:9,14,15
5:2,4,6,18
20:20 21:8
35:18
witness's
4:17
word 13:18
words 21:17
work 8:23
9:17 13:4,6
13:23,25
14:2,4
19:22 20:1
20:5,6,22
21:16,21,24
22:6,6,7,11
22:12,13,14
22:17,18,19
22:20,23
23:1,9,21
23:21 24:4
24:20 25:16
25:24 26:7
26:10,18
27:6,13,19
27:23 28:1
28:5,11,13
28:18,25
29:22 30:7
30:13 31:13
32:21
worked 8:18
worker 27:14
27:19,22
workers

24:15,21
25:22,23,24
27:7,14
28:1
workers'
9:10
workforce
11:15 12:21
13:1 25:18
25:20 26:3
30:19
working 8:22
34:22
Works 20:16
20:22 25:17
28:13 29:24
30:12 31:4
32:11 33:10
34:15
world 19:3
worth 13:25
wouldn't
12:25 23:23
wrangling
15:14
wrapped
23:5
wrapping
14:4 23:2
written 4:21

**X**

X 3:1,12

**Y**

yard 23:21
yeah 11:12
31:11
year 15:20
18:19 34:1
34:1,3,10
years 8:7,8
8:15,21
13:21 16:9
16:11 17:23
22:22,22,22
22:24 23:6
24:16 29:3
yesterday
7:19

**Z**

Zimolong 2:3
2:4 5:13,13

20:19 21:5
35:22
Zoom 1:18
1:20 4:7,10
4:18 5:9

**0**

**1**

1 3:15 19:15
19:18
10:00 1:21
10:47 36:2
123 2:11
13 25:14
14 19:8
15 17:17 19:7
19:8
150 13:25
23:7
15024 18:22
1515 2:18
15th 2:18
31:5,9,13
31:16 32:7
1670 2:11
17 17:17 19:8
19:8
18 8:15
19 3:15,16
19:10
19085 2:5
19102 2:18
19109 2:11
1969 16:9,13
1st 17:19
18:10

**2**

2 3:16 19:16
19:18
2:19-cv-016...
1:4
20 22:24
24:16
200 24:8
2015 17:19
2017 17:20
2018 18:17
19:5
2019 18:10
19:1
2020 1:14
2021 18:10

21 19:10
215)525-5850
2:12
215)665-0842
2:5
215)683-3573
2:19
231 4:6
25 3:16 24:16

**3**

3 3:16 14:15
25:1,4
30 1:14
30-year 34:11
300 13:25
14:24
31st 17:19
18:10

**4**

400 14:11
4002 4:6

**5**

5 3:5 14:16
14:19
50 16:9 23:3
552 2:4

**6**

6 3:8
600,000
14:19
65 23:15
67 23:15

**7**

70 24:6
75 24:6

**8**

**9**

90's 16:19
99.8 20:22

# Exhibit P

Joseph Canuso
September 30, 2020

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - -

ROAD-CON, INC., NESHAMINY    :   CIVIL ACTION
CONSTRUCTORS, INC., LOFTUS   :   NO. 2:19-cv-01667-JS
CONSTRUCTION, INC.,          :
PKF-MARK III, and SCOTT A.   :
LACAVA                       :
                 Plaintiffs, :
                             :
        -V-                  :
                             :
CITY OF PHILADELPHIA and     :
JAMES KENNEY, IN HIS         :
OFFICIAL CAPACITY AS MAYOR   :
OF THE CITY OF PHILADELPHIA  :
                 Defendants. :

- - - - - - - - - - - - - - -

- - -

Wednesday, September 30, 2020

- - -

ORAL ZOOM DEPOSITION OF JOSEPH
CANUSO, taken pursuant to the Subpoena, held remotely
and by Zoom videoconference in Pennsylvania, commencing
at 1:30 p.m., before SHARON RICCI, RMR, CRR - Notary
Public there being present.

Joseph Canuso
September 30, 2020

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   ZIMOLONG, LLC

 4   BY:        WALTER S. ZIMOLONG, ESQUIRE
                P.O. Box 552
 5              Villanova, PA 19085
                (215)665-0842
 6              wally@zimolonglaw.com

 7              Representing the Plaintiffs

 8

 9
     KANG, HAGGERTY & FETBROYT, LLC
10
     BY:        MICHAEL SCOTT WEINERT, ESQUIRE
11              123 S. Broad Street, Suite 1670
                Philadelphia, PA 19109
12              (215)525-5850
                mweinert@khflaw.com
13
                Representing the Intervenors
14

15

16   CITY OF PHILADELPHIA LAW DEPARTMENT

17   BY:        LYDIA FURST, ESQUIRE
                AMY KIRBY, ESQUIRE
18              1515 Arch Street, 15th Floor
                Philadelphia, PA 19102
19              (215)683-3573
                lydia.furst@phila.gov
20              amy.kirby@phila.gov

21              Representing the Defendants

22

23

24

25
```

Joseph Canuso
September 30, 2020

Page 3

1                          I N D E X

2

3

WITNESS                                        PAGE
4
JOSEPH CANUSO
5   (Witness sworn)                              5

6

7

EXAMINATION BY:
8
MS. KIRBY:                                     5
9

10                      - - -

11

12                  E X H I B I T S

13

NUMBER                 DESCRIPTION        PAGE
14
    (None presented)
15

16                      - - -

17

18

19

20

21

22

23

24

25

Joseph Canuso
September 30, 2020

Page 4

```
 1              COURT REPORTER:  Counsel, I will
 2   read a stipulation into the record.  Please
 3   bear with me, as it is long.
 4              It is hereby stipulated and agreed
 5   by and between counsel for all parties present
 6   that pursuant to 231 Pa. Code 4002 this
 7   deposition is being conducted by Zoom
 8   conference, that the court reporter, all
 9   counsel, and the witness are all in separate
10   remote locations and participating via Zoom
11   conference meeting under the control of
12   Strehlow & Associates Court Reporting Service,
13   that the officer administering the oath to the
14   witness need not be in the place of the
15   deposition and the witness shall be sworn in
16   remotely by the court reporter after
17   confirming the witness's identity, that this
18   Zoom conference will not be recorded unless
19   previously noticed as a videotaped deposition
20   and that any recording without the express
21   written consent of all parties shall be
22   considered unauthorized, in violation of law,
23   and shall not be used for any purpose in this
24   litigation or otherwise.
25              It is further stipulated that
```

Joseph Canuso
September 30, 2020

Page 5

1    exhibits may be marked by the attorney

2    presenting the exhibit to the witness, and

3    that a copy of any exhibit presented to a

4    witness shall be emailed to or otherwise in

5    possession of all counsel prior to any

6    questioning of a witness regarding the exhibit

7    in question.  All parties shall bear their own

8    costs in the conduct of this deposition by

9    Zoom conference.

10              So stipulated, counsel?

11              MR. ZIMOLONG:  Wally Zimolong for

12   the plaintiff.  So stipulated.

13              MS. KIRBY:  Amy Kirby for the City

14   of Philadelphia.  So stipulated.

15              MR. WEINERT:  Michael Weinert.  So

16   stipulated.

17              MR. ZIMOLONG:  And we would just

18   like to reserve the right for the witness to

19   read and sign.

20              ...JOSEPH CANUSO, after having been

21   first duly sworn, was examined and testified

22   as follows:

23              _ _ _

24      DIRECT EXAMINATION

25              _ _ _

Joseph Canuso
September 30, 2020

 1   BY MS. KIRBY:

 2   Q.     Good afternoon, Mr. Canuso.  My name is Amy Kirby

 3   and I'm an attorney for the City of Philadelphia and

 4   I'll be taking your deposition this afternoon.

 5          Have you ever been disposed -- deposed before?

 6   A.     Disposed and deposed, yes.

 7   Q.     Not in relation to -- well, I guess, how recently

 8   have you been deposed?

 9   A.     It's been years.  It's been -- not recently.

10   Yeah.

11   Q.     All right.  I'll go over just a few of the ground

12   rules which also may change just because we're on Zoom,

13   but I'm sure you're familiar with them.

14          So, of course, I'll ask questions.  I tend to

15   speak very quickly, so you can tell me to slow down if

16   you can't understand anything I'm saying.  But, please,

17   I ask that you don't answer, of course, until I finish

18   the question.  I'll do the same.  I'll make sure you

19   finish the question before I start another one.  It just

20   helps the court reporter take everything down.

21          Make sure, when you answer a question, you

22   actually verbally answer.  No nods of the head or

23   shakes of the head because she won't be able to take

24   that down.

25   A.     Okay.

Joseph Canuso
September 30, 2020

Page 7

1  Q.     If you need a break, feel free.  I just ask that

2  you don't take a break if there's a question pending.

3  So make sure you answer any question that's pending

4  before you ask for a break.

5          Is there any reason that you can't answer

6  truthfully this afternoon?

7  A.     No.

8  Q.     Okay.  So let's start with a little bit of your

9  background.

10          What is your current position?

11  A.     I am chief executive officer of Neshaminy

12  Constructors.

13  Q.     And how long have you been the chief executive

14  officer of Neshaminy?

15  A.     Seventeen years.

16  Q.     And prior to that?

17  A.     Prior to that, I practiced corporate law.

18  Q.     Okay.  Are you currently a lawyer now or no?

19  A.     I'm not practicing, but I am licensed, yeah.

20  Q.     Okay.  And as the CEO of Neshaminy, what are your

21  duties generally?

22  A.     I oversee operations, administration, finance,

23  business development.

24  Q.     And do you have any role in choosing the projects

25  that Neshaminy bids on?

Joseph Canuso
September 30, 2020

Page 8

1    A.      I do.

2    Q.      Okay.  Is it a direct role or is it more of a

3    supervisory role?

4    A.      I am not the lead estimator, but I am involved in

5    decisions to bid or not bid projects.

6    Q.      Okay.  Who is the lead estimator?

7    A.      My brother, Tony.

8    Q.      Okay.  Same last name?

9    A.      Yes.

10   Q.      Tony Canuso, okay.

11   A.      Uh-huh.

12   Q.      So do you have final authority to determine what

13   Neshaminy bids on?

14   A.      We currently make that decision.

15   Q.      You currently make that decision or you and your

16   brother?

17   A.      Correct.  The latter, yes.

18   Q.      And tell me a little bit about Neshaminy, the

19   business.

20           Where are you located?

21   A.      We're up in Feasterville, Bucks County.  We've

22   been in operation since 1962, founded by my father.  And

23   we are, generally speaking, heavy and highway

24   contractor, primarily Public Works projects with, to

25   public agencies.

Joseph Canuso
September 30, 2020

Page 9

1  Q.    And are you a member of the Pennsylvania Heavy

2  and Highway Contractors Bargaining Association?

3  A.    Neshaminy Constructors is, yes.

4  Q.    And how long has Neshaminy Constructors been a

5  member of that association?

6  A.    Prior to my time, I believe it was mid 80's that

7  we --

8  Q.    Okay.  Since the mid 80's, has there been any

9  time that you haven't been affiliated with that

10 association?

11 A.    I do not believe so.

12 Q.    Okay.  And you just said that Neshaminy does

13 generally heavy and highway.

14       Can you just tell me what kind of work that

15 includes?

16 A.    Bridge construction and rake(PH) construction, a

17 lot of transit work, subway stations, elevated Regional

18 Rail stations.  That's generally the thrust of it.

19 Q.    Okay.  And I think you may have answered this

20 already, but how much of your business, Neshaminy's

21 business, is Public Works projects?

22 A.    Nearly exclusively.

23 Q.    Okay.  What's the other little piece?

24 A.    If there's a private developer, for example, that

25 own a bridge that needs to be renovated or something

Joseph Canuso
September 30, 2020

Page 10

1    like that, you know, that's generally what the private

2    sector -- that's the private piece typically.

3    Q.      Okay.

4    A.      Yeah.

5    Q.      And this may be a hard question to answer, but

6    generally what's the contract amount for the projects

7    that Neshaminy bids on and completes?

8    A.      For us, it ranges between usually a million, a

9    couple million, all the way up to 30-some million.

10   Q.      Okay.  So you're not doing a heavy load of

11   smaller projects.  Most of your projects, the threshold

12   is around a million dollars?

13   A.      Yeah, just by the way they come out.  There's

14   no -- yeah.

15   Q.      Okay.  And do you work as both the prime

16   contractor and a subcontractor?

17   A.      Primarily as a prime contractor.  I can't recall

18   a recent situation on a Public Works contract where we

19   were a subcontractor.

20   Q.      And where does Neshaminy Contractors do most of

21   its work?

22   A.      Primarily the five-county region.  We will be in

23   Pennsylvania, we have been in New Jersey, not so much

24   recently, and we have ventured north and west of the

25   five-county area for specific projects.

Joseph Canuso
September 30, 2020

Page 11

1   Q.      Okay.  In the state -- so outside Pennsylvania,

2   New Jersey, do you work in any other states?

3   A.      No.

4   Q.      Okay.  And working -- do you do work in the city

5   of Philadelphia also?

6   A.      Yes.

7   Q.      Okay.  And outside of the city of Philadelphia,

8   has Neshaminy ever signed on to a project labor

9   agreement?

10  A.      Not during my tenure.  I can't speak to before me

11  so -- yeah.  Actually, that's not entirely true.  We

12  signed on to one actually in New Jersey.  I'm going to

13  say it was 2009.  And it came out with a PLA on it, we

14  made a request to have the Steelworkers added.  The

15  request was granted, so we bid on the project.

16  Q.      Okay.  Were you awarded that contract?

17  A.      Yes, we were.

18  Q.      Okay.  And so you completed it with the PLA on

19  the project?

20  A.      Yes, we did, with the Steelworkers.

21  Q.      Sure.  Does Neshaminy monitor invitations to bid

22  in Philadelphia?

23  A.      Yes.

24  Q.      Okay.  And what factors does Neshaminy consider

25  when determining whether they're going to submit a bid

Joseph Canuso
September 30, 2020

Page 12

1   on a City of Philadelphia Public Works project?

2   A.      Where the owner is the City, is that your

3   question?

4   Q.      Yes.  Correct.

5   A.      Okay.  So there are some unique factors relating

6   to the City projects and there are some standard factors

7   that we apply to all projects in determining whether to

8   bid them.

9           The unique factors are, obviously, the City, as

10  far as I can recall, have a project specific

11  prequalification process.  You're not -- you don't have

12  standing prequalification.  You have to prequalify for

13  each job.  So that, in and of itself, is a

14  time-consuming process.

15          And that, in some cases, will affect our

16  interest in the project.  If it's up our alley, in our

17  wheelhouse, or if it's something more on the fringe.

18  The City also has the LBE requirement.  We do not have a

19  current physical bricks and mortars presence in the

20  city, so we have that five percent disadvantage going

21  in.

22          So those are the two unique aspects to it.  The

23  aspects that are applicable to any project, obviously,

24  the -- whether there's a PLA on it is a factor.  The

25  duration of the project, the complexity of the project,

Joseph Canuso
September 30, 2020

Page 13

1    the -- you know, our current situation with whether

2    there are other more attractive projects out there, what

3    our money capacity is based on our existing workload,

4    what resources we have available to perform the project,

5    financial considerations, if there's some reason to

6    think that payment will be delayed because the way the

7    project is laid out, you know, how the cash flow on a

8    project will be.  Typical stuff.

9    Q.    Okay.  So when we're talking about the unique

10   factors that are specific to the City of Philadelphia,

11   which essentially is the project specific

12   prequalifications and the LBE requirements?

13   A.    Uh-huh.

14   Q.    Do those -- how do those factor in to whether

15   you're going to bid on a project?

16         And let me take them separately.  So let's

17   start with LBE requirements.

18         How do the LBE requirements factor into whether

19   you will bid on a City of Philadelphia Public Works

20   project?

21   A.    Well, because we have a five percent disadvantage

22   out of the box, it would typically need to be a project

23   that is in our wheelhouse that we feel for a variety of

24   reasons, given access considerations or what -- for

25   example, if it's a bridge, if the bridge is over a

Joseph Canuso
September 30, 2020

Page 14

1  utility that we know such as SEPTA, versus one that we

2  don't have as much success with -- you know, we have to

3  have a level of confidence that we can overcome that

4  five percent disadvantage.  Because margins are very

5  thin in our industry right now, so five percent, you

6  know, can mean a hell of a lot.

7  Q.    Okay.  And I'll ask kind of the same question for

8  the prequalification process.

9           How does that specifically factor into whether

10  you bid on a City project?

11  A.    Well, it costs money and time to bid a project.

12  And depending on when the project is advertised, when it

13  comes to our attention, what other resources we have or

14  what other constraints on our resources we have with

15  other jobs for bidding.  If we don't believe we're going

16  to get an answer from the City until it's too close to

17  the bid, you know, it just may be a decision as to

18  whether we want to go with the resources in a fashion

19  knowing that we may not get prequalified.

20  Q.    Okay.  How many projects, if you can answer,

21  generally, let's say in the last five years, have you

22  bid on and been awarded for the City of Philadelphia?

23  A.    Last five years, I would say zero.

24  Q.    Zero.  So let me break that up then.

25           Have you bid on any projects in the last five

Joseph Canuso
September 30, 2020

Page 15

1    years with the City of Philadelphia?

2    A.      I don't think so.

3    Q.      So, obviously, we don't need to ask the second

4    part of the question.

5    A.      That's correct.

6    Q.      Okay.  Let's go even further then.

7            How about the last ten years?  I mean, what's

8    the last project you can remember bidding on for the

9    City?

10   A.      Yeah.  We bid on a -- something out on -- it's

11   near Venice Island.  It's on one of those islands in the

12   Schuylkill, there was some sort of a supportive

13   excavation type of renovation.  I'm going to guess it

14   was eight years ago.  And we were unsuccessful.

15   Q.      Okay.

16   A.      I think we also bid on the City Hall renovation,

17   which was an exterior renovation.  I think it went for

18   $10 million.  That was in the last ten years.

19   Q.      Okay.  Is it fair to assume that neither of those

20   projects had PLAs?

21   A.      Yeah, it's fair to assume that, I believe.  One

22   of them, I think, we might have been as a joint venture

23   partner, so that one I'm not sure because our

24   partner -- we might have -- we actually might have just

25   been providing estimating services for that party.

Joseph Canuso
September 30, 2020

Page 16

1              I'm just -- this is very distant past.  And
2    that party was a Philadelphia-based building trades
3    contractor.
4    Q.    Okay.  What was the name of that party?
5    A.    Buckley and Company.
6    Q.    Buckley?
7    A.    Yeah.
8    Q.    Okay.
9    A.    So I think they were the bidder and we were just
10   helping the estimate.
11   Q.    Okay.
12   A.    That's all I remember.  So that might have had a
13   PLA on it.  I don't remember.
14   Q.    Okay.  And do you recall if that was the Venice
15   Island project or the City Hall rehab project?
16   A.    The City Hall rehab project.  And Buckley was not
17   successful either.
18            The last one we got was in the first decade of
19   the century.  It was a Germantown Avenue bridge over in
20   Wissahickon that we bid as a general, we were awarded,
21   and it did not have a PLA on it.
22   Q.    Okay.  And you said you haven't bid on any
23   contracts in the last five years.  Obviously, you told
24   me the general considerations.
25            Is there anything else that has made you not

Joseph Canuso
September 30, 2020

Page 17

1  bid or anything specifically that's made you not bid on

2  these projects, or did we cover it all?

3  A.     Well, the 15th Street Bridge is the subject of

4  this litigation, which our kind of job, we would have

5  bid that if it didn't have a PLA.

6  Q.     Okay.  So was that the only reason you didn't bid

7  on the 15th Street Bridge project?

8  A.     Yep.

9  Q.     Okay.  Did you submit any information for

10 prequalification for that project?

11 A.     Nope, because it had a PLA on it.

12 Q.     Okay.  Are you aware that the PLA was removed

13 from that project?

14 A.     Too late in the game.  We had our resources

15 committed to other places.  And by the time it was

16 removed, we would have never been able to start and

17 prepare an intelligent estimate.

18 Q.     And just to be clear for the record, when you say

19 "resources were committed," you had other jobs that you

20 were going to complete instead of that one?

21 A.     We had other jobs we were bidding on, yeah.

22 Q.     Okay.  Fair enough.  Do you ever bid on more than

23 one job at the same time?

24 A.     Yeah.

25 Q.     Okay.

Joseph Canuso
September 30, 2020

Page 18

1    A.      Sure.

2    Q.      The other project that's the subject of this

3    litigation is the Northeast Airport runway project.

4            Are you familiar with that project?

5    A.      I'm just familiar with it because of this

6    litigation.

7    Q.      Okay.  That wasn't a project that would have been

8    in Neshaminy's wheelhouse?

9    A.      No, it was not.

10   Q.      Okay.  So it wouldn't be something that you would

11   bid on?

12   A.      That is correct.

13   Q.      And why was that something that wasn't

14   necessarily an interest to you in bidding?

15   A.      We usually don't spend a lot of time looking at

16   airport projects because of the strong building trades

17   union presence down there and they're just -- it's just

18   a headache.

19   Q.      Okay.  That's the only reason?

20   A.      Well, I don't remember what the specifics of that

21   project were, but there's a lot of flatwork out there,

22   as opposed to structure work, and it's paving

23   and --(Inaudible.)

24                       COURT REPORTER:  Sir, you trailed

25           off there.  Can you repeat that?

Joseph Canuso
September 30, 2020

Page 19

1           THE WITNESS:  I said our forte is
2       structural work such as bridges, and typically
3       the work down at the airport is either
4       building work, which we don't do, unless it's
5       incidental to a heavy structural project; or
6       flatwork, which is like runways that are on
7       grade, taxiways, and things like that which we
8       cannot be competitive on.  We do not have a
9       paving force.
10  BY MS. KIRBY:
11  Q.     Has Neshaminy -- I think you already answered
12  this question too, but I'll ask it just to clarify.
13          Generally, has Neshaminy ever refrained from
14  bidding on a City Public Works project for a reason
15  other than a PLA?
16  A.     I don't recall.
17  Q.     Okay.  Would the runway project be one of those
18  projects, an example of that?  So you didn't bid on it
19  for a reason other than the PLA, correct?
20  A.     I would say the two reasons were the PLA and it
21  wasn't attractive to us.  So you can, you know,
22  speculate as to which was more proximate, but we
23  declined to bid a number of projects that we tracked or
24  that come to our attention simply because we don't think
25  we could be competitive at it or for the other factors

Joseph Canuso
September 30, 2020

Page 20

1    that I described.

2    Q.    Okay.  You're answering all my questions very

3    quickly with your -- you have very comprehensive

4    answers, so we'll go through very quickly on this.

5    A.    Good.

6    Q.    Give me one second.

7              (Pause)

8              Do you have any idea how many projects you

9    have refrained from bidding on in, say, the last

10   five years with the City because there was a PLA on

11   them?

12   A.    I don't.

13   Q.    Okay.  I mean -- I'm not trying to make this a

14   memory test.

15             Do you think it's like one, do you think it's a

16   hundred?  I mean, just a general ballpark.

17   A.    Well, I can answer it this way, we generally will

18   just toss anything that comes out with a PLA.

19   Q.    Okay.  But you don't necessarily have a -- can't

20   quantify how many projects that come out with a PLA?

21   A.    I can't quantify.  If I think there's a chance

22   that the Steelworkers will be added, that's a different

23   story, by we have not had that experience with the

24   City.

25   Q.    Okay.  And to kind of just discuss that, have you

Joseph Canuso
September 30, 2020

Page 21

1   ever looked at a project that has a PLA and it looks
2   like something that would otherwise be attractive to
3   Neshaminy and discussed the idea of the Steelworkers
4   being included with someone from the City?
5   A.     Other than this 15th Street project where we, you
6   know, obviously, had an interest in bidding it and, you
7   know, obviously, money was involved for a reason, I
8   don't recall having a discussion directly with someone
9   from the City about it.
10  Q.     Adding the Steelworkers.  Okay.
11  A.     About adding the Steelworkers.  I've requested
12  multiple other agencies.  I don't recall if we did with
13  the City.
14  Q.     Okay.  Have you ever bid on a City project that
15  has -- requires a PLA?
16  A.     I don't believe so, no.  Not during my tenure.
17  Q.     Okay.  And why not?
18  A.     By definition, you're in breach of your
19  collective-bargaining agreement.
20  Q.     Okay.  Let's move on and talk a little bit about
21  Neshaminy and your workforce.
22         So how many full-time employees does Neshaminy
23  have?
24  A.     Let's say 10 to 12.
25  Q.     Okay.  And are those union employees or non-union

Joseph Canuso
September 30, 2020

Page 22

1   employees?

2   A.     Okay.  Maybe I didn't answer that question

3   correctly.  I'm talking about office and supervisory, is

4   about 10 to 12.  And two of them are building trades

5   union employees, but they're supervisors.  They do not

6   work with the tools, they're just superintendents, and

7   there's not a problem with their collective-bargaining

8   agreement to have them be superintendents.

9           So that's our -- I'll call it our

10  non-project-related workforce.  They're our employees.

11  Q.     Okay.  And other than the two employees, who are

12  members of the building trades, the other eight are not

13  union members?

14  A.     That is correct.

15  Q.     Okay.  And how did it happen that you hired two

16  supervisory employees that are members of the building

17  trades -- why didn't you go with the Steelworkers, I

18  guess?

19  A.     Well, with supervision you're not constrained by

20  who you hire.  You can hire somebody salary, you can

21  hire a Steelworker and you can hire a building

22  tradesperson, so we just go for the talent that we felt

23  was best for our needs.

24  Q.     Okay.  And other than that -- so you have the

25  ten -- I'm going to call them core employees just so

Joseph Canuso
September 30, 2020

Page 23

1   it's easy for me to understand.

2           So you have those ten core employees.  Who else

3   does Neshaminy employ?

4                       MR. ZIMOLONG:  Amy, just to object.

5           We don't agree -- obviously, you're using the

6           term "core employees."

7                       We don't necessarily agree that

8           that -- to the extent that that's a term of

9           art or something, that's fine for purposes of

10          questioning.  We don't agree that they're

11          considered core employees.

12                      We consider them management or

13          supervisory employees.

14                      MS. KIRBY:  Sure.  We can call them

15          management too.  That's fine.

16  BY MS. KIRBY:

17  Q.    So other than these ten management employees, who

18  else is on your payroll at Neshaminy?

19  A.    Those ten are not covered by a

20  collective-bargaining agreement necessarily because of

21  what they do, if that makes sense.  The other ones are

22  exclusively United Steelworkers employees, and we have

23  them when we need them.

24  Q.    When you bid on jobs, I'm assuming?

25  A.    When we have work for them, yes.

Joseph Canuso
September 30, 2020

Page 24

1    Q.      Okay.  Who writes their paychecks?  Does

2    Neshaminy or does Steelworkers?

3    A.      Neshaminy.

4    Q.      Okay.  And how many employees do you generally

5    have?

6    A.      Depends on the workload.  If we're slow, very

7    few.  If we're hot and heavy, we could be up to a

8    hundred.

9    Q.      Okay.  How many do you have right now?

10   A.      I'm guessing -- I don't know.  You know, probably

11   10 to 20.

12   Q.      Okay.  And do any of those employees generally

13   work for you 365, or very close to that, around the

14   year, or do most of them get laid off at some point?

15   A.      Again, I don't have the payroll records in front

16   of me, but nobody is insulated from layoff that is

17   United Steelworkers.

18           You know, you have different people with

19   different levels of talent and, you know, you will try

20   to keep those going that you don't want to lose to

21   another competitor.  But if there's no work, there's no

22   work.  So it's really situation dependent.  If we can

23   keep a continuity of work flow, which is more

24   challenging in the winter months, then they continue to

25   work.

Joseph Canuso
September 30, 2020

Page 25

1    Q.    Okay.  And when they're not working for

2    Neshaminy, are they free to go work for another

3    contractor?

4    A.    We do not constrain them.

5    Q.    Okay.  So does someone else constrain them, to

6    your knowledge?

7    A.    I would have -- you know, I don't really know

8    what happens as far as if they -- I mean, generally the

9    way the collective-bargaining agreement works is they go

10   back to the hiring hall and say Neshaminy just laid me

11   off, and then the other -- the union management will

12   attempt to place them with one of the other members of

13   the PAHHCBA.

14         Okay.  Now, whether they decide to go switch

15   unions, work in a union, or any of that stuff, is up to

16   them.  That's not something I can tell them or ask them

17   to do.

18   Q.    Sure.  Fair enough.  But they're not constrained

19   to work only for Neshaminy, they can work for another

20   Steelworker-affiliated contractor if they're laid off

21   from a job with you?

22   A.    Yeah.  I mean, they could quit tomorrow too if

23   they don't like the color of my tie.  So...

24   Q.    Okay.  Fair enough.  And I understand in the

25   declaration it says Neshaminy has chosen the United

Joseph Canuso
September 30, 2020

Page 26

1   Steelworkers as their collective-bargaining

2   representative.

3           Do you know what that means, that they've

4   chosen them?

5   A.     Well, again, this is ancient history, but

6   I -- speaking with my father, it's my understanding back

7   in the 80's that he made a decision of signing with the

8   Steelworkers, as opposed to having an election and, you

9   know, that kind of thing.

10  Q.     Okay.  And forgive my ignorance because you know

11  more about this than I do.

12          What do you mean by sign with the Steelworkers

13  versus an election?

14          So did Neshaminy say they only want to be

15  affiliated with workers from the Steelworkers or

16  what -- you know, I just want to understand a little bit

17  more about the mechanism.

18  A.     I'm not a labor attorney and, you know, my

19  understanding is there's two ways to become in signed

20  relations with a union.

21          The one is if the workers get together and

22  decide they want to unionize and call an election, and

23  that's more of a worker driven decision and management

24  can go along with it or resist it.  It's up to them.  Or

25  management can decide that, for whatever reason, that

Joseph Canuso
September 30, 2020

Page 27

1  they want to sign with that union.

2  Q.     Okay.

3  A.     And I believe in the case of Neshaminy, that

4  was -- the latter is the way we came into signing

5  relations with the Steelworkers in the 80's.

6  Q.     Okay.  And am I correct in understanding that the

7  signing of this agreement is for a term, right?  Is it

8  around three years usually?

9  A.     Yeah.  Uh-huh.  Yes.

10  Q.     Okay.  So after those three years, could you,

11  Neshaminy, decide you don't want to be affiliated with

12  the Steelworkers anymore?

13  A.     The -- there is a mechanism prior to the

14  beginning of negotiations, near the expiration of each

15  three-year term, for a contractor to opt out of

16  collective bargaining with the association.

17         At that point -- and, again, I am not an expert

18  at this -- the contractor could choose to either

19  negotiate separately with the union or attempt to, you

20  know, leave the union or leave -- you know, end the

21  signed relations.

22  Q.     Okay.  So is it fair to say that if you said

23  we've had it with the Steelworkers, we -- that you could

24  decide to either go, A, non-union and become a non-union

25  shop, or B, pick another union to affiliate with?

Joseph Canuso
September 30, 2020

Page 28

1    A.      That is technically correct.  As a practical

2    matter, there are huge impediments to doing that.

3    Q.      Okay.  Tell me a little bit about those

4    impediments.

5    A.      Well, I guess the one that's first and foremost

6    and, you know, you can't pick up a newspaper in a

7    recession environment without seeing it, but we have a

8    multi-employer defined benefit plan and when you have

9    withdraw of -- when you have an underfunded pension and

10   you leave the union, then you get a huge bill for your

11   share of the unfunded withdraw liability, and

12   that's -- that can be staggering in a down market.

13   Q.      Okay.  Anything else?

14   A.      Well, you have your workforce.  You'd have to

15   start a new workforce.  I mean, you know, we -- you

16   know, even though people get laid off and get rehired,

17   you generally try to maintain continuity with the same

18   group, particularly with the key folks.  Beyond that,

19   I'd have to check with counsel.

20   Q.      Okay.  And I'll pull it up if we need to, but I

21   can read generally what the declaration that you drafted

22   says regarding --  it says:  "Neshaminy maintains a

23   collective-bargaining agreement with United Steelworkers

24   so, therefore, cannot perform work on any City of

25   Philadelphia Public Works project that is subject to a

Joseph Canuso
September 30, 2020

1  project labor agreement with the current workforce."

2          I just want to understand what "current

3  workforce" means.

4  A.     My Steelworkers, Steelworker workforce, yeah.

5  Q.     So it means those non-ten management employees,

6  those other guys that you, or women who you hire to work

7  on your projects?

8  A.     Yeah, those that are covered by the

9  collective-bargaining agreement that are working with

10  the tools.

11  Q.     Okay.  And those are technically kind of -- is it

12  fair to say they're temporary employees or would you

13  call them permanent employees?

14  A.     I would prefer not to characterize it.  I think

15  I've been specific in how it typically works.

16  Q.     Fair enough.

17  A.     If that's okay.

18  Q.     Sure.  Could Neshaminy perform work on

19  Philadelphia Public Works projects that are not subject

20  to a PLA with their current workforce?

21  A.     Yes.

22  Q.     Okay.  Have you ever asked any Neshaminy employee

23  to change their union affiliation so that you could bid

24  on a Philadelphia Public Works project?

25  A.     There would be problems with me doing that.  No.

Joseph Canuso
September 30, 2020

Page 30

1   The answer is no.

2   Q.      Okay.  Generally, what are the problems with

3   that?

4   A.      Well, they have representatives.  And if

5   management attempts to negotiate any bargained rights or

6   responsibilities directly with a member, there are

7   repercussions.

8   Q.      Okay.  So you don't anticipate asking anyone to

9   move from the Steelworkers to another union so you could

10  bid on City projects, correct?

11  A.      I can't.  They've chosen to be Steelworkers.

12  Q.      Okay.  Would you bid on a City of Philadelphia

13  Public Works project that required a PLA if the

14  Steelworkers were included in the PLA?

15  A.      Yes.

16  Q.      Okay.

17  A.      It would have to be our kind of project.

18  Q.      Sure.  All those other factors that we discussed

19  before?

20  A.      All those other factors, yes.

21  Q.      Okay.

22                  MS. KIRBY:  I think I'm just about

23          done.  Can we take like two minutes, just let

24          me look over my notes real quick?

25                      It's 2:02.  At 2:05 can we come

Joseph Canuso
September 30, 2020

Page 31

1          back?
2                    MR. ZIMOLONG:  You want to sign
3          off?
4                    MS. KIRBY:  I'm just going to mute
5          myself.  I'll still be here.  You guys are
6          fine.
7                    MR. ZIMOLONG:  Yeah, we'll take a
8          three-minute break.
9                    _ _ _
10                    (Whereupon, a brief recess was
11          taken.)
12                    _ _ _
13                    MS. KIRBY:  All right.  I think
14          we're ready.  I just have one or two, maybe,
15          more questions.
16   BY MS. KIRBY:
17   Q.    Do you recall bidding on the Pulaski Park Pier
18   wall renovation project in the City of Philadelphia?
19          And I believe it was in 2018, so it was
20   relatively recently.
21   A.    I don't recall it by that name.  I recall bidding
22   on a bunch of jobs, but I didn't recall that it was a
23   City of Philadelphia job.
24   Q.    Okay.  And you don't recall specifically bidding
25   on anything in 2018?

Joseph Canuso
September 30, 2020

Page 32

1  A.     I don't recall, no.

2              MS. KIRBY:  Okay.  Fair enough.  I

3         don't have any further questions.  I'm not

4         sure if your attorney has any or if

5         Mr. Weinert has any.

6              MR. WEINERT:  I have no questions.

7              MR. ZIMOLONG:  I don't have any

8         questions.  Thank you.

9              MS. KIRBY:  Thank you for your

10        time.

11             THE WITNESS:  Okay.

12             - - -

13             (Deposition concluded at 2:06 p.m.)

14             - - -

15

16

17

18

19

20

21

22

23

24

25

Joseph Canuso
September 30, 2020

Page 33

1

2                C E R T I F I C A T I O N

3

4

5          I, hereby certify that the proceedings and

6    evidence noted are contained fully and accurately in the

7    stenographic notes taken by me in the foregoing matter,

8    and that this is a correct transcript of the same.

9

10

11

12

         _____
13                Court Reporter - Notary Public

14

15

16          (The foregoing certification of this

17   transcript does not apply to any reproduction of the

18   same by any means, unless under the direct control

19   and/or supervision of the certifying reporter.)

20

21

22

23

24

25

Joseph Canuso
September 30, 2020

**A**

able 6:23
17:16
access 13:24
accurately
33:6
ACTION 1:4
added 11:14
20:22
adding 21:10
21:11
administeri...
4:13
administra...
7:22
advertised
14:12
affect 12:15
affiliate
27:25
affiliated 9:9
26:15 27:11
affiliation
29:23
afternoon 6:2
6:4 7:6
agencies 8:25
21:12
ago 15:14
agree 23:5,7
23:10
agreed 4:4
agreement
11:9 21:19
22:8 23:20
25:9 27:7
28:23 29:1
29:9
airport 18:3
18:16 19:3
alley 12:16
amount 10:6
Amy 2:17
5:13 6:2
23:4
amy.kirby...
2:20
ancient 26:5
and/or 33:19
answer 6:17
6:21,22 7:3
7:5 10:5
14:16,20
20:17 22:2

30:1
answered
9:19 19:11
answering
20:2
answers 20:4
anticipate
30:8
anymore
27:12
applicable
12:23
apply 12:7
33:17
Arch 2:18
area 10:25
art 23:9
asked 29:22
asking 30:8
aspects 12:22
12:23
Associates
4:12
association
9:2,5,10
27:16
assume 15:19
15:21
assuming
23:24
attempt
25:12 27:19
attempts 30:5
attention
14:13 19:24
attorney 5:1
6:3 26:18
32:4
attractive
13:2 19:21
21:2
authority
8:12
available
13:4
Avenue 16:19
awarded
11:16 14:22
16:20
aware 17:12

**B**

B 3:11 27:25
back 25:10

26:6 31:1
background
7:9
ballpark
20:16
bargained
30:5
bargaining
9:2 27:16
based 13:3
bear 4:3 5:7
beginning
27:14
believe 9:6,11
14:15 15:21
21:16 27:3
31:19
benefit 28:8
best 22:23
Beyond 28:18
bid 8:5,5
11:15,21,25
12:8 13:15
13:19 14:10
14:11,17,22
14:25 15:10
15:16 16:20
16:22 17:1
17:1,5,6,22
18:11 19:18
19:23 21:14
23:24 29:23
30:10,12
bidder 16:9
bidding
14:15 15:8
17:21 18:14
19:14 20:9
21:6 31:17
31:21,24
bids 7:25
8:13 10:7
bill 28:10
bit 7:8 8:18
21:20 26:16
28:3
box 2:4 13:22
breach 21:18
break 7:1,2,4
14:24 31:8
bricks 12:19
bridge 9:16
9:25 13:25
13:25 16:19

17:3,7
bridges 19:2
brief 31:10
Broad 2:11
brother 8:7
8:16
Buckley 16:5
16:6,16
Bucks 8:21
building 16:2
18:16 19:4
22:4,12,16
22:21
bunch 31:22
business 7:23
8:19 9:20
9:21

**C**

C 2:1 33:2,2
call 22:9,25
23:14 26:22
29:13
Canuso 1:19
3:4 5:20
6:2 8:10
capacity 1:9
13:3
case 27:3
cases 12:15
cash 13:7
century
16:19
CEO 7:20
certification
33:16
certify 33:5
certifying
33:19
challenging
24:24
chance 20:21
change 6:12
29:23
characterize
29:14
check 28:19
chief 7:11,13
choose 27:18
choosing 7:24
chosen 25:25
26:4 30:11
city 1:8,10
2:16 5:13

6:3 11:4,7
12:1,2,6,9
12:18,20
13:10,19
14:10,16,22
15:1,9,16
16:15,16
19:14 20:10
20:24 21:4
21:9,13,14
28:24 30:10
30:12 31:18
31:23
CIVIL 1:4
clarify 19:12
clear 17:18
close 14:16
24:13
Code 4:6
collective
27:16
collective-b...
21:19 22:7
23:20 25:9
26:1 28:23
29:9
color 25:23
come 10:13
19:24 20:20
30:25
comes 14:13
20:18
commencing
1:20
committed
17:15,19
Company
16:5
competitive
19:8,25
competitor
24:21
complete
17:20
completed
11:18
completes
10:7
complexity
12:25
comprehen...
20:3
concluded
32:13

conduct 5:8
conducted
4:7
conference
4:8,11,18
5:9
confidence
14:3
confirming
4:17
consent 4:21
consider
11:24 23:12
considerati...
13:5,24
16:24
considered
4:22 23:11
constrain
25:4,5
constrained
22:19 25:18
constraints
14:14
construction
1:5 9:16,16
Constructors
1:4 7:12
9:3,4
contained
33:6
continue
24:24
continuity
24:23 28:17
contract 10:6
10:18 11:16
contractor
8:24 10:16
10:17 16:3
25:3,20
27:15,18
Contractors
9:2 10:20
contracts
16:23
control 4:11
33:18
copy 5:3
core 22:25
23:2,6,11
corporate
7:17
correct 8:17

12:4 15:5
18:12 19:19
22:14 27:6
28:1 30:10
33:8
correctly
22:3
costs 5:8
14:11
counsel 4:1,5
4:9 5:5,10
28:19
County 8:21
couple 10:9
course 6:14
6:17
court 1:1 4:1
4:8,12,16
6:20 18:24
33:13
cover 17:2
covered
23:19 29:8
CRR 1:21
current 7:10
12:19 13:1
29:1,2,20
currently
7:18 8:14
8:15

**D**

D 3:1
decade 16:18
decide 25:14
26:22,25
27:11,24
decision 8:14
8:15 14:17
26:7,23
decisions 8:5
declaration
25:25 28:21
declined
19:23
Defendants
1:10 2:21
defined 28:8
definition
21:18
delayed 13:6
DEPART...
2:16
dependent

24:22
depending
14:12
Depends 24:6
deposed 6:5,6
6:8
deposition
1:18 4:7,15
4:19 5:8
6:4 32:13
described
20:1
DESCRIP...
3:13
determine
8:12
determining
11:25 12:7
developer
9:24
development
7:23
different
20:22 24:18
24:19
direct 5:24
8:2 33:18
directly 21:8
30:6
disadvantage
12:20 13:21
14:4
discuss 20:25
discussed
21:3 30:18
discussion
21:8
disposed 6:5
6:6
distant 16:1
DISTRICT
1:1,1
doing 10:10
28:2 29:25
dollars 10:12
drafted 28:21
driven 26:23
duly 5:21
duration
12:25
duties 7:21

**E**

E 2:1,1 3:1,11

33:2
**EASTERN**
1:1
**easy** 23:1
**eight** 15:14
22:12
**either** 16:17
19:3 27:18
27:24
**election** 26:8
26:13,22
**elevated** 9:17
**emailed** 5:4
**employ** 23:3
**employee**
29:22
**employees**
21:22,25
22:1,5,10
22:11,16,25
23:2,6,11
23:13,17,22
24:4,12
29:5,12,13
**entirely**
11:11
**environment**
28:7
**ESQUIRE**
2:4,10,17
2:17
**essentially**
13:11
**estimate**
16:10 17:17
**estimating**
15:25
**estimator** 8:4
8:6
**evidence** 33:6
**EXAMINA...**
3:7 5:24
**examined**
5:21
**example** 9:24
13:25 19:18
**excavation**
15:13
**exclusively**
9:22 23:22
**executive**
7:11,13
**exhibit** 5:2,3
5:6

**exhibits** 5:1
**existing** 13:3
**experience**
20:23
**expert** 27:17
**expiration**
27:14
**express** 4:20
**extent** 23:8
**exterior**
15:17

_____ F _____

**F** 33:2
**factor** 12:24
13:14,18
14:9
**factors** 11:24
12:5,6,9
13:10 19:25
30:18,20
**fair** 15:19,21
17:22 25:18
25:24 27:22
29:12,16
32:2
**familiar** 6:13
18:4,5
**far** 12:10
25:8
**fashion** 14:18
**father** 8:22
26:6
**Feasterville**
8:21
**feel** 7:1 13:23
**felt** 22:22
**FETBROYT**
2:9
**final** 8:12
**finance** 7:22
**financial** 13:5
**fine** 23:9,15
31:6
**finish** 6:17,19
**first** 5:21
16:18 28:5
**five** 12:20
13:21 14:4
14:5,21,23
14:25 16:23
20:10
**five-county**
10:22,25

**flatwork**
18:21 19:6
**Floor** 2:18
**flow** 13:7
24:23
**folks** 28:18
**follows** 5:22
**force** 19:9
**foregoing**
33:7,16
**foremost**
28:5
**forgive** 26:10
**forte** 19:1
**founded** 8:22
**free** 7:1 25:2
**fringe** 12:17
**front** 24:15
**full-time**
21:22
**fully** 33:6
**FURST** 2:17
**further** 4:25
15:6 32:3

_____ G _____

**game** 17:14
**general** 16:20
16:24 20:16
**generally**
7:21 8:23
9:13,18
10:1,6
14:21 19:13
20:17 24:4
24:12 25:8
28:17,21
30:2
**Germantown**
16:19
**Give** 20:6
**given** 13:24
**go** 6:11 14:18
15:6 20:4
22:17,22
25:2,9,14
26:24 27:24
**going** 11:12
11:25 12:20
13:15 14:15
15:13 17:20
22:25 24:20
31:4
**Good** 6:2

20:5
**grade** 19:7
**granted**
11:15
**ground** 6:11
**group** 28:18
**guess** 6:7
15:13 22:18
28:5
**guessing**
24:10
**guys** 29:6
31:5

_____ H _____

**H** 3:11
**HAGGER...**
2:9
**hall** 15:16
16:15,16
25:10
**happen** 22:15
**happens** 25:8
**hard** 10:5
**head** 6:22,23
**headache**
18:18
**heavy** 8:23
9:1,13
10:10 19:5
24:7
**held** 1:19
**hell** 14:6
**helping** 16:10
**helps** 6:20
**highway** 8:23
9:2,13
**hire** 22:20,20
22:21,21
29:6
**hired** 22:15
**hiring** 25:10
**history** 26:5
**hot** 24:7
**huge** 28:2,10
**hundred**
20:16 24:8

_____ I _____

**idea** 20:8
21:3
**identity** 4:17
**ignorance**
26:10

**III** 1:5
**impediments**
28:2,4
**Inaudible**
18:23
**incidental**
19:5
**included** 21:4
30:14
**includes** 9:15
**industry** 14:5
**information**
17:9
**insulated**
24:16
**intelligent**
17:17
**interest** 12:16
18:14 21:6
**Intervenors**
2:13
**invitations**
11:21
**involved** 8:4
21:7
**Island** 15:11
16:15
**islands** 15:11

_____ J _____

**JAMES** 1:9
**Jersey** 10:23
11:2,12
**job** 12:13
17:4,23
25:21 31:23
**jobs** 14:15
17:19,21
23:24 31:22
**joint** 15:22
**JOSEPH**
1:18 3:4
5:20

_____ K _____

**KANG** 2:9
**keep** 24:20
24:23
**KENNEY**
1:9
**key** 28:18
**kind** 9:14
14:7 17:4
20:25 26:9

29:11 30:17
**Kirby** 2:17
3:8 5:13,13
6:1,2 19:10
23:14,16
30:22 31:4
31:13,16
32:2,9
**know** 10:1
13:1,7 14:1
14:2,6,17
19:21 21:6
21:7 24:10
24:10,18,19
25:7,7 26:3
26:9,10,16
26:18 27:20
27:20 28:6
28:15,16
**knowing**
14:19
**knowledge**
25:6

_____ L _____

**labor** 11:8
26:18 29:1
**LACAVA**
1:6
**laid** 13:7
24:14 25:10
25:20 28:16
**late** 17:14
**law** 2:16 4:22
7:17
**lawyer** 7:18
**layoff** 24:16
**LBE** 12:18
13:12,17,18
**lead** 8:4,6
**leave** 27:20
27:20 28:10
**let's** 7:8
13:16 14:21
15:6 21:20
21:24
**level** 14:3
**levels** 24:19
**liability**
28:11
**licensed** 7:19
**litigation**
4:24 17:4
18:3,6

**little** 7:8 8:18
9:23 21:20
26:16 28:3
**LLC** 2:3,9
**load** 10:10
**located** 8:20
**locations**
4:10
**LOFTUS** 1:4
**long** 4:3 7:13
9:4
**look** 30:24
**looked** 21:1
**looking** 18:15
**looks** 21:1
**lose** 24:20
**lot** 9:17 14:6
18:15,21
**LYDIA** 2:17
**lydia.furst...**
2:19

_____ M _____

**maintain**
28:17
**maintains**
28:22
**management**
23:12,15,17
25:11 26:23
26:25 29:5
30:5
**margins** 14:4
**marked** 5:1
**market** 28:12
**matter** 28:2
33:7
**MAYOR** 1:9
**mean** 14:6
15:7 20:13
20:16 25:8
25:22 26:12
28:15
**means** 26:3
29:3,5
33:18
**mechanism**
26:17 27:13
**meeting** 4:11
**member** 9:1
9:5 30:6
**members**
22:12,13,16
25:12

**memory**
20:14
**Michael** 2:10
5:15
**mid** 9:6,8
**million** 10:8
10:9,9,12
15:18
**minutes**
30:23
**money** 13:3
14:11 21:7
**monitor**
11:21
**months** 24:24
**mortars**
12:19
**move** 21:20
30:9
**multi-empl...**
28:8
**multiple**
21:12
**mute** 31:4
**mweinert...**
2:12

_____ N _____

**N** 2:1 3:1
33:2
**name** 6:2 8:8
16:4 31:21
**near** 15:11
27:14
**Nearly** 9:22
**necessarily**
18:14 20:19
23:7,20
**need** 4:14 7:1
13:22 15:3
23:23 28:20
**needs** 9:25
22:23
**negotiate**
27:19 30:5
**negotiations**
27:14
**neither** 15:19
**Neshaminy**
1:4 7:11,14
7:20,25
8:13,18 9:3
9:4,12 10:7
10:20 11:8

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11:21,24 | 10:3,10,15 | **Park** 31:17 | **PKF-MARK** | **primarily** | 12:1 13:19 | 21:12 31:17 | 26:2 |
| 19:11,13 | 11:1,4,7,16 | **part** 15:4 | 1:5 | 8:24 10:17 | 19:14 28:25 | 31:21,21,22 | **representat...** |
| 21:3,21,22 | 11:18,24 | **participating** | **PLA** 11:13 | 10:22 | 29:19,24 | 31:24 32:1 | 30:4 |
| 23:3,18 | 12:5 13:9 | 4:10 | 11:18 12:24 | **prime** 10:15 | 30:13 33:13 | **recess** 31:10 | **Representing** |
| 24:2,3 25:2 | 14:7,20 | **particularly** | 16:13,21 | 10:17 | **Pulaski** 31:17 | **recession** | 2:7,13,21 |
| 25:10,19,25 | 15:6,15,19 | 28:18 | 17:5,11,12 | **prior** 5:5 | **pull** 28:20 | 28:7 | **reproduction** |
| 26:14 27:3 | 16:4,8,11 | **parties** 4:5,21 | 19:15,19,20 | 7:16,17 9:6 | **purpose** 4:23 | **record** 4:2 | 33:17 |
| 27:11 28:22 | 16:14,22 | 5:7 | 20:10,18,20 | 27:13 | 17:18 | 4:18 | **request** 11:14 |
| 29:18,22 | 17:6,9,12 | **partner** | 21:1,15 | **private** 9:24 | **purposes** | **recorded** | 11:15 |
| **Neshaminy's** | 17:22,25 | 15:23,24 | 29:20 30:13 | 10:1,2 | 23:9 | 4:18 | **requested** |
| 9:20 18:8 | 18:7,10,19 | **party** 15:25 | 30:14 | **probably** | **pursuant** | **recording** | 21:11 |
| **never** 17:16 | 19:17 20:2 | 16:2,4 | **place** 4:14 | 24:10 | 1:19 4:6 | 4:20 | **required** |
| **new** 10:23 | 20:13,19,25 | **Pause** 20:7 | 25:12 | **problem** 22:7 | | **records** | 30:13 |
| 11:2,12 | 21:10,14,17 | **paving** 18:22 | **places** 17:15 | **problems** | **_____** | 24:15 | **requirement** |
| 28:15 | 21:20,25 | 19:9 | **plaintiff** 5:12 | 29:25 30:2 | **Q** | **refrained** | 12:18 |
| **newspaper** | 22:2,11,15 | **paychecks** | **Plaintiffs** 1:6 | **proceedings** | **quantify** | 19:13 20:9 | **requirements** |
| 28:6 | 22:24 24:1 | 24:1 | 2:7 | 33:5 | 20:20,21 | **regarding** 5:6 | 13:12,17,18 |
| **nods** 6:22 | 24:4,9,12 | **payment** 13:6 | **plan** 28:8 | **process** 12:11 | **question** 5:7 | 28:22 | **requires** |
| **non-projec...** | 25:1,5,14 | **payroll** 23:18 | **PLAs** 15:20 | 12:14 14:8 | 6:18,19,21 | **region** 10:22 | 21:15 |
| 22:10 | 25:24 26:10 | 24:15 | **please** 4:2 | **project** 11:8 | 7:2,3 10:5 | **Regional** | **reserve** 5:18 |
| **non-ten** 29:5 | 27:2,6,10 | **pending** 7:2,3 | 6:16 | 11:15,19 | 12:3 14:7 | 9:17 | **resist** 26:24 |
| **non-union** | 27:22 28:3 | **Pennsylvania** | **point** 24:14 | 12:1,10,16 | 15:4 19:12 | **rehab** 16:15 | **resources** |
| 21:25 27:24 | 28:13,20 | 1:1,20 9:1 | 27:17 | 12:23,25,25 | 22:2 | 16:16 | 13:4 14:13 |
| 27:24 | 29:11,17,22 | 10:23 11:1 | **position** 7:10 | 13:4,7,8,11 | **questioning** | **rehired** 28:16 | 14:14,18 |
| **Nope** 17:11 | 30:2,8,12 | **pension** 28:9 | **possession** | 13:15,20,22 | 5:6 23:10 | **relating** 12:5 | 17:14,19 |
| **north** 10:24 | 30:16,21 | **people** 24:18 | 5:5 | 14:10,11,12 | **questions** | **relation** 6:7 | **responsibili...** |
| **Northeast** | 31:24 32:2 | 28:16 | **practical** | 15:8 16:15 | 6:14 20:2 | **relations** | 30:6 |
| 18:3 | 32:11 | **percent** 12:20 | 28:1 | 16:15,16 | 31:15 32:3 | 26:20 27:5 | **RICCI** 1:21 |
| **Notary** 1:21 | **ones** 23:21 | 13:21 14:4 | **practiced** | 17:7,10,13 | 32:6,8 | 27:21 | **right** 5:18 |
| 33:13 | **operation** | 14:5 | 7:17 | 18:2,3,4,7 | **quick** 30:24 | **relatively** | 6:11 14:5 |
| **noted** 33:6 | 8:22 | **perform** 13:4 | **practicing** | 18:21 19:5 | **quickly** 6:15 | 31:20 | 24:9 27:7 |
| **notes** 30:24 | **operations** | 28:24 29:18 | 7:19 | 19:14,17 | 20:3,4 | **remember** | 31:13 |
| 33:7 | 7:22 | **permanent** | **prefer** 29:14 | 21:1,5,14 | **quit** 25:22 | 15:8 16:12 | **rights** 30:5 |
| **noticed** 4:19 | **opposed** | 29:13 | **prepare** | 28:25 29:1 | | 16:13 18:20 | **RMR** 1:21 |
| **number** 3:13 | 18:22 26:8 | **Philadelphia** | 17:17 | 29:24 30:13 | **_____** | **remote** 4:10 | **ROAD-CON** |
| 19:23 | **opt** 27:15 | 1:8,10 2:11 | **prequalific...** | 30:17 31:18 | **R** | **remotely** | 1:4 |
| | **ORAL** 1:18 | 2:16,18 | 12:11,12 | **projects** 7:24 | **R** 2:1 33:2 | 1:19 4:16 | **role** 7:24 8:2 |
| **_____** | **outside** 11:1 | 5:14 6:3 | 14:8 17:10 | 8:5,24 9:21 | **Rail** 9:18 | **removed** | 8:3 |
| **O** | 11:7 | 11:5,7,22 | **prequalific...** | 10:6,11,11 | **rake(PH)** | 17:12,16 | **rules** 6:12 |
| **O** 33:2 | **overcome** | 12:1 13:10 | 13:12 | 10:25 12:6 | 9:16 | **renovated** | **runway** 18:3 |
| **oath** 4:13 | 14:3 | 13:19 14:22 | **prequalified** | 12:7 13:2 | **ranges** 10:8 | 9:25 | 19:17 |
| **object** 23:4 | **oversee** 7:22 | 15:1 28:25 | 14:19 | 14:20,25 | **read** 4:2 5:19 | **renovation** | **runways** 19:6 |
| **obviously** | **owner** 12:2 | 29:19,24 | **prequalify** | 15:20 17:2 | 28:21 | 15:13,16,17 | |
| 12:9,23 | | 30:12 31:18 | 12:12 | 18:16 19:18 | **ready** 31:14 | 31:18 | **_____** |
| 15:3 16:23 | **_____** | 31:23 | **presence** | 19:23 20:8 | **real** 30:24 | **repeat** 18:25 | **S** |
| 21:6,7 23:5 | **P** | **Philadelphi...** | 12:19 18:17 | 20:20 29:7 | **really** 24:22 | **repercussio...** | **S** 2:1,4,11 |
| **office** 22:3 | **P** 2:1,1 | 16:2 | **present** 1:22 | 29:19 30:10 | 25:7 | 30:7 | 3:11 |
| **officer** 4:13 | **p.m** 1:21 | **physical** | 4:5 | **providing** | **reason** 7:5 | **reporter** 4:1 | **salary** 22:20 |
| 7:11,14 | 32:13 | 12:19 | **presented** | 15:25 | 13:5 17:6 | 4:8,16 6:20 | **saying** 6:16 |
| **OFFICIAL** | **P.O** 2:4 | **pick** 27:25 | 3:14 5:3 | **proximate** | 18:19 19:14 | 18:24 33:13 | **says** 25:25 |
| 1:9 | **Pa** 2:5,11,18 | 28:6 | **presenting** | 19:22 | 19:19 21:7 | 33:19 | 28:22,22 |
| **okay** 6:25 7:8 | 4:6 | **piece** 9:23 | 5:2 | **public** 1:22 | 26:25 | **Reporting** | **Schuylkill** |
| 7:18,20 8:2 | **PAGE** 3:3,13 | 10:2 | **previously** | 8:24,25 | **reasons** | 4:12 | 15:12 |
| 8:6,8,10 9:8 | **PAHHCBA** | **Pier** 31:17 | 4:19 | 9:21 10:18 | 13:24 19:20 | **representat...** | **SCOTT** 1:5 |
| 9:12,19,23 | 25:13 | | | | **recall** 10:17 | | 2:10 |
| | | | | | 12:10 16:14 | | |
| | | | | | 19:16 21:8 | | |

second 15:3
20:6
sector 10:2
seeing 28:7
sense 23:21
separate 4:9
separately
13:16 27:19
SEPTA 14:1
September
1:14
Service 4:12
services
15:25
Seventeen
7:15
shakes 6:23
share 28:11
SHARON
1:21
shop 27:25
sign 5:19
26:12 27:1
31:2
signed 11:8
11:12 26:19
27:21
signing 26:7
27:4,7
simply 19:24
Sir 18:24
situation
10:18 13:1
24:22
slow 6:15
24:6
smaller 10:11
somebody
22:20
sort 15:12
speak 6:15
11:10
speaking
8:23 26:6
specific 10:25
12:10 13:10
13:11 29:15
specifically
14:9 17:1
31:24
specifics
18:20
speculate
19:22

spend 18:15
staggering
28:12
standard
12:6
standing
12:12
start 6:19 7:8
13:17 17:16
28:15
state 11:1
states 1:1
11:2
stations 9:17
9:18
Steelworker
22:21 29:4
Steelworke...
25:20
Steelworkers
11:14,20
20:22 21:3
21:10,11
22:17 23:22
24:2,17
26:1,8,12
26:15 27:5
27:12,23
28:23 29:4
30:9,11,14
stenographic
33:7
stipulated 4:4
4:25 5:10
5:12,14,16
stipulation
4:2
story 20:23
Street 2:11
2:18 17:3,7
21:5
Strehlow
4:12
strong 18:16
structural
19:2,5
structure
18:22
stuff 13:8
25:15
subcontrac...
10:16,19
subject 17:3
18:2 28:25

29:19
submit 11:25
17:9
Subpoena
1:19
subway 9:17
success 14:2
successful
16:17
Suite 2:11
superinten...
22:6,8
supervision
22:19 33:19
supervisors
22:5
supervisory
8:3 22:3,16
23:13
supportive
15:12
sure 6:13,18
6:21 7:3
11:21 15:23
18:1 23:14
25:18 29:18
30:18 32:4
switch 25:14
sworn 3:5
4:15 5:21

_____

T

T 3:11 33:2,2
take 6:20,23
7:2 13:16
30:23 31:7
taken 1:19
31:11 33:7
talent 22:22
24:19
talk 21:20
talking 13:9
22:3
taxiways 19:7
technically
28:1 29:11
tell 6:15 8:18
9:14 25:16
28:3
temporary
29:12
ten 15:7,18
22:25 23:2
23:17,19

tend 6:14
tenure 11:10
21:16
term 23:6,8
27:7,15
test 20:14
testified 5:21
Thank 32:8,9
thin 14:5
thing 26:9
things 19:7
think 9:19
13:6 15:2
15:16,17,22
16:9 19:11
19:24 20:15
20:15,21
29:14 30:22
31:13
three 27:8,10
three-minute
31:8
three-year
27:15
threshold
10:11
thrust 9:18
tie 25:23
time 9:6,9
14:11 17:15
17:23 18:15
32:10
time-consu...
12:14
told 16:23
tomorrow
25:22
Tony 8:7,10
tools 22:6
29:10
toss 20:18
tracked
19:23
trades 16:2
18:16 22:12
22:12,17
tradesperson
22:22
trailed 18:24
transcript
33:8,17
transit 9:17
true 11:11
truthfully 7:6

try 24:19
28:17
trying 20:13
two 12:22
19:20 22:4
22:11,15
26:19 30:23
31:14
type 15:13
Typical 13:8
typically 10:2
13:22 19:2
29:15

_____

U

Uh-huh 8:11
13:13 27:9
unauthorized
4:22
underfunded
28:9
understand
6:16 23:1
25:24 26:16
29:2
understand...
26:6,19
27:6
unfunded
28:11
union 18:17
21:25 22:5
22:13 25:11
25:15 26:20
27:1,19,20
27:25 28:10
29:23 30:9
unionize
26:22
unions 25:15
unique 12:5,9
12:22 13:9
United 1:1
23:22 24:17
25:25 28:23
unsuccessful
15:14
usually 10:8
18:15 27:8
utility 14:1

_____

V

V- 1:7
variety 13:23

Venice 15:11
16:14
venture
15:22
ventured
10:24
verbally 6:22
versus 14:1
26:13
videoconfe...
1:20
videotaped
4:19
Villanova 2:5
violation 4:22

_____

W

wall 31:18
Wally 5:11
wally@zim...
2:6
WALTER
2:4
want 14:18
24:20 26:14
26:16,22
27:1,11
29:2 31:2
wasn't 18:7
18:13 19:21
way 10:9,13
13:6 20:17
25:9 27:4
ways 26:19
we'll 20:4
31:7
we're 6:12
8:21 13:9
14:15 24:6
24:7 31:14
we've 8:21
27:23
Wednesday
1:14
Weinert 2:10
5:15,15
32:5,6
went 15:17
west 10:24
wheelhouse
12:17 13:23
18:8
winter 24:24
Wissahickon

16:20
withdraw
28:9,11
witness 3:3,5
4:9,14,15
5:2,4,6,18
19:1 32:11
witness's
4:17
women 29:6
work 9:14,17
10:15,21
11:2,4
18:22 19:2
19:3,4 22:6
23:25 24:13
24:21,22,23
24:25 25:2
25:15,19,19
28:24 29:6
29:18
worker 26:23
workers
26:15,21
workforce
21:21 22:10
28:14,15
29:1,3,4,20
working 11:4
25:1 29:9
workload
13:3 24:6
works 8:24
9:21 10:18
12:1 13:19
19:14 25:9
28:25 29:15
29:19,24
30:13
wouldn't
18:10
writes 24:1
written 4:21

_____

X

X 3:1,11

_____

Y

yeah 6:10
7:19 10:4
10:13,14
11:11 15:10
15:21 16:7
17:21,24

25:22 27:9
29:4,8 31:7
year 24:14
years 6:9
7:15 14:21
14:23 15:1
15:7,14,18
16:23 20:10
27:8,10
Yep 17:8

_____

Z

zero 14:23,24
Zimolong 2:3
2:4 5:11,11
5:17 23:4
31:2,7 32:7
Zoom 1:18
1:20 4:7,10
4:18 5:9
6:12

_____

0

_____

1

1:30 1:21
10 15:18
21:24 22:4
24:11
12 21:24 22:4
123 2:11
1515 2:18
15th 2:18
17:3,7 21:5
1670 2:11
19085 2:5
19102 2:18
19109 2:11
1962 8:22

_____

2

2:02 30:25
2:05 30:25
2:06 32:13
2:19-cv-016...
1:4
20 24:11
2009 11:13
2018 31:19
31:25
2020 1:14
215)525-5850
2:12
215)665-0842

Joseph Canuso
September 30, 2020

2:5
**215)683-3573**
2:19
**231** 4:6

---
**3**
**30** 1:14
**30-some** 10:9
**365** 24:13

---
**4**
**4002** 4:6

---
**5**
**5** 3:5,8
**552** 2:4

---
**6**

---
**7**

---
**8**
**80's** 9:6,8
26:7 27:5

Exhibit Q

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROAD-CON, INC, et al., | : | |
| *Plaintiffs,* | : | Civil No: 2:19-cv-01667 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADEPHIA, et al. | : | |
| *Defendants.* | : | |

I, Jonathan Janiszewski, make this declaration and aver as follows:

1. I am the Deputy Commissioner for the City of Philadelphia (the "City") Procurement Department.

2. In my capacity as Deputy Commissioner, I am responsible for overseeing the policies and operations of the Procurement Department.

3. Section 8-200 of the Home Rule Charter (the "Charter") provides that all contracts, other than those that fall within certain noted exceptions, "shall be awarded to the lowest responsible bidder". Thus, the Procurement Department understands that, as a general matter, all contracts must be awarded to the lowest responsible bidder.

4. The Procurement Department cannot modify this Charter provision providing for award to the lowest responsible bidder, instead that requirement can only be modified if the Charter, though legislation, authorizes such modification.

5. The Procurement Department interprets Philadelphia Code Section 17-109 as such an exception to the lowest responsible bidder requirement, authorized by Section 8-200 of the Charter.

6. This exception allows the Procurement Department to award a contract to a bidder, who is not otherwise the lowest bidder, if that bidder satisfies the Local Bidding Entity requirements of Section 17-109 of the Philadelphia Code.

7. If a contractor meets those requirements, it receives a "bid preference" that, for purposes of establishing a bidder's price, reduces its bid price by 5% for bids over one million dollars.  Thus, this can allow a higher priced bidder to be deemed the low bidder if application of the bid preference effectively makes the bidder receiving the preference the low bid.

8. In contrast, the Procurement Department does not interpret the City's use of a Project Labor Agreement ("PLA") on a project as a "bid preference".  Instead, a bidder's ability to comply with requirements in a PLA is regarded as a matter of contractor responsibility. It does not affect the bid price.

9. As a result, the Procurement Department does not regard the use of PLAs which are contemplated by the applicable Executive Order as requiring an ordinance as an exception to the Charter requirement.

Date:   December 1, 2020

/s/ *Jonathan R. Janiszewski*
_____
Jonathan R. Janiszewski
Deputy Commissioner
City of Philadelphia Procurement
Department