UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

**Road-Con, Inc.**, at al.

    Plaintiffs,

v.

**City of Philadelphia**,

    Defendants.

Case No. 2:19-cv-01667-JS

**PLAINTIFFS' RESPONSE TO DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The defendants seek summary judgment on numerous grounds, but none of their arguments have merit.

## I. THE PLAINTIFFS' CLAIMS ARE NOT MOOT

The defendants claim that Executive Order 5-20[1] has mooted the plaintiffs' First Amendment claims, as well as their claims under the state's competitive-bidding laws and the city charter. *See* Defs.' Br., ECF No. 79, at 3–4. The defendants are mistaken for three separate and independent reasons. First, a defendant cannot moot a lawsuit by voluntarily changing its ways after a plaintiff sues. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot."). Second, Executive Order 5-20 does not moot the plaintiffs' claims under the state's competitive-

---

1. The plaintiffs' motion for summary judgment and statement of material facts referred to Executive Order 5-20 as "Executive Order 4-20" because the executive order attached to our statement of material facts had "4-20" written in handwriting at the top. *See* Executive Order 4-20, attached as Ex. 15 to Pls.' Statement of Material Facts, ECF No. 75-15. The defendants call it "Executive Order 5-20," and the version on the city's website is also called "Executive Order 5-20" and has a handwritten "5-20" at the top. *See* https://bit.ly/3yJReML. We will follow the defendants' nomenclature and refer to the executive order as "5-20" going forward.

bidding laws and the city charter, because it fails to ensure that Steelworker-affiliated contractors will be placed on an equal footing with Council-affiliated contractors. Third, the plaintiffs are seeking damages, and Executive Order 5-20 cannot moot the plaintiffs' claims when they are seeking retrospective relief.

### A. The Defendants Cannot Moot The Plaintiffs' Claims By Voluntarily Changing Their Ways After A Lawsuit Is Filed

The defendants issued Executive Order 5-20 *after* the plaintiffs sued, and a defendant cannot moot a claim through voluntary cessation after a lawsuit has been filed. *See W.T. Grant*, 345 U.S. at 632; *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."); *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004). This Court has already held as much:

> Defendants argue injunctive relief is unavailable because they have ceased using project labor agreements on the 15th Street Bridge Project and the Runway Project. Even if Defendants voluntarily ceased including project labor agreements on City projects, however, this case is not moot because they could resume doing so. When a case would otherwise be moot, a court still has jurisdiction if a defendant voluntarily ceases its allegedly unlawful behavior.

Memorandum, ECF No. 20, at 6–7. Nothing prevents the defendants from rescinding Executive Order 5-20 and reinstating the requirement that employees of city contractors join and pay a Council-affiliated union, so the executive order does not moot anything.

The defendants try to escape the voluntary-cessation doctrine by suggesting that they changed their practices in response to *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018), and *Allan Myers, L.P. v. Dep't of Transportation*, 202 A.3d 205 (Pa. Comm. Ct. 2019). *See* Defs.' Br., ECF No. 79, at 3–4. And they claim that these court rulings make "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* at 4 (quoting *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019); *see also id.* (citing *Hartnett v. Pennsylvania State Educ. Ass'n*,

963 F.3d 301, 307 (3d Cir. 2020)). But the defendants in *Hartnett* changed their conduct immediately after the Supreme Court issued its ruling in *Janus*, and they conceded that that *Janus* had rendered their agency-shop arrangements unconstitutional. Each of these facts led the Third Circuit to conclude that there was "no reasonable likelihood" that the challenged behavior could resume:

> Once the Supreme Court changed course in *Janus*, the unions *immediately* stopped collecting agency fees. And since *Janus*, they have *conceded* that Pennsylvania's agency-fee arrangement violates the First Amendment and have forsworn collecting fees from nonmembers. *So we see no reasonable likelihood that the unions will try to collect agency fees from the teachers ever again*.

*Hartnett*, 963 F.3d at 307 (emphasis added). Neither of these facts is present here. The defendants did not issue Executive Order 5-20 until October 15, 2020 — nearly two and a half years after *Janus*, and almost two years after *Allan Myers*. And far from conceding the illegality of their previous practices, the defendants continue to assert that their PLAs were lawful all along under *Janus* and *Allan Myers*. *See* Defs.' Br., ECF No. 79, at 4 n.1 ("[I]t is the City's position that its past usage of PLAs did not violate the First Amendment rights of Plaintiff Contractors or Mr. LaCava, even under *Janus*"); *id.* at 14 ("Project labor agreements remain permissible under Pennsylvania law; there is no legal basis for a ban on all present or future PLAs." (citing *Allan Myers*, 202 A.3d at 211)). This is nothing like the situation in *Hartnett*, where the defendants immediately changed their ways in response to *Janus* and conceded the illegality of their past actions. The defendants bear a "heavy burden" of demonstrating that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,"[2] and they cannot carry that burden when they dawdled in response to *Janus* and *Allan Myers* and continue to defend the legality of their past PLAs.

---

2. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted)).

### B. Executive Order 5-20 Does Nothing To Ensure That Steelworker-Affiliated Contractors Will Be Placed On An Equal Footing With Council-Affiliated Contractors

There is an additional reason why Executive Order 5-20 cannot moot the plaintiffs' claims under the city charter and the state's competitive-bidding laws: The executive order does nothing to ensure that the United Steelworkers will be placed on an equal footing with the Philadelphia Building and Construction Trades Council. The city continues to insist on the diversity-and-inclusion regime that prevented the United Steelworkers from joining the city's project labor agreement in 2018, and those diversity edicts are front and center in Executive Order 5-20. *See* Lazer Decl. (2020) ¶ 11 (attached as Ex. E to defendants' statement of material facts, ECF No. 80-1); Exec. Order § 5-20 §§ 1(a)(iv) and 4(c) (attached as attachment 1 to the 2020 Lazer declaration, which in turn is attached as Ex. E to the city's statement of material facts, ECF No. 80-1). Mr. Lazer's declaration says only that the United Steelworkers "will be provided an *opportunity* to sign on to the PLA before bids are solicited for the project." *See* Lazer Decl. (2020) ¶ 16 (emphasis added). But an "opportunity" of that sort is useless when the city continues to insist on diversity-and-inclusion provisions that have kept the United Steelworkers from signing the city's PLA. And the city has failed to produce evidence showing that the United Steelworkers will be willing or able to agree to any other conditions that the city's PLA will impose on union signatories.

There is also unrebutted deposition testimony showing that the city discriminates against Steelworker-affiliated contractors even in the absence of a PLA. On at least two occasions, Road-Con submitted the lowest responsible bid on a city contract that did not have a PLA attached, yet the city refused to execute a contract with Road-Con. *See* Hoffman Dep. 31:16–18; 33:24–34:2; 34:17–35:3; 35:2–35:5; 37:5–24 (attached as Exhibit 14 to plaintiffs' statement of material facts, ECF No. 75-14). When Road-Con asked city officials why the city would not award one of these projects to Road-Con, despite the fact that Road-Con submitted the lowest responsible bid, it was told that "we were not of the right union type and it was causing some internal friction inside the City." *See* Hoffman Dep.

35:15–17; 37:25–38:8. So the city's discrimination against the United Steelworkers persists even when it is not formally codified as city policy, and the Court cannot deny judicial relief in response to Mr. Lazer's representation that the city will merely *offer* the United Steelworkers an opportunity to sign on the city's project labor agreement.

### C. Executive Order 5-20 Cannot Moot The Plaintiffs' Claims Because The Plaintiffs Are Seeking Damages

Finally, the issuance of Executive Order 5-20 cannot moot the plaintiffs' claims because they are seeking *damages* in addition to declaratory and injunctive relief. *See* Memorandum (ECF No. 20) at 6 ("Cases like this one which seek monetary damages for past wrongs cannot be mooted by the Defendants' subsequent behavior."); *see also Burns v. Pa. Dep't of Correction*, 544 F.3d 279, 284 (3d Cir. 2008) (claim for nominal damages prevents mootness even when prospective relief is no longer available). The plaintiffs' claims are not moot.[3]

## II. THE PLAINTIFFS HAVE STANDING TO ASSERT THEIR FIRST AMENDMENT AND EQUAL PROTECTION CLAIMS

The defendants claim that the plaintiffs lack standing to challenge the city's diversity-and-inclusion requirements—even though the plaintiffs have indisputably suffered injury in fact from the city's exclusion of the United Steelworkers. The defendants contend that the plaintiffs are asserting equal-protection rights that belong to the United Steelworkers, rather than rights belonging to the plaintiffs, and that the equal-protection claims therefore

---

3. In a footnote, the defendants suggest that standing should be assessed at the time the plaintiffs' filed their *amended* complaint, rather than when the lawsuit was initially filed. *See* Defs.' BR., ECF No. 79, at 4–5 n.2 (citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007)). But a plaintiff's standing is always measured at the time he initially brings suit, regardless of any subsequent amendments to the pleadings. *See Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." (emphasis added)); *Carney v. Adams*, 141 S. Ct. 493, 499 (2020) ("[S]tanding is assessed 'at the time the action commences'" (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 191 (2000)). *Rockwell* does not depart from this rule; it merely holds that courts should consider the jurisdictional facts alleged in an amended pleading, even when deciding whether standing exists at the time the original complaint was filed.

violate the prudential rule against third-party standing. *See* Defs.' Br., ECF No. 79, at 5–6; *see also Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("A party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). The defendants are wrong. The city's diversity-and-inclusion goals violate the equal-protection rights of plaintiff Scott LaCava by limiting the available construction employment hours available to white men and discouraging contractors and unions from employing white men on city construction projects. *See* Pls.' Additional Statement of Material Facts, ECF No. 86, ¶¶ 7–8; LaCava Suppl. Decl. ¶ 3 ("I am a white male.") (attached as Ex. 1 to plaintiffs' additional statement of material facts, ECF No. 86-1); *see also Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."). The diversity-and-inclusion goals also violate Mr. LaCava's equal-protection rights because he is a member of the United Steelworkers, and a racially discriminatory policy that excludes an entire union from city contracts violates the rights of its individual members no less than the rights of the union itself. *See, e.g.*, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 65–66 (1997) ("An association has standing to sue or defend in such capacity, however, only if its members would have standing in their own right."). And because Mr. LaCava has standing to assert his own equal-protection rights, the remaining plaintiffs may likewise present an equal-protection challenge to the city's diversity-and-inclusion regime. *See Town of Chester v. Laroe Estates, Inc.,* 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

The defendants also contend that the plaintiffs "must prove an injury in fact *to his or her First Amendment rights*" before they can assert a First Amendment claim." *See* Defs.' Br., ECF No. 79, at 6. That is incorrect. The *standing* inquiry does not require a plaintiff to demonstrate an injury to one's First Amendment rights; any type of "injury in fact" confers Article III standing. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n.14 (1973) ("[A]n identifiable trifle is enough for standing." (citation and internal quotation marks omitted)); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152 (1970) ("The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise."); *id.* at 154 (recognizing that "injury in fact" may include "'aesthetic, conservational, and recreational' as well as economic values."). This is not an antitrust case where a litigant must demonstrate "antitrust injury" as a condition of standing. *See, e.g.*, *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Whether one has suffered an "injury . . . to his or her First Amendment rights" goes to the merits, not standing. In all events, plaintiff LaCava has undoubtedly demonstrated an "injury" to his "First Amendment rights," because he could not work on city projects subject to a PLA when this lawsuit was filed unless he joined a union that he did not wish to associate with. *See* LaCava Affidavit ¶¶ 3–6 (attached as Ex. 5 to plaintiffs' statement of material facts, ECF No. 75-5). The Court has already held that "[t]his is compelled speech, and it is prohibited under *Janus*." Memorandum, ECF No. 20, at 14. The Court has also recognized that "[t]he plaintiffs . . . have standing to bring this case," *id.* at 11 n.5, and the city does not contest or engage the Court's previous analysis of the plaintiffs' standing.

The defendants try to defeat standing by invoking Executive 5-20, which purports to remove the requirement that employees of city contractors join or pay a union. *See* Defs.'

Br., ECF No. 79, at 6. But that argument goes to mootness, not standing. A plaintiff's standing is determined by the world that existed when the original complaint was filed,[4] and the issuance of Executive 5-20 post-dates the filing of this lawsuit. The defendants' observation that they imposed PLAs on only some city projects is likewise irrelevant, as the plaintiffs suffered injury by their exclusion from those particular projects. *See id.* at 6–7. And the defendants' insistence that the plaintiffs were never "compelled" to join or pay a union is a non-sequitur. *See id.* at 7. It is undisputed that the city required employees of city contractors to join or pay a Council-affiliated union as a *condition* of performing city work, and that is surely enough to establish injury in fact for Mr. LaCava and the contractor plaintiffs. *See* Memorandum, ECF No. 20, at 11 n.5.

### III. THE CITY'S PROJECT LABOR AGREEMENT VIOLATES THE FIRST AMENDMENT

The city's project labor agreement compelled the employees of city contractors to join and pay a city-approved union as a condition of working on a city project. This is as unconstitutional as a policy that requires the city's own employees to join or pay a union as a condition of city employment. *See Janus*, 138 S. Ct. at 2486; *see also* Memorandum, ECF No. 20, at 13 ("If the minimal payments at issue in *Janus* were unconstitutional, then the full union dues alleged here are as well.").

The defendants do not attempt to explain how this case can be distinguished from *Janus*. Instead, the defendants argue that rational-basis review should apply to the city's project labor agreement. Defs.' Br., ECF No. 79, at 7–10. That stance is incompatible with *Janus*, which holds that either "exacting scrutiny" or "strict scrutiny" applies to arrangements that require public employees to financially support a union, and the Court explicitly rejected the dissenting opinion's argument for rational-basis review. *See Janus*, 138 S. Ct.

---

4. *See Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); *Carney v. Adams*, 141 S. Ct. 493, 499 (2020).

at 2465 ("This form of minimal scrutiny is foreign to our free-speech jurisprudence."). No different standard of review should apply to project labor agreements that require employees of city contractors to join and support a city-approved union as a condition of working on a city construction project. The ruling in *Hanten v. School District of Riverview Gardens*, 13 F. Supp. 2d 971, 976 (E.D. Mo. 1998), *aff'd*, 183 F.3d 799 (8th Cir. 1999), on which the defendants rely, long pre-dates *Janus*, and its decision to apply rational-basis review to a project labor agreement can no longer be sustained given *Janus*'s repudiation of rational-basis review for public-sector agency shops. *See Janus*, 138 S. Ct. at 2465.

## IV. THE CITY'S DIVERSITY-AND-INCLUSION GOALS VIOLATE 42 U.S.C. § 1981 AND THE EQUAL PROTECTION CLAUSE

The defendants try to defeat the plaintiffs' 42 U.S.C. § 1981 claim by observing that section 1981 does not create a cause of action, and that lawsuits brought to vindicate rights under section 1981 must rely on the cause of action established in 42 U.S.C. § 1983. *See* Defs.' Br., ECF No. 79, at 9. But the plaintiffs *have* invoked 42 U.S.C. § 1983 as the source of their cause of action, as their demand for relief asks the Court to "[d]eclare that the defendants are violating the plaintiffs' federally protected rights under 42 U.S.C. § 1983," and to "award the plaintiffs nominal and compensatory damages under 42 U.S.C. § 1983." Third Am. Compl., ECF No. 70, at ¶ 164(c), ¶ 164(h). And even if the complaint had failed to identify or invoke 42 U.S.C. § 1983 as a cause of action, that would not matter under a regime of notice pleading. Complaints are not required to identify the causes of action on which they rely, and the federal rules of civil procedure do not establish a code-pleading regime. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *Rannels v. S. E. Nichols, Inc.*, 591 F.2d 242, 245–46 (3d Cir. 1979); *Sanjuan v. American Board of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (Easterbrook, J.) ("Any need to plead facts that, if true, establish each element of a 'cause of action' was abolished by the Rules of Civil Procedure in 1938, which to signify the radical change from code pleading also

replaced 'cause of action' with 'claim for relief.' One pleads a 'claim for relief' by briefly describing the events." (citation omitted)).

The defendants deny that their diversity-and-inclusion goals qualify as "intentional discrimination,"[5] but the city is surely engaged in *intentional* discrimination when its race and sex preferences are commanded by executive order and written into Schedule C of the city's project labor agreement. *See* Executive Order 5-20 § 4(c) (requiring project labor agreements to "[i]nclude diversity goals for Appropriate Labor Organizations and contractors.") (Attachment 1 of Ex. E to the city's statement of material facts, ECF No. 80-1); Schedule C of Philadelphia Public Projects Labor Agreement (attached as Exhibit "D" to Exhibit 7 to the Plaintiffs' Statement of Material Facts, ECF No. 75-7). And the defendants are actively and intentionally discriminating against white male tradesmen such as Mr. LaCava by attempting to limit the construction employment hours available to white men and discouraging contractors from employing white men on city construction projects. *See* LaCava Suppl. Decl. ¶ 3 (attached as Ex. 1 to plaintiffs' additional statement of material facts, ECF No. 86). The defendants are also wrong to deny that their diversity-and-inclusion goals require the contractor plaintiffs "to take any affirmative action to change the makeup of their workforce." Defs.' Br., ECF No. 79, at 10. Schedule C requires participating contractors to "use their best efforts to *add* minority males and women to their permanent or steady workforces." Philadelphia Public Projects Labor Agreement, Schedule C, § 3(b) (emphasis added) (attached as Ex. "D" to plaintiffs' requests for admission, which is in turn attached as Ex. 7 to plaintiffs' statement of material facts, ECF No. 75-7). That indisputably requires the contractor plaintiffs to "change" the makeup of their workforces as a condition of working on city projects. It also requires participating contractors to violate 42 U.S.C. § 1981, which prohibits employers from discriminating against whites when making contracts of employment. *See McDonald v. Santa Fe Trail Transportation Co.*, 427

---

5. Defs.' Br., ECF No. 79, at 9–11.

U.S. 273, 287 (1976) ("[W]e cannot accept the view that the terms of § 1981 exclude its application to racial discrimination against white persons.").

Finally, the defendants are violating 42 U.S.C. § 1981 regardless of their reasons for excluding the United Steelworkers from the PLA. The defendants suggest that the Steelworkers objected only to the third-party monitoring requirements in Schedule C, rather than the city's "goals" of limiting the construction employment hours available to white men. *See* Defs.' Br., ECF No. 79, at 10. But even if that were true, it remains the case that the city is intentionally discriminating on the basis of race and sex in awarding city contracts — and that violates both section 1981 and the Equal Protection Clause. The city is discriminating against Mr. LaCava by limiting the construction employment hours available to white men and discouraging contractors and unions from employing white men on city construction projects. And the city is discriminating against the contractor plaintiffs by requiring them to "*add* minority males and women to their permanent or steady workforces" as a condition of receiving city work. *See* Philadelphia Public Projects Labor Agreement, Schedule C, § 3(b) (emphasis added) (attached as Ex. "D" to plaintiffs' requests for admission, which is in turn attached as Ex. 7 to plaintiffs' statement of material facts, ECF No. 75-7). Each of the plaintiffs is suffering a violation of its rights under section 1981 and the Equal Protection Clause, and that remains the case even if the United Steelworkers is willing to implement the city's diversity goals.

The city is also wrong to claim that its diversity-and-inclusion goals are merely aspirational rather than "mandates" or "quotas." Defs.' Br., ECF No. 79, at 11–12. Section 2(b) of Schedule C says:

> The Union(s) shall set participation goals that *will significantly increase participation of minority males and women*. Such goals shall be consistent with the Commission Report and such Commission updates as may be issued.

Philadelphia Public Projects Labor Agreement, Schedule C § 2(b) (emphasis added).[6] This language compels participating unions to set goals that "will" change the racial and demographic makeup of their workforces—and it requires that these goals produce a *result* that "significantly increase[s] participation of minority males and women." A union that stands pat and fails to *increase* the participation of minority males and women is violating its contract with the city. This explicitly requires participating unions to change the racial and demographic makeup of their workforces as a condition of receiving city work—and that is flatly unlawful under 42 U.S.C. § 1981 and the Equal Protection Clause.

The requirements imposed on city contractors also violate 42 U.S.C. § 1981 and the Equal Protection Clause. Section 3(d) of Schedule C says:

> The Contractors shall use their best efforts to meet or exceed the goals established for minority males and women participation in Section 1 of this Schedule C.

Philadelphia Public Projects Labor Agreement, Schedule C § 3(d). The city insists that this does not disqualify a contractor from receiving city work if it fails to meet the city's diversity targets, but that does nothing to defeat the plaintiffs' section 1981 and equal-protection claims. Section 3(d) still *discriminates* among city contractors based on the racial makeup of their workforce. Contractors that have all minority employees are under no obligation to deploy their "best efforts" to change their racial composition. By contrast, a contractor that has mostly white employees, and any contractor that falls short of the city's diversity "goals," must undertake its "best efforts" to change the racial makeup of its workforce as a condition of receiving city work. This violates 42 U.S.C. § 1981, which gives every "person"[7] the "same right" to make and enforce contracts with the city, without regard to the

---

6. Philadelphia Public Projects Labor Agreement is attached as Exhibit "D" to the plaintiffs' requests for admission, which appears in the record at ECF No. 75-7.
7. The word "person" includes corporations and business entities. *See* 1 U.S.C. § 1 ("the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707–08 (2014).

racial makeup of the contracting party. And it violates the Equal Protection Clause by foisting a "best efforts" requirement only on the subset of city contractors that are insufficiently female or minority.

## V. THE CITY'S PROJECT LABOR AGREEMENT VIOLATES STATE AND CITY COMPETITIVE-BIDDING LAWS

The defendants complain that the plaintiffs' requested remedy is overbroad because *Allan Myers* acknowledges that Pennsylvania's competitive-bidding laws might allow for PLAs in "extraordinary circumstances." *See Allan Myers, L.P. v. Dep't of Transportation*, 202 A.3d 205, 215 (Pa. Cmwlth. Ct. 2019) ("The use of a PLA is permitted where the contracting agency can establish extraordinary circumstances, and PennDOT did not make that demonstration in this case."). But the burden is on the *city* to demonstrate that extraordinary circumstances exist, *id.*, and the defendants have made no attempt to explain how "extraordinary circumstances" could justify the imposition of a PLA on *any* city construction project. *Allan Myers* makes clear that a municipality cannot use "boilerplate" justifications (such as "time is of the essence") to demonstrate "extraordinary circumstances." *See id.* Yet the defendants have invoked nothing but vague and conclusory boilerplate in their efforts to justify the city's PLA,[8] hardly a demonstration of the "extraordinary circumstances" that *Allan Myers* requires.

If the city believes that it might be able to demonstrate "extraordinary circumstances" that could justify imposing a PLA on a future city contract, then the Court could add the following language after paragraph 2 on page 2 of the proposed final judgment:

> If the defendants believe that "extraordinary circumstances" would allow them to impose a project labor agreement on a future contract in a manner

---

8. *See, e.g.*, Executive Order 5-20 ("WHEREAS, the City's history with Project Labor Agreements has demonstrated that such agreements are a valuable public contracting approach for ensuring that a building or construction work project is completed at the lowest reasonable cost, by the highest quality and most professional work force, and in a timely manner without labor disruptions such as strikes, lockouts, or slowdowns") (attached as attachment 1 to the 2020 Lazer declaration, which in turn is attached as Exhibit E to the city's statement of material facts, ECF No. 80-1).

consistent with Pennsylvania's competitive-bidding laws, then the defendants may ask this Court to modify the injunction to allow them to impose a project labor agreement on that particular contract, and the Court will modify the injunction to allow the project labor agreement if the defendants carry their burden of demonstrating "extraordinary circumstances" under *Allan Myers, L.P. v. Dep't of Transportation*, 202 A.3d 205, 215 (Pa. Cmwlth. Ct. 2019).

*See* Proposed Final Judgment, (ECF No. 74-2), at p. 2 ¶ 2. The Court should not include this paragraph if it concludes that the city's PLA violates the First Amendment, because there is no "extraordinary circumstances" caveat to the holding of *Janus*.

## VI. THE MAYOR'S EXECUTIVE ORDERS VIOLATE SECTION 8-200 OF THE CITY CHARTER

The city charter requires contracts to be awarded to the "lowest responsible bidder"—and the *only* exception to this rule is for city *ordinances* that establish "bid preferences for businesses located in or doing business in Philadelphia." Philadelphia Home Rule Charter § 8-200(1) (emphasis added). This makes no allowance for the mayor to impose his own bid preferences by executive order, or to depart from the charter's requirement to award city contracts to the "lowest responsible bidder."

The defendants try to escape the city charter by denying that their project labor agreement establishes a "bid preference"; they instead argue that compliance with the city's project labor agreement is a threshold requirement for qualifying as a "responsible" bidder under the city charter. Decl. of Jonathan Janiszewski ¶ 8 ("[T]he Procurement Department does not interpret the City's use of a Project Labor Agreement ('PLA') on a project as a 'bid preference'. Instead, a bidder's ability to comply with requirements in a PLA is regarded as a matter of contractor responsibility.") (attached as Exhibit Q to the city's statement of material facts, ECF No. 80-1). On this view, *every* non-union contractor—and every contractor affiliated with the United Steelworkers or some other union that does not belong to the Philadelphia Building and Construction Trades Council—is not a "responsible bidder," which allows the city to assert that no "preference" has been conferred on Council-affiliated contractors.

This is nonsense. A contractor does not need a unionized workforce to qualify as a "responsible bidder" under the city charter—much less a unionized workforce that affiliates with a union belonging to the Philadelphia Building and Construction Trades Council. And a contractor does not need to comport with the city's "diversity goals" to qualify as a "responsible bidder" either, so long as it is not engaged in unlawful discrimination against women or racial minorities. A contractor is "responsible" if it obeys the law and performs its work competently; the mayor is not permitted to define "responsible bidder" in a manner that allows him to exclude the entire universe of non-union contractors (and other disfavored entities) from city construction projects.

The city's project labor agreement indisputably confers a "bid preference" on Council-affiliated contractors, by allowing them to leapfrog a "responsible" contractor who submitted (or would have submitted) a lower bid. Indeed, the city's project labor agreement confers a "preference" far more egregious and extreme than the preference conferred upon local businesses, because it *categorically excludes* non-union contractors and Steelworker-affiliated contractors from competing against contractors affiliated with the Philadelphia Building and Construction Trades Council. But does not even matter whether the city or this Court calls this a "bid preference." The city charter prohibits *any* departure from the "lowest responsible bidder" rule, except for preferences established by city ordinance upon businesses located in or doing business in Philadelphia. *See* Philadelphia Home Rule Charter § 8-200(1). Any other attempt to depart from the "lowest responsible bidder" rule violates the city charter—regardless of whether city officials call it a "bid preference," a "project labor agreement," or something else. The project labor agreement is incompatible with the "lowest responsible bidder" regime, and it cannot be sustained under the city charter.

## CONCLUSION

The defendants' motion for summary judgment should be denied.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

| | |
|---|---|
| WALTER S. ZIMOLONG | JONATHAN F. MITCHELL |
| Pennsylvania Bar No. 89151 | Pennsylvania Bar No. 91505 |
| Zimolong, LLC | Mitchell Law PLLC |
| P.O. Box 552 | 111 Congress Avenue, Suite 400 |
| Villanova, Pennsylvania 19085 | Austin, Texas 78701 |
| (215) 665-0842 (phone) | (512) 686-3940 (phone) |
| wally@zimolonglaw.com | (512) 686-3941 (fax) |
| | jonathan@mitchell.law |

Dated: December 20, 2021        *Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I certify that on December 20, 2021, I served this document through CM/ECF upon:

AMY M. KIRBY
LYDIA FURST
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania 19102
(215) 683-3566
amy.kirby@phila.gov
lydia.furst@phila.gov

*Counsel for Defendants*

EDWARD T. KANG
SUSAN MOON O
123 South Broad Street, Suite 1670
Philadelphia, Pennsylvania 19109
(215) 525-5850 (phone)
(215) 525-5860 (fax)
ekang@khflaw.com
so@khflaw.com

*Counsel for Intervenors*

                                               /s/ Jonathan F. Mitchell
                                               JONATHAN F. MITCHELL
                                               *Counsel for Plaintiffs*