UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

**Road-Con, Inc.**; **Neshaminy Constructors, Inc.**; **Loftus Construction, Inc.**; **PKF-Mark III, Inc.**; and **Scott A. LaCava**,

        Plaintiffs,

v.

**City of Philadelphia**; and **James Kenney**, in his official capacity as mayor of the City of Philadelphia,

        Defendants.

Case No. 2:19-cv-01667-JS

**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The defendants and intervenors oppose the plaintiffs' motion for summary judgment, but none of their arguments warrant denial of the motion.

## I. THE PLAINTIFFS HAVE STANDING

The plaintiffs have already refuted the defendants' standing objections in their response to the defendants' motion for summary judgment, and we respectfully incorporate the arguments from our previous brief. *See* ECF No. 85, at 5–8. To reiterate: (1) Plaintiff Scott LaCava has indisputably established injury to his First Amendment and Equal Protection rights, *id.* at 6–7; and (2) Article III allows *any* injury in fact to confer standing, regardless of whether that "injury" violates an individual's First Amendment and Equal Protection rights, *id.* at 7. The defendants are conflating standing with the merits by insisting that Article III requires the plaintiffs to show injury to their "First Amendment rights" or "Equal Protection rights." Whether a plaintiff has suffered an injury to his "First Amendment rights" or "Equal Protection rights" goes to the merits; standing is concerned only with whether there is *some* type of injury that can be redressed by judicial relief. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690

n.14 (1973) ("[A]n identifiable trifle is enough for standing." (citation and internal quotation marks omitted)); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152 (1970) ("The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise."); *id.* at 154 (recognizing that "injury in fact" may include "'aesthetic, conservational, and recreational' as well as economic values.").

A plaintiff's standing is assessed at the moment the complaint is filed. *See Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."). And when the plaintiffs filed their lawsuit on April 18, 2019, the city of Philadelphia was planning to impose a project labor agreement on the 15th Street Bridge Project[1] and the Runway Project.[2] It is undisputed that this project labor agreement excluded members of the United Steelworkers from working on these construction projects — and it would have excluded contractors who have agreements with the United Steelworkers from obtaining city contracts (or subcontracts) on either of these projects.[3] That inflicts "injury in fact" on plaintiff Scott LaCava, who was barred from working on the city projects subject to a project labor agreement at the time this lawsuit was filed.[4] And it likewise inflicts "injury in fact" on the contractor plaintiffs, who could not have obtained

---

1. *See* Pls.' Statement of Undisputed Facts (ECF No. 75) at ¶ 23 ("At the time the plaintiffs filed this lawsuit on April 18, 2019, the city planned to use a project labor agreement for the 15th Street Bridge Project."); Defs.' Response (ECF No. 84) at ¶ 23 ("There is no dispute as to this paragraph."); Intervenors' Response (ECF No. 82) at ¶ 23 ("Undisputed.").
2. *See* Pls.' Statement of Undisputed Facts (ECF No. 75) at ¶ 33 ("At the time the plaintiffs filed this lawsuit on April 18, 2019, the city planned to use a project labor agreement for the Runway Project."); Defs.' Response (ECF No. 84) at ¶ 33 ("There is no dispute as to this paragraph."); Intervenors' Response (ECF No. 82) at ¶ 33 ("Undisputed.").
3. *See* Pls.' Statement of Undisputed Facts (ECF No. 75) at ¶¶ 18–19; Defs.' Response (ECF No. 84) at ¶¶ 18–19; Intervenors' Response (ECF No. 82) at ¶¶ 18–19.
4. Pls.' Statement of Undisputed Facts (ECF No. 75) at ¶¶ 31, 40; Defs.' Response (ECF No. 84) at ¶¶ 31, 40; Intervenors' Response (ECF No. 82) at ¶¶ 31, 40.

city contracts for either of these projects unless they purged their workforces and terminated their collective-bargaining agreements with the United Steelworkers.[5]

Indeed, the defendants and intervenors have *conceded* that:

> At the time the original complaint in this lawsuit was filed on April 18, 2019, Mr. LaCava could not work on the 15th Street Bridge Project unless he became a member of one of the unions listed in Schedule A of the 15th Street Bridge Project Labor Agreement and supported that union financially.

Pls.' Statement of Undisputed Facts (ECF No. 75) at ¶ 31.[6] The defendants and intervenors have also admitted that:

> Because Road-Con maintains a collective-bargaining agreement with the United Steelworkers, it could not perform work on the Runway Project with its current workforces at the time the original complaint was filed.

Pls.' Statement of Undisputed Facts (ECF No. 75) at ¶ 39.[7] All of this establishes injury in fact, because neither Mr. LaCava nor Road-Con was eligible to work on certain city construction projects when they filed suit. *See SCRAP*, 412 U.S. at 690 n.14 ("[A]n identifiable trifle is enough for standing." (citation and internal quotation marks omitted)). And the defendants present no argument for how this fails to qualify as "injury in fact."

The defendants also deny that Mr. LaCava's "injury" is "imminent" because he is not currently being "forced to join another union." Defs.' Br. (ECF No. 83) at 3. The defendants are mischaracterizing the "injury" that Mr. LaCava is asserting. Mr. LaCava is *not* claiming that the city is "forc-

---

5. Pls.' Statement of Undisputed Facts (ECF No. 75) at ¶ 39; Defs.' Response (ECF No. 84) at ¶ 39; Intervenors' Response (ECF No. 82) at ¶ 39.
6. *See also* Defs.' Response (ECF No. 84) at ¶ 31 ("There is no dispute as to this paragraph."); Intervenors' Response (ECF No. 82) at ¶ 31 ("Undisputed."); Pls.' Statement of Undisputed Facts (ECF No. 75) at ¶ 40 ("At the time the original complaint in this lawsuit was filed on April 18, 2019, Mr. LaCava could not work on the Runway Project unless he became a member of one of the unions chosen by the city to participate in the Runway Project PLA and supported that union financially."); Defs.' Response (ECF No. 84) at ¶ 40 ("There is no dispute as to this paragraph."); Intervenors' Response (ECF No. 82) at ¶ 40 ("Undisputed.").
7. *See also* Defs.' Response (ECF No. 84) at ¶ 39 ("There is no dispute as to this paragraph."); Intervenors' Response (ECF No. 82) at ¶ 39 ("Undisputed.").

ing" him to join another union, and the city is allowing Mr. LaCava to remain in the United Steelworkers so long as he refrains from working on city construction projects subject to PLAs. Instead, Mr. LaCava's "injury" is that the city has disqualified him from working on certain city construction projects because of his membership in the United Steelworkers and his refusal to join a Council-affiliated union. *That* injury is surely "imminent," and Mr. LaCava was suffering that injury on the day he filed the lawsuit.[8] Nor is Mr. LaCava (or any of the contractor plaintiffs) required to prove that they actually would have obtained work on city construction projects in the absence of the city's project labor agreement. *See* Defs.' Br. (ECF No. 83) at 3–4. The lost *opportunity* to work on a city construction project is all that is needed to establish injury in fact—and a plaintiff need not prove that he actually would have obtained the work in the absence of the PLA. *See Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.").[9]

The defendants are equally wrong to accuse the plaintiffs of attempting to litigate equal-protection rights that belong to the United Steelworkers. See Defs.' Br. (ECF No. 83) at 4. The city's diversity-and-inclusion goals violate the equal-protection rights that belong to plaintiff Scott LaCava, by limiting the available construction employment hours available to white men and discouraging contractors and unions from employing white men on city construction projects. *See* Pls.' Additional Statement of Material Facts, ECF No. 86, ¶¶ 7–8; LaCava Suppl. Decl. ¶ 3 ("I am a white male.") (attached as Ex. 1 to plaintiffs' additional statement of material facts, ECF No. 86-

---

8. *See* note 6 and accompanying text, *supra*.
9. *See also id.* ("To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.").

1). We explained this in our previous briefing and respectfully incorporate that discussion. *See* ECF No. 85, at 5–6.

## II.  THE PLAINTIFFS' CLAIMS ARE NOT MOOT

The plaintiffs have also addressed the defendants' mootness arguments in our response to the defendants' motion for summary judgment, and we respectfully incorporate that discussion. *See* ECF No. 85, at 1–5. The issuance of Executive Order 5-20 is an act of voluntary cessation, which is incapable of mooting a claim for prospective relief. *See id.* at 2–3. *Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301 (3d Cir. 2020), is no help to the defendants because the defendants in that case changed their conduct immediately in response to *Janus* and *conceded* the illegality of their past practices. The defendants in this case, by contrast, waited until years after the rulings in *Janus* and *Allan Myers* before issuing Executive Order 5-20, and they continue to defend the legality of their previous ways. *See* Defs.' Br. (ECF No. 83) at 6 n.1. They cannot possibly show that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"[10]—especially when they refuse to acknowledge that their past practices were unlawful.

The defendants also deny that the plaintiffs' claim for nominal damages can stave off mootness, despite this Court's earlier ruling the contrary. *Compare* Defs.' Br. (ECF No. 83) at 6, *with* Memorandum (ECF No. 20) at 6 ("Cases like this one which seek monetary damages for past wrongs cannot be mooted by the Defendants' subsequent behavior."). The defendants' attempt to limit the holding of *Burns v. Pa. Dep't of Correction*, 544 F.3d 279 (3d Cir. 2008), to procedural due-process claims is untenable, as *any* claim for nominal damages will prevent mootness. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). The defendants are also wrong to insist that the plaintiffs must "prove" an "actual First Amendment or Equal Protection injury" to prevent mootness, as that concerns the *merits* rather than the existence of an Article III case or controversy. And the defendants are wrong to insist that the plaintiffs must produce evidence of actual harm to maintain a nominal-damages claim. *See Uzuegbunam*, 141 S. Ct. at 800 ("[A] party whose rights are

---

10. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted)).

invaded can always recover nominal damages without furnishing any evidence of actual damage." (citation and internal quotation marks omitted)).

### III. THE CITY'S PROJECT LABOR AGREEMENTS VIOLATE THE FIRST AMENDMENT

The defendants' argument for rational-basis review has been fully addressed in our response to the city's motion for summary judgment, and we respectfully incorporate that discussion. *See* ECF No. 85, at 8–9.

The intervenors try to defeat the plaintiffs' First Amendment claims by observing that neither Mr. LaCava nor the employees of the contractor plaintiffs have been "compelled . . . either directly or indirectly, to join or financially support any specific union." Intervenors' Br. (ECF No. 81) at 3. But the plaintiffs need only show that the city is requiring union membership as a *condition* of working on a city construction project—in the same way that the state of Illinois required Mark Janus to financially support a union as a *condition* of his employment with the state. The First Amendment (as interpreted in *Janus*) prohibits the city from limiting public employment to those who are willing to join or financially support a union. *Janus* likewise prohibits the city from requiring the employees of city contractors to join and support a city-approved union as a condition of working on a city construction project. There is also no need for Mr. LaCava or the contractor plaintiffs to show that they have "chang[ed] their union affiliation" or are planning to do so. *See* Intervenors' Br. (ECF No. 81) at 3. The defendants are violating the First Amendment *regardless* of whether Mr. LaCava or the contractor plaintiffs decide to "chang[e] their union affiliation" in response to the city's PLA. The mere fact that the contractor plaintiffs (and their employees) have been disqualified from working on city construction projects because of their affiliation with the United Steelworkers is all that is needed to establish a First Amendment violation under *Janus*.

The intervenors appear to be arguing to that the city cannot violate the First Amendment unless it compels Mr. LaCava and the employees of the contractor plaintiffs to join a union even when they are *not* working on city construction projects—and that the city is not "compelling" speech unless it is somehow requiring union membership without regard to whether the affected individual is performing city work. *See, e.g.*, Intervenors' Br. (ECF No. 81) at 3 ("Plaintiffs . . . have worked

on City projects without changing their union affiliation."). But *Janus* makes clear that the First Amendment's protections against compelled speech (and compelled subsidies of speech) prohibit municipalities from conditioning public employment on union membership. And the city cannot evade the holding of *Janus* by hiring contractors and then compelling the employees of those contractors to join a city-approved union as a condition of performing city work.

The intervenors observe that the city does not always impose its project labor agreement on public-works projects,[11] but that has no relevance to the constitutional issue. The city's project labor agreement violates *Janus* whenever it is imposed, because the city is not allowed to require union membership as a condition of receiving *any* city work. The intervenors try to distinguish *Janus* by suggesting that the public employees in *Janus* had no choice and were "forced to pay agency fees,"[12] while Mr. LaCava and the employees of the contractor plaintiffs need not work on any city project subject to a PLA. That mischaracterizes the facts of *Janus*. The public employees in *Janus had* a "choice" in whether to pay agency fees; they could have quit their job and sought private-sector employment. The Supreme Court held, however, that a state or municipality cannot *condition* public employment on the payment of money to a union. A city likewise cannot require union membership as a *condition* of working on city construction projects.

The intervenors insist that the constitutionality of project labor agreements must be assessed on a case-by-case basis,[13] but that stance is incompatible with *Janus*. *Janus* holds that public-sector agency shops are *per se* unconstitutional under the First and Fourteenth Amendments, and it specifically held that any "compelling" governmental interest in "labor peace" can be achieved through means less restrictive of First Amendment freedoms. *See Janus*, 138 S. Ct. at 2466 ("[I]t is now undeniable that 'labor peace' can readily be achieved 'through means significantly less restrictive of associational freedoms' than the assessment of agency fees." (citation omitted)). So too here. Any "compelling" governmental interests that the intervenors might assert can easily be

---

11. *See* Intervenors' Br. (ECF No. 81) at 3.
12. Intervenors' Br. (ECF No. 81) at 4.
13. *See* Intervenors' Br. (ECF No. 81) at 4–5.

obtained through mechanisms that do not compel union membership as a condition of working on city construction projects. If the city is concerned about preventing labor stoppages, for example, or ensuring "the efficient and expeditious completion of construction projects," then the city can insist that the United Steelworkers (or any other union that represents workers on city construction projects) promise not to strike in exchange for receiving city work. That is no justification for *categorically excluding* the United Steelworkers (as well as non-union contractors and employees) from working on a city project, especially when there is no risk that non-union workers would strike. And the intervenors do not tout any other allegedly "compelling" interests that could justify compulsory union membership on city construction projects.

The defendants and intervenors are equally wrong to criticize the relief that the plaintiffs have sought. The defendants and intervenors claim that the plaintiffs are seeking a "blanket"[14] injunction against the use of PLAs, but that is untrue. The plaintiffs are seeking to enjoin the city *only* from imposing PLAs that compel employees of city contractors or subcontractors to "join, pay, or associate with a union as a condition of performing work on a city project." Proposed Final Judgment (ECF No. 74-2) at page 2, ¶ 2. The city will remain free to impose project labor agreements that prevent work stoppages and that establish wages and conditions — so long as those agreements do not violate the First Amendment by compelling union membership, financial support, or association. The plaintiffs are not asking for a "blanket" injunction against the use of project labor agreements; they are seeking only to enjoin the use of project labor agreements that violate the First Amendment.

Finally, the intervenors cannot salvage the city's project labor agreements by invoking the "market participant" doctrine. *See* Intervenors' Br. (ECF No. 81) at 5–6. *Janus* makes clear that the First Amendment limits the government's ability to compel union membership and financial support *even when* the government is acting as a "market participant" rather than a regulator. When the city of Philadelphia establishes public schools and employs teachers, for example, it is acting

---

14. Defs.' Br. (ECF No. 83) at 13; Intervenors' Br. (ECF No. 81) at 5.

as a "participant" (or a "proprietor") in the education market. But its status as a "market participant" does *not* allow the city to insist that its teachers join or pay a union as a condition of employment — even though a private employer *could* decide to establish an agency shop in its collective-bargaining agreement. *See Janus*, 138 S. Ct. 2448. *Janus* likewise prohibits the city from insisting that the employees of its contractors join and pay a union as a condition of working on city construction projects, even when the city is acting as a "participant" or "proprietor" in the construction market. *Janus* is fully applicable to the city's construction projects — in the same way that *Janus* applies to the city's public-school system.

## IV. THE CITY'S DIVERSITY-AND-INCLUSION GOALS VIOLATE 42 U.S.C. § 1981, THE EQUAL PROTECTION CLAUSE, AND THE PENNSYLVANIA CONSTITUTION

The defendants attempt to defeat the 42 U.S.C. § 1981 and equal-protection claims by denying a causal relationship between their racially discriminatory conduct and the plaintiffs' injuries. *See* Defs.' Br. (ECF No. 83) at 9 ("To find discrimination under § 1981 or the Equal Protection Clause, Plaintiffs must show that the City's conduct did in fact cause their alleged injury."). But there is no question that the city's racially discriminatory diversity-and-inclusion goals caused injury to each of the plaintiffs. Because the city insisted that participating unions assent to the diversity-and-inclusion goals and monitoring requirements described in Schedule C of the Philadelphia Public Projects Labor Agreement, the United Steelworkers was not able to join the city's PLA as a signatory. *See* Lazer Decl. (2020) ¶ 11 (attached as Ex. E to defendants' statement of material facts, ECF No. 80-1). And because the United Steelworkers refused to sign onto the city's project labor agreement, the plaintiffs have been unable to work on city projects subject to a PLA. There is an unbroken chain of but-for causation between: (1) The existence of the racially discriminatory diversity-and-inclusion provisions in Schedule C; (2) The continued exclusion of the United Steelworkers from the city's PLA; and (3) The plaintiffs' inability to work on city projects subject to a PLA.

The defendants also claim that the plaintiffs have failed to show race or sex discrimination directed at them personally. *See* Defs.' Br. (ECF No. 83) at 9 ("Here, the City did not engage in

any conduct that amounted to discrimination against Plaintiffs."). That is demonstrably untrue. The city is openly and patently discriminating against *all* white male tradesmen—including plaintiff Scott LaCava—by attempting to limit the construction employment hours available to white men and discouraging contractors and unions from employing white men on city construction projects. The city is also discriminating against the contractor plaintiffs by requiring them to "*add minority males and women to their permanent or steady workforces*" as a condition of receiving city work. *See* Philadelphia Public Projects Labor Agreement, Schedule C, § 3(b) (emphasis added) (attached as Ex. "D" to plaintiffs' requests for admission, which is in turn attached as Ex. 7 to plaintiffs' statement of material facts, ECF No. 75-7). The plaintiffs are not suing the city because it regarded the makeup of the United Steelworkers as insufficiently diverse, and the plaintiffs are not purporting to assert any claims on behalf of the United Steelworkers. They are asserting their *own* rights to pursue and obtain city contracts without encountering barriers or obstacles imposed by the city's discriminatory policies, and to be free from race and sex discrimination when competing for city work.

Finally, both the defendants and the intervenors are wrong to claim that only "mandates" or "quota" qualify as intentional discrimination forbidden by 42 U.S.C. § 1981, the Equal Protection Clause, and the Pennsylvania Constitution. *See* Defs.' Br. (ECF No. 83) at 11 ("Without a mandate or penalty, the City's diversity goal does not amount to discrimination."); Intervenors' Br. (ECF No. 81) at 7 ("[T]he city's **goals** are neither requirements nor quotas that must be met" (emphasis in original)). *Any* form of conscious discriminatory preference is "intentional" discrimination, regardless of whether it takes the form of a rigid quota or a contextualized plus factor. *See Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); Pls.' Resp. to Intervenors' MSJ (ECF No. 87) at 5.

There is also no obstacle to the plaintiffs' asserting claims under the Pennsylvania Constitution, which prohibits the city from denying "equality of rights" because of race or sex. *See* Pa. Const. art. I, §§ 28–29. The defendants complain that this was not alleged in the pleadings, but the rules of civil procedure do not require code pleading and courts must award appropriate relief without regard to the contents of a complaint. *See* Fed. R. Civ. P. 54(c) ("A . . . final judgment

should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*." (emphasis added)); *see also Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 333 (2010); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016); 10 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2664 (4th ed. 2014) ("Because of the second sentence of Rule 54(c), the demand for judgment required by Rule 8(a)(3) loses much of its significance once a case is at issue. If defendant has appeared and begun defending the action, adherence to the particular legal theories of counsel that may have been suggested by the pleadings is subordinated to the court's duty to grant the relief to which the prevailing party is entitled, whether it has been demanded or not." (footnotes omitted)).

## V. THE CITY'S PROJECT LABOR AGREEMENTS VIOLATE STATE AND CITY COMPETITIVE-BIDDING LAWS

The defendants and intervenors correctly observe that *Allan Myers* leaves open the possibility that Pennsylvania's competitive-bidding laws might allow for PLAs to be used in "extraordinary circumstances." *See Allan Myers, L.P. v. Dep't of Transportation*, 202 A.3d 205, 215 (Pa. Cmwlth. Ct. 2019) ("The use of a PLA is permitted where the contracting agency can establish extraordinary circumstances, and PennDOT did not make that demonstration in this case."). But the burden is on the *city* to demonstrate that extraordinary circumstances exist, *id.*, and neither the defendants nor the intervenors have attempted to explain how "extraordinary circumstances" could justify the imposition of a PLA on *any* city construction project. *Allan Myers* makes clear that a municipality cannot use "boilerplate" justifications (such as "time is of the essence") to demonstrate "extraordinary circumstances." *See id.* Yet the defendants and intervenors invoke nothing but vague and conclusory boilerplate in their efforts to justify the city's PLA,[15] hardly a demonstration of the "extraordinary circumstances" that *Allan Myers* requires.

---

15. *See, e.g.*, Defs.' Br. (ECF No. 83) at 13 ("PLAs . . . are used to ensure that complex time-sensitive construction projects run smoothly with minimal delays."); *id.* at 13 ("[T]he Runway Project lent itself to the use of a PLA due to its need for multiple trades and time-sensitive nature."); Intervenors' Br. (ECF No. 81) at 5 ("The use of PLAs for the efficient and expeditious completion of construction projects is a compelling state interest . . . .").

The defendants and intervenors also observe that earlier decisions from the Pennsylvania Commonwealth Court had approved the use of PLAs. *See* Defs.' Br. (ECF No. 83) at 13 at (citing *A. Pickett Construction, Inc. v. Luzerne County Convention Center Authority*, 738 A.2d 20 (Pa. Cmwlth. 1999), and *Sossong v. Shaler Area School District*, 945 A.2d 788, 794 (Pa. Cmwlth. 2008)); Intervenors' Br. (ECF No. 39) at 13 (citing *Pickett*, *Sossong*, and *Glenn. O Hawbaker, Inc. v. Department of General Services*, No. 405 M.D. 2009 (Pa. Cmwlth. 2009)). But *Allan Myers* distinguished each of those cases and read them narrowly,[16] and *Allan Myers* made clear that going forward project labor agreements will be permissible *only* in "extraordinary circumstances." *Allan Myers*, 202 A.3d at 215.

If the city believes that it might be able to demonstrate "extraordinary circumstances" that could justify imposing a PLA on a future city contract, then paragraph 2 of the proposed final judgment could be modified to read as follows:

> 2. Defendants the City of Philadelphia and Mayor James Kenney, and their officers, agents, servants, employees, attorneys, designees, subdivisions, agencies, subordinates, and successors in office, as well as any person acting in concert or participation with them, are permanently **ENJOINED** from imposing a project labor agreement on any contract to which the city or its agencies or subdivisions is a party. A "project labor agreement" is defined to include any requirement that an employee of a city contractor or subcontractor join, pay, or associate with a union as a condition of performing work on a city project.
>
> **If the defendants believe that "extraordinary circumstances" would allow them to impose a project labor agreement on a future contract in a manner consistent with Pennsylvania's competitive-bidding laws, then the defendants may ask this Court to modify the injunction to allow them to impose a project labor agreement on that particular contract, and the Court will modify the injunction to allow the project labor agreement if the defendants carry their burden of demonstrating "extraordinary circumstances" under *Allan Myers, L.P. v. Dep't of Transportation*, 202 A.3d 205, 215 (Pa. Cmwlth. Ct. 2019).**

---

16. *See Allan Myers*, 202 A.3d at 215 ("*Pickett*, *Sossong* and *Hawbaker* are all factually distinguishable."); *id.* (noting that each of the projects in *Pickett*, *Sossong* and *Hawbaker* had "a critical deadline," a fact that was not present in *Allan Myers*).

*See* Proposed Final Judgment (ECF No. 74-2) at page 2, ¶ 2. The Court should not include this boldfaced paragraph if it concludes that the city's project labor agreement violates the First Amendment, because there is no "extraordinary circumstances" exception to the holding of *Janus*.

## VI. THE MAYOR'S EXECUTIVE ORDERS VIOLATE SECTION 8-200 OF THE CITY CHARTER

The city charter requires contracts to be awarded to the "lowest responsible bidder"—and the *only* exception to this rule is for city *ordinances* that establish "bid preferences for businesses located in or doing business in Philadelphia." Philadelphia Home Rule Charter § 8-200(1) (emphasis added). This makes no allowance for the mayor to impose his own bid preferences by executive order, or to depart from the charter's requirement to award city contracts to the "lowest responsible bidder."

The defendants try to escape the city charter by denying that project labor agreements establish a "bid preference"; they instead try to characterize the city's PLA as a "bidding requirement." Defs.' Br. (ECF No. 83) at 14. But a *requirement* that city contractors employ union labor is the most extreme form of "bid preference," and is even more repugnant to the city charter than a policy that establishes a mere "preference" for union contractors. The defendants appear to be arguing that the mayor *would* violate the city charter if his orders had merely conferred a "price preference" on union contractors akin to the bonus that local business entities receive,[17] while simultaneously insisting that the more extreme step of *requiring* city contractors to employ union labor would *not* violate the charter because that would transform a "bid preference" into a "bidding requirement." This is wordplay. The city's PLA is obviously a "bid preference," because contractors affiliated with the city-favored unions are being *preferred* over non-union contractors and contractors affiliated with the United Steelworkers. And regardless of whether one chooses to call the PLA a "bid

---

17. *See* Defs.' Br. (ECF No. 83) at 12–13 (describing Philadelphia Code Section 17-109 n72, which confers "a price preference to contractors who can certify that they are local business entities.").

preference," the mayor's executive orders *still* violate the city charter because they depart from its requirement to award city contracts to "the lowest responsible bidder."[18]

The intervenors, by contrast, claim that the city charter allows the mayor (and the city council) to establish whatever "bid preferences" they want. *See* Intervenors' Br. (ECF No. 81) at 9. In the intervenors' view, the city charter merely *authorizes* the city council to establish "bid preferences" for local businesses; it does not in any way *limit* the city council's authority (or the mayor's authority) to confer other bid preferences. This argument cannot be squared with the language and structure of section 8-200(1), which establishes a *rule* that requires contracts be awarded to the "lowest responsible bidder," and then creates an *exception* that allows the city council to confer bid preferences upon local businesses. The mayor may not unilaterally depart from the *rule* of competitive bidding established in section 8-200(1). Only the city council may do that, and only in the limited circumstances described in section 8-200(1).

## CONCLUSION

The plaintiffs' motion for summary judgment should be granted.

Respectfully submitted.

 /s/ Jonathan F. Mitchell 

| | |
|---|---|
| WALTER S. ZIMOLONG | JONATHAN F. MITCHELL |
| Pennsylvania Bar No. 89151 | Pennsylvania Bar No. 91505 |
| Zimolong, LLC | Mitchell Law PLLC |
| P.O. Box 552 | 111 Congress Avenue, Suite 400 |
| Villanova, Pennsylvania 19085 | Austin, Texas 78701 |
| (215) 665-0842 (phone) | (512) 686-3940 (phone) |
| wally@zimolonglaw.com | (512) 686-3941 (fax) |
| | jonathan@mitchell.law |

Dated: December 27, 2021                             *Counsel for Plaintiffs*

---

18. *See* Philadelphia Home Rule Charter § 8-200(1) ("[T]he contract shall be awarded to the lowest responsible bidder and in conformity with any procedure established by the Procurement Department by regulation, designed to appropriately maximize accessibility by vendors, maximize transparency to the public, and minimize costs to the City").

# CERTIFICATE OF SERVICE

I certify that on December 27, 2021, I served this document through CM/ECF upon:

AMY M. KIRBY
LYDIA FURST
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania 19102
(215) 683-3566
amy.kirby@phila.gov
lydia.furst@phila.gov

*Counsel for Defendants*

EDWARD T. KANG
SUSAN MOON O
123 South Broad Street, Suite 1670
Philadelphia, Pennsylvania 19109
(215) 525-5850 (phone)
(215) 525-5860 (fax)
ekang@khflaw.com
so@khflaw.com

*Counsel for Intervenors*

      /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs*