IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROAD-CON, INC., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 19-1667 |
| | : | |
| THE CITY OF PHILADELPHIA, et al. | : | |

## **M E M O R A N D U M**

**Juan R. Sánchez, C.J.**                                                                     **December 14, 2022**

      Plaintiffs Road-Con, Inc., Neshaminy Constructions, Inc., Loftus Construction, Inc., PFK-Mark III, and Scott LaCava bring this action against Defendants the City of Philadelphia and Mayor James Kenney ("the City"), alleging the City's use of Project Labor Agreements ("PLAs")[1] pursuant to Executive Order ("Order") violated their federal, state, and local rights. In this four Count Complaint, Plaintiffs claim: (1) the PLAs violated their constitutional First Amendment rights, (2) the PLAs violated their constitutional Equal Protection rights and statutory rights under 42 U.S.C. § 1981, (3) the Orders and PLAs violated state and local competitive bidding law, and (4) the Orders violated the Philadelphia Home Rule Charter. Plaintiffs, Defendants, and Intervenor-Defendants Mechanical Contractors Association of Eastern Pennsylvania, Inc. and National Electrical Contractors Association, Penn-Del-Jersey Chapter all move for summary judgment. Because Plaintiffs do not have standing for the First Amendment claim and but for causation for the § 1981 claim, and cannot redefine terms at will for the Home Rule Charter claim,

---

[1] PLAs are collective bargaining agreements between unions and contractors which govern the terms and conditions of employment for craft workers on construction projects. *Project Labor Agreements*, AFL-CIO, https://aflcio.org/what-unions-do/empower-workers/project-labor-agreements (last visited Dec. 9, 2022). The City used PLAs at least as far back as 2011. Pls.' Statement of Material Facts ¶ 12, ECF No. 75. This Memorandum only discusses events relevant to these claims.

these claims will all be denied. Their competitive bidding law claim will be denied as to the Orders but granted as to the PLAs.[2]

## BACKGROUND[3]

Road-Con, Loftus, PFK, and Mark-III ("contractor Plaintiffs") are all contractors who hire employees through the United Steelworkers ("the USW") pursuant to collective bargaining agreements ("CBAs") with the Pennsylvania Heavy and Highway Contractors Bargaining Association (Road-Con, Loftus, and Mark-III) or United Steelworkers Local 15024 (PFK).[4] Scott LaCava is a member of the USW who has worked for Road-Con for twenty-five years.[5] This group brings suit against the City and Mayor Kenney in his official capacity.[6] Mechanical Contractors Association of Eastern Pennsylvania, Inc. d/b/a Mechanical and Service Contractors Association of Eastern Pennsylvania, and National Electrical Contractors Association, Penn-Del-Jersey

---

[2] As to the Equal Protection claim, the Equal Protection Clause of the Fourteenth Amendment provides "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Equal Protection requires "all racial classifications . . . [to] be analyzed . . . under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *accord Hassan v. City of New York*, 804 F.3d 277, 295 (3d Cir. 2015) (quoting *Cmty. Servs. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005)) (finding the challenged policy had to proceed to the appropriate level of review because "the protected trait by definition plays a role in the decision-making process, inasmuch as the policy explicitly classifies people on that basis"). Similarly, Equal Protection subjects gender-based classifications to intermediate scrutiny analysis. *Hassan*, 804 F.3d at 298-99. The burden of justification under these standards lies with the State. *Id.* at 305. Because the City did not address its policy justifications, the Court will reserve ruling on this claim pending further briefing.

[3] Unless otherwise noted, the following facts are not in dispute.

[4] Defs.' Statement Material Facts ¶¶ 41, 44, 57, 59, 61-2, 69, 79, ECF No. 80. Hereinafter, the Parties' Statements of Material Facts will be cited to in short form as "Pls.' Statement" and "Defs.' Statement."

[5] *Id.* ¶ 45.

[6] Third Am. Compl. 1, ECF No. 70.

Chapter ("the Associations") represent member contractors who have worked on City projects with PLAs.[7] They are Intervenor-Defendants in this suit.

From 2016 to early 2019, the City used PLAs on certain construction projects pursuant to a series of Orders issued by the Mayor's Office.[8] The first Order relevant to this case is Executive Order 8-15, which then-Mayor Michael A. Nutter signed on December 31, 2015.[9] The Order provided for City agencies to review all proposed building and construction projects with an estimated cost greater than $3 million (Section 2(a)).[10] This review was to determine if a PLA would be appropriate for the project.[11] The Order did not require use of a PLA on any project (Section 3(c)), selection of any labor organization (Section 3(c)), or selection of a unionized contractor (Section 6(b)).[12] It did require PLAs to have diversity and inclusion goals (Section 5(e)).[13]

The Order also included the "Philadelphia Public Projects Labor Agreement" ("the PLA Template") as an attachment.[14] The PLA Template was pre-filled with the Philadelphia Building and Construction Trades Council ("the Trades Council") and required contractors to sign an

---

[7] Mem. Law Supp. Mot. . . . Intervene 2, ECF No. 19-2. Hereinafter, the Parties' various Memorandums of Law in Support of their Motions for Summary Judgment will be cited to in short form as "Mem. Law."

[8] Defs.' Statement ¶¶ 1-2, 6, ECF No. 80.

[9] *Id.* ¶ 2.

[10] Exec. Ord. 8-15 at 2, ECF No. 80-1 at 3.

[11] *Id.* at 2-4, ECF No. 80-1 at 3-5.

[12] *Id.* at 4, 6, ECF No. 80-1 at 5, 7.

[13] *Id.* at 4, ECF No. 80-1 at 5.

[14] *Id.* at 5, ECF No. 80-1 at 6. This document was a template intended for modification. Pls.' Reply Defs.' & Intervenors' Resp.'s Pls.' Statement ¶ 14, ECF No. 92.

agreement with the Council (Art. I).[15] It provided for integration of local CBAs (Art. II, § 4) and hiring through the union signatories (Art. III, § 2).[16] It also mandated union membership for contractor employees (Art. III, § 5) ("the compelled unionization clause") and included a diversity in hiring provision.[17] Despite the compelled unionization clause, contractor Plaintiffs never asked an employee to change their union membership, and Road-Con never asked LaCava to join a different union.[18] Additionally, LaCava did not prefer to work on projects in Philadelphia.[19]

The PLA Template also had several attachments, including Schedule C, "Increasing Opportunities for Women and Minorities in the Building Trades Union(s) and the Public Works Projects."[20] Schedule C has three sections which outline expectations for the City, the union signatory, and the contractor signatory.[21] A fourth section outlines provisions for third-party monitoring in certain circumstances.[22] The first section sets goals for City construction projects to include minority men on at least thirty-two percent of all employment hours, and women on at

---

[15] Philadelphia Public Projects Labor Agreement 1, 4, ECF No. 75-7 at 120, 123.

[16] *Id.* at 5, ECF No. 75-7 at 124.

[17] *Id.* at 9-10, 15-16, ECF No. 75-7 at 128-29, 134-35. The provision is excerpted below.

> Section 2.   Opportunities for Women and Minorities. The parties also agree that increasing participation by women and minorities [sic] employees on the Public Works Project is a desirable goal. Accordingly, the parties shall undertake the activities identified in Schedule C to support the City, Union and Contractor objectives of increased opportunities for participation in the Union(s) and for actual work performed . . . .

[18] Defs.' Statement ¶¶ 43, 46, 58, 65, 81, ECF No. 80.

[19] *Id.* ¶ 48.

[20] PLA Schedule C 1-3, ECF No. 75-7 at 141-43.

[21] *Id.*

[22] *Id.* at 24, ECF No. 75-7 at 143.

least seven percent of all employment hours.[23] To support these goals, Schedule C states contractors "shall use their best efforts to meet or exceed the goals."[24] It also states contractors shall (1) use apprenticeship programs to support the City's diversity goals and (2) try to add minority men and women to their workforces.[25]

In 2018, the City and the USW discussed including the USW as a PLA signatory.[26] In November, the City indicated it was willing to allow USW-affiliated contractors to use USW workforces and CBAs.[27] The City also indicated the USW would have to agree to Schedule C.[28] Counsel for the USW responded in January 2019.[29] The USW reiterated its interest in signing but asked for clarification of Schedule C's requirements.[30] Specifically, the USW wanted to

---

[23] *Id.* at 22, ECF No. 75-7 at 141.

[24] *Id.* at 23-24, ECF No. 75-7 at 142-43.

[25] *Id.* The exact language is as follows:

> (a)     The Contractors shall support the City and Union efforts to increase the participation of minority males and women in the Public Works Project through apprenticeship programs and other initiatives.
>
> (b)     The Contractors shall use their best efforts to add minority males and women to their permanent or steady workforces. The Contractors shall provide workforce demographic information to the City in advance of project commencement.
> . . . .
>
> (d)     The Contractors shall use their best efforts to meet or exceed the goals established for minority males and women participation in Section 1 of this Schedule C.

[26] Lazer Decl. ¶ 11, Dec. 1, 2020, ECF No. 75-13.

[27] Letter from Richard Lazer, Nov. 26, 2018, ECF No. 80-1 at 69-70.

[28] *Id.*

[29] Letter from Nathan Kilbert, Jan. 3, 2019, ECF No. 80-1 at 72.

[30] *Id.* This conversation became a source of dispute between the parties. The City's Deputy Mayor of Labor, Richard Lazer, submitted a sworn declaration for this litigation. Lazer Decl., Dec. 1, 2020, ECF No. 75-13. His declaration states "[t]he discussions were ultimately unsuccessful

understand what participation goals and outreach had been "found to be appropriate."[31] The USW also asked about recruitment alternatives to evaluate and expressed concern with the third-party monitoring provisions.[32] The City did not respond to this letter.[33] As of June 2020, the City had never included the USW as a PLA signatory.[34]

In March 2019, the City solicited bids for two projects with PLAs: the 15th Street Bridge Project and the Runway Project.[35] The Memo for the 15th Street Bridge Project recommended use of a PLA because the Project needed to be "completed prior to Police move-in by end of calendar year 2020."[36] Also, the Project was going to require coordination between contractors and several utility companies, work in stages, and "significant jacking of the bridge to accommodate pier and abutment work."[37] The Runway Project Memo also recommended use of a PLA, as the Project would require six different trades and "phasing to allow aircraft to move in a safe and timely

---

because the United Steelworkers believed that their organization could not comply with the diversity and inclusion goals of the City's PLAs." *Id.* at ¶ 11. Based on this statement, Plaintiffs argue Mr. Lazer "has stated that the city's diversity-and-inclusion [sic] goals were the but-for [sic] cause of the city's refusal to add the United Steelworkers as a signatory to the PLA." Pls.' Statement ¶ 96, ECF No. 75. The Associations and the City dispute this claim on numerous grounds. *See* Intervenor-Defs.' Resp. Pls.' Statement ¶ 96, ECF No. 82; Defs.' Resp. Pls.' Statement ¶¶ 52, 96, ECF No. 84; *see also* Lazer Decl., Dec. 6, 2021 at ¶¶ 4-8, ECF No. 80-1 at 74. Because the Parties do not contest the legitimacy of the underlying exchange, this dispute is not material to the analysis.

[31] *Id.*

[32] *Id.*

[33] Defs.' Statement ¶ 20, ECF No. 80.

[34] Pls.' Statement ¶ 19, ECF No. 75. The parties dispute the reasons for this lack of inclusion. *See* Pls.' Resp. Defs.' Statement ¶¶ 16, 19, 20, ECF No. 86. However, this dispute does not impact the analysis of Plaintiffs' claims.

[35] Defs.' Statement ¶¶ 26, 28, ECF No. 80.

[36] 15th Street Bridge Project Mem. 82, ECF No. 80-1 at 82.

[37] *Id.*

manner, with minimal disruptions, across the PNE airfield."[38] A representative of the Trades Council signed the PLAs included in each Project's bid package.[39]

In April 2019, Plaintiffs filed suit challenging the City's use of PLAs on these two projects and all future projects.[40] As a result, the City withdrew the PLAs to allow construction to proceed pending this litigation.[41] The City also re-evaluated its wider practices regarding PLAs.[42] In October 2020, the Mayor's Office replaced Executive Order 8-15 with Executive Order 5-20[43] and eliminated the compelled unionization clause.[44]

**PROCEDURAL HISTORY**

This Court granted the City's Motion to Dismiss in March 2020. Plaintiffs filed an Amended Complaint in April 2020 and a Second Amended Complaint in June 2020. The parties then filed cross-motions for summary judgment. In February 2021 the Court granted Intervenor-

---

[38] PNE Runway Project Mem. 1-2, ECF No. 80-1 at 90-91.

[39] 15th St. Bridge Project Bid Packet 60, ECF No. 75-7 at 176; PNE Runway Project PLA 20, ECF No. 75-7 at 201.

[40] Defs.' Statement ¶ 30, ECF No. 80.

[41] *Id.* ¶ 31.

[42] *Id.* ¶ 7.

[43] Some of the filings referred to this Order as No. 4-20 in error. Pls.' Resp. Defs.' Br. Supp. Mot. Summ. J. 1 n.1, ECF No. 85. Executive Order 5-20 is the correct document name.

[44] Exec. Ord. 5-20, ECF No. 75-15; Defs.' Statement ¶ 9, ECF No. 80. The exact language reads:

> Any Project Labor Agreement entered into pursuant to this Executive Order shall . . . Make clear that no employee shall be required to be or become a member of an Appropriate Labor Organization or pay any agency fees to an Appropriate Labor Organization, as a condition of performing work under the Project Labor Agreement. Any provision in a Project Labor Agreement that requires an employee to be, or become, a member of an Appropriate Labor Organization, or to pay any agency fees to an Appropriate Labor Organization, shall be unenforceable, null, and void.

Exec. Ord. 5-20 § 4(d), ECF No. 75-15, 4.

Defendants' Motion to Intervene. The Court also granted Plaintiffs' Motion for Leave to File a Third Amended Complaint in August 2021. Plaintiffs filed the Third Amended Complaint in September 2021, and the Parties again filed the current cross Motions for Summary Judgment in December 2021. The Court heard oral arguments on the Motions in September 2022.[45]

## STANDARD OF REVIEW

A court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Only material facts which "might affect the outcome of the suit under the governing law" will preclude summary judgment. *Id.* at 248. When considering a motion for summary judgment, the court must "view all facts in the light most favorable to the non-moving party and draw all inferences in that party's favor." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). Where, as here, cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (alteration, quotation marks, and citation omitted).

## DISCUSSION

Plaintiffs challenge the City's PLA regime under four legal theories. In Count 1, Plaintiffs

---

[45] The docket entries for these filings are: Initial Complaint, ECF No. 1; Initial Motion to Dismiss, ECF No. 6; Order Granting Initial Motion to Dismiss, ECF No. 21; Amended Complaint, ECF No. 24; Second Amended Complaint, ECF No. 28; Motions for Summary Judgment, ECF Nos. 34, 47; Order Granting Motion to Intervene, ECF No. 64; Order Granting Leave to Amend, ECF No. 69; Third Amended Complaint, ECF No. 70; Motions for Summary Judgment, ECF Nos. 74, 77, 79.

claim the PLAs violate their First Amendment right to refrain from joining a union. Because the contractors and their employees were never compelled to join a union or pay dues and never faced imminent unionization, the Court finds Plaintiffs do not have standing to bring this claim. In Count 2, Plaintiffs assert the diversity and inclusion goals violate the Equal Protection Clause and § 1981.[46] Because race was not a but for cause of Plaintiffs' injury, the Court finds the diversity and inclusion goals do not violate § 1981. In Count 3, Plaintiffs claim the Orders and PLAs violate state and local competitive bidding law. Although the Orders do not violate competitive bidding law because they do not favor any contractor, the PLAs violate competitive bidding law because they effectively precluded Plaintiffs from participating in the bidding process. Finally in Count 4, Plaintiffs argue the Orders contravene a Philadelphia Home Rule Charter ("the Charter" or "the City Charter") provision which gives City Council the power to create bid preferences. Since the Orders do not establish bid preferences, the Court finds they do not violate the Charter. The Court will now address each Count in turn.

### A. The First Amendment

Plaintiffs' first claim arises under the First Amendment as applied to the states by the Fourteenth Amendment. They argue the Orders and PLAs violate the First Amendment because the City requires contractor employees to join a union as a condition of working on city construction projects. Pls.' Mot. Summ. J. 8, ECF No. 76. The City responds (1) the Plaintiffs lack standing, (2) the claim is moot, and (3) the policy is constitutional. Defs.' Mem. Law 3-4, 6-8, ECF No. 79 at 6-7, 9-11. Standing is an "irreducible constitutional minimum," so the Court starts with this threshold analysis. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs do not have standing to bring this claim because compelled unionization never occurred and was

---

[46] Regarding the Equal Protection claim, *see supra* note 2.

never imminent.[47] And because Plaintiffs do not have standing for this claim, the Court will not address the claim's mootness or legal merit.

Under U.S. CONST. art. III, § 2, the judicial power of the federal courts extends to "cases" and "controversies." Standing ensures federal courts do not exceed their constitutional authority, and "limits the category of litigants empowered to maintain a lawsuit . . . to seek redress for a legal wrong." *Spokeo v. Robins,* 578 U.S. 330, 338 (2016). The courts can only adjudicate cases in which both sides have a personal stake. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The plaintiff bears the burden of establishing standing, and the weight of this burden changes at each successive stage of litigation. *Lujan*, 504 U.S. at 561. At the summary judgment stage, the plaintiff must offer specific facts supported by the evidence. *Id.* The plaintiff must also show standing for each claim and for each form of relief sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).[48] To establish standing, the plaintiff must show they have "(1) suffered an injury in fact,

---

[47] The Court previously found Plaintiffs had standing to bring the case. Mem., Mar. 27, 2020 at 11 n.5, ECF No. 20. This analysis did not consider the issue herein, Plaintiffs' standing to bring a particular *claim*. Moreover, the prior finding occurred at the Motion to Dismiss stage, which only requires "general factual allegations of injury" to support standing. *Lujan*, 504 U.S. at 561. At the summary judgment stage, as explained *infra*, the burden is higher.

[48] At the outset, the Parties contest whether standing should be assessed under the initial Complaint or under the Third Amended Complaint. "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. U.S.*, 549 U.S. 457, 473-74 (2007); *see also Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 677 F.3d 178, 185 (3d Cir. 2012) (noting an amended complaint is the "operative pleading for standing purposes"). The City argues Plaintiffs do not have standing for a First Amendment claim because the compelled unionization clause was no longer in effect when Plaintiffs filed the Third Amended Complaint. Defs.' Reply Br. . . . Mot. for Summ. J. 4, ECF No. 89. However, when "the amended complaint specifically refers to or adopts the earlier pleading," that pleading still has legal effect for jurisdictional purposes. *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985); *see also Ali v. Hogan*, 26 F.4th 587, 596-600 (4th Cir. 2022) (analyzing standing pursuant to an amended complaint which incorporated the allegations of the first complaint). In this case, Plaintiffs included the relevant allegations in the Third Amended Complaint. The initial Complaint thus has legal effect for analyzing standing.

(2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338.

The Parties' dispute stems from the first standing requirement: injury in fact.[49] The City and the Associations argue Plaintiffs lack standing to assert a First Amendment claim because they have not shown a First Amendment injury, as no employee was ever compelled to join a union or to pay dues. Defs.' Mem. Law 6, ECF No. 79 at 9; Intervenor-Defs.' Mem. Law 3-4, ECF No. 77-2. Plaintiffs respond standing does not require a First Amendment injury specifically, and any injury will do. Pls.' Resp. Defs.' Br. Supp. Mot. Summ. J. 7, ECF No. 85. The Court rejects this claim because it ignores a basic requirement of standing. It must be met for each claim, as "standing is not dispensed in gross." *Davis*, 554 U.S. at 733-34 (alteration, quotation marks, and citation omitted). Plaintiffs must establish an injury in fact for a First Amendment claim. And to show an injury in fact, a plaintiff "must establish three sub-elements: first, the invasion of a legally protected interest; second, that the injury is both 'concrete and particularized'; and third, that the injury is 'actual or imminent, not conjectural or hypothetical.'" *Thorne v. Pep Boys Manny Moe & Jack, Inc.*, 980 F.3d 879, 885 (3d. Cir. 2020) (quoting *Spokeo*, 578 U.S. at 339). To show an injury for a First Amendment claim, a plaintiff must thus show the invasion of a protected First Amendment interest.[50] Plaintiffs have failed to do so.

---

[49] They do not dispute causation or redressability.

[50] The cases Plaintiffs cite are distinguishable. First, Plaintiffs quote the plurality in *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973): "an identifiable trifle is enough for standing." This quote, taken in context, does not stand for the proposition that *any* injury can provide standing for *any* claim. Rather, it acknowledges that where a legally cognizable injury exists, it can provide standing regardless of how modest it may be. Plaintiffs also cite *Association of Data Processing Service Organizations Inc. v. Camp,* 397 U.S. 150, 152 (1970): "[t]he first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." This statement does not impact the requirement

A plaintiff can show an invasion of a legally protected First Amendment interest by alleging a direct violation of their First Amendment rights. *See, e.g., Davis*, 554 U.S. at 736 (challenging a federal election law which assessed different campaign contribution limits on candidates based on personal expenditure amounts). Plaintiffs in this case initially stated three theories of First Amendment injury. They argued the City (1) required contractors to compel employees to join unions affiliated with the Trades Council, (2) refused to include the USW as a signatory to the PLA,[51] and (3) discriminated against contractors and tradesmen who affiliated with certain unions. Third Am. Compl. ¶¶ 138-140, ECF No. 70. In response to the City and the Associations' arguments, Plaintiffs then changed their statement of the injury and claimed the City requires contractor employees to join certain unions as a condition of employment on City projects. Pls.' Resp. Defs.' Br. Supp. Mot. Summ. J. 8, ECF No. 85. Plaintiffs request damages, and declaratory and injunctive relief on this basis. Third Am. Compl. ¶ 164, ECF No. 70. The Court will now address the claims for retrospective relief (damages) and prospective relief (declaratory and injunctive) in turn, neither of which is available to Plaintiffs.

---

to establish an injury relevant to the legal claim, as it merely recognizes injuries need not be economic.

[51] The Court notes Plaintiffs do not have standing to assert a claim on behalf of the USW. Generally, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). The courts recognize third-party standing only if a plaintiff meets three conditions: "1) the plaintiff must suffer injury; 2) the plaintiff and the third party must have a close relationship; and 3) the third party must face some obstacles that prevent it from pursuing its own claims." *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288-89 (3d Cir. 2002) (internal quotation marks and citation omitted). The third party in this case, the USW, does not face any obstacle to pursuing a claim. Rather, the USW chose not to sue because it does not believe the City violated its First Amendment or Equal Protection rights. Letter from Nathan Kilbert, Jan. 3, 2019, ECF No. 80-1, 72.

To have standing for retrospective relief, a plaintiff must show evidence of a past injury. *Yaw v. Del. River Basin Comm'n*, 49 F.4th 302, 317-18 (3d Cir. 2022). Plaintiffs cannot do so here. Although the PLAs in this case included compelled unionization clauses, no compelled unionization or fee payment *actually* occurred. Defs.' Statement ¶¶ 43, 58, 65, 81, ECF No. 80. The individual Plaintiff, Scott LaCava, was never asked to join a different union. *Id.* ¶ 46. And the only injury to contractor Plaintiffs was the inability to bid with their own workforces on contracts with a PLA. Though allegedly caused by the compelled unionization clause, loss of the opportunity to bid is not a First Amendment injury.[52] Because Plaintiffs have not shown a past injury to their First Amendment rights, the Court finds Plaintiffs do not have standing for retrospective relief.

To have standing for prospective relief, a plaintiff must show they are likely to suffer a future injury that is actual and imminent, not conjectural or hypothetical. *Adarand Constructors, Inc.*, 515 U.S. at 211. Speculation regarding possible future injury is not sufficient. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983). For a compelled unionization claim, prospective relief is appropriate when compelled unionization or fee payment is imminent. *See, e.g., Harris v. Quinn*, 573 U.S. 616, 657 n.30 (2014) (abrogated on other grounds) (noting petitioners did not face imminent unionization, and so their claims were not ripe, as there were no upcoming elections and the union was not seeking certification through alternative methods). Prospective relief is also appropriate when there is a credible threat of future enforcement. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 166-67 (2014) (finding a substantial threat of enforcement sufficient to render standing where the state had previously enforced the challenged statute through

---

[52] The Court notes this type of injury *does* establish standing for Plaintiffs to bring an Equal Protection claim. *See, e.g., Adarand Constructors, Inc.*, 515 U.S. at 211 ("The injury in [Equal Protection cases] is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.'") (citation omitted).

administrative proceedings and criminal prosecution); *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 364 (3d Cir. 2014) (finding standing where "[t]he threat of cost shifting" was "entirely believable in light of recent history," which included prior litigation).

Plaintiffs cannot make a showing of imminence or of a future enforcement threat. At the time of the initial Complaint and prior to the City's policy change, no contractor Plaintiff had been selected for a project with a PLA, and so no employee faced compelled unionization. Even if one of the contractor Plaintiffs had submitted a winning bid, the record does not show any threat of enforcing the compelled unionization clause. This possibility of future injury is the type of mere speculation that does not create standing.[53] Although unionization was a condition of employment on City construction projects, contractor Plaintiffs cannot establish standing for prospective relief because compelled unionization was not imminent or threatened.

The individual Plaintiff LaCava does not have standing for prospective relief either because he did not have the requisite intent to work on City projects to support a claim. An injury in fact "requires an intent that is concrete." *Carney v. Adams*, 141 S. Ct. 493, 502 (2020). When a plaintiff seeks to challenge a government regulation under the First Amendment, a generalized grievance will not suffice. *Id.* LaCava stated he has no preference as to the types or locations of projects he works on. Defs.' Statement ¶ 48, ECF No. 80. LaCava's claim is thus a "generalized grievance" which does not create standing, as he did not have a concrete intention or desire to work on City construction projects. *Adams*, 141 S. Ct. at 499. Because Plaintiffs do not have standing to pursue a First Amendment claim, there is no need to address the merits of the Parties' various arguments.

---

[53] Moreover, while the contractors' employees have First Amendment protections in seeking employment with the City, the contractors have not established they have similar protections in bidding. *See, e.g.*, *McClintock v. Eichelberger*, 169 F.3d 812, 817 (3d Cir. 1999) (holding contractors did not have a sufficiently ongoing relationship with governmental commission to support a First Amendment claim for retaliation when the commission refused the firm's bid).

### B.  The Equal Protection Clause and 42 U.S.C. § 1981

In Count 2, Plaintiffs assert a constitutional claim under the Equal Protection Clause of the

Fourteenth Amendment and a statutory claim under 42 U.S.C. § 1981. They argue Schedule C's

diversity and inclusion goals violate these laws by compelling unions to "change the racial and

demographic makeup of their workforces," by discriminating against contractors based on that

makeup, and by compelling contractors "to give discriminatory preferences to minorities and

women at the expense of white men." Third Am. Compl. ¶¶ 142-44, ECF No. 70.[54] The City again

argues Plaintiffs do not have standing to pursue these claims on behalf of the USW. Defs.' Mem.

Law 5-6, ECF No. 79. The City and the Associations also argue Schedule C does not discriminate

against Plaintiffs.[55] *Id.* at 9-11; Intervenor-Defs.' Mem. Law 11-12, ECF No. 77-2. For the Equal

Protection claim, the Court will deny Plaintiffs' motion insofar as they bring a claim on behalf of

the USW.[56] *See supra* note 51. As to the § 1981 claim, the Court will deny Plaintiffs' motion

because race was not a but for cause of their inability to work on City projects with PLAs.

Plaintiffs challenge Schedule C as violative of 42 U.S.C. § 1981, which states: "[a]ll

persons within the jurisdiction of the United States shall have the same right . . . to make and

---

[54] Plaintiffs also claim Schedule C violates the Pennsylvania Constitution. Pls.' Mot. Summ. J. 10-11, ECF No. 76. But Plaintiffs did not raise this claim in the Third Amended Complaint and only devote two sentences of analysis to it. *Id.* This Court may only grant summary judgment "if the movant shows . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because Plaintiffs did not show they are entitled to judgment, the Court cannot grant relief on this basis.

[55] The Associations argue Plaintiffs must show they are a racial minority to bring these claims. Intervenor-Defs.' Mem. Law 11, ECF No. 77-2. However, White people are covered by the Equal Protection Clause, *see, e.g.*, *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 320 (1978) (allowing a White applicant's Equal Protection challenge to a medical school's admissions program), and by § 1981, *see e.g., McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976) (holding § 1981 applies to racial discrimination against White people in private employment).

[56] Regarding the remainder of the Equal Protection claim, *see supra* note 2.

enforce contracts . . . as is enjoyed by white citizens."[57] To succeed on a § 1981 claim, "a plaintiff

must . . . prove that, but for race, it would not have suffered the loss of a legally protected right."

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

According to Plaintiffs, "[t]here is an unbroken chain of but-for causation between: (1) The [sic]

existence of the racially discriminatory diversity-and-inclusion [sic] provisions in Schedule C; (2)

The [sic] continued exclusion of the United Steelworkers from the city's PLA; and (3) The [sic]

plaintiffs' inability to work on city projects subject to a PLA." Pls.' Reply Br. Supp. Mot. Summ.

J. 9, ECF No. 91. Contrary to this argument, the record shows race was not the but for cause

preventing the USW from signing onto PLAs. In other words, the City did not exclude the USW

because its union membership is majority White and male.[58] There were two intervening, non-

race-based reasons for the failure to sign the USW: (1) a breakdown in negotiations, and (2) the

publication of a state court decision.

  During negotiations the USW indicated the City's diversity and inclusion goals were not

an issue. Letter from Nathan Kilbert, Jan. 3, 2019, ECF No. 80-1 at 72. The USW sought to clarify

its obligations under those goals and to obtain guidance regarding, *inter alia*, outreach and third-

party monitoring. *Id.* The City did not respond to this request for guidance. Defs.' Statement ¶ 20,

ECF No. 80. To the extent these goals may have prevented the USW from signing onto the PLAs,

---

[57] The City argues this claim cannot proceed because Plaintiffs did not plead it under 42 U.S.C. §
1983. Defs.' Mem. Law 9, ECF No. 79. Because § 1981 does not create an implied right of action
against the State, the remedy to enforce it is § 1983. *McGovern v. City of Phila.,* 554 F.3d 114,
116 (3d Cir. 2009). However, "no heightened pleading rule requires plaintiffs . . . to invoke § 1983
expressly in order to state a claim." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014).
Although Plaintiffs did not cite § 1983 in Count 2, Plaintiffs asked for relief under § 1983. Third
Am. Compl. ¶ 164(h), ECF No. 70. Therefore, Plaintiffs properly pleaded this claim.

[58] Plaintiffs have not even established this basic fact regarding the USW's membership and their
own employees.

it was because these discussions did not proceed, not because the USW's membership is predominantly White men. Plaintiffs ignore this significant distinction. The City also notes a state court decision issued in 2019 negatively impacted negotiations. *Id.* ¶ 19. Though Plaintiffs dispute the City's characterization of the decision's role in negotiations, this dispute is immaterial because the PLA under negotiation would no longer have been legal.[59] Pls.' Resp. Defs.' Statement ¶ 19, ECF No. 86. Because negotiations broke down and a state court decision precluded the PLA under discussion, race was not a but for cause of Plaintiffs' injury. Plaintiffs' § 1981 claim thus fails.

### C. Pennsylvania's Competitive Bidding Law

In Count 3, Plaintiffs challenge the Orders and PLAs under state and local competitive bidding law. Plaintiffs claim the City's PLA regime creates preferences for contractors who already affiliate with the Trades Council over contractors affiliated with other unions. Pls.' Mot. Summ. J. 12, ECF No. 76. The City argues this claim is moot because of an intervening policy change. Defs.' Mem. Law 3, ECF No. 79. Under the City's new PLA policy, contractor employees will not be required to join a labor organization or pay agency fees as a condition of employment. Defs.' Statement ¶ 9, ECF No. 80. The City and the Associations also argue the requested relief, a permanent injunction of PLAs, is inappropriate. Defs.' Mem. Law 13-14, ECF No. 79; Intervenor-Defs.' Mem. Law 14, ECF No. 77-2. The Court first resolves the mootness question against the City because the policy change does not address all of Plaintiffs' allegations. As to the merits, the Court finds the Orders did not violate Pennsylvania's competitive bidding law because they did not discriminate among contractors. But the Court finds the Runway Project PLA violated

---

[59] The state court struck down a PLA that required signatories to hire personnel through local unions but created an exception for USW-affiliated contractors. *Allan Myers, L.P. v. Dept. of Transp.*, 202 A.3d 205, 215 (Pa. Commw. Ct. 2019). The City and the USW were discussing a parallel arrangement. *See* Defs.' Statement ¶ 19, ECF No. 80; Letter from Richard Lazer, Nov. 26, 2018, ECF No. 80-1 at 69-70. The *Allan Myers* case is discussed in detail in Section C, *infra*.

competitive bidding law because it was issued absent extraordinary circumstances. Finally, the 15th Street Bridge Project PLA violated competitive bidding law because it effectively precluded Plaintiffs from participating in the bidding process. Still, permanent injunctive relief is unfitting because PLAs are not illegal in Pennsylvania.[60] The Court will first address mootness before turning to a competitive bidding law analysis.

A case becomes moot when "there is no longer a live case or controversy." *U.S. v. Kissinger*, 309 F.3d 179, 180 (3d Cir. 2002). Plaintiffs claim the PLAs (1) "do not create a level playing field" insofar as they favor contractors associated with the Trades Council unions, (2) disadvantage contractors who do not agree to Schedule C, and (3) force them to hire new employees through the union hiring hall. Third Am. Compl. ¶¶ 154-56, ECF No. 70. The City argues this entire claim is moot because of an intervening policy change forbidding compelled unionization. Defs.' Statement ¶ 9, ECF No. 80. Because the new policy only addresses Plaintiffs' first allegation, a live controversy remains regarding allegations (2) and (3) and the claim is not moot. And because the claim is not moot, the Court will not address the Parties' arguments regarding the voluntary cessation exception and the moot-ability of a claim for damages. Having found the existence of a live controversy, the Court will turn to the merits.

Pennsylvania's Procurement Code requires contracts "entered into . . . through competitive sealed bidding" to "be awarded to the lowest responsible and responsive bidder." 62 PA. CONS. STAT. § 3911(a).[61] The Philadelphia Home Rule Charter also requires contracts to "be awarded to

---

[60] The Court notes Plaintiffs seek to limit their request for injunctive relief to PLAs *as defined by the Plaintiffs* in the initial Complaint. Pls.' Resp. Defs.' Statement ¶ 30, ECF No. 86 (quoting Compl. 1, ECF No. 1). This attempt to re-define PLAs is unnecessary. It is enough for the Court to grant declaratory relief without enjoining future use of PLAs.

[61] Plaintiffs also cite the Pennsylvania Constitution, which requires competitive bidding for "all purchases of materials, printing, supplies or other personal property." Art. III, § 22. On its face

the lowest responsible bidder." § 8-200(1).[62] Under this regime, PLAs fall within the municipality's discretion. *Allan Myers, L.P. v. Dept. of Transp.*, 202 A.3d 205, 211 (Pa. Commw. Ct. 2019). They are allowed when there are extraordinary circumstances, provided they use a common standard that does not favor any particular contractor. *Id.* at 215.[63] Plaintiffs challenge Orders 8-15 and 5-20, the PLA Template, the 15th Street Bridge Project PLA, and the Runway Project PLA under these laws. Third Am. Compl. ¶ 161, ECF No. 70. Plaintiffs ask the Court to declare these documents illegal and to issue a permanent injunction against the City's enforcement of the Orders and use of PLAs. *Id.* The Orders do not violate competitive bidding law because they do not contain provisions discriminating among contractors. Both Project PLAs, however, violated the law. The Runway Project PLA was issued absent extraordinary circumstances, and the 15th

---

this provision does not apply to service contracts, and state courts have agreed with this interpretation. *Reading Blue Mountain & N. R.R. v. Seda-Cog Joint Rail Auth.*, 235 A.3d 438, 452 n.24 (Pa. Commw. Ct. 2020); *Pa. Associated Builders & Contractors, Inc. v. Commonwealth Dept. of Gen. Servs.*, 996 A.2d 576, 582 (Pa. Commw. Ct. 2010). This Court has also found the constitutional provision does not apply to contracts for construction services. Mem., Mar. 27, 2020 at 18 n.9, ECF No. 20. Thus, the Court will not consider a state constitutional competitive bidding law claim.

[62] Annotation 1 to Section 8-200(1) clarifies that since the lowest bidder may "not be capable of the performance required," the bidder must also be "responsible" as defined by judicial decisions:

> the question of who is the lowest responsible bidder is one for the sound discretion of the proper municipal authority and does not necessarily mean the one whose bid on its face is lowest in dollars, but includes financial responsibility, also integrity, efficiency, industry, experience, promptness, and ability to successfully carry out the particular undertaking.

*A. Pickett Constr., Inc. et al. v. Luzerne Cnty. Convention Ctr. Auth.*, 738 A.2d 20, 24 (Pa. Commw. Ct. 1999) (quoting *Kratz v. City of Allentown*, 304 Pa. 51, 54 (1931)). As explained *infra* Section D, the City is well within its discretion under the Charter to use Orders to set contract requirements.

[63] The Court notes this case, which provides the test to analyze this claim, is based on sections of the Procurement Code which apply to state agencies and not to municipalities. *Allan Myers,* 202 A.3d at 210-11. However, the provision which applies to municipalities, 62 PA. CONS. STAT. § 3911(a), parallels the state agency requirement that contracts awarded through competitive sealed bidding go to the lowest responsible bidder.

Street Bridge Project PLA required employment through the Trades Council unions. This requirement effectively precluded the USW-affiliated Plaintiffs from bidding on the projects. Each challenged document, the Orders and the PLAs, is now considered in turn.[64]

Under competitive bidding law, a government entity has wide discretion to set project requirements, as long as the requirements do not distinguish among contractors. *See, e.g., A. Pickett Constr.*, 738 A.2d at 24 (noting a government entity's discretion to set bid specifications and award a contract "properly includes an assessment of need for promptness and timely completion of the project"). The City's Orders outline an evaluation process to decide if a project will benefit from a PLA. Exec. Ord. 8-15, ECF No. 80-1 at 1-6; Exec. Order 5-20, ECF No. 75-15. They include criteria, like the need to complete projects "in a timely manner without labor disruptions such as strikes, lockouts, or slowdowns." Exec. Order 5-20 at 1, ECF No. 75-15 at 2. The Orders do not require use of a PLA on a project or selection of any labor organization, and do not compel union membership. Exec. Ord. 8-15 § 3(c), ECF No. 80-1 at 4; Exec. Ord. 5-20 §§ 2, 4(d), 5(b), ECF No. 75-15 at 3-4. The Orders thus do not distinguish among contractors and do not violate competitive bidding law.

Plaintiffs nevertheless argue the Orders discriminate among contractors by requiring PLAs to include diversity and inclusion goals. Pls.' Mot. Summ. J. 13, ECF No. 76. This argument fails because the requirement does not preclude any contractor from bidding on a contract. *See, e.g., A. Pickett Constr.,* 738 A.2d at 25 (quoting the trial court's finding "that it may be difficult or distasteful for Plaintiffs to accept the provisions of the PLA does not mean it is anti-competitive").

---

[64] The Court does not analyze the legality of the PLA Template because templates do not have binding legal effect.

Turning to the PLAs, Pennsylvania government agencies may not use PLAs by default and must evaluate whether extraordinary circumstances justify one on a project. *Allan Myers*, 202 A.3d at 215. The state courts have found extraordinary circumstances exist when a project involves significant time constraints. *Id.* (describing prior cases that upheld PLAs where (1) a convention center had to be completed "because of demands of the state funding and the need to keep an anchor tenant," (2) two schools had to be completed for opening in the fall, and (3) a prison had to be completed "because of a growing inmate population and safety concerns"). "Boilerplate language" that "time is of the essence" will not meet this requirement. *Id*. Nor will ordinary inconveniences such as road improvements.[65] *Id.*

If a project presents extraordinary circumstances, then a court must analyze the project's PLA to ensure it uses a common standard and does not discriminate among contractors. *Id.* State courts have upheld PLAs that (1) open the bidding process to all contractors, regardless of union or non-union affiliation, (2) do not mandate integration of local CBAs, and (3) do not require employment based on union affiliation. *See id.* at 212-13 (describing valid PLAs from *A. Pickett Constr.,* 738 A.2d 20, and *Hawbaker v. Dept. of Gen. Servs.*, No. 405 M.D. 2009 (Pa. Commw. Ct. Dec. 1, 2009) (unreported single judge opinion)). By contrast, a state court struck down a PLA that required all signatories to hire personnel through local unions *except* for the USW contractors. *Id.* at 215. As a result, the USW contractors could bid on contracts with their own workforce while all other contractors could not. *Id.* at 214. The court held this outcome violated Pennsylvania's competitive bidding law:

> Allan Myers [the plaintiff contractor] cannot make its employees or subcontractors join a union. The PLA does not guarantee that the Local Unions will accept Allan Myers' existing workforce as members or assign them back if they are accepted.

---

[65] The caselaw has not held any other circumstances to be extraordinary, but the *Allan Myers* court implied labor shortages may meet the requirement. 202 A.3d at 215.

> Allan Myers cannot bid for the Project with an unknown workforce. The PLA has effectively precluded a nonunion contractor, such as Allan Myers, from participating in the bid solicitation.

*Id.* at 215 (citation omitted).

Of the two projects in this case, the Runway Project ran afoul of the extraordinary circumstances requirement because there were no significant time constraints on completion. In recommending use of a PLA, the Runway Project Memo only noted the project would involve six different trades and require "phasing to allow aircraft to move in a safe and timely manner, with minimal disruptions, across the PNE airfield." Runway Project Mem. 2, ECF No. 80-1 at 91. There was no indication the work had to be complete by a certain date. Because these considerations are not extraordinary circumstances, the Runway Project PLA violated Pennsylvania's competitive bidding law. The 15th Street Bridge Project, by contrast, had to "be completed prior to Police move-in by end of calendar year 2020." 15th Street Bridge Project Mem. 2, ECF No. 80-1 at 82. Because this type of time constraint is similar to the constraints validated by the state courts, the 15th Street Bridge Project met the extraordinary circumstances requirement.

The next step is to analyze if the Project's PLA used a common standard that did not favor any contractor. *Allan Myers*, 202 A.3d at 215. The factual background of this case differs from *Allan Myers*, wherein a non-union contractor challenged a PLA. *Id.* at 207. Here, USW-affiliated contractors challenge the PLA. Nevertheless, the 15th Street Bridge Project PLA so closely resembles elements of the overturned *Allan Myers* PLA as to compel the same result. The 15th Street Bridge Project PLA was pre-signed by the Trades Council. 15th St. Bridge Project Bid Packet 60, ECF No. 75-7 at 176. It mandated integration of the local CBAs (Art. III, § 4(b)), required contractors to employ through the Council's union members (Art. IV § 2), and had a compelled unionization clause (Art. IV § 5). *Id.* at 47, 50, 51, ECF No. 75-7 at 163, 166, 167.

22

Because of these provisions, contractors unaffiliated with the Trades Council unions could not bid with their own workforces. This result violated Pennsylvania's competitive bidding law.

### D.  The Philadelphia Home Rule Charter

In their final Count, Plaintiffs challenge the Orders under Philadelphia's Home Rule Charter. Third Am. Compl. ¶ 163, ECF No. 70. The Charter requires contracts to "be awarded to the lowest responsible bidder and in conformity with any procedure established by the Procurement Department . . . provided, however, that City Council may, by ordinance, prescribe bid preferences for businesses located in or doing business in Philadelphia." § 8-200(1). Plaintiffs claim the Orders violate the Charter because they create bid preferences for "contractors that employ members of city-preferred unions, or that allocate a sufficient number of employment hours to women and minorities."[66] Pls.' Mot. Summ. J. 14, ECF No. 76. The City argues PLAs establish project *requirement*s, and so the Orders do not contravene Council's power to create bid *preferences*. Defs.' Mem. Law Opp. Pls.' Second Mot. Summ. J. 14, ECF No. 83. Plaintiffs respond this distinction is "wordplay." Reply Br. Supp. Mot. Summ. J. 13, ECF No. 91. The question then is whether the Orders create "bid preferences" or "project requirements." Because the Orders do not create bid discounts, the Court finds they do not impute Council's power to create bid preferences and do not violate the Charter.[67]

---

[66] As discussed *supra* Section C, the Orders do not mandate the selection of particular contractors, regardless of unionization or employee diversity, for projects. To the extent "contractors affiliated with city-favored unions are being *preferred* over non-union contractors and contractors affiliated with United Steelworkers," this argument is more appropriate to Plaintiffs' competitive bidding law claim. Reply Br. Supp. Mot. Summ. J. 13, ECF No. 91.

[67] The Associations argue the Charter "neither prohibits the Mayor of the City from issuing executive orders related to bid preferences nor requires the City Council (as opposed to the Mayor of the City) to prescribe bid preferences." Intervenor-Defs.' Mem. Law 15, ECF No. 77-2. This argument does not follow from a plain reading of the provision. The Court understands § 8-200(1) to reserve the power to establish bid preferences for Council.

The term "bid preference" refers to the application of a discount to a bid to make it more competitive.[68] *See, e.g.*, *Bid Preference definition*, LAW INSIDER, https://www.lawinsider.com/dictionary/bid-preference (last visited Dec. 9, 2022). Given this definition, Plaintiffs' claim is unavailing because the Orders do not establish bid preferences, or discounts. The Orders outline how the City will decide to use a PLA on a project. This evaluation process falls within the Procurement Department's authority under Charter Section 8-200 to establish bidding procedures and contract requirements. It also falls within the Mayor's authority under Charter Section 6-500 over the Executive Branch. Accordingly, the Court finds the Orders do not violate the City Charter.

**CONCLUSION**

The Court will grant each Party's Motion for Summary Judgment in part and deny each Motion in part as follows. For the Plaintiffs, the Court will grant their Motion for Summary Judgment as to the competitive bidding law claim's challenge of the PLAs. For the City and the Associations, the Court will grant their Motions for Summary Judgement as to the First Amendment claim, § 1981 claim, competitive bidding law claim's challenge of the Orders, and City Charter claim. The Court will reserve ruling on the Equal Protection claim. An appropriate Order follows.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

---

[68] For example, Charter Section 17-109 gives bids by certified local contractors a discount. This discount is a percentage off the total bid price, and the percentage amount depends on the size of the contract. Phila. Home Rule Charter § 17-109(d).